1

2

3

4    SULLIVAN HILL REZ & ENGEL          **Electronically Filed: 02/13/20**
     A Professional Law Corporation
5     James P. Hill, SBN 90478
      Christopher V. Hawkins, SBN 222961
6    600 B Street, 17th Floor
     San Diego, California 92101
7    Telephone:    (619) 233-4100
     Fax Number:   (619) 231-4372
8
     Attorneys for Debtor and Debtor in Possession,
9    Vestavia Hills, Ltd. dba Mount Royal Towers

10                **UNITED STATES BANKRUPTCY COURT**
                  **SOUTHERN DISTRICT OF CALIFORNIA**
11

12   In re                                    ) CASE NO. 20-00018-LA11
                                              )
13   VESTAVIA HILLS, LTD.                      ) Chapter 11
      dba MOUNT ROYAL TOWERS,                  )
14                                             ) **DEBTOR'S MOTION FOR ORDER:**
              Debtor.                          ) **(1)(A) APPROVING STALKING**
15                                             ) **HORSE AGREEMENT; (B)**
                                              ) **APPROVING OVERBID**
16                                             ) **PROCEDURES; (C) APPROVING**
                                              ) **RETENTION OF BROKER; (D)**
17                                             ) **APPROVING REJECTION OF**
                                              ) **COMMONWEALTH AGREEMENT;**
18                                             ) **(E) SCHEDULING FINAL SALE**
                                              ) **HEARING; AND (2)(A) APPROVING**
19                                             ) **SALE OF ASSETS FREE AND**
                                              ) **CLEAR; (B) APPROVING**
20                                             ) **ASSUMPTION AND ASSIGNMENT**
                                              ) **OF EXECUTORY CONTRACTS**
21                                             ) **AND UNEXPIRED LEASES; AND**
                                              ) **(C) GRANTING RELATED RELIEF**
22                                             )
                                              ) Initial Hearing Date:
23                                             ) Time:        To be announced by Court
                                              ) Sale Hearing Date:
24                                             ) Time:
                                              ) Ctrm:         2
25                                             ) United States Bankruptcy Court
                                              ) 325 West "F" Street
26                                             ) San Diego, CA 92101-6991
                                              ) Judge: Hon. Louise DeCarl Adler
27
28

409001-v7

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 2

I.  STATEMENT OF FACTS ............................................................................. 2

    A.  Background ....................................................................................... 2

    B.  The Debtor's Business ...................................................................... 2

    C.  The Debtor's Prepetition Struggles and Efforts to Sell ................. 3

    D.  The Debtor's Ongoing Operational Losses ..................................... 3

    E.  The Prepetition Stalking Horse ........................................................ 4

    F.  The Current Stalking Horse .............................................................. 5

    G.  The Requested Retention of Blueprint .............................................. 6

    H.  The Proposed Overbid Procedures .................................................... 8

    I.  The Proposed Marketing and Advertising ........................................ 8

    J.  The Proposed Sale Notice ................................................................. 9

    K.  The Rejection of the Disputed Commonwealth Agreement ............... 9

II.  RELIEF REQUESTED ................................................................................. 10

III.  SERVICE OF THIS MOTION ....................................................................... 11

IV.  AUTHORITY AND ARGUMENT .................................................................. 11

    A.  The Overbid Procedures Are Appropriate and in the Best Interests
of the Debtor, the Estate, and Creditors ........................................... 11

        1.  The Overbid Procedures Are Reasonable, Appropriate and
Will Maximize Value ............................................................... 11

        2.  The Notice Procedures Are Reasonable and Appropriate ........... 13

        3.  The Assumption and Assignment Procedures Are
Reasonable and Appropriate ..................................................... 14

        4.  The Proposed Marketing is Appropriate ................................... 14

    B.  Approval of the Sale is Appropriate and in the Best Interests of the
Debtor's Estate .................................................................................. 15

        1.  The Sale is Authorized by Section 363 of the Bankruptcy
Code as a Sound Exercise of the Debtor's Business
Judgment ................................................................................... 15

2. The Sale of the Assets Free and Clear of All Encumbrances (Except for Permitted Encumbrances) is Authorized by Section 363(f) of the Bankruptcy Code ........................................ 17

C. Assumption and Assignment of the Contracts is Authorized by Section 365 of the Bankruptcy Code ....................................... 19

1. Authority ...................................................................... 19

2. The Debtor's Sound Business Judgment Supports the Assumption and Assignment of the Contracts to be Assigned ...... 21

3. Adequate Assurance of Future Performance Will Be Demonstrated With Respect to the Contracts to be Assigned ...... 21

D. The Prophylactic Rejection of the Disputed Commonwealth Agreement is Warranted ........................................................ 23

E. The Debtor's Employment of Blueprint Should be Approved ............... 23

V. WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d) ...................... 24

VII. CONCLUSION ...................................................................... 24

# TABLE OF AUTHORITIES

**Page**

**Cases**

Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.),
    103 B.R. 524 (Bankr. D.N.J. 1988).................................................22

Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot),
    94 B.R. 343 (E.D. Pa. 1988)....................................................18

Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville
    Corp. (In re Johns-Manville Corp.), 60 B.R. (Bankr. S.D.N.Y. 1986).........16

EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp.
    (In re Sanshoe Worldwide Corp.), 139 B.R. 585 (S.D.N.Y. 1992) ..............22

Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.),
    107 F.3d 558 (8th Cir. 1997)....................................................11

In re Abbotts Dairies of Pa., Inc.,
    788 F.2d 143 (3d Cir. 1986)....................................................15

In re AbitibiBowater Inc.,
    418 B.R. 815 (Bankr. D. Del. 2009)............................................20

In re Bygaph, Inc.,
    56 B.R. 596 (Bankr. S.D.N.Y. 1986) .........................................22

In re Decora Indus., Inc.,
    2002 WL 32332749 (D. Del. May 20, 2002)........................................15, 20

In re Delaware & Hudson Ry. Co.,
    124 B.R. 169 (D. Del. 1991) ....................................................15

In re Dundee Equity Corp.,
    No. 89-10233 (FGC), 1992 WL 53743 (Bankr. S.D.N.Y. Mar. 6, 1992 ......18

In re Dura Auto. Sys., Inc.,
    No. 06-11202 (Bankr. D. Del. July 24, 2007)..................................12

In re Exide Techs.,
    340 B.R. 222 (Bankr. D. Del. 2006)............................................20

In re Federal Mogul Global, Inc.,
    293 B.R. 124 (D. Del. 2003) ....................................................21

In re Food Barn Stores, Inc.,
    107 F.3d 558 (8th Cir. 1997)....................................................15

In re Integrated Res.,
    147 B.R. at 656 .......................................................................................16

In re Integrated Resources,
    147 B.R., 650 (SD N.Y.1992) ................................................................16

In re Kellstrom Indus., Inc.,
    282 B.R. 787 (Bankr. D. Del. 2002)........................................................18

