SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
James P. Hill, SBN 90478
Christopher V. Hawkins, SBN 222961
600 B Street, 17th Floor
San Diego, California 92101
Telephone: (619) 233-4100
Fax Number: (619) 231-4372

Attorneys for Debtor and Debtor In Possession,
Vestavia Hills, Ltd. dba Mount Royal Towers

**Electronically Filed: 2/13/20**

UNITED STATES BANKRUPTCY COURT
Southern District of California

In re

VESTAVIA HILLS, LTD.
DBA MOUNT ROYAL TOWERS,

Debtor.

CASE NO. 20-00018-LA11

**DECLARATION OF KEVIN MORIARTY IN SUPPORT OF DEBTOR'S MOTION FOR ORDER: (1)(A) APPROVING STALKING HORSE AGREEMENT; (B) APPROVING OVERBID PROCEDURES; (C) APPROVING RETENTION OF BROKER; (D) APPROVING REJECTION OF COMMONWEALTH AGREEMENT; (E) SCHEDULING FINAL SALE HEARING; AND (2)(A) APPROVING SALE OF ASSETS FREE AND CLEAR; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

Initial Hearing Date:
Time: To be announced by Court
Sale Hearing Date:
Time:
Ctrm: 2
United States Bankruptcy Court
325 West "F" Street
San Diego, CA 92101-6991
Judge: Hon. Louise DeCarl Adler

I, Kevin Moriarty, hereby declare under penalty of perjury:

1.      I am an individual over the age of majority and am competent to testify as to the facts set forth in this declaration.  If called upon to testify, I could and would testify to the facts set forth in this declaration.  I am authorized by the Debtor to submit this declaration.

2.      I am the President and Chief Executive Officer of IPG Holding, Inc., the General Partner of Vestavia Hills, Ltd., the debtor and debtor in possession herein ("Debtor").  I have held my position since 2016.  Prior to that time, I served the Debtor in various other capacities, some going back as far as 1998.  As part of my employment and service in these capacities, I am generally familiar with the Debtor's history, day-to-day operations, business and financial affairs, and books and records, as well as the Debtor's restructuring efforts.

3.      I submit this declaration in support of the Debtor's Motion for Order: (1)(A) Approving Stalking Horse Agreement; (B) Approving Overbid Procedures; (C) Approving Retention of Broker; (D) Approving Rejection of Commonwealth Agreement; (E) Scheduling Final Sale Hearing; and (2)(A) Approving Sale of Assets Free and Clear; (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; And (C) Granting Related Relief.

4.      On January 3, 2020, the Debtor filed its petition for relief under Chapter 11.  The Debtor is operating its business as a debtor in possession under Sections 1107 and 1108.  See ECF 1.  No trustee, examiner or committee has been appointed.

**The Debtor's Business**

5.      The Debtor is an Alabama limited partnership with its home office and principal place of business in San Diego, California.  It operates a retirement community business in Vestavia Hills, Alabama commonly known as Mount Royal Towers.  The Debtor provides skilled nursing services and independent living services to approximately 150 elderly residents under its care in its Mount Royal Towers facility.  The Debtor employs 152 employees, including 136 who are paid on

an hourly basis and 17 who earn salaries.  In addition to its employees, the Debtor uses the services of independent contractors to perform specialized tasks that, for various reasons, the employees cannot perform.

**The Debtor's Prepetition Struggles and Efforts to Sell**

6.     Over the past six years, the Debtor has struggled to secure viable refinancing alternatives for the Wells Fargo loan – the arbitration of which resulted in an amount due of more than $18,000,000.  Refinancing proved challenging and unsuccessful due in part to the size of the loan debt, volatility in the industry, and post-2008 lender hesitance to make loans of this size and type.  During this same time, the Debtor has actively pursued a sale of its principal operating assets, including the Mount Royal Towers real estate and the related personal property (collectively, "Assets").  In 2016, the Debtor retained Blueprint Healthcare Real Estate Advisors ("Blueprint") to assist in evaluating and effecting a sale.  Blueprint is a real estate brokerage and advisory firm that specializes in senior housing and healthcare real estate.  In 2017, Blueprint found a potential buyer who entered into a purchase agreement for the Debtor's Assets–but after performing due diligence for several months, that buyer backed out of the sale.  Thereafter, the Debtor found a second buyer–Commonwealth–and entered into a sale agreement with it ("Commonwealth Agreement").  Despite the Debtor having provided Commonwealth with numerous extensions of time to close the transactions, Commonwealth never did so, and the contract ultimately terminated.  Commonwealth then launched the extensive litigation that became the key driver necessitating the Debtor's bankruptcy.

**The Debtor's Ongoing Operational Losses**

7.     Based on historical performance, the Debtor projects a monthly operating deficit on a cash basis of approximately $70,000 going forward for the next six months.  This operating deficit does not include interest payments to Wells Fargo, or professional fees in the Chapter 11 case–meaning that the Debtor's actual cash needs

/ / /

will be greater than $70,000 per month until such time as the Assets can be sold.  The Debtor's current cash position is approximately $141,000.

8.    At present, the Debtor's finances do not allow it to continue in business long term, given its ongoing operational losses, the large award just granted to Wells Fargo in the arbitration, and the ceaseless litigation with Commonwealth.  Of course, the most important constituents implicated here are the elderly residents of Mount Royal Towers.  They must be provided in-place uninterrupted continuity of care.  The best (and perhaps only) manner in which these residents can be protected is through an expedited sale of the Debtor's operating assets to a new owner qualified to own and operate the Mount Royal Towers facility.

**The Prepetition Stalking Horse**

9.    In recognition of all the foregoing events and factors, the Debtor began to explore the possibility of a section 363 bankruptcy sale free and clear of any disputed claims and interests of Commonwealth, the proceeds of which would be used to pay some or all of the Wells Fargo loan and hopefully other creditors.  In January of 2019, the Debtor re-engaged Blueprint to search further for a potential purchaser.  After extensive marketing, Blueprint identified a potential buyer to the Debtor which was willing to pursue this course of action and serve as a stalking horse bidder.  In the months leading up to the Chapter 11 filing, the Debtor negotiated and entered into, subject to Court approval and overbid, a stalking horse asset purchase agreement with a proposed buyer.  Commonwealth–seeking advantage in both the litigation and its efforts to drive the Debtor's business downwards so as to purchase it for itself as cheaply as possible–served discovery on the stalking horse.  The Debtor believes that Commonwealth's hostilities led this earlier stalking horse buyer to exercise its contractual right to terminate the purchase agreement–which it did on December 31, 2019, three days before the Debtor's bankruptcy petition was filed.

10.    Commonwealth's efforts to drive the price of the Debtor's assets lower have succeeded.  The purchase price in the 2017 agreement was $22,670,000.  The

original purchase price in the 2018 Commonwealth agreement was $19,000,000. The purchase price in the prior stalking horse agreement of 2019 was $17,000,000. Following the termination of the aforementioned earlier stalking horse agreement, the Debtor diligently and aggressively marketed its assets, which led to the Debtor's instant purchase agreement with the proposed Stalking Horse. The purchase price in the Agreement now at issue in this Motion is $12,000,000.

**The Current Stalking Horse**

11.     After Commonwealth drove away the pre-petition stalking horse, Blueprint immediately went back to work, approaching another potential bidder who had been on Blueprint's radar. Those discussions proved fruitful, and on February 6, 2020, the Debtor entered into a new stalking horse asset purchase agreement ("Agreement"), subject to Court approval and overbid, for substantially all of the Debtor's Assets, as well as assumption and assignment of certain executory contracts and unexpired leases to be designated (collectively, "Designated Contracts") with MED Healthcare Partners, LLC ("Stalking Horse"). A copy of the Agreement with the Stalking Horse is attached hereto as Exhibit C. The Stalking Horse is a proven provider of skilled nursing, assisted living, and rehabilitation services. Along with its partner management companies, it manages and operates over 115 skilled nursing facilities with over 10,000 resident beds in 20 states. In particular, it has bought assets out of bankruptcies in section 363 sales. Attached as Exhibit D hereto is a true and correct copy of an order from one such bankruptcy transaction. Accordingly, the Stalking Horse understands the section 363 sale process, and has demonstrated an ability to close purchases in the bankruptcy sale context.

12.     As described above, the purchase price, subject to overbid, is now $12,000,000. The Agreement provides for a breakup fee ("Breakup Fee") of $400,000 in the event that the Stalking Horse is overbid by a third party–and the Overbid Procedures provide for an initial overbid increment of $500,000, subsuming the

/ / /

Breakup Fee, so as to achieve a net economic "win" for the estate even if there is only one overbidder.  For additional detail, see the Agreement.

**The Requested Retention of Blueprint**

13.    Throughout Blueprint's extensive efforts since 2016 in securing multiple purchasers, given its commission-based engagement agreement, Blueprint has yet to be compensated by the Debtor.  With this Motion, the Debtor requests authority to employ Blueprint as its sole broker and real estate advisor for sale of the Debtor's Assets in connection with its Chapter 11 bankruptcy on a commission-based compensation basis, pursuant to section 327(a) of the Bankruptcy Code.  The Debtor requires the services of a real estate advisor and broker knowledgeable in the sale of healthcare real estate to adequately market and sell the Assets in the overbid period proposed in the Motion.

14.    It is necessary and essential that the Debtor employ Blueprint to provide healthcare real estate advisory services in this Chapter 11 case, including, but not limited to, the following services:

a.    to provide assistance with marketing, the sale, and closing on the sale of the Assets;

b.    to provide assistance with determining the sale price of the Assets;

c.    to prepare marketing materials and recommend a strategy for the sale of the Assets;

d.    to screen and pre-qualify prospective overbid purchasers; and

e.    to provide the assistance of an agent licensed in Alabama where the Debtor's Mount Royal Towers facility is located.

15.    The Debtor desires to employ Blueprint under a new commission-based engagement agreement ("Blueprint"), a copy of which is attached as Exhibit A to the Declaration of Jacob Gehl ("Gehl Declaration").  The agreement provides for a commission equal to one and one-half percent (1.5 %) of the purchase price to be paid in full directly from sale proceeds upon closing.  Blueprint will bear the cost of its

own expenses.  See Exhibit A to the Gehl Declaration, ¶15.  The Debtor believes that Blueprint's proposed commission is at "market" and is reasonable under the circumstances.

**The Proposed Overbid Procedures**

16.     The Debtor proposes to solicit overbids for the Assets utilizing the Overbid Procedures. The Overbid Procedures describe, among other things, the Assets available for sale, the manner in which bidders and bids become "qualified," the coordination of due diligence activities among Qualified Bidders and the Debtor, the receipt and negotiation, in concert with the Debtor and Debtor's counsel, of overbids received, the conducting of any auction, and the selection and approval of a winning bidder (and possibly a backup bidder).  The Overbid Procedures also provide for the assumption and assignment of the Designated Contracts, including cure procedures, pursuant to Bankruptcy Code section 365.  Greater detail is contained in the Overbid Procedures attached to the Motion as Exhibit A.

17.     The Overbid Procedures were developed consistent with the Debtor's competing needs to promote participation and active bidding while at the same time minimizing the risk of business disruption associated with a prolonged stay in Chapter 11.  The Overbid Procedures reflect the Debtor's objective of conducting the auction in a controlled, fair, and open manner while enabling the Debtor to select the highest or otherwise best offer for the Assets.

**The Proposed Marketing and Advertising**

18.     The Debtor proposes that Blueprint–who has been marketing the Assets for several years–continue marketing them for approximately another 45 days following entry of the Court's order approving the Overbid Procedures.  Blueprint intends to implement an aggressive email and telephone campaign to contact the appropriate portion of the 20,000 clients in its industry-related database.  Blueprint will also advertise the sale in Senior Housing Business's "Southeast" publication, as well as in the Alabama Business Journal.  The Debtor believes it is unlikely that a

buyer for Mount Royal Towers would be identified from a national newspaper ad, and accordingly, the Debtor does not intend to use such media for further advertising for the sale.

**<u>The Proposed Sale Notice</u>**

19. The Debtor also requests approval of the Sale Notice to facilitate the sale process and enable the Debtor to provide interested parties with adequate and sufficient notice of the proposed auction and the sale hearing. The Debtor proposes to serve, no later than two business days following the Court's entry of the Overbid Procedures Order, a copy of the Sale Notice (which includes the Overbid Procedures and the order approving them) by first-class mail, postage prepaid upon (a) the Office of the United States Trustee; (b) counsel for Wells Fargo; (c) counsel for Commonwealth; (d) all counterparties to Designated Contracts; (e) all entities with recorded claims, liens, interests, or encumbrances against the Debtor's right, title, and interest in the Assets and any other entities reasonably known to have asserted any such claim, liens, interests, or encumbrances; (f) all entities reasonably known to have expressed a bona fide interest in acquiring some or substantially all of the Debtor's assets during the six (6) months preceding the date hereof; (g) the Internal Revenue Service; (h) the Securities Exchange Commission; and (i) all known creditors of the Debtor. The Debtor submits that doing so will constitute sufficient notice of the sale under the facts and circumstances of this case.

**<u>The Rejection of the Disputed Commonwealth Agreement</u>**

20. As described above, after nine amendments which included multiple closing extensions provided by the Debtor to Commonwealth, it became apparent to the Debtor and to the Debtor's litigation counsel in Alabama at the Campbell Partners firm that Commonwealth had alternative motives and intentions with respect to its purchase of Mount Royal Towers. After Commonwealth failed to obtain the necessary government operating approvals by the deadlines set forth under the Purchase Agreement, as amended, the Debtor could not agree to further delay closing

without running afoul of the loan forbearance deadline imposed by Wells Fargo and without risking its licensing in Alabama for the facility. Accordingly, on November 16, 2018, the Commonwealth Agreement terminated.

21.    As of the Petition Date, the Debtor does not believe that the terminated Commonwealth Agreement was executory. Nonetheless, out of an abundance of caution, with this Motion, the Debtor seeks Court approval to reject the Commonwealth Agreement pursuant to Section 365 of the Bankruptcy Code to the extent it or any portion of it is executory. As has become clear, attempting to further engage with Commonwealth has and will only lead to further litigation–the last thing the Debtor can afford, and the last thing that the residents of Mount Royal Towers need and deserve.

22.    The Debtor believes that the Overbid Procedures will increase the likelihood that the Debtor will receive the greatest possible consideration for the Assets because such procedures will ensure a competitive and fair bidding process. The Debtor also believes that the Overbid Procedures will promote active bidding from seriously interested parties and will generate the highest or otherwise best offer reasonably available for the Assets. The Overbid Procedures will allow the Debtor to conduct the auction–if a qualified overbid is received–in a controlled, fair and open manner that will encourage participation by financially capable bidders that demonstrate the ability to close the sale. The Debtor believes that the Overbid Procedures will encourage bidding, are consistent with other procedures previously approved by courts in this and other districts, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. The Overbid Procedures were designed with the input of Blueprint, the Debtor's broker and advisor, who has extensive experience not only with the Debtor's Assets, but in the senior housing and healthcare real estate market generally, including having closed approximately 270 transactions valued at over $5.6 billion. Specifically, Blueprint has significant experience selling senior housing and

healthcare real estate and operating businesses in the distressed context, including Section 363 sales in bankruptcy as set forth in the Gehl Declaration at paragraph 15.

23. Accordingly, the Debtor submits that the Overbid Procedures are reasonable and appropriate, and demonstrate an exercise of the Debtor's sound business judgment, as such procedures are designed to maximize the value to be received by the Debtor's estate for the Assets.

24. As part of the relief requested herein, the Debtor also seeks authority under Sections 105(a) and 365 of the Bankruptcy Code to assume and assign all Designated Contracts designated by the winning bidder. The Overbid Procedures specify the process by which the Debtor will serve notice of the potential assumption/ assignments and cure amounts on counterparties, and the procedures and deadlines for counterparties to file objections. These procedures ensure that each counterparty will have sufficient notice of such assumption and assignment, and an opportunity to contest the cure amount, if any, for its assumed contract, as well as the ability of the successful bidder to provide adequate assurance of future performance with respect to such contract. Accordingly, the Debtor submits that the procedures for the assumption and assignment of the Designated Contracts are fair and reasonable, and respectfully requests that the Court approve such procedures.

25. Here, the Debtor cannot continue to operate indefinitely. It loses money each month. Its value continues to decline, as shown by the various dwindling purchase prices over the last few years. The Debtor does not have the funds to pay off the Wells Fargo loan in full. At some, point, Wells Fargo could be permitted to foreclose–a result likely to bring significant hardship upon the residents of Mount Royal Towers. The Debtor's Assets must be sold quickly and with the certainty that a section 363 sale process brings to bear.

26. With the Overbid Procedures, the Assets will receive extensive marketing–on top of the years of marketing they have already had. Their value will be tested through the auction and sale process contemplated by the Overbid Procedures.

Consequently, the fairness and reasonableness of the consideration to be paid by the successful bidder will be demonstrated by adequate "market exposure" and an open and fair auction and sale process–the best means for establishing whether a fair and reasonable price is being paid. Thus, the Debtor submits that the consideration paid by successful bidders will constitute the highest or otherwise best offer for the transferred Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. As such, the Debtor's determination to sell the Assets through a section 363 auction and sale process, as provided for in the Overbid Procedures, is a valid and sound exercise of the Debtor's business judgment.

27. For the reasons described above, as of the Petition Date, the Debtor does not believe that the terminated Commonwealth Agreement was executory. Nonetheless, out of an abundance of caution, the Debtor also seeks Court approval to reject the Commonwealth Agreement pursuant to section 365 to the extent it is executory,. As has become clear, attempting to further engage with Commonwealth will only lead to further litigation–the last thing the Debtor can afford, and the last thing that the residents of Mount Royal Towers need and deserve. To the extent that the Commonwealth Agreement remains executory–which the Debtor disputes–it holds no benefits for the estate, only burdens, and rejecting it will pave the way for the proposed sale, realizing maximum value for the Debtor's Assets, and ensuring continued quality of care for residents. Accordingly, rejection is in the best interests of the estate, and well warranted by the Debtor's business judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 13, 2020, at San Diego, California.

Kevin Moriarty

**EXHIBIT TABLE**

| Exhibit | Description | Pages |
|---|---|---|
| **A** | Overbid Procedures Order | 13–21 |
| **B** | Sale Order | 22–27 |
| **C** | Asset Purchase Agreement with Stalking Horse | 28–101 |
| **D** | Order from Previous Bankruptcy Transaction | 102–123 |
| **E** | Notice of Sale | 124–128 |

**EXHIBIT A**

**CSD 1001A** [07/01/18]

Name, Address, Telephone No. & I.D. No.
SULLIVAN HILL REZ & ENGEL, APLC
James P. Hill, SBN 90478 / Christopher V. Hawkins, SBN 222961
600 B Street, 17th Floor
San Diego, CA 92101
Telephone: (619) 233-4100 / Fax Number: (619) 231-4372
Attorneys for Debtor and Debtor In Possession, Vestavia Hills, Ltd. dba Mount Royal Towers

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

In Re
VESTAVIA HILLS, LTD. dba Mount Royal Towers,

Debtor.

BANKRUPTCY NO. 20-00018-LA11

Date of Hearing:
Time of Hearing:
Name of Judge: Hon. Louise DeCarl Adler

**ORDER ON**

**BID PROCEDURES MOTION**

The court orders as set forth on the continuation pages attached and numbered 2 through _____ with exhibits, if any, for a total of _____ pages. Motion/Application Docket Entry No. _____.

//

//

//

//

//

//

//

DATED:

_______________________________
Judge, United States Bankruptcy Court

The Court having considered the motion ("Motion") of Vestavia Hills, Ltd. dba Mount Royal Towers ("Debtor"), the debtor and debtor in possession herein, for entry of:

(a) an order (the "Overbid Procedures Order") (i) approving MED Healthcare Partners, LLC as the "Stalking Horse Bidder" in connection with the proposed sale ("Sale") of substantially all of the Debtor's assets pursuant to the terms of an "Asset Purchase Agreement" attached as an exhibit to the Motion (ii) authorizing and approving certain proposed procedures, substantially in the form attached as Exhibit "A" hereto ("Overbid Procedures") in connection with the proposed Sale, certain proposed assumption and assignment procedures in connection with the Sale, and certain notice procedures, substantially in the form attached as Exhibit "B" hereto ("Sale Notice"), (iii) scheduling a hearing (the "Sale Hearing") to consider final approval of the Sale; and (iv) granting related relief; and

(b) following the Sale Hearing, an order ("Sale Order") (i) approving the Sale to the successful bidder or back-up bidders , (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases (collectively, "Assumed Contracts"), and (iii) granting related relief;

the Court having held a hearing on the Motion; having made findings of fact as reflected on the record of the hearing which are hereby incorporated into this Order pursuant to Rule 52 (a)(1) of the Federal Rules of Civil Procedure, as incorporated by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure; it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors, and all other interested parties; notice appearing proper; and good cause appearing therefor,

IT IS HEREBY ORDERED that:

1) The Motion is granted. All terms not defined herein shall have the meaning given them in the Motion.
2) The Asset Purchase Agreement is approved, subject to overbid pursuant to the terms of the Overbid Procedures.
3) MED Healthcare Partners, LLC is approved as the Stalking Horse Bidder, subject to overbidding as set forth herein. This approval includes the Break-Up Fee in the amount of four hundred thousand dollars ($400,000.00).
4) The Overbid Procedures, attached as Exhibit "A" hereto, are approved and incorporated into this Order by reference, as though fully set forth herein.
5) The Court will conduct the Sale Hearing on __________, 2020 at ___.
6) In order to be considered qualifying, an overbid must be received by the Debtor's Bankruptcy Court-appointed broker, Blueprint Healthcare Real Estate Advisors, LLC, Attn.: Jacob Gehl, no later than __________ 2020 (21 days before the Sale Hearing by electronic email as follows: jacob@blueprintHCRE.com.
7) On or before _________, 2020 (14 days prior to the Sale Hearing), the Debtor will file with the Bankruptcy Court and serve on each nondebtor party to a Contract or Lease a notice of potential assumption and assignment.
8) Each non-debtor party to a Contract or Lease shall have until _________, 2020 (7 days prior to the Sale Hearing) to file and serve any objection to the assumption and assignment of the Contract or Lease and/or the Cure Amount and must state in its objection with specificity what Cure Amount the party contends is required (with appropriate documentation).
9) To the extent that the Commonwealth Agreement, or any portion of it, remained executory as of the commencement of Debtor's bankruptcy case, which this Court does not find or conclude, it is hereby rejected pursuant to Bankruptcy Code section 365, as a proper exercise of the Debtor's business judgment. The parties to that contract reserve all rights to claims and defenses arising out of termination or breach of that contract notwithstanding its rejection or prior termination.
10) The Sale Notice is approved.
11) The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bid Procedures.
12) Notwithstanding Federal Rules of Bankruptcy Procedure 6004(h), 6006(d) or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.
13) This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

IT IS SO ORDERED.

Case 20-00018-LA11 Filed 02/13/20 Entered 02/13/20 18:22:23 Doc 121-1 Pg. 16 of 128
Exhibit A

**EXHIBIT A**

Exhibit A
Page 16

# Overbid Procedures

Vestavia Hills, Ltd. dba Mount Royal Towers
USBC Case No. 20-00018-LA11

Escrow Agent: Riverside Abstract
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
Email: Alazarus@rsabstract.com
Attention: Aryeh Lazarus

Vestavia Hills, Ltd. ("Debtor") is a Chapter 11 debtor in possession in the bankruptcy case currently pending in the United States Bankruptcy Court for the Southern District of California ("Bankruptcy Court"). These Overbid Procedures were approved by order of the Bankruptcy Court entered___________, 2020.

## Assets to be Sold

The assets to be sold comprise substantially all of the Debtor's business assets, and include all real and personal property owned by the Debtor used in the operation of a senior housing community in Vestavia Hills, Alabama, commonly known as Mount Royal Towers. The assets are described in more detail in the Asset Purchase Agreement (defined below).

## Stalking Horse Asset Purchase Agreement

The Bankruptcy Court's_____________, 2020 order also approved an "Asset Purchase Agreement" entered into between the Debtor as seller and MED Healthcare Partners, LLC or its designee or designees ("Stalking Horse") as buyer, subject to the Overbid Procedures described herein. A copy of the Asset Purchase Agreement is attached hereto. All terms not defined herein shall have the meaning given them in the Asset Purchase Agreement.

## Purchase Price/Overbid Increments

The Asset Purchase Agreement calls for a purchase price of $12,000,000, and is subject to these Overbid Procedures described herein. The initial overbid increment is $500,000–meaning the initial overbid must be $12,500,000 or more.

**Due Diligence Materials**

In order to receive access to due diligence materials, parties interested in overbidding must provide the Escrow Agent with an executed nondisclosure agreement in a form approved by Debtor.

**Submitting a Qualified Bid**

In order to submit a qualified bid, a bidder must provide the Escrow Agent no later than______________, 2020 (21 days before the Sale Hearing):

- A fully-executed Overbidder Agreement in substantially the form attached hereto, together with a redline showing any changes.
- A cash deposit of $____________ nonrefundable unless the bidder is not selected as the winner.
- Evidence of ability to close satisfactory to the Debtor in its sole discretion.
- A list of the contracts the bidder is offering to have assumed and assigned to it pursuant to section 365 of the Bankruptcy Code (each a “Contract” and collectively the “Contracts”).
- Evidence satisfactory to the Debtor in its sole discretion to permit the Debtor to determine the bidder’s ability to comply with section 365 of the Bankruptcy Code, including providing adequate assurance of such assignee’s ability to perform in the future with respect to any Contract proposed to be assumed and assigned.

**Due Diligence Deadline**

Due diligence must be completed by the time a bid is submitted. The Overbidder Agreement so provides and does not permit a “diligence out” or other basis to withdraw once a bid has been submitted.

**“As Is, Where Is”**

The sale of the Assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, except, with respect to a successful bidder, to the extent set forth in the relevant Overbidder Agreement of such successful bidder approved by the Bankruptcy Court.

**Free of Any and All Claims and Interests**

The assets shall be sold free and clear of all Encumbrances to the maximum extent permitted under section 363(f) of the Bankruptcy Code, except for Permitted Encumbrances and those liabilities of Seller expressly assumed or agreed to be discharged by the winning bidder.

**Bid Deadline**

In order to be considered for qualifying, a bid must be received by the Debtor's Bankruptcy Court-appointed broker, Blueprint Healthcare Real Estate Advisors, LLC, ATTN: Jacob Gehl, no later than ____________ 2020 (21 days before the Sale Hearing (defined below) by electronic email as follows: jacob@blueprintHCRE.com

**Cure Amounts Associated With Assumed and Assigned Contracts**

On or before___________, 2020 (14 days prior to the Sale Hearing), the Debtor will file with the Bankruptcy Court and serve on each nondebtor party to a Contract or Lease a notice of potential assumption and assignment (the "Cure Notice"). The Cure Notice shall state the cure amount that the Debtor believes is necessary to assume such Contract or Lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and notify each party that such party's Contract or Lease is subject to potential assumption and assignment to one of the qualified bidders at the conclusion of the Sale Hearing. Each non-debtor party to the Contracts or Leases shall have until _____________, 2020 (7 days prior to the Sale Hearing) to file and serve any objection to the assumption and assignment of the Contract or Lease and/or the Cure Amount and must state in its objection with specificity what Cure Amount the party contends is required (with appropriate documentation in support thereof). If no objection is timely received, the Cure

Amount set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Contract or Lease, or any other document, and the non-Debtor party to the Contract or Lease shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims as to such Contract or Lease against the Debtor, an assignee of the Contract or Lease, or the property of any of them. If an objection to the Cure Amount is timely filed and received and the parties are unable to consensually resolve the dispute, the amount to be paid under section 365 of the Bankruptcy Code, if any, with respect to such objection will be determined at the Sale Hearing or at a subsequent hearing date to be determined by the Bankruptcy Court. Cure Amounts with respect to any Contract or Lease that is assumed and assigned to a purchaser shall be paid out of the proceeds of sale.

**Sale Hearing/Auction**

On______________, 2020 at___, the Bankruptcy Court will conduct a "Sale Hearing." In the event that no qualified overbid has been timely received, the Debtor will request that the Bankruptcy Court approve the sale of the Debtor's assets to the Stalking Horse on the terms set forth in the Asset Purchase Agreement. In the event that one or more qualified overbids have been received, the Debtor will conduct an auction in the Bankruptcy Court. In order to bid at the auction, a party must have timely submitted a qualified overbid as described above. Subsequent overbid increments will be in amounts of $100,000 or such other amount as the Debtor may set and the Bankruptcy Court may approve. The Debtor retains full discretion to select the "highest and best" bid and to request that the Bankruptcy Court approve it as the winning bid. The Debtor may also request that the Bankruptcy Court approve one or more "back up" bids, with whom the Debtor will close if the winning bidder fails to do so. The Stalking Horse shall not be required to be a "back up" bidder.

**Closing**

The closing shall take place on or about the date which shall be the first day of the month following the last to occur of the following, or such earlier date as the Parties may agree:

(i) ten (10) days following Buyer's receipt of approval of the change of ownership and the issuance of any other license or Certificates of Need (if applicable) necessary for the operation of the Facility by the Alabama Department of Public Health ("ADPH") and the Alabama State Health Planning and Development Agency ("SHPDA"), including without limitation the New Operator Licenses; and

(ii) the Sale Order has become a Final Order.

