SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
James P. Hill, SBN 90478
Christopher V. Hawkins, SBN 222961
Kathleen Cashman-Kramer, SBN 128861
600 B Street, 17th Floor
San Diego, California 92101
Telephone: (619) 233-4100
Fax Number: (619) 231-4372

Attorneys for Debtor and Debtor In Possession,
Vestavia Hills, Ltd., dba Mount Royal Towers

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>VESTAVIA HILLS, LTD.,<br>DBA MOUNT ROYAL TOWERS,<br><br>Debtor | Case No. 20-00018-LA11<br><br>Chapter 11<br><br>**DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S [PROPOSED] FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED AUGUST 6, 2021**<br><br>Date.: August 26, 2021<br>Time: 2:00 p.m.<br>Dept.: 2<br>Judge: Hon. Louise DeCarl Adler |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................... 1

   A.   EXECUTIVE SUMMARY OF THE PLAN ....................................... 2

   B.   FACT BACKGROUND SUMMARY ............................................... 4

      1.   Pre-Petition Issues Leading to the Filing of Chapter 11 ............. 5

      2.   The Post-Petition Sale of the Debtor's Business ...................... 8

      3.   Wells Fargo Claims and Treatment. ................................... 9

      4.   Post-Petition Challenges Faced by the Debtor ....................... 10

      5.   Summary of Classification and Treatments of Classified Claims and Interests ................................................... 14

      6.   Recommendation of the Plan Proponent. ............................. 18

   C.   PURPOSE OF THIS DOCUMENT ................................................ 18

   D.   DEADLINES FOR VOTING AND OBJECTING; CONFIRMATION HEARING DATE ........................................... 19

   E.   TIME AND PLACE OF THE CONFIRMATION HEARING .......... 19

   F.   DEADLINE FOR OBJECTING TO THE CONFIRMATION OF THE PLAN ............................................................................. 20

   G.   IDENTITY OF PERSON TO CONTACT FOR MORE INFORMATION REGARDING THE PLAN ................................. 20

   H.   DISCLAIMER ............................................................................ 20

   I.   IMPORTANT NOTICES AND CAUTIONARY STATEMENTS ... 20

II.  FURTHER BACKGROUND INFORMATION. ....................................... 22

   A.   DESCRIPTION AND HISTORY OF DEBTOR'S BUSINESS AND MANAGEMENT ................................................................ 22

   B.   PRINCIPALS/AFFILIATES OF DEBTOR'S BUSINESS .............. 22

   C.   MANAGEMENT OF DEBTOR BEFORE AND AFTER THE BANKRUPTCY ........................................................................ 23

   D.   EVENTS LEADING TO CHAPTER 11 FILING ........................... 23

   E.   SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE ....................................................................................... 23

      1.   Significant Bankruptcy Proceedings and Events ..................... 24

      2.   Legal Proceedings ........................................................ 27

      3.   Post-Confirmation Litigation Information for Creditors .......... 28

   F.   CLAIMS AND CLAIMS OBJECTIONS ....................................... 31

i

G.    FRAUDULENT CONVEYANCES AND PREFERENCE
        RECOVERIES ................................................................34

III.    SUMMARY OF THE PLAN OF REORGANIZATION .............................34

A.    UNCLASSIFIED ADMINISTRATIVE CLAIMS............................34
        1.    Description.......................................................34
        2.    Treatment .......................................................36
        3.    Court Approval of Post-Confirmation Fees Not Required.......37

B.    DESIGNATION AND TREATMENT OF IMPAIRED
        CLASSES OF CLAIMS AND INTERESTS ................................37

C.    MEANS FOR PLAN IMPLEMENTATION ..................................40
        1.    Means of Effectuating the Plan ................................40
        2.    Management of the Reorganized Debtor................................40
        3.    Bar Date for Certain Administrative Claims ...........................40
        4.    Effectuating Documents; Further Transactions.......................41
        5.    Objections to Claims................................................41

D.    RISK FACTORS.......................................................42

E.    OTHER PROVISIONS OF THE PLAN ..........................................42
        1.    Executory Contracts and Unexpired Leases:............................42
        2.    Recapitalization and Reorganization ...........................43
        3.    Retention of Jurisdiction.....................................43

F.    TAX CONSEQUENCES OF THE PLAN .........................................44

G.    CONFIRMATION REQUIREMENTS AND PROCEDURES .........45

H.    WHO MAY OBJECT OR VOTE TO APPROVE THE PLAN.........45
        1.    Who May Object to Confirmation of the Plan ........................45
        2.    Who May Vote to Accept/Reject the Plan..............................46
        3.    What is an Alleged Claim/Interest..................................46

IV.    SIGNIFICANT PLAN TERMS AND DEFINITIONS .................................46

A.    The Bar Date. .......................................................46
B.    What Is an Impaired Claim/Interest ................................48
C.    Who is Not Entitled to Vote ........................................48
D.    Who Can Vote in More Than One Class ...........................49
E.    Votes Necessary to Confirm the Plan ................................49
F.    Votes Necessary for a Class to Accept the Plan .................49
G.    Treatment of Non-Accepting Classes ................................49

ii

    H.     Request for Confirmation Despite Non-Acceptance by Impaired Classes ................................................................................50

    I.      Absolute Priority Rule .................................................................50

V.     LIQUIDATION ANALYSIS ...................................................................51

VI.    FEASIBILITY ..........................................................................................53

VII.   EFFECT OF CONFIRMATION OF PLAN ...........................................53

    A.     DISCHARGE .................................................................................53

    B.     REVESTING OF PROPERTY IN DEBTOR .................................54

    C.     REVOCATION, MODIFICATION AND AMENDMENT OF PLAN ..........................................................................................55

    D.     POST-CONFIRMATION STATUS REPORT .................................55

    E.     QUARTERLY FEES .......................................................................55

    F.     POST-CONFIRMATION EMPLOYMENT .....................................55

    G.     REMEDIES UPON DEFAULT; POST-CONFIRMATION CONVERSION/DISMISSAL ..........................................................56

    H.     FINAL DECREE ............................................................................57

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL STATUTES, REGULATIONS, AND RULES**

11 U.S.C.
§ 101 .................................................................................................passim
§ 1129(a)(8) ........................................................................................ 49
§ 1129(b) ............................................................................................ 49
§ 1129(b)(2)(B)(ii) .............................................................................. 50

28 U.S.C.
§ 1930 ................................................................................................. 41
§ 1930(a)(6) ................................................................................... 36, 55

Chapter 7 of the Bankruptcy Code ...............................................50, 51, 52, 56

Bankruptcy Code
§ 327 ................................................................................................... 36
§ 365 ................................................................................................... 43
§ 501 ................................................................................................... 54
§ 502 ................................................................................................... 54
§ 502(g) ............................................................................................... 53
§ 502(h) ............................................................................................... 53
§ 506 ................................................................................................. 9, 26
§ 507(a)(1) ..........................................................................34, 43, 45, 48
§ 507(a)(2) ......................................................................................... 48
§ 507(a)(7) ......................................................................................... 48
§ 507(a)(8) ............................................................................... 17, 39, 48
§ 524 ................................................................................................... 54
§ 541 ................................................................................................... 54
§§ 547 and 548 ................................................................................... 34
§ 1103 ................................................................................................. 36
§ 1122 ................................................................................................. 55
§ 1123 ................................................................................................. 55
§ 1123(b)(3) ........................................................................................ 54
§ 1125 ................................................................................................... 1
§ 1127 ................................................................................................. 55
§ 1129 ................................................................................................... 1
§ 1141 ................................................................................................. 54

iv

Coronavirus Aid, Relief, and Economic Security Act
(CARES Act) ........................................................................11, 28, 29, 30

**RULES**

Bankruptcy Rule 3022 .............................................................................57

Local Bankruptcy Rule 3020-1(b) ...........................................................55

## I.      **INTRODUCTION**

Vestavia Hills, Ltd., an Alabama limited partnership dba Mount Royal Towers ("Company" or "Debtor"), debtor and debtor-in-possession in the above-referenced Chapter 11 case ("Bankruptcy Case"), commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. ("Bankruptcy Code") on January 3, 2020 with the United States Bankruptcy Court for the Southern District of California ("Bankruptcy Court").

The Debtor submits this proposed First Amended[1] Disclosure Statement ("Disclosure Statement") in support of the Debtor's [Proposed] First Amended Chapter 11 Plan of Reorganization dated August 6, 2021 ("Plan") pursuant to Section 1125 of the Bankruptcy Code. Chapter 11 allows debtors, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization. The Plan may provide for debtors to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. Debtor is the proponent (the "Proponent"), within the meaning of Bankruptcy Code § 1129, of the [Proposed] First Amended Chapter 11 Plan of Reorganization dated August 6, 2021 sent to you in the same envelope as this document.  No solicitation materials, other than this Disclosure Statement and the materials transmitted with it have been approved by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.  All holders of claims entitled to vote to accept or reject the Plan should read the Plan and this Disclosure Statement in their entirety before voting to accept or reject the Plan.

**THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE PLAN.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE**

---

[1] This First Amended Disclosure Statement amends the original Disclosure Statement filed July 2, 2021 (ECF #516) to clarify and/or add additional non-material information that was unintentionally omitted from that original document, as well as to modify the treatments of certain claims based upon the Debtor's revised or additional projections.

1

**PLAN, AND THE RESPECTIVE EXHIBITS AND SCHEDULES THERETO IN THEIR ENTIRETY**.

Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

Please read the Plan attached as Exhibit A to this Disclosure Statement. The terms of the Plan will control your rights as a creditor, equity interest holder or other party in interest in this Chapter 11 case. In general, however, the Plan assumes closing a Bankruptcy Court approved sale of certain Debtor's real and personal property assets to MED Healthcare Partners, LLC ("MED") by, on or before October 31, 2021.

### A. <u>EXECUTIVE SUMMARY OF THE PLAN</u>

The Plan, at its core, is a liquidating plan that reorganizes the Debtor and Debtor Estate in order to accomplish the sale of the Debtor's significant operating assets and to provide for the continuing administration of the Reorganized Debtor Estate to collect and distribute proceeds of other assets and to receive and distribute proceeds of funding from new equity in amounts sufficient to pay all Allowed Creditor Claims. The Plan is a 100-cent-on-the dollar payment plan, with holders of Allowed General Unsecured claims being paid in full over two years (24 months), if not sooner. The Debtor will sell certain Debtor's real and personal property assets consisting of its continuing care retirement community, commonly known as "Mount Royal Towers," ("MRT"), on real property currently owned by the Debtor located near Birmingham, Alabama to a cash buyer with the net sales proceeds being paid to the Debtor's only secured creditor, Wells Fargo Bank, N. A. ("Wells Fargo"). The sale is expected to close on or before October 31, 2021 to the current Bankruptcy Court approved purchaser of those assets, MED. Following sale closing, the Debtor will be involved in winding up its financial affairs and finalizing pending litigation involving the Debtor, various alleged creditors and certain of the Debtor's Limited Partners.[2] The

---

[2] The following limited partners of the Debtor are treated as being five members. Though seven individuals are involved and they serve as Trustees or Successor or Co-Trustees of various Trusts which may also be involved as limited partners.

2

Debtor is able to offer General Unsecured Creditors a payment-in-full plan solely based on the agreement by its Limited Partners to provide essential additional new value funding as provided in and subject to confirmation of the Plan as presented herein.

The Debtor previously requested and obtained Bankruptcy Court approval to sell MRT to MED free and clear of all liens, claims and interests. MED was the only qualified purchaser willing to buy MRT for a Cash sales price of Twelve Million Dollars ($12,000,000). Under the Plan, the net proceeds of sale will be paid to Wells Fargo in full satisfaction of the secured claim possessed by Wells Fargo. The remainder of the Wells Fargo debt is separately classified in the Plan as the "Judgment Claim" and is the only allowed, under-secured claim for which the Debtor and Limited Partners have joint and several liability.

To recapitalize the Reorganized Debtor, which will allow the Debtor to perform the Plan, two new corporate entities will be formed by the Limited Partners. On confirmation, the newly formed entities will become the New General Partner and the New Limited Partner of the Reorganized Debtor. The entities will be funded with sufficient loans from the Limited Partners for the Reorganized Debtor to: (i) make all payments required to be made on the Effective Date of the Plan which is November 15, 2021 ("Effective Date"); and (ii) thereafter make all future payments on Allowed Claims of creditors as required by the Plan. Acting through the newly created corporate entities, owned equally by the Limited Partners, the Reorganized Debtor will borrow the amounts necessary for the Reorganized Debtor to wind up various litigation matters, perform all Plan obligations and close the Case.

The only remaining assets then to be used for Plan distributions will be: (i) Cash in the Debtor's account at sale closing; (ii) proceeds of litigation recoveries from Commonwealth Assisted Living, LLC, Series E ("Commonwealth") and its agents;

---

Of the seven individuals, three, Jack Rowe, Judy Chance and Karen McElliott, are widowed. Collectively, they are referred to as the Limited Partners.

3

and (iii) additional funding provided by the Limited Partners to make Plan payments to allowed priority Claims and also to pay Allowed General Unsecured creditor Claims over time to the extent the forgoing funding sources prove insufficient to pay the Allowed General Unsecured creditor Claims in full.

The Debtor's and Limited Partners' most significant joint financial obligation concerns Wells Fargo. On April 16, 2020, Wells Fargo obtained a judgment against the Limited Partners as guarantors of the Debtor's loan. Under the Plan, money received by the Reorganized Debtor from the Limited Partners will be paid to Wells Fargo to fully satisfy the net balance owed on the judgment over time. Plan payments to Wells Fargo of $80,000 per month will be made through December 31, 2021.  On January 15, 2022, monthly payments of $165,000 per month will be made to Wells Fargo until the judgment is paid in full by a balloon payment on October 31, 2023, while accruing simple interest at the rate of  0.22 percent per annum.