In re Lionel Corp.,
    722 F.2d 1063 (2d Cir. 1983) .................................................................15

In re Montgomery Ward Holding Corp.,
    242 B.R. 147 (D. Del. 1999) ..................................................................15

In re Mushroom Transp. Co.,
    382 F.3d 325 (3d Cir. 2004) ...................................................................11

In re Network Access Solutions Corp.,
    330 B.R. 67 (Bankr. D. Del. 2005).........................................................20

In re New Century TRS Holdings, Inc.,
    No. 07-10416 (Bankr D. Del. Apr. 20, 2007) ........................................12

In re Nortel Networks, Inc.,
    Case No. 09-10138 (KG) (Bankr. D. Del. June 30, 2009) (D.I. 1012).........13

In re O'Brien Envtl. Energy, Inc.,
    181 F.3d 527 (3d Cir. 1999) ................................................................. 12

In re Prime Motor Inns Inc.,
    166 B.R. 993 (Bankr. S.D. Fla. 1994) ....................................................22

In re Rachels Indus. Inc.,
    109 B.R. 797 (Bankr. W.D. Tenn. 1990) ...............................................22

In re Traffic Control & Safety Corp.,
    Case No. 12-11287 (KJC) (Bankr. D. Del. May 14, 2012) (D.I. 128)..........13

In re Trans World Airlines, Inc.,
    No. 01- 00056 (PJW), 2001 WL 1820326
    (Bankr. D. Del. Apr. 2. 2001)................................................................15

In re Tweeter Home Etm't Group, Inc.,
    Case No. 07-10787 (PJW) (Bankr. D. Del. June 27, 2007) (D.I. 211) .........13

In re United Healthcare Sys. Inc.,
    No. 97-1159, 1997 WL 176574 (D.N.J. Mar. 26, 1997)..............................15

In re Vertis Holdings, Inc.,
    Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012 (D.I. 206) ...........13

NLRB v. Bildisco & Bildisco,
       465 U.S. 513 (1984) ................................................................20

Meyers v. Martin (In re Martin),
       91 F.3d 389 (3d Cir. 1996) ......................................................15

Official Comm. for Unsecured Creditors v. Aust
       (In re Network Access Solutions, Corp., 330 B.R. 67
       (Bankr. D. Del. 2005) ..............................................................20

Official Comm. of Subordinated Bondholders v. Integrated Res. Inc.
       (In re Integrated Res. Inc.), 147 B.R. 650 (S.D.N.Y. 1992) ........12

Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery,
       330 F.3d 548 (3d Cir. 2003) .....................................................11

Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon
       Assocs.),1989 WL 106838 (N.D. Ill. Sept. 8, 1989) ...................16

Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,
       872 F.2d 36 (3d Cir. 1989) .......................................................20

Smith v. Van Gorkom,
       488 A.2d 858 (Del. 1985)) .......................................................16

**Statutes**

11 U.S.C. § 101 et seq. ......................................................................2

11 U.S.C. § 105(a) ....................................................................2, 13, 18

11 U.S.C. § 327(a) ...................................................................6, 8, 23

11 U.S.C. § 363 .....................................................................2, 11, 15

11 U.S.C. § 363(b) .....................................................................1, 15

11 U.S.C. § 363(f) ....................................................................passim

11 U.S.C. § 363(f)(2) .......................................................................18

11 U.S.C. § 363(f)(4) .......................................................................18

11 U.S.C. § 363(m) ......................................................................1, 11

11 U.S.C. § 365 ...................................................................1, 2, 8, 13

11 U.S.C. § 365(a) ...........................................................................19

11 U.S.C. § 365(b)(1) .......................................................................19

11 U.S.C. § 365(c)(2) .......................................................................21

11 U.S.C. § 365(f)(1) .......................................................................19

11 U.S.C. § 365(f)(2) .......................................................................19

**Rules**

Federal Rules of Bankruptcy Procedure, rule 2002.................................................13

Federal Rules of Bankruptcy Procedure, rule 2002(a) ...........................................13

Federal Rules of Bankruptcy Procedure, rule 2002(c) ...........................................13

Federal Rules of Bankruptcy Procedure, rule 6004(h) ...........................................24

Federal Rules of Bankruptcy Procedure, rule 6006(d) ...........................................24

Vestavia Hills, Ltd. dba Mount Royal Towers (the "Debtor") hereby moves this Court (the "Motion"):

(A)    for entry of an initial order ("Overbid Procedures Order"), following the initial hearing on this Motion, in substantially the form attached as Exhibit A to the Moriarty Declaration (defined below):

1.    approving the Agreement (defined below) with the Stalking Horse (defined below) for the sale of the Assets (defined below);

2.    approving the Overbid Procedures (defined below) (including the marketing, advertising and use of the Sale Notice as described below) which include a request for a break-up fee to the Stalking Horse Bidder in the event the Stalking Horse is overbid;

3.    approving the retention of Blueprint Healthcare Real Estate Advisors as broker and real estate advisor;

4.    approving the rejection of the disputed prior agreement with Commonwealth Assisted Living, LLC, Series E; and

5.    scheduling the final Sale Hearing (defined below) to approve the Stalking Horse as the purchaser, or, if overbids are received, to conduct an auction of the Assets described herein; and further

(B)    for entry of a subsequent order ("Sale Order"), following the Sale Hearing, in substantially the form attached as Exhibit B to the Moriarty Declaration:

1.    approving the sale of substantially all of the assets of the Debtor to the Stalking Horse (or any winning overbidder) free and clear of any liens, claims or encumbrances pursuant to Section 363(b) and (f) as a good faith purchaser entitled to the protections of Section 363(m);

2.    approving the assumption and assignment of the Designated Contracts (defined below) designated by the Stalking Horse (or any winning overbidder) pursuant to Section 365; and

3.    granting related relief.

This Motion is brought pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code (11 U.S.C. § 101 et seq.) on the grounds that the Debtor does not have the financial means to continue operating its business indefinitely; its assets must be sold to ensure continued quality of care of the residents; the overbid procedures described herein are fair, reasonable, designed to realize maximum value for the Assets, and constitute a proper exercise of the Debtor's business judgment; and the sale to be achieved through such sale procedures (and related relief) is in the best interest of the Debtor's estate.

This Motion is based on the Declaration of Kevin Moriarty filed concurrently herewith ("Moriarty Declaration"), the Declaration of Jacob Gehl filed concurrently herewith ("Gehl Declaration"), the pleading and other documents on file with this Court in this case, and the arguments and evidence to be presented at the hearing on the Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF FACTS

**A.    Background**

On January 3, 2020, the Debtor filed its petition for relief under Chapter 11. The Debtor is operating its business as a debtor in possession under Sections 1107 and 1108. See ECF 1. No trustee, examiner or committee has been appointed.

Additional information regarding the circumstances leading to the commencement of the Chapter 11 case and evidence in support of this Motion are set forth in the Omnibus First Day Declaration of Kevin Moriarty (ECF 9), which declaration is incorporated herein.