**Questions Regarding Overbid Procedures**

Questions regarding these Overbid Procedures should be directed to the Debtor's Bankruptcy Court-approved broker: Blueprint Healthcare Real Estate Advisors, LLC, ATTN: Jacob Gehl, jacob@blueprintHCRE.com, 310.893.7182.

Case 20-00018-LA11 Filed 02/13/20 Entered 02/13/20 18:22:23 Doc 121-1 Pg. 22 of 128
Exhibit B

**EXHIBIT B**

Exhibit B
Page 22

CSD 1001A [07/01/18]

Name, Address, Telephone No. & I.D. No.
SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
James P. Hill, SBN 90478 / Christopher V. Hawkins, SBN 222961
600 B Street, 17th Floor
San Diego, CA 92101
Telephone: (619) 233-4100 / Fax: (619) 231-4372
Attorneys for Debtor and Debtor In Possession,
Vestavia Hills, Ltd. dba Mount Royal Towers

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

In Re
VESTAVIA HILLS, LTD. dba Mount Royal Towers,

Debtor.

BANKRUPTCY NO. 20-00018-LA11

Date of Hearing:
Time of Hearing:
Name of Judge: Hon. Louise D. Adler

## ORDER ON

**DEBTOR'S MOTION FOR ORDER: (1)(A) APPROVING STALKING HORSE AGREEMENT; (B) APPROVING OVERBID PROCEDURES; (C) APPROVING RETENTION OF BROKER; (D) APPROVING REJECTION OF COMMONWEALTH AGREEMENT; (E) SCHEDULING FINAL SALE HEARING; AND (2)(A) APPROVING SALE OF ASSETS FREE AND CLEAR; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

//

The court orders as set forth on the continuation pages attached and numbered 2 through with exhibits, if any, for a total of pages. Motion/Application Docket Entry No. .

//

//

//

//

//

//

DATED:

Judge, United States Bankruptcy Court

Case 20-00018-LA11 Filed 02/13/20 Entered 02/13/20 18:22:23 Doc 121-1 Pg. 24 of 128

**CSD 1001A** [07/01/18]**(Page 2)**
ORDER ON DEBTOR'S MOTION FOR ORDER: (1)(A) APPROVING STALKING HORSE AGREEMENT; (B) APPROVING OVERBID PROCEDURES; (C) APPROVING RETENTION OF BROKER; (D) APPROVING REJECTION OF COMMONWEALTH AGREEMENT; (E) SCHEDULING FINAL SALE HEARING; AND (2)(A) APPROVING SALE OF ASSETS FREE AND CLEAR; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF

Exhibit B

DEBTOR: VESTAVIA HILLS, LTD. dba Mount Royal Towers, CASE NO: 20-00018-LA11

The Court having considered the motion ("Sale Motion") of Vestavia Hills, Ltd. dba Mount Royal Towers ("Debtor"), the debtor and debtor in possession herein, for entry of:

(a) an order (the "Bid Procedures Order") (i) approving MED Healthcare Partners, LLC ("MED") as the "Stalking Horse Bidder" in connection with the proposed sale ("Sale") of substantially all of the Debtor's assets pursuant to the terms of an "Asset Purchase Agreement" attached as an exhibit to the Motion (ii) authorizing and approving certain proposed procedures, substantially in the form annexed hereto as Exhibit "A" ("Bid Procedures") in connection with the proposed Sale, certain proposed assumption and assignment procedures in connection with the Sale, and certain notice procedures, substantially in the form annexed hereto as Exhibit "B" ("Sale Notice"), (iii) scheduling a hearing (the "Sale Hearing") to consider final approval of the Sale; and (iv) granting related relief; and

(b) following the Sale Hearing, an order ("Sale Order") (i) approving the Sale to the Successful Bidders or Back-Up Bidders , (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases (collectively, "Assumed Contracts"), and (iii) granting related relief;
the Court having held an initial hearing on the Sale Motion on ________, 2020, and having entered the Bid Procedures Order (ECF __); the Court having held a second hearing on the Sale Motion on ____________ 2020; it appearing that the relief requested in the Sale Motion is in the best interests of the Debtor, its estate, its creditors, and all other interested parties; notice appearing proper; and good cause appearing therefor,

IT IS HEREBY FOUND THAT:

(a) The notice given of the hearing on the Sale Motion was appropriate and complied in all material respects with the requirements of the sale procedures ("Overbid Procedures") approved by order of the Court entered on __________ [Docket No. ___] ("Bid Procedures Order"), the Federal Bankruptcy Rules and the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of California ("Local Bankruptcy Rules") and such notice was otherwise good and sufficient, and appropriate under the particular circumstances, and no other or further notice of the Sale Motion or the hearing on the Sale Motion is required in order to effectuate the relief granted in this Order. A reasonable opportunity to object to, or be heard with respect to, the Sale Motion and the relief requested therein has been afforded to all interested persons and entities.

(b) The Debtor and its professionals engaged in fair and reasonable efforts, under the circumstances of this case, to obtain a fair price for the Assets, and the consideration to be paid by MED for the Assets provided for by the Agreement is fair.

(c) The Debtor has complied materially with all Overbid Procedures with respect to the sale of the Assets. The auction of the Assets was fair to all parties-in-interest and complied materially with all Overbid Procedures.

(d) The terms and conditions of the Agreement (i) are fair and reasonable, (ii) represent the highest and best offer for the Assets, and (iii) will provide, from a sale of the Assets, a greater recovery for the Debtor's creditors than would be provided by any other alternative for the sale or other disposition of the Assets. The Purchase Price provided by the Agreement constitutes fair consideration for the Assets. The Debtor's entering into and consummating the Agreement is a sound exercise of the Debtor's business judgment. The transaction contemplated by the Agreement is in the best interests of the Debtor's creditors and estate.

CSD 1001A

Exhibit B
Page 24

Case 20-00018-LA11 Filed 02/13/20 Entered 02/13/20 18:22:23 Doc 121-1 Pg. 25 of 128
**CSD 1001A** [07/01/18]**(Page 3)** Exhibit B
ORDER ON DEBTOR'S MOTION FOR ORDER: (1)(A) APPROVING STALKING HORSE AGREEMENT; (B) APPROVING OVERBID PROCEDURES; (C) APPROVING RETENTION OF BROKER; (D) APPROVING REJECTION OF COMMONWEALTH AGREEMENT; (E) SCHEDULING FINAL SALE HEARING; AND (2)(A) APPROVING SALE OF ASSETS FREE AND CLEAR; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF
DEBTOR: VESTAVIA HILLS, LTD. dba Mount Royal Towers, CASE NO: 20-00018-LA11

(e) Good cause exists to authorize the Debtor to sell the Assets free and clear of all Encumbrances (other than Permitted Encumbrances), Excluded Liabilities and interests of any kind or nature because one or more of the requirements set forth in Section 363(f) of the Bankruptcy Code have been satisfied.

(f) The Agreement was negotiated, proposed and entered into by and between the Debtor and MED without collusion, in good faith, and from arm's-length bargaining positions. There has been no fraud or collusion with respect to the auction, or any manipulation with respect to the bidding or sale price with respect to the transaction between the Debtor and MED. Neither the Debtor nor MED has engaged in any conduct that would cause or permit the Agreement, or the transaction contemplated thereby, to be invalidated or avoided under Section 363(n) of the Bankruptcy Code. Accordingly, upon consummation of the transaction contemplated by the Agreement, MED will be a buyer in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code, and, as such, is entitled to the protections afforded by Section 363(m) of the Bankruptcy Code.

(g) MED was the highest and best bidder for the Assets.

(h) Good cause exists to authorize the Debtor to execute any document, and to take any act, appropriate to effectuate the Agreement.

(i) In light of the Debtor's need to consummate the sale of the Assets expeditiously in order to preserve and maximize value for the Debtor's estate and its creditors, good cause exists to waive the 14-day stays of orders provided by Rules 6004(h) and 6006(d) of the Federal Bankruptcy Rules.

IT IS HEREBY ORDERED that:

1) The Sale Motion is granted. All terms not defined herein shall have the meaning given them in the Sale Motion, or if not defined in the Sale Motion, then in the Agreement.

2) All objections to the Sale Motion are overruled.

3) All persons and entities given notice of the Sale Motion who failed to object timely to the relief granted hereby are hereby deemed to consent to the relief granted hereby.

4) All of the terms and conditions of the Agreement are hereby approved, and the Debtor is hereby authorized, pursuant to Sections 105(a), 363(b), (f) and (m) of the Bankruptcy Code to sell and to assign to MED the Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), Excluded Liabilities and interests of any nature whatsoever, for a Purchase Price of $12,000,000, pursuant to the terms and conditions of the Agreement.

5) Except as otherwise set forth in the Agreement, the sale to MED of the Assets shall be "AS IS," "WHERE IS," and "WITH ALL FAULTS" without any representations or warranties of any kind whatsoever made by the Debtor with respect to the Assets.

CSD 1001A

Exhibit B
Page 25

Case 20-00018-LA11 Filed 02/13/20 Entered 02/13/20 18:22:23 Doc 121-1 Pg. 26 of 128

**CSD 1001A** [07/01/18]**(Page 4)**
ORDER ON DEBTOR'S MOTION FOR ORDER: (1)(A) APPROVING STALKING HORSE AGREEMENT; (B) APPROVING OVERBID PROCEDURES; (C) APPROVING RETENTION OF BROKER; (D) APPROVING REJECTION OF COMMONWEALTH AGREEMENT; (E) SCHEDULING FINAL SALE HEARING; AND (2)(A) APPROVING SALE OF ASSETS FREE AND CLEAR; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF
Exhibit B
DEBTOR: VESTAVIA HILLS, LTD. dba Mount Royal Towers, CASE NO: 20-00018-LA11

6) Pursuant to Sections 363(b) and (f) of the Bankruptcy Code, the Debtor is hereby authorized and empowered to: (i) perform under, consummate, and implement the Agreement; (ii) execute all additional instruments and documents which may be reasonably necessary or desirable to implement the Agreement and the transaction contemplated thereby; (iii) take all further acts as may be necessary or appropriate for the purposes of transferring, granting, or conveying the Assets to MED pursuant to the provisions of the Agreement; (iv) take such other and further acts as are contemplated by the Agreement or reasonably required to fulfill the Debtor's obligations under the Agreement, all without further order of this Court.

7) The transfer and sale of the Assets pursuant to this Order and the Agreement shall vest MED with good title to the Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), Excluded Liabilities and interests of any nature whatsoever, and any and all other rights, claims and interests of any nature whatsoever that may be asserted by any person or entity, including, without limitation, any entity asserting a secured claim against the Assets. Any entity hereafter asserting such an interest against the Assets shall be, and hereby is, forever barred from asserting such interest against the Assets and against MED.

8) Pursuant to Sections 365(a) and (f), at Closing, the Designated Contracts shown on Exhibit __ hereto will be assigned to MED, any objections to such assignment – including to cure amounts or adequate assurance of future performance – having been overruled.

9) At Closing, Blueprint shall be paid directly from escrow its commission of one and one-half percent (1.5%) of the Purchase Price.

10) MED is not, as a result of any acts taken by it in connection with the purchase of the Assets, (i) a successor to the Debtor, (ii) a continuation or substantial continuation of the Debtor or any enterprise of the Debtor, or (iii) the alter ego of the Debtor.

11) MED shall have no liability to any creditor or to any other person or entity as a purported successor to the Debtor. The consummation of the transaction provided by the Agreement shall not subject MED to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtor or any other person or entity by reason of such transaction, including, without limitation, any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever based on successor or transferee liability.

12) All Persons are hereby enjoined from taking any actions against MED, any Affiliate or assignee of MED, or the Assets to recover any claim that such Person has against Seller relating in any way to the Debtor, the Assets and/or the sale.

13) The Agreement and any related agreements, documents or other instruments may be modified, amended, or supplemented by the Debtor, on the one hand, and MED, on the other hand, in a writing signed by such parties, without further order of this Court, provided that any such modification, amendment or supplement does not have a materially adverse effect on the Debtor's estate.

14) The failure to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of the Court, MED, and the Debtor that the Agreement be authorized in its entirety.

CSD 1001A

Exhibit B
Page 26

Case 20-00018-LA11 Filed 02/13/20 Entered 02/13/20 18:22:23 Doc 121-1 Pg. 27 of 128

**CSD 1001A** [07/01/18]**(Page 5)**
ORDER ON DEBTOR'S MOTION FOR ORDER: (1)(A) APPROVING STALKING HORSE AGREEMENT; (B) APPROVING OVERBID PROCEDURES; (C) APPROVING RETENTION OF BROKER; (D) APPROVING REJECTION OF COMMONWEALTH AGREEMENT; (E) SCHEDULING FINAL SALE HEARING; AND (2)(A) APPROVING SALE OF ASSETS FREE AND CLEAR; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF
Exhibit B
DEBTOR: VESTAVIA HILLS, LTD. dba Mount Royal Towers, CASE NO: 20-00018-LA11

15) The Purchaser, as a buyer in good faith, shall be entitled to the protections of Section 363(m) of the Bankruptcy Code if this Order or any authorization contained herein is reversed or modified on appeal. Pursuant to Section 363(m) of the Bankruptcy Code, absent a stay of this Order pending appeal entered prior to the Closing of the transaction contemplated by the Agreement, the reversal or modification on appeal of this Order, or any provision hereof, shall not affect the validity of such transaction if such transaction is closed prior to such stay, reversal or modification on appeal.

16) The validity of the transaction contemplated by the Agreement approved hereby shall not be affected by the appointment of a trustee, the dismissal of the Debtor's case, or the conversion of the Debtor's case to one under Chapter 7 of the Bankruptcy Code.

17) Any conflict between the terms and provisions of this Order and the Agreement shall be resolved in favor of this Order.

18) This Order shall be binding in all respects upon MED, the Debtor, all creditors of the Debtor, including those creditors of the Debtor who purport to hold contingent, unliquidated or disputed claims, all holders of equity interests in the Debtor, all holders of Encumbrances and any trustee that may be appointed in the Debtor's Chapter 11 case or upon any conversion of the Debtor's case to one under Chapter 7 of the Bankruptcy Code. Nothing contained in any Chapter 11 plan confirmed in the Debtor's case, or in any order confirming any such Chapter 11 plan, shall conflict with or derogate from the provisions of this Order and this Order shall control to the extent of any such conflict or derogation.

19) The Debtor, MED, and all creditors, governmental units and other parties-in-interest are bound by, and shall comply with, the provisions of this Order and are hereby directed to take any and all acts appropriate to facilitate the prompt consummation of the transaction approved hereby.

20) This Order is and shall be (i) effective as a determination that, at the Closing and after MED's payment of the Purchase Price in accordance with the terms of the Agreement, any and all Encumbrances existing as to the Assets prior to the Closing Date have been unconditionally released, discharged and terminated as charges against the Assets and/or MED (but not as against the proceeds of the sale of the Assets to which any such interests attach), and (ii) binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

21) Notwithstanding the provisions of Rule 6004(h) or 6006(d) of the Federal Bankruptcy Rules, this Order shall be effective immediately after its entry absent a stay pending appeal of this Order.

22) This Court shall retain exclusive jurisdiction to (i) enforce and implement the terms and provisions of the Agreement, (ii) compel the Debtor or MED to perform its respective obligations under the Agreement, (iii) resolve any disputes, controversies or claims arising out of or relating to the Agreement or the transaction contemplated thereby, and (iv) interpret, implement and enforce the provisions of the Agreement and this Order.

CSD 1001A

Exhibit B
Page 27

Case 20-00018-LA11 Filed 02/13/20 Entered 02/13/20 18:22:23 Doc 121-1 Pg. 28 of 128
Exhibit C

**EXHIBIT C**

Exhibit C
Page 28

---

ASSET PURCHASE AGREEMENT

by and among

Vestavia Hills Ltd.

("Seller")

And

MED Healthcare Partners, LLC, or an entity to be formed

("Buyer")

Dated as of: February 6, 2020

**Table of Contents**

**Page**

ARTICLE 1 DEFINITIONS ..... 1
ARTICLE 2 SALE AND TRANSFER OF ASSETS ..... 8
2.1 Sale and Transfer of Assets ..... 8
2.2 Assets Free and Clear; Undertaking. ..... 8
2.3 Excluded Assets. ..... 8
2.4 Consideration for Sale and Transfer. ..... 9
2.5 Excluded Liabilities. ..... 10
2.6 Allocation of Purchase Price ..... 11
ARTICLE 3 EXPENSES; ADJUSTMENTS ..... 11
3.1 Expenses. ..... 11
3.2 Reconciliation of Proration Items. ..... 11
3.3 Payor Programs Receivables ..... 12
3.4 Surveys ..... 15
3.5 Employment. ..... 15
3.6 Transfer of Patient Trust Funds. ..... 17
3.7 Offset ..... 18
ARTICLE 4 INSPECTION ..... 18
4.1 Inspection Period. ..... 18
4.2 Title and Survey. ..... 20
4.3 Assumed Contracts. ..... 21
ARTICLE 5 BANKRUPTCY MATTERS ..... 21
5.1 Sale Motion. ..... 21
5.2 Break-Up Fee. ..... 22
5.3 Alternative Transaction. ..... 23
5.4 Certain Sale Order Matters. ..... 23
5.5 Executory Contracts and Unexpired Leases ..... 23

ARTICLE 6 CLOSING ..... 23
6.1 Closing. ..... 23
ARTICLE 7 REPRESENTATIONS AND WARRANTIES OF SELLER ..... 24
7.1 Organization, Corporate Power and Qualification. ..... 24
7.2 Financial Statements. ..... 24
7.3 Absence of Undisclosed Liabilities. ..... 25
7.4 Letters of Credit. ..... 25
7.5 Absence of Certain Recent Changes. ..... 25
7.6 Title to Assets. ..... 26
7.7 Other Representations Respecting Real Property. ..... 26
7.8 Personal Property. ..... 28
7.9 Contracts. ..... 28
7.10 Defaults. ..... 30
7.11 Inventory. ..... 30
7.12 Equipment. ..... 30
7.13 Permits and Licenses. ..... 30
7.14 Assets Necessary to Business. ..... 31
7.15 Litigation, etc. ..... 31
7.16 Court Orders, Decrees and Laws. ..... 31
7.17 Taxes. ..... 32
7.18 Non-Foreign Status; Patriot Act. ..... 32
7.19 Program Compliance. ..... 32
7.20 HIPAA Matters. ..... 33
7.21 Compliance Program. ..... 33
7.22 Reimbursement Matters. ..... 34
7.23 Environmental Matters. ..... 34
7.24 Insurance; Malpractice. ..... 35
7.25 Improper Payments. ..... 35
7.26 Certain Representations With Respect to the Facility. ..... 36
7.27 Books of Account; Reports. ..... 37
7.28 No Finders or Brokers. ..... 37
7.29 Enforceability; Authority; No Conflict. ..... 38
7.30 Consents and Approvals of Governmental Authorities. ..... 38

7.31 Knowledge; Miscellaneous. .... 38
7.32 Disclosure. .... 39
7.33 “Life Care” Contracts. .... 39
ARTICLE 8 REPRESENTATIONS AND WARRANTIES OF BUYER .... 39
8.1 Organization; Corporate Power and Qualification. .... 39
8.2 Binding Effect. .... 39
8.3 No Finders or Brokers. .... 40
8.4 Pending Litigation. .... 40
8.5 Court Orders, Decrees and Laws. .... 40
8.6 Taxes. .... 40
8.7 Labor Matters. .... 41
8.8 Consents and Approvals of Governmental Authorities. .... 41
8.9 Improper Payments. .... 41
8.10 Exchange Act Reports. .... 41
8.11 Disclosure. .... 41
ARTICLE 9 SURVIVAL OF REPRESENTATIONS AND WARRANTIES .... 41
9.1 Representations and Warranties. .... 41
9.2 AS-IS SALE. .... 42
ARTICLE 10 COOPERATION; LICENSURE APPROVALS; INTERIM PERIOD OPERATIONS OF THE FACILITY .... 43
10.1 Cooperation. .... 43
10.2 Interim Period Operations of Facility. .... 44
ARTICLE 11 COVENANTS OF BUYER .... 45
11.1 Commercially Reasonable Efforts to Secure Consents. .... 45
11.2 Information. .... 45
11.3 Corporate Action. .... 45
11.4 Handling of Documents. .... 45
11.5 Non-Disclosure. .... 45
11.6 Continuing Covenants. .... 45
11.7 Seller’s Post-Closing Access to Records. .... 46
ARTICLE 12 COVENANTS OF SELLER .... 46
12.1 Access and Information. .... 46
12.2 Personnel Matters. .... 47

12.3 Cost Reports; Reimbursement Matters. .......... 48
12.4 Departmental Violations. .......... 48
12.5 Update Disclosures; Seller's Right and Duty to Notify. .......... 48
ARTICLE 13 CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLER .......... 49
13.1 Bankruptcy Court Approval. .......... 49
13.2 Elimination of the Lis Pendens. .......... 49
13.3 Payment of Purchase Price. .......... 49
13.4 Representations and Warranties True; Performance of Covenants. .......... 49
13.5 Authority. .......... 49
13.6 No Obstructive Proceeding. .......... 49
13.7 No Agency Proceedings. .......... 49
13.8 Documents of Transfer. .......... 50
ARTICLE 14 CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER .......... 50
14.1 Representations and Warranties True; Performance of Covenants. .......... 50
14.2 No Obstructive Proceeding. .......... 50
14.3 Bankruptcy Court Approval. .......... 51
14.4 Documents of Transfer. .......... 51
14.5 Consents and Approvals. .......... 51
14.6 No Material Adverse Change. .......... 51
14.7 Federal and State Approvals; Licensing. .......... 51
14.8 Title Insurance. .......... 52
14.9 Delivery of Certain Documents. .......... 52
14.10 No Outstanding Governmental Liability .......... 52
ARTICLE 15 TERMINATION; PRE-CLOSING BREACH .......... 52
15.1 Optional Termination. .......... 52
15.2 Termination. .......... 52
15.3 Default. .......... 52
ARTICLE 16 MISCELLANEOUS .......... 53
16.1 Condemnation, Damage and Destruction. .......... 53
16.2 Expenses. .......... 54
16.3 Non-Solicitation. .......... 54
16.4 Prohibition on Use of Name; Consent. .......... 55

16.5 Cooperation. 55
16.6 Notices. 55
16.7 Entire Agreement. 56
16.8 Governing Law/Jurisdiction/Venue. 56
16.9 Section Headings. 56
16.10 Exhibits. 56
16.11 Assignment. 57
16.12 Binding on Successors and Assigns 57
16.13 Amendments. 57
16.14 Drafting Party 57
16.15 Counterparts. 57
16.16 Reproduction of Documents. 57
16.17 Press Releases. 58
16.18 Waiver of Special, Exemplary, Punitive and Consequential Damages. 58

# ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** ("Agreement") is entered into, subject to the Court approval described below, as of the 6th day of February, 2020, by and among Vestavia Hills, Ltd., an Alabama limited partnership ("Seller") and MED Healthcare Partners, LLC, a Delaware limited liability company, or an entity to be formed pursuant to Section 16.11(b) ("Buyer").

W I T N E S S E T H:

**WHEREAS**, Seller is the fee simple owner of the real estate located at 300 Royal Tower Drive, Vestavia Hills, AL 35209, as more particularly set forth and described on Exhibit A attached hereto (collectively, the "Land");

**WHEREAS**, Seller is the owner of the buildings, fixtures, certain personal property and improvements located on or in the Land (the "Improvements", and together with the Land, the "Real Property");

**WHEREAS**, Seller operates, or has previously operated, on the Real Property a 143-bed skilled nursing facility ("SNF"), a 98-bed assisted living facility ("ALF"), a 41-bed specialty care assisted living facility ("SCALF") and a 150-bed independent living facility ("ILF"), all as described on Exhibit A (collectively, the "Facility");

**WHEREAS,** Seller has filed a petition for relief under Chapter 11 of title 11 of the United States Code ("Bankruptcy Code") initiating a bankruptcy case ("Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of California ("Bankruptcy Court");

**WHEREAS**, Seller wishes to sell and Buyer wishes to purchase the Assets (as that term is hereinafter defined) subject to the terms and conditions set forth herein;

**NOW, THEREFORE**, for and in consideration of the premises, and the agreements, covenants, representations and warranties hereinafter set forth, and other good and valuable consideration, the receipt and adequacy all of which are forever acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

For the purposes of this Agreement, the following definitions shall apply:

"Accounts Receivable" means (a) all trade accounts receivable and other rights to payment from residents and customers of Seller and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of

products sold or services rendered to customers of Seller, (b) all other accounts or notes receivable of Seller and the full benefit of all security for such accounts or notes and (c) any claim, remedy or other right related to any of the foregoing.

"ADPH" is defined in Section 6.1.

"Affiliate" means with respect to Buyer and/or Seller, any entity that controls, is controlled by, or is under common control with either party.

"Assets" means all of Seller's right, title and interest in and to the following assets pertaining to Seller or the Facility:

(a)     the Real Property;

(b)     all furnishings, fixtures, equipment, computer hardware and other tangible personal property owned by Seller and used in the operation of the Facility wherever situated, to the extent assignable, including without limitation the items listed in Appendix 1B (the "FF&E");

(c)     all vehicles, if any, owned by Seller and used in the operation of the Facility, including without limitation the vehicles listed in Appendix 1C;

(d)     all of Seller's rights, benefits and interests under the Assumed Contracts (as hereinafter defined), including any agreements with the residents of the Facility; provided that Buyer specifically will not assume any union contracts or collective bargaining agreements;

(e)     to the extent transferable, Certificates of Need for 143 SNF beds and 41 SCALF beds;

(f)     Subject to Applicable Laws and Section 2.3 below, all books, records, documents and other writings used in connection with the operation of the Facility of which Seller is the owner and has the right to transfer same, provided Seller, its successors, agents, directors, shareholders or managing members shall have a continuing right to make copies of all documents at the expense of the person making such copies;

(g)     all inventory of materials and supplies of Seller on hand at the Closing, subject to Section 3.4;

(h)     Subject to Applicable Laws, all Medicare provider numbers and provider agreements, to the extent Seller has any interest in same and to the extent assignable if Buyer, in its sole discretion, shall elect to accept them;

(i)     Subject to Applicable Laws, all Medicaid provider numbers and provider agreements, to the extent Seller has any interest in same and to the extent assignable if Buyer, in its sole discretion, shall elect to accept them;

(j) all Payor Agreements with insurance companies and/or managed care organizations, to the extent Seller has any interest in same and to the extent transferable if Buyer, in its sole discretion, shall elect to accept them as an Assumed Contract hereunder;

(k) Except as provided in Section 2.3 below, all of Seller's right, title and interest in the name of the Facility any and all derivatives thereof and any other names used by Seller or the Facility, or to which Seller has any rights;

(l) All rights under any patent, trademark, service mark, trade name or copyright, whether registered or unregistered, and any applications therefore, and all computer software specific to the Facility (including software licenses, documentation and related object and source codes to the extent owned by Seller and transferable), technologies, websites, domain names, licenses, methods, formulations, data bases, trade secrets, technology rights and licenses know-how, inventions and any other intellectual property or other proprietary rights of any kind or nature used or useful in the operation of the Facility other than the Excluded Assets (the "Intellectual Property");

(m) all resident contracts or other agreements with residents of the Facility (the "Resident Agreements");

(n) the Patient Trust Funds and Property (as defined below);

(o) The goodwill of Seller in or arising from the operation of the Facility; and

(p) all other assets, personal or mixed, tangible or intangible, used in connection with the operation of the Facility;

*Provided*, *that*, in each instance above, ***other than the Excluded Assets***

"Assumed Liabilities" means those liabilities and obligations of Seller which accrue for performance subsequent to the Closing under the following:

(a) All Assumed Contracts expressly assumed by Buyer hereunder;

(b) All admissions agreements or residents' agreements for residents of the Facility entered into by Seller in the ordinary course of business and outstanding as of the Closing; and

(c) those liabilities of Seller specifically assumed by Buyer pursuant to the undertaking provided in Section 2.2 hereof or otherwise specifically assumed by Buyer pursuant to the provisions of this Agreement.

"Bid Procedures Order" is defined in Section 5.1(a) of this Agreement.

"Business Day" or "Business Days" means any weekday other than a weekday on which banks in the State of Alabama are authorized or required to be closed.

"Buyer" is defined in the introductory paragraph of this Agreement.

"CHOW" is defined in Section 7.30.

"Closing" and "Closing Date" are defined in Section 6.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Commencement Date of the Inspection Period" is defined in the definition of "Inspection Period" below.

"Commercially Reasonable Efforts" means the efforts that a reasonable Person would use in the individual circumstance, including the fact that the Contemplated Transactions will take place under the jurisdiction of and subject to the approval of the Bankruptcy Court, and taking all factors into account including without limitation giving reasonable consideration to its own interests, exercising discretion within its good faith business judgment and provided further that a Person required to use Commercially Reasonable Efforts under this Agreement will not be thereby required to take actions that would result in a Material Adverse Change in the benefits to such Person of this Agreement and the Contemplated Transactions or to dispose of or make any change to its business, expend any material funds or incur any other material burden.