The Plan impairs all classes of Claims other than Class 3A, Class 3B and Class 6. Operational feasibility depends on the  Limited Partners willingness to: (i) withhold collection of their pre-petition unsecured Claims and their post-petition Administrative Claims; and (ii) continue to recapitalize the Reorganized Debtor entity with loans in order to fund all future ongoing post-confirmation payments necessary to: (i) pay the Judgment Claim in full; (ii) pay legal fees to achieve plan confirmation and conclude post-confirmation litigation; and (iii) make a 100 percent distribution on Allowed Claims of General Unsecured Creditors over a two-year (24-month) period payable in equal quarterly installments with each such installment made on the 10th day of each month beginning with the first such quarterly distribution on the 10th day of the first month following the Effective Date and continuing each quarter thereafter until all such Allowed Claims are paid in full.  The Limited Partners have agreed to all of the foregoing.

## B.  **FACT BACKGROUND SUMMARY**

Upon filing the Chapter 11 Case, the Debtor owned and operated a continuing care retirement community, MRT. The Debtor provided (or previously provided) facilities for independent living, licensed assisted living, specialty care assisted living for memory care and skilled nursing for seniors.  Real Property[3] owned by the Debtor then consisted of: (i) three buildings, including an 11-story main building, additional residence buildings, and an ancillary building for equipment; and (ii) a two-level parking lot. Additionally, the Debtor owned personal property, equipment and inventory necessary to operate the facility and had cash in the bank valued at $1,531,957.02.

When the Chapter 11 Case was filed, the Debtor had approximately 148 employees and there were then 144 residents at MRT as well as available "beds" and rooms that could house an additional number of residents. During the course of the Chapter 11 Case, the Debtor continued operations of MRT in the senior living facility business with the same management that was in place on the Petition Date.

The most significant events affecting post-petition operations included: (i) the global COVID-19 Pandemic which hit senior residential care facilities and their residents and employees tragically hard; and (ii) the Debtor's efforts to sell MRT to a qualified buyer for cash. Other significant events included: (i) disputes over the Debtor's access to certain government provided financial assistance including litigation with the Small Business Administration ("SBA"), a matter which remains on appeal as of the date that this Disclosure Statement is being filed and served; and (ii) ongoing litigation with Wells Fargo, Commonwealth and other creditors.

---

[3] On the Debtor's Schedules and Statements filed as ECF Docket Number 1, the value of the Debtor's Real Property was listed as $17 Million. The true actual market value of the Real Property was determined to be less than $12 Million based on the purchase price received from MED. For clarity, future ECF Docket References will relate to filings made in the Main Bankruptcy Case ("ECF # ___"), and in various Adversary Proceedings identified separately by reference to a designation for either the Adversary Party or the Court in which the action is pending.

5

### 1. Pre-Petition Issues Leading to the Filing of Chapter 11

The Company's financial difficulties arose as the result of a series of unfortunate events the bulk of which were unrelated to the Debtor's operations, management, or financial viability. Though the Company never missed or was never late on any monthly debt service obligation owed to its series of three bank lenders, the loan and security interest owed by the Company were part of an asset portfolio that was acquired by Wachovia Bank, which itself subsequently failed and then fell into FDIC receivership. During this period of financial institution turmoil, the then outstanding loan amount of in excess of $23 Million transformed from a fully performing, short-term obligation that was due for renewal into an "all due" mammoth sum owed after the loan subsequently devolved to Wells Fargo once Wachovia was declared insolvent.

Thus, what had originally been a manageable, timely paid, five-year renewable, secured debt burden in the hands of Wachovia and the original lender with which the Company had maintained a good working relationship, unfortunately became an all-due, secured obligation "in default" after Wells Fargo acquired the position. Despite its best efforts, the Company was unable to refinance the principal amount then owed in excess of $23 Million. The Company's Limited Partners arranged for a $5 Million personal loan and used the proceeds of that loan to pay down principal of the Wells Fargo obligation. With Wells Fargo unwilling to further extend the loan, the debt principal matured on December 31, 2017. Wells Fargo subsequently delivered a Notice of Default on January 3, 2018 declaring that the Company owed Wells Fargo $18,366,477.28 as of December 31, 2017, and simultaneously also proceeded with foreclosure proceedings.

Pending foreclosure, the Company sought to sell MRT to satisfy all outstanding debt owed to Wells Fargo. On February 1, 2018, Company and Commonwealth entered into a non-binding Letter of Intent for the sale and purchase of MRT and subsequently entered into a purchase agreement on March 29, 2018 ("Purchase

Agreement"). Pursuant to the Purchase Agreement, Commonwealth agreed to purchase MRT for $26,680,000.

Following Purchase Agreement execution, and in consideration of payment by the Company of $1,500,000 in principal and approximately $536,708.33 in accrued interest to Wells Fargo, Wells Fargo executed a forbearance agreement with the Company dated April 9, 2018 ("Forbearance Agreement"). Pursuant to the Forbearance Agreement, Wells Fargo agreed to delay foreclosure proceedings until October 1, 2018, pending consummation of the Purchase Agreement. Under the terms of the Forbearance Agreement, the Company had the option to further extend the forbearance period until December 14, 2018. In order to exercise this option, the Company had to pay an additional $500,000 in principal by September 14, 2018.

From March 2018 through November 2018, the Company and Commonwealth entered into a total of nine amendments to the Purchase Agreement. Among other things, these amendments extended dates: (i) by which approvals could be received from certain governmental authorities and regulatory agencies in the State of Alabama in connection with Commonwealth's acquisition of MRT, and (ii) to consummate the transaction or terminate the Purchase Agreement. While Commonwealth and the Debtor were extending and exchanging Purchase Agreement Amendments, the Alabama Department of Public Health issued a Consent Decree, which mandated that, if the Company failed to transfer its operational licenses for the assisted living facility and specialty care assisted living facility before November 30, 2018, it would be required to issue discharge notices to MRT's Residents. Delay in consummation of the transactions contemplated by the Purchase Agreement also resulted in the Company exercising its extension option under the Forbearance Agreement by paying Wells Fargo $500,000 to extend the forbearance period until December 14, 2018.

Unfortunately, the sale to Commonwealth was never consummated. Following Commonwealth's failure to timely procure financing and to timely obtain required

operating approvals by the last agreed deadline, the Purchase Agreement terminated by its own terms on November 16, 2018, and the Company began the search for a new qualified buyer for MRT and all of its assets and operations.

On November 21, 2018, Commonwealth filed a lawsuit under seal against the Company and its limited partners entitled, "*Commonwealth Assisted Living, LLC, Series E v. Vestavia Hills, Ltd., Judith A. Chance, Karen McElliott, Frank A. Virgadamo, Connie Virgadamo, B. Renee Barnard, Charles Barnard and Jack L. Rowe,*" in Alabama State Court ("Commonwealth Lawsuit"). The Commonwealth Lawsuit when filed sought specific performance by the Company under the Purchase Agreement and requested money damages from the Debtor and from the limited partner Defendants.  The Company asserted counterclaims against Commonwealth and is now seeking damages for Commonwealth's failure to timely perform its obligations under the Purchase Agreement.  The Debtor's filing of the Bankruptcy Case initiated an automatic stay of Commonwealth's litigation against the Debtor and eventually, removal of the Commonwealth Lawsuit to Federal Court and the subsequent transfer of venue to the Bankruptcy Court.

As a result of the collapse of the Commonwealth sale, the Company was unable to meet its obligation to Wells Fargo under the extended Forbearance Agreement. Wells Fargo instituted an arbitration action against the Limited Partners. On December 20, 2019, the AAA arbitration panel entered a final award in favor of Wells Fargo and against the Limited Partners of $18,086,910.61. The Company and Limited Partners attempted to reach a settlement with Commonwealth and to obtain a new loan to pay off Wells Fargo in full. When neither option materialized, the Debtor sought bankruptcy protection. On January 3, 2020, the Debtor filed its Chapter 11 Petition.

## 2.    The Post-Petition Sale of the Debtor's Business

On February 6, 2020, the Debtor and MED entered into an Asset Purchase Agreement ("Asset Purchase Agreement").  The Asset Purchase Agreement provides

8

for the sale of certain of the Debtor's Mount Royal Towers real and personal property assets ("Debtor Assets") to MED for an aggregate purchase price of $12,000,000 and payment of a sale commission equal to 1.5 percent of the purchase price to Blueprint Healthcare Real Estate Advisors ("Blueprint"). On March 25, 2020, the Bankruptcy Court issued an order approving MED as a "Stalking Horse Bidder" in connection with the proposed sale of the Debtor Assets. ECF #185. The Bankruptcy Court initially scheduled a final sale hearing for May 21, 2020 to consider final approval of the sale of the Debtor Assets.

At the May 21, 2020 hearing, the Bankruptcy Court granted Debtor's motion to set a new date for final sale hearing, among other things, and set the final sale hearing on the sale of the Debtor Assets for July 30, 2020. At the July 30, 2020 hearing, the Bankruptcy Court approved the bid of MED as the final and only qualified bid for the Debtor Assets and authorized the assumption and assignment to MED of certain executory contracts and unexpired leases. On August 31, 2020, the Bankruptcy Court issued an order ("August 2020 Order") which, among other things: (a) approved the sale of the Debtor Assets to MED, as described in and pursuant to the terms of the Asset Purchase Agreement; and (b) rejected the purported "overbid" by Commonwealth's affiliate, MCAP Birmingham LLC, as non-conforming and a non-qualifying bid. ECF #381

Sale closing is anticipated to occur on or before October 31, 2021. The transaction contemplated by the Asset Purchase Agreement was initially delayed due to interference by Commonwealth in the license transfer process concerning administrative procedural requirements related to Alabama's licensing requirements. Additionally, COVID-19 Pandemic restrictions created further delays by preventing MED's ability to have contractors and other agents access MRT to perform various assessments related to modifications of the MRT facility required to satisfy closing

9

conditions. During these delay periods, the Debtor continued to operate and received financial assistance from various federal government disaster relief programs.

Following the closing of the sale to MED of the MRT facility and related business assets as defined in the Court's August 2020 Order: (i) net sale proceeds will be paid to Wells Fargo directly from escrow; (ii) executory contracts and unexpired leases will be assigned to MED; and (iii) the sale commission will be paid to Blueprint. The August 2020 Order also included rulings that MED will not become a successor or *alter ego* to Debtor or continue any enterprise of Debtor in connection with its purchase of Debtor Assets, and that MED will have no liability to any creditor or to any other person or entity as a purported successor to Debtor.  The August 2020 Order further enjoined all creditors and interest holders from taking any actions against MED or any affiliate or assignee of MED or against Debtor Assets to recover any claim that such creditors and interest holders may have against Debtor relating in any way to Debtor, Debtor Assets and/or the sale and transfer of Debtor Assets.

### 3.    Wells Fargo Claims and Treatment

On April 16, 2020, Wells Fargo obtained a money judgment in the Northern District of Alabama Federal Court against the Limited Partners ("Judgment"). Collection of that Judgment has been stayed by Order of the Bankruptcy Court in Adversary Proceeding Number 20-90083-LA. ("WF Adv. ECF #37"). Under Bankruptcy Code Section 506, Wells Fargo is what is known as an under-secured creditor. The debt amount owed to Wells Fargo is greater than the sales price the Debtor obtained from MED. Net sale proceeds, after payment of the costs and expenses of sale, including the sale commission to Blueprint and ordinary course expenses of sale closing, such as escrow fees, title fees and related expenses reasonable and necessary to close escrow, will be paid to Wells Fargo as a secured creditor in satisfaction of Wells Fargo's Class 1 secured claim.  After receiving net sale proceeds directly from escrow, Wells Fargo will still be owed money by both: (i) the Debtor (as

10

an under-secured, unsecured claimholder); and (ii) by the Limited Partners who were guarantors of the Debtor's financial obligations to Wells Fargo and against whom Wells Fargo obtained the judgment.

As a debt obligation of both the Debtor and the Limited Partners, however, the balance of Wells Fargo's claim amount after Wells Fargo's receipt of the net proceeds of sale has been separately classified in the Plan as the Class 2 Judgment Claim. The Judgment Claim amount will continue to earn interest at the applicable Federal Judgment Interest Rate of 0.22 percent. Interest and principal will be paid to Wells Fargo on its Judgment Claim under the Plan by regular monthly payments of $80,000 per month until December 31, 2021 and payments of $165,000 per month thereafter until the Class 2 Judgment Claim is paid in full by a balloon payment of the full remaining balance of Wells Fargo's Class 2 Judgment Claim no later than October 31, 2023, as more fully discussed below.

### 4. <u>Post-Petition Challenges Faced by the Debtor</u>

The COVID-19 pandemic has had a significant impact on senior care facilities nation-wide and world-wide. For the Debtor, the COVID-19 pandemic significantly increased operating costs. The care and safety of Residents and employees was and remains the Debtor's top priority. Fortunately, MRT did not experience any known cases of the novel coronavirus in Residents or staff until early 2021. As the development and proliferation of an immunization became available, the Debtor took steps to expedite the vaccination of Residents and employees in the early portion of 2021.  The Debtor's vaccination and safety protocols created very effective barriers against the spread and effects of COVID-19 at MRT.

The significant financial impacts from the COVID-19 pandemic were partially offset through the Debtor's participation in various government assistance and grant programs. Following the June 26, 2020 entry of a Preliminary Injunction Order issued by the Bankruptcy Court in Adversary Proceeding Number 20-90073-LA ("SBA Adv.

11

ECF #26) on July 2, 2020, the Debtor received $1,138,105.00 in a Small Business Administration ("SBA") guaranteed funding grant through the PPP Program (the "PPP Funds"). Additionally, between April 2020 and February 2021, the Debtor received additional funds consisting of grant funds from the CARES Act Healthcare Relief Program, stimulus and other funds from the HHS Provider Relief Fund, and funds from Medicaid. These funds, received post-petition, between April 2020 and February 2021, including the PPP Funds described above, total $1,801,716, all of which were reported and reflected in the Debtor's Monthly Operating Reports filed in the Case.

A second significant challenge facing the Debtor concerns litigation with the SBA. With the exception of the PPP Funds, all of the other governmental emergency relief funding which the Debtor received was in the form of grants which do not need to be repaid. Use and forgiveness of the PPP Funds, however, became the subject of significant litigation between the Debtor and the SBA. Initially, the SBA took the position that Chapter 11 Debtors were not eligible to obtain PPP Funds. The Debtor disagreed and sought emergency declaratory and injunctive relief from the Bankruptcy Court ordering the SBA to permit the Debtor to participate in the PPP Funds Program.