**B.    The Debtor's Business**

The Debtor is an Alabama limited partnership with its home office and principal place of business in San Diego, California.  It operates a retirement community business in Vestavia Hills, Alabama commonly known as Mount Royal Towers.  The Debtor provides skilled nursing services and independent living services

to approximately 150 elderly residents under its care in its Mount Royal Towers facility.  The Debtor employs 152 employees, including 136 who are paid on an hourly basis and 17 who earn salaries.  In addition to its employees, the Debtor uses the services of independent contractors to perform specialized tasks that, for various reasons, the employees cannot perform.  See the Moriarty Declaration, ¶ 5.

**C.**    **The Debtor's Prepetition Struggles and Efforts to Sell**

Over the past six years, the Debtor has struggled to secure viable refinancing alternatives for the Wells Fargo loan–the arbitration of which resulted in an amount due of more than $18,000,000.  Refinancing proved challenging and unsuccessful due in part to the size of the loan debt, volatility in the industry, and post-2008 lender hesitance to make loans of this size and type.  During this same time, the Debtor has actively pursued a sale of its principal operating assets, including the Mount Royal Towers real estate and the related personal property (collectively, "Assets").  In 2016, the Debtor retained Blueprint Healthcare Real Estate Advisors ("Blueprint") to assist in evaluating and effecting a sale.  Blueprint is a real estate brokerage and advisory firm that specializes in senior housing and healthcare real estate.  In 2017, Blueprint found a potential buyer who entered into a purchase agreement for the Debtor's Assets–but after performing due diligence for several months, that buyer backed out of the sale.  Thereafter, the Debtor found a second buyer–Commonwealth Assisted Living, LLC, Series E ("Commonwealth")–and entered into a sale agreement with it ("Commonwealth Agreement").  Despite the Debtor having provided Commonwealth with numerous extensions of time to close the transactions, Commonwealth never did so, and the contract ultimately terminated due to Commonwealth's failure to perform timely.  Commonwealth then launched the extensive litigation that became the key driver necessitating the Debtor's bankruptcy.  See the Moriarty Declaration, ¶ 6.

**D.**    **The Debtor's Ongoing Operational Losses**

Based on historical performance, the Debtor projects a monthly operating deficit on a cash basis of approximately $70,000 going forward for the next six

months.  This operating deficit does not include interest payments to Wells Fargo, or professional fees in the Chapter 11 case–meaning that the Debtor's actual cash needs will be greater than $70,000 per month until such time as the Assets can be sold.  The Debtor's current cash position is approximately $141,000.  <u>See</u> the Moriarty Declaration, ¶ 7.

At present, the Debtor's finances do not allow it to continue in business long term, given its ongoing operational losses, the large award just granted to Wells Fargo in the arbitration, and the ceaseless litigation with Commonwealth.  Of course, the most important constituents implicated here are the elderly residents of Mount Royal Towers.  They must be provided in-place uninterrupted continuity of care.  The best (and perhaps only) manner in which these residents can be protected is through an expedited sale of the Debtor's operating assets to a new owner qualified to own and operate the Mount Royal Towers facility.  <u>See</u> the Moriarty Declaration, ¶ 8.

**E.    <u>The Prepetition Stalking Horse</u>**

In recognition of all the foregoing events and factors, the Debtor began to explore the possibility of a section 363 bankruptcy sale free and clear of any disputed claims and interests of Commonwealth, the proceeds of which would be used to pay some or all of the Wells Fargo loan and hopefully other creditors.  In January of 2019, the Debtor re-engaged Blueprint to search further for a potential purchaser.  After extensive marketing, Blueprint identified a potential buyer to the Debtor which was willing to pursue this course of action and serve as a stalking horse bidder.  In the months leading up to the Chapter 11 filing, the Debtor negotiated and entered into, subject to Court approval and overbid, a stalking horse asset purchase agreement with the proposed buyer.  Commonwealth–seeking advantage in both the litigation and its efforts to drive the Debtor's business downwards so as to purchase it for itself as cheaply as possible–served discovery on the stalking horse.  The Debtor believes that Commonwealth's hostilities led the stalking horse to exercise its contractual right to terminate the purchase agreement–which it did on December 31, 2019, three days

1  before the bankruptcy was filed.  <u>See</u> the Moriarty Declaration, ¶ 9.

2    Commonwealth's efforts to drive the price of the Debtor's assets lower have

3  succeeded.  The purchase price in the 2017 agreement was $22,670,000.  The original

4  purchase price in the 2018 Commonwealth agreement was $19,000,000.  The

5  purchase price in the prior stalking horse agreement of 2019 was $17,000,000.  The

6  purchase price in the Agreement at issue in this Motion is $12,000,000.  Following the

7  termination of the aforementioned purchase agreement, the Debtor diligently and

8  aggressively marketed its assets, which led to the Debtor's instant purchase agreement

9  with the proposed Stalking Horse.  <u>See</u> the Moriarty Declaration, ¶ 10.

10 **F.** **<u>The Current Stalking Horse</u>**

11   After Commonwealth drove away the pre-petition stalking horse, Blueprint

12 immediately went back to work, approaching another potential bidder who had been

13 on Blueprint's radar.  Those discussions proved fruitful, and on February 6, 2020, the

14 Debtor entered into a new stalking horse asset purchase agreement ("Agreement") for

15 the Assets, as well as assumption and assignment of certain executory contracts and

16 unexpired leases to be designated (collectively, "Designated Contracts"), subject to

17 Court approval and overbid, with MED Healthcare Partners, LLC ("Stalking Horse").

18 A copy of the Agreement with the Stalking Horse is attached as Exhibit C to the

19 Moriarty Declaration.  The Stalking Horse is a proven provider of skilled nursing,

20 assisted living, and rehabilitation services. Along with its partner management

21 companies, it manages and operates over 115 skilled nursing facilities with over

22 10,000 resident beds in 20 states.  In particular, it has bought assets out of

23 bankruptcies in section 363 sales.  <u>See</u> Exhibit D to the Moriarty Declaration.

24 Accordingly, the Stalking Horse understands the section 363 sale process, and has

25 demonstrated an ability to close purchases in the bankruptcy sale context.

26   As described above, the purchase price, subject to overbid, has now fallen to

27 $12,000,000.  The Agreement provides for a breakup fee ("Breakup Fee") of $400,000

28 in the event that the Stalking Horse is overbid by a third party–and the Overbid

Procedures provide for an initial overbid increment of $500,000, so as to achieve a net economic "win" for the estate even if there is only one overbidder.  For additional detail, <u>see</u> the Agreement.

**G.    The Requested Retention of Blueprint**

Throughout Blueprint's extensive efforts since 2016 in securing multiple purchasers, given its commission-based engagement agreement, Blueprint has yet to be compensated by the Debtor.  With this Motion, the Debtor requests authority to employ Blueprint as its sole broker and real estate advisor for sale of the Debtor's Assets in connection with its Chapter 11 bankruptcy on a commission-based compensation basis, pursuant to section 327(a) of the Bankruptcy Code.  The Debtor requires the services of a real estate advisor and broker knowledgeable in the sale of healthcare real estate to adequately market and sell the Assets.