"Contract" means all contracts and agreements related to the operation of the business of Seller.

"Contemplated Transactions" means all of the transactions contemplated by this Agreement.

"Data Room" means that certain box.com internet site, located at https://app.box.com/s/j2g8ybnpq7s7mh0cj2scxgvylc7n0ett, into which Seller has as of the Effective Date of this Agreement uploaded books, records, contracts and other information in connection with Buyer's diligence during the Inspection Period.

"Date of Seller's Acquisition" means the date upon which Seller commenced its ownership and operation of the Facility.

"Deposit" is defined in Section 2.4.

"Due Diligence Checklist" is defined in Section 4.1.

"Effective Date" means the date this agreement is signed by the Parties.

"Encumbrance" means any claim, charge, easement, servitude, assessment, encumbrance, encroachment, defect in title, security interest, bailment (in the nature of a pledge or for purposes of security), mortgage, deed of trust, the grant of a power to confess judgment, conditional sales and title retention, lease, sublease, option, right of first refusal or first offer, lien, hypothecation, pledge, restriction or other similar arrangement or interest in real or personal property, whether imposed by contract, law, equity or otherwise.

"Environmental Laws" is defined in Section 7.23.

“Escrow Agent” is defined in Section 2.4.

"Excluded Asset" is defined in Section 2.3.

"Excluded Liabilities" is defined in Section 2.5.

"Facility" has the meaning set forth in the Recitals.

"FF&E" is defined in the definition of “Assets” above.

“Final Order” means an Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Bankruptcy Rule 8002; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"GAAP" means generally accepted accounting principles for financial reporting in the United States, applied on a basis consistent with the basis on which the Seller Financial Statements were prepared.

"Governing Documents" means, with respect to any particular entity, (a) if a corporation, the articles or certificate of incorporation and the bylaws; (b) if a general partnership, the partnership agreement and any statement of partnership; (c) if a limited partnership, the limited partnership agreement and the certificate of limited partnership; (d) if a limited liability company, the articles of organization and operating agreement; (e) if another type of Person, any other charter or similar document adopted or filed in connection with the creation, formation or organization of the Person; (f) all equity holders' agreements, voting agreements, voting trust agreements, joint venture agreements, registration rights agreements or other agreements or documents relating to the organization, management or operation of any Person or relating to the rights, duties and obligations of the equity holders of any Person; and (g) any amendment or supplement to any of the foregoing.

"Governmental Authorization" means any consent, license, registration or permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

"Governmental Body" means any:

(a) nation, state, county, city, town, borough, village, district or other jurisdiction;

(b) federal, state, local, municipal, foreign or other government;

(c) governmental or quasi-governmental authority of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers);

(d) multinational organization or body;

(e) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; or

(f) official of any of the foregoing.

"Hazardous Substance" is defined in Section 7.23.

"Inspection Period" means the period beginning on the date hereof, subject to Buyer's receipt of substantially all the documents identified on the Due Diligence Checklist (the "Commencement Date of the Inspection Period"), and ending on the date that is no later than five (5) days after the Commencement Date of the Inspection Period, or any earlier date, at the sole discretion of Buyer . The Seller has delivered (by uploading to the Data Room) to the Buyer substantially all the documents identified on the Due Diligence Checklist.

"Intellectual Property" is defined in clause (l) of the definition of "Assets" above.

"Inventory" means the consumable inventory that is located at the Facility at the Closing, including, without limitation, all Inventory listed in Data Room; or en route to the Facility at the Closing pursuant to a purchase order assumed by Buyer as an Assumed Contract.

"IRS" means the Internal Revenue Service.

"Knowledge" shall have the meaning set forth in Article 7.

**"**Material Adverse Change" shall mean any circumstance, event, effect or change that, individually or in the aggregate, is or would reasonably be expected to be materially adverse to (1) the business, assets, results of operations or financial condition of the Facility taken as a whole, or (2) the ability of the Seller to perform its obligations under this Agreement or to consummate the transactions contemplated herein; provided, however, that in no event shall any of the following facts, circumstances, events, changes, occurrences or effects, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there is a Material Adverse Change: (i) any change in general economic, business, financial, credit or market conditions internationally, nationally or locally; (ii) any action taken by Seller that is expressly permitted or required by this Agreement; (iii) any occurrence generally affecting the residential health care industry, including any changes to reimbursement methodology; (iv) any change in GAAP or applicable law or the interpretation thereof; (v) any act of terrorism, war (whether or not declared), national disaster or any national or international calamity affecting the United States; (vi) any losses arising or incurred in the ordinary and usual course of operating the Seller's business; or (vii) any effect resulting from the execution of this Agreement, the

announcement of this Agreement, the consummation of the transactions contemplated hereby, the identity of Buyer or any breach by Buyer of any provision hereof.

"New Operator Licenses" means the transfer or issuance, as applicable, of new operating licenses to Buyer or its designee by ADPH with respect to the Facility, including without limitation, all licenses necessary to operate the Facility as a 143-bed skilled nursing facility, a 98-bed assisted living facility, a 41-bed specialty care assisted living facility, and a 150-bed independent living facility.

"Payor Programs" means (a) Medicare, Medicaid, TRICARE (formerly known as CHAMPUS) and any other federal or state governmental healthcare programs in which Seller is a participating provider in good standing, and (b) any health maintenance organization, preferred provider organization, health care service plan, health benefit plan, health insurance plan or other third party reimbursement and payment program in which Seller is a participating provider in good standing.

"Permitted Encumbrances" means the following:

(a)    Covenants, easements and agreements of record provided that they do not prohibit or adversely affect the maintenance of the structure or structures now on the Property;

(b)    Building, zoning, subdivision and other governmental laws, codes, acts and regulations, provided the same are not violated by the current use of the Property;

(c)    Consents for the erection of any structures on, under or above any streets, alleys, roads or highways which abut the Property;

(d)    Minor encroachments of the Property upon any street, road, alley, highway or adjoining premises;

(e)    Minor encroachments upon and affixations to the Property from any adjoining property;

(f)    Rights, if any, relating to the construction and maintenance by any public utility of wires, poles, pipes, conduits and appurtenances thereto, on, under or across the Property;

(g)    Minor variations between the record lot lines of the Property and those shown on the official tax map of the applicable county;

(h)    Real estate taxes, water charges, sewer rents, vault charges and other assessments not yet due and payable, subject to adjustment as provided in the Agreement;

(i)    Standard exceptions contained in the form of title insurance policy then issued by Title Company; and

(j)    encumbrances approved by Buyer pursuant to Section 4.2 below.

"Person" means any individual, corporation, partnership, joint venture, association, joint stock company, trust or unincorporated organization.

"Post-Closing Receivables" means all of the Accounts Receivable arising or generated from goods sold or services rendered on or after the Closing.

"Pre-Closing Receivables" means all of the Accounts Receivable arising or generated from goods sold or services rendered before the Closing.

"Purchase Price" is defined in Section 2.4.

"Real Property" has the meaning set forth in in the Recitals.

"Resident" or "Residents" means any Person who is residing in the Facility for the purpose of receiving treatment or services offered by the Facility, or who is receiving such services as an "out-patient", and shall include Persons commonly referred to as "patients" with respect to the operation of health care Facility.

"Sale Order" means a Final Order of the Bankruptcy Court in form and substance acceptable to Buyer that complies with the provisions of Section 5.1(b) of this Agreement approving, *inter alia*, (a) the sale of the Assets to Buyer free and clear of any Encumbrances (other than Permitted Encumbrances), Excluded Liabilities or interests, and (b) the assumption and assignment of the Assumed Contracts to Buyer.

"Seller" is defined in the introductory paragraph hereto.

"Title Company" shall be either Madison Title Agency or Riverside Abstract, as determined by Buyer.

ARTICLE 2
SALE AND TRANSFER OF ASSETS

2.1 Sale and Transfer of Assets. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase and acquire from Seller the Assets, all as is more particularly set forth herein.

2.2 Assets Free and Clear; Undertaking. Pursuant to the Sale Order, the Assets shall be sold free and clear of all Encumbrances to the maximum extent permitted under section 363(f) of the Bankruptcy Code, except for Permitted Encumbrances and those liabilities of Seller expressly assumed or agreed to be discharged by Buyer as set forth herein. Except as provided herein, Buyer shall not assume any other liability or obligation of Seller fixed or contingent, disclosed or undisclosed, other than the Assumed Liabilities.

2.3 Excluded Assets. Seller is not selling and Buyer is not purchasing or assuming obligations with respect to the following (collectively the "Excluded Assets"):

(a) All cash and cash equivalents, all depository accounts, settlements, overpayments by Seller, rebates, insurance refunds of unearned premiums, utility deposits, prepaid expenses, the proceeds of casualty or property insurance where the damage has been fully repaired or restored prior to Closing in accordance with the provisions of Section 16.1, and all similar credits associated with the operation of the Facility prior to Closing;

(b) Accounts receivable associated with goods or services provided in the operation of the Facility prior to the Closing Date;

(c) Seller's business and fiscal records and other records that Seller is required by law to retain in its possession, described in Data Room, which shall be updated as appropriate; however, after Closing, Buyer or Buyer's representatives will have access upon reasonable prior notice during normal business hours to such portions of such business and fiscal records and other records related to the prior operations of the Facility as may be necessary for the continued operations of the Facility by Buyer;

(d) All prepaid expenses (said prepaid expenses, to the extent assumed by Buyer, shall be prorated as of the Closing and Buyer shall pay to Seller the portion thereof attributable to periods from and after the Closing);

(e) All claims for any rebate, refund or credit of taxes, whether real, personal, tangible or intangible, and other governmental charges of whatever nature, and all rebates, refunds, credits and amounts payable in respect thereof, whenever and however paid, issued or credited, in each case, to the extent the same relate to any period prior to the Closing Date (whether in whole or in part, and, if in part, as shall be allocated to the period prior to the Closing Date based on the relative number of days applicable thereto);

(f) any confidential or proprietary information of the Seller that is not primarily used or held in connection with the operation of the Facility;

(g) Personal property owned by the residents of the Facility;

(h) the ActivCare business name; ActivCare logos, trademarks and copyrights; ActivCare policies, programs, methods and techniques relating to dementia and Alzheimer's residents; marketing materials relating to ActivCare proprietary programs; and ActivCare proprietary activity calendars, all of which are owned by ActivCare Living, a California corporation (collectively, the "ActivCare Materials");

(i) All records (including equipment, software and databases in which such records are stored) located at the offices of ActivCare Living, a California corporation and affiliate of Seller with respect to the internal corporate matters of Seller;

(j) Seller's Certificate of Need for seventy-two (72) SCALF beds, and all of Seller's rights to own and operate such SCALF beds (which for the avoidance of doubt are separate and apart from the 41 SCALF beds being transferred hereunder), which are to be transferred by Seller to a third party buyer pursuant to a separate agreement; and

(k) The additional items in Data Room, which shall be updated as appropriate.

2.4    Consideration for Sale and Transfer.

(a)    Deposit. Buyer shall deposit, (a) within five (5) Business Days after the execution of this agreement, the sum of One Hundred Thousand and No/100 Dollars ($100,000.00) as an earnest money deposit (the "Deposit") with either Madison Title Agency or Riverside Abstract, as determined by Buyer ("Escrow Agent"), and (b) within five (5) Business Days after entry of the Sale Order, an additional sum of One Hundred Thousand Dollars ($100,000.00) to increase the Deposit to a total of Two Hundred Thousand Dollars ($200,000.00). The parties hereby direct the Escrow Agent to retain such Deposit, as escrow agent, to be applied against the Purchase Price at Closing and in accordance with this Agreement.

(i)    Purchase Price. In consideration of the purchase and sale of the Assets, at the Closing, the Buyer shall pay to the Seller the sum of Twelve Million Dollars and No/100 Dollars ($12,000,000.00) (the "Purchase Price").  Buyer shall deliver to Escrow Agent, by wire transfer of immediately available funds, the Purchase Price, less the Deposit, and subject to the prorations, deposit, escrows and adjustments set forth in this Agreement in accordance with the provisions of Article 3 below.

(ii)    Reserved.

2.5    Excluded Liabilities.  Except for the Assumed Liabilities, Buyer shall not assume and under no circumstances shall Buyer be obligated to pay or assume, and none of the assets of Buyer shall be or become liable for or subject to, any liability, indebtedness, commitment, or obligation of Seller, whether known or unknown, fixed or contingent, recorded or unrecorded, currently existing or hereafter arising or otherwise (collectively, the "Excluded Liabilities"), including, without limitation, the following Excluded Liabilities:

(a)    liability for any and all claims by or on behalf of Seller's employees relating to periods prior to the Closing; provided, however, that this clause (a) shall not apply to any employee benefits constituting Assumed Liabilities, if any;

(b)    all suits, claims, indemnities, judgments, stipulation agreements, mortgages, taxes, contingent liabilities and other obligations of Seller, and all impositions of income tax and other taxes for all time periods prior to the Closing;

(c)    all suits, claims, indemnities, judgments, stipulation agreements, contingent liabilities and other obligations of Seller based upon any tort or breach of contract claim asserted by any Resident, former Resident, employee or any other party that is based upon acts or omissions or events for all time periods prior to the Closing;

(d)    all suits, claims, indemnities, judgments, stipulation agreements, contingent liabilities and other obligations of Seller attributable to any time periods prior to the Closing arising out of any contract, whether or not such contract is assigned to Buyer, or any accounts payable of Seller;

(e) all liabilities or obligations arising from Seller's participation in Medicare, Medicaid, or any other governmental insurance programs, restricted grant or loan programs of any grant provider or Governmental Authority. For purposes of this Agreement, "Governmental Authority" or "Governmental Authorities" shall include any and all federal, state, local or foreign government or political subdivision thereof, including any department, commission, board, bureau, property owners association, utility district, flood control district, improvement district, or similar district, or other instrumentality of any of them, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority, or any arbitrator, court, (including the Bankruptcy Court), tribunal of competent jurisdiction or other entity or officer, exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including, but not limited to, the Centers for Medicare and Medicaid Services, the Alabama Department of Public Health ("ADPH") and the Alabama State Health Planning and Development Agency ("SHPDA").

The parties agree and expressly understand that Buyer is not responsible for and is not assuming any liabilities, obligations, or Encumbrances of the Seller or relating to the Assets except for the specific obligations listed in this Agreement relating to periods following Closing, and Seller will hold Buyer harmless from same, subject to the terms of Article 10, below.

2.6 Allocation of Purchase Price. Buyer and Seller shall use Commercially Reasonable Efforts to agree upon an allocation of the Purchase Price among the real, personal and intangible property for all tax purposes. In the event Buyer and Seller cannot agree upon an allocation at least ten (10) Business Days prior to the Closing Date, each party or the Certified Public Accountant ("CPA") acting for each party shall select a third mutually acceptable CPA (the "Independent CPA") who shall, in turn, make a fair and reasonable allocation ("Allocation") and prepare IRS Forms 8594 for each party. To facilitate the allocation process, each party may submit a proposal for allocation to the Independent CPA, but the decision of the Independent CPA shall be final and binding upon the parties.

ARTICLE 3
EXPENSES; ADJUSTMENTS

3.1 Expenses.

(a) Seller shall be responsible for and pay: (1) the title insurance premiums for the base Title Policy issued by the Title Company as determined by the Parties; (2) one-half of the Escrow Agent's closing escrow fee; (3) the cost of preparing the Deed; (4) any transfer Tax; and (5) real estate property taxes and assessments, which will be prorated between Buyer and Seller for the period for which such taxes are assessed, regardless of when payable. If the current tax bill is not available on the Closing Date, then the proration shall be made on the basis of the most recent ascertainable tax assessment and tax rate. Any taxes paid at or prior to the Closing Date shall be prorated based upon the amounts actually paid.

(b) Buyer shall be responsible for and pay (1) the extra premium for any ALTA extended coverage Title Policy over and above that of the premium of a base Title Policy, (2) all recording fees respecting the Deed, (3) any mortgage registration Tax in connection with

any Buyer mortgage financing, (4) the costs of any third party reports ordered by Buyer in connection with this transaction (other than the Title Policy), (5) the costs of any endorsements to the Title Policy requested by Buyer in the manner permitted by the terms of this Agreement; (6) the costs of updating or obtaining an updated survey as required by an ALTA title policy; (7) one-half of the Escrow Agent's closing escrow fee, and (8) real estate property taxes and assessments, which will be prorated between Buyer and Seller for the period for which such taxes are assessed, regardless of when payable.

(c) All other costs, charges, and expenses shall be borne and paid as provided in this Agreement, or in the absence of such provision, in accordance with Applicable Law or local custom.

3.2 Reconciliation of Proration Items. The following adjustments shall be made as of the Closing and shall be added to the Purchase Price or credited against the Purchaser's cash payment obligations at Closing, as the case may be:

(a) Assumed Liabilities are to be apportioned between Seller and Buyer on a pro-rata basis with Seller being responsible for such expenses and obligations attributable to the Facility before the Closing, and Buyer being responsible for such expenses and obligations attributable to the conduct of the Facility after the Closing (collectively, "Proration Items").

(b) Buyer and Seller shall supply information required to permit the Title Company to list on the closing statement at Closing the Proration Items that can be accurately or reasonably estimated at Closing (the "Scheduled Proration Items"). The Scheduled Proration Items will be paid and reimbursed at Closing by adding such amounts to the Purchase Price or crediting such amounts against the Buyer's cash payment obligations at Closing, as the case may be. Seller and Buyer hereby agree that if any of the aforesaid Scheduled Proration Items cannot be calculated accurately as of the Closing, then the same shall be calculated as soon as reasonably practicable after the Closing, and either Party owing the other Party a sum of money based on such subsequent proration(s) shall pay said sum within thirty (30) days thereafter.

(c) Notwithstanding anything in this Agreement to the contrary, the following Proration Items shall be apportioned as follows:

(i) Costs accrued under the Assumed Contracts shall be paid up to and through the Closing Date by Seller. Costs under the Assumed Contracts arising or related to an event or occurrence after the Closing shall be the responsibility of the Buyer;

(ii) All utilities shall be prorated based upon estimates using the most recent actual invoices. Seller shall receive a credit for the amount of deposits, if any, with utility companies that are transferable and that are assigned to Buyer at Closing. In the case of non-transferable deposits, Buyer shall be responsible for making any new security deposits required by utility companies providing service to the Property;

(iii) Seller shall be entitled to the return of all bonds, deposits, letters of credit, set aside letters or other similar items, if any, that are outstanding with respect to the Facility or any of the Assets that have been provided by Seller or any of its affiliates, agents or

investment advisors to any governmental agency, public utility, or similar entity (collectively, "Owner Deposits"). To the extent that any funds are released as a result of the termination of any Owner Deposits for which Seller did not receive a credit, such funds shall be delivered to Seller immediately upon their receipt.

(iv) Real estate and personal property taxes and assessments will be prorated between Buyer and Seller for the period for which such taxes are assessed, regardless of when payable. If the current tax bill is not available at Closing, then the proration shall be made on the basis of the most recent ascertainable tax assessment and tax rate. Any taxes paid at or prior to Closing shall be prorated based upon the amounts actually paid.

(d) Dispute Resolution. Any controversy or claim arising under or relating to the reconciliation process under this Section 3.2 will be resolved by the Bankruptcy Court.

3.3 Payor Programs Receivables.

(a) Accounts Payable. Seller shall be responsible for payment of all accounts payable pertaining to goods or services received prior to the Closing in the ordinary course of administration of its Bankruptcy Case, but such provision does not constitute a condition of Closing. All accounts payable invoices received by the Buyer after Closing pertaining to goods or services received prior to the Closing shall be submitted to Seller on a weekly basis. Buyer shall be responsible for payment of all accounts payable relating to goods and services received by the Facility after the Closing. The parties agree to allocate the amount of any account payable which includes services both before and after the Closing. The basis of the allocation shall be that Seller shall be responsible for the portion allocated to all time periods prior to the Closing, and Buyer shall be responsible for the portion allocated to the time period after the Closing.

(b) Collection of Accounts Receivable. Pursuant to and in accordance with this Agreement, upon Closing, Buyer shall have responsibility for the billing for and collection of Post-Closing Receivables and for the collection of Pre-Closing Receivables. The cost for the collection of Pre-Closing Receivables will be at Seller's expense, which shall be equal to 25% of the Pre-Closing Receivables collected by Buyer, which shall not include any Medicaid receivables or private pay/share of cost receivables billed by Seller and received within 30 days of Closing. The cost for the collection of Post-Closing Receivables will be at Buyer's expense. Seller shall remain responsible for billing of Pre-Closing Receivables. Seller shall retain title to all Pre-Closing Receivables. Buyer shall have no liability for uncollected receivables. In the event Seller or Buyer have any questions concerning the accounting or crediting of any payments hereunder, Seller or Buyer shall make specific inquiry to the other, and the requested party shall respond within five (5) Business Days.

(c) Reconciliation. On the first Business Day after the end of each thirty (30) day period commencing at the Closing and continuing for a period of twelve calendar months (each, a "Reconciliation Period"), Buyer will perform a reconciliation of any Payment Adjustments for each Reconciliation Period. The reconciliations under this Section 3.3(c) will be performed on the basis of specific dates of service, as applicable. Buyer will follow the

allocation methodologies and the payment mechanisms described in this Section 3.3(c) in performing all the reconciliations. During each Reconciliation Period, Buyer will maintain a Reconciliation Statement. Buyer will have fifteen (15) Business Days after the last day of each Reconciliation Period to deliver the Reconciliation Statement to Seller. Seller will then have ten (10) Business Days after receiving the Reconciliation Statement to deliver a statement setting forth the items in a Reconciliation Statement with which Seller disagrees ("Dispute Notice") to Buyer. If Seller delivers a Dispute Notice, the disagreement will be resolved pursuant to the procedures described in this Section 3.3(c). If Seller does not deliver a Dispute Notice before the deadline, the Reconciliation Statement, as delivered by Buyer, will be deemed to have been accepted by Seller and will be final and binding on the Parties. If required by Buyer's accounts receivable lender, Seller shall enter into a collateral assignment agreement with Buyer and such lender to effectuate the assignment of Buyer's Post-Closing Receivables.

(d) Allocation. The collections on Accounts Receivables after the Closing, whether received by Buyer or Seller, will be allocated between Buyer and Seller and handled as follows:

(i) Pre-Closing Receivables. Seller will be allocated and entitled to all amounts collected on Pre-Closing Receivables.

(ii) Post-Closing Receivables. Buyer will be allocated and entitled to all amounts collected on Post-Closing Receivables.

(iii) Application of Payments. Payments received by Buyer or Seller after the Closing shall be handled as follows:

(A) To the extent such payments either specifically indicate on the accompanying remittance advice, or if the Parties agree, that they relate to periods prior to the Closing, (A) in the event that the payments are received by Buyer, Buyer shall promptly forward the payments to Seller (but in any event, not later than five (5) Business Days following the receipt of such payment, and until so forwarded, such payment shall be held in trust for the benefit of Seller); and (B) in the event that such payments are received by Seller, Seller shall retain the payments.

(B) To the extent such payments either specifically indicate on the accompanying remittance advice, or if the Parties agree, that they relate to periods after the Closing: (A) in the event that the payments are received by Seller, Seller shall promptly forward the payments to Buyer (but in any event, not later than five (5) Business Days following the receipt of such payment, and until so forwarded, such payment shall be held in trust for the benefit of Buyer); and (B) in the event that such payments are received by Buyer, Buyer shall retain the payments;

(C) To the extent such payments either specifically indicate, or if the Parties agree, that the payments relate to periods both prior to and after the Closing each Party shall promptly (and in any event within five (5) Business Days following receipt) forward to the other Party its respective portion of such payment.

(D) As to any payment received by either Party during the first sixty (60) days after the Closing on behalf of a Resident which fails to designate the period to which it relates, and for which the Parties cannot reasonably determine the payor's intent after due inquiry, such payment shall first be applied to reduce such Resident's Pre-Closing Receivable balances (if any), with any excess to be applied to reduce such Resident’s Post-Closing Receivable balances. All unidentified payments relating to a Resident received after the sixtieth (60th) day after the Closing shall be deemed to relate to Post-Closing Receivables.

(e) Misapplication of Payments. In the event that any payment hereunder is misapplied by the Parties, except as otherwise provided herein, the Party which erroneously received said payment shall remit the same to the other within ten (10) Business Days after such determination is made.

(f) Cooperation in Processing of Claims. Buyer and Seller agree to provide each other, upon written request and in a timely manner, with copies of all explanation of benefits, remittance advice, Medicare and Medicaid reimbursement requests, and other evidence of payments whether before or after the Closing. Each Party agrees to take all reasonable steps to assist the other in processing Medicare and Medicaid claims and obtaining Medicare and Medicaid payments for services rendered (i) in the case of Buyer, after the Closing, and (ii) in the case of Seller, prior to the Closing.

(g) Access. For the period described in Section 11.7 below, Seller and its agents and representatives shall have reasonable access during business hours to such medical records, Resident contracts, patient status reports, medical necessity documentation, services documentation, account documentation, remittance advice documentation, nursing services statements, and other documents and records as reasonably necessary to confirm the division of the Accounts Receivable, payments of accounts payable, to facilitate billing and collection of Pre-Closing Receivables, to handle any of Seller's accounts payable or reconcile any financial information.

(h) Overpayment Claims. In the event that any Governmental Authority or Payor Program making payments to Seller for services performed prior to Closing makes any claim for fines, civil money penalties, recoupment of fraudulent charges or overpayments (including, without limitation, recapture of pass-throughs) occurring for any such period (the “Overpayment Claims”), then Seller agrees to save, indemnify, defend and hold Buyer harmless for, from and against any and all loss, damage, injury or expense incurred by Buyer because of any such claim. In the event that any Governmental Authority or Payor Program making payments to Buyer for services performed from and after the Closing makes any Overpayment Claims, then Buyer agrees to save, indemnify, defend and hold Seller harmless for, from and against any and all loss, damage, injury or expense incurred by Seller because of any such claim.

(i) Dispute Resolution. Buyer and Seller shall reasonably cooperate to resolve any dispute arising from allocation of Accounts Receivable received by the other. To the extent Buyer and Seller cannot resolve such dispute informally, Buyer or Seller may deliver a Dispute Notice outlining the disagreement to the other. If Buyer or Seller delivers a Dispute Notice to the other, Buyer and Seller will thereafter, for a period of no more than fifteen (15) Business Days, negotiate in good faith to resolve the disputed items. If the disputed items are

not so resolved, then Buyer or Seller may by written notice to the other, demand that the dispute be submitted to the resolution in the Bankruptcy Court.

3.4 Surveys. Seller shall at its sole and exclusive cost and expense be liable and responsible for the correction of all violations cited by ADPH or any governmental agency in any survey ("Agency Survey"), whether cited prior to or on or after the Closing but attributable to actions occurring prior to the Closing, as detailed in the Statement of Deficiencies issued by any governmental agency ("Statement"), if any, accompanying said Agency Survey, and all proposed or imposed remedies (the "Survey Remedies"), including but not limited to any civil monetary penalty, that result from an undisclosed condition or incident at the Facility prior to the Closing or as a result of an undisclosed action or inaction of Seller prior to or on the Closing, until the same are cured and, if applicable, any proposed denial of payment by, or termination of certification to participate in, the Medicare or Medicaid programs set forth in the Statement or otherwise resulting from the Agency Survey or Statement is withdrawn.

3.5 Employment.

(a) For purposes hereof, the term "Facility Employees" shall mean all full-time and part-time employees (hourly and salaried) who are employed by Seller at the Facility. To the extent that the Worker Adjustment and Retraining Notification Act ("WARN Act") and any Department of Labor ("DOL") regulations related thereto or any other comparable state law pertain to Seller with respect to the transfer of the Facility, the parties hereby agree to comply with their respective obligations under the WARN Act and all DOL regulations and state laws with respect to the transfer of the Facility. Seller shall provide Buyer with an updated listing of the current Facility Employees as of ten (10) days prior to the Closing Date and a further updated list as of the close of business on the day immediately prior to the Closing Date. Seller shall keep Buyer apprised on a regular basis of any terminations or hires of Facility Employees in the period between the date hereof and the Closing Date.

(b) From the date hereof through the Closing, Seller may not, without the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), (i) increase the base salary or hourly wage of any Facility Employee, other than increases in the ordinary course and consistent with Seller's past practices; (ii) make any material changes to the severance benefits, retirement benefits, welfare benefits, fringe benefits, perquisites or other benefit and compensation programs, policies, and arrangements (including vacation pay, sick pay, other paid time off, insurance benefits and other material fringe benefits) made available to the Facility Employees; or (iii) hire any Facility Employee except in the ordinary course to fill vacancies that may be created by the separation of any existing Facility Employee.

(c) On or about the Open Discussion Date (as defined below) , Buyer and Seller shall jointly meet with Facility Employees to introduce Buyer to Facility Employees.