On May 27, 2020, the Debtor filed an Adversary Proceeding naming as defendants the SBA and its then Administrator, the Honorable Jovita Corranza.[4] On June 26, 2020, following extensive briefing and argument, the Bankruptcy Court granted the Debtor's Emergency Application for an Injunction (SBA Adv. ECF #26), and the SBA honored the Injunction thereby permitting the Debtor to receive the PPP Funds. Subsequently, on July 10, 2020, the SBA appealed the Bankruptcy Court's Decision to the United States District Court for the Southern District of California (SBA ECF Adv. #31). On March 26, 2021, the District Court entered an Order: 1) vacating the Bankruptcy Court's decision; and 2) granting the SBA's Motion for

---

[4] The SBA Adversary Proceeding is identified as Adversary Proceeding Number 20-90073-LA. The initial appeal by the SBA to the United States District Court for the Southern District of California is identified as Case Number 20-CV-1308. Currently, the pending Appeal that has been taken by the Debtor to the United States Court of Appeals for the Ninth Circuit is identified as Appellate Case Number 21-55547.

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

Case No. 20-00018-LA11

Withdrawal of the Reference (SBA ECF Adv. #78). On May 24, 2021, the Debtor appealed the District Court Decision to the Ninth Circuit Court of Appeals where the matter remains pending.

On June 21, 2021, Debtor filed its Opening Brief in the Appeal (Appeal ECF# 10) and the parties have subsequently agreed to participate in the Ninth Circuit's voluntary mediation program. If settlement cannot be achieved, challenges presented by the SBA litigation remain active for the Debtor.  Full briefing to the Ninth Circuit Court of Appeals is not expected to be completed until October 2021.  If and to the extent that the SBA prevails in its arguments on appeal, and if the Debtor's application for forgiveness of the PPP funds is denied[5], it is possible that the SBA will ultimately be allowed a post-petition claim that the Debtor will have to repay, and which may require additional funding by the Limited Partners, which the Limited Partners have agreed to provide.  If and to the extent that any portion of the SBA claim survives the pending appeal process, the Debtor intends to object to the SBA's claim on multiple grounds and to seek disallowance of the claim.  If the SBA Claim is finally allowed in any amount against the Debtor, then the SBA will be paid 100 percent of its allowed claim in quarterly installments of principal and interest over a five-year (60-month) period together with 1 percent per annum interest  amortized over a five-year (60-month) period commencing upon the order allowing its Claim becoming final, with quarterly payments then commencing thereafter to the SBA on the 10th day of the first full month following the order approving its Claim becoming final, in full satisfaction of the SBA's Claim.

A third major challenge which the Debtor faced related to the litigation which was required to be commenced by the Debtor against Wells Fargo.  Since the Debtor was the principal obligor on the debt owed to Wells Fargo, and the Limited Partners

---

[5] The SBA has never argued that the Debtor did not use the PPP funds as Congress intended and, as a result, the Debtor believes that its application for forgiveness should be approved in full.  The SBA has been in receipt of that application since November 2020, and has failed to act on it, despite the Debtor's complete compliance with all requirements.

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

Case No. 20-00018-LA11

were only secondarily liable for the debt, the Debtor was placed in an unusually difficult financial dilemma. On January 22, 2020, the Bankruptcy Court initially approved emergency loan (line of credit) funding for the Debtor from the Limited Partners in order for the Debtor to maintain safe operating conditions at MRT (ECF #48). On February 4, 2020, the Bankruptcy Court approved Interim Financing arrangements between the Debtor and the Limited Partners for line of credit borrowing (ECF #100). Thus, the Limited Partners effectively became the financial backstop for the Debtor to continue in safe operation while timely paying all post-petition operating expenses and making adequate protection payments of $65,000 per month to Wells Fargo.

On April 16, 2020, Wells Fargo obtained the Alabama Judgment against the Limited Partners and shortly thereafter commenced actions to collect on the Judgment. With the financial viability of the Debtor's operations and the health and safety of Residents and employees being placed in jeopardy, the Debtor commenced an Adversary Proceeding (Adversary Proceeding Number 20-90083-LA) against Wells Fargo requesting that Wells Fargo be restrained and enjoined from taking actions against the Limited Partners to collect the Judgment debt. On June 23, 2020, the Debtor commenced an Adversary Proceeding naming Wells Fargo as the Defendant. (WF Adv. ECF #1). On August 6, 2020, the Preliminary Injunction requested by the Debtor was approved (WF Adv. #37) and continues in place pursuant to Court Order approving a Stipulation between the parties. (WF Adv. EFC #38).

The injunction, by its terms, will expire 30-days after closing of the sale to MED, but Plan confirmation provides for and allows the Debtor and the Limited Partners to pay the full amount of Wells Fargo's Class 2 Judgment Claim over time and without the necessity of further injunctive relief being necessary other than as expressly provided in the Plan.

14

The final set of hurdles placed as obstacles to the Debtor's Chapter 11 progress concerned litigation efforts undertaken by Commonwealth both to pursue Commonwealth's pre-petition actions against the Debtor and the Limited Partners and to interfere with the actions undertaken by the Debtor to sell Debtor Assets to MED. After the Chapter 11 Case was filed, the Debtor removed the Commonwealth Lawsuit to Alabama Federal Court. The Alabama Bankruptcy Court then ordered venue of the removed lawsuit transferred to the Southern District of California, and the Commonwealth Lawsuit has become an Adversary Proceeding in the Bankruptcy Court as Adversary Proceeding Number 20-90060-LA-11.

Litigation of Commonwealth related actions and proceedings has been held in abeyance pending closing of the sale of the Debtor Assets in order to maintain safe operations at MRT and allow the Debtor and its management to focus on finalizing the sale closing. The Debtor anticipates that litigation with Commonwealth will proceed after the sale closing. The Debtor believes that: (i) Commonwealth is owed nothing by either the Debtor or by the Limited Partners; and (ii) Commonwealth's actions have caused significant damage to the Debtor and the Limited Partners by reason of Commonwealth's pre-and post-petition actions, including violations of the automatic stay. It is assumed that Commonwealth disputes the Debtor's and the Limited Partners' contentions and holds contrary beliefs.

## 5.    Summary of Classification and Treatments of Classified Claims and Interests

The discussion below summarizes the classification and treatment of the classified Allowed Claims and Interests. The detailed discussion of these topics are set forth at length in section III.B. below.

**Class 1:** The Allowed Secured Claim of Wells Fargo ("Secured Claim") will be paid in full through payments to Wells Fargo directly from escrow of the net sales proceeds resulting from sale of the Mount Royal Towers Debtor Assets to MED.

15

**Class 2**: The Class 2 Allowed Wells Fargo Section 506 Bifurcated Judgment Claim ("Judgment Claim") will be paid in full with interest over 24 months on the terms described in section III.B. below.

**Class 3A**: The Class 3A Disputed Unsecured Commonwealth Claim is disputed and unliquidated and was filed by Commonwealth as a $0 (Zero) amount claim, and as such it will receive $0 (Zero) under the Plan. If the Commonwealth Claim is finally allowed in any amount against the Debtor, or if Commonwealth obtains a money judgment against the Limited Partners, then Commonwealth will be paid 100 percent of its Allowed Class 3 Claim or Judgment with interest over five years on the terms set forth in section III.B. below.

**Class 3B**: The Class 3B Disputed Unsecured SBA Claim will receive nothing under the Plan. If the SBA Claim is finally allowed in any Amount against the Debtor, then the SBA will be paid 100 percent of its Allowed Class 3B Claim with interest over five years on the terms set forth in section III.B. __ below.

**Class 4**: The Allowed Class 4 Claims of the Residents of Mount Royal Towers will be treated as follows: Resident Contracts will be assumed by the Debtor and assigned to MED on the terms set forth in section III.B below.

**Class 5**: The Allowed Unsecured Claims of all creditors not included in any other Class will be paid in full, with simple interest fixed at the federal judgment rate that exists as of the Effective Date, amortized over a two-year (24-month) period commencing on the Effective Date on the terms set forth in section III.B. below.

**Class 6**: The holders of Allowed Class 6 Claims will be paid in full in Cash on the Effective Date of the Plan.

**Class 7**: The holders of Allowed Class 7-A Unsecured Claims will receive nothing in the Plan and will have their Sub-Class 7-A Claims discharged in the Order Confirming the Plan. The Holders of Allowed Sub-Class 7-B Claims will be entitled to receive all Litigation Proceeds that may be awarded and paid to the Limited Partners

16

and which they will use to pay to the holder of the Class 2 Judgment Claim until such Class 2 Judgment Claim is paid in full, and to the extent that any such Litigation Proceeds are also used to pay Allowed Class 5 Claims.

**Class 8:** The Allowed equity interests of the Debtor existing on the Petition Date shall be cancelled and extinguished as of the Effective Date and the holders of Class 8 interests shall not receive any distributions under the Plan.

### 6. <u>Recommendation of the Debtor as Plan Proponent</u>

IN THE VIEW OF THE DEBTOR AS PLAN PROPONENT, THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY AND CERTAINTY FOR CREDITORS THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS OF THE DEBTOR AND RECOMMENDS THAT CREDITORS VOTE TO ACCEPT THE PLAN.

### C. <u>PURPOSE OF THIS DOCUMENT</u>

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

**<u>READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT</u>:**

**(1)    WHO CAN VOTE OR OBJECT TO CLAIMS;**

**(2)    WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your Claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

17

**(3)    THE HISTORY OF DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;**

**(4)    WHAT THINGS THE BANKRUPTCY COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

**(5)    WHAT IS THE EFFECT OF CONFIRMATION; AND**

**(6)    WHETHER THE PLAN IS FEASIBLE**

This Disclosure Statement cannot tell you everything about your rights. It is recommended that you consult with your own legal counsel to obtain more specific advice on how the Plan will affect your rights and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement. If there are any inconsistencies between the Plan and this Disclosure Statement, the provisions of the Plan will govern.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court [has approved] this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**D.    <u>DEADLINES FOR VOTING AND OBJECTING; CONFIRMATION HEARING DATE</u>**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THE CHAPTER 11 CASE.

18

### E.   TIME AND PLACE OF THE CONFIRMATION HEARING

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place on [DATE–TBD], 2021 in Department 2, Room 118, of the United States Bankruptcy Court for the Southern District of California.

### F.   DEADLINE FOR OBJECTING TO THE CONFIRMATION OF THE PLAN

Objections to the Confirmation of the Plan must be filed with the Bankruptcy Court and properly served to ensure that any objections are actually and timely received by counsel for Debtor by [DATE–TBD], 2021.

### G.   IDENTITY OF PERSON TO CONTACT FOR MORE INFORMATION REGARDING THE PLAN

Any interested party desiring further information about the Plan should contact counsel for Debtor, James P. Hill, Sullivan Hill Rez & Engel, APLC, 600 B Street, 17th Floor, San Diego, California 92101, Telephone: (619) 233-4100, or electronic mail at hill@sullivanhill.com.

### H.   DISCLAIMER

The financial data relied upon in formulating the Plan is based on Debtor's books and records and historical financial statements. Debtor's management represents that the information contained in this Disclosure Statement is true and correct to Debtor's best knowledge. The Bankruptcy Court has not yet determined whether the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

### I.   IMPORTANT NOTICES AND CAUTIONARY STATEMENTS

The liquidation analysis, estimates, and other financial information referenced in this Disclosure Statement and in the Plan were developed by the Debtor with the assistance of its Professionals. Although the Debtor's Professionals assisted in the preparation of this Disclosure Statement, in doing so, such Professionals relied upon

19

factual information and assumptions regarding financial, business, and accounting data provided by Debtor and management, none of which information has been audited. Debtor's Professionals have not independently verified such information and, accordingly, make no representations or warranties as to its accuracy. Moreover, although reasonable efforts have been made to provide accurate information, Debtor cannot represent or warrant that the information provided or referenced in this Disclosure Statement, including without limitation any and all financial information, is without inaccuracy or omission.

This Disclosure Statement contains only a summary of the Plan. All creditors and holders of Interests are encouraged to read and carefully analyze this Disclosure Statement in its entirety, including the attached Plan and the matters described in this Disclosure Statement, prior to submitting votes in favor of or against the Plan. All summaries of the Plan contained in this Disclosure Statement are qualified in their entirety by the Plan itself and documents described in this Disclosure Statement and the Plan as being filed prior to approval of this Disclosure Statement, which are controlling in the event of any inconsistency. Subsequent to this date, there can be no assurance that (a) the information and representations contained are materially accurate or (b) that this Disclosure Statement contains all material information.

No person or entity may rely upon the Plan or Disclosure Statement for any purpose other than to determine whether to vote in favor of or against the Plan. Nothing contained in such documents constitutes an admission of any fact or liability by any party and no information contained in such documents may be deemed evidence of any tax or other legal effects of the Plan on holders of Claims or Interests in the Chapter 11 Case.

Bankruptcy Court approval of this Disclosure Statement does not constitute either a guaranty of the accuracy or completeness of the information contained in this Disclosure Statement or an endorsement of the Plan by the Bankruptcy Court.

20

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission nor has the Commission passed or opined upon the accuracy or adequacy of the statements contained herein.

As to contested matters, adversary proceedings and other actions or threatened actions, this Disclosure Statement shall not be construed as an admission or stipulation, but rather as a statement made in settlement negotiations.

No statements or information regarding the Debtor, its assets or securities are authorized, offered, or made, other than the statements expressly made in this Disclosure Statement.

## II. FURTHER BACKGROUND INFORMATION

### A. DESCRIPTION AND HISTORY OF DEBTOR'S BUSINESS AND MANAGEMENT

Vestavia Hills, Ltd. was formed as an Alabama limited partnership in 1997. The Debtor is currently owned by eight limited partners, including the Limited Partners. The Debtor owns a 100 percent ownership interest in MRT.

Renee Barnard, the trustee and beneficiary of one of the Limited Partners, is the Debtor's Chief Operating Officer, and Charles Barnard, also a Limited Partner, has been the Debtor's on-site property manager.