It is necessary and essential that the Debtor employ Blueprint to provide healthcare real estate advisory services in this Chapter 11 case, including, but not limited to, the following services:

1.    to provide assistance with marketing, the sale, and closing on the sale of the Assets;

2.    to provide assistance with determining the sale price of the Assets;

3.    to prepare marketing materials and recommend a strategy for the sale of the Assets;

4.    to screen and pre-qualify prospective overbidder purchasers; and

5.    to provide the assistance of an agent licensed in Alabama where the Mount Royal Towers Facility is located.

The Debtor desires to employ Blueprint under a new commission-based engagement agreement ("Blueprint"), a copy of which is attached as Exhibit A to the Gehl Declaration.  The agreement provides for a commission equal to one and one-half percent (1.5 %) of the purchase price to be paid in full directly from sale proceeds upon closing.  Blueprint will bear the cost of its own expenses.  <u>See</u> Exhibit A to the

Gehl Declaration, ¶5.  The Debtor believes that Blueprint's proposed commission is "market" and reasonable under the circumstances.  See the Moriarty Declaration, ¶15.

Blueprint is a leading advisory firm focused exclusively on senior housing and healthcare real estate, having closed over 270 transactions valued at over $5.6 billion. See the Gehl Declaration, ¶15.

Neither BluePrint nor any of its shareholders, associates, or employees has any interest in or connection with the Debtor, any creditors of the Debtor, the United States Trustee, any person employed by the United States Trustee, or any other party in interest, including their respective attorneys, except for Blueprint's prior work on behalf of the Debtor as described herein; and the following:

The Stalking Horse (and its principal Mordy Lahasky) is a very large and active purchaser of continuing care retirement communities and skilled nursing facilities. Blueprint has represented many sellers who sold assets to the Stalking Horse. Blueprint estimates that since 2016, it has served as a seller's agent in approximately 10 or more transactions in which the Stalking Horse or one of its affiliates was the buyer.  Blueprint has never contracted with the Stalking Horse or any of its affiliates to provide real estate brokerage or advisory services, nor has Blueprint ever been paid by any of them for any such services.  In short, Blueprint has always been on the opposite, or seller's, side of the transactions in which the Stalking Horse has been involved, always as a buyer.  See the Gehl Declaration, ¶11.

The Stalking Horse is known to Blueprint as having closed every single one of the transactions described above, in which it contracted to purchase, and in which Blueprint has been involved as a seller's agent.  Accordingly, Blueprint is uniquely positioned to provide an educated opinion as to the likelihood of the Stalking Horse closing the Mount Royal Towers sale, in the event that it is the winning bidder – which likelihood Blueprint believes to be very high (as high as any buyer in the relevant industry).  See the Gehl Declaration, ¶12.

/ / /

///

In addition, no shareholder or employee of Blueprint holds or represents any interest adverse to the estate, and Blueprint is "disinterested" within the meaning of section 327(a) of the Bankruptcy Code.  See the Gehl Declaration at ¶13.

**H.    The Proposed Overbid Procedures**

The Debtor proposes to solicit overbids for the Assets utilizing the Overbid Procedures. The Overbid Procedures describe, among other things, the Assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among Qualified Bidders and the Debtor, the receipt and negotiation, in concert with the Debtor and Debtor's counsel, of overbids received, the conducting of any auction, and the selection and approval of a winning bidder (and possibly a backup bidder).  The Overbid Procedures also provide for the assumption and assignment of the Designated Contracts, including cure procedures, pursuant to Bankruptcy Code section 365.  For greater detail, see the Overbid Procedures attached as Exhibit A hereto.

The Overbid Procedures were developed consistent with the Debtor's competing needs to promote participation and active bidding while at the same time minimizing the risk of business disruption associated with a prolonged stay in Chapter 11.  The Overbid Procedures reflect the Debtor's objective of conducting the auction in a controlled, fair, and open manner, while enabling the Debtor to select the highest or otherwise best offers for the Assets.  See the Moriarty Declaration, ¶17.

**I.    The Proposed Marketing and Advertising**

The Debtor proposes that Blueprint–who has been marketing the Assets for several years–continue marketing them for approximately another 45 days following entry of the Court's order approving the Overbid Procedures.  Blueprint intends an aggressive email and telephone campaign to contact the appropriate portion of its 20,000 clients in its industry-related database.  Blueprint will also advertise the sale in Senior Housing Business's "southeast publication" as well as in the Alabama Business

Journal. The Debtor believes it unlikely that a buyer for Mount Royal Towers would be identified from a national newspaper ad, and accordingly, the Debtor does not intend to use such media for further advertising for the sale. See the Gehl Declaration, ¶14.

**J.    The Proposed Sale Notice**

The Debtor also requests approval of the Sale Notice to facilitate the sale process and enable the Debtor to provide interested parties with adequate and sufficient notice of the proposed auction and the sale hearing. The Debtor proposes to serve, no later than two business days following the Court's entry of the Overbid Procedures Order, a copy of the Sale Notice (which includes the Overbid Procedures and the order approving them) by first-class mail, postage prepaid upon (a) the Office of the United States Trustee; (b) counsel for Wells Fargo; (c) counsel for Commonwealth; (d) all counterparties to Designated Contracts; (e) all entities with recorded claims, liens, interests, or encumbrances against the Debtor's right, title, and interest in the Assets and any other entities reasonably known to have asserted any such claim, liens, interests, or encumbrances; (f) all entities reasonably known to have expressed a bona fide interest in acquiring some or substantially all of the Debtor's assets during the six (6) months preceding the date hereof; (g) the Internal Revenue Service; (h) the Securities Exchange Commission; and (i) all known creditors of the Debtor. The Debtor submits that doing so will constitute sufficient notice of the sale under the facts and circumstances of this case.

**K.    The Rejection of the Disputed Commonwealth Agreement**

As described above, after nine amendments which included multiple closing extensions provided by the Debtor to Commonwealth, it became apparent that Commonwealth had alternative motives and intentions with respect to its purchase of Mount Royal Towers. After Commonwealth failed to obtain the necessary government operating approvals by the deadlines set forth under the Purchase Agreement, as amended, the Debtor could not agree to further delay closing without

running afoul of the loan forbearance deadline imposed by Wells Fargo and without risking its licensing in Alabama for the facility.  Accordingly, on November 16, 2018, the Commonwealth Agreement terminated.  See the Moriarty Declaration, ¶ 20.

As of the Petition Date, the Debtor does not believe that the terminated Commonwealth Agreement was executory.  Nonetheless, out of an abundance of caution, with this Motion, the Debtor seeks Court approval to reject the Commonwealth Agreement to the extent it or any portion of it is executory, pursuant to Section 365.  As has become clear, attempting to further engage with Commonwealth has and will only lead to further litigation–the last thing the Debtor can afford, and the last thing that the residents of Mount Royal Towers need and deserve.  See the Moriarty Declaration, ¶ 21.