(d) Buyer shall make offers of at-will employment, effective as of the Closing, to Facility Employees as provided for in this Section 3.5 (such offers, the "Buyer Employment Offers"). Buyer will make such Buyer Employment Offers to a sufficient number

of Facility Employees in order not to trigger the notice and related provisions of the WARN Act. For purposes of this Section 3.5, each employee hired by Buyer at the Closing shall be referred to as a "Hired Employee." Provided that the Inspection Period has expired and Buyer has not terminated as provided herein (the date that such condition is satisfied, the "Open Discussion Date"), Buyer shall be permitted to interview and take applications from Facility Employees (including "part time" employees) in order to evaluate each for employment with Buyer, and Seller shall provide reasonable cooperation in order to facilitate the same. Seller agrees that it shall terminate, effective as of the Closing, all Facility Employees. Set forth in a schedule included in the Data Room is a true and correct list of all vested and unvested, accrued but unpaid vacation and sick leave and other benefits, together with any applicable payroll taxes, for the Facility Employee (the "Employee PTO"), which schedule shall be updated at Closing. Buyer shall receive at Closing a credit against the Purchase Price equal to 100% of the Employee PTO for the Hired Employees, and the responsibility for such Employee PTO for the Hired Employees shall be assumed by Buyer. In no event shall Buyer be liable for, and Seller shall indemnify and hold Buyer harmless on account of all other liabilities and obligations with respect to the Facility Employees, including without limitation, any and all severance payments, bonus packages, wages, salary, overtime, vacation, sick leave and equivalents, pension and other employee benefits or compensation, of any nature, relating to the employees of the Facility, and the same shall be paid to the Facility Employees by Seller at Closing.

(e)     Any such existing full time Hired Employees shall (a) retain their balance of accrued and unused vacation time, and (b) retain their current seniority for purposes of accruing new benefits.

(f)     At all times after the Open Discussion Date so long as this Agreement is in effect, Buyer shall have the right to meet privately with and interview any or all site Facility Employees working at the Facility in connection with their being hired at the Facility on and after the Closing, at Buyer's discretion.

(g)     In the event that Buyer's failure to comply with this Section 3.5 results in Seller being deemed to have incurred a "plant closing" or "mass layoff" as such terms are defined in the WARN Act and the regulations promulgated pursuant thereto, Buyer shall reimburse Seller at Closing for any costs and expenses, including without limitation legal fees incurred by Seller to comply with the WARN Act in connection with the subject transaction.

(h)     Buyer shall defend, indemnify and hold harmless Seller from and against any and all actual losses, costs, claims, damages and expenses (including reasonable attorney's fees), whether under statute, common law or contract incurred by or asserted against Seller by a Hired Employee (i) as a result of or arising out of Buyer, following the Closing, failing to honor the Employee PTO accruing prior to Closing to any such Hired Employee for which a credit was given in accordance with Section 3.5(d) above, and (ii) in respect of labor and employment matters first accruing after the Closing with respect to the Hired Employees, which obligation shall survive the Closing.

(i)     Seller, with respect to its employees, shall defend, indemnify and hold Buyer harmless from and against any and all actual losses, costs, claims, damages and expenses (including reasonable attorney's fees), whether under statute, common law or contract, incurred

by or asserted against Buyer arising from or attributable to any claims brought by any Facility Employees (including any Hired Employees) in respect of (i) labor and employment matters accruing prior to the Closing, (ii) any Termination Benefits with respect to any Facility Employee, (iii) and all other obligations or liabilities with respect to the Facility Employees (other than the Employee PTO of Hired Employees for which Buyer receives a credit at Closing), which obligation shall survive the Closing. As used herein, "Termination Benefit" means any liabilities for any termination pay or severance payments, benefits (including the employer portion of any employment taxes), statutory liabilities, liquidated damages, accrued sick days and vacation days in each case with respect to a separation of employment.

3.6 Transfer of Patient Trust Funds.

(a) On or prior to the Closing Date, Seller shall provide to Buyer a true, correct and complete accounting (properly reconciled) certified as being true, correct and complete by Seller of any patient trust funds and an inventory of all residents' property held by Seller on the Closing Date for patients at the Facility, a copy of which shall be attached hereto as Schedule 3.6 ("Patient Trust Funds and Property").

(b) Seller hereby agrees to transfer, or to cause to be transferred, to Buyer the Patient Trust Funds and Property on the Closing Date. Seller shall comply with all governmental statutes, rules and regulations with respect to the transfer of such Patient Trust Funds and Property. Buyer hereby agrees that it will accept the Patient Trust Funds and Property in trust for the residents, in accordance with applicable statutory and regulatory requirements; provided, however, such transfer shall not relieve Seller of its custodial and fiduciary responsibilities for such funds and property to the beneficiaries thereof for the period prior to and on the Closing Date.

(c) Seller will indemnify, defend and hold Buyer harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event the amount of funds, if any, transferred to Buyer did not represent the full amount of the funds delivered to Seller as custodian as of the Closing Date, or with respect to any Patient Trust Funds and Property delivered, or claimed to have been delivered, to Seller, but which were not delivered by Seller to Buyer, or for claims which arise from actions or omissions of Seller with respect to the Patient Trust Funds and Property prior to and on the Closing Date.

(d) In addition to and not in lieu, place, stead or substitution of any other indemnity set forth herein, Buyer will indemnify, defend and hold Seller harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event a claim is made against Seller by a patient for his/her Patient Trust Funds and Property where said funds were transferred to Buyer pursuant to the terms hereof, or for claims which arise from actions or omissions of Buyer after the Closing Date with respect to Patient Trust Funds and Property actually received by Buyer.

3.7 Offset. Buyer may offset against any amounts due to Seller pursuant to this Agreement, including without limitation Section 3.2 and Section 3.3 above, all costs and expenses incurred by it in connection with any Governmental Liability after the Closing Date. Buyer shall give Seller prompt written notice of any Governmental Liability for which Buyer

believes it is entitled to an offset, in reasonable detail to permit Seller to evaluation such claim. Seller shall give prompt written notice to Buyer of any objection to Buyer exercising an offset right under this Section 3.7. The parties shall cooperate with each other with respect to resolving any dispute with respect to any Governmental Liability.  Buyer shall not exercise an offset right so long as such dispute is still outstanding.

ARTICLE 4
INSPECTION

4.1     Inspection Period.

(a)     Buyer shall have the right, at reasonable times and upon at least two (2) Business Days' prior notice to Seller to enter upon the Real Property and Facility to conduct such inspections, investigations, tests and studies as Buyer shall deem necessary, including, without limitation, environmental site assessments, engineering tests and studies, physical examinations of the Real Property and Facility, due diligence investigations and feasibility studies. In furtherance of the foregoing, Buyer shall be permitted to conduct a Phase I environmental study; provided that Buyer shall not conduct a Phase II environmental study without Seller's prior written consent, not to be unreasonably withheld.  To the extent Buyer hires any third party site inspectors, engineers or other parties that will invasively inspect and/or test the Real Property and Facility, Buyer will first ensure to Seller's satisfaction that such third parties have adequate insurance covering any potential damage done to the Real Property and/or the Facility as a result of such inspection/testing.  Furthermore, Buyer will ensure that sufficient measures are taken to minimize disruption to the Facility, and Buyer shall restore the Real Property and Facility to the same condition as it was in before such inspection/testing.

(b)     Following the expiration of the Inspection Period, in the event that Buyer has not terminated this Agreement in accordance with this Section, Buyer shall also have the right to tour the Facility, to review the books and records related to the financial condition and the operations thereof, to observe the day-to-day operations and management thereof and interview employees of the Facility; provided that all visits by Buyer shall be accompanied by Seller's representative or designee and shall be conducted in such a manner as not to interfere with the normal operations of Seller or the Facility.

(c)     Notwithstanding anything to the contrary in this Agreement, neither Seller nor Seller's Representative shall be required to disclose any information to Buyer if such disclosure would, in Seller's reasonable discretion, (i) jeopardize any attorney-client privilege; or (ii) contravene any applicable law, fiduciary duty or binding agreement entered into prior to the date of this Agreement.  In such event, Seller shall inform Buyer that such information is being withheld, and Seller shall state the basis therefor.  Prior to the Closing Date, without the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed, Buyer shall not contact any suppliers to, or patients of, the Seller.

(d)     Buyer shall have until the expiration of the Inspection Period to conduct such due diligence investigation as may be deemed appropriate by Buyer.  To facilitate Buyer's due diligence investigation, Buyer has identified certain items of diligence, as are listed on a due diligence checklist attached as Exhibit B (the "Due Diligence Checklist"). Seller shall promptly

deliver to Buyer (i) all items on the Due Diligence Checklist in the possession of Seller which have previously been prepared by Seller, and (ii) all items in the possession of Seller reasonably requested by Buyer which may assist Buyer in obtaining new or updated similar items (such as environmental studies, appraisals, feasibility studies, insurance reviews, books and records related to the financial condition and the operations of the Facility and title insurance policies). Buyer may add to the Due Diligence Checklist during the Inspection Period by delivering either (x) an amended written Due Diligence Checklist, or (y) a request for additional information, which may be sent by email, to the Seller from time to time.

(e)     Buyer shall have the right to terminate this Agreement for any reason or no reason, and receive a return of the Deposit, prior to the expiration of the Inspection Period by delivering written notice to Seller pursuant to Section 16.6 of this Agreement at any time before the end of the Inspection Period.  If no such notice is sent by Buyer to Seller before the end of the Inspection Period, Buyer shall be obligated to close and the Deposit shall be nonrefundable except as provided herein, and subject to satisfaction of each of the conditions set forth in Article 13 and Article 14 hereof, and if any such condition is not satisfied the Deposit shall promptly be fully refunded to Buyer (subject to customary escrow charges).  In conducting due diligence, Buyer shall preserve the confidentiality of all nonpublic information of Seller and shall use its reasonable best efforts to avoid disrupting normal operations of the Facility.

4.2     Title and Survey.

(a)     Promptly upon execution hereof, Buyer shall cause the Title Company to order a preliminary title report for the Title Policy dated on or after the date of this Agreement (the "Title Commitment"), together with copies of all of the underlying documentation described in such Title Commitment (the "Title Documents").  Seller has delivered the most recent survey of the Real Property in Seller's possession or control (the "Survey") to Buyer, if any.  Buyer may order an ALTA/ACSM as-built survey of the Real Property at Buyer' sole cost and expense (the "Updated Survey") accompanied by a certificate of a registered surveyor licensed in the State of Alabama, certified as directed by Buyer, sufficient to cause the title company to delete the standard printed survey exceptions and to issue the Title Policy free from any survey objections or exceptions.

(b)     Buyer shall have a period of ten (10) Business Days after receipt by Buyer of the latest Survey, the Title Commitment and the Title Documents (the "Title Review Period"), in which to review the Title Commitment, the Title Documents, and/or the Survey, and notify Seller in writing of such objections as Buyer may have to any matters contained therein (the "Objection Notice"; any of said objections set forth on the Objection Notice are deemed the "Objectionable Exceptions").  If Seller does not notify Buyer in writing within five (5) Business Days after receiving the Objection Notice, Seller shall be deemed to have agreed to remove all said Objectionable Exceptions on or before Closing.  If Seller timely notifies Buyer in writing within such period that it elects not to cure one or more of said Objectionable Exceptions ("Seller's Notice"), Buyer shall have the right to either (i) terminate this Agreement by delivering written notice within five (5) Business Days after receipt of such Seller's Notice, in which event the Deposit shall be promptly returned to Buyer and neither Party shall have any further rights or obligations under the Agreement, except for any provision herein that is expressly intended to survive the termination, or (ii) the Buyer may agree to consummate the

transaction in accordance with the terms hereof and take title subject to the Objectionable Exceptions. Upon expiration of the Title Review Period, Buyer shall have the right, at its sole discretion, to promptly obtain the Updated Survey as described in Section 4.2(a) above. Upon receipt of the Updated Survey, Buyer shall have ten (10) Business Days in which to review the Updated Survey and deliver to Seller an Objection Notice pertaining to any matter contained therein which was not shown on the Survey. If Seller does not notify Buyer in writing within five (5) Business Days after receiving the Objection Notice, Seller shall be deemed to have agreed to remove all said Objectionable Exceptions on or before Closing. If Seller timely delivers a Seller's Notice within such period that it elects not to cure one or more of said Objectionable Exceptions, Buyer shall have the same rights as described above regarding these Objectionable Exceptions. All exceptions to which Buyer did not object and all those Objectionable Exceptions that Seller has elected not to cure shall constitute "Permitted Encumbrances." Prior to the Closing Date, Buyer may, at its sole cost and expense, obtain an update or endorsement to the Title Commitment which updates the effective date of the Title Commitment. If such update or endorsement adds any previously unlisted title or survey exceptions to the Title Commitment which: (1) renders title to the Real Property unmarketable, and/or (2) would have a Material Adverse Change on Buyer's contemplated use(s) of the Real Property, then Buyer may object to any such new exception(s) by delivering written notice to Seller prior to Closing Date and any such notice shall: (y) be treated as an Objection Notice; and (z) Seller shall have until the earlier to occur of: (A) the time periods provided above, or (B) the Closing Date, to respond to such Objection Notice.

(c) Buyer shall be entitled to obtain an owner's Title Policy with extended coverage (the "Title Policy") issued by the Title Company, dated as of the Closing Date, in the full amount of the Purchase Price, the form of which shall be the most recently updated American Land Title Association Owner's Policy (or such other form required or promulgated pursuant to applicable state insurance regulations), subject only to the Permitted Encumbrances. The Title Policy shall show that Seller has fee simple title to the Real Property, free from all liens, restrictions, encumbrances, easements and clouds on title whatsoever, except the Permitted Encumbrances and other matters approved by Buyer in writing in its sole discretion. At Closing, the Title Policy shall be issued to Buyer in the amount of the Purchase Price. The costs of this extended coverage plus any endorsements shall be paid for by Buyer.

4.3 Assumed Contracts. Buyer shall have the right to review all Contracts and select which Contracts such Buyer desires to have assigned by Seller at Closing. No later than 14 days prior to the Final Sale Hearing, Buyer shall notify Seller which Contracts the Buyer desires to assume, and all such approved Contracts shall be referred to as the "Assumed Contracts." Buyer shall list such Assumed Contracts, and such list shall be attached hereto as Schedule 3. At Closing, Seller agrees to assign all of its right, title and interest in the Assumed Contracts to Buyer. Seller shall use Commercially Reasonable Efforts to assign the Assumed Contracts, including obtaining any consent required for such assignment. If, as a condition to the assignment and assumption of any of the Assumed Contracts, it shall be necessary to cure any defaults thereunder, then Seller shall perform such acts and pay such sums as shall be required to cure any such default. As to Assumed Contracts, Buyer shall assume and undertake to perform all obligations under the Assumed Contracts assigned to it but only to the extent such obligations arise from and after the Closing. Seller shall use Commercially Reasonable Efforts to terminate

any Contract that is not assumed by Buyer on or prior to Closing by and at the expense of Seller; provided that in all events Buyer shall not have any liability with respect to Contracts which are not Assumed Contracts.

ARTICLE 5
BANKRUPTCY MATTERS

5.1 Sale Motion. Within seven (7) Business Days following the execution of this Agreement, Seller shall promptly file with the Bankruptcy Court a motion (the "Sale Motion"), in form and substance substantially in conformance with attached Exhibit C - "Form of Sale Motion and Bid Procedures Order", requesting:

(a) following an initial hearing, entry of an initial order in form and substance substantially in conformance with attached Exhibit C - "Form of Sale Motion and Bid Procedures Order" ("Bid Procedures Order") approving Buyer as a "stalking horse" pursuant to the terms of this Agreement. The Bid Procedures Order shall provide, *inter alia*, that in the event: (i) the Bankruptcy Court approves a sale of all or some of the Assets with a buyer other than Buyer; (ii) Seller enters into a definitive agreement for an Alternative Transaction; or (iii) Seller files a plan of reorganization that does not contemplate a sale of the Assets to Buyer, Seller shall be required to pay Buyer a fee in the amount of four hundred thousand dollars ($400,000.00) (the "Break-Up Fee"). The Break-Up Fee, if earned pursuant to the preceding sentence, shall be paid at closing from the sale proceeds prior to the payment of any other amounts. The Bid Procedures Order shall further provide that: (i) any competing bid shall be deemed a Qualified Competing Bid (as defined in the Bid Procedures Order) for the Assets only if such bid shall be at least $500,000.00 higher than Buyer's bid; and (ii) the deadline for the submission of competing bids shall be no more than forty five (45) days following entry of the Bid Procedures Order. The Bid Procedures shall further provide that, in the event of an Auction, for minimum bid increments of $100,000. The Bid Procedures Order shall further provide that any Qualified Competing Bid shall be a bid for all of the Assets and shall contemplate the same transaction form and structure as contemplated by this Agreement. In the event that Buyer is not the winning bidder at the Auction, the Bid Procedure Order shall not provide that Buyer shall serve as a backup bidder. In the event the Bankruptcy Court does not enter the Bid Procedures Order approving the Break-Up Fee substantially in conformance with attached Exhibit C - "Form of Sale Motion and Bid Procedures Order", Buyer shall be entitled, at Buyer's election, to terminate this Agreement and, if Buyer has paid the Deposit, Seller shall be required to return the Deposit to Buyer; and

(b) following the Sale Hearing, entry of the Sale Order. The Sale Order shall contain, *inter alia*, the following provisions: (i) approval of this Agreement, including the sale of the Assets by Seller to Buyer, which shall vest in Buyer all right, title, and interest of Seller to the Assets free and clear of all Encumbrances (other than Permitted Encumbrances), Excluded Liabilities and interests pursuant to Section 363(f) of the Bankruptcy Code; (ii) a finding that Buyer has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, the transactions contemplated by this Agreement have been undertaken by Seller and Buyer at arm's length and without collusion, and Buyer is entitled to the protections of Section 363(m) of the Bankruptcy Code; (iii) all Persons shall be enjoined from taking any actions against Buyer, any Affiliate or assignee of Buyer, or the Assets to recover any claim that such Person has against

Seller; (iv) Buyer shall have no successor Liability on account of the purchase or sale of the Assets, except on account of Assumed Liabilities; (v) due notice of the Sale Procedures Motion, Sale Procedures Order, the Sale Order, and this Agreement shall have been provided; (vi) there shall be sufficient cause to lift the stay contemplated by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure with regards to the Contemplated Transactions; and (vii) the Bankruptcy Court retains exclusive jurisdiction to interpret and enforce the provisions of this Agreement and the Sale Order in all respects.

5.2 Alternative Transaction. Notwithstanding anything to the contrary set forth in this Agreement, this Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller and the Bankruptcy Court of higher or better competing bids (each an "Alternative Transaction"). Nothing contained herein shall be construed to prohibit Seller and its Representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of any such Alternative Transaction, subject to the terms and conditions of the Bid Procedures Order, including the Break-Up Fee. Seller and Buyer further acknowledge that, to obtain Bankruptcy Court approval of the transactions contemplated herein, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and, if required under the Bid Procedures Order, conducting an auction (the "Auction").

5.3 Certain Sale Order Matters. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including providing such assurances as the Bankruptcy Court may require as a condition to making a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing the required assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" buyer under Section 363(m) of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code.

5.4 Filings with Bankruptcy Court. Seller shall deliver or cause to be delivered to Buyer for review and comment all documents to be filed by Seller with the Bankruptcy Court that relate to the transactions contemplated by this Agreement, as soon as commercially reasonable and in any event not less than one (1) Business Day prior to filing, including all motions, proposed orders, applications, and supporting papers prepared by Seller, prior to filing such documents. The Sale Motion and proposed Bid Procedures Order prepared by Seller and relating to the transactions contemplated by this Agreement to be filed by Seller following execution of this Agreement must be in form and substance substantially in conformance with attached Exhibit C - "Form of Sale Motion and Bid Procedures Order".

5.5 Executory Contracts and Unexpired Leases. Seller shall use its best efforts to gain approval by the Bankruptcy Court of the purchase and sale of the Assets and the assumption and assignment of all Assumed Contracts and Assumed Liabilities contemplated hereby to the fullest extent required by Sections 363 and 365 and all other applicable provisions of the Bankruptcy Code within the terms of the Bid Procedures Order and Sale Order. The Bid

Procedures Order shall be substantially in conformance with attached Exhibit C - "Form of Sale Motion and Bid Procedures Order". Seller shall serve on all non-Seller counterparties to all of the Assumed Contracts a notice specifically stating that Seller may be seeking the assumption and assignment of such Assumed Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the Cure Amounts stated in such notices, if any, which deadline shall not be less than seven (7) days prior to the Sale Hearing.

ARTICLE 6
CLOSING

6.1 Closing.

(a) The closing of the transactions contemplated hereby (the "Closing") shall take place on or about the date (the "Closing Date") which shall be the first day of the month following the last to occur of the following, or such earlier date as the Parties may agree:

(i) ten (10) days following Buyer's receipt of approval of the change of ownership and the issuance of any other license or Certificate of Needs (if applicable) necessary for the operation of the Facility by the Alabama Department of Public Health ("ADPH") and the Alabama State Health Planning and Development Agency ("SHPDA"), including without limitation all of the New Operator Licenses; and

(ii) the Sale Order has become a Final Order.

(b) The Closing and the risk of loss with respect to the Assets, and the legal transfer of the operations of the Facility associated therewith, shall take place effective as of 12:01 a.m. Eastern Time at the Closing, and all income and expense attributable to the ownership of the Assets and under Assumed Contracts and Assumed Liabilities (measured on an accrual basis) prior to the Closing shall be for the account of Seller and thereafter for the account of Buyer.

ARTICLE 7
REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows, which shall be true and correct as of the Effective Date and as of the Closing Date:

7.1 Organization, Corporate Power and Qualification. Seller is a limited partnership that validly exists under the laws of Alabama. Subject to the Bankruptcy Court approval described herein, Seller has full power and right to enter into and perform its obligations under this Agreement and the other documents, including, without being limited to, conveying the Real Property and the other Assets. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (1) have been duly authorized by all necessary action on the part of Seller, (2) do not require any governmental or other consent (except as otherwise provided herein) and (3) will not result in the breach of any agreement, indenture or other instrument to which Seller is a party or is otherwise bound. Seller is duly qualified to do business and is in good standing in the State of Alabama.

7.2    Financial Statements.

(a)    Seller has uploaded to the Data Room the balance sheet or sheets of the Facility (consolidated) as of December 31, 2017 and December 31, 2018, and the related profit and loss statement for the annual periods ending December 31, 2017, and December 31, 2018, plus the balance sheet of Seller as of November 1, 2019 and statement of operations of Seller for the twelve (12) months then ended (such unaudited financial statements being herein called "Seller Financial Statements").

(b)    To the knowledge of Seller, the Seller Financial Statements are true, complete and accurate, have been based upon the information contained in the books and records of Seller and present fairly the assets, liabilities and financial condition of Seller as at the respective dates thereof and the results of its operations for the periods ended at the respective dates thereof, in each case prepared in general conformity with GAAP applied on a consistent basis throughout the periods involved and with prior periods, except for the profit and loss statement for the annual periods ending December 31, 2017, and December 31, 2018, the Seller Financial Statements are unaudited, and do not contain "audit adjustments" or footnotes.  To the knowledge of Seller, the Seller Financial Statements do not contain any material inaccuracy and do not suffer from any material omissions in accordance with GAAP.

7.3    Absence of Undisclosed Liabilities.  To the knowledge of Seller, except as and to the extent reflected or reserved against in the Seller Financial Statements and except for commitments and obligations incurred in the ordinary course of business accruing after the date of the most recent Seller Financial Statements, Seller as the date of the most recent Seller Financial Statements, had, or will have at Closing, no undisclosed liabilities, claims or obligations (whether accrued, absolute, contingent, unliquidated or otherwise, whether or not known to Seller or any directors, officers or employees of Seller, whether due to become payable and regardless of when or by whom asserted).

7.4    Letters of Credit.  There are no outstanding letters of credit issued at the request of Seller to any suppliers or obligees of Seller with respect to the operations of Facility.

7.5    Absence of Certain Recent Changes.  Except as expressly provided in this Agreement or as set forth in a schedule included in the Data Room, in alphabetical order corresponding to the following subsections, since the date of the most recent Seller Financial Statements, and through the Closing Date, Seller has not and will use commercially reasonable efforts not to have:

(a)    except in the Ordinary Course of its Business, but consistent with the ordinary course of administration of the Bankruptcy Case, incurred any indebtedness or other liabilities (whether accrued, absolute, contingent or otherwise), guaranteed any indebtedness or sold any of its assets;

(b)    suffered any damage, destruction or loss, whether or not covered by insurance, in excess of $10,000;

(c) terminated any management personnel of Seller, or suffered the loss of or other termination of a business relationship with any material suppliers of Facility, without replacing same with an equivalent party;

(d) to the knowledge of Seller, increased the regular rate of compensation payable by it to any employee, member, or any physician other than normal merit and cost of living increases granted in the Ordinary Course of Business; or increased such compensation by bonus, percentage, compensation service award or similar arrangement theretofore in effect for the benefit of any of its employees, and no such increase is required;

(e) established or agreed to establish, amended or terminated any pension, retirement or welfare plan or arrangement for the benefit of its employees not theretofore in effect;

(f) entered into any collective bargaining agreements with any union;

(g) except with respect to liens or encumbrances arising by operation of law, permitted or allowed any of the Assets to be subjected to any mortgage, pledge, lien, security interest, encumbrance, restriction or charge of any kind;

(h) written down the value of any of the Assets, except for write-downs and write-offs in the Ordinary Course of Business but consistent with the ordinary course of administration of the Bankruptcy Case, none of which are material or revalued any of the Assets;

(i) suffered any extraordinary losses, canceled any debts or waived any claims or rights of substantial value, other than in the usual and Ordinary Course of Business but consistent with the ordinary course of administration of the Bankruptcy Case;

(j) paid, lent or advanced any amount to, or sold, transferred or leased any properties or assets (real, personal or mixed, tangible or intangible) to, or entered into any agreement or arrangement with, any member of Seller or any of the officers or directors of Seller or of any "affiliate" or "associate" of any of its officers or directors (as such terms are defined in the rules and regulations of the Securities and Exchange Commission under the Securities Act of 1933, as amended), except for reimbursement of ordinary and reasonable business expenses related to the business of the Facility and compensation to officers at rates not exceeding the rates of compensation as of the date of the most recent Seller Financial Statements;

(k) to the knowledge of Seller, amended, terminated or otherwise altered any material contract, agreement or license pertaining to the Facility to which Seller is a party, except in the Ordinary Course of Business but consistent with the ordinary course of administration of the Bankruptcy Case;

(l) to the knowledge of Seller, entered into a material transaction pertaining to the Facility other than in the Ordinary Course of Business but consistent with the ordinary course of administration of the Bankruptcy Case;

(m) canceled, or failed to continue, insurance coverages pertaining to the Facility; or

(n) agreed, whether in writing or otherwise, to take any action described in this Section 0.

7.6 Title to Assets.Seller has, or will have at Closing, good and marketable title to all of the Real Property subject to no mortgage, pledge, lien, lease, conditional sales agreement, option, right of first refusal or to any other encumbrance or charge, including taxes, except Permitted Encumbrances.

7.7 Other Representations Respecting Real Property.

(a) Seller enjoys peaceful and undisturbed possession of the Real Property. Seller's use of the Real Property does not currently, and to the knowledge of Seller, did not in the past, violate any existing zoning, building or use statutes, rules, ordinances or regulations of any federal, state, county or local entity, authority or agency the violation of which would have a Material Adverse Change on the Assets or the business of Seller as it is conducted on the date of execution hereof. Seller has not received any notice of any violation of any law, zoning ordinance or regulation affecting the Real Property which violation could reasonably be expected to have a Material Adverse Change, and neither has received any notice of nor has any knowledge of or information as to any existing or threatened condemnation or other legal action of any kind involving the Real Property that may reasonably be expected to affect the value of the Real Property. The use of the Real Property, and the activities conducted thereon, have been, and are proper and, to the knowledge of Seller, are in material compliance with all material applicable laws, rules and regulations with proper permits and licenses and the property has in effect a valid certificate of occupancy;

(b) To the knowledge of Seller there are no contracts, leases or agreements in effect with respect to the Real Property of any kind or nature whatsoever, whether or not of record, with the exception of admission agreements and residential lease agreements entered into with Residents of the Facility in the ordinary course of business;

(c) to the knowledge of Seller, there are no building, use or deed restrictions relating to the Real Property that are not of public record. To the knowledge of Seller, there are no latent structural defects in any buildings or improvements located on the Real Property;

(d) to the knowledge of Seller there are no unrecorded easements relating to the Real Property, or special assessments or proposed special assessments relating to the Real Property, and no federal, state or local taxing authority has asserted any tax deficiency, lien or assessment against the Real Property that has not been paid;

(e) to the knowledge of Seller, there are no outstanding accounts payable or choate or inchoate mechanics' liens or rights to claim a mechanic's lien in favor of any contractor, materialman, laborer or any other Person in connection with any portion of the Real Property;

(f) to the knowledge of Seller and other than as disclosed in the Title Report, the land adjacent, abutting or contiguous to the Real Property is not used for the benefit of the Real Property for any purpose, including, but not limited to, storm drainage, utility service or

access to the Real Property and such land is not in any way necessary for the operation or use of the Real Property. Seller has rights of ingress and egress from the Real Property that are adequate for the purposes for which the Real Property currently is used;

(g) all service utilities, including gas, water, electricity, telephone and sewer, are presently available and serving the Real Property in an adequate manner for its current use;

(h) to the knowledge of Seller and other than as disclosed in the Title Report, no part of any Improvement encroaches on any real property not included in the Real Property, and there are no buildings, structures, fixtures or other Improvements primarily situated on adjoining property which encroach on any part of the Real Property;

(i) to the knowledge of Seller, the Real Property for the Facility abuts on and has direct vehicular access to a public road or has access to a public road via a permanent, irrevocable, appurtenant easement benefiting such land and comprising a part of the Real Property, is supplied with public or quasi-public utilities and other services appropriate for the operation of the Facility located thereon and to the knowledge of Seller is not located within any flood plain or area subject to wetlands regulation or any similar restriction; and

(j) to the knowledge of Seller, there is no existing or proposed plan to modify or realign any street or highway or any existing or proposed eminent domain proceeding that would result in the taking of all or any part of the Facility or that would prevent or hinder the continued use of the Facility as heretofore used in the conduct of the business of Seller.