### B. PRINCIPALS/AFFILIATES OF DEBTOR'S BUSINESS

The Debtor has one general partner, IPG Holding, a California corporation, which is entitled to 1 percent of the Debtor's profits and losses pursuant to the Debtor's existing limited partnership agreement, as amended to date. The Debtor has eight limited partners who, as of the date hereof and prior to the Effective Date, would otherwise be entitled collectively to the other 99 percent of the Debtor's profits and losses and individually as follows: HCG Lending, LLC, a California limited liability Debtor, 62.093125 percent; HCG Properties, LLC, a California limited liability Debtor, 16.573951 percent; Judith Chance, Trustee, Declaration of Trust dated 2/16/88

21

Trust No. 2, as amended, 3.483231 percent; Karen L. McElliott, Trustee, Non-Exempt Trust C under the Ronald Joseph & Karen L. McElliott 1985 Family Trust dated 8/4/84, 3.483231 percent; Frank A. Virgadamo, Trustee, Virgadamo Family Trust dated May 6, 1996, 3.483231 percent; Jack L. Rowe, Trustee, Jack and Barbara Rowe Family Trust dated April 21, 1998, 3.483231 percent; JRMF Leasing Corporation, a California corporation, 3.340520 percent; and B. Renee Barnard, Trustee, Barnard Living Trust dated April 13, 2000, 3.059480 percent.

Each of HCG Lending, LLC and HCG Properties, LLC are managed by ActivCare Living, Inc.  D. Kevin Moriarty is the Chief Executive Officer of ActivCare Living, Inc. and B. Renee Barnard is the President of ActivCare Living, Inc.  HCG Lending, LLC is owned by the Limited Partners, and ActivCare Living, Inc.  HCG Properties, LLC is owned by the Limited Partners and six other individuals.  D. Kevin Moriarty is the President/CEO of JRMF Leasing Corporation, and B. Renee Barnard is the Exec. Vice President/Treasurer of JRMF Leasing Corp.   JRMF Leasing Corporation is owned by the trusts of Rowe, McElliott, Chance and Virgadamo.

## C.    MANAGEMENT OF DEBTOR BEFORE AND AFTER THE BANKRUPTCY

The management of the Debtor before the bankruptcy filing was performed through a management team, which consisted of: Renee Barnard, Charles Barnard and Kevin Moriarty. In addition, outside consultants were retained as needed. Accounting is, for the most part, handled through an outside accountant.  The Debtor is currently using the same management team and will continue to do so through and after closing the sale of the MRT facility and related business assets to MED.

## D.    EVENTS LEADING TO CHAPTER 11 FILING

The Debtor had gross income in 2019 of $9,850,144 with operating income losses of $3,075,022. In 2020, the Debtor had gross income of $9,672,787 with operating income losses of $3,551,392.  Year-end balance sheets of the Debtor and

22

profit and loss statements reflecting the results of the Debtor's operations for the years 2017 through 2020 are available for review by contacting counsel to the Debtor and requesting said balance sheets and statements.

Before the petition was filed the Debtor was able generally to pay its expenses and claims as they became due, up until the time Wells Fargo called its note all due and payable, as described above. The Chapter 11 filing became necessary as a result of the enormous financial burdens imposed by the "all-due" nature of the Debtor's principal loan obligation with Wells Fargo as discussed above, and further as a result of the increasingly costly impact of Commonwealth's refusal to timely close on the Commonwealth Purchase Agreement.

## E.    SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE

### 1.    Significant Bankruptcy Proceedings and Events

On January 3, 2020, the Debtor filed a voluntary petition to reorganize under Chapter 11 of the Bankruptcy Code and an order for relief was entered by the Bankruptcy Court. The Chapter 11 Case was assigned to the Honorable Louise DeCarl Adler, United States Bankruptcy Judge. ECF #1. Since the Petition Date, the Debtor has operated as a debtor-in-possession pursuant to the applicable provisions of the Bankruptcy Code.

First, as required, pursuant to Court Orders, the Debtor retained Sullivan Hill Rez & Engel as General Counsel; Squar Milner, LLP as Accountants; Elisabeth Eisner as Special Transactional Counsel; Campbell Partners, APC as Special Litigation Counsel; and Harbuck Keith & Holmes LLC as Special Alabama Licensing and Regulatory Counsel. The Bankruptcy Court approved the employment of these professional persons by Orders, respectively: (i) entered January 30, 2020 of Sullivan Hill (ECF #80); (ii) entered February 3, 2020 of Squar Milner (ECF #96); (iii) entered February 10, 2020 of Ms. Eisner (ECF #112); (iv) entered February 10, 2020 of

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

Case No. 20-00018-LA11

Campbell Partners (ECF #114); and (v) entered April 16, 2020 of Harbuck Keith (ECF #210).

Second, Debtor filed its emergency Motion for Interim Use of Cash Collateral on January 3, 2020 (ECF #5). Commonwealth objected to the use of cash collateral, but the Bankruptcy Court granted the Debtor's emergency motion on January 15, 2020 (ECF #35).  Ultimately, the Debtor and Wells Fargo stipulated to adequate protection permitting the use of cash collateral so long as the Debtor paid Wells Fargo $65,000 per month. An order approving the Debtor's Stipulation with Wells Fargo was entered by the Bankruptcy Court on February 3, 2020 (ECF #95).

Third, the § 341(a) Meeting of Creditors was held on January 28, 2020 and concluded at that time.

Fourth, on May 4, 2020, the Bankruptcy Court entered the Bar Date order (ECF #235) fixing July 6, 2020 as the deadline for filing certain proofs of Claim and Interests in the Chapter 11 Case.  Notice of the Bar Date was mailed to parties in interests in the Chapter 11 Case on May 5, 2020 (ECF #237).  Finally, the Bar Date order provides that any creditor that is required to, but does not, file a proof of Claim within the time fixed therein for so doing shall be forever barred from (i) participating in the Chapter 11 Case; (ii) voting with respect to any plan of reorganization filed in the Chapter 11 Case; and (iii) receiving any distribution under any plan of reorganization filed in the Chapter 11 case. (ECF # 235).

Fifth, on February 6, 2020, the Debtor and MED entered into the Asset Purchase Agreement, which provides for the sale of the Debtor Assets to MED for an aggregate purchase price of $12,000,000 and payment of a sale commission equal to 1.5 percent of the purchase price to Blueprint. The August 31, 2020 Order issued by the Bankruptcy Court (ECF #381), among other things: (a) approved the sale of Debtor Assets to MED, pursuant to the terms of the Asset Purchase Agreement; (b) rejected the purported "overbid" by Commonwealth's affiliate, MCAP Birmingham LLC as

24

non-conforming and a non-qualifying bid; and (c) approved the assumption of the then-existing Resident Contracts with residents of MRT and further approved the assignment of those then-existing Resident Contracts to MED, effective on the closing of the sale of the MRT assets to MED.

The net proceeds of the sale, after payment of the costs and expenses of sale, including the sale commission to Blueprint and the ordinary course expenses of sale closing, including escrow fees, title fees and related expenses reasonable and necessary to close escrow, will be paid to Wells Fargo directly from escrow. The balance of the claim of Wells Fargo will be a general unsecured claim, subject to final allowance pursuant to Bankruptcy Code § 506(a). The closing date of the sale of the Debtor Assets to MED is expected to occur approximately on or before September 30, 2021. At or promptly following the closing of the sale of the Debtor Assets to MED: (i) the net proceeds of the sale will be paid to Wells Fargo directly from escrow; (ii) certain executory contracts and unexpired leases (as more fully described in Exhibit "2" of the August 2020 Order) will be assigned to MED; and (iii) the sale commission will be paid to Blueprint.

Sixth, between January 23, 2020, and April 16, 2020, pursuant to order issued by the Bankruptcy Court, the Debtor made payments to Wells Fargo totaling $195,000 at $65,000 per month. Between April 17, 2020, and June 15, 2021, the Debtor made payments to Wells Fargo totaling an additional $910,000 at $65,000 per month. On August 6, 2020, the Bankruptcy Court issued an order granting a preliminary injunction against Wells Fargo preventing Wells Fargo from enforcing the Alabama Court's April 16, 2020 Judgment against assets of the Limited Partners. Based on the preliminary injunction order, between August 15, 2020 and June 15, 2021, Wells Fargo received additional payments from the Limited Partners totaling $165,000. On January 15, 2021, Wells Fargo received an additional payment of $1,000,000 from the Limited Partners. In summary, after the Petition was filed, Wells Fargo has been paid

25

a total of $2,270,000 consisting of $1,105,000 from the Debtor and $1,165,000 from the Limited Partners.

Seventh, on February 4, 2020, the Bankruptcy Court issued an order authorizing the Debtor to enter into a Post-Petition Line of Credit with the Limited Partners as lenders totaling $3,100,000. (ECF #100). The Line of Credit has been used as it was intended, namely, to make payments for the Debtor's operating expenses, general corporate expenses, and administrative expenses as allowed by the Bankruptcy Court, including as necessary for the Debtor to make the Debtor's monthly $65,000 payments to Wells Fargo.

## 2.    Legal Proceedings

The Debtor has the following lawsuits or Adversary Proceedings pending:

a. *Commonwealth Assisted Living, LLC, Series E v. Vestavia Hills, Ltd., Judith A. Chance, Karen McElliott, Frank A. Virgadamo, Connie Virgadamo, B. Renee Barnard, Charles Barnard and Jack L. Rowe,"* now identified in Case No. 20-00018-LA11, Adv. Proc. No. 20-90060-LA, and *Vestavia Hills, Ltd. Vs. Commonwealth Assisted Living, LLC*, Adv. Proc. 20-90029-LA, which have both been stayed but which the Debtor believes will or should be proceeding to a conclusion in the Bankruptcy Court.

b. *Vestavia Hills, Ltd. dba Mount Royal Towers v. Wells Fargo Bank National Association,* Adv. Proc. No. 20-90083-LA, which the Debtor believes is fully resolved by the treatment of Wells Fargo by the Plan, albeit the Section 105 injunction

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

Case No. 20-00018-LA11

against Wells Fargo is to remain in place as long as Plan payments continue to be made as provided herein.

c.   *Vestavia Hills, Ltd. dba Mount Royal Towers v. the Administrator of the United States Small Business Administration,* Adv. Proc. No. 20-90073, currently on appeal in the United States Court of Appeals for the Ninth Circuit as Case Number 21-55547, as more fully discussed below.

d.   The Jefferson County Board of Tax Assessors ("Board") improperly assessed the value of the Real Property.   On April 17, 2020, the Debtor filed a motion in the Bankruptcy Court for determination of the value of the Real Property in Alabama.   (ECF #213). On May 29, 2020, the Bankruptcy Court granted the motion that the tax assessments of the Real Property for the years 2019 and 2020 be lowered to $12,000,000. (ECF #276).  The Board and the Debtor subsequently agreed to compromise their positions settling the dispute, and all sums due to the Board pursuant to the parties' settlement for the Debtor's ad valorem taxes for tax years 2019 and 2020 have been paid in full.  This matter has since been concluded.

**3.**     **Post-Confirmation Litigation Information for Creditors**

The SBA, Commonwealth and Wells Fargo cases and proceedings listed above have been stayed pending the closing of the sale of the Debtor Assets to MED.

Following closing of the sale to MED and termination or expiration of the stays or injunctions then in place with respect to the SBA, Commonwealth and Wells Fargo, the Limited Partners will continue to honor their post-confirmation agreement to fund

27

the Reorganized Debtor to enable the Debtor to receive and use new equity funding as needed to: (A) pay ongoing administrative costs and expenses of the Reorganized Debtor; (B) make Plan required payments to Wells Fargo; and (C) continue to pursue and defend litigation and appeals with: [i] the SBA concerning the Debtor's right to receive PPP loan funds and to have forgiven the portion of the PPP funding eligible for forgiveness, as permitted by the CARES Act and applicable SBA regulations; [ii] Commonwealth; and [iii] Wells Fargo, if and as needed.

Post-Confirmation, the Debtor and Limited Partners believe that ongoing or stayed litigation will continue or terminate as follows.

**With respect to Wells Fargo:** Plan Confirmation will functionally end the litigation with Wells Fargo. So long as the Debtor and Limited Partners stay current with all Plan required payments to Wells Fargo, then Wells Fargo will continue to be stayed and enjoined from commencing or undertaking any enforcement or collection actions against the Limited Partners or against the assets of the Limited Partners. Upon payment in full of the Class 2 Judgment Claim, Wells Fargo will file an Acknowledgement of Satisfaction of Judgment and will cause the dismissal of the Alabama Federal Court Action, with prejudice, to occur.

**With Respect to Commonwealth**: The Debtor believes that the Bankruptcy Court will retain jurisdiction to hear, determine and decide all matters relating to the litigation between Commonwealth on the one side and the Debtor and its Limited Partners on the other. Commonwealth filed a motion for the Bankruptcy Court to Abstain; or in the Alternative to Remand the Removed Lawsuit to State Court. The Court fixed September 16, 2021 as the date for hearing Commonwealth's motions.

Commonwealth's litigation as filed to date also includes Commonwealth's Motion for Relief from Stay filed in the Bankruptcy Court to continue its action against the Limited Partners and the Debtor. Once the sale to MED closes, the Debtor will stipulate to stay relief so that all litigation with Commonwealth, including any claim

objections and affirmative claims for damages which the Debtor and Limited Partners will be filing against Commonwealth, can be fully, fairly, and finally resolved.

The Debtor will apply 100 percent of the proceeds which the Debtor receives from any litigation recovery from its litigation against Commonwealth: [i] first, *pro rata* to all Allowed Class 5 Claimholders up to the Allowed Principal Amount of any Class 5 Claim until all such Allowed Class 5 Claims are paid in full; [ii] next to Wells Fargo until the Allowed Class 2 Judgment Claim is paid in full with interest as provided in the Plan; [iii] finally, the balance of any then remaining litigation recovery amounts will be paid to the Limited Partners on account of their Class 7-B Claim until the Allowed Principal Amount of the Class 7-B Claims are paid in full, without interest.

The Limited Partners will assign to Wells Fargo 100 percent of the proceeds which the Limited Partners may receive from any Commonwealth litigation recovery for the payment of the Allowed Amount of any then remaining unpaid amount of the Class 2 Judgment Claim. If the Class 2 Judgment Claim is paid in full, any remaining litigation proceeds will then be used to pay any then unpaid legal or accounting fees owed by the Reorganized Debtor to its legal and accounting professionals.