## II.    RELIEF REQUESTED

With this Motion, the Debtor seeks entry of two orders:

(A)    first, following the initial hearing on this Motion, the Overbid Procedures Order in substantially the form attached as Exhibit A to the Moriarty Declaration:

1.    approving the Agreement with the Stalking Horse, including the Breakup Fee;

2.    approving the Overbid Procedures (including the marketing, advertising and use of the Sale Notice as described herein);

3.    approving the retention of Blueprint as the Debtor's broker;

4.    approving the rejection of the disputed Commonwealth Agreement;

5.    scheduling the final Sale Hearing to approve the Stalking Horse as the purchaser, or, if overbids are received, to conduct an auction of the Assets; and

(B)    second, following the Sale Hearing, the Sale Order in substantially the form attached as Exhibit B to the Moriarty Declaration:

1.    approving the sale of the Assets to the Stalking Horse (or any winning overbidder) free and clear of any encumbrances pursuant to

Section 363(b) and (f) as a good faith purchaser entitled to the protections of Section 363(m);

2.    approving the assumption and assignment of the Designated Contracts designated by the Stalking Horse (or any winning overbidder) pursuant to Section 363; and

3.    granting related relief.

### III.    SERVICE OF THIS MOTION

A copy of this Motion and all supporting papers will be served on all of the following:  The United States Trustee; All secured creditors; The 20 largest unsecured creditors; Wells Fargo, Commonwealth, Municipal Capital Appreciation Partners; Securities and Exchange Commission; Internal Revenue Service; and All Registered Users, as such term is defined in Local Rule 1001-6(b)(23).

### IV.    AUTHORITY AND ARGUMENT

**A.    The Overbid Procedures Are Appropriate and in the Best Interests of the Debtor, the Estate, and Creditors**

**1.  The Overbid Procedures Are Reasonable, Appropriate and Will Maximize Value**

The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See, In re Mushroom Transp. Co., 382 F.3d 325, 339 (3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003) (same); Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.), 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

To that end, courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. See, In re

1  O'Brien Envtl. Energy, Inc., 181 F.3d 527, 537 (3d Cir. 1999); see also Official

2  Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res.

3  Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding and

4  . . . maximize the value of the debtor's assets").

5          The Debtor believes that the Overbid Procedures will increase the likelihood

6  that the Debtor will receive the greatest possible consideration for the Assets because

7  such procedures will ensure a competitive and fair bidding process.  The Debtor also

8  believes that the Overbid Procedures will promote active bidding from seriously

9  interested parties and will generate the highest or otherwise best offer reasonably

10  available for the Assets.  The Overbid Procedures will allow the Debtor to conduct the

11  auction–if a qualified overbid is received–in a controlled, fair and open manner that

12  will encourage participation by financially capable bidders that demonstrate the ability

13  to close the sale.  The Debtor believes that the Overbid Procedures will encourage

14  bidding, are consistent with other procedures previously approved by courts in this

15  and other districts, and are appropriate under the relevant standards governing auction

16  proceedings and bidding incentives in bankruptcy proceedings.  The Overbid

17  Procedures were designed with the input of Blueprint, the Debtor's broker, who has

18  extensive experience not only with the Debtor's Assets, but in the healthcare real

19  estate market generally, including having closed approximately 270 transactions

20  valued at over $5.6 billion.  Specifically, Blueprint has significant experience selling

21  healthcare real estate and operating business in the distressed context, including

22  Section 363 sales in bankruptcy.  See the Moriarty Declaration, ¶ 17, and the Gehl

23  Declaration, ¶15;see also In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537; see also

24  In re Dura Auto. Sys., Inc., No. 06-11202 (Bankr. D. Del. July 24, 2007); In re New

25  Century TRS Holdings, Inc., No. 07-10416 (Bankr D. Del. Apr. 20, 2007); In re Three

26  A's Holdings, L.L.C., No. 06-10886 (Bankr. D. Del. Sept. 7, 2006).

27          Similar bidding procedures have been previously approved by bankruptcy

28  courts in other Districts.  See, e.g., In re Vertis Holdings, Inc., Case No. 12-12821

(CSS) (Bankr. D. Del. Nov. 2, 2012 (D.I. 206); <u>In re Northstar Aerospace (USA) Inc.</u>, Case No. 12-11817 (MFW) (Bankr. D. Del. June 27, 2012) (D.I. 119); <u>In re Traffic Control & Safety Corp.</u>, Case No. 12-11287 (KJC) (Bankr. D. Del. May 14, 2012) (D.I. 128); <u>In re Real Mex Rests. Inc.</u>, Case No. 11-13122 (BLS) (Bankr. D. Del. Nov. 9, 2011) (D.I. 393); <u>In re Nortel Networks, Inc.</u>, Case No. 09-10138 (KG) (Bankr. D. Del. June 30, 2009) (D.I. 1012); <u>In re Tweeter Home Etm't Group, Inc.</u>, Case No. 07-10787 (PJW) (Bankr. D. Del. June 27, 2007) (D.I. 211).

Accordingly, the Debtor submits that the Overbid Procedures are reasonable and appropriate.  The Debtor also submits that the Overbid Procedures demonstrate an exercise of the Debtor's sound business judgment, as such procedures are designed to maximize the value to be received by the Debtor's estate for the Assets.  <u>See</u> the Moriarty Declaration, ¶ 19.

**2.      The Notice Procedures Are Reasonable and Appropriate**

Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify creditors of the sale, including a disclosure of the time and place of any auction, the terms and conditions of the sale, and the deadline for filing any objections thereto.

The Debtor submits that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Overbid Procedures, the auction, and the Sale Hearing to the Debtor's creditors and all other interested parties that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Assets.

Accordingly, the Debtor respectfully requests that the Court approve the notice procedures set forth herein, including the form and manner of service of the Sale Notice attached as Exhibit E to the Moriarty Declaration, and that no other or further notice of the Overbid Procedures, the auction, or the Sale Hearing is necessary or required.

/ / /

/ / /

### 3.    The Assumption and Assignment Procedures Are Reasonable and Appropriate

As part of the relief requested herein, the Debtor also seeks authority under Sections 105(a) and 365 of the Bankruptcy Code to assume and assign all Designated Contracts designated by the winning bidder.  The Overbid Procedures specify the process by which the Debtor will serve notice of the potential assumption/assignments and cure amounts on counterparties, and the procedures and deadlines for counterparties to file objections.  These procedures ensure that each counterparty will have sufficient notice of such assumption and assignment, and an opportunity to contest the cure amount, if any, for its assumed contract, as well as the ability of the successful bidder to provide adequate assurance of future performance with respect to such contract.

Accordingly, the Debtor submits that the procedures for the assumption and assignment of the Designated Contracts are fair and reasonable, and respectfully requests that the Court approve such procedures. See the Moriarty Declaration, ¶ 24.