(k) none of the encumbrances set forth in the title report impairs or materially interferes with the use or value of the Real Property or the Facility. The Real Property described on Exhibit A constitutes all real property used in connection with the operation of the Facility.

7.8 Personal Property. The Assets consisting of the FF&E are subject to no liens or encumbrances except the security interests of record described in the Data Room. Seller agrees to remove all security interests reflected on Buyer's UCC search, if any, on or before the Closing Date (except those approved by Buyer in writing, except for security interests related to capital financing leases or personal property leases that are being assumed by Buyer and for Permitted Encumbrances) and to similarly remove any other security interests filed with respect to the Assets between the date of such UCC search and the Closing Date. Any bills of sale, assignments or other instruments to be executed and delivered by the Seller at the Closing will be valid and binding and enforceable in accordance with their respective terms, and will effectively vest in Buyer good and marketable title to all the Assets.

7.9 Contracts.

(a) Seller has uploaded to the Data Room a copy or description of each contract, lease, agreement and other instrument to which Seller is a party or is bound that involves an unperformed commitment or obligation (contingent or otherwise) (the “Contracts”). Except as has been uploaded to the Data Room, all such contracts, leases and agreements are in full force and effect, to Seller’s knowledge there has been no threatened cancellation thereof, to Seller’s knowledge there are no outstanding disputes thereunder, each is with unrelated third

parties and was entered into on an arms-length basis in the ordinary course of business. Additionally, no purchase commitment of Seller is in excess of ordinary requirements of its business or is at an excessive price. To Seller's knowledge, there are no contracts, leases, agreements or other instruments to which Seller is a party or is bound (other than insurance policies) that could either singularly or in the aggregate have a Material Adverse Change if terminated. To Seller's knowledge there are no employment agreements or other agreements to which Seller is a party or by which Seller is bound that contain any severance or termination pay liabilities or obligations pertaining to the Facility. Except as has been uploaded to the Data Room, to Seller's knowledge all contracts, leases, agreements and other instruments regarding the Facility may be terminated by Buyer upon thirty (30) days' notice or less. Seller covenants and agrees that it shall use Commercially Reasonable Efforts to pay all amounts due and otherwise discharge its duties under all contracts which are not assigned to Buyer, and shall use Commercially Reasonable Efforts to pay all amounts due vendors, suppliers and service providers for items and services received at the Facility, both in the ordinary course of administration of its Bankruptcy Case, but Buyer agrees and acknowledges that this provision is not a condition to Closing.

(b) Except as set forth in the Data Room (and except for purchase contracts and orders for inventory in the Ordinary Course of Business consistent with past practice), Seller is not, as of the date of this Agreement, a party to or bound by any:

(i) material agreement or contract not made in the Ordinary Course of Business of the Facility but consistent with the ordinary course of administration of the Bankruptcy Case;

(ii) employee collective bargaining agreement or other contract with any labor union as relates to the Facility;

(iii) covenant not to compete;

(iv) lease or similar agreement under which Seller is a lessor or sublessor of any material real property owned or leased by Seller or any portion of premises otherwise occupied by Seller as relates to the Facility;

(v) (i) lease or similar agreement under which (A) Seller is lessee of, or holds or uses, any machinery, equipment, vehicle or other tangible personal property owned by a third party or (B) Seller is a lessor or sublessor of any tangible personal property owned by Seller, (ii) continuing contract for the future purchase of materials, supplies or equipment pertaining to the Facility, or (iii) management, service, consulting or other similar type of contract pertaining to the Facility;

(vi) license or other agreement relating in whole or in part to, trademarks (including, but not limited to, any license or other agreement under which Seller has the right to use any of the same owned or held by a third party);

(vii) agreement or contract under which Seller has borrowed or lent any money or issued any note, bond, indenture or other evidence of indebtedness or directly or

indirectly guaranteed indebtedness, liabilities or obligations of others (other than (i) endorsements for the purpose of collection in the Ordinary Course of Business, (ii) agreements or contracts among Seller and its limited partners/guarantors or among the Facility and its limited partners/guarantors, such as promissory notes to Seller's limited partners/guarantors. and (iii) advances to employees of the Facility in the Ordinary Course of Business);

(viii) mortgage, pledge, security agreement, deed of trust or other document granting a lien on the Facility (including liens upon properties acquired under conditional sales, capital leases or other title retention or security devices but excluding operating leases) other than Permitted Encumbrances;

(ix) other agreement, contract, lease, license, commitment or instrument relating to the Facility to which Seller is a party or by or to which the Facility or any of its assets or business are bound or subject; or

(x) any agreement, contract, understanding or business venture relating to the Facility with any physician, other provider or any other Person that violates the Medicare/Medicaid Fraud and Abuse amendments or any regulations thereunder adopted by the U.S. Department of Health and Human Services or other federal or state statutes or regulations.

7.10 Defaults.

(a) Except as has been uploaded to the Data Room, to Seller's knowledge, it is not in default under, nor has any event occurred that, with the lapse of time or action by a third party, could result in a material default under any outstanding indenture, mortgage, contract, instrument or agreement pertaining to the Facility to which Seller is a party or, to the knowledge of Seller, by which the Facility may be bound, including the Contracts, or under any provision of the Governing Documents of Seller.

(b) Subject to Buyer's obtaining the necessary regulatory approvals and subject to the Seller obtaining the consent of a majority in interest of the members and shareholders of Seller and the Bankruptcy Court approval described herein, as applicable, to Seller's knowledge, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not violate any provision of, or result in the breach of, or constitute a default under, any law the violation of which would result in a significant liability to Buyer; does not constitute a violation of or a default under, or a conflict with, any term or provision of the Governing Documents of Seller or any contract, commitment, indenture, lease, instrument or other agreement, or any other restriction of any kind to which Seller is a party or is bound, or cause, or give any party grounds to cause (with or without notice, the passage of time or both) the maturity of any liability or obligation of Seller, to be accelerated, or increase any such liability or obligation, except as has been uploaded to the Data Room, and specifically except with respect to the Commonwealth litigation.

7.11 Inventory. The Inventory consists of a quality and quantity usable and saleable in the Ordinary Course of Business of the Facility. The quality of the Inventory of the Facility on the Closing Date will be consistent with prior practice and of such quality as is customarily found in a facility such as the Facility, and the quantity of Inventory at the Facility on the

Closing Date will include at least a three (3) day supply of food and medical and pharmaceutical inventories and supplies.

7.12 Equipment. Except for ordinary wear and tear and for any defects which would not have a Material Adverse Change, all FF&E used in the operation of the business and all of the tangible personal property other than inventory included in the Assets: (a) is adequate and suitable for its present uses, (b) has been maintained in accordance with normal industry practice, and (c) has been and is properly certified, permitted and/or registered if required by and in accordance with the laws of the State of Alabama. The quality and quantity of the FF&E of the Facility on the Closing Date will not be materially different from the FF&E on the date of this Agreement.

7.13 Permits and Licenses. Seller has uploaded to the Data Room a list of permits and licenses, listing and briefly describing each permit, license or similar authorization from each Governmental Body issued with respect to the operation or ownership of the Facility by Seller together with the designation of the respective expiration dates of each. Except as has been uploaded to the Data Room, all of such permits, licenses and authorizations will continue to be valid and in full force and effect in accordance with their respective terms until the consummation of the transactions contemplated hereby. To Seller's knowledge, Seller is not required to obtain any additional permits, licenses or similar authorizations (including, without limitation, any additional certificates of need) from any Governmental Body for the proper conduct of the Facility' business except as has been uploaded to the Data Room. In addition, except as has been uploaded to the Data Room:

(a) To Seller’s knowledge, no default has occurred in any material respect in the due observance or condition of any permit or license that has not been heretofore corrected;

(b) Seller has not received any notice from any source to the effect that there is lacking any permit or license needed in any material respect in connection with the operation of the Facility;

(c) Seller has not received any notice that the Facility is out of compliance with the terms of all such permits and licenses or that such permits or licenses will not be renewed upon expiration, or that any material conditions will be imposed in order to receive any such renewal, nor has Seller received any notice that it has not complied in all material respects with the terms of all permits and licenses.

7.14 Assets Necessary to Business. Seller presently has and at Closing will have and transfer to Buyer title to all Assets to be transferred hereunder, and will use its Commercially Reasonable Efforts to transfer to Buyer all Assumed Contracts to the extent the same can legally be transferred by Seller. To the knowledge of Seller, such Assets are all of the assets necessary to permit Buyer to carry on the business of the Facility as presently conducted. Since the date of the most recent Seller Financial Statements, neither Seller nor the Facility has sold any of the Facility’s Assets except sales of inventory in the Ordinary Course of Business and consistent with the administration of the Bankruptcy Case.

7.15    Litigation, etc.  Except as has been uploaded to the Data Room, there is no litigation, arbitration, governmental claim, investigation or proceeding pending or, to Seller's knowledge, threatened against Seller or any shareholder, partner, manager or member of Seller with respect to the Facility at law or in equity, before any court, arbitration tribunal or governmental agency.  Except as has been uploaded to the Data Room, no such proceeding concerns the ownership or other rights with respect to the Assets.  To Seller's knowledge, there are no facts based on which material claims may be hereafter made against Seller or any shareholder, partner, manager or member of Seller pertaining to the Facility.  Except as provided in Section 2.2, any and all claims arising from incidents on or before the Closing Date shall be the sole responsibility of Seller and are specifically excluded from the liabilities to be assumed by Buyer hereunder.  To Seller's knowledge, except as set forth in the Data Room, and specifically excepting the Commonwealth litigation, all claims and litigations against Seller are fully covered by insurance, except for any applicable deductible.

7.16    Court Orders, Decrees and Laws.  Except as disclosed in the Data Room and except in connection with the Bankruptcy Case and the Commonwealth litigation: (a) There is not outstanding or, to the knowledge of Seller, threatened, any order, writ, injunction or decree of any court, governmental agency or arbitration tribunal against or affecting Seller, any managing member of Seller or the Assets which would significantly interfere with the abilities to conduct the business of the Facility; (b) To the knowledge of Seller, Seller is in compliance in all material respects with all applicable federal, state and local laws, regulations and administrative orders that are material to the business conducted by Seller at the Facility and Seller  has received no notices of alleged violations thereof which remain uncured; and (c) To the knowledge of Seller, no governmental authorities are presently conducting proceedings against Seller with respect to the Facility and no such investigation or proceeding is pending or being threatened.

7.17    Taxes.  Except as set forth in the Data Room: (a) all federal, state and other tax returns of Seller as pertains to the Facility required by law to be filed have been timely filed or will be filed as of Closing, and Seller has paid or will pay at Closing all taxes (including taxes on properties, income, franchises, licenses, sales and payrolls) which have become due pursuant to such returns or pursuant to any assessment, except for any taxes and assessments of which the amount, applicability or validity is currently being contested in good faith by appropriate proceedings and with respect to which Seller has set aside on its books adequate reserves; (b) all such tax returns have been prepared in material compliance with all applicable laws and regulations, to Seller's knowledge, and are true and accurate in all material respects; and (c) there are no tax liens on any of the Assets except those with respect to taxes not yet due and payable and except for any taxes and assessments of which the amount, applicability or validity is currently being contested in good faith by appropriate proceedings and with respect to which Seller has set aside on its books adequate reserves.

7.18    Non-Foreign Status; Patriot Act.  Seller is not a "foreign person" as such term is defined in Section 1445(f) of the Code.  Seller is a "United States person" within the meaning of Section 7701(a)(30) of the Code.  Seller is in compliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury (OFAC) and in any enabling legislation or other Executive Orders or regulations in respect thereof (the Order and such other rules, regulations, legislation, or orders

are collectively called the "Orders"). Neither Seller nor any beneficial owner of Seller: (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists"); (ii) is a Person who has been determined by competent authority to be subject to the prohibitions contained in the Orders; or (iii) is owned or controlled by, or acts for or on behalf of, any Person on the Lists or any other Person who has been determined by competent authority to be subject to the prohibitions contained in the Orders.

7.19 Program Compliance. Neither Seller nor any partner of Seller is a party to, or the beneficiary of, any agreement, contract, understanding or business venture with any provider or referral source that violates the Medicare/Medicaid Fraud and Abuse amendments or any regulations thereunder adopted by the U.S. Department of Health and Human Services or any regulations adopted by any other federal or state agency or that results in overutilization of health care services by Residents.

7.20 HIPAA Matters.

(a) To the knowledge of Seller, each business, entity or component of any entity owned or controlled by Seller that is a health plan, healthcare clearinghouse or healthcare provider, as such terms are defined in the Federal Privacy Regulations (collectively, the “Covered Entities”), is in material compliance with and has not violated the administrative simplification section of HIPAA, the Federal Privacy Regulations, the Federal Transaction Regulations or applicable state privacy laws.

(b) A complete and accurate list of all Covered Entities and each Organized Health Care Arrangement (as defined in the Federal Privacy Regulations) in which a Covered Entity participates has been uploaded to the Data Room. Complete and accurate copies of each Covered Entity’s policies relating to the privacy of its Residents’ Protected Health Information (as defined in the Federal Privacy Regulations) has been uploaded to the Data Room,..

(c) Complete and accurate copies of all agreements between a Covered Entity and a Business Associate (as defined in the Federal Privacy Regulations) (collectively, “Business Associate Agreements”), together with a complete and accurate summary of the terms and conditions of any oral arrangements with Business Associates, have been uploaded to the Data Room. Neither Seller nor any Covered Entity is aware of any breach by a Business Associate of any Business Associate Agreement or any violation by a Business Associate of HIPAA, the Federal Transaction Regulations, the Federal Privacy Regulations, or the Federal Security Regulations.

(d) To Seller’s knowledge, no Resident has filed a HIPAA related complaint with Seller, the Facility or any Governmental Body.

7.21 Compliance Program. Seller has uploaded to the Data Room a copy of its current compliance program materials. Except as has been uploaded to the Data Room, Seller (a) is not a party to a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services, (b) has no reporting obligations pursuant to any

settlement agreement entered into with any Governmental Body, (c) has not been the subject of any government payor program investigation conducted by any federal or state enforcement agency, (d) has not been a defendant in any qui tam/False Claims Act or similar litigation, (e) has not been served with or received any search warrant, subpoena, civil investigative demand, contact letter, or telephone or personal contact by or from any federal or state enforcement agency (except in connection with medical services provided to third-parties who may be defendants or the subject of investigation into conduct unrelated to the operation of the Facility or any other health care businesses conducted by Seller), and (f) to Seller's knowledge, has not received any written complaints or complaints through their telephonic hotlines from employees, independent contractors, vendors, physicians, or any other person that would indicate that Seller has in the past violated, or is currently in violation of, any law or regulation. Seller has uploaded to the Data Room a description of each audit and investigation conducted by Seller pursuant to its compliance program with respect to the Facility during the last three years. For purposes of this Agreement, the term "Compliance Program" refers to provider programs of the type described in the Compliance Program Guidance published by the Office of Inspector General of the Department of Health and Human Services.

7.22 Reimbursement Matters. A list of all Medicare and Medicaid Cost Reports filed by Seller for the past 4 years, either not audited by the fiscal intermediary or audited and not formally settled has been uploaded to the Data Room. A statement setting forth the audit status of such Medicare Cost Reports has been uploaded to the Data Room. Except as has been uploaded to the Data Room, to Seller's knowledge, the amounts set up as provisions for Medicare and Medicaid adjustments and adjustments by any other third-party payors on the Seller Financial Statements are sufficient to pay any amounts for which Seller may be liable. Seller is aware of no basis for any claims against Seller by any third-party payors other than routine Medicare and Medicaid audit adjustments.

7.23 Environmental Matters.

(a) To Seller's knowledge, all federal, state and local permits, licenses and authorizations required for the use and operation of the Real Property have been obtained and are presently in effect.

(b) None of the Real Property has been used by Seller (and to the best of Seller's knowledge, by any other Person at any time) to handle, treat, store or dispose of Hazardous Substance (as defined below), nor, to Seller's knowledge, is any of the Real Property, including all soils, groundwaters and surface waters located on, in or under the Real Property, contaminated with pollutants or other substances which contamination may give rise to a clean-up obligation under any federal, state or local law, rule, regulation or ordinance, including, but not limited to, the federal Comprehensive Environmental Response, Compensation and Liability Act, 42 USC 9601 et seq.

(c) To Seller's knowledge, there are no underground and aboveground tanks located in, on or under any Real Property.

(d) To Seller's knowledge, there are no outstanding violations or any consent decrees entered against Seller regarding environmental and land use matters, including, but not

limited to, matters affecting the emission of air pollutants, the discharge of water pollutants, the management of Hazardous Substances, or noise.

(e) To Seller’s knowledge, there are no claimed, threatened or alleged violations with respect to any federal, state or local environmental law, rule, regulation, ordinance, permit, license or authorization, and there are no present discussions with any federal, state or local governmental agency concerning any alleged violation of environmental laws, rules, regulations, ordinances, permits, licenses or authorizations.

(f) To Seller’s knowledge, all operations conducted by Seller on the Real Property have been and are in compliance with all federal, state and local statutes, rules, regulations, ordinances, permits, licenses and authorizations relating to environmental compliance and control.

(g) To the best of Seller's actual knowledge, no part of the Real Property has been designated by any governmental agency having jurisdiction as wetlands or as inhabited by an endangered species.

For purposes hereof, "Hazardous Substances" means any of the following: (i) any "hazardous waste," "solid waste," "hazardous material," "hazardous substance," "toxic substance," "pollutant," or "contaminant" as those or similar terms are defined or regulated under any Environmental Laws; (ii) any mold, mildew, fungus, or other potentially dangerous organisms ("Mold"); (iii) asbestos (whether or not friable) and asbestos-containing materials; (iv) any volatile organic compounds, including oil and petroleum products; (v) any substances that because of their quantitative concentration, chemical, radioactive, flammable, explosive, infectious or other characteristics, constitute or may reasonably be expected to constitute or contribute to a danger or hazard to health, safety or welfare of any person or to the environment, including any polychlorinated biphenyls (PCBs), infectious medical wastes (including tissue, syringes, needles, blood samples or any material contaminated with bodily fluids of any type), toxic metals, etchants, pickling and plating wastes, explosives, reactive metals and compounds, pesticides, herbicides, urea formaldehyde foam insulation and chemical, biological and radioactive wastes; (vi) radon gas; (vii) any other substance the presence of which on the Premises is prohibited by any Environmental Laws; and (viii) any other substance that by any Environmental Laws requires special handling or notification of any Governmental Authority in its collection, storage, treatment, or disposal. However, for the purposes of the covenants and indemnification obligations set forth in this Agreement, the term "Hazardous Substances" shall not include small quantities of materials, chemicals or substances normally used in connection with the use, management, operation, or ownership of the Facility provided that such materials, chemicals or substances are generated, produced, stored, handled, used transported and disposed in a safe and prudent manner in strict compliance with all Environmental Laws.

"Environmental Laws" means all laws, statutes, codes, ordinances, orders, interpretations, rules and regulations of any governmental authority relating to human health or the environment, including the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901 et seq. ("RCRA"); the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. Section 9601 et seq. ("CERCLA"), the Toxic Substances Control Act, 15 U.S.C. Section 2601, et seq., the Federal Hazardous Materials Transportation Law, 49 U.S.C. Section

5101 et seq., the Clean Water Act, 33 U.S.C. Section 1251, et seq., the Clean Air Act, 42 U.S.C. Section 7401 et seq., the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq., and all similar Alabama laws that are applicable, as well as all regulations promulgated thereunder any other rule of law of any governmental authority applicable to the Real Property and/or Facility and relating to human health or the environment.

7.24    Insurance; Malpractice.  Seller has uploaded to the Data Room a list and brief description of all policies of fire, general liability, professional liability, product liability, environmental impairment liability, worker's compensation, health and other forms of insurance policies or binders currently in force insuring against risks of Seller. All insurance policies or binders of Seller are valid, outstanding and enforceable and will continue to be valid, binding and enforceable until the consummation of the transactions contemplated by this Agreement.

7.25    Improper Payments.  Neither Seller nor any managing member of Seller nor, to Seller's knowledge, any officer or employee thereof have made any bribes, kickbacks or other improper payments on behalf of the Facility or received any such payments from vendors, suppliers or other persons contracting with the Facility.

7.26    Certain Representations With Respect to the Facility.

(a)    The Facility is licensed by ADPH as a 143 bed skilled nursing facility, and was formerly licensed as a 98 bed assisted living facility and a 113 bed specialty care assisted living facility.  Except as has been disclosed to Buyer by document uploaded to the Data Room, the Facility is presently in material compliance with all the terms, conditions and provisions of its SNF license.

(b)    Seller has uploaded to the Data Room a list of all current contractual arrangements with the insurance payors with respect to the Facility. A copy of such existing contracts have been uploaded to the Data Room; and to Seller's knowledge the Facility is presently in compliance with all of the terms, conditions and provisions of such contracts in all material respects.

(c)    The Facility is qualified for participation in the Medicare Program.  A copy of the existing Medicare contracts have been uploaded to the Data Room; and the Facility is presently in compliance with all of the terms, conditions and provisions of such contracts in all material respects.

(d)    The Facility is qualified for participation in the Medicaid program.  A copy of existing Alabama Medicaid and related Managed Care Organization contracts have been uploaded to the Data Room; and the Facility is presently in compliance with all the terms, conditions and provisions of such contracts in all material respects.

(e)    The Facility does not currently, and has not in the past ten (10) years, participated in the TriCare (formerly known as CHAMPUS) program.

(f) Seller has uploaded to the Data Room a copy of the most recent fire marshal reports with respect to the Facility. Seller has no knowledge of any fire code violations at the Facility.

(g) Seller has received no written notification that the Facility is in violation of local building codes, ordinances or zoning laws that have not been resolved. To Seller's knowledge, the buildings in which the Facility is located comply with all state and local building codes, ordinances and zoning codes, except where such non-compliance would not have a Material Adverse Change on Buyer.

(h) Seller has uploaded to the Data Room a copy of the surveys of the Facility by the ADPH for the two (2) years prior to the date hereof. Seller has uploaded to the Data Room copies of all Statements of Deficiency and Plans of Correction pertaining to the Facility's operations for the past two (2) years.

(i) Seller has uploaded to the Data Room a list of the current status of the Facility's medical staff, if applicable, showing state licensure, and professional liability insurance coverage, which list includes expiration dates, of each physician or other licensed healthcare professional.

(j) Except as has been disclosed by materials uploaded to the Data Room, Seller has received no written notice and, to Seller's knowledge, Seller is not aware of any material violation concerning the Facility from any Governmental Authority about a violation of any federal, state, county, or city statute, ordinance, code, rule, or regulation (including without limitation those relating to zoning and the requirements of Title III of the Americans with Disabilities Act of 1990 (42 U.S.C. 12181, et seq., The Provisions Governing Public Accommodations and Services Operated by Private Entities)); provided that portions of the Improvements may have been "grandfathered" as it relates to passage of new codes and ordinances.

(k) During the three-year period prior to the Closing Date, except as set forth in the Data Room, Seller has not received any of the following with respect to the Facility:

(i) A notice of violations with a scope and severity level of "F" or higher;

(ii) A notice of termination of the license issued by ADPH to operate the Facility as a skilled nursing facility;

(iii) A notice of termination of the certification issued by ADPH or CMS of the Facility to participate in the Medicare and/or Medicaid reimbursement programs;

(iv) A notice that the Facility is not in substantial compliance with the requirements for participation in the Medicare and/or Medicaid reimbursement programs;

(v) A notice of a material Life Safety Code deficiency cited by CMS, ADPH, or state or local building, fire safety or health authorities that have not been corrected as of the date hereof; and

(vi) A notice of imposition of civil monetary penalties or other intermediate sanctions in accordance with 42 CFR §488.430 et seq.

7.27 Books of Account; Reports. Seller has uploaded to the Data Room the books of account and other financial records of Seller pertaining to the Facility. All such books and records uploaded to the Data Room are complete and correct and represent actual, bona fide transactions and, to Seller's knowledge, have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls. To Seller's knowledge, Seller has filed all reports and returns required by any law or regulation to be filed by it.

7.28 No Finders or Brokers. Neither Seller nor any officer or director of Seller has engaged any finder or broker in connection with the transactions contemplated hereunder, except for Blueprint Healthcare Advisors, and any fee or commission due to Blueprint or any such broker shall be the sole responsibility of Seller.

7.29 Enforceability; Authority; No Conflict. Subject to the Bankruptcy Case and the Commonwealth litigation, Seller has full power and authority to enter into this Agreement and to carry out the transactions contemplated herein, subject to Buyer's obtaining the necessary regulatory approvals. The execution, delivery, and performance of this Agreement constitute the valid and binding agreement of Seller enforceable in accordance with its terms (except as the same may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as to the remedy of specific performance that may not be available under the laws of various jurisdictions) assuming that this Agreement has been duly authorized, delivered and executed by Buyer and constitutes the valid and binding obligation, enforceable against Buyer in accordance with its terms (except as enforceability against Buyer may be restricted, limited or delayed to the same extent as referred to in the parenthetical phrase immediately above).

7.30 Consents and Approvals of Governmental Authorities. To Seller's knowledge, no characteristic of the Facility or of the nature of its business or operations requires any consent, approval or authorization of, or declaration, filing or registration with any governmental or regulatory authority in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, except for (a) Seller's submission of a CMS-855A Change of Ownership ("CHOW") Application, (b) Buyer's receipt of a new Alabama Medicaid provider agreement, (c) issuance by ADPH to Buyer of new licenses to operate a skilled nursing facility, assisted living facility, and specialty care assisted living facility, (d) any other approvals to be obtained by Buyer, and (e) approval of the Bankruptcy Court.

7.31 Knowledge; Miscellaneous.

(a) As used in this Agreement, the term "to the knowledge of Seller" or any other reference to the knowledge of Seller (i) shall mean and apply to the actual knowledge of Renee Barnard and Kevin Moriarty (the "Seller's Knowledge Individuals"), and not to any other persons, (ii) shall mean the actual (and not implied or constructive) knowledge of one or more of the Seller's Knowledge Individuals, without any duty on Seller's Knowledge Individuals to

conduct any investigation or inquiry of any kind, and (iii) shall not apply to or to be construed to apply to information or material which may be in the possession of Seller generally or incidentally, but which is not actually known to one or more of Seller's Knowledge Individuals. Similarly, any reference to any written notice, claim, litigation, filing or other correspondence or transmittal to Seller set forth herein shall be limited to refer to only those actually received by or known to one or more of the Seller's Knowledge Individuals in the limited manner provided in clauses (i) through (iii) above.

(b) Notwithstanding anything contained in this Agreement to the contrary, all of the representations and warranties which are made by Seller and set forth herein or in any of the documents or instruments required to be delivered by Seller hereunder, shall be subject to the following conditions and limitations: (a) there shall be no liability on the part of Seller for any breach of a representation or warranty arising from any matter or circumstance of which Buyer had actual knowledge at Closing; and (b) if prior to the time of Closing, during the course of Buyer's inspections, studies, tests and investigations, or through other sources, Buyer gains knowledge of a fact or circumstance which, by its nature, indicates that a representation or warranty was or has become untrue or inaccurate, and such fact or circumstance was not intentionally withheld from Buyer by Seller with the intent to defraud Buyer and was not otherwise the result of a breach or default by Seller in the performance of any of its obligations under this Agreement, Buyer's sole and exclusive right and remedy shall be to terminate this Agreement, in which event Seller shall permit the Escrow Agent to refund to Buyer the Deposit, whereupon this Agreement shall be deemed cancelled and the parties hereto shall be released of all obligations and liabilities under this Agreement, except those that are expressly stated to survive the cancellation or termination of this Agreement; and Buyer shall have no rights of action against Seller, in law or in equity, for damages or specific performance.

7.32 Disclosure. To the best of Seller's knowledge, no representation or warranty or other statement made by Seller in this Agreement, the Data Room, or otherwise in connection with the Contemplated Transactions contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading.