**With Respect to the SBA:** The Debtor sued the SBA and the Administrator of the SBA for injunctive relief to compel the SBA to permit the Debtor to participate in the PPP under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") passed by the United States Congress in response to the COVID-19 pandemic. The PPP expanded allowable uses of SBA 7(a) loans to support payroll costs, rent, mortgage interest, utilities, and interest on existing debt obligations. Provided that loan proceeds are used for the uses permitted under the PPP and all other PPP conditions are satisfied, a significant percentage or the entirety of the PPP funds would qualify for forgiveness, and any balance not forgiven would be loaned to the borrower at an interest rate of 1 percent per annum payable over a five-year period for PPP

29

funding made on or after June 2020 as permitted by applicable amended SBA regulations. The Debtor initially prevailed in obtaining a preliminary injunction in its lawsuit against the SBA and received PPP funds totaling $1,138,105.

The Debtor applied for full forgiveness of the entirety of the PPP loan since the Debtor's use of the funds qualified in full for forgiveness under the PPP. As stated above, that application for full forgiveness was timely filed by the Debtor in November 2020, and the SBA has not yet acted upon it.

The SBA, however, successfully appealed the decision in the Debtor's favor to the United States District Court for the Southern District of California and obtained a reversal of the decision granting an injunction. The decision of the United States District Court for the Southern District of California was subsequently appealed by the Debtor to the Ninth Circuit Court of Appeals.

The Debtor will continue to pursue and defend litigation and appeals concerning its right to receive PPP loan funds and to have the portion of the PPP loan that is eligible for forgiveness forgiven as permitted by the CARES Act and applicable SBA regulations. The Debtor and SBA have agreed to enter into the Ninth Circuit's Voluntary Mediation Program to see if the matter can be settled. Additionally, the briefing schedule for the Appeal has been extended by the Court of Appeals in order to accommodate what will hopefully be a consensual resolution of the Debtor's dispute with the SBA. If settlement with the SBA cannot be achieved, if and to the extent thereafter the SBA prevails in its arguments on appeal, it is possible that the SBA will assert it should be allowed a post-petition Administrative Priority Claim that the Debtor will have to pay, and which may require additional funding by the Limited Partners. If and to the extent that any portion of the SBA Claim survives the pending appeal process, the Debtor intends to object to the SBA's claim on multiple grounds and to seek disallowance of the claim. If the SBA Claim is finally allowed in any amount against the Debtor, then the SBA will be paid 100 percent of its Allowed

30

Class 3B Claim in quarterly installments of principal and interest over a five-year (60-month) period with 1 percent per annum simple interest amortized over a five-year (60-month) period commencing upon the order allowing its Claim becoming final, with quarterly payments then commencing thereafter to the SBA on the 10th day of the first full month following the order approving the Class 3B Claim becoming final, in full satisfaction of the Class 3 Claim.

## F. <u>CLAIMS AND CLAIMS OBJECTIONS</u>

Claims against the Debtor consist of those scheduled by the Debtor (ECF #1) and those filed by Creditors on Proof of Claim forms (*see*, Claims Register in Bankruptcy Case Number 20-00018-LA-11), as well as any additional claims that may be added by amendment. The only secured claim against the Debtor Assets is the claim possessed by Wells Fargo, for an amount which exceeds the value of the Debtor Assets. In the Plan, Wells Fargo is separately classified as possessing two classes of Claims, Class 1, Secured, and Class 2, Judgment.

In the scheduled Claims, a number of those identified as having been owed or payable by the Debtor on the filing date consisted of two distinct categories of claims which are no longer involved as creditors in the Chapter 11 process based on actions taken by the Debtor and approved by the Bankruptcy Court to resolve the claims of the scheduled creditors. In general, those two categories of claims involve: (i) priority employee wage and benefit claims; and (ii) Resident claims.

With respect to the priority employee claims, on January 10, 2020, the Claims of employees owed pre-petition wages, salaries, benefits, and tax withholding obligations were ordered allowed and paid by the Bankruptcy Court in full. (ECF #25). Accordingly, the Debtor paid all such Claims of employees, and therefore, all scheduled Claims belonging to employees have been satisfied, are not classified, and will not be treated in, dealt with, or paid though the Plan.

31

With respect to Resident Claims, to the extent not assumed and assigned as part of the sale process and sale to MED, those claims are separately classified (Class 4), and all such Claims will be separately satisfied through the closing of the sale by being assigned to MED upon sale closing. Modification of the Class 4 Claims (through substituting a new health service provider by Court Order) may constitute "impairment" of the Claims which the Residents may possess, again, to the extent not already assumed and assigned. Accordingly, the remaining Class 4 Residents whose contracts are to be assigned to MED are treated in the Plan as being impaired and, as a result, are eligible to vote to accept or reject the Plan.

Finally, the Claims of the Limited Partners are also separately classified as Sub-Class 7-A and 7-B in the Plan. Prior to the Chapter 11 filing, the Limited Partners loaned the Debtor substantial amounts of money in order to obtain extensions from Wells Fargo, reduce the principal of the Wells Fargo debt and cover operating losses. The Limited Partners also guaranteed the Debtor's debt to Wells Fargo, which as discussed above, became the subject of an American Arbitration Award issued against the Limited Partners in the amount of $18,086,910.61.

Class 5 consists of scheduled and filed, non-duplicate, undisputed claims of general unsecured creditors, after removing from Class 5 all employee (priority/satisfied), and separately classified Resident, Limited Partner, Wells Fargo, SBA and Commonwealth claims. Class 5 thus consists of: (i) eight (8) unsecured creditor claims that were timely filed totaling $187,595.30; and (ii) sixty-seven (67) scheduled (originally and by recent amendment) unsecured creditors with scheduled claims totaling $1,436,133.96. This amount includes the $1,188,556.34 unsecured claim for ActivCare Living for advances, management fees, and direct chargebacks. The eight filed claims are included within the 67 scheduled claims. The Debtor has identified at least six unsecured claims to date for which objections will be filed, due to disputes over amounts owed. The Debtor is informed that ActivCare Living will

32

waive any distribution on its claim of $1,188,556.34 conditioned on confirmation of the Debtor's Plan as presented herein, which will enable the Debtor to make 100-cents-on-the-dollar distributions to holders of Allowed Claims of non-insider Class 5 general unsecured creditors.  As a result, after removal of ActivCare Living's unsecured claim, there remains $247,577.62 in general unsecured claims to be paid through the Plan, subject to adjustment based on resolution of claims objections as appropriate.

Class 3A includes the disputed, unliquidated general unsecured Claim of Commonwealth, arising as a result of the Debtor's rejection of the Commonwealth pre-petition contract which Commonwealth breached and failed to perform for its purchase of the Debtor's MRT assets.  The Limited Partners have filed  an objection to  Commonwealth's Claim. That objection also requests affirmative relief from Commonwealth seeking money damages.

Wells Fargo filed objections to the Claims of the Limited Partners. (ECF #s 321–325). The Limited Partners initially responded to the Objections requesting time to file responses. (ECF #373). Wells Fargo and the Limited Partners agreed by Stipulation to postpone all litigation related to the claim objections (ECF #377). On August 19, 2020, the Court Ordered Approval of the Stipulation. (ECF #378). The Debtor believes that Wells Fargo will withdraw the objections for two reasons. First, the unsecured claims of the Limited Partners are being discharged and not being paid through the Plan. Second, Wells Fargo will be receiving an assignment to receive any litigation proceeds which the Limited Partners will receive on account of their Class 7-B (priority and post-petition) Allowed Claims.

Objections to claims are filed by parties in interest in the Bankruptcy Case creating litigation with scheduled or filing creditors who have not proven their disputed claims, where claims are duplicative, over-inflated or not legally tenable claims. Some of the creditor claims included in the disputed portion of the creditor claims are in all three of these categories, meaning they were filed by a party in

33

litigation with Debtor, are over inflated, and they include claims that are part of a separate claim in the bankruptcy and thus are duplicative. Other than objections to the Commonwealth Proof of Claim, objections to the Claim of the SBA to the extent any portion of it survives following resolution of the appeal process, and objections to other claims for which Proofs of Claims were filed that are at variance with and greater than the amounts scheduled by the Debtor, the Debtor has not identified claims of other creditors which it intends to dispute other than duplicated claims. Proofs of Claim timely filed by Scheduled Creditors control claim amounts to be paid to creditors under the Plan except to the extent the Debtor files objections to those claims. Duplicate recoveries will not be paid.  The Debtor reserves all rights to object to Claims as appropriate in accordance with applicable rules and law.

### G.   FRAUDULENT CONVEYANCES AND PREFERENCE RECOVERIES

Debtor and Debtor's counsel has investigated potential claims under Bankruptcy Code §§547 and 548 and believe that there are no viable actions for avoidance and recovery of preferential and fraudulent transfers.

## III.   SUMMARY OF THE PLAN OF REORGANIZATION

### A.   UNCLASSIFIED ADMINISTRATIVE CLAIMS

**1.   Description:**  Allowed Administrative Claims are all costs and expenses of administration of the Chapter 11 Case allowed under Code §§507(a)(1), including without limitation the actual and necessary costs and expenses of preserving the Debtor's estate and operating its businesses, including wages, salaries, management fees or commissions for services rendered post-petition, any indebtedness or obligation incurred or assumed by the Debtor, as debtor-in-possession. The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date unless a particular Claimant agrees to a different treatment.

34

The Debtor employed various Professionals including Sullivan Hill Rez & Engel as General Counsel; Baker Tilly (fka Squar Milner, LLP) as Accountants; Elisabeth Eisner as Special Transactional Counsel; Campbell Partners, APC as Special Litigation Counsel; and Harbuck Keith & Holmes LLC as Special Alabama Licensing and Regulatory Counsel. Such Professionals were authorized to be paid 80 percent of their fees and reimbursed all of their costs on an interim basis. The Professionals received interim payments per a March 5, 2020 Order of the Bankruptcy Court. (ECF #165). Pursuant to an order granting the Professionals' first interim fee applications, the Bankruptcy Court authorized payment of the 20 percent "holdback" portions of the Professionals' fees on August 14, 2020 (ECF #374) and September 11, 2020 (ECF #390), which the Debtor has paid. Similarly, pursuant to the order granting the Professionals' second interim fee applications, the Bankruptcy Court further authorized payment of the 20 percent "holdback portions of the Professional' fees on March 17, 2021 (ECF #s 476, 477, 478, 479, 480, and 481).

The Debtor expects the Professionals will file their third interim fee applications prior to confirmation of the Debtor's Plan, seeking authorization for payment of the 20 percent holdback portion on such Professionals' fees from December 1, 2020 through the cut-off date of their third interim fee applications. Final fee applications for all estate Professionals will be filed after confirmation of the Plan.

The balance of unpaid Professionals' fee claims, the unpaid claims of other Court appointed officials such as the Patient Care Ombudsman (ECF #60) and the fees owed to the Office of the United States Trustee, will not be classified in the Plan, but will be paid in full by the Debtor on the Effective Date or as the Professionals or claimholders may otherwise agree. The following amounts were outstanding to the Professionals as of June 30, 2021:

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

Case No. 20-00018-LA11

| Professional | Time Period | Current Holdback (7 Months) | Monthly Average |
|---|---|---|---|
| Sullivan Hill | Dec 2020–June 2021 | $89,782.60 | $12,826.09 |
| Campbell Partners | Dec 2020–June 2021 | $8,029.50 | $1,147.07 |
| Elisabeth Eisner | Dec 2020–June 2021 | $154.00 | $22.00 |
| Baker Tilly fka Squar Milner | Dec 2020–June 2021 | $6,191.90 | $884.56 |
| Patient Care Ombudsman | Dec 2020–June 2021 | $169.46 | $24.21 |
| Harbuck | Dec 2020–June 2021 | $2,474.50 | $353.50 |
| | | $106,801.96 | $15,257.42 |

The Debtor estimates that the aggregate Amount of Allowed Administrative Claims to be paid on the Effective Date of the Plan will be approximately $150,000 based on the historical monthly average of the aggregate amounts incurred and paid to the Professionals, as reported above, taking into account that interim fees and costs will be paid in the interim period up to the Effective Date pursuant to the interim fee procedures in effect in the Case.

**2.    Treatment:**  On the Effective Date, or as soon thereafter as is practical, each holder of an Allowed Administrative Claim (including the United States Trustee) except for the Limited Partners as Class 7-B Claimholders shall be paid in full, in cash on the Effective Date.  Each Professional employed at the expense of the Debtor's estate pursuant to Code §§327 and 1103 and an appropriate order of the Bankruptcy Court, shall be paid the unpaid portion of its Allowed Administrative Claim in Cash.  Allowed Accounts Payable Post-Petition Claims and Allowed Post-Petition Accrued Wages, if any, and other post-confirmation claims of a similar nature shall receive payment in full in Cash on the Effective Date of the Plan.  Subsequent professional legal and accounting fees will be paid by the Reorganized Debtor in the ordinary course of business without the need for Bankruptcy Court Approval.

36

The United States Trustee's fees will be paid in accordance with 28 U.S.C. §1930(a)(6). The Reorganized Debtor shall be responsible for the timely payment of all fees incurred after the Effective Date pursuant to 28 U.S.C. § 1930(a)(6).

Post-Confirmation, the United States Trustee's fees shall be paid on a quarterly basis until a final decree is entered or the Chapter 11 Case is dismissed or converted and shall not accrue thereafter.

### 3. <u>Court Approval of Post-Confirmation Fees Not Required</u>

Requests by Professionals for payment of fees and costs are generally subject to review and approval by the Bankruptcy Court. Post-Confirmation no such approval will be necessary and those fees and costs will be paid in the ordinary course of business. Additionally, fees of the Bankruptcy Court Clerk and the Office of the United States Trustee will not be subject to Bankruptcy Court approval and may be paid in the ordinary course of business when due.

### B. <u>DESIGNATION AND TREATMENT OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS</u>

The following sets forth the designation and treatment of those classified Claims and Interests which are impaired under the Plan. Each member of the impaired Classes as set forth below are entitled to vote on the Plan. The Distributions received pursuant to this Article III shall represent full and final satisfaction of all Allowed Claims.