### 4.    The Proposed Marketing is Appropriate

Based on the advice of its broker, the Debtor believes that it is unlikely that the buyer for Mount Royal Towers will be identified from a national newspaper ad. The buyer pool of continuing care retirement communities in bankruptcy is fairly narrow. The most important tool for finding potential buyers for these Assets is Blueprint's database of owners of continuing care retirement communities and nursing homes. There are many "under the radar" high net worth buyers for these types of senior communities.  Blueprint intends to implement an aggressive email and telephone campaign into the relevant portions of the 20,000 clients in its industry-related database.  Blueprint also recommends running an ad in Senior Housing Business's "Southeast" publication as well as in the Alabama Business Journal. See the Gehl Declaration, 16.

/ / /

1   ///

2   **B.     Approval of the Sale is Appropriate and in the Best Interests of the**

3   **Debtor's Estate**

4        **1.     The Sale is Authorized by Section 363 of the Bankruptcy Code as a**

5             **Sound Exercise of the Debtor's Business Judgment**

6        Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a

7   hearing, may use, sell, or lease, other than in the ordinary course of business, property

8   of the estate[.]"  11 U.S.C. § 363(b).  Although section 363 does not specify a

9   standard for determining when it is appropriate for a court to authorize the use, sale, or

10  lease of property of the estate, courts routinely authorize sales of a debtor's assets if

11  such sale is based upon the sound business judgment of the debtor.  See, Meyers v.

12  Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Montgomery Ward

13  Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co.,

14  124 B.R. 169, 175-76 (D. Del. 1991); and In re Trans World Airlines, Inc., No. 01-

15  00056 (PJW), 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2. 2001).

16       Courts typically consider the following factors in determining whether a

17  proposed sale satisfies this standard: (a) whether a sound business justification exists

18  for the sale; (b) whether adequate and reasonable notice of the sale was given to

19  interested parties; (c) whether the sale will produce a fair and reasonable price for the

20  property; and (d) whether the parties have acted in good faith.  See, In re Decora

21  Indus., Inc., 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing In re Delaware

22  & Hudson Ry. Co., 124 B.R. at 176); In re United Healthcare Sys. Inc., No. 97-1159,

23  1997 WL 176574, at *4 & n.2 (D.N.J. Mar. 26, 1997).

24       A sound business purpose for the sale of a debtor's assets outside the ordinary

25  course of business may be found where such a sale is necessary to preserve the value

26  of assets for the estate, its creditors or interest holders.  See, e.g., In re Abbotts Dairies

27  of Pa., Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir.

28  1983); see also In re Food Barn Stores, Inc., 107 F.3d 558, 564–65 (8th Cir. 1997)

/ / /

(stating that the paramount goal in any proposed sale of property of the estate is to maximize value).

Furthermore, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." <u>Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.</u> (<u>In re Johns-Manville Corp.</u>), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." <u>In re Integrated Resources</u>, 147 B.R., 650 at 656 (SD N.Y.1992) (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. <u>See</u>, <u>Pitt v. First Wellington Canyon Assocs.</u> (<u>In re First Wellington Canyon Assocs.</u>), 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

Here, the Debtor cannot continue to operate indefinitely. It loses money each month. Its value continues to decline, as shown by the various dwindling purchase prices over the last few years. The Debtor does not have to funds to pay off the Wells Fargo loan in full. At some point, Wells Fargo could be permitted to foreclose–a result likely to bring significant hardship upon the residents of Mount Royal Towers. The Debtor's Assets must be sold quickly and with the certainty that a section 363 sale process brings to bear.

With the Overbid Procedures, the Assets will receive extensive marketing–on top of the years of marketing they have already had.  Their value will be tested through the auction and sale process contemplated by the Overbid Procedures. Consequently, the fairness and reasonableness of the consideration to be paid by the successful bidder will be demonstrated by adequate "market exposure" and an open and fair auction and sale process–the best means for establishing whether a fair and reasonable price is being paid. Thus, the Debtor submits that the consideration paid by successful bidders will constitute the highest or otherwise best offer for the transferred Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. As such, the Debtor's determination to sell the Assets through a section 363 auction and sale process, as provided for in the Overbid Procedures, is a valid and sound exercise of the Debtor's business judgment. See the Moriarty Declaration, ¶ 26.

Accordingly, the Debtor respectfully requests that the sale be approved upon the completion of the Overbid Procedures.

**2.     The Sale of the Assets Free and Clear of All Encumbrances (Except for Permitted Encumbrances) is Authorized by Section 363(f) of the Bankruptcy Code**

In the interest of attracting the best bids for the Assets, the Debtor submits that the sale should be free and clear of all liens, claims and encumbrances (except for any specifically permitted encumbrances) in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims and encumbrances attaching to the net proceeds of the sale, as and to the extent applicable.

Section 363(f) of the Bankruptcy Code authorizes a debtor to sell Assets free and clear of liens, claims, interests, and encumbrances if:

a.     applicable non-bankruptcy law permits sale of such property free and clear of such interests;

b.     such entity consents;

c.   such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

d.   such interest is in bona fide dispute; or

e.   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the assets "free and clear" of all liens, claims and encumbrances (except for Permitted Encumbrances).  See, In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); In re Dundee Equity Corp., No. 89-10233 (FGC), 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) (same).

The Debtor submits that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to any interest in the Assets being sold.  Wells Fargo is consenting to the sale, meaning that section 363(f)(2) is satisfied with respect to Wells' interest.  The Debtor scheduled Gordon Food Services, Inc. ("Gordon") as holding a lien claim in "Food Inventory" in the amount of $21,657.03 as of the petition date, and the Debtor believes that Gordon too will consent to the sale–again meaning that section 363(f)(2) is satisfied with respect to Gordon's interest.  Commonwealth does not hold an interest in any of the Assets, and if it were to contend otherwise, the Debtor would vigorously dispute it, meaning

that section 363(f)(4) would be satisfied.  The Debtor is unaware of any other interests in the Assets being sold, and again, and if anyone were to contend otherwise, the Debtor would vigorously dispute it, meaning that section 363(f)(4) would be satisfied.

Additionally, any lienholder will be adequately protected by having its liens, if any, attach to the proceeds of the sale, in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses that the Debtor and its estate may possess with respect thereto.

Accordingly, following the Overbid Procedures, the Debtor respectfully requests that the Assets be sold free and clear of any liens, claims and encumbrances (except for permitted encumbrances) pursuant to section 363(f) of the Bankruptcy Code.

## C. **Assumption and Assignment of the Contracts is Authorized by Section 365 of the Bankruptcy Code**

### 1.    Authority

Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(l) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee– (A) cures or provides adequate assurance that the trustee will promptly cure, such default . . . ; (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provide adequate assurance of future performance under such contract or lease. 11 U.S.C. § 365(b)(1).