7.33 "Life Care" Contracts. There is no endowment, "life care," or other lump sum monetary payment contract or agreement in connection with the use or occupancy of the Facility by any person. No person using or occupying any part of the Facility has paid any entrance fee, investment fee, endowment, "life care" fee, or other lump sum monetary payment in connection with his or her use or occupancy of the Facility. No person using or occupying any part of the Facility has been promised any special concessions or care except as fully set forth in contracts uploaded to the Data Room. All contracts uploaded to the Data Room in connection with the occupancy of the Facility by residents are compliant with all applicable rules and regulations regarding such contracts, except as specifically disclosed in the Data Room.

## ARTICLE 8
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants as follows:

8.1     Organization; Corporate Power and Qualification.  Buyer is a limited liability company that validly exists under the laws of Delaware.   Buyer has full power and right to enter into and perform its obligations under this Agreement and the other documents.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (1) have been duly authorized by all necessary action on the part of Buyer, (2) do not require any governmental or other consent (except as otherwise provided herein) and (3) will not result in the breach of any agreement, indenture or other instrument to which Buyer is a party or is otherwise bound.

8.2     Binding Effect.  The execution, delivery, and performance of this Agreement constitutes the valid and binding agreement of Buyer enforceable in accordance with its terms (except as the same may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as to the remedy of specific performance that may not be available under the laws of various jurisdictions) assuming that this Agreement has been duly authorized, delivered and executed by Seller and constitutes the valid and binding obligation, enforceable against Seller in accordance with its terms (except as enforceability against Seller may be restrict-ed, limited or delayed to the same extent as referred to in the parenthetical phrase immediately above).

8.3     No Finders or Brokers.  Neither Buyer nor any partner, officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereunder, except for Blueprint Healthcare Advisors.

8.4     Pending Litigation.  There are no proceedings pending or, to the knowledge of Buyer, threatened, against or affecting Buyer in any court or before any governmental authority or arbitration board or tribunal that involve the possibility of materially and adversely affecting the properties, business, prospects, profits or condition (financial or otherwise) of Buyer considered as a whole.  Buyer will promptly notify Seller of any lawsuits, claims, proceedings or investigations that are commenced against either it or any Affiliate thereof, between the date of this Agreement and the Closing Date, that may relate to, or affect, the Assets, the Assumed Liabilities or the Real Property.

8.5     Court Orders, Decrees and Laws.  There is not outstanding or, to Buyer's knowledge, threatened any order, writ, injunction or decree of any court, governmental agency or arbitration tribunal against or affecting Buyer or any of its assets that would significantly interfere with its ability to conduct its business. To Buyer's knowledge, Buyer is in compliance with all applicable federal, state and local laws, regulations and administrative orders that are material to the business of Buyer.  No governmental authorities are presently conducting any investigation or proceeding against Buyer and, to Buyer's knowledge, no such investigation or proceeding is pending or being threatened.

8.6     Taxes.  All federal, state and other tax returns of Buyer required by law to be filed have been timely filed, and Buyer has paid or provided for all taxes (including taxes on properties, income, franchises, licenses, sales and payrolls) that have become due pursuant to such returns or pursuant to any assessment, except for any taxes and assessments of which the amount, applicability or validity is currently being contested in good faith by appropriate proceedings and with respect to which Buyer has set aside on its books reserves deemed to be

adequate.  The amounts set up as provisions for taxes on Buyer's financial statements are sufficient for the payment of all unpaid federal, state, county and local taxes accrued for or applicable to the period then ended and all periods prior thereto for which Buyer may be liable, except for any taxes and assessments of which the amount, applicability or validity is currently being contested in good faith by appropriate proceedings and with respect to which Buyer has set aside on its books reserves deemed to be adequate.  There are no tax liens on any of the property of Buyer except those with respect to taxes not yet due and payable and except for any taxes and assessments of which the amount, applicability or validity is currently being contested in good faith by appropriate proceedings and with respect to which Buyer has set aside on its books reserves deemed to be adequate.  Buyer has withheld from each payment made to employees the amount of all taxes (including, but not limited to, federal, state and local income taxes and Federal Insurance Contribution Act taxes) required to be withheld therefrom and all amounts customarily withheld therefrom, and have set aside all other employee contributions or payments customarily set aside with respect to such wages and have paid or will pay the same to, or have deposited or will deposit such payment with, the proper tax receiving officers or other appropriate authorities.

8.7    Labor Matters.  To Buyer's knowledge, Buyer is in compliance with all applicable laws and agreements respecting employment and employment practices, terms and conditions of employment and wages and hours, and is not engaged in any unfair labor practice.  There is no labor strike, dispute, slowdown or stoppage actually pending or, to Buyer's knowledge, threatened against or affecting Buyer that materially adversely affects the business of Buyer taken as a whole.  No grievance that might have a Material Adverse Change on Buyer or the conduct of its business considered as a whole is pending.

8.8    Consents and Approvals of Governmental Authorities.  No characteristic of Buyer or of the nature of its business or operations requires any consent, approval or authorization of, or declaration, filing or registration with any governmental or regulatory authority in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, except for the approvals otherwise required herein or the consummation of the Contemplated Transactions.

8.9    Improper Payments.  Neither Buyer nor, to the knowledge of Buyer, any partner, officer or employee of Buyer has made any bribes, kickbacks or other improper payments on behalf of Buyer or received any such payments from vendors, suppliers or other persons contracting with Buyer.

8.10    Exchange Act Reports.  Buyer has timely filed all reports required to be filed by § 13 or 15(d) of the 1934 Act for the twelve (12) months preceding the date hereof.  None of such reports contains any untrue statement of a material fact or omits to state a material fact required to be stated therein in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

8.11    Disclosure.  No representations and warranties by Buyer in this Agreement and no statement in this Agreement or any document or certificate furnished or to be furnished to Seller pursuant hereto contains or will contain any untrue statement or omits or will omit to state a fact necessary in order to make the statements contained therein not misleading.  Buyer has disclosed

to Seller all facts known to Buyer material to the assets, liabilities, business operations and property of Buyer. There are no facts known to Buyer not yet disclosed that would adversely affect the future operations of Buyer.

ARTICLE 9
SURVIVAL OF REPRESENTATIONS AND WARRANTIES

9.1 Representations and Warranties. The parties acknowledge that neither Seller's nor Buyer's representations and warranties shall survive Closing hereunder. Each representation and warranty is provided to the best of the knowledge of the party giving such representation and warranty and is intended to provide information to the other party sufficient to permit such other party to determine whether to proceed with closing the transactions contemplated hereby. No representation, warranty or covenant continues hereunder after Closing, except as expressly provided herein as surviving.

9.2 AS-IS SALE.

(a) Other than as expressly set forth in this Agreement and in Escrow Agent's standard form Warranty Deed, (i) Buyer acknowledges and agrees that Buyer is acquiring the Assets (including the Land, the Real Property and the Facility) in "AS IS" condition as of the end of the Inspection Period, WITH ALL FAULTS, IF ANY, AND WITHOUT ANY WARRANTY, EXPRESS OR IMPLIED, and (ii) neither Seller nor any agents, representatives, or employees of Seller have made any representations or warranties, direct or indirect, oral or written, express or implied (other than Seller's Representations in Article 7 above, none of which survive the Closing except as expressly set forth therein), to Buyer or Buyer's agents with respect to the condition of the Assets, their fitness for any particular purpose, or their compliance with any laws or regulations. Buyer is not aware of and does not rely upon any such representation beyond the closing. Buyer acknowledges that the Inspection Period will have afforded Buyer the opportunity to make such inspections (or have such inspections made by consultants) as they desire of the Assets and all factors relevant to its use, including, without limitation, the interior, exterior, and structure of the improvements, the condition of soils and subsurfaces, and the status of all zoning, permitting and other entitlements relevant to the use or contemplated use of the Assets, the licensing and status of licensing therefor. Buyer acknowledges that during the Inspection Period, Buyer and Buyer's agents will independently and with the assistance of Buyer's professional advisors and consultants, undertake whatever studies, tests and investigation Buyers desire to conduct relating to the Assets. Subject only to Seller's Representations in Article 7 above, Buyers have entered into this Agreement based upon the opportunity to conduct such inspections. Except as otherwise provided herein, and subject only to Seller's representations in Article 7 above, none of which survive the Closing except as expressly set forth therein, Buyer is relying solely on its own investigation of the Facility, the Assets and the business to be acquired hereunder, and their value and is assuming the risk that adverse physical, economic or other conditions may not have been revealed by such investigation.

(b) From and after the Closing, Buyer hereby irrevocably and unconditionally releases and forever discharges Seller, its partners, officers, directors, managers, and all persons acting by, through, under, or in concert with any of the aforesaid persons or entities (collectively,

the “Released Parties”), or any of them, from and against any and all causes of action, suits, debts, liens, obligations, liabilities, claims, demands, damages, judgments, losses, orders, penalties, costs, or expenses, including, without limitation, attorneys’ fee (collectively, the “Claims”)s, of any kind or nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, liquidated or unliquidated, which the Buyer (or the Buyer’s predecessor-in-interest) have, own, hold, or claim to have, own, or hold, or at any time up to the Closing have had, owned, held or claimed to have had, owned, or held against any of the Released Parties of any nature and from whatever cause ***other than*** Claims arising out of and directly related to the performance or failure to perform the terms of this Agreement (which Claims shall not be released by this Section 9.2(b)) (collectively, “Released Claims”). Buyer expressly waives the benefits of any provision of applicable law, which may provide that a general release does not extend to claims which the Buyer did not know or suspect to exist in its favor at the time of executing the release.

ARTICLE 10
COOPERATION; LICENSURE APPROVALS;
INTERIM PERIOD OPERATIONS OF THE FACILITY

10.1 Cooperation.

(a) The Parties hereby covenant and agree to cooperate fully with the other and do all such other things as may be reasonably necessary to (i) affect an orderly transfer of the operation of the Facility and the Assets to, and to perfect and confirm the ownership of the Facility and the Assets by the Buyer and (ii) effectuate the Contemplated Transactions.

(b) Seller shall reasonably cooperate with Buyer to assist Buyer in utilizing Seller’s existing provider numbers with respect to the Payor Programs from and after the Closing, including without limitation the Existing Medicare Provider Number and the Existing Medicaid Provider Number, as and to the extent permitted by Applicable Laws, until such time as new provider number(s) are issued in favor of Buyer but not later than twelve (12) months from the Closing. Seller shall reasonably cooperate with Buyer prior to Closing in connection with any application required to operate the Facility.

(c) Not later than 10 business days following the entry of the Final Sale Order, Buyer shall submit and proceed, in a commercially reasonable manner, to prosecute and obtain all applications and other documents required for the issuance to Buyer of, or transfer to Buyer from Seller, of all licenses and certifications necessary to operate the Facility under the Applicable Laws, including without limitation the New Operator Licenses. Without limiting the foregoing, Buyer will proceed expeditiously in making application for or otherwise procuring all necessary licenses and certifications, including, if available, the right to assume Seller’s provider numbers and/or to obtain new provider numbers in Buyer’s name, as applicable, and the taking of any other action and the satisfaction of all other requirements prescribed by Applicable Law or otherwise necessary for the consummation of this Agreement and required to operate the Facility (collectively, the “Licensure Approvals”).

(d) Seller shall reasonably cooperate with Buyer in connection with Buyer’s efforts to obtain the Licensure Approvals, and in that regard, Seller agrees to execute any

applications or notifications (subject to Seller's reasonable approval) required in connection with such efforts. Seller agrees to promptly provide or make available to Buyer any existing documentation requested by ADPH or SHPDA as necessary for the issuance of such Licensure Approvals. The Parties hereby agree that Buyer shall be responsible for payment of all filing fees and costs associated with obtaining the Licensure Approvals, other than such costs and expenses incurred by Seller in preparing the Seller portions of any applications required in connection therewith.

(e)    Effective on the Closing Date, subject to applicable law, Seller agrees to permit Buyer to use Seller's Medicare provider number currently in use at the Facility (the "Existing Medicare Provider Number") for a period commencing on the Closing and continuing for up to twelve (12) months from the Closing. Notwithstanding the foregoing, the Seller retains any and all rights and liabilities relating to the existing Medicare Provider Number relating to any and all periods preceding the Closing Date.

(f)    Effective on the Closing Date, subject to applicable law, Seller shall, upon the request of Buyer, agrees to permit Buyer to use Seller's Medicaid provider number currently in use at the Facility (the "Existing Medicaid Provider Number") for a period commencing on the Closing and continuing for up to twelve (12) months from the Closing. Notwithstanding the foregoing, the Seller retains any and all rights and liabilities relating to the existing Medicaid Provider Number relating to any and all periods preceding the Closing Date.

10.2    Interim Period Operations of Facility.

(a)    Seller shall not make any material changes in the normal and ordinary operation of the Facility consistent with past practices from the Effective Date of this Agreement through the Closing Date (except those changes for which Buyer shall have provided consent or as required under the Bankruptcy Code or an Order of the Bankruptcy Court). Unless specifically permitted pursuant to the terms of this Agreement, directed by an Order of the Bankruptcy Court or otherwise required by the Bankruptcy Code or Applicable Law, Seller shall not remove any of the Assets from the Facility, nor shall it transfer Residents from the Facility to a facility owned or operated by an entity that is owned in whole or part, directly or indirectly, by Seller, directly or indirectly or any Affiliate.

(b)    Seller shall exercise Commercially Reasonable Efforts to: (i) preserve the present residency occupancy levels of the Facility; (ii) preserve the goodwill with all of the suppliers, Residents and others having business relations with Seller or the Facility; and (iii) retain substantially all of the Facility's employees.

(c)    Seller shall exercise Commercially Reasonable Efforts to: (i) cause all of the Assets to be operated in material compliance with all Applicable Laws, as are now in effect; (ii) maintain the existing licenses and certifications; and (iii) maintain the Records in accordance with all Applicable Laws.

(d)    Seller shall promptly notify Buyer in writing of any Material Adverse Change occurring or arising after the Effective Date. Without limiting the foregoing, Seller shall deliver to Buyer within five (5) days: (i) copies of all surveys and inspection reports from any

Governmental Authorities received after the Effective Date; (ii) notices received of any action pending, threatened or recommended to revoke, withdraw or suspend any right of Seller to operate the Facility, to terminate participation in Medicare, Medicaid or any other Payor Program, to terminate or fail to renew any provider agreement, or to take any action that would interfere with Buyer' ability to operate the Facility in the ordinary course consistent with past practices; and (iii) updates to any exhibit or schedule or information uploaded to the Data Room as required to be in compliance with this Agreement, including making each representation and warranty of Seller true and correct at Closing. Buyer shall be entitled to terminate this Agreement within five (5) Business Days of receipt if any updated schedule or updated exhibit pursuant to this Section 10.2(d) shall disclose any such Material Adverse Change occurring after the Effective Date. Upon termination of this Agreement under the terms of this Section 10.2(d), Buyer shall receive a return of the Deposit and no party to this Agreement shall have any further claims or obligations under this Agreement thereafter, except those obligations that expressly survive termination of this Agreement.

## ARTICLE 11
## COVENANTS OF BUYER

Buyer hereby covenants and agrees as follows:

11.1 Commercially Reasonable Efforts to Secure Consents. Buyer shall take the necessary corporate action and shall use its Commercially Reasonable Efforts to secure before the Closing all necessary consents and approvals needed to satisfy all the conditions precedent to the obligations of Seller hereunder.

11.2 Information. Buyer shall promptly provide to Seller upon reasonable request any information or documents reasonably necessary for Seller or its members to make an informed judgment as to the advisability of consummating the transactions contemplated hereby or to verify the representations and warranties herein. Until the Closing Date, Buyer shall notify Seller of any matter that may be materially adverse to Buyer and its subsidiaries considered as a whole and shall keep Seller fully informed of such events.

11.3 Corporate Action. Buyer will take all necessary action and use its best efforts to obtain all consents, approvals and amendments of agreements required of it to carry out the transactions contemplated by this Agreement and to satisfy the conditions specified herein.

11.4 Handling of Documents. With respect to information provided by Seller pursuant to this Agreement prior to the Closing, Buyer shall keep all such information confidential that is not in the public domain, except to the extent that such information becomes generally available to the public other than as a result of a disclosure directly or indirectly by Buyer, was known by Buyer on a non-confidential basis prior to disclosure to Buyer by Seller pursuant to this Agreement or becomes available to Buyer on a non-confidential basis from a source (other than Seller) that is entitled to disclose the same, and to exercise the same care in handling such information as it would exercise with similar information of its own.

11.5 Non-Disclosure. Buyer will keep confidential and not disclose to any third party any information relating to the business of Seller, whether acquired by Buyer before or after the

Closing Date, that Seller has not made generally available to the public. This provision shall survive Closing.

11.6 Continuing Covenants. Buyer covenants and agrees that from and after the Closing, it shall pay all amounts due and otherwise discharge its duties under all Assumed Contracts and Assumed Liabilities, shall pay all amounts due vendors, suppliers and service providers for items and services received at the Facility or relating to the Assets on or after the Closing, and shall operate the Facility in accordance with all applicable laws. This provision shall survive Closing.

11.7 Seller's Post-Closing Access to Records. For a period of five (5) years following the Closing Date, upon reasonable notice, Buyer shall allow Seller and its agents and representatives to have reasonable access to, and to make copies of, the books, records and supporting materials relating to any period prior to the Closing Date, including the files and records related to the Facility, to enable Seller to investigate and defend any Resident or employee claims, to file or defend reports and tax returns, to verify Accounts Receivable collections due Seller, to objection to claims against the bankruptcy estate and otherwise administer the bankruptcy case in the ordinary course, and to conduct other matters as may be necessary for Seller in its sole discretion. In addition, Seller shall be entitled to remove any such record for purposes of litigation, arbitration or other proceeding, involving a Resident or employee of the Facility to whom such record refers or other claims if the provision of an original record is reasonably necessary to provide evidence in same. Any record so removed shall be returned promptly following its use. Buyer agrees to maintain such books, records and other material relating to the operation of the Assets prior to the Closing Date, including, but not limited to, the files and records, Resident records and records of Resident funds related to the Facility, in the manner required by law. This provision shall survive Closing.

## ARTICLE 12
## COVENANTS OF SELLER

Seller hereby covenants and agrees as follows:

12.1 Access and Information. Between the date of this Agreement and the Closing Date, Seller will, to the extent it can legally do so, provide to the Buyer and its officers, attorneys, accountants and other representatives, during normal business hours, or upon Buyer's reasonable request:

(a) access to the Facility, subject to prior approval of the Seller and upon at least two (2) Business Days prior notice, in order to conduct engineering, environmental and related third party inspections of the Facility;

(b) access to all of the agreements, commitments, books, records, accounts, tax returns, and documents of the Facility, and permit Buyer to make copies thereof;

(c) furnish the Buyer and its representatives with all information concerning the business, properties and affairs of the Facility, as Buyer reasonably requests;

(d) to the extent not previously provided to Buyer, furnish Buyer true and complete copies of all financial and operating statements of the Facility reasonably requested by Buyer, and deliver or make available to Buyer, to the extent not previously provided to the Buyer, the following:

(i) The books and records of the Facility;

(ii) The reports of state and federal regulatory examinations pertaining to the Facility;

(iii) Leases, contracts and commitments between the Seller and any other person pertaining to the Facility;

(iv) All Contracts, written agreements or letters of intent relating to the Facility;

(v) All licenses, permits, certificates of occupancy, variances, warranties, and guaranties in the possession of Seller or its agents pertaining to the Facility shall be delivered to Buyer;

(vi) Listing of capital expenditures for the Facility for the period from the Date of Seller's Acquisition to the date hereof;

(vii) Copies of the prior year's property tax and insurance invoices for the Facility;

(viii) Aged receivables report of the Facility through the Closing of this Agreement and monthly receivables reports for the period from the Date of Seller's Acquisition to the date hereof;

(ix) Copies of all insurance policies now in effect with respect to the Facility, copies of any claims under such policies;

(x) All engineering and technical reports, soils tests, environmental audits or reports, plats, surveys and architectural, structural and mechanical plans and specifications relating to the Facility, to the extent in the possession of Seller or its agents;

(xi) The tax statements on the Real Property for the period from the Date of Seller's Acquisition to the date hereof;

(xii) Copies of any notices of violations of any federal, state, municipal or other health, fire, building, zoning, safety, environmental protection or other applicable codes, laws, rules, regulations or ordinances relating or applying to the Facility, if any;

(xiii) Physical examination of the Real Property; and

(xiv) Physical examination of the FF&E.

Buyer shall use its best efforts to avoid disrupting the normal operations of the Facility and to preserve the confidential nature of the transaction contemplated herein.

12.2 Personnel Matters. During the period from and after the Inspection Period and through the Closing Date, to the extent Seller agrees and is legally authorized to do so and the applicable employee has authorized such disclosure, Seller will afford to the officers, attorneys, accountants and other authorized representatives of Buyer access to all records concerning the employees of the Facility.

12.3 Cost Reports; Reimbursement Matters. Seller shall timely file all Medicare and Medicaid cost reports relating to periods ending prior to the Closing Date, including without limitation termination cost reports required to be filed as a result of the consummation of the transactions contemplated by this Agreement. Seller shall use its Best Efforts to insure that such cost reports shall be true, accurate and complete in all material respects. Seller shall furnish to Buyer accurate and complete copies of all such cost reports upon the filing thereof, including a copy of the detailed depreciation schedule used to file the terminating cost report by Seller. The proceeds and liabilities of cost reports for periods prior to the Closing Date, and any liabilities with respect to Excluded Assets or Excluded Liabilities, shall accrue to and be the responsibility of Seller. In the event Seller or Buyer receives any retroactive payments from Medicare, Medicaid or others which payments are applicable to any period of time both before and after the Closing Date, the party receiving any such payment shall promptly forward to the other party hereto the portion of any such payment applicable to its period of operation of the Facility. In the event Medicare, Medicaid or any other third party payor deducts from amounts due Buyer, any amounts due such payors by Seller, Seller shall promptly reimburse Buyer for such amounts due Buyer. In the event Medicare, Medicaid or any other third party payor deducts from amounts due Seller, any amounts due such payors by Buyer, Buyer shall promptly reimburse Seller for such amounts due Seller. After Closing, Seller or Seller's accountant will have access upon reasonable prior notice during normal business hours to relevant books and records at the Facility relating to the filing of any post-closing Medicare and Medicaid cost reports, or responding to any inquiries regarding pre-closing Medicare and Medicaid cost reports.

12.4 Departmental Violations. All notes or notices of violations of law or municipal ordinances, orders or requirements noted in or issued by the Departments of Buildings, Fire, Labor, Health, or any other State or Municipal Department having jurisdiction against or affecting the business, property or assets of the Facility shall be complied with prior to the Closing Date. All such notes or notices, after the date hereof and prior to the Closing Date, shall be complied with by Seller prior to the Closing Date. Upon written request, Seller shall furnish Buyer with an authorization to make the necessary searches for such notes or notices.

12.5 Update Disclosures; Seller's Right and Duty to Notify. Seller shall promptly notify Buyer in writing of any Material Adverse Change occurring or arising after the date of execution hereof. Further, Seller shall deliver to Buyer within five (5) days: (i) copies of all surveys and inspection reports from any Governmental Authorities received after the deliveries during the Inspection Period; (ii) notices received of any action pending, threatened or recommended to revoke, withdraw or suspend any right of Seller to operate the Facility, to terminate participation in Medicare, Medicaid or any other Payor Program, to terminate or fail to renew any provider agreement, or to take any action that would interfere with Buyer's ability to

operate the Facility in the ordinary course consistent with past practices; and (iii) updates to any exhibit or schedule as required to be in compliance with this Agreement, including making each representation and warranty of Seller true and correct at Closing. Buyer shall be entitled to terminate this Agreement within five (5) Business Days of receipt of any updated schedule or updated exhibit pursuant to this Section 12.5 that discloses any Material Adverse Change occurring after the expiration of the Inspection Period; and upon such termination shall be entitled to a refund of its Deposit. Upon termination of this Agreement under the terms of this Section 12.5, no party to this Agreement shall have any further claims or obligations under this Agreement, except those obligations that expressly survive termination of this Agreement.

## ARTICLE 13
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLER

All obligations of Seller that are to be discharged under this Agreement at the Closing are subject to the performance, at or prior to the Closing, of all covenants and agreements contained herein that are to be performed by Buyer at or prior to the Closing and to the fulfillment at, or prior to, the Closing, of each of the following conditions (unless expressly waived in writing by Seller at any time at or prior to the Closing):

13.1    Bankruptcy Court Approval. The approval of the Bankruptcy Court to the sale of the Assets to the Buyer and compliance by the Buyer of all other Orders of the Bankruptcy Court in connection therewith.

13.2    Reserved.

13.3    Payment of Purchase Price. Buyer shall deliver the balance of the Purchase Price due hereunder to the Escrow Agent, subject to prorations as provided herein.

13.4    Representations and Warranties True; Performance of Covenants. All of the representations and warranties made by Buyer contained in Article 8 of this Agreement shall be true as of the date of this Agreement, shall be deemed to have been made again at and as of the date of Closing, and shall be true at and as of the date of Closing in all material respects; Buyer shall have performed and complied in all material respects with all covenants and conditions required by this Agreement to be performed or complied with by Buyer prior to or at the Closing.

13.5    Authority. All action required to be taken by or on the part of Buyer to authorize the execution, delivery and performance of this Agreement by Buyer and the consummation of the transactions contemplated hereby shall have been duly and validly taken by the Board of Directors of Buyer.

13.6    No Obstructive Proceeding. No action or proceedings shall have been instituted against, and no order, decree or judgment of any court, agency, commission or governmental authority shall be subsisting against Seller, or the officers or directors of Seller, that seeks to, or would, render it unlawful as of the Closing to effect the transactions contemplated hereby in accordance with the terms hereof, and no such action shall seek damages in a material amount by reason of the transactions contemplated hereby. Also, no substantive legal objection to the transactions contemplated by this Agreement shall have been received from or threatened by any

governmental department or agency other than in connection with seeking Bankruptcy Court approval.

13.7 No Agency Proceedings. There shall not be pending or, to the knowledge of Seller or Buyer, threatened, any claim, suit, action or other proceeding brought by a governmental agency before any court or governmental agency, seeking to prohibit or restrain the transactions contemplated by this Agreement or material damages in connection therewith other than in connection with seeking Bankruptcy Court approval.

13.8 Documents of Transfer. Seller shall have been furnished with all Closing documents required by this Agreement, including but not limited to the following documents from Buyer:

(i) Assignment. A fully executed counterpart to the Assignment (as set forth in Section 8.3 below).

(ii) Closing Statement. A fully executed closing statement setting forth all adjustments to the Purchase Price.

(iii) Closing Certificate. A fully executed closing certificate confirming that the representations and warranties made by Buyer in this Agreement are true and correct in all material respects as of the Closing Date and the covenants to be performed by Buyer pursuant to this Agreement have been performed in all material respects as of the Closing Date.

(iv) Other Documents. Such other documents and instruments as Seller may reasonably request to accomplish the transaction which is the subject of this Agreement or to evidence compliance with the covenants and agreements of Buyer contained in this Agreement.

## ARTICLE 14
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER

All obligations of Buyer that are to be discharged under this Agreement at the Closing are subject to the performance, at or prior to the Closing, of all covenants and agreements contained herein that are to be performed by Seller at or prior to the Closing and to the fulfillment at or prior to the Closing of each of the following conditions (unless expressly waived in writing by Buyer at any time at or prior to the Closing):

14.1 Representations and Warranties True; Performance of Covenants. All of the representations and warranties of Seller contained in Article 7 of this Agreement shall be true in all material respects as of the date of this Agreement, shall be deemed to have been made again at and as of the Closing, and shall be true in all material respects at and as of the date of Closing. Seller shall have performed or complied in all material respects with all covenants and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

14.2 No Obstructive Proceeding. Except as uploaded to the Data Room, and specifically excepting the Commonwealth litigation, no action or proceedings shall have been

instituted against, and no order, decree or judgment of any court, agency, commission or governmental authority shall be subsisting against Buyer or the officers or directors of Buyer that seeks to, or would, render it unlawful as of the Closing to effect the transactions contemplated hereby in accordance with the terms hereof, and no such action shall seek damages in a material amount by reason of the transaction contemplated hereby.  Also, no substantive legal objection to the transactions contemplated by this Agreement shall have been received from or threatened by any governmental department

     14.3    Bankruptcy Court Approval.  The Sale Order shall have been entered, shall be a Final Order, and shall in form and substance substantially in conformance with attached Exhibit C - "Form of Sale Motion and Bid Procedures Order".  Without limiting the foregoing, the Bankruptcy Court Order shall provide for the sale and transfer to the Buyer of the Facility and Assets free and clear of liens (other than the Permitted Encumbrances) and free and clear of liabilities (other than the Assumed Liabilities).

     14.4    Documents of Transfer.  Buyer shall have been furnished with all Closing documents required by this Agreement, including but not limited to the following documents from Seller:

     (a)    Deed.  A fully executed Special Warranty Deed conveying good and marketable fee simple title to the Real Property, free and clear of all liens, encumbrances, easements, and restrictions of every nature and description except Permitted Encumbrances, as evidenced by delivery of the Title Policy.