<u>Class 1</u>: **The Allowed Class 1 Secured Claim of Wells Fargo Bank, N.A.**

**Description:** Class 1 consists of the Allowed Secured Claim of Wells Fargo in an amount equal to the net proceeds to be received when the sale of the Debtor Assets to MED closes. The Allowed Secured Claim of Wells Fargo is secured by liens on all pre-petition real and personal property assets of the Debtor subject to Wells Fargo's first priority deed of trust and security agreement perfected by applicable trust deed and UCC-1 filings. The Debtor believes that the fair market value of the Real

37

Property in which Wells Fargo claims a security interest is $12,000,000 minus the net costs of sale. This value is based on the price available to the Debtor upon closing of the Court-approved Bankruptcy Code § 363 sale of the certain Mount Royal Towers real and personal property assets, defined herein as the Debtor Assets, as approved by the Court's August 2020 Order entered August 30, 2020 (ECF #381). Pursuant to Bankruptcy Code § 506 (a), an allowed claim of a creditor secured by a lien on property in which the estate has an interest is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property and is an unsecured claim to the extent that the value of such creditor's interest is less than the amount of such allowed claim.

**Treatment:** The then due and owing amount of the secured portion of the Class 1 Secured Claim will be paid in full by paying to Wells Fargo the net sales proceeds resulting from sale of the Debtor Assets to MED, which net sales proceeds shall be paid to Wells Fargo directly out of escrow, which is expected to close on or before October 31, 2021. Notwithstanding any other provision of this Plan, the Class 1 Secured Claim of Wells Fargo is not discharged.

**Impaired/Not Impaired:** The Class 1 Claimant is impaired.

**Voting:** The Class 1 Claimant is entitled to vote on the Plan.

**Class 2:**      **The Allowed Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim**

**Description:** Class 2 consists of the unsecured portion of the Allowed partially secured and partially unsecured Claim held by Wells Fargo, calculated as being the remaining net amount owed to Wells Fargo on the Effective Date of the Plan based upon on the Federal Court Judgment amount that Wells Fargo obtained on April 16, 2020 against the Limited Partners after applying and deducting as credits all payments received by Wells Fargo from the Debtor and the Limited Partners after January 3, 2020. Wells Fargo's Class 2 Claim is undersecured as provided by

38

Bankruptcy Code § 506. The Debtor believes that the undersecured Amount of the Wells Fargo Judgment Claim is or will be equal to at least $2,500,000. Following payment of all net sales proceeds to Wells Fargo from the close of escrow of the Bankruptcy Court-approved sale of the Debtor Assets, the Allowed amount of any remaining Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim will be determined by the Bankruptcy Court after notice and opportunity for hearing based upon the net amount owed to Wells Fargo Bank by the Limited Partners on the Alabama Judgment following credit against the Judgment amount being applied for payments made to Wells Fargo Bank during the Chapter 11 Case, including payment of the Class 1 Claim.

**Treatment:** The Allowed Amount of any Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim will be paid in full as follows: (i) monthly Cash payments in the amount of $80,000 on the 15th day of each full calendar month remaining in 2021 following the Effective Date; and (ii) monthly Cash payments in the amount of $165,000 per month beginning on January 15, 2022 and through and including the 24th calendar month following the Effective Date (October 2023), at which time the entire remaining unpaid balance owing on the Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim shall be paid in full in a balloon payment to be made no later than October 31, 2023. Simple interest at the rate of twenty-two hundredths of one percent (0.22 percent) per annum shall accrue and be payable on the allowed amount of the Class 2 Claim (as determined by the Court), with each such payment to be applied first to then outstanding interest and then to outstanding principal from the Effective Date of the Plan until the Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim is paid in full, which shall be no later than October 31, 2023. In addition, the Debtor and Limited Partners intend to continue to pursue legal proceedings and remedies against Commonwealth following the Effective Date of the Plan and through that litigation will seek recovery of Litigation Proceeds including

monetary damages, attorneys' fees, and costs in the amount as determined by the Court in connection with the Commonwealth Case.  Following payment by the Debtor of any Litigation Proceeds applied to full payment of the Allowed Amount of any then unpaid Class 5 Claims without, the Debtor will apply any excess Litigation Proceeds received by the Debtor, up to the Allowed Amount of any Class 2 Judgment Claim, to payment of the Allowed Amount of any Class 2 Judgment Claim. Notwithstanding any other provision of this Plan, the Class 2 Judgment Claim of Wells Fargo is not discharged. Following receipt by the Limited Partners of any Litigation Proceeds in connection with the legal proceedings, the Limited Partners will apply any Litigation Proceeds received by the Limited Partners up to the Allowed Amount of any Class 2 Judgment Claim, to payment of the Allowed Amount of any Class 2 Judgment Claim. Until fully paid, with interest as provided herein, the Class 2 Judgment Claim is not discharged by the Confirmation of the Plan. As to the Debtor, the Reorganized Debtor and the Limited Partners, the Class 2 Judgment Claim and the Alabama Judgment shall not be discharged by reason of the entry of the Order confirming the Plan. Until fully paid, with interest as provided herein, the Debtor, Reorganized Debtor and the Limited Partners shall not be released and shall not receive a release of the obligations to pay the Class 2 Judgment Claim or to pay the Alabama Judgment.

> **Impaired/Not Impaired:**  The Class 2 Claimant is impaired.

> **Voting:**  The Class 2 Claimant is entitled to vote on the Plan.

**C.     The Class 3 Disputed Claims**

> **1.     Class 3A–the Disputed Unsecured Commonwealth Claim:**

**Description:** Class 3A consists of the Disputed Claim of Commonwealth which the Debtor believes will only include the Disputed Unsecured Commonwealth Claim, if any. The Disputed Unsecured Commonwealth Claim is disputed and unliquidated and was filed as a $0 (Zero) amount claim, and should not be allowed as a Claim against the Debtor, and as such it will receive $0 (Zero) under the Plan, and

is, in the Debtor's opinion, therefore unimpaired. The existence and amount of any Class 3A Claim will be determined by the Bankruptcy Court after notice and a hearing.

Commonwealth has litigation pending in the Bankruptcy Court against the Debtor. The Debtor and Limited Partners intend to move for summary judgment in the Commonwealth Case and believe they will be successful on this motion.  In the event the Debtor is successful on the motion for summary judgment, or thereafter if a trial on the merits is required, there will not be any Unsecured Commonwealth Claim. Commonwealth has Filed a Proof of Claim. The Debtor and the Limited Partners intend to pursue objections to the Commonwealth Proof of Claim and to seek affirmative relief from Commonwealth consisting of the Litigation Proceeds.

**Treatment:**  The disputed and disallowed Commonwealth Claim will receive nothing under the Plan. The Proof of Claim filed by Commonwealth identifies no damage or claim amount being owed by the Debtor. If the Commonwealth Claim is finally allowed in any amount against the Debtor, or if Commonwealth obtains a money judgment against the Limited Partners, then Commonwealth will be paid 100 percent of its Allowed Class 3 Claim or Judgment in equal quarterly installments of principal and interest over a five-year (60-month) period with simple interest fixed at the federal judgment rate that exists as of the Effective Date, amortized over a five-year (60-month) period commencing upon the order allowing its Claim or Judgment becoming final, with quarterly payments then commencing thereafter to Commonwealth on the 10th day of the first full month following the order approving the Class 3 Claim or judgment becoming final, in full satisfaction of the Class 3 Claim or Judgment.

**Impaired/Not Impaired:**  The Class 3A Claimant is disputed and not impaired to the extent that the Commonwealth Claim is determined to be $0 (Zero) consistent with Commonwealth's Proof of Claim.

41

**Voting:**  The Class 3A Claimant is not entitled to vote on the Plan unless the Bankruptcy Court permits Commonwealth to vote on the Plan after a hearing.

## 2.  <u>Class 3B:</u>  <u>The Disputed Unsecured SBA Claim</u>

**Description:** Class 3B consists of the Disputed Claim which the Debtor believes will only include the Disputed Unsecured SBA Claim, if any.  The SBA Claim is disputed, as the Debtor believes that the claim, which is based upon the claim asserted by the SBA for repayment by the Debtor of the post-petition Paycheck Protection Program ("PPP") loan that the Debtor received on July 2, 2020 in the amount of $1,138,105.  The Debtor believes that the entire amount of the PPP loan is subject to applicable forgiveness rules, and it has applied for such forgiveness. Accordingly, then the SBA should have no Claim against the Debtor, and as such it will receive $0 (Zero) under the Plan, and is, in the Debtor's opinion, therefore unimpaired. The existence and amount of any Class 3B Claim will be determined by the Bankruptcy Court after notice and a hearing. In the event the Debtor is successful on its forgiveness application, there will not be any Unsecured SBA Claim. If and to the extent the Debtor is not successful in having the Unsecured SBA Claim forgiven or disallowed, the Debtor will pay and satisfy the SBA Claim as provided herein.

**Treatment:**   The disputed and disallowed SBA Claim will receive nothing under the Plan.  If the SBA Claim is finally allowed in any amount against the Debtor,  then the SBA will be paid 100 percent of its Allowed Class 3B Claim in equal quarterly installments of principal and interest over a five-year (60-month) period with simple interest fixed at one percent (1 percent) per annum (as provided in applicable SBA regulations governing repayment of any PPP loan not qualified for forgiveness– see  https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/first-draw-ppp-loan)  amortized  over  a  five-year  (60-month) period commencing upon the order allowing its Claim becoming final, with quarterly payments then commencing thereafter to the SBA on the 10th day of the first full

42

month following the order approving the Class 3B Claim becoming final, in full satisfaction of the Class 3B Claim.

**Impaired/Not Impaired:**  The Class 3B Claimant is disputed and not impaired to the extent that the SBA Claim is deemed to be $0 (Zero) at this time.

**Voting:**  The Class 3B Claimant is not entitled to vote on the Plan unless the Bankruptcy Court permits the SBA to vote on the Plan after a hearing.

    **D.**   <u>**Class 4**</u>:   <u>**The Allowed Class 4 Claims of the Residents of Mount Royal Tower**</u>

**Description:**  Class 4 consists of the Allowed Claims of the residents of Mount Royal Towers whose Resident Contracts have not been assumed prior to the Effective Date (the "Residents").  The Residents are parties to executory contracts with the Debtor which will be assumed by the buyer of Mount Royal Towers upon the closing of the sale of Mount Royal Towers.

**Treatment:**  The Allowed Class 4 Claims of the Residents of Mount Royal Towers whose Resident Contracts have not yet been assumed and assigned are impaired. The Debtor will assume any contracts with the residents of MRT, to the extent not already assumed by the Debtor and assigned to MED pursuant to the terms of the August 30, 2020 Order approving the sale of the MRT assets to MED (ECF #381), on the Effective Date which remain executory on the Effective Date as obligations of the Debtor.  The Debtor will transfer or assign any remaining unassigned Resident Contracts in connection with the proposed sale of Debtor Assets to MED or in connection with any other potential future sale of Debtor Assets.  The Confirmation Order constitutes an order approving the assumption of each Resident Contract, as modified.

**Impaired/Not Impaired.**  The Class 4 Claimants are impaired.

**Voting**.  The Class 4 Claimants are entitled to vote on the Plan.

43

**E.    Class 5:    The Allowed Class 5 Unsecured Claims**

**Description.**  Class 5 consists of the Allowed General Unsecured Claims not included in any other Class in amounts to be determined by the Bankruptcy Court, excluding the Claims included in any other Class.

**Treatment**.  The Allowed Class 5 Unsecured Claims will be paid in full, with simple interest fixed at the federal judgment rate that exists as of the Effective Date, amortized over a two-year (24-month) period commencing on the Effective Date.  The Class 5 Unsecured Allowed Claims shall be payable in equal pro rata quarterly installments of principal and interest with each such installment made on the 10th day of each month beginning with the first such distribution on the 10th day of the first month following the Effective Date, for a period of twenty-four (24) months following the Effective Date of the Plan; provided, however, that the holders of Allowed Class 5 Claims may be paid earlier than  the defined two-year (24-month) amortization period of payments on Class 5 Claims up to the remaining balance due on such claims on the 30th day following the Debtor's receipt, if any, of any post-confirmation net Litigation Proceeds (after application of payment of the Litigation Proceeds described above to Allowed Class 2 Claims).

**Impaired/Not Impaired.**  The Class 5 Claimants are impaired.

**Voting.**  The Class 5 Claimants are entitled to vote on the Plan.

**F.    Class 6:    The Allowed Class 6 Tax Claims.**

**Description:**  Allowed Claims for Taxes other than Priority Claims under Bankruptcy Code § 507(a)(8).

**Treatment:**  The holders of Allowed Class 6 Claims will be paid in full in Cash on the Effective Date of the Plan.  At this time, the Debtor does not believe that there are any such claims.

**Impaired/Not Impaired** The Class 6 Tax Claims are not  impaired.

**Voting:** Class 6 is not entitled to vote on the plan.

**G.**    **Class 7:**    **The Allowed Class 7 Sub-Class 7-A and Sub-Class 7-B Claims**

**Description:**    Sub-Class 7-A consists of the Allowed Pre-Petition Unsecured Claims filed by the Limited Partners. Sub-class 7-B consists of the Allowed Post-Petition Priority Claims of the Limited Partners.

**Treatment:**    The holders of Allowed Class 7-A Unsecured Claims will receive nothing in the Plan and will have their Sub-Class 7-A Claims discharged in the Order Confirming the Plan.  The holders of Allowed Pre-Petition Class 7 Claims are divided into two sub-classes. Sub-Class 7-A consists of the Allowed Pre-Petition Claims of the Limited Partners. Sub-Class 7-B consists of the Allowed Post-Petition Claims of the Limited Partners. The Holders of Allowed Sub-Class 7-B Claims will be entitled to receive all Litigation Proceeds that may be awarded and paid to the Limited Partners and which they will use to pay to the holder of the Class 2 Judgment Claim until such Class 2 Judgment Claim is paid in full, and to the extent that any such Litigation Proceeds are also used to pay Allowed Class 5 Claims. In full satisfaction of the Allowed Sub-Class 7-B Claims, the Holders of Allowed Sub-Class 7-B Claims will be paid, Pro Rata, the net Litigation Proceeds received by the Reorganized Debtor after payment of all Class 2 and Class 5 Claims are paid in full as provided in the Plan.