Section 365(f)(1) provides:

Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

Section 365(f)(2) provides:

The trustee may assign an executory contract or unexpired lease of the debtor only if—

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

The standard in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. See In re Decora Indus., Inc., 2002 WL 32332749, at *8 (D. Del. May 20, 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp., 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard.").

To determine if the business judgment standard is met, the court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re AbitibiBowater Inc., 418 B.R. 815, 831 (Bankr. D. Del. 2009). "This is not a difficult standard to satisfy and requires only a showing that

[assumption or] rejection will benefit the estate." *Id.* (citations omitted). Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." In re Network Access Solutions Corp., 330 B.R. 67, 75 (Bankr. D. Del. 2005). Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. See In re Federal Mogul Global, Inc., 293 B.R. 124, 126 (D. Del. 2003).

## 2. The Debtor's Sound Business Judgment Supports the Assumption and Assignment of the Contracts to be Assigned

In the present case, the Debtor's assumption and assignment of the Contracts to be Assigned to the successful bidder meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. The assumption and assignment is necessary for the successful bidders to conduct business going forward, and since no purchaser would pay top dollar for the Assets without certain executory contracts and unexpired leases, the assumption and assignment of such agreements is essential to securing the highest or otherwise best offer for the Assets.  Consequently, the Debtor submits that the procedures for the assumption and assignment of the Designated Contracts are fair and reasonable, and respectfully requests that, following such procedures, the Court authorize the Debtor to assume and assign the Contracts to be Assigned in the manner provided for herein.

## 3. Adequate Assurance of Future Performance Will Be Demonstrated With Respect to the Contracts to be Assigned

A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(c)(2).

409001-v7

The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." <u>EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp.</u> (<u>In re Sanshoe Worldwide Corp.</u>), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); <u>In re Prime Motor Inns Inc.</u>, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); <u>In re Rachels Indus. Inc.</u>, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); <u>Carlisle Homes, Inc. v. Azzari</u> (<u>In re Carlisle Homes, Inc.</u>), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. <u>See</u>, <u>e.g.</u>, <u>In re Bygaph, Inc.</u>, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

Pursuant to the Overbid Procedures, qualified bidders are required to provide the Debtor with such financial and other information providing adequate assurance of future performance under any Designated Contract to be assigned to allow the Debtor to provide such information to any counterparty that has requested it in writing. Moreover, under the Overbid Procedures, counterparties to Designated Contracts will have the opportunity to object to adequate assurance of future performance by the successful bidders.

Accordingly, the Debtor submits that the assumption and assignment of the Designated Contracts as set forth herein should be approved pursuant to section 365 of the Bankruptcy Code.

**D.    The Prophylactic Rejection of the Disputed Commonwealth Agreement is Warranted**

For the reasons described above, as of the Petition Date, the Debtor does not believe that the terminated Commonwealth Agreement was executory.  Nonetheless, out of an abundance of caution, with this Motion, the Debtor seeks Court approval to reject the Commonwealth Agreement to the extent it is executory, pursuant to Section 365.  As has become clear, attempting to further engage with Commonwealth will only lead to further litigation–the last thing the Debtor can afford, and the last thing that the residents of Mount Royal Towers need and deserve.  To the extent that the Commonwealth Agreement remains executory–which the Debtor disputes–it holds no benefits for the estate, only burdens, and rejecting it will pave the way for the proposed sale, realizing maximum value for the Debtor's Assets, and ensuring continued quality of care for residents.  Accordingly, rejection is in the best interests of the estate, and well warranted by the Debtor's business judgment.  See the Moriarty Declaration, ¶ 27.

**E.    The Debtor's Employment of Blueprint Should be Approved**

Blueprint is a leading advisory firm focused exclusively on senior housing and healthcare real estate, having closed over 270 transactions valued at over $5.6 billion.  The Debtor requires the services of a real estate advisor knowledgeable in the sale of healthcare real estate to adequately market and sell the business.  Specifically, the Debtor requires the following services:

1.    to provide assistance with marketing, sale, and closing of the sale of the business;

2.    to provide assistance with determining the sale price of the business;

3.    to prepare marketing materials and recommend a strategy for the sale of the Business;

4.    to screen and pre-qualify prospective overbidder purchasers; and

5.      to provide the assistance of an agent licensed in Alabama where the Mount Royal Towers Facility is located.

Blueprint has extensive experience with the Assets, having first started marketing them in 2016, and having brought multiple bidders to the Debtor (and to contract). The Blueprint Agreement–including the commission equal to one and one-half percent (1.5 %) of the purchase price to be paid in full directly from sale proceeds upon closing–is fair, reasonable and on market terms, and properly incentivizes Blueprint to find a purchaser willing to pay the highest price. Accordingly, the Debtor requests authority to employ Blueprint (on the commission basis described above) as its sole broker and real estate advisor for sale of the Debtor's Assets in connection with its Chapter 11 bankruptcy, pursuant to section 327(a) of the Bankruptcy Code.

## V.    <u>WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d)</u>

Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the [debtor] to assign an executory contract or unexpired . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." <u>Id</u>. at 6006(d). The Debtor requests that the Court waive the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d), respectively, in connection with the sale. No party will be prejudiced by such waiver, and time is of the essence here–not only to minimize the ongoing diminution of the Debtor's bankruptcy estate due to its operational losses, but to give the residents of Mount Royal Towers the certainty and peace of mind they deserve, and to ensure their continuity of care.

## VII.    <u>CONCLUSION</u>

Based on the foregoing, the Debtor requests that the Court:

1.      Enter the Overbid Procedures Order, following the initial hearing on this Motion:

a. approving the Agreement with the Stalking Horse for the sale of the Assets;

b. approving the Overbid Procedures (including the marketing, advertising and use of the Sale Notice as described above);

c. approving the retention of Blueprint;

d. approving the rejection of the disputed Commonwealth Agreement; and

e. scheduling the final Sale Hearing to approve the Stalking Horse as the purchaser, or, if overbids are received, to conduct an auction of the Assets; and

2. Enter the Sale Order, following the Sale Hearing:

a. approving the sale of the Assets to the Stalking Horse (or any winning overbidder) free and clear of any encumbrances pursuant to Section 363(b) and (f) as a good faith purchaser entitled to the protections of Section 363(m);

b. approving the assumption and assignment of the Designated Contracts designated by the Stalking Horse (or any winning overbidder) pursuant to Section 365; and

c. granting related relief; and

3. Grant such other relief as the Court may find just and proper.


Dated:    February 13, 2020          SULLIVAN HILL REZ & ENGEL,
                                     A Professional Law Corporation

                                     By:    _/s/ James P. Hill_____
                                            James P. Hill
                                            Attorneys for Debtor and Debtor in
                                            Possession, Vestavia Hills, Ltd. dba
                                            Mount Royal Towers

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT TABLE**

| Exhibit | Description | Pages |
|:---:|:---|:---|
| **A** | Overbid Procedures | 27-32 |

**EXHIBIT A**

# Overbid Procedures

Vestavia Hills, Ltd. dba Mount Royal Towers
USBC Case No. 20-00018-LA11

Escrow Agent: Riverside Abstract
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
Email: Alazarus@rsabstract.com
Attention: Aryeh Lazarus

Vestavia Hills, Ltd. ("Debtor") is a Chapter 11 debtor in possession in the bankruptcy case currently pending in the United States Bankruptcy Court for the Southern District of California ("Bankruptcy Court"). These Overbid Procedures were approved by order of the Bankruptcy Court entered_____, 2020.