     (b)    Bill of Sale.  A fully executed Bill of Sale without representations (all representations as to title are set forth in this Agreement).

     (c)    Assignments.  Fully executed assignments without representations (all representations as to title are set forth in this Agreement).

     (d)    Closing Statement.  A fully executed closing statement setting forth all adjustments to the Purchase Price.

     (e)    Closing Certificate.  A fully executed closing certificate without representations (all representations are set forth in this Agreement).

     14.5    Consents and Approvals.  Subject to the administration of the Bankruptcy Case, each of the parties to any Assumed Contract, and under which the transactions contemplated hereby would constitute or result in a default or acceleration of the obligations thereunder, shall have given such consent as may be necessary to permit the consummation of the transactions contemplated hereby without constituting or resulting in a default or acceleration under such agreement or instrument, and any consents required from any public or regulatory agency or organization having jurisdiction shall have been given.

     14.6    No Material Adverse Change.  From the date of this Agreement until the Closing, the operations of the Facility shall have been conducted in the Ordinary Course of Business consistent with past practice and from the date of the Seller Financial Statements until the

Closing, but consistent with the ordinary course of administration of the Bankruptcy Case; no event shall have occurred or have been threatened since the expiration of the Inspection Period that has or would have a Material Adverse Change.

14.7 Federal and State Approvals; Licensing. All actions by (including any authorization, consent or approval) or in respect of (including notice to), or filings with, any governmental authority or other person that are required to consummate the transactions contemplated under this Agreement, shall have been obtained and shall not have been revoked, including, without limitation, the New Operator License, and on or before the Closing Date Seller shall have granted to Buyer the right to use Seller's Medicare and Medicaid provider number (to the extent permitted under law) until the date that Buyer or its designee receives its tie-in notice, and Buyer or its designee shall have received such reissuance or assignment of the licenses, certificates and other regulatory approvals necessary to operate the business of the Facility, or evidence satisfactory to Buyer that such licenses, certificates and other regulatory approvals will be timely issued upon providing documentation to the ADPH that the Closing has occurred (including the issuance of the Certificate of Need).

14.8 Title Insurance. Buyer shall have received the Title Policy in accordance with this Agreement.

14.9 Delivery of Certain Documents. At the Closing, Seller shall have delivered to Buyer documents executed by the shareholders, directors, partners managers or members of the Seller, as applicable, in such form as the title company shall require, executed not more than ten (10) days prior to the Closing Date, approving and authorizing the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

14.10 No Outstanding Governmental Liability. Seller shall have paid on or before the Closing Date, all Overpayment Claims, civil monetary penalties, costs associated with Survey Remedies, and any other fine, penalty or payment issued by, or due to a Governmental Authority (collectively, the "Governmental Liability") which are known to Seller prior to Closing. 14.11 Elimination of the Lis Pendens. Elimination of the lis pendens filed in that certain lawsuit entitled "Commonwealth Assisted Living, LLC, Series E v. Vestavia Hills, Ltd., et al., Case No. CV-2018-00390 and Vestavia Hills, Ltd., et al. v. Commonwealth Assisted Living, LLC, Series E, et al., Case No. 2:18-cv-02075-JHE".

ARTICLE 15
TERMINATION; PRE-CLOSING BREACH

15.1 Optional Termination. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date as follows:

(a) By the mutual consent of Buyer and Seller, as evidenced by a writing executed by both parties;

(b) By Seller, if any of the conditions set forth in Article 13 shall not have been met on or before the Closing Date; provided that the occurrence of any such condition has not been (1) waived in writing by Seller or (2) satisfied by Buyer within ten (10) days (or such

longer period as shall be provided herein) after written notice to Buyer of the failure of such condition as provided herein; provided, further that Seller shall not be entitled to terminate this Agreement pursuant to this Section 15.1(b) if Seller's breach of this Agreement has contributed to the failure of such condition or prevented the consummation of the transactions contemplated hereby;

(c) By Seller, if Buyer defaults on any material obligation hereunder, and such default continues for more than thirty (30) days after written notice from Seller;

(d) By Buyer, if any of the conditions provided in Article 14 hereof have not been met on or before the Closing Date; provided that the occurrence of any such condition has not been (1) waived in writing by Buyer or (2) satisfied by Seller within ten (10) days (or such longer period as shall be provided herein) after written notice to Seller of the failure of such condition as provided herein; provided, further that Buyer shall not be entitled to terminate this Agreement pursuant to this Section 15.1 if Buyer's breach of this Agreement has contributed to the failure of such condition or prevented the consummation of the transactions contemplated hereby; or

(e) By Buyer, if Seller defaults on any material obligation hereunder, and such default continues for more than thirty (30) days after written notice from Buyer.

15.2 Termination. In the event this Agreement is terminated as provided above, Buyer shall deliver to Seller all documents (and copies thereof in its possession) concerning Seller and its subsidiaries previously delivered by Seller to Buyer; and neither of the parties, nor any of their respective partners, members, directors, or officers, shall have any further liability to the other party hereunder, including without limitation for costs, expenses, loss of anticipated profits, consequential damages, or otherwise, except as specifically set forth in Section 15.3.

15.3 Default.

(a) Default by Seller. If Buyer is entitled to terminate this Agreement in accordance with Sections 15.1(d) or 15.1(e), then Buyer, as its sole and exclusive remedy against Seller for such failure to close, may elect to either (a) terminate this Agreement and receive a refund of the Deposit whereupon this Agreement shall terminate and be of no further force and effect and neither party shall have any other obligation or liability to the other hereunder, except for those provisions which survive this Agreement and any transactions contemplated thereby (the "Surviving Obligations"), or (b) pursue a suit for specific performance.

(b) Default by Buyer. If Seller is entitled to terminate this Agreement in accordance with Sections 15.1(d) or 15.1(e), then Seller, as its sole and exclusive remedy against Buyer for such failure to close, may terminate this Agreement and retain the Deposit, as liquidated damages, without need for further order of the Bankruptcy Court, whereupon this Agreement shall terminate and be of no further force and effect and neither party shall have any other obligation or liability to the other hereunder, except for Surviving Obligations.

ARTICLE 16
MISCELLANEOUS

16.1 Condemnation, Damage and Destruction. If, prior to Closing, the Real Property, or any part thereof, shall be condemned, damaged or destroyed, the Seller shall promptly notify Buyer in writing. Seller shall determine, in a manner reasonably acceptable to Buyer, and notify in writing Buyer of, the independently estimated cost (by an appraiser reasonably approved by Buyer) for repair or restoration of such damage or destruction or the value of the portion of the Real Property which may be taken as a result of any such proposed or commenced condemnation proceeding, as soon as reasonably practical following such event ("Seller Determination Notice").

(a) In the event that (i) the Seller Determination Notice estimates that the cost of repair or restoration of such damage or destruction or the value of the portion of the Real Property which may be taken as a result of any such proposed or commenced condemnation proceeding exceeds $750,000 or such casualty or condemnation could reasonably result in a material reduction in the number of licensed beds at the Facility or (ii) such damage or destruction is uninsured, then Buyer may terminate this Agreement by delivery to Seller of a written termination notice given within fifteen (15) days after Buyer's receipt of the Seller Determination Notice and receive a refund of the Deposit.

(b) In the event that the Seller Determination Notice estimates that the cost of repair or restoration of such damage or destruction or the value of the portion of the Real Property which may be taken as a result of any such proposed or commenced condemnation proceeding does not exceed $750,000 and would not result in a material reduction in the number of licensed beds at the Facility, or if Buyer does not terminate the Agreement in accordance with 16.1(a) above, then:

(i) In the event of damage or destruction, Seller shall assign to Buyer all insurance claims and proceeds with respect thereto (less sums theretofore expended in connection with such fire or casualty, if any, by Seller) (in which event Buyer shall have the right to participate in the adjustment and settlement of any insurance claim relating to said damage), and credit Buyer at Closing with an amount equal to Seller's insurance deductible. In such event, Buyer shall have no right to terminate.

(ii) In the event of a proposed or commenced condemnation, Seller shall assign to Buyer all condemnation proceeds with respect thereto (less sums theretofore expended in connection with such condemnation action, if any, by Seller)(in which event Buyer shall have the right to participate in any settlement proceedings). In such event, Buyer shall have no right to terminate.

(c) If this Agreement is not terminated pursuant to this Section 16.1, Seller agrees (x) to cooperate with Buyer in any loss adjustment negotiations, legal actions and agreements with the insurance company or condemning authority, (y) to assign to Buyer at the Closing all of their rights to any such insurance or condemnation proceeds with respect to such claim, and (z) it will not settle any insurance claims or legal actions relating thereto without Buyer's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned.

16.2 Expenses. All expenses of the preparation of this Agreement, including, without limitation, counsel fees, accounting fees, investment adviser's fees, broker's fees, and related expenses and disbursements, shall be borne by the respective parties incurring such expense, whether or not such transactions are consummated. Closing expenses shall be paid in accordance with local custom of the State of Alabama, as more particularly set forth herein.

16.3 Non-Solicitation. For a period of two (2) years from and after the Closing, Seller shall not directly or indirectly induce or solicit, or directly or indirectly aid or assist any other person or entity to induce or solicit, current employees, salesmen, agents, consultants, distributors, representatives, advisors, customers, residents (or their family members) or suppliers of Seller to terminate their employment or business relations with Seller and/or the Facility, nor for a period of two (2) years from and after the Closing, shall Seller employ any Hired employees, salesmen or agents of Seller. Nothing contained in this paragraph shall prevent Seller from hiring any individual who responds, without personal inducement or solicitation, to a general advertisement of employment opportunities. In the event of a breach or threatened breach of this section, Buyer shall be entitled to an injunction restraining such breach; but nothing herein shall be construed as prohibiting Buyer from pursuing any other remedy available to Buyer as a result of such breach or threatened breach. Buyer and Seller acknowledge and agree that since a remedy at law for any breach or attempted breach of the provisions of this Section 16.3 shall be inadequate, Buyer shall be entitled to specific performance and injunctive or other equitable relief in case of any such breach or attempted breach, in addition to whatever other remedies may exist at law. All parties hereto also waive any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief. The provisions of this Section 16.3 shall be deemed to be valid to the extent of any lesser area and for any lesser duration permitted by law if the area and duration set forth herein is deemed to be too broad by a court of competent jurisdiction. The invalidity or non-enforceability of this Section 16.3 in any respect shall not affect the validity or enforceability of this Section in any other respect or of any other provisions of this Agreement.

16.4 Prohibition on Use of Name; Consent.

(a) Neither Seller, nor any managing member, parent, subsidiary, or affiliate of same, nor any person controlling, controlled by, or under common control with same, shall on any date after the Closing use the words "Mount Royal Towers" or any similar names in the conduct of a trade or business competitive with or similar to the business being sold to Buyer hereunder. At the Closing, Seller will deliver to Buyer a written consent duly executed evidencing its consent without charge to the use by Buyer (and any affiliate or successor or assignee thereby) of the name "Mount Royal Towers" and any variants thereof.

(b) Neither Buyer, nor any managing member, parent, subsidiary, or affiliate of same, nor any person controlling, controlled by, or under common control with same, shall on any date after the Closing use the words "ActivCare Living", "ActivCare", or any similar names in the conduct of a trade or business competitive with or similar to the business being sold to Buyer hereunder.

16.5 Cooperation.

       (a) By Buyer. In the event Seller is required to defend against any action, suit or proceeding arising out of a claim pertaining to the business or operations of Seller, Buyer shall provide such assistance and cooperation, including, without limitation, witnesses and documentary or other evidence as may reasonably be requested by Seller in connection with its defense. Seller shall reimburse Buyer for its reasonable out-of-pocket expenses incurred in providing such assistance and cooperation.

(b) By Seller. In the event Buyer is required to defend against any action, suit or proceeding arising out of a claim pertaining to a liability assumed by Buyer pursuant to this Agreement relating to the Business or operations of Seller, Seller shall provide such assistance and cooperation, including without limitation, witnesses and documentary or other evidence, as may reasonably be requested by Buyer in connection with its defense. Buyer shall reimburse Seller for its reasonable out-of-pocket expenses incurred in providing such assistance.

16.6 Notices. All notices, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given (i) on receipt, if delivered in person, (ii) after two business days, if mailed by certified mail or registered mail (postage prepaid), (iii) after one business day, if sent by reputable overnight courier service (charges prepaid):

To Seller: Vestavia Hills Ltd.
9619 Chesapeake Dr., Suite 103
San Diego, CA 92123
Attn: Kevin Moriarty
Email: kevin@activcareliving.com

With a copy to: Sullivan Hill Rez & Engel
600 B Street, 17th Floor
San Diego, CA 92101
Attn: Christopher V. Hawkins, Esq.
Email: hawkins@sullivanhill.com

To Buyer: MED Healthcare Partners, LLC
34 Lord Ave
Lawrence, NY 11559
Attn: Ephram Lahasky
Email: mordyeph@gmail.com

With a copy to: Gutnicki LLP
4711 Golf Road, Suite 200
Skokie, IL 60076
Attn: Stacy Flanigan
Email: sflanigan@gutnicki.com

or to such other address as either Seller or Buyer may designate by notice to the other.

16.7 Entire Agreement. This Agreement and the Appendices, Exhibits, schedules and documents delivered pursuant hereto and/or uploaded to the Data Room constitute the entire contract between the parties hereto pertaining to the subject matter hereof (except for Buyer's obligations under any confidentiality agreements executed by Buyer, which shall continue to apply) and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether written or oral, of the parties, and there are no representations, warranties or other agreements between the parties in connection with the subject matter hereof, except as specifically set forth herein. No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the parties to be bound thereby.

16.8 Governing Law/Jurisdiction/Venue. The validity and construction of this Agreement shall be governed by the laws of the State of California, without giving effect to any choice or conflict of law provision or rule (whether of the State of Alabama or any other jurisdiction). The Bankruptcy Court shall retain exclusive jurisdiction over any dispute arising over this Agreement; and in the event that the Bankruptcy Court should decline such jurisdiction or is otherwise unavailable, then venue to resolve such dispute shall lie with any court of competent jurisdiction in San Diego County, California.

16.9 Section Headings. The headings contained in this Agreement are for reference only and shall not limit or control the meaning of any provision of this Agreement.

16.10 Exhibits. All Exhibits, Appendices, schedules and documents referred to in or attached to this Agreement and/or uploaded to the Data Room are integral parts of this Agreement as if fully set forth herein and all statements appearing therein shall be deemed to be representations.

16.11 Assignment.

(a) Seller shall not assign this Agreement without first obtaining the written consent of the Buyer.

(b) Prior to the Closing Date, Buyer shall have the unilateral right to assign this Agreement to one or more entities created by (or with the consent of) Buyer in which Buyer or its principals are the managing member or manager, and the creditworthiness of which and ability to obtain required licenses are reasonably acceptable to Seller. In connection with such assignment, such assignee shall expressly assume all rights and obligations of Buyer hereunder, in which event the initial Buyer shall have no liability under this Agreement. The parties acknowledge that the rights to acquire the Real Property and/or furnishings, fixtures and equipment may be assigned to a separate entity than the other operating assets and intangible assets associated with the Facility, subject to any required approval of the Bankruptcy Court and the consent of Seller which consent shall not be unreasonably withheld or delayed.

16.12 Binding on Successors and Assigns. Subject to Section 16.11, this Agreement shall inure to the benefit of and bind the respective heirs, administrators, successors and assigns of the parties hereto. Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the parties to this Agreement or their respective successors or permitted assigns any legal or equitable right, remedy or claim under or in respect

of this Agreement or any provision contained herein, it being the intention of the parties to this Agreement that this Agreement shall be for the sole and exclusive benefit of such parties or such successors and assigns and not for the benefit of any other person.

16.13 Amendments. This Agreement may be amended, but only in writing, signed by the parties hereto, at any time prior to the Closing.

16.14 Drafting Party. The provisions of this Agreement, and the documents and instruments referred to herein, have been examined, negotiated, drafted and revised by counsel for each party hereto and no implication shall be drawn nor made against any party hereto by virtue of the drafting of this Agreement.

16.15 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall comprise one and the same instrument. Any such counterparts may be delivered by facsimile or e-mail (in .pdf format), and all such counterparts so delivered shall be treated as original documents for all purposes.

16.16 Reproduction of Documents. This Agreement and all documents relating thereto, including without limitation, consents, waivers and modifications that may hereafter be executed, the Exhibits and documents delivered at the Closing, and financial statements, certificates and other information previously or hereafter furnished to a party hereunder to the other party may be reproduced by the recipient by any photographic, photostatic, microfilm, microcard, miniature photographic or other similar process and the recipient may destroy any original documents so reproduced. Each party agrees and stipulates that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by the party in the ordinary course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

16.17 Press Releases. Buyer and Seller shall cooperate with each other in releasing information concerning this Agreement and the transactions contemplated hereby, provided Buyer will not release such information until on or after the Closing Date. Each of the parties to this Agreement shall furnish to the others drafts of all releases and grant such other parties reasonable time to comment on such drafts, prior to publication. Nothing contained in this Agreement shall prevent any party to this Agreement at any time from furnishing any information to any governmental body or agency to the extent required by applicable law or reasonably necessary to pursue the Contemplated Transactions.

16.18 Waiver of Special, Exemplary, Punitive and Consequential Damages. Each party hereby irrevocably waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any claim, action or proceeding referred to in this Agreement any special, exemplary, punitive or consequential damages. The foregoing sentence shall survive the Closing or the termination of this Agreement for any reason. Each party acknowledges that it knowingly and voluntarily makes these waivers.

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

SELLER:

Vestavia Hills, Ltd.
By: IPG Holding, its General Partner

By: ______________________
Name: Kevin Moriarty
Title: President/CEO

BUYER:

MED Healthcare Partners, LLC

By: ______________________
Name: ______________________
Title: ______________________

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

SELLER:

Vestavia Hills, Ltd.
By: IPG Holding, its General Partner

By: ________________
Name: Kevin Moriarty
Title: President/CEO

BUYER:

MED Healthcare Partners, LLC

By: [signature]
Name: Ephram Lahasky
Title: Member

Case 20-00018-LA11 Filed 02/13/20 Entered 02/13/20 18:22:23 Doc 121-1 Pg. 95 of 128
Exhibit C

EXHIBITS

A – Legal Description

B – Due Diligence Checklist

C – Form of Sale Motion and Bid Procedures Order

{1171/001/00380984.8}65

Exhibit C
Page 95

Exhibit A

LEGAL DESCRIPTION


A parcel of land situated in the Northwest 1/4 of the Southeast 1/4 of Section 17, Township 18 South, Range 2 West, Jefferson County, Alabama, being more particularly described as follows:

Commence at the Southwest corner of the Northwest 1/4 of the Southeast 1/4 of Section 17, Township 18 South, Range 2 West, which is the Point of Beginning; thence proceed North 00°00'00" East along the West boundary of said Northwest 1 /4 of the Southeast 1 /4 for a distance of 631.36 feet; thence turn an interior angle to the left of 50°19'55" and leaving said West boundary run South 50°19'55" East for a distance of 168.15 feet; thence turn an interior angle to the right of 137°19'53" and run North 86°59'58" East for a distance of 58.97 feet; thence turn an interior angle to the right of 130°19'02" and run North 37°19'00" East for a distance of 110.00 feet; thence turn an interior angle to the left of 87°00'00" and run South 49°41 '00" East for a distance of 186.23 feet; thence turn an interior angle to the left of 250°00'00" and run North 60°19'00" East for a distance of 367.30 feet; thence turn an angle to the left of 89°16'00" and run South 28°57'00" East for a distance of 489.28 feet; thence turn an interior angle to the left of 71°00'00" and run South 80°03'00" West for a distance of 99.55 feet; thence turn an interior angle to the left of 221°48'38" and run South 38°14'22" West for a distance of 306.47 feet; thence turn an interior angle to the left of 127°22'22" and run North 89°08'00" West for a distance of 665.27 feet to the Point of Beginning.

TOGETHER WITH the following appurtenant rights and easements granted in (a) that certain Agreement Regarding Underground Utility Easement recorded in Instrument 9314/9038 and (b) that certain License Agreement recorded in Real 2178, page 369, in the Probate Office of Jefferson County, Alabama.

Exhibit B

DUE DILIGENCE CHECKLIST

1. General and Corporate Governance

   1. Organizational documents for Seller, and all amendments thereto, including Certificate of Incorporation/Formation and By-Laws/Operating or LLC Agreement.

2. Licensure and Regulatory

   1. All certificates, certificates of need, licenses, permits, approvals, or applications currently held or pending approval for the use and operation of all businesses operated by Seller.

   2. Copies of any reports or other documentation regarding resident incidents that have resulted, or could reasonably be expected to result, in litigation (or threats of litigation) and/or a claim or report to Seller's insurer(s) or applicable regulatory agencies.

   3. Survey history – 3 years.

   4. All correspondence related to any admission bans, payment bans, threatened decertification or CMP's within the last 18 months.

3. Employee Matters; Benefits and Pension Plans

   5. Occupational Safety and Health Administration ("OSHA") records, including but not limited to, any notice of a violation with respect to OSHA laws or regulations.

   6. List any understanding EEO/Civil Rights/Wage and Hour/OSHA charges or employment litigation.

   7. Current compensation data (in excel format) for all staff with the following information:

      i) Name

      ii) Date of hire

      iii) Position

        iv)      Pay rate

        v)      Status: Full Time or Part Time

        vi)     Weekly Hours

8.     Summary of benefit plans:  medical, dental, vision, pharmacy, group life, supplemental life, and supplemental disability programs:

        i)      Summary Plan Description with carrier name and plan detail;

        ii)     Employer/Employee premium totals and splits;

        iii)    How many employees are enrolled in each type and line of coverage, as well as by benefit options (single, ee+1, family, etc.);

9.     Description of 401k or other retirement or pension benefits:

        i)      Summary Plan Description with carrier name and plan detail;

        ii)     Employer contributions or matching program details.

10.    Last 2 years EEO-1 reports.

4.     Real Estate Matters

1.     A list of all properties, including all owned and leased facilities, real estate, and related operations, together with all certificates of occupancy.

2.     Describe any known problems relating to compliance with the Environmental Statutes.  Include a discussion of any violations of such laws and regulations by the Seller, the actions taken to cure such violations and the results thereof. "Environmental Statutes" includes, but is not limited to:  (a) the Clean Air Act; (b) the Resource Conservation and Recovery Act (also known as "RCRA"); (c) the Comprehensive Environmental Response Compensation and Liability Act (including, without limitation, Titles I and III) (also known as "CERCLA"); (d) the Toxic Substances Control Act; (e) the Federal Water Pollution Control Act; (f) Occupational Safety and Health Act; (g) any and all equivalent state statutes; and (h) the regulations implementing the foregoing statutes and similar state and local statutes, regulations, laws, and ordinances.

5.     Litigation and Other Proceedings

1.     Descriptions of any litigation or proceeding currently pending or threatened against Seller, any Qui Tam/whistleblower suits, suits brought pursuant to the Federal False Claims Act or similar state acts and any pending, threatened or past actions, administrative proceedings, settlements, arbitrations or lawsuits brought by any governmental or other third-party payor.  The preceding shall include, but

shall not be limited to, medical staff disciplinary proceedings, employee lawsuits or arbitrations or employee allegations of Equal Employment Opportunity Commission (also known as "EEOC") or OSHA violations, and claims for professional negligence or deficient quality of care.

2. Descriptions of any criminal or civil penalties, sanctions, or exclusions, termination or suspension from government programs imposed by any public or private payor, or by any federal or state government agency.

3. Copies of citations or notices (including notices of violation or notices of deficiencies) from government agencies received in the past three years.

4. Descriptions of any inquiries, investigations, audits or examinations (including any threatened or reasonably foreseeable recoupments of money paid to Seller) from any state or federal professional or licensing agencies, governmental and third party payors, fiscal intermediaries or carriers, including, but not limited to, relating to Medicaid/Medicare fraud and abuse and any Medicare Part A or Part B probes, with descriptions of any correspondence received from the OIG, the New York State Department of Health, the New York State Office of the Medicaid Inspector General, the New York State Attorney General, or from other investigative or prosecutorial body.

5. Descriptions of any notices of termination of contracts with managed care organizations or other private payors.

6. Descriptions of all consent decrees, judgments, other decrees or orders, settlement agreements and other agreements to which Seller is a party or is bound.

6. Contracts

1. All other contracts, of any nature, with persons or entities who or which provide ancillary services with an aggregate annual contract value of at least ten thousand dollars ($10,000.00).

7. Financials

1. Copies of any outstanding Medicaid case-mix-audit or Medicare appeals taken since 1/1/09.

2. Facility Financial Statements (income and expense) for Year to Date. Please provide audited statements for the last 3 years, as well as monthly, detailed, data in excel format for the last 3 years and YTD periods. In addition please send last 3 years of Tax returns for the facility.

3. Any correspondence with the Federal or State Fiscal Intermediary for all open periods, including settlement letters, pending NPR's, etc.

4.      Summary of rates and copies of any managed care, VA and other insurance contracts.

5.      Sample of resident contracts in effect

6.      List of all residents who do not have a payer source, are illegal aliens or within penalty of transfer of assets.

7.      List of fixed assets, machinery, equipment and vehicles (whether owned, leased, or used by the Seller), giving for each material asset or group of assets cost, original cost, date acquired, serial numbers, depreciation reserve, method of depreciation, insured value, estimated remaining useful life, condition suitability for use, and (if available) appraised value.

8.      Physical Plant/Capital Expenditures Items needed prior to signed purchase agreement

1.      Summary of capital expenditures including building improvements and additions/replacements to furniture, fixtures and equipment during past three years (fixed asset lapsing schedule).

2.      Schedule of leased equipment/assets

3.      Most recent life safety code surveys.

4.      Summary of any life safety code waivers.

5.      Copies of any violations or correspondence regarding any potential violations of building code or insurance requirements.

6.      Copies of any correspondence or notices regarding violations or enforcement of environments laws or regulations affecting the facility (including any correspondence or notices regarding any neighboring or adjacent sites).

7.      Copy of any license or permits required by local, state, or federal entities relating to the physical plant or real property (i.e. Health departments, EPA etc.).

9.      Insurance/Risk Management

1.      Copies of all insurance certificates – incl. coverage occurrence or claims made.

2.      Loss runs from 2015 to the latest possible Year to date  for each of the above insurance types (with such detail as Purchaser may reasonably request for any losses exceeding $50,000 during such period).

3.      A list of all open GL/PL claims.

4.      Facility CLIA certificates.

Case 20-00018-LA11 Filed 02/13/20 Entered 02/13/20 18:22:23 Doc 121-1 Pg. 101 of 128
Exhibit C

Exhibit C

FORM OF SALE MOTION AND BID PROCEDURES ORDER

{1171/001/00380984.8}71

Exhibit C
Page 101

**EXHIBIT D**

Randal S. Mashburn
U.S. Bankruptcy Judge

Dated: 2/27/2017

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Vanguard Healthcare, LLC, *et al.* [1] | ) | Case No. 16-03296 |
| | ) | Chapter 11 |
| Six Cadillac Dr., Suite 310 | ) | Judge Mashburn |
| Brentwood, TN 37027 | ) | |
| | ) | Jointly Administered |
| Debtors. | | |
| | | Hearing: February 21, 2017 |

**ORDER (A) AUTHORIZING AND APPROVING SALE OF ASSETS OF VANGUARD OF MEMPHIS, LLC FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING ASSET PURCHASE AGREEMENT, (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (D) GRANTING RELATED RELIEF**

This matter is before the Court on the motion (the "**Sale Motion**") filed on January 24, 2017, by Vanguard of Memphis, LLC (the "**Debtor**" or "**Memphis**") for entry of an order (this "**Order**") (a) authorizing and approving the sale (the "**Sale**") of the Assets[2] free and clear of all Liens, Claims and Interests of any kind or nature whatsoever (excluding the Assumed Liabilities and Permitted Encumbrances) pursuant to that certain Asset Purchase Agreement (the

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Vanguard Healthcare, LLC (9650); Vanguard Healthcare Services, LLC (7563); Vanguard Financial Services, LLC (3403); Aurora Australis, LLC (7099); Boulevard Terrace, LLC (8709); Elderscript Services, LLC (4179); Eldercare of Jackson County, LLC (7855); Glen Oaks, LLC (8238); Palace RBS, LLC (9601); Shady Lawn, LLC (7397); Vanguard of Ashland, LLC (8367); Vanguard of Church Hill, LLC (1049); Vanguard of Crestview, LLC (1046); Vanguard of Manchester, LLC (6203); Vanguard of Memphis, LLC (4623); Vanguard of Ripley, LLC (1050); Vicksburg Convalescent, LLC (7298); and Whitehall OpCo, LLC (6186).

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed in the Agreement and the Sale Motion, as applicable. To the extent of any inconsistency between the Sale Motion and the Agreement with respect to defined terms, the Agreement shall govern.