Sub-Class 7-A Claims will be discharged under the Plan.

Sub-Class 7-B members will each receive cash payments to be paid from litigation proceeds after, in order: (i) payment in full of the Class 2 Judgment Claim; and (ii) payment in full of the Class 5 Claims. If no litigation proceeds are recovered by the Debtor, then the holders of Class 7-B Claims will receive nothing on account of their claims and the Sub-Class 7-B Claims will be discharged.

**Impaired/Not Impaired:**    The Sub-Class 7-A and 7-B Claimants are impaired.

45

**Voting:**  The Sub-Class 7-A and Sub-Class 7-B Claimants are entitled to vote on the Plan.

**H.    <u>Class 8:</u>        <u>The Allowed Class 8 Interests</u>**

**Description:**  Class 8 consists of the Allowed equity interests of the Debtor existing on the Petition Date.  As of the Petition Date, the Debtor had eight limited partners and a general partner.

**Treatment:**  The Allowed equity interests of the Debtor existing on the Petition Date shall be cancelled and extinguished as of the Effective Date and shall not receive any Distributions under the Plan.

**Impaired/Not Impaired:**  The Class 8 Interest Holders are receiving nothing under the Plan on account of such interests and pursuant to § 1126(g) are deemed to have rejected the Plan.

**Voting:**  The Allowed Class 8 Interests are not entitled to vote on the Plan.

**I.    <u>DESIGNATION AND TREATMENT OF UNIMPAIRED CLASSES OF CLAIMS AND INTERESTS</u>**

Except to the extent the Court may estimate and allow for voting purposes only the disputed Claims in Class 3A and Class 3B,  Classes 3A, 3B and 6 are deemed not impaired and, as a result, are not entitled to vote on the Plan.  Pursuant to Bankruptcy Code § 1126(f), the Class 3A, 3B and 6 Claimants are deemed to have accepted the Plan and are not entitled to vote on the Plan.  Should the Court estimate and allow either or both the Claims of Class 3A and 3B for voting purposes only, the holders of Class 3A and 3B may nevertheless be permitted to vote on the Plan as deemed impaired holders of Claims, which the Debtor disputes.  Should such holders of Class 3A and 3B Claims vote against confirmation, the Debtor believes, and will argue, that its Plan may be confirmed and that the treatment afforded such creditors may be "crammed down" on such Classes pursuant to Bankruptcy Code § 1129(b).

46

### J.     MEANS FOR PLAN IMPLEMENTATION

#### 1.     Means of Effectuating the Plan

The Reorganized Debtor will make the distributions required under the Plan to holders of Allowed Claims by using cash received from the then-existing cash in the Debtor's bank account. In addition, funding will come from periodic cash infusions by the new corporate General Partner or Limited Partner in such amounts as necessary to make all Plan required payments. Litigation recoveries, if any, collected from Commonwealth will be used as provided in the Plan. The Reorganized Debtor and the New General Partner and Limited Partner of the Reorganized Debtor with loans from the Limited Partners will commit their financial capability and re-capitalization to fund the Plan.

The Reorganized Debtor will pay all monthly post-confirmation expenses within thirty (30) days of the date such expenses are due. Monthly expenses include, but are not limited to professional fees and litigation costs.

#### 2.     Management of the Reorganized Debtor

**Identity**. The managers, officers and general partner identified and set forth in this Disclosure Statement shall serve as managers and officers and owners of the Reorganized Debtor as of the Effective Date. Renee Barnard will continue as the Chief Operating Officer of the Reorganized Debtor. Kevin Moriarty will continue as the President/CEO of the Reorganized Debtor, and together with Renee Barnard will oversee operations of the Reorganized Debtor.

**Post-confirmation managerial duties**. The managerial duties of the current management staff as established post-petition will remain the same.

**No Post-Confirmation Compensation.** Management will not receive compensation from the Reorganized Debtor after confirmation.

47

### 3.    Bar Date for Certain Administrative Claims.

Except as otherwise provided in the Confirmation Order, all applications by Professionals for final compensation for services rendered and for reimbursement of expenses incurred on or before the Effective Date (including without limitation any compensation requested by any Professional or other entity for making a substantial contribution to the Chapter 11 Case) and all other requests for payment of Administrative Claims not otherwise Allowed but incurred before the Effective Date under Code §§507(a)(1 ) or 507(b) (except only for Claims in trade debt incurred in the ordinary course of business and Claims under 28 U.S.C. §1930) shall be filed no later than thirty (30) days after the Effective Date, unless such date is extended by order of the Bankruptcy Court entered upon motion filed prior to the deadline hereunder, on notice to the Reorganized Debtor. Any such Claim that is not filed by the deadline shall be forever barred.  Holders of Administrative Claims required to file applications, motions, or other requests for payment of such Claims and who do not do so timely shall be forever barred from asserting such Claims against the Reorganized Debtor or any other individual or entity in connection with their respective activities in the Reorganized Case or any of their respective property. The Bankruptcy Court shall retain exclusive jurisdiction over any disputes concerning Administrative Claims.

### 4.    Effectuating Documents; Further Transactions

The Chief Operating Officer, President, Chief Executive Officer, or any other appropriate agent or officer of the Reorganized Debtor, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, partnership interests or other equity interests, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Secretary or any other appropriate agent or officer of

48

the Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions, if necessary.

### 5.   Objections to Claims

Any Claim which is not timely objected to and which has not previously been disallowed, will be deemed to be an Allowed Claim upon the expiration of the applicable time for making an objection. A Claim which is timely objected to will be considered a Disputed Claim until such time as an order has been entered by the Bankruptcy Court and such order has become a Final Order.

Unless another date is established by the Bankruptcy Court, all objections to Claims shall be filed and served on such Claimholders ninety (90) days after the Effective Date except as extended by: (a) agreement between the Claimant and the Debtor, if the Proof of Claim is filed before the Effective Date; (b) agreement between the Claimant and the Reorganized Debtor, if the Proof of Claim is filed after the Effective Date; or (c) by order of the Bankruptcy Court upon application by the Reorganized Debtor; provided, however, that if a Proof of Claim is filed after the Effective Date, then the deadline to object to such claim shall be ninety (90) days after such Proof of Claim has been filed.

### K.   RISK FACTORS

The Debtor does not believe any risks are associated with the Reorganized Debtor's performance under the Plan. The Limited Partners have sufficient liquid assets to fund all necessary Plan required financial obligations into the new entities that will become the Reorganized Debtor's New General and New Limited Partners. Thus, the Debtor believes that the Reorganized Debtor will be able to meet all of its financial obligations under the Plan.

Risks from litigation recoveries are inherent in any litigation scenario, but the structuring of the Plan is such that all required Plan payments will be made in a timely

49

manner even if no litigation recoveries are recovered and collected by either the Reorganized Debtor or by the Limited Partners.

### L.    OTHER PROVISIONS OF THE PLAN

#### 1.    Executory Contracts and Unexpired Leases

After the sale to MED closes, the Debtor will have no executory contracts or unexpired leases. All Resident Contracts are being assumed and assigned to MED, if not already assigned to MED prior to the Effective Date by reason of the sale closing to MED.

#### 2.    Recapitalization and Reorganization

The existing equity interests in the Debtor will be cancelled and extinguished as of the Effective Date and the Class 8 Interest holders will not receive or retain any property or rights on account of their equity interests. On the Effective Date, in return for a cash infusion sufficient to pay all obligations required to be paid on the Effective Date: (i) a newly formed corporate entity will become the General Partner of the Reorganized Debtor which will hold a 1 percent ownership and profit and distribution entitlement as the sole General Partner of the Reorganized Debtor; and (ii) a separate newly formed corporate entity will become the Limited Partner of the Reorganized Debtor which will hold a 99 percent ownership and profit and distribution entitlement as the sole Limited Partner of the Reorganized Debtor.

The Debtor reserves the right to convert from an Alabama limited partnership to any other type of limited liability entity following the Effective Date.

#### 3.    Retention of Jurisdiction

The Bankruptcy Court will retain jurisdiction over the Bankruptcy Case until a final decree is entered by the Bankruptcy Court. It is estimated that the final decree will be entered approximately eighteen months (18) months after the Plan is confirmed

50

by the Bankruptcy Court. At that time, the Bankruptcy Case will be closed. The Bankruptcy Court shall retain jurisdiction for the following purposes:

a.    to determine the allowance of Claims and Interests upon the timely objection thereto;

b.    to determine all adversary proceedings and contested matters;

c.    to approve, pursuant to Code §365, the assumption, assignment or rejection of any executory contract or unexpired lease of the Debtor except as otherwise provided in the Plan;

d.    to determine requests for payments of Claims entitled to priority under Code §507(a)(1), including compensation of parties entitled thereto;

e.    to resolve controversies and disputes regarding the interpretation of the Plan or any exhibit thereto;

f.    to implement the provisions of the Plan and enter orders in aid of Confirmation and consummation of the Plan;

g.    to adjudicate any disputes with holders of Claims or Interests or any causes of action;

h.    to hear and determine all pending or future controversies, suits, and disputes that may arise under the Plan including without limitation disputes between the Debtor and the Claimants and controversies arising in connection with the interpretation of the Plan, including any and all schedules, documents, and exhibits and any documents intended to implement the provisions of the Plan;

i.    to consider any modification, alteration, or amendment to the Plan;

j.    to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, including any exhibit thereto, or in any order of the Bankruptcy Court, including the Confirmation Order, as may be

51

necessary to carry out the purposes and intent of the Plan and to implement and effectuate the Plan;

k.    to determine such other matters as may be provided for in the Confirmation Order or other orders of the Bankruptcy Court as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

l.    to enforce all orders, judgments, injunctions, and rulings entered in connection with the Chapter 11 Case; and

m.    to enter a final decree closing the Chapter 11 Case.

## M.    TAX CONSEQUENCES OF THE PLAN

CREDITORS AND INTERESTS HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to the Debtor. The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules that make it difficult to state completely and accurately all the tax implications of any proposed action.

The Debtor does not anticipate that Plan confirmation will have a material effect on its tax liability. THE DEBTOR MAKES NO REPRESENTATIONS REGARDING POTENTIAL TAX CONSEQUENCES TO CREDITORS.

## N.    CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OR THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain

52

deadlines for filing Claims. Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Plan. Some requirements include: (i) the Plan must be proposed in good faith, (ii) the Plan must be accepted by all holders of Claims entitled to vote to accept or reject it unless certain other conditions are met with respect to satisfying confirmation, (iii) the Plan contemplates paying creditors at least as much as creditors would receive in a Chapter 7 liquidation, and (iv) the Plan must be feasible.  These requirements are not the only requirements necessary for confirmation of the Plan by the Bankruptcy Court.

## O.   WHO MAY OBJECT OR VOTE TO APPROVE THE PLAN

### 1.   Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

### 2.   Who May Vote to Accept/Reject the Plan

A creditor or Interest holder has a right to vote for or against the Plan if such creditor or Interest holder has a Claim or Interest which is both: (1) Allowed or Allowed for voting purposes and (2) classified as an impaired class.

### 3.   What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an Allowed Claim or interest to have the right to vote. Generally, any Rule–compliant Proof of Claim or Interest will be allowed, unless a party in interest objects. When an objection to a Claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

Case No. 20-00018-LA11

## IV.    SIGNIFICANT PLAN TERMS AND DEFINITIONS

### A.    The Bar Dates for Filing Claims

**THE BAR DATE FOR FILING A PROOF OF CLAIM FOR GENERAL PREPETITION CLAIMS IN THE CHAPTER 11 CASE WAS JULY 6, 2020.** (ECF #235). A creditor or Interest holder may have an allowed Claim or Interest even if a Proof of Claim or Interest was not timely filed.  A Claim is deemed allowed if (1) it is scheduled on Debtor's schedules and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim. An Interest is deemed allowed if it is scheduled and no party in interest has objected to the Interest.  The general bar date order applies to general prepetition Claims,  governmental claims and claims under Section 503(b)(9).  The general bar date did not apply and excluded the following creditors (who were not required to file Claims by the July 6, 2020 bar date): (1) Claims of the U.S. Trustee for fees payable pursuant to 28 U.S.C. § 1930; (2) Claims for which a Proof of Claim against Debtor was properly filed; (3) any Claim (i) that is listed in schedules of the Debtor or any amendments thereto, and (ii) that is not described therein as "disputed," "contingent," or "unliquidated," and (iii) whose holder does not dispute the amount or characterization of the Claim as set forth in the schedules; (4) Claims allowable under Sections 503(b) and 507(a)(2) of the Bankruptcy Code as an administrative expense (other than any Claim allowable under Section 503(b)(9) of the Bankruptcy Code), including such Claims held by Professionals; (5) Claims of any party that are exempt from filing a Proof of Claim pursuant to an order of the Court in this Chapter 11 case, including without limitation any order approving postpetition debtor in possession financing; (6) any Claim that has been paid in full by the Debtor pursuant to the Bankruptcy Code or in accordance with an order of the Court; and (7) any Claim against the Debtor that has been allowed by an order of the Court, entered on or before the July 6, 2020 general bar date.

**THE BAR DATE FOR FILING POSTPETITION ADMINISTRATIVE EXPENSE CLAIMS IN THE CHAPTER 11 CASE WAS APRIL 9, 2021.** The Bankruptcy Court set April 9, 2021 as the Chapter 11 Administrative Claims Bar Date. ECF 470. The only parties not required to comply with the Chapter 11 Administrative Claims Bar Date are: (a) the U.S. Trustee, on account of Claims for fees payable pursuant to 28 U.S.C. § 1930; (b) any person or entity that has already properly filed a Proof of Claim for a post-petition administrative priority claim against the Debtor; (c) any and all Professionals retained in this Chapter 11 case by the Debtor; (d) Claims of any party that are exempt from filing a filing a Proof of Claim pursuant to an order of the Court in these this Chapter 11 case, including without limitation any order approving postpetition debtor in possession financing; (e) any Claim that has been paid in full by the Debtor pursuant to the Bankruptcy Code or in accordance with an order of the Court; and (f) any Claim against the Debtor that has been allowed by an order of the Court entered on or before the April 9, 2021 Administrative Claims Bar Date.