### Assets to be Sold

The assets to be sold comprise substantially all of the Debtor's business assets, and include all real and personal property owned by the Debtor used in the operation of a senior housing community in Vestavia Hills, Alabama, commonly known as Mount Royal Towers. The assets are described in more detail in the Asset Purchase Agreement (defined below).

### Stalking Horse Asset Purchase Agreement

The Bankruptcy Court's_____, 2020 order also approved an "Asset Purchase Agreement" entered into between the Debtor as seller and MED Healthcare Partners, LLC or its designee or designees ("Stalking Horse") as buyer, subject to the Overbid Procedures described herein. A copy of the Asset Purchase Agreement is attached hereto. All terms not defined herein shall have the meaning given them in the Asset Purchase Agreement.

### Purchase Price/Overbid Increments

The Asset Purchase Agreement calls for a purchase price of $12,000,000, and is subject to these Overbid Procedures described herein. The initial overbid increment is $500,000–meaning the initial overbid must be $12,500,000 or more.

409167-v2

**Exhibit A
Page 28**

**Due Diligence Materials**

In order to receive access to due diligence materials, parties interested in overbidding must provide the Escrow Agent with an executed nondisclosure agreement in a form approved by Debtor.

**Submitting a Qualified Bid**

In order to submit a qualified bid, a bidder must provide the Escrow Agent no later than＿＿＿＿＿＿, 2020 (21 days before the Sale Hearing):

- A fully-executed Overbidder Agreement in substantially the form attached hereto, together with a redline showing any changes.
- A cash deposit of $＿＿＿＿＿ nonrefundable unless the bidder is not selected as the winner.
- Evidence of ability to close satisfactory to the Debtor in its sole discretion.
- A list of the contracts the bidder is offering to have assumed and assigned to it pursuant to section 365 of the Bankruptcy Code (each a "Contract" and collectively the "Contracts").
- Evidence satisfactory to the Debtor in its sole discretion to permit the Debtor to determine the bidder's ability to comply with section 365 of the Bankruptcy Code, including providing adequate assurance of such assignee's ability to perform in the future with respect to any Contract proposed to be assumed and assigned.

**Due Diligence Deadline**

Due diligence must be completed by the time a bid is submitted. The Overbidder Agreement so provides and does not permit a "diligence out" or other basis to withdraw once a bid has been submitted.

**"As Is, Where Is"**

409167-v2

**Exhibit A**
**Page 29**

The sale of the Assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, except, with respect to a successful bidder, to the extent set forth in the relevant Overbidder Agreement of such successful bidder approved by the Bankruptcy Court.

### Free of Any and All Claims and Interests

The assets shall be sold free and clear of all Encumbrances to the maximum extent permitted under section 363(f) of the Bankruptcy Code, except for Permitted Encumbrances and those liabilities of Seller expressly assumed or agreed to be discharged by the winning bidder.

### Bid Deadline

In order to be considered for qualifying, a bid must be received by the Debtor's Bankruptcy Court-appointed broker, Blueprint Healthcare Real Estate Advisors, LLC, ATTN: Jacob Gehl, no later than _____ 2020 (21 days before the Sale Hearing (defined below) by electronic email as follows: jacob@blueprintHCRE.com

### Cure Amounts Associated With Assumed and Assigned Contracts

On or before_____, 2020 (14 days prior to the Sale Hearing), the Debtor will file with the Bankruptcy Court and serve on each nondebtor party to a Contract or Lease a notice of potential assumption and assignment (the "Cure Notice").  The Cure Notice shall state the cure amount that the Debtor believes is necessary to assume such Contract or Lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and notify each party that such party's Contract or Lease is subject to potential assumption and assignment to one of the qualified bidders at the conclusion of the Sale Hearing.  Each non-debtor party to the Contracts or Leases shall have until _____, 2020 (7 days prior to the Sale Hearing) to file and serve any objection to the assumption and assignment of the Contract or Lease and/or the Cure Amount and must state in its objection with specificity what Cure Amount the party contends is required (with appropriate documentation in support thereof).  If no objection is timely received, the Cure

Amount set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Contract or Lease, or any other document, and the non-Debtor party to the Contract or Lease shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims as to such Contract or Lease against the Debtor, an assignee of the Contract or Lease, or the property of any of them.  If an objection to the Cure Amount is timely filed and received and the parties are unable to consensually resolve the dispute, the amount to be paid under section 365 of the Bankruptcy Code, if any, with respect to such objection will be determined at the Sale Hearing or at a subsequent hearing date to be determined by the Bankruptcy Court.  Cure Amounts with respect to any Contract or Lease that is assumed and assigned to a purchaser shall be paid out of the proceeds of sale.

### Sale Hearing/Auction

On_____, 2020 at____, the Bankruptcy Court will conduct a "Sale Hearing."  In the event that no qualified overbid has been timely received, the Debtor will request that the Bankruptcy Court approve the sale of the Debtor's assets to the Stalking Horse on the terms set forth in the Asset Purchase Agreement.  In the event that one or more qualified overbids have been received, the Debtor will conduct an auction in the Bankruptcy Court.  In order to bid at the auction, a party must have timely submitted a qualified overbid as described above.  Subsequent overbid increments will be in amounts of $100,000 or such other amount as the Debtor may set and the Bankruptcy Court may approve.  The Debtor retains full discretion to select the "highest and best" bid and to request that the Bankruptcy Court approve it as the winning bid.  The Debtor may also request that the Bankruptcy Court approve one or more "back up" bids, with whom the Debtor will close if the winning bidder fails to do so. The Stalking Horse shall not be required to be a "back up" bidder.

### Closing

The closing shall take place on or about the date which shall be the first day of the month following the last to occur of the following, or such earlier date as the Parties may agree:

409167-v2

**Exhibit A**
**Page 31**

(i)      ten (10) days following Buyer's receipt of approval of the change of ownership and the issuance of any other license or Certificates of Need (if applicable) necessary for the operation of the Facility by the Alabama Department of Public Health ("ADPH") and the Alabama State Health Planning and Development Agency ("SHPDA"), including without limitation the New Operator Licenses; and

(ii)      the Sale Order has become a Final Order.

### Questions Regarding Overbid Procedures

Questions regarding these Overbid Procedures should be directed to the Debtor's Bankruptcy Court-approved broker: Blueprint Healthcare Real Estate Advisors, LLC, ATTN: Jacob Gehl, jacob@blueprintHCRE.com, 310.893.7182.