"**Agreement**"), in substantially the form attached as **Exhibit 1** to Debtor's Exhibit and Witness List filed February 17, 2017 [Docket No. 979], by and between MED Healthcare Partners LLC (together with any entity to which it assigns its interests under the Agreement, the "**Buyer**"); (b) approving the Agreement; (c) approving a procedure for the assumption and assignment of the Desired Contracts; and (d) granting certain related relief. The Debtor has determined, after an extensive marketing effort and a competitive auction held on February 17, 2017, that the Buyer has made the highest or otherwise best offer for the Assets. Adequate and sufficient notice of the Sale Motion, the hearing before the Court on February 21, 2017 (the "**Sale Hearing**") and of any other related transactions has been given in the manner directed by the Court. The Court has reviewed and considered (a) the Sale Motion and all relief related thereto, (b) the objections thereto, (c) the Agreement, and (d) the evidence presented in support of the relief requested by the Debtor at the Sale Hearing, and agrees that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted in this Order; and the relief requested in the Sale Motion is in the best interests of the Debtor and the other Debtors, their estates and creditors and other parties-in-interest. Accordingly, and upon the record of the Sale Hearing and all other pleadings and proceedings in these Chapter 11 cases, including the Sale Motion; and after due deliberation thereon and good and sufficient cause appearing therefor, the Court hereby FINDS AND DETERMINES THAT:

**Jurisdiction, Final Order and Statutory Predicates**

A. This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

B. The statutory predicates for the relief requested in the Sale Motion are §§ 105(a), 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

**Notice of the Sale**

C. Notice of the Sale Motion was provided pursuant to Bankruptcy Rule 2002(a)(2) and Local Rule 9013-1 to all known parties in interest, including (i) the Office of the United States Trustee; (ii) the Internal Revenue Service; (iii) the Official Committee of Unsecured Creditors and its counsel (the "**Committee**") (iv) counsel for secured creditor Healthcare Financial Solutions, LLC (assignee of General Electric Capital Corporation) ("**HFS"**), (v) all other parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Assets; (vi) all applicable United States, state and local regulatory or taxing authorities, recording offices or any governmental entity which have a reasonably known interest in the Assets; and (vii) all parties on the most current matrix for the Debtor. Additionally notice has been provided to all potential purchasers previously identified or solicited by the Debtors and their professionals.

D. Notice of the sale of the assets of the Debtor and the Sale Hearing was reasonably calculated to provide all interested parties with timely and proper notice of the Sale and Sale Hearing.

E. As evidenced by the certificate of service previously filed with the Court, proper, timely, adequate and sufficient notice of the Sale Hearing, the Sale and the transactions contemplated thereby, including without limitation, the assumption and assignment of the Desired Contracts to the Buyer, was provided in accordance with Bankruptcy Rule 2002(a)(2) and Local Rule 9013-1 and the orders previously entered by this Court, §§ 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008. The notices were

good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale Motion, Sale Hearing, the Sale or the assumption and assignment of the Desired Contracts to the Buyer is or shall be required.

F. A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion and the relief requested therein (including the assumption and assignment of the Desired Contracts to the Buyer and any cure costs related thereto), has been afforded to all interested persons and entities.

**Good Faith of the Buyer**

G. The Agreement was negotiated, proposed and entered into by the Debtor and the Buyer without collusion, in good faith and from arms'-length bargaining positions.

H. The Buyer is not an "insider" or "affiliate" of the Debtor or any of the other Debtors as those terms are defined in the Bankruptcy Code.

I. The Buyer is purchasing the Assets in good faith and is a good faith buyer within the meaning of § 363(m) of the Bankruptcy Code. The Buyer proceeded in good faith in connection with all aspects of the Sale, including: (i) neither inducing nor causing the Debtor 's or the other Debtors' Chapter 11 filings; and (ii) disclosing all payments to be made by the Buyer in connection with the Sale. Accordingly, the Buyer is entitled to all of the protections afforded under § 363(m) of the Bankruptcy Code.

J. No other entity or group of entities has offered to purchase the Assets for greater economic value to the Debtor's estate than the Buyer. The Debtor's and the other Debtors' determination that the Agreement constitutes the highest and best offer for the Assets is a good, valid and sound exercise of the Debtor's and the other Debtors' business judgment.

## No Fraudulent Transfer

K. The consideration provided by the Buyer pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Assets, and (iii) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and § 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. Approval of the Sale Motion and the Agreement, and the consummation of the transactions contemplated thereby, is in the best interests of the Debtor and the other Debtors, their estates, creditors and other parties-in-interest.

L. There is no continuity of enterprise between the Buyer and the Debtor. The Sale does not amount to a consolidation, merger or de facto merger of Buyer and the Debtor.

## HFS Liens

M. The Debtor is jointly and severally liable to HFS for the entire amount of the Loan Obligations (as that term is defined in the Cash Collateral Order (defined below), and, for purposes of this Order, collectively the "**HFS Loan Obligations"**, as are other of the Debtors. The Debtor, together with certain of its Debtor affiliates and non-Debtor affiliates, is a party under both the Revolving Loan Documents and the Term Loan Documents (as those terms are defined in the Cash Collateral Order (defined below), and, for purposes of this Order, collectively the "**HFS Loan Documents**").

N. As security for timely payment and performance of the HFS Loan Obligations, and pursuant to the HFS Loan Documents, prior to the filing of these Chapter 11 cases, HFS, in its capacities as Agents under the HFS Loan Documents, was granted and continues to hold valid and perfected first priority liens on and security interests in, among other things, all of the Debtor's

property, both its real property and personal property, including all of the Assets (collectively "**HFS Pre-Petition Liens"**).

O. As provided and adjudicated in the Court's *Stipulated Final Order Authorizing Debtors' Limited Use Of Cash Collateral, Granting Adequate Protection, And Granting Related Relief* [Docket No. 168] (the "**Cash Collateral Order"**), the Debtors agree that HFS was granted and holds replacement liens and security interests in all of the Debtors' post-petition assets of the type and to the same extent provided in the HFS Loan Documents which includes replacement liens and security interests in all of the Assets and all of the Debtor's other assets, including without limitation the Debtor's Accounts Receivable, as security for the HFS Loan Obligations owing to HFS (collectively, "**HFS Replacement Liens**").

P. The Assets do *not* include, among other things, the Debtor's Accounts Receivable (amounts due, whether or not actually billed) for services provided up to the Effective Time of the legal transfer of the operations of the Debtor's Business to the Buyer (collectively, the "**Memphis Accounts Receivable"**) and the Assets do not include the Debtor's bank accounts or cash deposits. The Debtor's Accounts Receivable, bank accounts, and cash deposits are expressly included, among other things, in the definition of Excluded Assets in the Agreement and shall not be sold to the Buyer in the Sale.

Q. The Debtor and the Buyer agreed that notwithstanding any contrary or other provision in the Agreement, the treatment of all accounts receivable generated at or relating to the Facility, all payments thereon, and all of Debtor's bank accounts, including but not limited to the Deposit Accounts will be the subject of, and may be controlled by the terms of, a separate written agreement or agreements which will be executed prior to the Closing Date by the Debtor and the

Buyer, and any other parties determined necessary by the Debtor, in its sole discretion, (the "**Memphis Collections Agreement"**).

R. As further agreed by the Debtor and the Buyer in Section 2.14(e) of the Agreement, the purpose of the Memphis Collections Agreement is to ensure an orderly transition of the Facility from the Debtor to the Buyer and the collection of accounts receivable, while recognizing and maintaining the Debtor's and the Buyer's respective interests. Section 2.14 of the Agreement shall survive Closing.

S. All collections of the Memphis Accounts Receivable collected after the Closing Date of the Sale shall be deposited in a separate Memphis account held by Vanguard Financial Services (the "**Memphis Segregated Account**").

**Validity of Transfer**

T. The Debtor has (i) all requisite authority to execute and deliver the Agreement and all other documents contemplated thereby, (ii) all requisite authority necessary to consummate the transactions contemplated by the Agreement and (iii) taken all requisite action necessary to authorize and approve the Agreement and the consummation of the transactions contemplated thereby. The Sale has been duly and validly authorized by all requisite action. No consents or approvals, other than those expressly provided for in the Agreement, are required for the Debtor to consummate the Sale, the Agreement or the transactions contemplated thereby.

U. The Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtor nor the Buyer is fraudulently entering into the transactions contemplated by the Agreement.

     V. The Debtor has good and marketable title to the Assets and is lawful owner of the Assets. Subject to the indefeasible payment in cash of the amount of $7,500,000.00 to HFS (the "**HFS Payment**") at Closing, and pursuant to § 363(f) of the Bankruptcy Code with the consent of HFS, the transfer of the Assets to the Buyer will be, as of the closing of the transactions contemplated by the Agreement and this Order (the "**Closing Date**"), a legal, valid and effective transfer of the Assets, which transfer vests or will vest the Buyer with all right, title, and interest of the Debtor to the Assets free and clear of (i) all liens, claims and encumbrances (including any right of first offer or refusal regarding HFS's option to purchase any real property) relating to, accruing or arising any time prior to the Closing Date (collectively, the "**Liens**") and (ii) all debts arising under, relating to or in connection with any act of the Debtor or claims (as that term is defined in § 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, rights with respect to Claims (defined below) and Liens (x) that purport to give to any party (other than those counterparties to Desired Contracts expressly identified in the Exhibit 3.8 to the Agreement as being assumed and assigned or except as otherwise provided herein, the Department of Health and Human Services for recoupment or setoff under the Provider Agreement) a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, the Debtor's or the Buyer's interests in the Assets, or any similar rights, or (y) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of any

attributes of ownership) (collectively, as defined in this clause (ii), "**Claims**"), relating to, accruing or arising any time prior to the Closing Date, with the exception of Assumed Liabilities, Permitted Encumbrances, or as expressly provided in this Order.

**Section 363(f) Is Satisfied**

W. The conditions of § 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtor may sell the Assets free and clear of any interest in the Assets.

X. The Debtor may sell the Assets free and clear of all Liens, Claims and other interests of any kind or nature whatsoever against the Debtor, its estate or any of the Assets (except the Assumed Liabilities, Permitted Encumbrances and except as otherwise provided in this Order) because, in each case, the standards set forth in § 363(f)(2) of the Bankruptcy Code has been satisfied. Those holders of Liens or Claims against the Debtor, its estate or any of the Assets who did not object or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented pursuant to § 363(f)(2) of the Bankruptcy Code.

Y. HFS's consent to the sale of the Assets to the Buyer free and clear of its Liens is specifically subject to (and this Order so provides) indefeasible payment in cash of the HFS Payment being made directly to HFS at, and as a condition of, Closing for application to the HFS Loan Obligations in accordance with the terms of the HFS Loan Documents. HFS agrees to this reduced payment in this instance only, based on the unique circumstances relating to Memphis (continuing operating losses, etc.). HFS fully reserves all of its claims, rights and remedies, including without limitation, its objections to any argument that the HFS Loan Obligations somehow should be allocated among the various Debtors and non-Debtor borrowers.

Z. Nothing in this Order affects the continuation of the HFS Pre-Petition Liens or the HFS Replacement Liens on the property and assets of the Debtors other than the Debtor, and the

HFS Pre-Petition Liens and the HFS Replacement Liens on such property and assets of the other Debtors shall continue in full force and effect in all respects.

**Compelling Circumstances to Justify the Sale**

AA. Good and sufficient reasons for approval of the Agreement and the Sale have been articulated. The Sources and Uses Statement prepared by the Debtors' financial team reflects that there will be approximately $2,300,000 for distribution to the unsecured creditors of Memphis after (i) the HFS Payment, (ii) closing costs required under the Agreement and this Order to close the Sale, (iii) payment of the approved Breakup Fee of $125,000 (the "**Breakup Fee**") to Skyline Health Care, LLC (the "**Skyline**"). Any advances made to cover both pre-petition and post-petition operating expenses will be dealt with under a liquidation plan to be filed by the Debtor. With this agreement and the agreement of HFS to allow all proceeds of the Memphis Accounts Receivable collected after the Closing to be used to pay allowed claims in the Memphis case as provided in this Order, the Debtor asserts that the relief requested in the Sale Motion is in the best interests of the Debtor and the other Debtors, their estates, their creditors and other parties-in-interest.

BB. Given all of the circumstances of these Chapter 11 cases and the adequacy and fair value of the Cash Purchase Price under the Agreement, the proposed Sale constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

CC. The inclusion of patients' personally identifiable information in the Assets is consistent with the Debtor's pre-petition privacy policy because the transfer is necessary to the ongoing provision of health care services. Pursuant to § 363(b)(1)(A), the Debtor may sell patients' personally identifiable information.

DD. The consummation of the Sale and the assumption and assignment of the Desired Contracts is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, §§ 105(a), 363(b), 363(f), 363(m), and 365 thereof.

**Adequate Assurance of Future Performance**

EE. The Buyer has demonstrated adequate assurance of future performance with respect to the Desired Contracts pursuant to § 365(b)(1)(C) of the Bankruptcy Code.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

**General Provisions**

1. The relief requested in the Sale Motion, including the Sale, is granted and approved to the extent set forth in this Order.

2. Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled by announcement to the Court during the Sale Hearing, by the provisions of this Order, or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise (except the reservations of right and objections expressly announced by Committee counsel during the hearing or preserved in this Order), are hereby denied and overruled with prejudice. Those parties who did not object or withdrew their objections to the Sale Motion are deemed to have consented pursuant to § 363(f)(2) of the Bankruptcy Code to the Sale of the Assets in accordance with the terms of this Order.

**Approval of the Agreement**

3. The sale of the Assets and the consideration provided by the Buyer under the Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for

reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

4. Pursuant to §§ 363(b) and (f) of the Bankruptcy Code, the Debtor is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement, (ii) close the Sale as contemplated in the Agreement and this Order, and (iii) execute and deliver, perform under, consummate, implement and fully close the Agreement, including the assumption and assignment of the Desired Contracts to the Buyer, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and the Sale, including but not limited to the Memphis Collections Agreement.

5. This Order shall be binding in all respects upon (a) the Debtor and the other Debtors, (b) their estates, (c) all creditors of, and holders of equity interests in, the Debtors, (d) all holders of Liens, Claims or other interests (whether known or unknown) in, against or on all or any portion of the Assets, (e) all applicable United States, state and local regulatory or taxing authorities, recording offices or any governmental entity, (f) the Buyer and all successors and assigns of the Buyer, (g) the Assets and (h) any trustees, if any, subsequently appointed in the Debtors' Chapter 11 cases or upon a conversion of these cases to cases under Chapter 7 under the Bankruptcy Code. This Order and the Agreement shall inure to the benefit of the Debtor and the other Debtors, their estates and creditors, the Buyer and the respective successors and assigns of each of the foregoing.

**Transfer of the Assets and HFS Agreement Regarding Memphis Accounts Receivable**

6. Pursuant to §§ 105(a), 363(b), and 363(f) of the Bankruptcy Code, and subject to the indefeasible cash payment of the HFS Payment directly to HFS at Closing, the Debtor is

authorized to transfer the Assets to the Buyer on the Closing Date upon satisfaction and fulfillment of the conditions to Closing contained in the Agreement and this Order, and such transfer shall (a) constitute a legal, valid, binding and effective transfer of the Assets, (b) vest the Buyer with title to the Assets and (c) upon the Debtor 's receipt of the Cash Purchase Price, be free and clear of all Liens, Claims and other interests of any kind or nature whatsoever (other than Assumed Liabilities, Permitted Encumbrances and as otherwise provided in this Order), and Claims, with such Liens, including mechanics, materialmen and subcontractor Liens and rights to receive payment of trust funds, Claims and other interests to attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Assets. Upon the closing of the Sale (the "**Closing**"), the Buyer shall take title to and possession of the Assets subject only to the Assumed Liabilities, Permitted Encumbrances and any interests expressly provided for in this Order, and Buyer specifically shall take title free and clear of any successor liability claim against Memphis or the other Debtors that could be asserted by the United States or the State of Tennessee, through any agency including but not limited to the U.S. Department of Justice, the U.S. Department of Health and Human Services or Tennessee Attorney General's Office, against Buyer for (a) any legal claims under the False Claims Act, Tennessee Medicaid False Claims Act, or other state or federal statue, or (b) any state or federal administrative penalties, except as may be imposed by the Centers of Medicare & Medicaid Services under the Medicare provider agreement, pursuant to authority in the Medicare statute itself, 42 U.S.C. § 1395, et seq.

7. At Closing (and as a condition to the Closing), indefeasible payment in cash in the amount of the HFS Payment (in the amount of $7,500,000) shall be paid directly to HFS, for application in accordance with the terms of the HFS Loan Documents, as part of the Cash Purchase Price paid by Buyer under Section 2.4 of the Agreement. It is hereby adjudicated that HFS is, and

shall be, entitled to indefeasible retention of the full HFS Payment made to HFS at Closing as required by this Order. HFS's consent to the sale of the Assets to Buyer free and clear of its Liens is specifically subject to the HFS Payment being made in cash directly to HFS at Closing. Effective upon (and only upon) HFS's receipt of the HFS Payment, HFS agrees and consents that all proceeds of the Memphis Accounts Receivable collected after the Closing (the "**Post-Closing Collections**"), which Memphis shall collect and hold for the benefit of creditors in its Chapter 11 case in the Memphis Segregated Account, may be used to pay any and all allowed claims in the Memphis Chapter 11 case, but only after all proceeds of the Sale available to pay such allowed claims against Memphis first have been fully depleted. If and after all allowed claims in the Memphis Chapter 11 case have been paid in full, any excess Post-Closing Collections shall then be paid to HFS and applied in accordance with the HFS Loan Documents (including any amendment to or restatement thereof).

8. Except with respect to Assumed Liabilities, Permitted Encumbrances and any interests expressly provided for in this Order, all persons and entities that are in possession of some or all of the Assets on the Closing Date are directed to surrender possession of such Assets to the Buyer or its assignee at the Closing. The provisions of this Order authorizing the sale of the Assets free and clear of Liens, Claims and other interests of any kind or nature whatsoever (other than the Assumed Liabilities, Permitted Encumbrances and any interests expressly provided for in this Order) shall be self-executing, and neither the Debtor nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

9. The Debtor is hereby authorized to take any and all actions necessary to consummate the Agreement, including any actions that otherwise would require further approval

by its members or any of the Debtor's board of managers without the need of obtaining such approvals.

10. To the extent permitted by § 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Assets sold, transferred or conveyed to the Buyer on account of the filing or pendency of the Debtor's Chapter 11 case or the consummation of the transactions contemplated by the Agreement. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order.

11. Notwithstanding anything contained in this Order or the Agreement to the contrary, nothing in this Order or the Agreement releases the Buyer from compliance with any applicable license, permit, registration, authorization, or approval of or with respect to a governmental unit including but not limited to the Tennessee Department of Health and CMS as though such sale took place outside of bankruptcy. The Buyer shall continue to honor and comply with the terms and requirements of any such applicable license, permit, registration, authorization or approval.

12. Notwithstanding anything contained in this Order or the Agreement to the contrary, nothing in this Order or the Agreement shall authorize the transfer or assignment of any license if such transfer or assignment is prohibited by applicable nonbankruptcy law.

**Prohibition of Actions Against the Buyer**

13. Except for the Assumed Liabilities, Permitted Encumbrances, or as otherwise expressly provided for in this Order or the Agreement, the Buyer shall not have any liability or other obligation of the Debtor arising under or related to any of the Assets on account of the Sale.

14. After the Closing has occurred in accordance with the Agreement and this Order, the Buyer will have given substantial consideration under the Agreement for the benefit of the Debtor and the other Debtors, their estates and creditors. The consideration provided by the Buyer for the Assets under the Agreement is fair and reasonable, and accordingly the purchase may not be avoided under § 363(n) of the Bankruptcy Code.

**Assumption and Assignment of Desired Contracts**

15. Notwithstanding the Notice of Intent to Assume and Assign Executory Contracts provided to the parties to certain contracts and leases as listed on Exhibit A to the Sale Motion, no objections to the assumption and specified cure amounts have been filed. Further, as of the Sale Hearing, the Buyer has not designated any contracts to be assumed other than: (i) the provider agreement with the U.S. Department of Health and Human Services (the "Provider Agreement") (Docket No. 487); and (ii) that certain pharmacy agreement with Elderscript Services, LLC, as modified by the Agreement. Nevertheless, pursuant to §§ 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the Debtor's assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the Agreement as modified by this Order, of the Desired Contracts is hereby approved, and the requirements of §365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

16. The Debtor is hereby authorized and directed in accordance with §§ 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Buyer, effective upon the Closing Date, the Desired Contracts free and clear of all Claims, Liens or other interests of any kind or nature whatsoever and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Desired Contracts to the Buyer, provided the

assumption and assignment of the Provider Agreement shall be subject to compliance with all federal Medicare laws and regulations.

17. The Desired Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Contract (including those of the type described in §§ 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer and, pursuant to § 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Desired Contracts after such assignment to and assumption by the Buyer.

18. All defaults or other obligations of any of the Debtor under the Desired Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in § 365(b)(2) of the Bankruptcy Code) shall be cured pursuant to the terms of the Agreement on the Closing Date or as soon thereafter as reasonably practicable.

19. Nothing in this Order, the Sale Motion or in any notice or any other document is or shall be deemed an admission by the Debtor that any contract is an executory contract and/or unexpired lease or must be assumed and assigned pursuant to the Agreement or in order to consummate the Sale.

20. The failure of the Debtor or the Buyer to enforce at any time one or more terms or conditions of any Desired Contract shall not be a waiver of such term(s) or condition(s) or of the Debtor 's and Buyer's rights to enforce every term and condition of such Contract.

21. All parties to the Desired Contracts are forever barred and enjoined from raising or asserting against the Buyer any assignment fee, default, breach, Claim, pecuniary loss or condition to assignment arising under or related to the Desired Contracts existing as of the Closing Date or

arising by reason of the Closing, except for any amounts that are Assumed Liabilities or as otherwise provided in this Order.

**Payment of Transaction Fee to New Century Capital Partners**

22. The Debtor request to pay to New Century Capital Partners a transaction fee in the amount of 2% of the Sale is denied.

**Payment of Breakup Fee to Skyline**

23. The Debtor is authorized to pay to Skyline the Breakup Fee in the amount of $125,000.00, payable at Closing.

**Other Provisions**

24. This Order and the Agreement shall be binding in all respects upon all creditors and equity-holders of the Debtor and any of the other Debtors, all non-debtor parties to the Desired Contracts, all successors and assigns of the Debtor and any of its affiliates and subsidiaries and any trustees, examiners, “responsible persons” or other fiduciaries appointed in the Debtors’ bankruptcy cases or upon a conversion of such cases to cases under Chapter 7 of the Bankruptcy Code in accordance with the Bankruptcy Code and other applicable law. The Agreement shall not be subject to rejection or avoidance under any circumstances.

25. The Agreement may be modified, amended, or supplemented by the parties thereto in a writing signed by the parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor’s estate and is consistent with the terms of this Order.

26. Nothing in this Order or the Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the

Closing Date, and the Buyer reserves all rights and defenses with respect to any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order.

27. The transactions contemplated by the Agreement are undertaken by the Buyer without collusion and in good faith, as that term is defined in § 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal. The Buyer is a good faith buyer within the meaning of § 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of § 363(m) of the Bankruptcy Code.

28. Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these Chapter 11 cases, (b) any subsequent Chapter 7 cases into which these Chapter 11 cases may be converted or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Agreement (as modified by this Order) or the terms of this Order.

29. Notwithstanding anything to the contrary in the Sale Motion, the Agreement, any notice of proposed assumption and assignment of contracts with respect to the Sale Motion and Agreement, or this Order (including any provision that purports to be preemptory or supervening), nothing therein shall permit or otherwise effect a modification, sale, assignment, or any other transfer of (a) any insurance policies or related agreements that have been issued by ACE American Insurance Company or any of its affiliates and successors at any time to (or to provide coverage to) any of the Debtors (or their predecessors) and/or (b) any rights, benefits, claims, rights to payments and/or recoveries under such policies or related agreements.

30.     All real and personal property taxes due on the relevant Assets will be paid at Closing pursuant to the terms of the Agreement.

31.     The failure to specifically include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety; *provided*, *however*, that this Order shall govern if there is any inconsistency between the Agreement (including an Operations Transfer Agreement between the Debtor and the Buyer, and all other ancillary agreements, including the Memphis Collections Agreement) and this Order.  Likewise, all of the provisions of this Order are non-severable and mutually dependent.

32.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to the Buyer, (b) interpret, implement and enforce the provisions of this Order, (c) interpret, implement and enforce the provisions of the Memphis Collections Agreement and (e) enter any orders under §§ 363 or 365 of the Bankruptcy Code with respect to the Desired Contracts.

33.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in these Chapter 11 cases, the terms of this Order shall govern.

34.     Notwithstanding the foregoing or any other provision of this Order, nothing in this Order alters or affects the Cash Collateral Order, or any of the claims, Liens, or other rights granted to or held by HFS against the Assets under the Cash Collateral Order or under the HFS Loan

Documents, unless and until HFS receives indefeasible cash payment of the HFS Payment at Closing, as required by this Order.

**This Order was signed and entered electronically as indicated at the top of the first page.**

APPROVED FOR ENTRY:

*/s/ William L. Norton III*
William L. Norton III (TN 10075)
James B. Bailey (pro hac vice)
BRADLEY
1600 Division St., Suite 700
Nashville, TN 37203
615-252-2397
bnorton@bradley.com
jbailey@bradley.com
*Attorneys for Debtors*

Certificate of Service

The undersigned hereby certifies that on the 24th day of February, 2017, an advanced copy of the foregoing order was provided to counsel for the Buyer, HFS, Skyline, the Committee and the US Trustee.

*/s/ William L. Norton III*

This Order has been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.

**EXHIBIT "E"**

SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
James P. Hill, SBN 90478
Christopher V. Hawkins, SBN 222961
600 B Street, Suite 1700
San Diego, California 92101
Telephone: (619) 233-4100
Fax Number: (619) 231-4372

**Electronically Filed:**

Counsel for Debtor and Debtor in Possession, Vestavia Hills, Ltd. dba Mount Royal Towers

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>VESTAVIA HILLS, Ltd, an Alabama Limited Partnership, dba Mount Royal Towers<br><br>Debtor. | CASE NO. 20-00018-LA11<br><br>Chapter 11<br><br>**NOTICE OF SALE OF ASSETS, BIDDING PROCEDURES, ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND SALE HEARING**<br><br>**Initial Hearing Date:** TBD<br>Time: TBD<br>**Sale Hearing Date:** TBD<br>Time: TBD<br><br>Ctrm: 2<br>United States Bankruptcy Court<br>325 West "F" Street<br>San Diego, CA 92101-6991<br>Judge: Hon. Louise DeCarl Adler |

**TO THE HONORABLE LOUISE DECARL ADLER, THE UNITED STATES TRUSTEE, ALL CREDITORS AND OTHER PARTIES IN INTEREST:**

PLEASE TAKE NOTICE THAT on _______, 2020, Vestavia Hills, Ltd. ("Debtor"), the Chapter 11 debtor and debtor in possession, filed its Motion for ______________ (the "Motion"), as Docket No. _____, with the United States Bankruptcy Court for the Southern District of California ("Bankruptcy Court"). Any capitalized term not otherwise defined herein shall have the meaning given it in the Motion.

By order dated ____________("Bidding Procedures Order"), the Bankruptcy Court approved the Bidding Procedures governing the sale of substantially all of the assets of the Debtor. A copy of the Bidding Procedures Order is attached as Exhibit "A" hereto.

All interested parties are invited to make a bid in accordance with the terms of the Bidding Procedures.

Bids must be received by the Escrow Agent on or before **_________, 2020 at _:00 p.m.** Pacific Standard Time (the "Bid Deadline"). Escrow Agent can be contacted by phone at 310-893-7182 or by email at jacob@blueprintHCRE.com, Attention: Jacob Gehl, as more fully discussed in the Bidding Procedures Order.

On __________________ at _____Pacific Standard Time, the Bankruptcy Court will conduct a "Sale Hearing" to approve the sale. The Sale Hearing will be held at the United States Bankruptcy Court, Southern District of California located at 325 West "F" Street, San Diego, CA 92101-6991, Courtroom 2. If the Debtor receives two or more qualified bids, the Bankruptcy Court will conduct an auction at the Sale Hearing. In the event of a change in time or place of the auction, the Debtor shall use their reasonable best efforts to notify all qualified bidders who have timely submitted qualified bids on or before the Bid Deadline; provided, however, that the Bid Deadline can be extended by order of the Bankruptcy Court or written agreement

of the Debtor.

Upon completion of the auction, the Debtor shall then submit the successful bid and any back-up bid for approval by the Bankruptcy Court. Any objections to the sale must be filed with the Court and served on the Debtor no later than 7 days prior to the Sale Hearing.

If you did not receive a set of the moving papers, such papers will be provided, upon request, by the undersigned, or may be inspected at the office of the Clerk of the Bankruptcy Court at 325 West "F" Street, San Diego, CA 92101-6991.

Dated: February 13, 2020

SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation

By: *James P. Hill*
James P. Hill
Christopher V. Hawkins
Counsel for Debtor and Debtor in Possession, Vestavia Hills, Ltd. dba Mount Royal Towers

**Exhibit Table**

| Exhibit | Description | Pages |
|---|---|---|
| A | Bidding Procedures Order | |