The SBA filed an unsecured, non-priority Claim, Claim #18-1, on April 9, 2021 in the amount of $1,138,104.75. Other administrative priority Claims were timely filed by the Debtor's Limited Partners for their post-petition debtor in possession financing advances and for payments required by court order on behalf of the Debtor to Wells Fargo Bank. See Claim #s 19, 20, 21, 22 and 23, filed on April 9, 2021.

### B.    What Is an Impaired Claim/Interest?

As noted above, an Allowed Claim or Interest only has the right to vote if it is in a class that is <u>impaired</u> under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of such class. For example, a class comprised of General Unsecured Claims is impaired if the Plan fails to pay the members of such class 100 percent of what they are owed.

In the Chapter 11 Case, the Debtor believes that Classes 1, 2, 4, 5, 8 and Sub-Classes 7-A and 7-B are impaired and that holders of Claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Proponent believes that holders of unclassified administrative Claims are unimpaired and that holders of Claims of these unclassified Claims therefore do not have the right to vote to accept or reject the Plan. Parties who dispute the Debtor's characterization of their Claim or Interest as being impaired or unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the class.

### C.    Who is Not Entitled to Vote?

The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired classes; (3) Claims entitled to priority pursuant to § 507(a)(1), (a)(2), and (a)(8); and (4) Claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to § 507(a)(l), (a)(2), and (a)(7) are not entitled to vote because such Claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### D.    Who Can Vote in More Than One Class?

A creditor whose Claim has been Allowed in part as a secured Claim and in part as an unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured Claim and another ballot for the unsecured Claim.

### E.    Votes Necessary to Confirm the Plan

If impaired classes exist, the Bankruptcy Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any

insiders within such class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed below.

### F.    Votes Necessary for a Class to Accept the Plan

A class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted, voted in favor of the Plan. A class of Interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the shareholders of such class that actually voted, voted to accept the Plan.

### G.    Treatment of Non-Accepting Classes

As noted above, even if all impaired classes do not accept the proposed Plan, the Bankruptcy Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code. The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown." The Code allows the Plan to be "crammed down" on nonaccepting classes of Claims or Interests if it meets all consensual requirements except the voting requirements of §1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### H.    Request for Confirmation Despite Non-Acceptance by Impaired Classes

The Debtor will ask the Court to confirm the Plan by "cramdown" on any impaired classes if any of these classes do not vote to accept the Plan.

### I.    Absolute Priority Rule

The Plan cannot be confirmed by the Court if it violates the absolute priority rule. That rule is set forth in 11 U.S.C. §1129(b)(2)(B)(ii). That requirement applies only if the unsecured class, as a group, votes against confirmation of the Plan. If the

57

unsecured class votes against the Plan, the Plan violates the absolute priority rule, meaning that shareholders cannot keep their ownership Interests unless they pay in "new value." The newly formed corporate General Partner will pay cash into the Reorganized Debtor accounts sufficient to make all Plan required payments.

Under the Plan the General or Limited Partners will not receive or retain anything of value on account of existing partnership Interests. Therefore, the Plan does not violate the Absolute Priority Rule even if any class of Claims votes to deny confirmation. In addition, the Limited Partners have each agreed to provide "new value" to the Reorganized Debtor as under the Plan, the Limited Partners will: (i) cancel their existing limited partnership Interests; (ii) have their 7-A Claims discharged; and (iii) continue to lend sufficient funds to Reorganized Debtor to enable the Reorganized Debtor to make all required Plan payments.

Assuming the Bankruptcy Court determines that this type of contribution by the Limited Partners is "necessary," what is effectively a subordination of their post-petition Sub-Class 7-B administrative priority Claims and their agreement to infuse cash as needed into the Reorganized Debtor constitutes "new value" sufficient to satisfy the absolute priority rule, should the issue arise.

This "new value" will not increase the sums unsecured creditors would receive under the Plan. If the estate is converted to a Chapter 7 liquidation, the unsecured creditors would, most likely, receive nothing on their Claims.

## V. LIQUIDATION ANALYSIS

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a claimant or Interest holder is in an impaired class and that claimant or Interest holder does not vote to accept the Plan, then that claimant or Interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

Case No. 20-00018-LA11

In a Chapter 7 case, a debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative Claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed Claim in relationship to the total allowed unsecured Claims. Finally, Interest holders receive the balance, if any, that remains after all creditors are paid.

In a Chapter 7 case, a trustee is appointed and entitled to compensation from the bankruptcy estate in an amount not to exceed 25 percent on the first $5,000 of all moneys disbursed, 10 percent on any amount over $5,000 but less than $50,000, 5 percent on any amount over $50,000 but not in excess of $1 million, and 3 percent on all amounts over $1 million.

For the Bankruptcy Court to be able to confirm the Plan, the Bankruptcy Court must find that all creditors and Interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Debtor as Plan Proponent maintains that this requirement is met in the Plan.

Based on the nature of Debtor's business, if it were forced into a Chapter 7 liquidation, the value of the Debtor would very likely be far less than the amount of secured and priority Claims. This reality is due to the fact that a functional liquidation sale of Debtor Assets is the basic and most central feature of the Plan.  No added Chapter 7 fees, costs or expenses are being incurred under the Debtor's Plan whereas in a Chapter 7 liquidation numerous layers of fees and costs would be incurred, including a Chapter 7 trustee's fee, trustee's professionals' fees and costs, broker's fees, and other attendant fees and costs incurred in carrying the case forward, which would further greatly reduce any potential recoveries by any creditor. Further, Wells Fargo claims to hold a security interest in all of the Debtor's prepetition real and

59

personal property assets, including the Mount Royal Towers facility and related business assets, the fair market value of which, as established by the sale price of these defined Debtor Assets to MED, is far less than the amount owed to Wells Fargo as a secured creditor.  In short, there is little to no hope, in the opinion of Debtor's management, that any creditor would receive more in a Chapter 7 liquidation than creditors will receive under the Debtor's Plan.

If a trustee in a Chapter 7 case were to liquidate the Debtor's assets, it is unlikely that the trustee would receive proceeds in excess of the costs of the Chapter 7 administration and the secured creditor's liens.  Furthermore, liquidation of the Debtor's assets at this time would also likely result in rejection of the existing contracts which are now being assumed and assigned to MED, which would create large administrative Claims which would need to be paid before any unsecured creditors would be paid. Therefore, it is highly unlikely there would be any remaining funds available to general unsecured creditors in a Chapter 7 case.

As the Debtor has maintained throughout this Chapter 11 case, the Debtor has made a good faith effort to realize the maximum value for its business and assets and has concluded that the price being received from the sale of its Mount Royal Towers assets to MED represents the true fair market and going concern value of the Debtor's operating assets.  In contrast, a Chapter 7 Trustee would not be able to sell the business as a going concern given that the Limited Partners would not be providing additional post-conversion financial support to the Debtor Estate. Inasmuch as the Plan pays more to all creditors than those creditors could possibly ever receive in a Chapter 7 liquidation, the Plan clearly pays more than the liquidation value of the business.

## VI.    **FEASIBILITY**

Another requirement for confirmation involves Plan "feasibility", which means that confirmation of the Plan is not likely to be followed by a liquidation or the need

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

Case No. 20-00018-LA11

for further financial reorganization of Debtor or any successor to Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether Debtor will have enough cash on hand on the Effective Date to pay all the Claims and expenses which are entitled to be paid on such date. Debtor will have sufficient funds available from the new General Partner or new Limited Partner to make the required payments on the Effective Date.

The second aspect considers whether Debtor will have enough cash during the effective Plan period to make required Plan payments. Debtor is confident that it will have sufficient cash on hand in order to meet its obligations under the Plan because the Limited Partners have the available financial resources to fund future Plan obligations and they have committed to continue to do so as required.

YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR AND LEGAL COUNSEL IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL REPRESENTATIONS.

## VII.  EFFECT OF CONFIRMATION OF PLAN

### A.  DISCHARGE AND RELEASES

Except as otherwise provided in the Plan or the Confirmation Order, and expressly excluding the Class 1 and Class 2 Claims of Wells Fargo which are not discharged until paid in full as provided in the Debtor's Plan, the rights afforded under the Plan and the treatment of Claims under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims, including any interest accrued on Claims from the Petition Date. Except as otherwise provided in the Plan or the Confirmation Order, and as allowed by applicable law, Confirmation shall discharge and release the Debtor from all Claims or other debts that arose before the date of Confirmation, and all debts of the kind specified in Code §§ 502(g), 502(h) or 502(i), irrespective of whether: (i) a proof of Claim based on such debt is Filed or

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

Case No. 20-00018-LA11

deemed Filed pursuant to Code §501; (ii) a Claim based on such debt is allowed pursuant to Section 502 of the Bankruptcy Code; or (iii) the holder of a Claim based on such debt has accepted the Plan.

As of the date of Confirmation, except as provided in the Plan or Confirmation Order, all entities shall be precluded by the Confirmation Order from asserting against the Debtor, the estate of the Debtor, the Reorganized Debtor, or their respective officers, directors, members and managers, successors or property, any other or further Claims, debts, rights, causes of action, liabilities based upon any act, omission, transaction or other activity or inactivity of any kind or nature that occurred prior to the date of Confirmation.  In accordance with the foregoing, except as provided in the Plan or Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and all other debts and liabilities against the Debtor, pursuant to Code §§ 524 and 1141, and such discharge shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.

## B.    REVESTING OF PROPERTY IN DEBTOR

All property of the estate as defined in Code § 541 not distributed to holders of Allowed Claims pursuant to the Plan shall revest in the Reorganized Debtor on the Effective Date.  Thereafter, the Reorganized Debtor may operate its business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and Bankruptcy Court. As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims and Interests, except as specifically provided in the Plan or the Confirmation Order. In addition, in accordance with Code § 1123(b)(3), the Reorganized Debtor shall retain and may pursue all rights and Claims as it deems appropriate. All rights and claims of the Debtor against Commonwealth, or against any other person or entity, shall pass to the Reorganized Debtor upon the Effective Date.   The right to suspend Plan payments to

Commonwealth or any other person or entity during the pendency of any litigation is reserved to the Reorganized Debtor unless otherwise ordered by the Bankruptcy Court. Without limiting the foregoing, the Reorganized Debtor may, without application to or approval by the Court, pay fees that it incurs after the Effective Date for professional fees and expenses.

## C.    REVOCATION, MODIFICATION AND AMENDMENT OF PLAN

Subject to the restrictions on Plan modifications set forth in Code § 1127, the Debtor reserves the right to alter, amend or modify the Plan so long as such alteration, amendment or modification is consistent with the requirements of Code §§ 1122 and 1123, and occurs prior to the substantial consummation of the Plan.  The Debtor reserves the right to revoke or withdraw the Plan so long as such revocation or withdrawal is prior to the date of Confirmation. If the Debtor as Plan Proponent withdraws or revokes the Plan in accordance with this section, or if Confirmation does not occur, then the Plan shall be null and void in all respects.

## D.    POST-CONFIRMATION STATUS REPORT

Unless otherwise ordered by the Bankruptcy Court, pursuant to Local Bankruptcy Rule 3020-1(b), within one hundred and twenty (120) days following the entry of the Plan Confirmation Order, the Reorganized Debtor shall file a status report with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan.

## E.    QUARTERLY FEES

The Reorganized Debtor shall be responsible for the timely payment of all fees incurred after the Effective Date pursuant to 28 U.S.C. § 1930(a)(6).

## F.    POST-CONFIRMATION EMPLOYMENT

After the Confirmation Hearing Date, the Reorganized Debtor may engage, without notice, hearing, or order of the Bankruptcy Court, such attorneys, accountants,

63

and other professionals (the "Post-Confirmation Professionals") as it may desire to render services on such terms as it deems reasonable. With respect to services rendered by the Post-Confirmation Professionals, the Reorganized Debtor shall be authorized to pay for such services, related costs, and expenses without notice, hearing, or order of the Bankruptcy Court.

## G.    REMEDIES UPON DEFAULT; POST-CONFIRMATION CONVERSION/DISMISSAL

The Reorganized Debtor will have a number of obligations which it must perform in order to consummate the Plan. Many of these obligations will be required to be performed on or shortly after the Effective Date.  Plan obligations include such things as: (1) paying Allowed administrative and priority Claims; (2) making payments to secured creditors; and (3) making distributions to Unsecured Creditors.

If there is an inability on the part of Reorganized Debtor to substantially consummate the Plan, or if there is a material default by the Reorganized Debtor with respect to the Plan, any creditor, party in interest or the United States Trustee may request the Bankruptcy Court to: (1) convert the bankruptcy case to a case under Chapter 7 of the Bankruptcy Code; or (2) dismiss the bankruptcy case. Upon such request, and if appropriate cause is shown, the Bankruptcy Court may convert of dismiss the Chapter 11 Case, whichever option is in the best interest of creditors and the estate.  If the cause for conversion or dismissal is the failure to make a required payment under the Plan, a creditor or party in interest must give the Reorganized Debtor thirty (30) days written notice of the default in the Plan payment and the opportunity to cure the default.  If the Reorganized Debtor fails to timely cure the default, a motion to dismiss or convert may be filed.  In addition, a creditor or party in interest may exercise any other rights under any applicable law.  The Reorganized Debtor will be in material default under the Plan if it fails within twenty-one (21) days of the service of notice of default, plus three (3) additional days if served by mail,

64

either: (i) to cure the default or (ii) to obtain from the Bankruptcy Court an extension of time to cure the default or a determination that no default occurred.

The Confirmation Order may also be revoked under very limited circumstances. The Bankruptcy Court may revoke the Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke the Confirmation within one hundred and eighty (180) days after the entry of the Confirmation Order.

## H.    **FINAL DECREE**

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtor shall file a motion with the Bankruptcy Court to obtain a final decree to close the Chapter 11 Case.

Dated: August 6, 2021    By:    _____
Kevin Moriarty
President/CEO of the Debtor's General
Partner, IPG Holding
***Debtor and Plan Proponent***

Dated: August 6, 2021    SULLIVAN HILL REZ & ENGEL, APLC

By:    */s/ James P. Hill*    _____
James P. Hill
***Attorneys for Plan Proponent***

65