JULIAN I. GURULE (SBN: 252160)
 jgurule@buchalter.com
ANTHONY J. NAPOLITANO (SBN: 227691)
 anapolitano@buchalter.com
BUCHALTER, a Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Telephone: (213) 891-0700
Facsimile: (213) 896-0400

RICHARD J. BROCKMAN (admitted *pro hac vice*)
BRENT D. HITSON (admitted *pro hac vice*)
MARC P. SOLOMON (admitted *pro hac vice*)
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, AL 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

*Attorneys for Commonwealth Assisted Living, LLC*

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF CALIFORNIA

In re

VESTAVIA HILLS, LTD., d/b/a
MOUNT ROYAL TOWERS,

            Debtor.

Case No. 20-00018-LA11

Chapter 11

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF COMMONWEALTH ASSISTED LIVING, LLC'S MOTION TO DISMISS CHAPTER 11 CASE**

[Motion, Memorandum of P&As, Declaration of Anthony Napolitano concurrently filed]

**Hearing:**
Date: May 12, 2022
Time: 2:00 p.m. PDT
Place: United States Bankruptcy Court
Courtroom 2, Room 118
325 West F Street
San Diego, CA 92101

**TO THE HONORABLE LOUISE D. ADLER, UNITED STATES BANKRUPTCY JUDGE, THE DEBTOR, ITS COUNSEL AND ALL INTERESTED PARTIES:**

Commonwealth Assisted Living, LLC ("Commonwealth"), respectfully requests that the Court take judicial notice of the following documents in support of the concurrently filed *Motion to Dismiss Chapter 11 Case* commenced by Vestavia Hills, Ltd., d/b/a Mount Royal Towers ("Debtor") pursuant to Federal Rule of Evidence 201:

1.      **Motion for Order: (1)(A) Approving Stalking Horse Agreement; (B) Approving Overbid Procedures; (C) Approving Retention of Broker; (D) Approving Rejection of Commonwealth Agreement; (E) Scheduling Final Sale Hearing; and (2)(A) Approving Sale of Assets Free and Clear; (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief** filed by Debtor on February 13, 2020 as Docket No. 121 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 1**.

2.      **Order on Debtor's Motion to Extend Exclusivity Periods** entered by this Court on May 13, 2020 as Docket No. 251 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 2**.

3.      **Order on Debtor's Second Motion to Extend Exclusivity Periods** entered by this Court on July 22, 2020 as Docket No. 351 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 3**.

4.      **Debtor's Third Chapter 11 Status Report** filed by Debtor on November 5, 2020 as Docket No. 401 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 4**.

5.      **Order on Debtor's Third Motion to Extend Exclusivity Periods** entered by this Court on December 11, 2020 as Docket No. 428 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 5**.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF COMMONWEALTH ASSISTED LIVING, LLC'S MOTION TO DISMISS CHAPTER 11 CASE**

6. **Order on Debtor's Fourth Motion to Extend Exclusivity Periods** entered by this Court on January 29, 2021 as Docket No. 453 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 6**.

7. **Commonwealth Assisted Living, LLC, Series E's Objection to Debtor's Proposed Disclosure Statement Describing the Debtor's Chapter 11 Plan of Reorganization Dated July 2, 2021** entered by this Court on July 30, 2021 as Docket No. 532 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 7**.

8. **Debtor's Proposed First Amended Chapter 11 Plan of Reorganization dated August 6, 2021** filed by Debtor on August 6, 2021 as Docket No. 548 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 8**.

9. **Debtor's Proposed First Amended Disclosure Statement describing the Debtor's [Proposed] First Amended Chapter 11 Plan of Reorganization dated August 6, 2021** filed by Debtor on August 6, 2021 as Docket No. 549 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 9**.

10. **Minute Order** entered by this Court on August 12, 2021 as Docket No. 568 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 10**.

11. **Amended Tentative Ruling** entered by this Court on August 25, 2021 as Docket No. 578 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 11**.

12. **Order Regarding Commonwealth's Motion for Relief from the Automatic Stay** entered by this Court on October 12, 2021 as Docket No. 609 in the above-captioned chapter 11 bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 12**.

13. **Notice of Sale Closing and Notice Vacating Reserved Hearing Dates** filed by Debtor on October 20, 2021 as Docket No. 623 in the above-

captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 13**.

14. **Chapter 11 Monthly Operating Report for the Month Ending: 01/31/2022** filed by Debtor on February 23, 2022 as Docket No. 707 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 14**.

15. **Chapter 11 Monthly Operating Report for the Month Ending: 02/28/2022** filed by Debtor on March 25, 2022 as Docket No. 712 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 15**.

16. **Order Regarding Motion to Remand the Adversary Proceeding in Whole or in Part Under 11 U.S.C. § 1452 and Federal Rule of Bankruptcy Procedure 9027(d)** entered by this Court on October 12, 2021 as Docket No. 62 in the related adversary proceeding, Case No. 20-90060-LA, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 16**.

17. **Minute Order** entered by this Court on August 26, 2021 as Docket No. 580 in the above-captioned bankruptcy case, a true and complete copy of which was obtained from the Case Management/ Electronic Case Filing system of the United States Bankruptcy Court, Southern District of California, located at https:\\ecf.casb.uscourts.gov is attached hereto as **Exhibit 17**.

The above-referenced documents are properly the subject of judicial notice pursuant to Federal Rule of Evidence 201, which provides that a court may take judicial notice of facts "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201.

It is generally accepted that a bankruptcy court may take judicial notice of the bankruptcy court's records. "It is not error . . . for a court to take judicial notice of related proceedings and records in cases before that court." *State of Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975); *see also In re Earl*, 140 B.R. 728, 730 (Bankr. N.D. Ind. 1992) (finding that judicial notice of four related bankruptcy cases of Debtor was proper).

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

Court orders, pleadings, and other documents in related cases are appropriate subjects of judicial notice under Rule 201 because they are capable of accurate and ready determination by resort to the court's docket, whose accuracy cannot reasonably be questioned. *See, e.g.*, *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (taking judicial notice of pleadings, memoranda, and other court filings); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (a court may take judicial notice "of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue").

Furthermore, "[a] court may 'take judicial notice of the truth of facts asserted in documents such as (1) orders, (2) judgments, and (3) findings of fact and conclusions of law because they state the law of the case under the principles of collateral estoppel and res judicata.'" *Farmers Bank & Tr. Co. v. Wells (In re Wells)*, 536 B.R. 264, 267 n.2 (Bankr. E.D. Ark. 2015) (citations omitted). "The existence of a document entered into the official court docket is a public record subject to judicial notice . . . because such documents are publicly available in the court's records and are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned[.]'" *NRDC v. Kempthorne*, 2009 U.S. Dist. LEXIS 35541, at *18-19 (E.D. Cal. Apr. 27, 2009) (citing *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980)).

Finally, "[a]court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (citing *United States ex rel. Geisler v. Walters*, 510 F.2d 887, 890 n. 4 (3d Cir. 1975)). Accordingly, Commonwealth respectfully requests that this Court take judicial notice of the documents referenced above.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF COMMONWEALTH ASSISTED LIVING, LLC'S MOTION TO DISMISS CHAPTER 11 CASE**

Dated: April 8, 2022

BUCHALTER, A Professional Corporation

By: _____/s/ Julian I. Gurule_____

JULIAN I. GURULE
ANTHONY J. NAPOLITANO
BUCHALTER, a Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730

BRENT D. HITSON (admitted *pro hac vice*)
MARC P. SOLOMON (admitted *pro hac vice*)
RICHARD J. BROCKMAN (admitted *pro hac vice*)
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, AL 35203

*Attorneys for Commonwealth Assisted Living, LLC*

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

# Exhibit Index

In re Vestavia Hills, Ltd., dba Mount Royal Towers
Case No. 20-00018-LA11

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF COMMONWEALTH
ASSISTED LIVING, LLC'S MOTION TO DISMISS CHAPTER 11 CASE**

| Exhibit No. | Description | Page No.(s) |
|:---:|:---|:---:|
| 1 | Motion for Order: (1)(A) Approving Stalking Horse Agreement; (B) Approving Overbid Procedures; (C) Approving Retention of Broker; (D) Approving Rejection of Commonwealth Agreement; (E) Scheduling Final Sale Hearing; and (2)(A) Approving Sale of Assets Free and Clear; (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief [Docket No. 121] | 9 - 49 |
| 2 | Order on Debtor's Motion to Extend Exclusivity Periods [Docket No. 251] | 50 - 52 |
| 3 | Order on Debtor's Second Motion to Extend Exclusivity Periods [ Docket No. 351] | 53 - 55 |
| 4. | Debtor's Third Chapter 11 Status Report 9027(d) [Docket No. 401] | 56 - 75 |
| 5. | Order on Debtor's Third Motion to Extend Exclusivity Periods [Docket No. 428] | 76 - 78 |
| 6. | Order on Debtor's Fourth Motion to Extend Exclusivity Periods [Docket No. 453] | 79 - 83 |
| 7. | Commonwealth Assisted Living, LLC, Series E's Objection to Debtor's Proposed Disclosure Statement Describing the Debtor's Chapter 11 Plan of Reorganization Dated July 2, 2021 [Docket No. 532] | 84 - 116 |
| 8. | Debtor's Proposed First Amended Chapter 11 Plan of Reorganization dated August 6, 2021 [Docket No. 548] | 117- 163 |
| 9. | Debtor's Proposed First Amended Disclosure Statement describing the Debtor's [Proposed] First Amended Chapter 11 Plan of Reorganization dated August 6, 2021 [Docket No. 549] | 164 - 235 |

| 10. | Minute Order [Docket No. 568] | 236 - 237 |
| --- | --- | --- |
| 11. | Amended Tentative Ruling [Docket No. 578] | 238 - 243 |
| 12. | Order Regarding Commonwealth's Motion for Relief from the Automatic Stay [Docket No. 609] | 244 - 255 |
| 13. | Notice of Sale Closing and Notice Vacating Reserved Hearing Dates [Docket No. 623] | 256 - 265 |
| 14. | Chapter 11 Monthly Operating Report for the Month Ending: 01/31/2022 [Docket No. 707] | 266 - 325 |
| 15. | Chapter 11 Monthly Operating Report for the Month Ending: 02/28/2022 [Docket No. 712] | 326 - 386 |
| 16. | Order Regarding Motion to Remand the Adversary Proceeding in Whole or in Part Under 11 U.S.C. § 1452 and Federal Rule of Bankruptcy Procedure 9027(d) [Docket No. 62] | 387 - 408 |
| 17. | Minute Order [Docket No. 580] | 409 - 410 |

# EXHIBIT 1

1

2

3

4    SULLIVAN HILL REZ & ENGEL                    **Electronically Filed: 02/13/20**
     A Professional Law Corporation
5     James P. Hill, SBN 90478
      Christopher V. Hawkins, SBN 222961
6    600 B Street, 17th Floor
     San Diego, California 92101
7    Telephone:    (619) 233-4100
     Fax Number:   (619) 231-4372
8
     Attorneys for Debtor and Debtor in Possession,
9    Vestavia Hills, Ltd. dba Mount Royal Towers

10                 **UNITED STATES BANKRUPTCY COURT**
                   **SOUTHERN DISTRICT OF CALIFORNIA**
11

12   In re                                  ) CASE NO. 20-00018-LA11
                                            )
13      VESTAVIA HILLS, LTD.                ) Chapter 11
        dba MOUNT ROYAL TOWERS,            )
14                                          ) **DEBTOR'S MOTION FOR ORDER:**
                      Debtor.               ) **(1)(A) APPROVING STALKING**
15                                          ) **HORSE AGREEMENT; (B)**
                                            ) **APPROVING OVERBID**
16                                          ) **PROCEDURES; (C) APPROVING**
                                            ) **RETENTION OF BROKER; (D)**
17                                          ) **APPROVING REJECTION OF**
                                            ) **COMMONWEALTH AGREEMENT;**
18                                          ) **(E) SCHEDULING FINAL SALE**
                                            ) **HEARING; AND (2)(A) APPROVING**
19                                          ) **SALE OF ASSETS FREE AND**
                                            ) **CLEAR; (B) APPROVING**
20                                          ) **ASSUMPTION AND ASSIGNMENT**
                                            ) **OF EXECUTORY CONTRACTS**
21                                          ) **AND UNEXPIRED LEASES; AND**
                                            ) **(C) GRANTING RELATED RELIEF**
22                                          )
                                            ) Initial Hearing Date:
23                                          ) Time:        To be announced by Court
                                            ) Sale Hearing Date:
24                                          ) Time:
                                            ) Ctrm:        2
25                                          ) United States Bankruptcy Court
                                            ) 325 West "F" Street
26                                          ) San Diego, CA 92101-6991
                                            ) Judge: Hon. Louise DeCarl Adler
27

28

409001-v7

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 2

I.     STATEMENT OF FACTS .......................................................................... 2

       A.     Background ................................................................................ 2

       B.     The Debtor's Business ................................................................ 2

       C.     The Debtor's Prepetition Struggles and Efforts to Sell ............. 3

       D.     The Debtor's Ongoing Operational Losses ................................ 3

       E.     The Prepetition Stalking Horse ................................................. 4

       F.     The Current Stalking Horse ....................................................... 5

       G.     The Requested Retention of Blueprint ...................................... 6

       H.     The Proposed Overbid Procedures ............................................ 8

       I.      The Proposed Marketing and Advertising ................................. 8

       J.      The Proposed Sale Notice .......................................................... 9

       K.     The Rejection of the Disputed Commonwealth Agreement ...... 9

II.    RELIEF REQUESTED ............................................................................ 10

III.   SERVICE OF THIS MOTION ................................................................ 11

IV.    AUTHORITY AND ARGUMENT ......................................................... 11

       A.     The Overbid Procedures Are Appropriate and in the Best Interests
              of the Debtor, the Estate, and Creditors ................................... 11

              1.     The Overbid Procedures Are Reasonable, Appropriate and
                     Will Maximize Value ...................................................... 11

              2.     The Notice Procedures Are Reasonable and Appropriate ...... 13

              3.     The Assumption and Assignment Procedures Are
                     Reasonable and Appropriate ............................................ 14

              4.     The Proposed Marketing is Appropriate .......................... 14

       B.     Approval of the Sale is Appropriate and in the Best Interests of the
              Debtor's Estate ......................................................................... 15

              1.     The Sale is Authorized by Section 363 of the Bankruptcy
                     Code as a Sound Exercise of the Debtor's Business
                     Judgment .......................................................................... 15

|   |   | 2. | The Sale of the Assets Free and Clear of All Encumbrances (Except for Permitted Encumbrances) is Authorized by Section 363(f) of the Bankruptcy Code | 17 |

C. Assumption and Assignment of the Contracts is Authorized by Section 365 of the Bankruptcy Code .......... 19

    1. Authority .......... 19

    2. The Debtor's Sound Business Judgment Supports the Assumption and Assignment of the Contracts to be Assigned .......... 21

    3. Adequate Assurance of Future Performance Will Be Demonstrated With Respect to the Contracts to be Assigned .......... 21

D. The Prophylactic Rejection of the Disputed Commonwealth Agreement is Warranted .......... 23

E. The Debtor's Employment of Blueprint Should be Approved .......... 23

V. WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d) .......... 24

VII. CONCLUSION .......... 24

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.),
    103 B.R. 524 (Bankr. D.N.J. 1988) ................................................................. 22

Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot),
    94 B.R. 343 (E.D. Pa. 1988) ....................................................................... 18

Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville
    Corp. (In re Johns-Manville Corp.), 60 B.R. (Bankr. S.D.N.Y. 1986) ......... 16

EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp.
    (In re Sanshoe Worldwide Corp.), 139 B.R. 585 (S.D.N.Y. 1992) .............. 22

Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.),
    107 F.3d 558 (8th Cir. 1997) ....................................................................... 11

In re Abbotts Dairies of Pa., Inc.,
    788 F.2d 143 (3d Cir. 1986) ........................................................................ 15

In re AbitibiBowater Inc.,
    418 B.R. 815 (Bankr. D. Del. 2009) ............................................................ 20

In re Bygaph, Inc.,
    56 B.R. 596 (Bankr. S.D.N.Y. 1986) .......................................................... 22

In re Decora Indus., Inc.,
    2002 WL 32332749 (D. Del. May 20, 2002) ......................................... 15, 20

In re Delaware & Hudson Ry. Co.,
    124 B.R. 169 (D. Del. 1991) ....................................................................... 15

In re Dundee Equity Corp.,
    No. 89-10233 (FGC), 1992 WL 53743 (Bankr. S.D.N.Y. Mar. 6, 1992 ...... 18

In re Dura Auto. Sys., Inc.,
    No. 06-11202 (Bankr. D. Del. July 24, 2007) .............................................. 12

In re Exide Techs.,
    340 B.R. 222 (Bankr. D. Del. 2006) ............................................................ 20

In re Federal Mogul Global, Inc.,
    293 B.R. 124 (D. Del. 2003) ....................................................................... 21

In re Food Barn Stores, Inc.,
    107 F.3d 558 (8th Cir. 1997) ....................................................................... 15

iii

In re Integrated Res.,
    147 B.R. at 656 ........................................................................................ 16

In re Integrated Resources,
    147 B.R., 650 (SD N.Y.1992) .................................................................. 16

In re Kellstrom Indus., Inc.,
    282 B.R. 787 (Bankr. D. Del. 2002) ...................................................... 18

In re Lionel Corp.,
    722 F.2d 1063 (2d Cir. 1983) ................................................................ 15

In re Montgomery Ward Holding Corp.,
    242 B.R. 147 (D. Del. 1999) .................................................................. 15

In re Mushroom Transp. Co.,
    382 F.3d 325 (3d Cir. 2004) .................................................................. 11

In re Network Access Solutions Corp.,
    330 B.R. 67 (Bankr. D. Del. 2005) ........................................................ 20

In re New Century TRS Holdings, Inc.,
    No. 07-10416 (Bankr D. Del. Apr. 20, 2007) ........................................ 12

In re Nortel Networks, Inc.,
    Case No. 09-10138 (KG) (Bankr. D. Del. June 30, 2009) (D.I. 1012) ......... 13

In re O'Brien Envtl. Energy, Inc.,
    181 F.3d 527 (3d Cir. 1999) .................................................................. 12

In re Prime Motor Inns Inc.,
    166 B.R. 993 (Bankr. S.D. Fla. 1994) .................................................... 22

In re Rachels Indus. Inc.,
    109 B.R. 797 (Bankr. W.D. Tenn. 1990) ................................................ 22

In re Traffic Control & Safety Corp.,
    Case No. 12-11287 (KJC) (Bankr. D. Del. May 14, 2012) (D.I. 128) .......... 13

In re Trans World Airlines, Inc.,
    No. 01- 00056 (PJW), 2001 WL 1820326
    (Bankr. D. Del. Apr. 2. 2001) ................................................................ 15

In re Tweeter Home Etm't Group, Inc.,
    Case No. 07-10787 (PJW) (Bankr. D. Del. June 27, 2007) (D.I. 211) ......... 13

In re United Healthcare Sys. Inc.,
    No. 97-1159, 1997 WL 176574 (D.N.J. Mar. 26, 1997) ........................... 15

In re Vertis Holdings, Inc.,
    Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012 (D.I. 206) .......... 13

NLRB v. Bildisco & Bildisco,
    465 U.S. 513 (1984) ...................................................................................... 20

Meyers v. Martin (In re Martin),
    91 F.3d 389 (3d Cir. 1996) ......................................................................... 15

Official Comm. for Unsecured Creditors v. Aust
    (In re Network Access Solutions, Corp., 330 B.R. 67
    (Bankr. D. Del. 2005) .................................................................................. 20

Official Comm. of Subordinated Bondholders v. Integrated Res. Inc.
    (In re Integrated Res. Inc.), 147 B.R. 650 (S.D.N.Y. 1992) ........................ 12

Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery,
    330 F.3d 548 (3d Cir. 2003) ....................................................................... 11

Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon
    Assocs.),1989 WL 106838 (N.D. Ill. Sept. 8, 1989) ................................... 16

Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,
    872 F.2d 36 (3d Cir. 1989) ......................................................................... 20

Smith v. Van Gorkom,
    488 A.2d 858 (Del. 1985)) .......................................................................... 16

**Statutes**

11 U.S.C. § 101 et seq. ....................................................................................... 2

11 U.S.C. § 105(a) ..................................................................................... 2, 13, 18

11 U.S.C. § 327(a) ..................................................................................... 6, 8, 23

11 U.S.C. § 363 ........................................................................................ 2, 11, 15

11 U.S.C. § 363(b) .......................................................................................... 1, 15

11 U.S.C. § 363(f) ....................................................................................... passim

11 U.S.C. § 363(f)(2) .......................................................................................... 18

11 U.S.C. § 363(f)(4) .......................................................................................... 18

11 U.S.C. § 363(m) ......................................................................................... 1, 11

11 U.S.C. § 365 ....................................................................................... 1, 2, 8, 13

11 U.S.C. § 365(a) .............................................................................................. 19

11 U.S.C. § 365(b)(1) ......................................................................................... 19

11 U.S.C. § 365(c)(2) ......................................................................................... 21

11 U.S.C. § 365(f)(1) .......................................................................................... 19

11 U.S.C. § 365(f)(2) .......................................................................................... 19

409001-v7

v

1

**Rules**

Federal Rules of Bankruptcy Procedure, rule 2002 .................................................. 13

Federal Rules of Bankruptcy Procedure, rule 2002(a) ............................................ 13

Federal Rules of Bankruptcy Procedure, rule 2002(c) ............................................ 13

Federal Rules of Bankruptcy Procedure, rule 6004(h) ............................................ 24

Federal Rules of Bankruptcy Procedure, rule 6006(d) ............................................ 24

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Vestavia Hills, Ltd. dba Mount Royal Towers (the "Debtor") hereby moves this Court (the "Motion"):

(A)    for entry of an initial order ("Overbid Procedures Order"), following the initial hearing on this Motion, in substantially the form attached as Exhibit A to the Moriarty Declaration (defined below):

1.    approving the Agreement (defined below) with the Stalking Horse (defined below) for the sale of the Assets (defined below);

2.    approving the Overbid Procedures (defined below) (including the marketing, advertising and use of the Sale Notice as described below) which include a request for a break-up fee to the Stalking Horse Bidder in the event the Stalking Horse is overbid;

3.    approving the retention of Blueprint Healthcare Real Estate Advisors as broker and real estate advisor;

4.    approving the rejection of the disputed prior agreement with Commonwealth Assisted Living, LLC, Series E; and

5.    scheduling the final Sale Hearing (defined below) to approve the Stalking Horse as the purchaser, or, if overbids are received, to conduct an auction of the Assets described herein; and further

(B)    for entry of a subsequent order ("Sale Order"), following the Sale Hearing, in substantially the form attached as Exhibit B to the Moriarty Declaration:

1.    approving the sale of substantially all of the assets of the Debtor to the Stalking Horse (or any winning overbidder) free and clear of any liens, claims or encumbrances pursuant to Section 363(b) and (f) as a good faith purchaser entitled to the protections of Section 363(m);

2.    approving the assumption and assignment of the Designated Contracts (defined below) designated by the Stalking Horse (or any winning overbidder) pursuant to Section 365; and

3.    granting related relief.

This Motion is brought pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code (11 U.S.C. § 101 et seq.) on the grounds that the Debtor does not have the financial means to continue operating its business indefinitely; its assets must be sold to ensure continued quality of care of the residents; the overbid procedures described herein are fair, reasonable, designed to realize maximum value for the Assets, and constitute a proper exercise of the Debtor's business judgment; and the sale to be achieved through such sale procedures (and related relief) is in the best interest of the Debtor's estate.

This Motion is based on the Declaration of Kevin Moriarty filed concurrently herewith ("Moriarty Declaration"), the Declaration of Jacob Gehl filed concurrently herewith ("Gehl Declaration"), the pleading and other documents on file with this Court in this case, and the arguments and evidence to be presented at the hearing on the Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF FACTS

**A.    Background**

On January 3, 2020, the Debtor filed its petition for relief under Chapter 11. The Debtor is operating its business as a debtor in possession under Sections 1107 and 1108. See ECF 1. No trustee, examiner or committee has been appointed.

Additional information regarding the circumstances leading to the commencement of the Chapter 11 case and evidence in support of this Motion are set forth in the Omnibus First Day Declaration of Kevin Moriarty (ECF 9), which declaration is incorporated herein.

**B.    The Debtor's Business**

The Debtor is an Alabama limited partnership with its home office and principal place of business in San Diego, California.  It operates a retirement community business in Vestavia Hills, Alabama commonly known as Mount Royal Towers.  The Debtor provides skilled nursing services and independent living services

to approximately 150 elderly residents under its care in its Mount Royal Towers facility.  The Debtor employs 152 employees, including 136 who are paid on an hourly basis and 17 who earn salaries.  In addition to its employees, the Debtor uses the services of independent contractors to perform specialized tasks that, for various reasons, the employees cannot perform.  <u>See</u> the Moriarty Declaration, ¶ 5.

**C.**   **The Debtor's Prepetition Struggles and Efforts to Sell**

Over the past six years, the Debtor has struggled to secure viable refinancing alternatives for the Wells Fargo loan–the arbitration of which resulted in an amount due of more than $18,000,000.  Refinancing proved challenging and unsuccessful due in part to the size of the loan debt, volatility in the industry, and post-2008 lender hesitance to make loans of this size and type.  During this same time, the Debtor has actively pursued a sale of its principal operating assets, including the Mount Royal Towers real estate and the related personal property (collectively, "Assets").  In 2016, the Debtor retained Blueprint Healthcare Real Estate Advisors ("Blueprint") to assist in evaluating and effecting a sale.  Blueprint is a real estate brokerage and advisory firm that specializes in senior housing and healthcare real estate.  In 2017, Blueprint found a potential buyer who entered into a purchase agreement for the Debtor's Assets–but after performing due diligence for several months, that buyer backed out of the sale.  Thereafter, the Debtor found a second buyer–Commonwealth Assisted Living, LLC, Series E ("Commonwealth")–and entered into a sale agreement with it ("Commonwealth Agreement").  Despite the Debtor having provided Commonwealth with numerous extensions of time to close the transactions, Commonwealth never did so, and the contract ultimately terminated due to Commonwealth's failure to perform timely.  Commonwealth then launched the extensive litigation that became the key driver necessitating the Debtor's bankruptcy.  <u>See</u> the Moriarty Declaration, ¶ 6.

**D.**   **The Debtor's Ongoing Operational Losses**

Based on historical performance, the Debtor projects a monthly operating deficit on a cash basis of approximately $70,000 going forward for the next six

months.  This operating deficit does not include interest payments to Wells Fargo, or professional fees in the Chapter 11 case–meaning that the Debtor's actual cash needs will be greater than $70,000 per month until such time as the Assets can be sold.  The Debtor's current cash position is approximately $141,000.  <u>See</u> the Moriarty Declaration, ¶ 7.

At present, the Debtor's finances do not allow it to continue in business long term, given its ongoing operational losses, the large award just granted to Wells Fargo in the arbitration, and the ceaseless litigation with Commonwealth.  Of course, the most important constituents implicated here are the elderly residents of Mount Royal Towers.  They must be provided in-place uninterrupted continuity of care.  The best (and perhaps only) manner in which these residents can be protected is through an expedited sale of the Debtor's operating assets to a new owner qualified to own and operate the Mount Royal Towers facility.  <u>See</u> the Moriarty Declaration, ¶ 8.

**E.    <u>The Prepetition Stalking Horse</u>**

In recognition of all the foregoing events and factors, the Debtor began to explore the possibility of a section 363 bankruptcy sale free and clear of any disputed claims and interests of Commonwealth, the proceeds of which would be used to pay some or all of the Wells Fargo loan and hopefully other creditors.  In January of 2019, the Debtor re-engaged Blueprint to search further for a potential purchaser.  After extensive marketing, Blueprint identified a potential buyer to the Debtor which was willing to pursue this course of action and serve as a stalking horse bidder.  In the months leading up to the Chapter 11 filing, the Debtor negotiated and entered into, subject to Court approval and overbid, a stalking horse asset purchase agreement with the proposed buyer.  Commonwealth–seeking advantage in both the litigation and its efforts to drive the Debtor's business downwards so as to purchase it for itself as cheaply as possible–served discovery on the stalking horse.  The Debtor believes that Commonwealth's hostilities led the stalking horse to exercise its contractual right to terminate the purchase agreement–which it did on December 31, 2019, three days

before the bankruptcy was filed.  See the Moriarty Declaration, ¶ 9.

Commonwealth's efforts to drive the price of the Debtor's assets lower have succeeded.  The purchase price in the 2017 agreement was $22,670,000.  The original purchase price in the 2018 Commonwealth agreement was $19,000,000.  The purchase price in the prior stalking horse agreement of 2019 was $17,000,000.  The purchase price in the Agreement at issue in this Motion is $12,000,000.  Following the termination of the aforementioned purchase agreement, the Debtor diligently and aggressively marketed its assets, which led to the Debtor's instant purchase agreement with the proposed Stalking Horse. See the Moriarty Declaration, ¶ 10.

**F.    The Current Stalking Horse**

After Commonwealth drove away the pre-petition stalking horse, Blueprint immediately went back to work, approaching another potential bidder who had been on Blueprint's radar.  Those discussions proved fruitful, and on February 6, 2020, the Debtor entered into a new stalking horse asset purchase agreement ("Agreement") for the Assets, as well as assumption and assignment of certain executory contracts and unexpired leases to be designated (collectively, "Designated Contracts"), subject to Court approval and overbid, with MED Healthcare Partners, LLC ("Stalking Horse"). A copy of the Agreement with the Stalking Horse is attached as Exhibit C to the Moriarty Declaration.  The Stalking Horse is a proven provider of skilled nursing, assisted living, and rehabilitation services. Along with its partner management companies, it manages and operates over 115 skilled nursing facilities with over 10,000 resident beds in 20 states.  In particular, it has bought assets out of bankruptcies in section 363 sales.  See Exhibit D to the Moriarty Declaration. Accordingly, the Stalking Horse understands the section 363 sale process, and has demonstrated an ability to close purchases in the bankruptcy sale context.

As described above, the purchase price, subject to overbid, has now fallen to $12,000,000.  The Agreement provides for a breakup fee ("Breakup Fee") of $400,000 in the event that the Stalking Horse is overbid by a third party–and the Overbid

Procedures provide for an initial overbid increment of $500,000, so as to achieve a net economic "win" for the estate even if there is only one overbidder.  For additional detail, see the Agreement.

**G.    The Requested Retention of Blueprint**

Throughout Blueprint's extensive efforts since 2016 in securing multiple purchasers, given its commission-based engagement agreement, Blueprint has yet to be compensated by the Debtor.  With this Motion, the Debtor requests authority to employ Blueprint as its sole broker and real estate advisor for sale of the Debtor's Assets in connection with its Chapter 11 bankruptcy on a commission-based compensation basis, pursuant to section 327(a) of the Bankruptcy Code.  The Debtor requires the services of a real estate advisor and broker knowledgeable in the sale of healthcare real estate to adequately market and sell the Assets.

It is necessary and essential that the Debtor employ Blueprint to provide healthcare real estate advisory services in this Chapter 11 case, including, but not limited to, the following services:

1.    to provide assistance with marketing, the sale, and closing on the sale of the Assets;

2.    to provide assistance with determining the sale price of the Assets;

3.    to prepare marketing materials and recommend a strategy for the sale of the Assets;

4.    to screen and pre-qualify prospective overbidder purchasers; and

5.    to provide the assistance of an agent licensed in Alabama where the Mount Royal Towers Facility is located.

The Debtor desires to employ Blueprint under a new commission-based engagement agreement ("Blueprint"), a copy of which is attached as Exhibit A to the Gehl Declaration.  The agreement provides for a commission equal to one and one-half percent (1.5 %) of the purchase price to be paid in full directly from sale proceeds upon closing.  Blueprint will bear the cost of its own expenses.  See Exhibit A to the

Gehl Declaration, ¶5. The Debtor believes that Blueprint's proposed commission is "market" and reasonable under the circumstances. See the Moriarty Declaration, ¶15.

Blueprint is a leading advisory firm focused exclusively on senior housing and healthcare real estate, having closed over 270 transactions valued at over $5.6 billion. See the Gehl Declaration, ¶15.

Neither BluePrint nor any of its shareholders, associates, or employees has any interest in or connection with the Debtor, any creditors of the Debtor, the United States Trustee, any person employed by the United States Trustee, or any other party in interest, including their respective attorneys, except for Blueprint's prior work on behalf of the Debtor as described herein; and the following:

The Stalking Horse (and its principal Mordy Lahasky) is a very large and active purchaser of continuing care retirement communities and skilled nursing facilities. Blueprint has represented many sellers who sold assets to the Stalking Horse. Blueprint estimates that since 2016, it has served as a seller's agent in approximately 10 or more transactions in which the Stalking Horse or one of its affiliates was the buyer. Blueprint has never contracted with the Stalking Horse or any of its affiliates to provide real estate brokerage or advisory services, nor has Blueprint ever been paid by any of them for any such services. In short, Blueprint has always been on the opposite, or seller's, side of the transactions in which the Stalking Horse has been involved, always as a buyer. See the Gehl Declaration, ¶11.

The Stalking Horse is known to Blueprint as having closed every single one of the transactions described above, in which it contracted to purchase, and in which Blueprint has been involved as a seller's agent. Accordingly, Blueprint is uniquely positioned to provide an educated opinion as to the likelihood of the Stalking Horse closing the Mount Royal Towers sale, in the event that it is the winning bidder – which likelihood Blueprint believes to be very high (as high as any buyer in the relevant industry). See the Gehl Declaration, ¶12.

/ / /

409001-v7

7

/ / /

In addition, no shareholder or employee of Blueprint holds or represents any interest adverse to the estate, and Blueprint is "disinterested" within the meaning of section 327(a) of the Bankruptcy Code.  <u>See</u> the Gehl Declaration at ¶13.

**H.      The Proposed Overbid Procedures**

The Debtor proposes to solicit overbids for the Assets utilizing the Overbid Procedures. The Overbid Procedures describe, among other things, the Assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among Qualified Bidders and the Debtor, the receipt and negotiation, in concert with the Debtor and Debtor's counsel, of overbids received, the conducting of any auction, and the selection and approval of a winning bidder (and possibly a backup bidder).  The Overbid Procedures also provide for the assumption and assignment of the Designated Contracts, including cure procedures, pursuant to Bankruptcy Code section 365.  For greater detail, see the Overbid Procedures attached as Exhibit A hereto.

The Overbid Procedures were developed consistent with the Debtor's competing needs to promote participation and active bidding while at the same time minimizing the risk of business disruption associated with a prolonged stay in Chapter 11.  The Overbid Procedures reflect the Debtor's objective of conducting the auction in a controlled, fair, and open manner, while enabling the Debtor to select the highest or otherwise best offers for the Assets.  <u>See</u> the Moriarty Declaration, ¶17.

**I.      The Proposed Marketing and Advertising**

The Debtor proposes that Blueprint–who has been marketing the Assets for several years–continue marketing them for approximately another 45 days following entry of the Court's order approving the Overbid Procedures.  Blueprint intends an aggressive email and telephone campaign to contact the appropriate portion of its 20,000 clients in its industry-related database.  Blueprint will also advertise the sale in Senior Housing Business's "southeast publication" as well as in the Alabama Business

409001-v7

8

Journal.  The Debtor believes it unlikely that a buyer for Mount Royal Towers would be identified from a national newspaper ad, and accordingly, the Debtor does not intend to use such media for further advertising for the sale.  See the Gehl Declaration, 14.

**J.    The Proposed Sale Notice**

The Debtor also requests approval of the Sale Notice to facilitate the sale process and enable the Debtor to provide interested parties with adequate and sufficient notice of the proposed auction and the sale hearing. The Debtor proposes to serve, no later than two business days following the Court's entry of the Overbid Procedures Order, a copy of the Sale Notice (which includes the Overbid Procedures and the order approving them) by first-class mail, postage prepaid upon (a) the Office of the United States Trustee; (b) counsel for Wells Fargo; (c) counsel for Commonwealth; (d) all counterparties to Designated Contracts; (e) all entities with recorded claims, liens, interests, or encumbrances against the Debtor's right, title, and interest in the Assets and any other entities reasonably known to have asserted any such claim, liens, interests, or encumbrances; (f) all entities reasonably known to have expressed a bona fide interest in acquiring some or substantially all of the Debtor's assets during the six (6) months preceding the date hereof; (g) the Internal Revenue Service; (h) the Securities Exchange Commission; and (i) all known creditors of the Debtor.  The Debtor submits that doing so will constitute sufficient notice of the sale under the facts and circumstances of this case.

**K.    The Rejection of the Disputed Commonwealth Agreement**

As described above, after nine amendments which included multiple closing extensions provided by the Debtor to Commonwealth, it became apparent that Commonwealth had alternative motives and intentions with respect to its purchase of Mount Royal Towers.  After Commonwealth failed to obtain the necessary government operating approvals by the deadlines set forth under the Purchase Agreement, as amended, the Debtor could not agree to further delay closing without

running afoul of the loan forbearance deadline imposed by Wells Fargo and without risking its licensing in Alabama for the facility.  Accordingly, on November 16, 2018, the Commonwealth Agreement terminated.  See the Moriarty Declaration, ¶ 20.

As of the Petition Date, the Debtor does not believe that the terminated Commonwealth Agreement was executory.  Nonetheless, out of an abundance of caution, with this Motion, the Debtor seeks Court approval to reject the Commonwealth Agreement to the extent it or any portion of it is executory, pursuant to Section 365.  As has become clear, attempting to further engage with Commonwealth has and will only lead to further litigation–the last thing the Debtor can afford, and the last thing that the residents of Mount Royal Towers need and deserve.  See the Moriarty Declaration, ¶ 21.

## II.    RELIEF REQUESTED

With this Motion, the Debtor seeks entry of two orders:

(A)    first, following the initial hearing on this Motion, the Overbid Procedures Order in substantially the form attached as Exhibit A to the Moriarty Declaration:

1.    approving the Agreement with the Stalking Horse, including the Breakup Fee;

2.    approving the Overbid Procedures (including the marketing, advertising and use of the Sale Notice as described herein);

3.    approving the retention of Blueprint as the Debtor's broker;

4.    approving the rejection of the disputed Commonwealth Agreement;

5.    scheduling the final Sale Hearing to approve the Stalking Horse as the purchaser, or, if overbids are received, to conduct an auction of the Assets; and

(B)    second, following the Sale Hearing, the Sale Order in substantially the form attached as Exhibit B to the Moriarty Declaration:

1.    approving the sale of the Assets to the Stalking Horse (or any winning overbidder) free and clear of any encumbrances pursuant to

409001-v7

10

Section 363(b) and (f) as a good faith purchaser entitled to the protections of Section 363(m);

2.    approving the assumption and assignment of the Designated Contracts designated by the Stalking Horse (or any winning overbidder) pursuant to Section 363; and

3.    granting related relief.

### III.    SERVICE OF THIS MOTION

A copy of this Motion and all supporting papers will be served on all of the following:  The United States Trustee; All secured creditors; The 20 largest unsecured creditors; Wells Fargo, Commonwealth, Municipal Capital Appreciation Partners; Securities and Exchange Commission; Internal Revenue Service; and All Registered Users, as such term is defined in Local Rule 1001-6(b)(23).

### IV.    AUTHORITY AND ARGUMENT

**A.    The Overbid Procedures Are Appropriate and in the Best Interests of the Debtor, the Estate, and Creditors**

**1.  The Overbid Procedures Are Reasonable, Appropriate and Will Maximize Value**

The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See, In re Mushroom Transp. Co., 382 F.3d 325, 339 (3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003) (same); Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.), 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

To that end, courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. See, In re

O'Brien Envtl. Energy, Inc., 181 F.3d 527, 537 (3d Cir. 1999); see also Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

The Debtor believes that the Overbid Procedures will increase the likelihood that the Debtor will receive the greatest possible consideration for the Assets because such procedures will ensure a competitive and fair bidding process.  The Debtor also believes that the Overbid Procedures will promote active bidding from seriously interested parties and will generate the highest or otherwise best offer reasonably available for the Assets.  The Overbid Procedures will allow the Debtor to conduct the auction–if a qualified overbid is received–in a controlled, fair and open manner that will encourage participation by financially capable bidders that demonstrate the ability to close the sale.  The Debtor believes that the Overbid Procedures will encourage bidding, are consistent with other procedures previously approved by courts in this and other districts, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  The Overbid Procedures were designed with the input of Blueprint, the Debtor's broker, who has extensive experience not only with the Debtor's Assets, but in the healthcare real estate market generally, including having closed approximately 270 transactions valued at over $5.6 billion.  Specifically, Blueprint has significant experience selling healthcare real estate and operating business in the distressed context, including Section 363 sales in bankruptcy.  See the Moriarty Declaration, ¶ 17, and the Gehl Declaration, ¶15; see also In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537; see also In re Dura Auto. Sys., Inc., No. 06-11202 (Bankr. D. Del. July 24, 2007); In re New Century TRS Holdings, Inc., No. 07-10416 (Bankr D. Del. Apr. 20, 2007); In re Three A's Holdings, L.L.C., No. 06-10886 (Bankr. D. Del. Sept. 7, 2006).

Similar bidding procedures have been previously approved by bankruptcy courts in other Districts.  See, e.g., In re Vertis Holdings, Inc., Case No. 12-12821

(CSS) (Bankr. D. Del. Nov. 2, 2012 (D.I. 206); In re Northstar Aerospace (USA) Inc.,
Case No. 12-11817 (MFW) (Bankr. D. Del. June 27, 2012) (D.I. 119); In re Traffic
Control & Safety Corp., Case No. 12-11287 (KJC) (Bankr. D. Del. May 14, 2012)
(D.I. 128); In re Real Mex Rests. Inc., Case No. 11-13122 (BLS) (Bankr. D. Del. Nov.
9, 2011) (D.I. 393); In re Nortel Networks, Inc., Case No. 09-10138 (KG) (Bankr. D.
Del. June 30, 2009) (D.I. 1012); In re Tweeter Home Etm't Group, Inc., Case No. 07-
10787 (PJW) (Bankr. D. Del. June 27, 2007) (D.I. 211).

Accordingly, the Debtor submits that the Overbid Procedures are reasonable
and appropriate.  The Debtor also submits that the Overbid Procedures demonstrate an
exercise of the Debtor's sound business judgment, as such procedures are designed to
maximize the value to be received by the Debtor's estate for the Assets.  See the
Moriarty Declaration, ¶ 19.

### 2.    The Notice Procedures Are Reasonable and Appropriate

Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify
creditors of the sale, including a disclosure of the time and place of any auction, the
terms and conditions of the sale, and the deadline for filing any objections thereto.

The Debtor submits that the notice procedures described above fully comply
with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and
adequate notice of the Overbid Procedures, the auction, and the Sale Hearing to the
Debtor's creditors and all other interested parties that are entitled to notice, as well as
those parties that have expressed a bona fide interest in acquiring the Assets.

Accordingly, the Debtor respectfully requests that the Court approve the notice
procedures set forth herein, including the form and manner of service of the Sale
Notice attached as Exhibit E to the Moriarty Declaration, and that no other or further
notice of the Overbid Procedures, the auction, or the Sale Hearing is necessary or
required.

/ / /

/ / /

**3.    The Assumption and Assignment Procedures Are Reasonable and Appropriate**

As part of the relief requested herein, the Debtor also seeks authority under Sections 105(a) and 365 of the Bankruptcy Code to assume and assign all Designated Contracts designated by the winning bidder.  The Overbid Procedures specify the process by which the Debtor will serve notice of the potential assumption/assignments and cure amounts on counterparties, and the procedures and deadlines for counterparties to file objections.  These procedures ensure that each counterparty will have sufficient notice of such assumption and assignment, and an opportunity to contest the cure amount, if any, for its assumed contract, as well as the ability of the successful bidder to provide adequate assurance of future performance with respect to such contract.

Accordingly, the Debtor submits that the procedures for the assumption and assignment of the Designated Contracts are fair and reasonable, and respectfully requests that the Court approve such procedures. See the Moriarty Declaration, ¶ 24.

**4.    The Proposed Marketing is Appropriate**

Based on the advice of its broker, the Debtor believes that it is unlikely that the buyer for Mount Royal Towers will be identified from a national newspaper ad. The buyer pool of continuing care retirement communities in bankruptcy is fairly narrow. The most important tool for finding potential buyers for these Assets is Blueprint's database of owners of continuing care retirement communities and nursing homes. There are many "under the radar" high net worth buyers for these types of senior communities.  Blueprint intends to implement an aggressive email and telephone campaign into the relevant portions of the 20,000 clients in its industry-related database.  Blueprint also recommends running an ad in Senior Housing Business's "Southeast" publication as well as in the Alabama Business Journal. See the Gehl Declaration, 16.

/ / /

/ / /

**B.** **Approval of the Sale is Appropriate and in the Best Interests of the**
**Debtor's Estate**

    **1.** **The Sale is Authorized by Section 363 of the Bankruptcy Code as a**
    **Sound Exercise of the Debtor's Business Judgment**

Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b). Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. See, Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); and In re Trans World Airlines, Inc., No. 01-00056 (PJW), 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2. 2001).

Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. See, In re Decora Indus., Inc., 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing In re Delaware & Hudson Ry. Co., 124 B.R. at 176); In re United Healthcare Sys. Inc., No. 97-1159, 1997 WL 176574, at *4 & n.2 (D.N.J. Mar. 26, 1997).

A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See, e.g., In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); see also In re Food Barn Stores, Inc., 107 F.3d 558, 564–65 (8th Cir. 1997)

/ / /

(stating that the paramount goal in any proposed sale of property of the estate is to maximize value).

Furthermore, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Resources, 147 B.R., 650 at 656 (SD N.Y.1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. See, Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

Here, the Debtor cannot continue to operate indefinitely. It loses money each month. Its value continues to decline, as shown by the various dwindling purchase prices over the last few years. The Debtor does not have to funds to pay off the Wells Fargo loan in full. At some point, Wells Fargo could be permitted to foreclose–a result likely to bring significant hardship upon the residents of Mount Royal Towers. The Debtor's Assets must be sold quickly and with the certainty that a section 363 sale process brings to bear.

With the Overbid Procedures, the Assets will receive extensive marketing–on top of the years of marketing they have already had.  Their value will be tested through the auction and sale process contemplated by the Overbid Procedures. Consequently, the fairness and reasonableness of the consideration to be paid by the successful bidder will be demonstrated by adequate "market exposure" and an open and fair auction and sale process–the best means for establishing whether a fair and reasonable price is being paid. Thus, the Debtor submits that the consideration paid by successful bidders will constitute the highest or otherwise best offer for the transferred Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. As such, the Debtor's determination to sell the Assets through a section 363 auction and sale process, as provided for in the Overbid Procedures, is a valid and sound exercise of the Debtor's business judgment. See the Moriarty Declaration, ¶ 26.

Accordingly, the Debtor respectfully requests that the sale be approved upon the completion of the Overbid Procedures.

**2.      The Sale of the Assets Free and Clear of All Encumbrances (Except for Permitted Encumbrances) is Authorized by Section 363(f) of the Bankruptcy Code**

In the interest of attracting the best bids for the Assets, the Debtor submits that the sale should be free and clear of all liens, claims and encumbrances (except for any specifically permitted encumbrances) in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims and encumbrances attaching to the net proceeds of the sale, as and to the extent applicable.

Section 363(f) of the Bankruptcy Code authorizes a debtor to sell Assets free and clear of liens, claims, interests, and encumbrances if:

a.      applicable non-bankruptcy law permits sale of such property free and clear of such interests;

b.      such entity consents;

c.    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

d.    such interest is in bona fide dispute; or

e.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the assets "free and clear" of all liens, claims and encumbrances (except for Permitted Encumbrances). See, In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); In re Dundee Equity Corp., No. 89-10233 (FGC), 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) (same).

The Debtor submits that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to any interest in the Assets being sold.  Wells Fargo is consenting to the sale, meaning that section 363(f)(2) is satisfied with respect to Wells' interest.  The Debtor scheduled Gordon Food Services, Inc. ("Gordon") as holding a lien claim in "Food Inventory" in the amount of $21,657.03 as of the petition date, and the Debtor believes that Gordon too will consent to the sale–again meaning that section 363(f)(2) is satisfied with respect to Gordon's interest.  Commonwealth does not hold an interest in any of the Assets, and if it were to contend otherwise, the Debtor would vigorously dispute it, meaning

that section 363(f)(4) would be satisfied. The Debtor is unaware of any other interests in the Assets being sold, and again, and if anyone were to contend otherwise, the Debtor would vigorously dispute it, meaning that section 363(f)(4) would be satisfied.

Additionally, any lienholder will be adequately protected by having its liens, if any, attach to the proceeds of the sale, in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses that the Debtor and its estate may possess with respect thereto.

Accordingly, following the Overbid Procedures, the Debtor respectfully requests that the Assets be sold free and clear of any liens, claims and encumbrances (except for permitted encumbrances) pursuant to section 363(f) of the Bankruptcy Code.

## C. Assumption and Assignment of the Contracts is Authorized by Section 365 of the Bankruptcy Code

### 1. Authority

Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(l) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee– (A) cures or provides adequate assurance that the trustee will promptly cure, such default . . . ; (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provide adequate assurance of future performance under such contract or lease. 11 U.S.C. § 365(b)(1).

Section 365(f)(1) provides:

Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

Section 365(f)(2) provides:

The trustee may assign an executory contract or unexpired lease of the debtor only if—

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

The standard in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. See In re Decora Indus., Inc., 2002 WL 32332749, at *8 (D. Del. May 20, 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp., 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard.").

To determine if the business judgment standard is met, the court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re AbitibiBowater Inc., 418 B.R. 815, 831 (Bankr. D. Del. 2009). "This is not a difficult standard to satisfy and requires only a showing that

[assumption or] rejection will benefit the estate." *Id.* (citations omitted). Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." In re Network Access Solutions Corp., 330 B.R. 67, 75 (Bankr. D. Del. 2005). Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. See In re Federal Mogul Global, Inc., 293 B.R. 124, 126 (D. Del. 2003).

> **2.      The Debtor's Sound Business Judgment Supports the Assumption and Assignment of the Contracts to be Assigned**

In the present case, the Debtor's assumption and assignment of the Contracts to be Assigned to the successful bidder meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. The assumption and assignment is necessary for the successful bidders to conduct business going forward, and since no purchaser would pay top dollar for the Assets without certain executory contracts and unexpired leases, the assumption and assignment of such agreements is essential to securing the highest or otherwise best offer for the Assets. Consequently, the Debtor submits that the procedures for the assumption and assignment of the Designated Contracts are fair and reasonable, and respectfully requests that, following such procedures, the Court authorize the Debtor to assume and assign the Contracts to be Assigned in the manner provided for herein.

> **3.      Adequate Assurance of Future Performance Will Be Demonstrated With Respect to the Contracts to be Assigned**

A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(c)(2).

The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); In re Rachels Indus. Inc., 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

Pursuant to the Overbid Procedures, qualified bidders are required to provide the Debtor with such financial and other information providing adequate assurance of future performance under any Designated Contract to be assigned to allow the Debtor to provide such information to any counterparty that has requested it in writing. Moreover, under the Overbid Procedures, counterparties to Designated Contracts will have the opportunity to object to adequate assurance of future performance by the successful bidders.

Accordingly, the Debtor submits that the assumption and assignment of the Designated Contracts as set forth herein should be approved pursuant to section 365 of the Bankruptcy Code.

**D.     The Prophylactic Rejection of the Disputed Commonwealth Agreement is Warranted**

For the reasons described above, as of the Petition Date, the Debtor does not believe that the terminated Commonwealth Agreement was executory.  Nonetheless, out of an abundance of caution, with this Motion, the Debtor seeks Court approval to reject the Commonwealth Agreement to the extent it is executory, pursuant to Section 365.  As has become clear, attempting to further engage with Commonwealth will only lead to further litigation–the last thing the Debtor can afford, and the last thing that the residents of Mount Royal Towers need and deserve.  To the extent that the Commonwealth Agreement remains executory–which the Debtor disputes–it holds no benefits for the estate, only burdens, and rejecting it will pave the way for the proposed sale, realizing maximum value for the Debtor's Assets, and ensuring continued quality of care for residents.  Accordingly, rejection is in the best interests of the estate, and well warranted by the Debtor's business judgment.  See the Moriarty Declaration, ¶ 27.

**E.     The Debtor's Employment of Blueprint Should be Approved**

Blueprint is a leading advisory firm focused exclusively on senior housing and healthcare real estate, having closed over 270 transactions valued at over $5.6 billion. The Debtor requires the services of a real estate advisor knowledgeable in the sale of healthcare real estate to adequately market and sell the business.  Specifically, the Debtor requires the following services:

1.     to provide assistance with marketing, sale, and closing of the sale of the business;

2.     to provide assistance with determining the sale price of the business;

3.     to prepare marketing materials and recommend a strategy for the sale of the Business;

4.     to screen and pre-qualify prospective overbidder purchasers; and

409001-v7

23

5.    to provide the assistance of an agent licensed in Alabama where the Mount Royal Towers Facility is located.

Blueprint has extensive experience with the Assets, having first started marketing them in 2016, and having brought multiple bidders to the Debtor (and to contract). The Blueprint Agreement–including the commission equal to one and one-half percent (1.5 %) of the purchase price to be paid in full directly from sale proceeds upon closing–is fair, reasonable and on market terms, and properly incentivizes Blueprint to find a purchaser willing to pay the highest price. Accordingly, the Debtor requests authority to employ Blueprint (on the commission basis described above) as its sole broker and real estate advisor for sale of the Debtor's Assets in connection with its Chapter 11 bankruptcy, pursuant to section 327(a) of the Bankruptcy Code.

## V.    <u>WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d)</u>

Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the [debtor] to assign an executory contract or unexpired . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." <u>Id</u>. at 6006(d). The Debtor requests that the Court waive the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d), respectively, in connection with the sale. No party will be prejudiced by such waiver, and time is of the essence here–not only to minimize the ongoing diminution of the Debtor's bankruptcy estate due to its operational losses, but to give the residents of Mount Royal Towers the certainty and peace of mind they deserve, and to ensure their continuity of care.

## VII.   <u>CONCLUSION</u>

Based on the foregoing, the Debtor requests that the Court:

1.    Enter the Overbid Procedures Order, following the initial hearing on this Motion:

a. approving the Agreement with the Stalking Horse for the sale of the Assets;

b. approving the Overbid Procedures (including the marketing, advertising and use of the Sale Notice as described above);

c. approving the retention of Blueprint;

d. approving the rejection of the disputed Commonwealth Agreement; and

e. scheduling the final Sale Hearing to approve the Stalking Horse as the purchaser, or, if overbids are received, to conduct an auction of the Assets; and

2.  Enter the Sale Order, following the Sale Hearing:

a. approving the sale of the Assets to the Stalking Horse (or any winning overbidder) free and clear of any encumbrances pursuant to Section 363(b) and (f) as a good faith purchaser entitled to the protections of Section 363(m);

b. approving the assumption and assignment of the Designated Contracts designated by the Stalking Horse (or any winning overbidder) pursuant to Section 365; and

c. granting related relief; and

3.  Grant such other relief as the Court may find just and proper.


Dated:    February 13, 2020            SULLIVAN HILL REZ & ENGEL,
                                       A Professional Law Corporation


                                       By:    _/s/ James P. Hill_____
                                              James P. Hill
                                              Attorneys for Debtor and Debtor in
                                              Possession, Vestavia Hills, Ltd. dba
                                              Mount Royal Towers

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

409001-v7

26

# EXHIBIT TABLE

| Exhibit | Description | Pages |
|:---:|:---:|:---|
| **A** | Overbid Procedures | 27-32 |

# EXHIBIT A

# Overbid Procedures

Vestavia Hills, Ltd. dba Mount Royal Towers
USBC Case No. 20-00018-LA11

Escrow Agent: Riverside Abstract
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
Email: Alazarus@rsabstract.com
Attention: Aryeh Lazarus

Vestavia Hills, Ltd. ("Debtor") is a Chapter 11 debtor in possession in the bankruptcy case currently pending in the United States Bankruptcy Court for the Southern District of California ("Bankruptcy Court").  These Overbid Procedures were approved by order of the Bankruptcy Court entered_____, 2020.

### Assets to be Sold

The assets to be sold comprise substantially all of the Debtor's business assets, and include all real and personal property owned by the Debtor used in the operation of a senior housing community in Vestavia Hills, Alabama, commonly known as Mount Royal Towers.  The assets are described in more detail in the Asset Purchase Agreement (defined below).

### Stalking Horse Asset Purchase Agreement

The Bankruptcy Court's_____, 2020 order also approved an "Asset Purchase Agreement" entered into between the Debtor as seller and MED Healthcare Partners, LLC or its designee or designees ("Stalking Horse") as buyer, subject to the Overbid Procedures described herein.  A copy of the Asset Purchase Agreement is attached hereto.  All terms not defined herein shall have the meaning given them in the Asset Purchase Agreement.

### Purchase Price/Overbid Increments

The Asset Purchase Agreement calls for a purchase price of $12,000,000, and is subject to these Overbid Procedures described herein. The initial overbid increment is $500,000–meaning the initial overbid must be $12,500,000 or more.

409167-v2

**Due Diligence Materials**

In order to receive access to due diligence materials, parties interested in overbidding must provide the Escrow Agent with an executed nondisclosure agreement in a form approved by Debtor.

**Submitting a Qualified Bid**

In order to submit a qualified bid, a bidder must provide the Escrow Agent no later than_____, 2020 (21 days before the Sale Hearing):

- A fully-executed Overbidder Agreement in substantially the form attached hereto, together with a redline showing any changes.
- A cash deposit of $_____ nonrefundable unless the bidder is not selected as the winner.
- Evidence of ability to close satisfactory to the Debtor in its sole discretion.
- A list of the contracts the bidder is offering to have assumed and assigned to it pursuant to section 365 of the Bankruptcy Code (each a "Contract" and collectively the "Contracts").
- Evidence satisfactory to the Debtor in its sole discretion to permit the Debtor to determine the bidder's ability to comply with section 365 of the Bankruptcy Code, including providing adequate assurance of such assignee's ability to perform in the future with respect to any Contract proposed to be assumed and assigned.

**Due Diligence Deadline**

Due diligence must be completed by the time a bid is submitted. The Overbidder Agreement so provides and does not permit a "diligence out" or other basis to withdraw once a bid has been submitted.

**"As Is, Where Is"**

409167-v2

The sale of the Assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, except, with respect to a successful bidder, to the extent set forth in the relevant Overbidder Agreement of such successful bidder approved by the Bankruptcy Court.

### Free of Any and All Claims and Interests

The assets shall be sold free and clear of all Encumbrances to the maximum extent permitted under section 363(f) of the Bankruptcy Code, except for Permitted Encumbrances and those liabilities of Seller expressly assumed or agreed to be discharged by the winning bidder.

### Bid Deadline

In order to be considered for qualifying, a bid must be received by the Debtor's Bankruptcy Court-appointed broker, Blueprint Healthcare Real Estate Advisors, LLC, ATTN: Jacob Gehl, no later than _____ 2020 (21 days before the Sale Hearing (defined below) by electronic email as follows: jacob@blueprintHCRE.com

### Cure Amounts Associated With Assumed and Assigned Contracts

On or before_____, 2020 (14 days prior to the Sale Hearing), the Debtor will file with the Bankruptcy Court and serve on each nondebtor party to a Contract or Lease a notice of potential assumption and assignment (the "Cure Notice"). The Cure Notice shall state the cure amount that the Debtor believes is necessary to assume such Contract or Lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and notify each party that such party's Contract or Lease is subject to potential assumption and assignment to one of the qualified bidders at the conclusion of the Sale Hearing. Each non-debtor party to the Contracts or Leases shall have until _____, 2020 (7 days prior to the Sale Hearing) to file and serve any objection to the assumption and assignment of the Contract or Lease and/or the Cure Amount and must state in its objection with specificity what Cure Amount the party contends is required (with appropriate documentation in support thereof). If no objection is timely received, the Cure

409167-v2

Amount set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Contract or Lease, or any other document, and the non-Debtor party to the Contract or Lease shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims as to such Contract or Lease against the Debtor, an assignee of the Contract or Lease, or the property of any of them.  If an objection to the Cure Amount is timely filed and received and the parties are unable to consensually resolve the dispute, the amount to be paid under section 365 of the Bankruptcy Code, if any, with respect to such objection will be determined at the Sale Hearing or at a subsequent hearing date to be determined by the Bankruptcy Court.  Cure Amounts with respect to any Contract or Lease that is assumed and assigned to a purchaser shall be paid out of the proceeds of sale.

### Sale Hearing/Auction

On_____, 2020 at___, the Bankruptcy Court will conduct a "Sale Hearing."  In the event that no qualified overbid has been timely received, the Debtor will request that the Bankruptcy Court approve the sale of the Debtor's assets to the Stalking Horse on the terms set forth in the Asset Purchase Agreement.  In the event that one or more qualified overbids have been received, the Debtor will conduct an auction in the Bankruptcy Court.  In order to bid at the auction, a party must have timely submitted a qualified overbid as described above.  Subsequent overbid increments will be in amounts of $100,000 or such other amount as the Debtor may set and the Bankruptcy Court may approve.  The Debtor retains full discretion to select the "highest and best" bid and to request that the Bankruptcy Court approve it as the winning bid.  The Debtor may also request that the Bankruptcy Court approve one or more "back up" bids, with whom the Debtor will close if the winning bidder fails to do so. The Stalking Horse shall not be required to be a "back up" bidder.

### Closing

The closing shall take place on or about the date which shall be the first day of the month following the last to occur of the following, or such earlier date as the Parties may agree:

409167-v2

(i)      ten (10) days following Buyer's receipt of approval of the change of ownership and the issuance of any other license or Certificates of Need (if applicable) necessary for the operation of the Facility by the Alabama Department of Public Health ("ADPH") and the Alabama State Health Planning and Development Agency ("SHPDA"), including without limitation the New Operator Licenses; and

(ii)     the Sale Order has become a Final Order.

### Questions Regarding Overbid Procedures

Questions regarding these Overbid Procedures should be directed to the Debtor's Bankruptcy Court-approved broker: Blueprint Healthcare Real Estate Advisors, LLC, ATTN: Jacob Gehl, jacob@blueprintHCRE.com, 310.893.7182.

409167-v2

# EXHIBIT 2

**CSD 3000A** [07/01/18]
Name, Address, Telephone No. & I.D. No.

**Order Entered on**
**May 13, 2020**
**by Clerk U.S. Bankruptcy Court**
**Southern District of California**

## UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

| In Re | |
|---|---|
| Debtor. | BANKRUPTCY NO. |
| Plaintiff(s) | ADVERSARY NO. |
| v. | Date of Hearing: |
| | Time of Hearing: |
| Defendant(s) | Name of Judge: |

## ORDER ON

The court orders as set forth on the continuation pages attached and numbered _____ through _____ with

exhibits, if any, for a total of _____ pages.  Motion/Application Docket Entry No. _____ .

//

//

//

//

DATED:     May 13, 2020

Judge, United States Bankruptcy Court

**CSD 3000A**

**CSD 3000A** [07/01/18]**(Page 2)**
ORDER ON
DEBTOR:                                                          CASE NO.:
                                                                 ADV. NO.:

**CSD 3000A**

# EXHIBIT 3

**CSD 3000A** [07/01/18]
Name, Address, Telephone No. & I.D. No.

Order Entered on
July 23, 2020
by Clerk U.S. Bankruptcy Court
Southern District of California

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

| In Re | | |
|---|---|---|
| | Debtor. | BANKRUPTCY NO. |
| | Plaintiff(s) | ADVERSARY NO. |
| v. | | Date of Hearing: |
| | | Time of Hearing: |
| | Defendant(s) | Name of Judge: |

## ORDER ON

The court orders as set forth on the continuation pages attached and numbered _____ through _____ with

exhibits, if any, for a total of _____ pages.  Motion/Application Docket Entry No. _____ .

//

//

//

//

DATED:     July 22, 2020

Judge, United States Bankruptcy Court

**CSD 3000A**

**CSD 3000A** [07/01/18]**(Page 2)**
ORDER ON
DEBTOR:                                                    CASE NO.:
                                                           ADV. NO.:

# EXHIBIT 4

SULLIVAN HILL REZ & ENGEL        **Electronically Filed: 11/5/2020**
A Professional Law Corporation
  James P. Hill, SBN 90478
  Christopher V. Hawkins, SBN 222961
  Kathleen Cashman-Kramer, SBN 128861
600 B Street, 17th Floor
San Diego, California 92101
Telephone:    (619) 233-4100
Fax Number:   (619) 231-4372

Attorneys for Debtor and Debtor In Possession,
Vestavia Hills, Ltd., dba Mount Royal Towers

### UNITED STATES BANKRUPTCY COURT
Southern District of California

| | |
|---|---|
| In re | ) CASE NO. 20-00018-LA11 |
| | ) |
| VESTAVIA HILLS, LTD. | ) Chapter 11 |
| DBA MOUNT ROYAL TOWERS, | ) |
| | ) **DEBTOR'S THIRD CHAPTER 11 STATUS REPORT** |
| Debtor. | ) |
| | ) |
| | ) Date:        November 12, 2020 |
| | ) Time:        2 p.m. |
| | ) Dept.:       2 (Telephonic) |
| | ) Judge:       Hon. Louise DeCarl Adler |

Vestavia Hills, Ltd., the debtor and debtor in possession herein ("Debtor"), hereby submits this Third Chapter 11 Status Report pursuant to the Court's minute order entered August 8, 2020 (ECF 371).

The January 13, 2020 order required the Debtor to address various issues, including the following:

### Closure of Bank Accounts

The Debtor has closed all of its pre-petition bank accounts, other than:

(1)    the "Patient Trust Account," which the Court authorized the Debtor to maintain by order entered January 24, 2020 (ECF 53); and

(2)     the "Reserve Account," which the Debtor was able to convert to a debtor-in-possession account without jeopardizing the flow of revenue from the government or insurance companies, to the satisfaction of the United States Trustee, as described in ECF 7.

**Applications to Employ Professionals**

The following applications to employ professionals have been filed and/or ruled upon:

(1)     Application to Employ Sullivan Hill Rez & Engel as General Counsel (ECF 40)–granted by order entered January 30, 2020 (ECF 80).

(2)     Application to Employ Squar Milner, LLP as Accountants (ECF 52)–granted by Order entered February 3, 2020 (ECF 96).

(3)     Application to Employ Elisabeth Eisner as Special Transactional Counsel (ECF 87)–granted by order entered February 10, 2020 (ECF 112).

(4)     Amended Application to Employ Campbell Partners, APC as Special Litigation Counsel (ECF 128)–granted by order entered February 24, 2020 (ECF 144).

(5)     Application to Employ Harbuck Keith & Holmes LLC as Special Alabama Licensing and Regulatory Counsel Nunc Pro Tunc (ECF 168)–granted by order entered April 16, 2020 (ECF 210).

On February 4, 2020, Debtor filed its Motion Pursuant to Sections 328, 330, and 331, and 105(A) of the Bankruptcy Code for Approval of Procedures for Interim Compensation and Reimbursement of Professionals (ECF 97).  After hearing on the matter, this Court entered its order approving this motion on March 5, 2020 (ECF 160).

On June 22, 2020, Debtor submitted its first interim applications for compensation (Sullivan Hill Rez & Engel, APLC,–ECF 300; Campbell Partners, LLC, Special Counsel–ECF 301; Elizabeth Eisner, Special Counsel–ECF 302; Squar Milner LLP, Accountant–ECF 303; Virginia Moore-Bell, Ombudsman Health–304; and Harbuck Keith & Holmes, LLC, Special Counsel–ECF 305. After hearing on the first

interim application, this Court entered its order approving most of the interim applications on August 14, 2020 (ECF 374); however, Campbell Partners and Sullivan Hill were required by the Court to file amended/supplemental first interim applications (ECF 383 and 384, respectively).  On September 10, 2020, this Court issued its order approving the first interim fee applications of Campbell Partners and Sullivan Hill (ECF 90).

### Insider Compensation

On January 7, 2020, the Debtor filed a Notice of Intended Action requesting authority to compensate three insiders (ECF 14).  The Debtor has resolved all issues raised by the United States Trustee.  Commonwealth Assisted Living, LLC, Series E ("Commonwealth") objected (ECF 21 and 73).  On February 4, 2020, the Court entered an order authorizing the payment of insider compensation on a final basis to Barbara Lail and further authorizing payment of insider compensation to Renee Barnard and to Charles Barnard on an interim basis pending final hearing (ECF 101).  On February 27, 2020, the Court entered its order authorizing payment on insider compensation on a final basis to Renee Barnard and to Charles Barnard (ECF 150).

### Monthly Operating Reports

The Debtor's first monthly operating report was timely filed on February 20, 2020 (ECF 136).

The Debtor's second monthly operating report was timely filed on March 23, 2020 (ECF 180).

The Debtor's third monthly operating report was timely filed on April 20, 2020 (ECF 216).

The Debtor's fourth monthly operating report was timely filed on May 20, 2020 (ECF 262).

The Debtor's fifth monthly operating report was timely filed on June 23, 2020 (ECF 310).

/ / /

414565-v13

3

The Debtor's sixth monthly operating report was timely filed on July 23, 2020 (ECF 353).

The Debtor's seventh monthly operating report was timely filed on August 20, 2020 (ECF 379).

The Debtor's eighth monthly operating report was timely filed on September 23, 2020 (ECF 392).

The Debtor's ninth monthly operating report was timely filed on October 20, 2020 (ECF 395).

**90-Day Cash Flow Statement**

The Debtor's 90-day cash flow statement was timely provided to the United States Trustee.

**Cash Collateral**

On January 3, 2020, the Debtor filed a motion to use cash collateral (ECF 5). On January 15, 2020, the Court entered an interim order authorizing use of cash collateral (ECF 35).  On February 3, 2020, the Court entered a final order authorizing use of cash collateral (ECF 95).  The Debtor has timely made all required adequate protection payments to Wells Fargo.

**Sale of Debtor's Business**

On February 13, 2020, the Debtor filed a motion seeking approval of a sale process for selling its continuing care retirement community known as Mount Royal Towers (ECF 121).  On March 25, 2020, the Court entered its order approving a "stalking horse" asset purchase agreement, a process for marketing and overbid, and related relief (ECF 185).  As more fully discussed below, the sale process is underway following Court approval of the Debtor's sale procedure motion and then of the sale of Mount Royal Towers and related business assets to the stalking horse, MED Healthcare Partners, LLC ("MED").  MED is a large provider of skilled nursing, assisted living, and rehabilitation services.  Along with its partner management companies, MED manages and operates over 115 skilled nursing facilities with over

414565-v13

4

10,000 resident beds in 20 states, and it is particularly suited to purchase and assume full operating control and responsibility for Mount Royal Towers and its elderly resident population.

On May 5, 2020, the Debtor filed its Motion to Amend Overbid Procedures and Deadlines and to set New Date for Final Sale Hearing (ECF 538). After hearing on shortened time on May 21, 2020, this Court issued an order approving Debtor's motion and setting a final Sale Hearing for July 30, 2020. (ECF 264).

On May 12, 2020, Commonwealth Assisted Living, LLC, Series E ("Commonwealth") filed its Motion for an Order Compelling Debtor to (I) Enter into NDA; (II) Allow Access to Due Diligence Materials; and (III) Allow Inspection of Exterior Retaining Wall (ECF 248). After hearing on the Motion on June 11, 2020, this Court denied Commonwealth's Motion (ECF 298).

On July 16, 2020, Debtor filed its Statement re: Status of Sale Process and Lack of Qualifying Overbids (ECF 332) informing this Court that the Debtor had received no qualified overbids and thus recommending that the Court approve the sale of Mount Royal Towers to the Stalking Horse bidder, MED Healthcare. Debtor also stated that it had received–at the very last minute on the overbidder deadline date–a purported "overbid" from Commonwealth and its affiliate MCAP Birmingham, LLC ("MCAP" and collectively "Commonwealth") on July 9, 2020.  Debtor also stated that it deemed this purported "overbid" to be nonqualifying for a multitude of reasons, as listed in its Statement.

On July 20, 2020, Commonwealth filed a motion for an order qualifying the overbid of MCAP (ECF 336). After hearing on shortened time on the matter, on July 30, 2020, this Court issued an Order Denying Commonwealth's Motion for an Order Qualifying the Bid of MCAP (ECF 369).

After hearing on July 30, 2020, this Court entered an Order Approving: (A) Sale of Assets Free and Clear; (B) Approving Assumption and Assignment of

Executory Contracts and Unexpired Leases; and (C) Granting Related Relief (ECF 381).

**Debtor's Plan Exclusivity Periods**

On April 16, 2020, Debtor filed is first motion requesting an extension of the exclusivity periods (ECF 205). Debtor's motion was unopposed and on May 13, 2020, this Court issued its order extending the exclusivity filing period to August 3, 2020, and the exclusive solicitation period to September 29, 2020 (ECF 251).

On June 23, 2020, Debtor filed is second motion requesting an extension of the exclusivity periods (ECF 311). Debtor's motion was unopposed and on July 22, 2020, this Court issued its order extending the exclusivity filing period to November 2, 2020, and the exclusive solicitation period to December 28, 2020 (ECF 351).

On October 30, 2020, Debtor filed is third motion requesting an extension of the exclusivity periods (ECF 39). Debtor is seeking an order of this court extending the exclusivity filing period to February 5, 2021, and the exclusive solicitation period to March 6, 2021 (ECF 351). Hearing on the motion is set for December 10, 2020 (ECF 400).

The grounds for the third request include the fact that the sale which was approved by order entered August 31, 2020 (ECF 381 in the main Chapter 11 case), is not yet in a position to close, as well as the pendency of the SBA appeal (described below) of the Court's preliminary injunction lifting the bar to the Debtor's participation in the PPP/Cares Act program, the impact of which (if any) on this case is not yet known. Prominent among the reasons why the sale closing is taking more time than previously anticipated is that, although the Debtor and the Buyer (MED) are working diligently toward the smooth and successful turnover of the Debtor's operations so that the approved sale can close, including clearing the numerous administrative hurdles before management can transition and the sale can close, *once again* Commonwealth is interfering with and thwarting the sale process. Commonwealth and its affiliate, MCAP, are relentlessly pursuing blocking activities

in Alabama relating to issuance of the 113-bed SCALF Certificate of Need ("CON")
which ultimately should be transferred to MED.  The activities of Commonwealth and
MCAP are detailed and discussed at length in the Debtor's third motion for an
extension of the exclusivity period in the Chapter 11 case.  Those blocking activities
will greatly impact how much time it will take for the closing of the sale to MED to
close. See ECF 399-1 (Moriarty Declaration), ¶ 5.

A summary of those blocking activities follows:  While Commonwealth did not
appeal the sale approval order, it has undertaken other actions to undermine, thwart
and delay the sale process–this time, in Alabama.  Specifically, the Debtor has
encountered opposition from Commonwealth and its affiliate, MCAP, in connection
with being able to transfer to MED Healthcare, the court-approved purchaser of
Mount Royal Towers, 113 SCALF beds that are the subject of a CON application (i.e.,
a Certificate of Need application) pending before the State Health Planning and
Development Agency of the State of Alabama because Commonwealth, through its
MCAP affiliate, is asserting there that MCAP (Commonwealth) still has an
independent and viable right to purchase Mount Royal Towers and thereby the 113
SCALF beds.  Those beds are (i) property of the estate; (ii) part of the bundle of rights
that MED is purchasing, and (iii) necessary for MED to obtain the appropriate
licensing.  See ECF 399, p. 6.

The licensing requirement is a prerequisite step to closing the sale which this
Court has approved.  MCAP's alleged basis for its right to purchase those beds is
based on the rejected and terminated March 29, 2018 purchase contract (the "Rejected
Contract"), which this Court previously ordered rejected not just by one order–but by
two orders–both entered on March 25, 2020: the first being the order approving the
sale process itself (ECF 185), and the second being the order approving
Commonwealth's own motion (ECF 130 filed February 18, 2020) seeking to compel
the Debtor to reject the Rejected Contract and to require the escrow agent to return
Commonwealth's $700,000 purchase deposit that it had made pursuant to the Rejected

Contract. See ECF 186.  Not only did MCAP/Commonwealth fail to appeal or contest the Debtor's right to reject the Rejected Contract, but it expressly requested that Vestavia be compelled to reject that prepetition agreement as a condition to the sale process and to get its purchase deposit back.  See ECF 186.  As this Court is aware, that deposit was in fact returned to Commonwealth from escrow on or about September 4, 2020.  See ECF 399-1, ¶ 9.

Notwithstanding the Rejected Contract, and the two court orders approving and ordering that rejection, Commonwealth and MCAP have nevertheless continued to pursue the CON beds necessary to operate a SCALF in the Mount Royal Towers facility (i) on the ephemeral basis that because it at one time had a contract to purchase Mount Royal Towers; and (ii) on the illusory basis that it might someday still make an offer to buy Mount Royal Towers if MED Healthcare does not close on the sale.  On those specious grounds, MCAP (Commonwealth) contends it still has standing to pursue the SCALF CON beds.  See ECF 399-2 (Hunt Declaration), ¶¶ 7, 9, 10.  Commonwealth's activity in Alabama has proved to be a procedural blocking mechanism to the Debtor being able to secure the right to transfer those licenses to MED Healthcare, slowing if not blocking MED's closing of the sale.

In hindsight, the Debtor now understands more fully why Commonwealth so relentlessly tried to have its purported "overbid" approved at least as a backup bid at the sale approval hearing on May 21, 2020–namely, if the Court had granted Commonwealth and MCAP backup bidder status, they would arguably have had at least a toehold on which to base the argument currently being made by them in Alabama that MCAP (Commonwealth) still has standing to get the CON beds that the Debtor is working to secure in order to transfer to MED.  That argument, of course, fails now given that Commonwealth previously lost this shaky standing argument twice–first, when it attempted to alter the terms of the Court-approved form of the purchase agreement, which was rejected by two orders entered by the Court (ECF 298 and 381), and second, when the Court denied its motion to have its non-compliant and

non-conforming "overbid" allowed as an overbid, and again as a backup bid (ECF 369).

A motion to dismiss the Commonwealth/MCAP application pending before the State Health Planning and Development Agency has been filed with the administrative law judge ("ALJ") in Alabama who is adjudicating that dispute. The hearing on the motion was heard before the ALJ on the morning of November 5, 2020 and the matter was taken under submission. It is unknown when that motion will be decided. See ECF 399-2, ¶¶ 9, 18. As a result, although it is undisputed that Commonwealth and MCAP no longer have any right to purchase Mount Royal Towers, and certainly have no basis upon which to acquire a Certificate of Need nor licenses for operating the SCALF beds in that facility which are the subject of its CON application, Commonwealth and MCAP have repeatedly refused to withdraw their application for approval of the transfer of those beds to MCAP, resulting in a stalemate and delaying the issuance of licenses or the right to acquire licenses, which are predicates to closing the sale to MED. See ECF 399-2, ¶¶ 15, 17, 18. Unfortunately, Commonwealth has continued its relentless litigation campaign against the Debtor, notwithstanding rejection by this Court of (a) its pre-petition purchase agreement; its purported "overbid"; and (c) its attempt to have its non-conforming "overbid" allowed as a backup bid.

In light of the foregoing, the Debtor is doubtful that the sale of Mount Royal Towers to MED will close within the December 2020/January 2021 timeframe as the Debtor had optimistically been forecasting. As soon as the issues with respect to licensing are cleared up, the Debtor, in consultation with MED, will be in a better position to advise the Court and interested parties on an updated realistic timeline for closing of the sale.

**<u>Additional Matters</u>**

In addition to the matters required to be addressed by the Court's January 13, 2020 order, the following matters are also pending:

(1)    **Commonwealth's state court litigation**–transferred from Alabama to this Court, now adversary no. 20-90060–is the underlying subject of Commonwealth's motion for relief from stay (ECF 56).  That motion was heard by this Court on March 26, 2020, then taken off calendar, to be rescheduled after Commonwealth's motion for remand is filed.  See ECF 188 (minute order) in the main case.  Commonwealth then filed an ex parte motion to set briefing and hearing dates on its anticipated motions for remand and/or abstention and to reset its motion for relief from stay to proceed with the removed action. (ECF 19 in adversary no. 20-90060).  The Debtor's position was and is that both motions–stay relief and the abstention and/or remand motions–should be stayed and not heard until after the sale process is complete.  This Court agreed, and denied Commonwealth's ex parte motion on May 12, 2020, finding (among other things) that "[g]ranting this relief would be inconsistent with Court's prior rulings [s]tating that there is no urgency in completing discovery and moving forward with prepetition litigation (see ECF 45 in adversary 20-90029).  Denied without prejudice to renewal for a date after Sec. 363 sale closes."  See ECF 23 in adversary 20-90060. (This Court denied Commonwealth's same ex parte motion, filed in the main case at ECF 224, for the same reasons set forth in its order denying the application in the adversary.  See ECF 247 in the main case.)

The Debtor does not believe that this adversary proceeding can or should move forward in light of the Court's rulings above and in adversary 20-90029, as noted in item 2 below.

(2)  **The Debtor's motion for a section 105 injunction** (ECF 5 in adversary No. 20-90029) was heard by the Court on April 16, 2020, was granted in part, and denied in part (ECF 60). This Order enjoins proceeding against the Barnards (who are limited partners of the Debtor) until 30 days after the sale closes:

3. Based upon the findings and reasoning set forth in the Amended Tentative Ruling, the Motion is granted with respect to Renee Barnard and Charles Barnard. Commonwealth Assisted Living, LLC, Series E is hereby enjoined from continuing to prosecute the litigation styled as

Commonwealth Assisted Living, LLC, Series E v. Vestavia Hills, Ltd., et al., Civil Action No. 01-CV-2018-000390, Circuit Court of Jefferson County, Alabama (which action has been removed and transferred to this Court) against Renee Barnard and Charles Barnard (the "Barnard Injunction"); provided that, the Barnard Injunction shall automatically terminate 30 days after the closure of the sale of the Debtor's facility known as Mount Royal Towers or upon other further Order of the Court.

In addition, **the Debtor's motions for a protective order and to quash subpoenas** (ECF 30 and 50, respectively, in the Commonwealth adversary no. 20-90029, and ECF 183 filed in the main case) were set for hearing on April 30 and May 28, 2020, respectively. The Debtor does not believe that any more activity need take place in this adversary proceeding at this time. The Court's order, recognizing the current need to protect the Debtor's management and employees in place at the Mount Royal Towers facility, and in particular Renee Barnard and Charles Barnard, from litigation distractions through the sale process, should be applied to all litigation matters between the Debtor and Commonwealth through the sale process. The Debtor strongly agrees with the Court's observation that "[t]here is absolutely no emergency in discovery going forward in this litigation and no demonstrated prejudice to it being deferred" (ECF 49). This Court ruled that "Commonwealth . . . . is hereby enjoined from continuing to prosecute the litigation styled as Commonwealth Assisted Living, LLC, Series E v. Vestavia Hills, Ltd. et al., Civil Action No. 01-CV-2018-000390, Circuit Court of Jefferson County, Alabama (which action has been removed and transferred to this Court) against Renee Barnard and Charles Barnard (the "Barnard Injunction"); provided that, the Barnard Injunction shall automatically terminate *30 days after the closure of the sale of the Debtor's facility known as Mount Royal Towers or upon other further Order of the Court."* ECF #60 in adversary 20-90029 (emphasis added). And because any claim against the Limited Partners is derivative of Debtor, the Order denying relief from stay to proceed "with the removed action without prejudice to renewal for a date after Sec. 363 sale closes," See ECF 23 in adversary 20-90060 (This Court denied Commonwealth's same ex parte motion, filed

in the main case at ECF 224, for the same reasons set forth in its order denying the application in the adversary.  See ECF 247 in the main case), is dispositive.

(3)    **Charles Smith, as Personal Representative of the Estate of Tyler Smith, Deceased's motion for relief from stay** (ECF 172) was heard by the Court on April 16, 2020, and an order was entered granting relief from stay on June 3, 2020 (ECF 284).  The Debtor is informed that a settlement has been reached in that personal injury case, within policy limits.

(4) **Litigation with Wells Fargo Bank**.  On June 23, 2020 the Debtor commenced an adversary proceeding against Wells Fargo Bank, N.A. ("Wells Fargo") seeking to enjoin Wells Fargo from: (i) taking any new and further steps to execute upon the accounts, assets and property of the DIP Lenders; (ii) taking further action to enforce the Judgment against the accounts, assets and property of the DIP Lenders in any jurisdiction; and (iii) staying continuation of the Guarantor Litigation against the DIP Lenders for a short period of time until the closing of the sale of Mount Royal Towers or until further order of this Court during the Debtor's Chapter 11 Case.  See adversary 20-90083 (the "Wells Fargo Adversary").  The motion for injunctive relief (ECF 5 in the Wells Fargo Adversary) was opposed by Wells Fargo (ECF 12 filed July 6, 2020 in the Wells Fargo Adversary) to which the Debtor replied (ECF 13 in the Wells Fargo Adversary).

The Court granted the Debtor's motion (ECF 37 entered August 6, 2020 in the Wells Fargo Adversary) after the hearing scheduled for July 23, 2020 on numerous bases, including finding that Debtor Plaintiff is entitled to issuance of a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff has shown a substantial likelihood of success on the merits on the claims alleged in the Complaint, the risk of harm to Plaintiff if an injunction is not granted outweighs the risk of any harm to Wells Fargo if an injunction is granted, given the nature of Plaintiff's business operations, the public interest is served by issuing the requested injunction, and Plaintiff has sustained its initial burden of proof, having prevailed in

414565-v13

12

its arguments on all four prongs of the test for determining whether an injunction is warranted.  It then issued the requested injunctive relief, to last until 30 days after the closing of the pending sale of assets.  See ECF 37 in the Wells Fargo Adversary.

On August 6, 2020 the Debtor and Wells Fargo stipulated that the Wells Fargo Adversary is stayed for the period of the pendency of the injunctive relief; namely, until 30 days  after the close of the pending asset sale.  See ECF 36 (stipulation) and 38 (order approving the stipulation) in the Wells Fargo Adversary.  As a result, that adversary proceeding is currently stayed.

(6)  **Litigation with the SBA**.  On June 26, 2020, this Court granted the Debtor's motion for an injunction against the Small Business Administration and its administrator (collectively the "SBA") in adversary no. 20-90073 ("Adversary Proceeding").  ECF 26 and 27 in the Adversary Proceeding.  The result of that ruling was that the Debtor received approximately $1.1 million in Paycheck Protection Program ("PPP") funds, to use in accordance with the guidelines set forth by the SBA and Congress.  Thereafter, on July 10, 2020 the SBA appealed the injunction order.  ECF 31 and 32 in the adversary proceeding.  That appeal is currently pending in the U.S. District Court for the Southern District of California ("District Court") as case no. 3:20-cv-01308, is currently in the briefing stage, and oral argument is currently set for February 12, 2021, at 1:30 p.m.  See ECF 70 in the adversary proceeding.

The SBA initially filed an untimely Motion for Mandatory Withdrawal of the Reference with the Bankruptcy Court on July 29, 2020 [ECF 45], in Bankruptcy Adversary Case No. No. 20-90073).  The Debtor filed its initial Opposition to SBA's Motion for Mandatory Withdrawal of the Reference pursuant to stipulation and local Bankruptcy Court Rule 5011-1(b) on August 31, 2020 in the Adversary Proceeding [ECF 57].  The SBA filed its Reply on September 8, 2020 (ECF 61).  These documents were transmitted to the District Court at ECF 1 [1-1, 1-2, and 1-4] in Case

No. 20-cv-01824.[1]  On September 23, 2020, the District Court entered an Order Setting a Briefing Schedule for the Motion for Withdrawal of the Reference and the Debtor filed its response in the District Court on October 23, 2020 as ECF 5 (in case no. 3:20-cv-01824).

On July 31, 2020 the SBA filed, in the Adversary Proceeding, a motion to dismiss the Adversary Complaint under Rules 12(b)(1) and (6).  ECF 47.  On August 31, 2020 the Debtor filed opposition to the SBA's motion to dismiss.  ECF 57. On September 8, 2020 the SBA replied to the Debtor's opposition.  ECF 62.  At the hearing on the SBA's motion to dismiss on September 24, 2020, this Court denied the SBA's motion on several grounds, noting that the Adversary Case has been completed, at least at the trial court level.  It also agreed with the Debtor that the SBA's appeal of the preliminary injunction order divested this Court of jurisdiction to rule on this motion to dismiss.  It further found that, to the extent the Court still had jurisdiction to proceed in with the Adversary Proceeding pending the appeal, it is a waste of judicial resources to proceed.  This Court also agreed with the Debtor and noted that even if the Court has jurisdiction to rule on the motion to dismiss, the issues adjudicated in its preliminary injunction order are the law of the case unless and until the order is reversed on appeal.  See ECF 66 (tentative ruling) and 68 (order).

With respect to the SBA's motion to withdraw the reference, the Debtor takes the position that, given that the PPP money has been received and the Debtor has expended its funds in a manner that fulfills the Congressional intent behind the PPP and the CARES Act, there is nothing left for which the reference should be withdrawn.  In addition, the pendency of the appeal of the injunction order in the District Court case 3:20-cv-01308, application of the law of the case doctrine, and mootness (together with the fact that only core bankruptcy issues will remain if an appeal is granted)–all have significant bearing on whether the SBA's Motion to

---

[1] On September 18, 2020 the District Court entered its order transferring the second filed case, 3:20-cv-1824, with the appeal case, 3:20-cv-10308.  See ECF 3 in case no. 3:20-cv-01824.

414565-v13

14

Withdraw the Reference could be granted.  And, despite the fact that the SBA never requested a stay of the Adversary Proceeding[2], this Court on its own has now stayed the Adversary Proceeding "although no formal motion to stay" was filed:  "[T]he court exercises her inherent power to further stay proceedings in this action pending the district court's rulings on the motion to withdraw reference and the appeal of the preliminary injunction order.  The heart of this action involves the issues on appeal . . . ."  Order Denying Defendant's Motion to Dismiss the Complaint, [ECF 68, Page 6 of 7 (entered September 28, 2020).]

(7) **Debtor's Motion for Tax Determination.**  On April 17, 2020,  the Debtor filed a motion for determination of the value of the property in Alabama, and supplemental pleadings.  ECF 213.  The motion was based upon the fact that the Jefferson County Board of Tax Assessors ("Tax Assessor") had improperly assessed Parcel No. 28-00-17-4-002-003.000 and shown on the Tax Assessor's records with the Site Address of 126 Royal Tower Drive and commonly known by the address of 300 Royal Tower Drive (the "Real Property").  No party in interest opposed the motion, and on May 29, 2020, this Court entered its order granting the Debtor's motion.  See ECF 276.

Since that time, the Debtor, its principals, and its counsel have attempted to interact with  the Jefferson County Board of Assessors, to effectuate the order (ECF 276).  As of the date of this report, the Jefferson County Board of Assessors has

---

[2] The SBA failed to request a stay.  By failing to request a stay, the SBA itself facilitated the receipt by Vestavia of PPP funding which in turn allowed the Debtor to proceed to expend the funds to keep employees working and its doors open during the pandemic, fulfilling the statutory purpose of the PPP and the CARES Act. Because there can be no disgorgement from employees of salary, or the return of funds that were used for other CARES Act statutory purposes, there is no appropriate relief in the District Court.  Bankruptcy Rule 5011(c) specifically provides that the filing of a motion for the withdrawal of a case shall not stay the administration of any case but that such a motion for stay could be presented first to this Court and then to the District Court Judge. The SBA never brought such a request for a stay.  Instead, it fully participated in the Adversary Proceeding and further allowed this Court to enter the Preliminary Injunction, and then permitted the Debtor to act in reliance on that injunction and the CARES Act funding to keep employees in place and incur other expenses necessary to keep its facility fully operational during the pandemic.  The failure to request a stay allowed the Debtor to submit its application for PPP funds.  It allowed the Debtor to receive those funds.  And it allowed the Debtor to expend those funds for qualified purposes.  Moreover, the SBA continued litigating in this Court even after it filed its Motion for Withdrawal; i.e., the motion to dismiss which was actively litigated and resulted in this Court issuing the Order denying the motion and reaffirming that the law of the case applies. [Adversary Proceeding ECF 68]. The Motion to Withdraw should not be allowed as an exercise to unring the bell.

refused to acknowledge this Court's order.  The Debtor may be forced to bring the matter back before this Court to enforce its order on the Debtor's motion (ECF 276) if the County Board of Assessors does not comply.

**<u>Recommended Actions</u>**

The Debtor proposes that the Court continue all matters for a further Status Conference to be held at the Court's convenience during the middle of February 2021.

The Debtor is and will remain current on all required payment and reporting obligations set forth in the Local Rules of Procedure and the Orders of the Court.

The Limited Partners of the Debtor who also serve as the Debtor in Possession's  lenders are and will remain: (i) current in providing and having available the funding as needed to support the Debtor's operations; and (ii) current in providing Wells Fargo with the information and additional adequate protection payments required to be provided to Wells Fargo pursuant to this Court's Order Granting the Preliminary Injunction.

Given the activity necessarily associated with the sale closing and considering the interrelated nature of sale closing and its effect on the resolution of litigation claims and counterclaims, an extension of this Status Conference for a period of 60 to 90 days is the most cost-effective approach to take and is in the best interests of all creditors and parties in interest in this Chapter 11 case.

Dated:    November 5, 2020

SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation

By:    */s/James P. Hill*
James P. Hill
Attorneys for Debtor and Debtor in
Possession, Vestavia Hills, Ltd.,
dba Mount Royal Towers

CSD 3010 [07/01/18]
Name, Address, Telephone No. & I.D. No.

SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
James P. Hill (SBN 90478)/Christopher V. Hawkins (SBN 222961)
600 B Street, Suite 1700, San Diego, CA 92101
Tel.: (619) 233-4100; Fax No.: (619) 231-4372
Attorneys for Debtor and Debtor in Possession,
Vestavia Hills, Ltd. dba Mount Royal Towers

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

| In Re VESTAVIA HILLS, LTD. dba MOUNT ROYAL TOWERS, | Debtor. | BANKRUPTCY NO.   20-00018-LA11 |
|---|---|---|
| | Plaintiff(s) | ADVERSARY NO. |
| v. , | Defendant(s) | |

# PROOF OF SERVICE

I, <u>Linda Gubba-Reiner</u> am a resident of the State of California, over the age of 18 years, and not a party to this action.

On <u>November 5, 2020</u> , I served the following documents:

DEBTOR'S THIRD CHAPTER 11 STATUS REPORT

1.     **To Be Served by the Court via Notice of Electronic Filing ("NEF")**:

Under controlling Local Bankruptcy Rules(s) ("LBR"), the document(s) listed above will be served by the court via NEF and hyperlink to the document. On <u>November 5, 2020</u> , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the e-mail address(es) indicated and/or as checked below:

See Attached Service List.

☐     Chapter 7 Trustee

| ☑ | For Chpt. 7, 11, & 12 cases: UNITED STATES TRUSTEE ustp.region15@usdoj.gov | ☐ For ODD numbered Chapter 13 cases: THOMAS H. BILLINGSLEA, JR., TRUSTEE Billingslea@thb.coxatwork.com | ☐ For EVEN numbered Chapter 13 cases: DAVID L. SKELTON, TRUSTEE admin@ch13.sdcoxmail.com dskelton13@ecf.epiqsystems.com |
|---|---|---|---|

CSD 3010

CSD 3010 [07/01/18] (Page 2)

2. **Served by United States Mail**:

On _____ , I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing accurate copies in a sealed envelope in the United States Mail via 1) first class, postage prepaid or 2) certified mail with receipt number, addressed as follows:

3. **Served by Personal Delivery, Facsimile Transmission, Overnight Delivery, or Electronic Mail**:

Under Fed.R.Civ.P.5 and controlling LBR, on ___November 5, 2020___ , I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission, by overnight delivery and/or electronic mail as follows:

andy@campbellpartnerslaw.com                      eeisner@eeisner.com
harris@campbellpartnerslaw.com                    Stacy.Chiang@bakertilly.com
amalo@sheppardmullin.com
Virginia.Bell@adss.alabama.gov
TaRhonda.Wiggins@adss.alabama.gov
Tammy.Holman@adss.alabama.gov
kkeith@hkh.law
dhunt@hkh.law
kevin@activecareliving.com

I declare under penalty of perjury under the laws of the United States of America that the statements made in this proof of service are true and correct.

Executed on ___November 5, 2020___          Linda Gubba-Reiner  /s/ Linda Gubba-Reiner
              (Date)                                          (Typed Name and Signature)

                                             600 B Street, Suite 1700
                                              (Address)

                                             San Diego, CA  92101
                                              (City, State, ZIP Code)

CSD 3010

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- John Cannizzaro     john.cannizzaro@icemiller.com
- Kathleen A. Cashman-Kramer     Cashman-Kramer@Sullivanhill.com, kathylaw@san.rr.com;Rudolph@sullivanhill.com;hill@sullivanhill.com;bkstaff@sullivanhill.com;Rudolph@ecf.inforuptcy.com;cashman-kramer@ecf.inforuptcy.com
- Glen F. Dorgan     glen.dorgan@usdoj.gov, Brenda.seyler@usdoj.gov
- Ajay Gupta     ajay@guptalc.com, guptaar87864@notify.bestcase.com
- Julian Gurule     jgurule@buchalter.com, smartin@buchalter.com,docket@buchalter.com
- Christopher V. Hawkins     hawkins@sullivanhill.com, hill@sullivanhill.com;cashman-kramer@sullivanhill.com;bkstaff@sullivanhill.com;vidovich@ecf.inforuptcy.com;hawkins@ecf.inforuptcy.com
- James P. Hill     Hill@sullivanhill.com, hawkins@sullivanhill.com;bkstaff@sullivanhill.com;vidovich@ecf.inforuptcy.com;hill@ecf.inforuptcy.com;cashman-kramer@sullivanhill.com
- J. Barrett Marum     bmarum@sheppardmullin.com, egarcia@sheppardmullin.com
- David Ortiz     david.a.ortiz@usdoj.gov, USTP.REGION15@USDOJ.GOV;tiffany.l.carroll@usdoj.gov;abram.s.feuerstein@usdoj.gov
- William A. Smelko     bill.smelko@procopio.com, kristina.terlaga@procopio.com;calendaring@procopio.com
- Randye B. Soref     rsoref@polsinelli.com
- United States Trustee     ustp.region15@usdoj.gov

# EXHIBIT 5

CSD 3000A [07/01/18]
Name, Address, Telephone No. & I.D. No.

SULLIVAN HILL REZ & ENGEL, A Professional Law Corporation
James P. Hill, SBN 90478
Christopher V. Hawkins, SBN 222961
600 B Street, Suite 1700
San Diego, CA 92101   (Phone No. (619) 233-4100)
Attorneys for Vestavia Hills Ltd., Debtor and Debtor in Possession

Order Entered on
December 11, 2020
by Clerk U.S. Bankruptcy Court
Southern District of California

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

In Re
VESTAVIA HILLS, LTD., dba Mount Royal Towers

Debtor.

BANKRUPTCY NO. 20-00018-LA11

Plaintiff(s)

ADVERSARY NO.

v.

Defendant(s)

Date of Hearing: December 10, 2020
Time of Hearing: 2:00 p.m.
Name of Judge: Louise DeCarl Adler

## ORDER ON
## DEBTOR'S THIRD MOTION TO EXTEND EXCLUSIVITY PERIODS

The court orders as set forth on the continuation pages attached and numbered __2__ through __2__ with

exhibits, if any, for a total of __2__ pages.  Motion/Application Docket Entry No. __399__ .

//

//

//

//

DATED:    December 11, 2020

Judge, United States Bankruptcy Court

CSD 3000A

CSD 3000A [07/01/18](Page 2)
ORDER ON
DEBTOR'S THIRD MOTION TO EXTEND
DEBTOR: VESTAVIA HILLS, LTD., dba Mount Royal Towers

CASE NO.:  20-00018-LA11
ADV. NO.:

The Court having considered the third motion ("Motion") ECF 399, of Vestavia Hills, Ltd. dba Mount Royal Towers ("Debtor"), the debtor and debtor in possession herein, and good cause appearing therefor, as set forth in this Court's tentative ruling (ECF 425), for entry of an Order Extending the Exclusivity Periods, and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors, and all other interested parties; notice appearing proper; and good cause appearing therefor,

IT IS HEREBY ORDERED that:

1) The Motion is granted as set forth herein. All terms not defined herein shall have the meaning given them in the Motion.

2) The Exclusive Filing Period is extended to and including Friday February 5, 2021, without prejudice to the Debtor's right to seek additional extensions of such period.

3) The Exclusive Solicitation Period is extended to and including Friday, March 26, 2021, without prejudice to the Debtor's right to seek additional extensions of such period.

IT IS SO ORDERED.

CSD 3000A

Signed by Judge Louise DeCarl Adler December 11, 2020

# EXHIBIT 6

**CSD 3000A** [07/01/18]
Name, Address, Telephone No. & I.D. No.

SULLIVAN HILL REZ & ENGEL, A Professional Law Corporation
James P. Hill, SBN 90478
Christopher V. Hawkins, SBN 222961
600 B Street, Suite 1700, San Diego, CA 92101
Phone No. (619) 233-4100
Attorneys for Vestavia Hills Ltd., Debtor and Debtor in Possession

**Order Entered on**
January 29, 2021
**by Clerk U.S. Bankruptcy Court**
**Southern District of California**

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

In Re
VESTAVIA HILLS, LTD., dba Mount Royal Towers

Debtor.

BANKRUPTCY NO. 20-00018-LA11

Plaintiff(s)

ADVERSARY NO.

v.

Defendant(s)

Date of Hearing: January 28, 2021
Time of Hearing: 2:00 p.m.
Name of Judge: Louise DeCarl Adler

## ORDER ON
### DEBTOR'S FOURTH MOTION TO EXTEND EXCLUSIVITY PERIODS

The court orders as set forth on the continuation pages attached and numbered __2__ through __4__ with

exhibits, if any, for a total of __4__ pages.  Motion/Application Docket Entry No. __432__ .

//

//

//

//

DATED:   January 29, 2021

Judge, United States Bankruptcy Court

**CSD 3000A**

**CSD 3000A** [07/01/18] **(Page 2)**
ORDER ON   DEBTOR'S FOURTH MOTION TO EXTEND EXCLUSIVITY PERIODS
DEBTOR: VESTAVIA HILLS, LTD., dba Mount Royal Towers                    CASE NO.:   20-00018-LA11
                                                                        ADV. NO.:

The Court having considered the Fourth motion ("Motion") of Vestavia Hills, Ltd. dba Mount Royal Towers ("Debtor"), the debtor and debtor in possession herein, for entry of an Order Extending the Exclusivity Periods, and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors, and all other interested parties; notice appearing proper; the Court having issued its tentative ruling (ECF 449) on January 26, 2021, granting Debtor's Motion, with modification (a copy of which attached as Exhibit "1" hereto and is incorporated by reference as if set forth in full), and good cause appearing therefor,

IT IS HEREBY ORDERED that:

1) The Motion is granted as set forth herein. All terms not defined herein shall have the meaning given them in the Motion.

2) The Exclusive Filing Period is extended to and including Saturday July 3, 2021.

3) The Exclusive Solicitation Period is extended to and including Friday, September 3, 2021.

IT IS SO ORDERED.

**CSD 3000A**

Signed by Judge Louise DeCarl Adler January 29, 2021

**EXHIBIT "1"**

TENTATIVE RULING

ISSUED BY JUDGE LOUISE DECARL ADLER

Debtor:        VESTAVIA HILLS, LTD.
Number:        20-00018-LA11

Hearing:       02:00 PM   Thursday, January 28, 2021

Motion:        1) CHAPTER 11 PETITION 1) SETTING STATUS CONFERENCE; 2) SETTING
COMPLIANCE DEADLINES; AND 3) SETTING SANCTIONS, IF APPROPRIATE, INCLUDING
DISMISSAL, CONVERSION OR APPOINTMENT OF A CHAPTER 11 TRUSTEE OR EXAMINER
BECAUSE OF NONCOMPLIANCE WITH ABOVE-REFERENCE REQUIREMENTS (Fr 11/12/20)


2) STATUS CONFERENCE ON MOTION FOR RELIEF FROM AUTOMATIC STAY R/S JIG-1 FILED
BY JULIAN GURULE ON BEHALF OF COMMONWEALTH ASSISTED LIVING, LLC



3) DEBTOR'S FOURTH MOTION TO EXTEND EXCLUSIVE PERIODS WITHIN WHICH TO FILE
AND CONFIRM A PLAN OF REORGANIZATION FILED BY JAMES P. HILL ON BEHALF OF
VESTAVIA HILLS, LTD.

Motion to Extend Exclusive Periods to File and Confirm Plan of Reogn. **GRANTED WITH
MODIFICATION** as set forth below.
It appears that this will be the last extension giving the time constraints set forth in § 1121(c)(3).
Still, Debtor has shown cause for a final extension pursuant to § 1121(d)(1).

Commonwealth has filed a "Statement" indicating that it does not oppose the requested
extension but strongly disagrees with the characterization of the facts surrounding the need for
this delay as set forth in debtor's declaration in support filed by Mr. Moriarity.   There is no other
opposition.

Section 1121(d)(1) permits the Court to extend both the 120-day and the 180-day exclusivity
periods referred to in § 1121(c)(3) for "cause." However, the 120-day period may not be
extended beyond 18 months after the commencement date, and the 180-day period may not be
extended beyond 20 months after the commencement date. 11 U.S.C. § 1121(d)(2).    This
chapter 11 petition was filed on January 3, 2020, and §§ 1121(b)-(d) permit the Court to extend
exclusivity periods for cause, so long as the period for exclusive filing is not extended beyond 18
months postpetition (July 3, 2021), and the period for exclusive solicitation is not extended
beyond 20 months postpetition (September 3, 2021).    Therefore, the exclusive period i to file
the plan is extended to July 3, 2021 and the exclusive period to confirm same to Sept 3, 2021.

# EXHIBIT 7

1  JULIAN I. GURULE (SBN: 252160)
       jgurule@buchalter.com
2  ANTHONY J. NAPOLITANO (SBN: 227691)
       anapolitano@buchalter.com
3  BUCHALTER, a Professional Corporation
   1000 Wilshire Boulevard, Suite 1500
4  Los Angeles, CA 90017-1730
   Telephone: (213) 891-0700
5  Facsimile: (213) 896-0400

6  RICHARD J. BROCKMAN (admitted *pro hac vice*)
   BRENT D. HITSON (admitted *pro hac vice*)
7  MARC P. SOLOMON (admitted *pro hac vice*)
   BURR & FORMAN LLP
8  420 North 20th Street, Suite 3400
   Birmingham, AL 35203
9  Telephone: 205.251.3000
   Fax: 205.458.5100

10

11 *Attorneys for Commonwealth Assisted Living, LLC, Series E*

12            **UNITED STATES BANKRUPTCY COURT**

13            **SOUTHERN DISTRICT OF CALIFORNIA**

14 In re                              | Case No. 20-00018-LA11

15 VESTAVIA HILLS, LTD.,              | Chapter 11
   DBA MOUNT ROYAL TOWERS,
16                                    | **COMMONWEALTH ASSISTED**
        Debtor.                       | **LIVING, LLC, SERIES E'S OBJECTION**
17                                    | **TO DEBTOR'S PROPOSED**
                                      | **DISCLOSURE STATEMENT**
18                                    | **DESCRIBING THE DEBTOR'S**
                                      | **CHAPTER 11 PLAN OF**
19                                    | **REORGANIZATION DATED JULY 2,**
                                      | **2021**
20
                                      | Date:     August 26, 2021
21                                    | Time:     2:00 p.m.
                                      | Ctrm.:    2
22                                    |           United States Bankruptcy Court
                                      |           325 West "F" Street
23                                    |           San Diego, CA 92101-6991
                                      |           Judge: Hon. Louise DeCarl Adler
24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4

1

# <u>TABLE OF CONTENTS</u>

2                                                                                      <u>Pages</u>

3   I.      PRELIMINARY STATEMENT .................................................................. 1

4   II.     BACKGROUND FACTS ........................................................................ 5

5   III.    LEGAL ARGUMENT ........................................................................... 7

6          A.     The Plan Cannot Be Confirmed and the Approval of the Disclosure Statement
                  Should Therefore Be Denied ................................................................ 7

7
            B.     The Plan Cannot Be Confirmed Because It Has Been Proposed in Bad Faith
8                  and to Gain an Improper Litigation Advantage ...................................... 8

9              C.     The Plan Cannot Be Confirmed Because It Purports to Restructure the
                      Obligations of the Non-Debtor Limited Partners in Violation of Section 524(e). 10
10
            D.     The Plan Cannot Be Confirmed Because It Impermissibly Purports to Grant a
11                 Discharge to a Chapter 11 Debtor Under a Plan of Liquidation ......................... 11

12            E.     The Debtor Has Not Marketed the Post-Confirmation Equity Interests or
                    Terminated Exclusivity as Required for "New Value" Plans .............................. 12
13
            F.     The Plan Impermissibly Classifies Commonwealth's Claim in a Separate
14                 Class from Other Unsecured Claims ..................................................... 13

15           G.     The Disclosure Statement Should Not Be Approved Because It Does Not
                   Contain Adequate Information .......................................................... 14
16
    IV.     CONCLUSION ................................................................................. 17

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

i

BN 4266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S
PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF
REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 86

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Am. Capital Equip., LLC,*
   688 F.3d 145 (3d Cir. 2012)..................................................................... 6

*In re American Hardwoods,*
   885 F.2d 621 (9th Cir. 1989)................................................................... 9

*Bank of America Nat'l Trust & Savings Ass'n v. 203 N. LaSalle St. P'ship,*
   526 U.S. 434 (1999).......................................................................... 4, 12

*Barakat v. Life Ins. Co. of Va.* (*In re Barakat*),
   99 F.3d 1520 (9th Cir. 1996)................................................................ 13

*Blixseth v. Credit Suisse,*
   961 F.3d 1074 (9th Cir. 2020)............................................................... 10

*In re Claar Cellars LLC,*
   623 B.R. 578 (Bankr. E.D. Wash. 2021) .............................................. 10

*In re Felicity Assocs., Inc.,*
   197 B.R. 12 (Bankr. D.R.I. 1996) .......................................................... 7

*Fireman's Fund Ins. Co. v. Plant Insulation Co.* (*In re Plant Insulation Co.*)
   485 B.R. 203 (N.D. Cal. 2012) .............................................................. 8

*In re Forest Grove, LLC,*
   448 B.R. 729 (Bankr. D.S.C. 2011) ..................................................... 15

*In re Market Square Inn, Inc.,*
   163 B.R. 64 (Bankr. W.D. Pa. 1994) ..................................................... 7

*In re Moorpark Adventure,*
   161 B.R. 254 (Bankr. C.D. Cal. 1993) ................................................... 7

*Oxford Life Ins. Co. v. Tucson Self-Storage* (*In re Tucson Self-Storage*)
   166 B.R. 892 (B.A.P. 9th Cir. 1994)..................................................... 13

*In re Pac. Shores Dev.,*
   Inc., 2011 Bankr. LEXIS 785, (Bankr. S.D. Cal. Feb. 25, 2011) ......... 15

*In re Reilly,*
   71 B.R. 132 (Bankr. D. Mont. 1987) .................................................... 14

ii

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 87

*Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*,
    67 F.3d 1394 (9th Cir. 1995)................................................................ 2, 9, 10

*In re Rohnert Park Auto Parts, Inc.*,
    113 B.R. 610 (B.A.P. 9th Cir. 1990)........................................................ 10

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
    81 F.3d 355 (3d Cir. 1996)...................................................................... 14

*In re Silberkraus*,
    253 B.R. 890 (Bankr. C.D. Cal. 2000).................................................. 7, 8

*Teamsters Pension Trust Fund v. Malone Realty Co.*,
    82 B.R. 346 (E.D. Pa. 1988) ................................................................. 11

*Um v. Spokane Rock I*,
    LLC, 904 F.3d 815 (9th Cir. 2018) ...................................................... 11

*In re Unichem Corp.*,
    72 B.R. 95 (Bankr. N.D. Ill. 1987) ....................................................... 14

**Statutes**

11 U.S.C.
    524(e) .................................................................................................. 2, 9
    1129(a)(3) ............................................................................................... 8
    § 105(a) .................................................................................................. 2
    § 1125(a)(1) .......................................................................................... 14
    § 1125(b) .............................................................................................. 14
    § 1141(d)(3)(A) .................................................................................... 11
    § 1141(d)(3)(B) .................................................................................... 11
    § 1141(d)(3)(C) .................................................................................... 11

28 U.S.C.
    § 1452 .................................................................................................... 5

Bankruptcy Code
    § 524(e) ............................................................................................ 9, 10
    § 727(a) ................................................................................................ 11
    § 727(a)(1) ............................................................................................ 11
    § 1122 .............................................................................................. 4, 13
    § 1122(b) .............................................................................................. 13
    § 1125 .............................................................................................. 4, 16
    § 1129(a)(3) ....................................................................................... 4, 8
    § 1129(a)(8) .......................................................................................... 13
    § 1141(d) .............................................................................................. 11
    § 1141(d)(3) .................................................................................... 10, 11

iii

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S
PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF
REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 88

**Other Authorities**

7 Collier on Bankruptcy § 1129.03 (16th ed. 2021) ........................................................ 12

8 Collier on Bankruptcy ¶ 1141.05[4] ........................................................................... 11

iv

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 89

Commonwealth Assisted Living, LLC, Series E ("Commonwealth"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the *Debtor's Proposed Disclosure Statement Describing the Debtor's Chapter 11 Plan of Reorganization Dated July 2, 2021* [Docket No. 516] (the "Disclosure Statement").[1]  In support of this Objection, Commonwealth respectfully states as follows:

## I.   <u>PRELIMINARY STATEMENT</u>

The Disclosure Statement describes a Plan that the Debtor has proposed in bad faith in order to impermissibly restructure the Limited Partners' own liabilities and gain improper litigation advantages for the Limited Partners over Commonwealth.  The Plan is not confirmable – and, accordingly, the Court should not approve the Disclosure Statement.

The Disclosure Statement demonstrates that the Limited Partners have caused the Debtor to propose the Plan for an improper purpose.  As set forth in the Disclosure Statement, following the closing of the sale of Mount Royal Towers to MED Healthcare (the "Sale") and the distribution of the net Sale proceeds to Wells Fargo, the Debtor will no longer own any operating business and will have no way to generate business revenues.  *See* Disclosure Statement Art. I.A.  This is a plan of liquidation, plain and simple.  However, notwithstanding the Debtor's liquidation, the Limited Partners would continue to have exposure to Wells Fargo (on account of their guarantee of the Wells Fargo loan) and Commonwealth (on account of their guarantee of Commonwealth's prior asset purchase agreement with the Debtor).  The Limited Partners – none of whom, of course, are debtors – have therefore determined to attempt to use the Debtor's Plan to impermissibly restructure their own liabilities.  For example, the Plan proposes to require that any claim of Commonwealth against the Limited Partners would be paid over 60 months.  *See* Plan Art. V.C.2.[2]

There is no rational economic reason that the Limited Partners would agree to fund the Plan other than to improperly address their own guarantee liabilities and obtain litigation advantage over

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the Disclosure Statement.

[2] "[I]f Commonwealth obtains a money judgment against the Limited Partners, then Commonwealth will be paid 100 percent of the allowed Claim amount or Judgment amount over a five-year (60-month) period in full satisfaction of the claim…".  *See id.*

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S
PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF
REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 90

Commonwealth.  The Disclosure Statement makes clear that the Limited Partners are the sole source of funding for the ongoing payments under the Plan (other than the non-existent claims the Debtor asserts it has against Commonwealth).  *See* Disclosure Statement Art. I.A.  However, there is no post-confirmation operating business to capitalize, and the Limited Partners have no real expectation that they will ever receive an actual return on their proposed new investment in the Debtor.  *See* Disclosure Statement I.A ("The Plan, at its core, is a liquidating plan.").  The vast majority of the claims that the Limited Partners have proposed to pay under the Debtor's Plan are in reality guaranty obligations of the Limited Partners themselves.

If the Limited Partners wish to use the bankruptcy court to restructure their *own* financial obligations, they are free to file their *own* bankruptcy cases.  However, they cannot use the Debtor's Plan to do so.  *See*, *e.g.*, 11 U.S.C. 524(e); *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401-02 (9th Cir. 1995).

The Debtor and the Limited Partners wish to use the Plan to gain litigation advantage over Commonwealth.  Commonwealth had prepetition state court litigation pending against the Debtor and the Limited Partners in the Circuit Court for Jefferson County, Alabama (the "State Court Action").  The Debtor removed the State Court Action, which was transferred to this Court over a year ago.  The State Court Action has been stayed for over 18 months as the Court has permitted the Debtor to attempt to close the Sale to MED Healthcare.  The Court has set a hearing for September 16, 2021 to consider Commonwealth's motions to remand the State Court Action and grant relief from the automatic stay to allow the same to proceed.

Commonwealth submits that the Debtor and Limited Partners have engineered the Plan in an effort to continue to delay the State Court Action and obtain a forum of the Limited Partners' own choosing.  Indeed, for a year-and-a-half, the Debtor and Limited Partners have used the Limited Partners' DIP financing commitment as a basis to argue that this Court should stay Commonwealth's actions against the non-debtor Limited Partners.  *See*, *e.g.*, *Adversary Complaint of Vestavia Hills, Ltd. for Injunctive and Declaratory Relief Extending the Automatic Stay Provisions of Bankruptcy Code section 362 pursuant to 11 U.S.C. § 105(a) to Certain Non-Debtors*,

2

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 91

Case No. 20-90029 [Docket No. 1], p. 3, lines 9-14 ("[T]he cost of defending the Alabama State

Court Action and the time commitments in defending that litigation distract all [Limited Partners]

from their obligations as DIP lenders.  Therefore, the Debtor will be extremely prejudiced by the

near term continuation of the Alabama State Court Action in violation of, and frustration of, the

intent and purpose of the automatic stay.").  Given the Plan's supposed funding commitments by

the Limited Partners, the Limited Partners will undoubtedly argue that similar protection from the

State Court Action should be provided by the Court post-confirmation.  Commonwealth submits

that the Plan's 60-month payment term is a similar and transparent attempt to manufacture an

arguable basis for the Court to retain jurisdiction over the State Court Action, rather than remand it

back to Alabama.

The Limited Partners' recent objection to Commonwealth's proof of claim is likewise

intended to get the Court to adjudicate the merits of the State Court Action.[3]  The Court should

reject these efforts.  Here, following the closing of the Sale (assuming it ever occurs), the Debtor

would have no legitimate interest in the outcome of the litigation between Commonwealth and the

Limited Partners.  The Court itself has long recognized that fact.  The Court has observed that the

parties will face a "vastly different landscape" once the Sale has closed.  *See* Hrg. Tr. Nov. 12, 2020

p. 26, lines 3-11 ("Some of [the litigation issues] might go by the by in the event that the Debtor

closes by the end of January or if closing seems imminent.  And my concern is running up the bill

even more on litigation that is really – basically is not really a live controversy because there's no

longer a matter before this Court.  For example, if the Debtor closes, I suppose there's a stay we

still have to deal with, but it's a vastly different landscape at that point.").[4]  If the Debtor were to

actually close the Sale, there would no longer be any operating business to protect, no revenues

with which to pay claims, and no means to pay any indemnity claims held by the Limited Partners

(assuming any such claims actually exist).  All that would remain post-closing would be an

Alabama-based dispute between Commonwealth and the non-debtor Limited Partners.  The Court

---

[3] *See Objection to Claim and Notice Thereof* [Docket No. 524].

[4] A true and correct copy of the relevant pages of the transcript from the November 12, 2020 status conference are attached hereto as Exhibit 1.

3

BUCHALTER
A Professional Corporation
Los Angeles

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S
PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF
REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 92

1    should not permit the Debtor and the Limited Partners attempt to use the Plan process to obscure

2    that fact.

3         In addition, the Court should not approve the Disclosure Statement because the Plan

4    contains other impermissible provisions, including, *inter alia*:

5         • the Plan provides for the Debtor's discharge in violation of Bankruptcy Code section

6             1129(a)(3), which bars discharges for liquidating partnership debtors that are

7             ceasing to conduct business following consummation of the Plan.  11 U.S.C. §

8             1129(a)(3).

9         • the Plan purports to be a "new value" plan that grants new equity interests to the

10             Limited Partners in exchange for their supposed funding commitments.  However,

11             the Debtor has neither marketed such equity interests for overbid nor terminated

12             exclusivity to test whether the Debtor and creditors are obtaining the best terms for

13             the post-confirmation equity interests.  *See Bank of America Nat'l Trust & Savings*

14             *Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).

15         • the Plan separately classifies Commonwealth's unsecured claim from the claims of

16             other general unsecured creditors in violation of Bankruptcy Code section 1122.

17         Putting aside the Plan's patent defects, the Disclosure Statement does not contain adequate

18    information as required under Bankruptcy Code section 1125.  For example, the Debtor's ability to

19    pay unsecured claims under the Plan is dependent upon the supposed funding commitment provided

20    by the Limited Partners.  However, the Disclosure Statement contains *no information* regarding the

21    terms of such funding commitment – let alone how creditors will be assured that the Limited

22    Partners will make good on their obligations given that the Limited Partners will be on both sides

23    of such agreement (*i.e.*, as the Debtor's controlling owners and funding source).  The Disclosure

24    Statement similarly contains *no information* upon which creditors could make a determination

25    regarding whether the Limited Partners have the financial wherewithal to meet their Plan funding

26    obligations.  The Disclosure Statement does not provide any discussion or evidence – *e.g.*, bank

27

28

4

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S
PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF
REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 93

1    statements, financial disclosures – that the Limited Partners have the ability to make any payments

2    at all.

3          Finally, the Plan is contingent upon the prior closing of the Sale, a transaction that the Court

4    approved *over one year ago* that still has not closed.  Indeed, the seller-driven Sale contingencies

5    – *e.g.*, due diligence contingencies and licensing approvals – could have and should have been

6    completed last year prior to Sale approval.  Parties in interest (and the Debtor itself) should not be

7    forced to devote time and resources to a speculative plan confirmation process unless and until the

8    transaction upon which the entire Plan is premised actually occurs.

9          For the foregoing reasons and the reasons set forth in the balance of this Objection,

10   Commonwealth respectfully requests that the Court not approve the Disclosure Statement.

## II.    BACKGROUND FACTS

12         On January 3, 2020 (the "Petition Date"), the Debtor commenced this Chapter 11 Case.

13         On January 14, 2020, the Debtor and the Limited Partners filed their *Notice of Removal*

14   *Under 28 U.S.C. § 1452* in the State Court Action.

15         On January 24, 2020, Commonwealth filed the *Motion of Commonwealth Assisted Living,*

16   *LLC, Series E for Relief from the Automatic Stay* (the "Relief from Stay Motion") [Docket No. 56].

17         On January 29, 2020, Commonwealth filed *Commonwealth Assisted Living, LLC, Series*

18   *E's Motion to Remand and/or for Abstention* (the "Remand Motion"), Docket No. 7, in the removed

19   and transferred adversary proceeding styled as *Commonwealth Assisted Living, LLC, Series E v.*

20   *Vestavia Hills, Ltd.*, U.S. Bankr. Ct. S.D. Cal., A.P. Case No. 20-90060-LA (the "Adversary

21   Proceeding").

22         On February 13, 2020, the Debtor filed the *Debtor's Motion for Order (1)(A) Approving*

23   *Stalking Horse Agreement; (B) Approving Overbid Procedures; (C) Approving Retention of*

24   *Broker; (D) Approving Rejection of Commonwealth Agreement; (E) Scheduling Final Sale*

25   *Hearing; and (2)(A) Approving Sale of Assets Free and Clear; (B) Approving Assumption and*

26   *Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief*

27   [Docket No. 121] (the "Bid Procedures Motion").

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S
PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF
REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 94

On February 28, 2020, the U.S. Bankruptcy Court for the Northern District of Alabama entered its Memorandum Opinion and Order [A.P. Docket No. 18] transferring the Adversary Proceeding to this Court, but declining to rule on the Remand Motion.

On March 25, 2020, the Court entered the *Order on Bid Procedures Motion* [Docket No. 185] (as amended by the *Order Granting Debtor's Motion to Amend Overbid Procedures and Deadlines and to Set New Date for Final Sale Hearing* [Docket No. 264], the "Bid Procedures Order"), which, *inter alia*, approved (a) certain Overbid Procedures attached as Exhibit A thereto (the "Overbid Procedures") and (b) the Debtor's stalking horse purchase agreement (the "Stalking Horse APA") with MED Healthcare Partners, LLC (the "MED Healthcare").

On May 5, 2020, the Debtor filed the *Debtor's Motion to Amend Overbid Procedures and Deadlines and to Set New Date for Final Sale Hearing* [Docket No. 238], pursuant to which the Debtor requested that the Court approve a delay of the sale process, with a new overbid deadline of July 9, 2020 and an auction and sale date of July 30, 2020.

On May 21, 2020, the Court entered the *Order Granting Debtor's Motion to Amend Overbid Procedures and Deadlines and to Set New Date for Final Sale Hearing* [Docket No. 264], which, among other things, set July 9, 2020 as the amended bid deadline and July 30, 2020 as the auction and sale hearing date (the "Sale Hearing").

On July 30, 2020, the Court held the Sale Hearing and approved the Sale to MED Healthcare.

On August 31, 2020, the Court entered its *Order Granting Debtor's Motion for Order Approving:  (A) Sale of Assets Free and Clear; (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 381].

On July 1, 2021, the Court held a status conference and set a briefing schedule and hearing date for the Remand Motion and the Relief from Stay Motion [Docket No. 511].

On July 2, 2021, the Debtor filed the Plan [Docket No. 515] and the Disclosure Statement [Docket No. 516].

6

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 95

On July 12, 2021, the Limited Partners filed an objection to Commonwealth's proof of claim [Docket No. 524].

### III.    LEGAL ARGUMENT

**A.    The Plan Cannot Be Confirmed and the Approval of the Disclosure Statement Should Therefore Be Denied**

Courts may consider substantive plan issues at the disclosure statement hearing and deny approval of a disclosure statement that describes a plan that cannot be confirmed under the Bankruptcy Code.  *See*, *e.g.*, *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) ("Courts have recognized that if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing.") (internal citations and quotation marks omitted); *see also In re Silberkraus*, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000) (noting that where "it would be a waste of resources to approve any disclosure statement" because the plan is nonconfirmable, "it is appropriate for the court to deny approval of the disclosure statement describing the nonconfirmable plan").  At a disclosure statement hearing, the bankruptcy court may address legal issues that determine whether a plan can be confirmed.  *See In re Moorpark Adventure*, 161 B.R. 254, 256-58 (Bankr. C.D. Cal. 1993) ("The Debtor's request to approve its filed Disclosure Statement is denied in view of this court's determination that the Debtor's Plan is not confirmable."); *see also In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("It has become standard Chapter 11 practice that when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face.") (internal quotation omitted); *In re Market Square Inn, Inc.*, 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of confirmation, it is appropriate to refuse the approval of the disclosure statement.").

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 96

Here, the Plan cannot be confirmed and the Court should therefore spare the Debtor and other parties in interest the wasted time and resources that would be spent litigating a contested confirmation proceeding, and should instead simply deny approval of the Disclosure Statement. As set forth below, the Plan is not confirmable because it has not been proposed in good faith, it purports to impermissibly grant a discharge to a liquidating debtor, it distributes "new value" equity without a market test, and it separately classifies Commonwealth's unsecured claim from the claims of other unsecured creditors.  If the Debtor intends to continue with its misguided plan process, the Court should, at a minimum, require that the Debtor amend its Plan to address its clear defects, and submit a revised Disclosure Statement for consideration by creditors and the Court.

**B.    The Plan Cannot Be Confirmed Because It Has Been Proposed in Bad Faith and to Gain an Improper Litigation Advantage**

Bankruptcy Code section 1129(a)(3) provides that a plan must be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. 1129(a)(3).  The Bankruptcy Code does not define "good faith" for purposes of section 1129(a)(3).

However, "[a] proposed plan does not meet the good faith standard… if it is intended 'to obtain tactical litigation advantages' that are 'not within the legitimate scope of the bankruptcy laws.'" *Fireman's Fund Ins. Co. v. Plant Insulation Co.* (*In re Plant Insulation Co.*) 485 B.R. 203, 232 (N.D. Cal. 2012)  (quoting *Official Comm. of Unsecured Creditors v. Nucor Corp.* (*In re SGL Carbon Corp.*), 200 F.3d 154, 167-169 (3d Cir. 1999)); *see also In re Silberkraus*, 253 B.R. 890, 902 (Bankr. C.D. Cal. 2000), *aff'd by* 336 F.3d 864 (9th Cir. 2003) (finding chapter 11 case to be in bad faith where debtor filed bankruptcy "to obstruct, delay, and stay the ongoing pending state court specific performance litigation" and debtor's "forum shopping to try to have the bankruptcy court, rather than the state court, determine the validity and enforceability of the option to purchase").

Here, the terms of the Plan are designed to gain improper advantage in the Debtor's and the Limited Partners' litigation with Commonwealth.  The Debtor is not reorganizing.  The Plan is expressly contingent upon the prior closing of the Sale transaction with MED Healthcare, after

8

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 97

BUCHALTER
A Professional Corporation
Los Angeles

which the Debtor will have no operating business or means to generate revenue. *See* Plan Art. XI.A(2). The Plan provides for the immediate distribution of Sale proceeds to Wells Fargo on account of what is essentially the liquidation of Wells Fargo's collateral (which is appropriate). If the Debtor had drafted the Plan in good faith – and without attempting to gain improper litigation advantage for the Limited Partners – the Plan would recognize the realities of the case and simply provide for the prompt wind down of the Debtor's affairs following the payment of Wells Fargo's secured claim.

However, the Limited Partners engineered the Debtor's bankruptcy filing – and now the Plan – in an attempt to stall the State Court Action and improperly shop for their preferred venue. The Plan is a continuation of this effort. For example, after the Effective Date, the Plan is entirely dependent upon the Limited Partner's supposed funding commitments to pay claims. *See* Plan Art. III.C.1 ("The Reorganized Debtor and the New General Partner and Limited Partner of the Reorganized Debtor with loans from the Limited Partners will commit their financial capability and re-capitalization to fund the Plan."). Yet, with respect to the vast majority of unsecured claims – *i.e.*, Wells Fargo's deficiency claim and Commonwealth's claims – the Limited Partners themselves are already liable on the debt as guarantors. The Limited Partners guaranteed the Wells Fargo loan and similarly guaranteed the Debtor's obligations under the asset purchase agreement that forms the basis for Commonwealth's claims. *See, e.g.*, Disclosure Statement § I.B.3 ("After receiving net sale proceeds directly from escrow, Wells Fargo will still be owed money by both: (i) the Debtor (as an under-secured, unsecured claimholder); and (ii) by the Limited Partners who were guarantors of the Debtor's financial obligations to Wells Fargo and against whom Wells Fargo obtained the judgment."). Accordingly, for millions of dollars of unsecured claims proposed to be addressed under the Plan, the Limited Partners are already personally liable. The Debtor's proposal to pay unsecured claims that the Limited Partners themselves have guaranteed under the Plan over 60 months serves no legitimate purpose. But the Debtor and the Limited Partners will undoubtedly use the funding commitment to argue that the State Court Action should remain stayed and not be remanded to Alabama.

9

BUCHALTER
A Professional Corporation
Los Angeles

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 98

**C.    The Plan Cannot Be Confirmed Because It Purports to Restructure the Obligations of the Non-Debtor Limited Partners in Violation of Section 524(e)**

Bankruptcy Code section 524(e) provides, in relevant part, that the "discharge of the debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Ninth Circuit case law makes clear that section 524(e) prohibits a debtor's chapter 11 plan from restructuring claims against non-debtors. *See, e.g.*, *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401-02 (9th Cir. 1995); *In re American Hardwoods*, 885 F.2d 621, 626 (9th Cir. 1989).

The bankruptcy court lacks the power to confirm plans of reorganization which do not comply with applicable provisions of the Bankruptcy Code." *Lowenschuss,* 67 F.3d at 1401. The Ninth Circuit has repeatedly held that section 524(e) "prevents a bankruptcy court from extinguishing claims of creditors against non-debtors over the very debt discharged through the bankruptcy proceedings." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1082 (9th Cir. 2020); *In re Lowenschuss*, 67 F.3d at 1401-02 (collecting cases). "[S]ection 524(e) precludes a co-obligor of a bankrupt debtor from piggybacking on rights the debtor enjoys under the Bankruptcy Code, including the right to discharge or restructure indebtedness. If a co-obligor seeks a discharge or to restructure its liability on a jointly liable claim, section 524(e) effectively requires the co-obligor to commence its own bankruptcy case." *In re Claar Cellars LLC*, 623 B.R. 578, 593 (Bankr. E.D. Wash. 2021); *see also In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610, 615-16 (B.A.P. 9th Cir. 1990) (finding a plan was improperly confirmed where the plan included a five-year injunction against collecting from co-obligors).

Here, Article V.C2 of the Plan purports to restructure Commonwealth's claims against the Limited Partners, who are not debtors in the Chapter 11 Case. *See* Plan Art. V.C.2 ("if Commonwealth obtains a money judgment against the Limited Partners, then Commonwealth will be paid 100 percent of the allowed Claim amount or Judgment amount over a five-year (60-month) period in full satisfaction of the claim…"). Because the Plan attempts to restructure

10

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 99

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

Commonwealth's claims against the Limited Partners, it is not confirmable and the Disclosure Statement should not be approved.

**D.     The Plan Cannot Be Confirmed Because It Impermissibly Purports to Grant a Discharge to a Chapter 11 Debtor Under a Plan of Liquidation**

The discharge provisions of the Plan violate the Bankruptcy Code's prohibition on discharges for entities liquidating their assets and discontinuing their business under a chapter 11 plan. Bankruptcy Code section 1141(d)(3) provides that:

> The confirmation of a plan does not discharge a debtor if –
>
> (A)    the plan provides for the liquidation of all or substantially all of the property of the estate;
>
> (B)    the debtor does not engage in business after consummation of the plan; and
>
> (C)    the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3). Bankruptcy Code section 727(a)(1) provides that the "court shall grant the debtor a discharge, unless…the debtor is not an individual." "Section 727(a)(1) bars a discharge in a chapter 7 case if the debtor is not an individual. Thus, a partnership or corporation is not entitled to a discharge if its plan provides for the liquidation of substantially all of its assets and the debtor does not thereafter continue in business." 8 Collier on Bankruptcy ¶ 1141.05[4] (16th ed. 2021); *see also Um v. Spokane Rock I,* LLC, 904 F.3d 815, 817 (9th Cir. 2018) (citing 11 U.S.C. § 1141(d)(3) with respect to operation of discharge for individual chapter 11 debtor); *Teamsters Pension Trust Fund v. Malone Realty Co.*, 82 B.R. 346, 349 (E.D. Pa. 1988) ("Under § 1141(d)(3), a corporate or partnership debtor that is both liquidating and discontinuing its business does not receive a discharge when its plan is confirmed.").

Here, Article III.A of the Plan purports to satisfy, discharge, and release all claims pursuant to Bankruptcy Code section 1141(d). However, the Plan cannot be confirmed because each of the three elements set forth in section 1141(d)(3) are present here. *First*, the Plan provides for the liquidation of substantially all of the property of the estate. 11 U.S.C. § 1141(d)(3)(A). The Debtor

11

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 100

1    cannot dispute that its business is solely comprised of the Mount Royal Towers facility – and that

2    the Debtor has conditioned the Plan upon the closing of the Sale to MED Healthcare.  *Second*,

3    assuming that the Plan were to be confirmed, the Debtor would plainly not engage in any business

4    following consummation of the Plan.  11 U.S.C. § 1141(d)(3)(B).  The Debtor would have sold its

5    only operating asset and the Plan makes clear that no operating business will remain.  Indeed, the

6    Debtor acknowledges that it will have no means of generating revenue and will be dependent upon

7    the supposed funding commitments of the Limited Partners.  *See* Plan Art. III.C.1    *Third*, the

8    Debtor would be denied a discharge under section 727(a) if the Chapter 11 Case were a chapter 7

9    case.   11 U.S.C. § 1141(d)(3)(C).  The plain language of section 727(a)(1) provides that no

10   discharge shall be granted if "the debtor is not an individual."  11 U.S.C. § 727(a)(1); 8 Collier on

11   Bankruptcy ¶ 1141.05[4]  ("Section 727(a)(1) bars a discharge in a chapter 7 case if the debtor is

12   not an individual.").  Accordingly, the Plan cannot be confirmed, and the Disclosure Statement

13   should not be approved.

14   **E.    The Debtor Has Not Marketed the Post-Confirmation Equity Interests or**
      **Terminated Exclusivity as Required for "New Value" Plans**

15

16        In *203 N. LaSalle Street*, 526 U.S. 434, the Supreme Court held that new value chapter 11

17   plans – *i.e.*, plans that provide reorganized equity interests to old equity holders in exchange for

18   "new value" – cannot be confirmed unless the plan proponent either markets the new equity

19   interests or terminates plan exclusivity.  *See id*.  ("It is enough to say, assuming a new value

20   corollary, that plans providing junior interest holders with exclusive opportunities free from

21   competition and without benefit of market valuation fall within the prohibition of §

22   1129(b)(2)(B)(ii).").

23        The principal response to *203 North LaSalle* at the bankruptcy court
          level has focused on efforts to expose the debtor's equity interests
24        to the market. Courts have had little trouble in refusing to confirm
          new value plans in which the plan proponent has refused to market
25        the interests in the reorganized debtor, such as by conducing an
          auction or something similar. In other cases, courts have permitted
26        new value plans when nonsubordinated creditors were given an
          equal opportunity to bid on the equity in the reorganized debtor. In
27

28                                                12

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4626628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S**
**PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF**
**REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 101

still other cases, courts have looked at the process by which the equity in the reorganized debtor was packaged and marketed to prospective acquirers.

7 Collier on Bankruptcy P 1129.03 (16th ed. 2021).

Here, the Plan purports to be a "new value" plan that grants new equity interests to the Limited Partners in exchange for their supposed funding commitments. *See* Plan Art. X.B. ("Following the Effective Date, the Debtor will be recapitalized by Cash from the New General Partner and the New Limited Partner. In return for Cash and Cash equivalents paid by the Limited Partners, the Limited Partners, Pro Rata, will own the equity interests of the New General Partner and the New Limited Partner in fulfilling their ongoing obligations to fund all Plan required payments."). However, the Debtor has neither marketed such equity interests for overbid nor terminated exclusivity to test whether the Debtor and creditors are obtaining the best terms for the post-confirmation equity interests. The Court cannot therefore confirm the Plan.

## F.    The Plan Impermissibly Classifies Commonwealth's Claim in a Separate Class from Other Unsecured Claims

Section 1122 of the Bankruptcy Code governs the classification of claims and interests and provides that:

> (a)   Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.

> (b)   A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122. "Most courts have agreed that § 1122 contemplates some limits on the separate classification of similar claims." *Barakat v. Life Ins. Co. of Va.* (*In re Barakat*), 99 F.3d 1520, 1524-25 (9th Cir. 1996). "[O]ne clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Id.* at 1525 (quoting *Phoenix Mut. Life Ins. Co. v.*

13

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4626628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 102

*Greystone III Joint Venture* (*In re Greystone III*), 995 F.2d 1274, 1279 (5th Cir. 1991)).  Generally, unsecured claims will comprise a single class, "whether trade, tort, publicly held debt or a deficiency of a secured creditor, because they are claimants of an equal legal rank entitled to share pro rata."  *Oxford Life Ins. Co. v. Tucson Self-Storage* (*In re Tucson Self-Storage*) 166 B.R. 892, 897 (B.A.P. 9th Cir. 1994) (quoting *In re Fairfield Executive Assoc.*, 161 B.R. 595, 600, n.6 (D.N.J. 1993)).

Here, the Debtor has not articulated a valid basis for the separate classification of general unsecured claims of the same priority.  Indeed, all unsecured claims under the Plan – *i.e.*, Wells Fargo's deficiency claim, Commonwealth's claim, and trade debt – are receiving the same treatment, namely, payment in full over 60 months.  The Debtor has stated no basis for why separate classification is appropriate here, and Commonwealth submits that the Debtor has proposed the three unsecured claim classes in a transparent effort to gerrymander an impaired consenting class for purposes of satisfying Bankruptcy Code section 1129(a)(8).

## G.    The Disclosure Statement Should Not Be Approved Because It Does Not Contain Adequate Information

A plan proponent may not solicit the acceptance or rejection of a chapter 11 plan unless the holders of relevant claims or interests are provided with a disclosure statement approved by the bankruptcy court that contains adequate information regarding the proposed plan of reorganization. 11 U.S.C. § 1125(b).  The Bankruptcy Code defines "adequate information" as follows:

> [I]nformation of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).  The purpose of a disclosure statement is to provide sufficient information so that a typical investor can make an informed judgment whether to vote for or against the plan. *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987).  "[C]reditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed

14

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 103

reorganization plan, [therefore] the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).

Courts in the Ninth Circuit have developed a non-exclusive list of disclosure items that should be included in a disclosure statement.[5]  *In re Reilly*, 71 B.R. 132, 134 (Bankr. D. Mont. 1987) (citing *In re Metrocraft Publishing*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)).

A disclosure statement does not contain adequate information when it does not provide information as to the financial wherewithal of parties that are committed to funding payments under the proposed plan.  When a plan is contingent on affiliates' personal contributions, "in order to provide adequate information, Debtor must disclose information regarding [the insider's] financial situation that shows his ability to make such contributions."  *In re Forest Grove, LLC*, 448 B.R. 729, 735 (Bankr. D.S.C. 2011).  In *Forest Grove*, the debtor failed to provide any financial information regarding its insider's ability to make financial contributions to the plan.  *Id.* at 735-36 ("As a result, the Court is left with mere assertions by Debtor and Maxey that Maxey will personally contribute . . . . This is insufficient to provide creditors with adequate information and assurance regarding Debtor's future income."); *see also In re Pac. Shores Dev.*, Inc., 2011 Bankr. LEXIS 785, at *15-16 (Bankr. S.D. Cal. Feb. 25, 2011) (requiring debtor to amend disclosure statement because "Creditors should be informed that the four previous subsidiaries in which they are receiving stock may never again do business and may never have any value.  The possibility of value being received in return for stock to be issued under the Plan is fully dependent upon Debtor's principal choosing to start new business ventures in these entities, which may be unlikely.").

Here, the Plan is expressly dependent upon the supposed commitment of the Limited Partners to fund payments to all classes of unsecured creditors.  *See*, *e.g.*, Disclosure Statement Art.

---

[5] The Ninth Circuit disclosure items include:  (1) the events which led to the bankruptcy filing; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor; (7) the scheduled claims; (8) the estimated return to creditors under a chapter 7 liquidation; (9) the accounting method used to produce financial information and the name of the accountant(s) responsible for the analyses; (10) the future management of the debtor; (11) the chapter 11 plan or a summary thereof; (12) the estimated administrative expenses; (13) the collectability of accounts receivable; (14) financial information, date, valuations or projections relevant to voting; (15) information regarding the risks of the plan; (16) the actual or projected realizable value from avoidances actions; (17) litigation likely to arise in a nonbankruptcy context; (18) debtor's tax attributes; and (19) relationship of the debtor with affiliates.  *See id.*

15

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 4626628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 104

I.A  ("The Debtor is able to offer general unsecured creditors a payment-in-full plan solely based on the willingness of its Limited Partners to provide essential additional funding as provided in and subject to confirmation of the Plan as presented herein.").  The Debtor cannot satisfy its post-confirmation payment obligations under the Plan without the Limited Partner's financial commitment.  The Disclosure Statement, however, fails to provide any information for creditors to use to evaluate the Limited Partners' supposed funding commitments and their financial ability to perform.  The Disclosure Statement does not state whether or not there will be an enforceable agreement between the Debtor and the Limited Partners providing for the funding required under the Plan – or, if such an agreement is contemplated, what the terms are proposed to be.

Even assuming, *arguendo,* that there will be a funding commitment enforceable against the Limited Partners, the Disclosure Statement does not address how creditors would have assurance that the Debtor would actually enforce the Limited Partners' payment obligations.  The Plan provides for the Debtor's existing general partner and Limited Partners to remain in control of the Debtor following the Effective Date.  *See id.* ("To recapitalize the Reorganized Debtor, which will allow the Debtor to perform the Plan, two new corporate entities will be formed by the Limited Partners.  On confirmation, the newly formed entities will become the New General Partner and the New Limited Partner of the Reorganized Debtor.").  The Limited Partners will therefore be on both sides of the purported agreement that forms the basis for the Debtor's supposed financial ability to pay claims under the Plan.  The Disclosure Statement does not describe any independent enforcement mechanism under which creditors would be assured that the Limited Partners could be compelled to make good on their Plan funding commitments.

The Disclosure Statement also provides no information regarding the Limited Partners' financial wherewithal and ability to meet the substantial claims that the Plan proposes to pay in full.  The Disclosure Statement contains no bank statements, financial disclosures or similar information that would afford creditors a basis to evaluate whether to vote to accept or reject a Plan that contains payment terms that are wholly dependent upon the Limited Partners.

16

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

Exhibit 7, Page 105

Accordingly, the Disclosure Statement does not contain adequate information as required under Bankruptcy Code section 1125 and the Court should therefore decline to approve it.

## IV.   __CONCLUSION__

For the reasons set forth in this Objection, Commonwealth respectfully requests that the Court deny approval of the Disclosure Statement and provide for such other and further relief as is just and proper.

DATED:  July 29, 2021                             BUCHALTER
                                                  A Professional Corporation


                                                  By:   /s/ *Julian I. Gurule*

                                                  JULIAN I. GURULE
                                                  ANTHONY J. NAPOLITANO
                                                  BUCHALTER, PC
                                                  1000 Wilshire Boulevard, Suite 1500
                                                  Los Angeles, CA  90017-1730
                                                  Telephone:  213.891.0700
                                                  Fax:  213.896.0400
                                                  E-mail:  jgurule@buchalter.com
                                                  anapolitano@buchalter.com


                                                  RICHARD BROCKMAN (admitted *pro hac vice*)
                                                  BRENT D. HITSON (admitted *pro hac vice*)
                                                  MARC P. SOLOMON (admitted *pro hac vice*)
                                                  BURR & FORMAN LLP
                                                  420 North 20th Street, Suite 3400
                                                  Birmingham, AL  35203
                                                  Telephone:  205.251.3000
                                                  Fax:  205.458.5100

                                                  *Attorneys for Commonwealth Assisted Living,  LLC, Series E*

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 46266628v4 **COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

# Exhibit Index

In re Vestavia Hills, Ltd., dba Mount Royal Towers
Case No. 20-00018-LA11

**COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

| Exhibit No. | Description | Page No.(s) |
|---|---|---|
| 1 | Copies of the relevant pages of the transcript from the November 12, 2020 status conference. | 23 - 27 |

i

# EXHIBIT 1

Exhibit 1 - Page 23

Exhibit 7, Page 108

```
 1              UNITED STATES BANKRUPTCY COURT

 2              SOUTHERN DISTRICT OF CALIFORNIA

 3            JUDGE LOUISE DECARL ADLER, PRESIDING

 4

 5

 6   IN THE MATTER OF:              )
                                    )
 7                                  )
     VESTAVIA HILLS, LTD.           )
 8   _____) CASE NO. 20-00019-LA
                                    )
 9   VESTAVIA HILLS, LTD., DBA      ) ADV. NO. 20-90029
     MT. ROYAL TOWERS,              )
10                                  )
                         PLAINTIFF, )
11                                  )
     v.                             )
12                                  )
                                    )
13   COMMONWEALTH ASSISTED LIVING, LLC., )
                                    )
14                                  )
                         DEFENDANT. )
15   _____)

16

17     1)   STATUS CONFERENCE ON DEBTOR'S MOTION TO QUASH SUBPOENA
            OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER
18          (FR. 8/6/20);

19     2)   STATUS CONFERENCE ON PLAINTIFF'S MOTION FOR A
            PROTECTIVE ORDER (FR. 8/6/20).
20

21

22
                 REPORTER'S TRANSCRIPT OF PROCEEDINGS
23
                      SAN DIEGO, CALIFORNIA
24
                 THURSDAY, NOVEMBER 12, 2020
25

26
     U.S. BANKRUPTCY COURT              BY PATRICIA A. CALLIHAN
27   DEPARTMENT NO. 2                   CSR 13375
     325 W. F STREET
28   SAN DIEGO, CA  92101
```

Case 20-00018-LA11    Filed 07/30/21    Entered 07/30/21 15:16:40    Doc 532    Pg. 26 of 120
20-00018 (20-90029)                                                    Exhibit 1 Page 26
THURSDAY, NOVEMBER 12, 2020

2

```
 1                              APPEARANCES

 2

      FOR THE PLAINTIFF/DEBTOR:
 3
      SULLIVAN HILL
 4    BY JAMES P. HILL
      600 B STREET, 17TH FLOOR
 5    SAN DIEGO, CALIFORNIA  92101

 6

      FOR BUYER MEDHEALTH CARE:
 7
      POLSINELLI
 8    BY RANDYE B. SOREF
      2049 CENTURY PARK EAST, SUITE 2000
 9    LOS ANGELES, CALIFORNIA  90067

10

      FOR WELLS FARGO BANK:
11
      SHEPPARD MULLIN
12    BY J. BARRETT MARUM
      501 WEST BROADWAY, 19TH FLOOR
13    SAN DIEGO, CALIFORNIA  92101

14

      FOR COMMONWEALTH ASSISTED LIVING:
15
      BUCHALTER
16    BY JULIAN GURULE
      1000 WILSHIRE BOULEVARD, SUITE 1500
17    LOS ANGELES, CALIFORNIA  90017

18

      FOR GUARANTORS AND LIMITED PARTNERS:
19
      PROCOPIO CORY HARGREAVES & SAVITCH
20    BY WILLIAM A. SMELKO
      525 B STREET, SUITE 2200
21    SAN DIEGO, CALIFORNIA  92101

22

      FOR THE UNITED STATES TRUSTEE:
23
      OFFICE OF THE UNITED STATES TRUSTEE
24    BY DAVID M. ORTIZ
      880 FRONT STREET, SUITE 3230
25    SAN DIEGO, CALIFORNIA  92101

26

27

28
```

UNITED STATES BANKRUPTCY COURT

Case 20-00018-LA11   Filed 07/30/21   Entered 07/30/21 15:16:40   Doc 592   Pg. 27 of 126
20-00018 (20-90029)                                    THURSDAY, NOVEMBER 12, 2020
28

26

 1   TO RULE ON IT --

 2            THE COURT:  RIGHT.  RIGHT.  I REMEMBER THAT.

 3            WHAT I'M CONCERNED ABOUT IS THIS, MR. GURULE.  SOME

 4   OF THIS MIGHT GO BY THE BY IN THE EVENT THAT THE DEBTOR

 5   CLOSES BY THE END OF JANUARY OR IF CLOSING SEEMS IMMINENT.

 6   AND MY CONCERN IS RUNNING UP THE BILL EVEN MORE ON LITIGATION

 7   THAT IS REALLY -- BASICALLY IS NOT REALLY A LIVE CONTROVERSY

 8   BECAUSE THERE'S NO LONGER A MATTER BEFORE THIS COURT.  FOR

 9   EXAMPLE, IF THE DEBTOR CLOSES, I SUPPOSE THERE'S A STAY WE

10   STILL HAVE TO DEAL WITH, BUT IT'S A VASTLY DIFFERENT

11   LANDSCAPE AT THAT POINT.  SO I'M TRYING TO GET AN IDEA -- I

12   DON'T MIND LOOKING AT THE PROSPECT OF SETTING THESE FOR

13   HEARING, BUT I DON'T THINK IT WILL BE A HEARING ON THE

14   SUBSTANCE OF THE MOTIONS ON THE JANUARY 28TH DATE, JUST

15   BECAUSE I DON'T WANT THE DEBTOR TO BE SPENDING ITS

16   TIME -- AND I DON'T WANT MR. SMELKO TO BE SPENDING HIS

17   CLIENT'S MONEY -- ON DEFENSE OF THESE MOTIONS IF THE TIME

18   COULD BE BETTER SERVED IN GETTING THIS MATTER CLOSED AS A

19   SALE.  SO WHILE I'M WILLING TO HAVE IT ON THE CALENDAR FOR

20   THE PURPOSES OF DISCUSSING A TIMETABLE FOR

21   BRIEFING -- ADDITIONAL OR SUPPLEMENTAL BRIEFING ON THESE

22   MOTIONS, I DON'T THINK -- I'M CERTAINLY NOT GOING TO REQUIRE

23   THE OPPOSING PARTIES TO BE FILING PLEADINGS IN TIME FOR THAT

24   HEARING.  SO YOU'RE LOOKING AT A FURTHER DELAY; YOU DO

25   UNDERSTAND THAT?

26            MR. GURULE:  YES, YOUR HONOR.  AND THAT I THINK IS

27   CONSISTENT WITH WHAT YOUR HONOR HAS OBSERVED BEFORE IN TERMS

28   OF TIMING.  BUT I WAS SUGGESTING ALSO THAT WE JUST SCHEDULE A

1  STATE OF CALIFORNIA

2

3  COUNTY OF SAN DIEGO

4

5          I, PATRICIA A. CALLIHAN, COURT REPORTER, DO HEREBY

6  CERTIFY:

7          THAT I REPORTED IN SHORTHAND THE PROCEEDINGS HELD

8  IN THE FOREGOING CAUSE ON THE 12TH DAY OF NOVEMBER, 2020;

9  THAT MY NOTES WERE LATER TRANSCRIBED INTO TYPEWRITING UNDER

10 MY DIRECTION; AND THAT THE FOREGOING TRANSCRIPT CONTAINS A

11 CORRECT STATEMENT OF THE PROCEEDINGS.

12

13         DATED THIS 19TH DAY OF NOVEMBER, 2020.

14

15                          /s/ Patricia A. Callihan
                            Patricia A. Callihan, CSR No. 13375
16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES BANKRUPTCY COURT

Exhibit 1 - Page 27
Exhibit 7, Page 112

Name, Address, Telephone No. & I.D. No.
JULIAN GURULE (SBN: 252160)
BUCHALTER
A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA  90017-1730
Telephone: 213.891.0700
Fax: 213.896.0400
Email:  jgurule@buchalter.com
Counsel for Commonwealth Assisted Living LLC Series E

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

In Re
VESTAVIA HILLS, LTD.,
DBA MOUNT ROYAL TOWERS

Debtor.

BANKRUPTCY NO. 20-00018-LA11

N/A

Plaintiff(s)

ADVERSARY NO.

v.
N/A

Defendant(s)

# PROOF OF SERVICE

I, Shirlene Martin am a resident of the State of California, over the age of 18 years,

and not a party to this action.

On 7/30/2021 , I served the following documents:
**COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S OBJECTION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED JULY 2, 2021**

1. **To Be Served by the Court via Notice of Electronic Filing ("NEF")**:

Under controlling Local Bankruptcy Rules(s) ("LBR"), the document(s) listed above will be served by the court via NEF and hyperlink to the document. On 7/30/2021 , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the e-mail address(es) indicated and/or as checked below:

- John Cannizzaro    john.cannizzaro@icemiller.com
- Kathleen A. Cashman-Kramer    Cashman-Kramer@Sullivanhill.com, kathylaw@san.rr.com;Rudolph@sullivanhill.com;hill@sullivanhill.com;bkstaff@sullivanhill.com;Rudolph@ecf.inforuptcy.com;cashman-kramer@ecf.inforuptcy.com
- Glen F. Dorgan    glen.dorgan@usdoj.gov, Brenda.seyler@usdoj.gov
- Ajay Gupta    ajay@guptalc.com, guptaar87864@notify.bestcase.com
- Julian Gurule    jgurule@buchalter.com, smartin@buchalter.com;docket@buchalter.com
- Christopher V. Hawkins    hawkins@sullivanhill.com, hill@sullivanhill.com;cashman-kramer@sullivanhill.com;bkstaff@sullivanhill.com;vidovich@ecf.inforuptcy.com;hawkins@ecf.inforuptcy.com
- James P. Hill    Hill@sullivanhill.com, hawkins@sullivanhill.com;bkstaff@sullivanhill.com;vidovich@ecf.inforuptcy.com;hill@ecf.inforuptcy.com;cashman-kramer@sullivanhill.com
- J. Barrett Marum    bmarum@sheppardmullin.com, egarcia@sheppardmullin.com
- David Ortiz    david.a.ortiz@usdoj.gov, USTP.REGION15@USDOJ.GOV;tiffany.l.carroll@usdoj.gov;abram.s.feuerstein@usdoj.gov
- William A. Smelko    bill.smelko@procopio.com, kristina.terlaga@procopio.com;calendaring@procopio.com
- Randye B. Soref    rsoref@polsinelli.com
- United States Trustee    ustp.region15@usdoj.gov

CSD 3010
BN 46416072v1

American LegalNet, Inc.
www.FormsWorkFlow.com

☐    Chapter 7 Trustee:

☒    For Chpt. 7, 11, & 12 cases:          ☐   For ODD numbered Chapter 13 cases:          ☐   For EVEN numbered Chapter 13 cases:

UNITED STATES TRUSTEE              THOMAS H. BILLINGSLEA, JR., TRUSTEE              DAVID L. SKELTON, TRUSTEE
ustp.region15@usdoj.gov              Billingslea@thb.coxatwork.com              admin@ch13.sdcoxmail.com
                                                                                      dskelton13@ecf.epiqsystems.com

2.    **Served by United States Mail**:

     On 7/30/2021                    , I served the following person(s) and/or entity(ies) at the last known
address(es) in this bankruptcy case or adversary proceeding by placing accurate copies in a sealed envelope in the
United States Mail via 1) first class, postage prepaid or 2) certified mail with receipt number, addressed as follows:

See attached list.

3.    **Served by Personal Delivery, Facsimile Transmission, Overnight Delivery, or Electronic Mail**:

     Under Fed.R.Civ.P.5 and controlling LBR, on  7/30/2021                    , I served the following person(s)
and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile
transmission, by overnight delivery and/or electronic mail as follows:

VIA FEDERAL EXPRESS

Honorable Judge Louise D. Adler
U.S. Bankruptcy Court – Southern District
 Jacob Weinberger United States Courthouse
325 West F Street
San Diego, California 92101kruptcy Court, - Southern District

     I declare under penalty of perjury under the laws of the United States of America that the statements made
in this proof of service are true and correct.

Executed on   7/30/2021                              Shirlene Martin  /s/ *Shirlene Martin*
          (Date)                                      (Typed Name and Signature)

                                                   Buchalter, 1000 Wilshire Blvd., Suite 1500
                                                      (Address)

                                                   Los Angeles, CA 90017
                                                      (City, State, ZIP Code)

CSD 3010
BN 46416072v1

American LegalNet, Inc.
www.FormsWorkFlow.com

## SERVICE LIST
### In re Vestavia Hills, Ltd: Case No. 20-00018-LA11

VIA U.S. MAIL

| The United States Trustee | |
|---|---|
| | Office of the United States Trustee<br>Attn: United States Trustee<br>880 Front Street, Suite 3230<br>San Diego CA 92101 |
| **All secured creditors** | |
| | Wells Fargo, N.A.<br>Attn: DA<br>One West 4th Street<br>Third Floor, MAC D40D0-030<br>Winston Salem, NC 27101 |
| | Baker Donelson/Tim Lupinacci<br>Patton Hahn Matt Cahill<br>1400 Wells Fargo Tower, 420 20th Street North Birmingham, AL 35203 |
| | Gordon Food Service, Inc.<br>P.O. Box 88029<br>Chicago, IL  60680-1029 |

| 20 Largest Unsecured Creditors | | |
|---|---|---|
| American Lighting Inc.<br>P.O. BOX 10872<br>Birmingham, AL 35202 | Ameripride Services Inc.<br>P.O. BOX 1564<br>Bemidji, MN 56619-1564 | ActivCare Living<br>9619 Chesapeake Dr., Ste. 103<br>San Diego, CA 92123 |
| Calvin Anthony Morris<br>216 Mamie Lane<br>Birmingham, AL 35215 | Cantata Health<br>fka NTT Data<br>P.O. Box 123875<br>Dallas, TX 75312-3875 | Custom Medical Solutions<br>7100 Northland Circle, #410<br>Brooklyn Park, MN 55428 |
| Elisabeth Eisner<br>4040 Porte de Palmas<br>Suite 32<br>San Diego, CA 92122 | Felder Services, LLC<br>P.O. Box 70171<br>Mobile, AL 36670 | Just Medical Inc.<br>1071 Jamestown Blvd., Unit D-6<br>Watkinsville, GA 30677 |
| Malimar Technology Group<br>P.O. Box 880595<br>San Diego, CA 92168 | McKesson<br>P.O. Box 630693<br>Cincinnati, OH 45263-0693 | Medico, Inc.<br>1600 7th Street North<br>Clanton, AL 35045 |
| Mobilex USA<br>P.O. Box 17462<br>Baltimore, MD 21297 | Nutrition Systems Consulting<br>404 Legacy Park #A<br>Ridgeland, MS 39157-4315 | ~~Omnicare, Inc.~~ Undeliverable<br>~~Dept 781668~~<br>~~Detroit, MI 48278-1668~~ |
| Pointclickcare Tech. IN<br>P.O. Box 674802<br>Detroit, MI 48267 | Restore Therapy Services<br>245 Cahaba Valley Parkway, #2<br>Pelham, AL 35124 | Seniors Resource Guide<br>P.O. Box 6027<br>Denver, CO 80206 |
| Trinity Contractors LLC<br>561 Simmons Drive<br>Trussville, AL 35173 | Willis of Alabama<br>P.O. Box 730416<br>Dallas, TX 75373 | Omnicare, Inc.<br>8220 Remmet Ave.<br>Canoga Park, CA 91304 |

| Others | |
|---|---|
| | Andy Campbell, Managing Partner<br>Harris Haggod<br>Campbell Partners<br>505 20th St N, Suite 1600<br>Birmingham, AL 35203 |
| | Virginia Moore-Bell, Director<br>Tammy Holman/TaRhonda Wiggins<br>Office of State Long-Term Care<br>Ombudsman Program<br>Alabama Department of Senior Services<br>201 Monroe Street, Suite 350<br>Montgomery, AL 36130<br>*Patient Care Ombudsman Appointed by U.S. Trustee* |

| Government Agencies | |
|---|---|
| | **SEC**<br>Bankruptcy Counsel<br>444 South Flower Street, Suite 900<br>Los Angeles, CA 90071 |
| | **IRS**<br>Centralized Insolvency Operation<br>Post Office Box 7346<br>Philadelphia, PA 19101-7346 |
| | Alabama Department of Revenue<br>Legal Division<br>P.O. Box 320001<br>Montgomery, AL 36132-0001 |

# EXHIBIT 8

SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
James P. Hill, SBN 90478
Christopher V. Hawkins, SBN 222961
Kathleen Cashman-Kramer, SBN 128861
600 B Street, 17th Floor
San Diego, California 92101
Telephone: (619) 233-4100
Fax Number: (619) 231-4372
Attorneys for Debtor and Debtor In Possession,
Vestavia Hills, Ltd., dba Mount Royal Towers

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 20-00018-LA11 |
| VESTAVIA HILLS, LTD., | Chapter 11 |
| DBA MOUNT ROYAL TOWERS, | **DEBTOR'S [PROPOSED] FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED AUGUST 6, 2021** |
| Debtor. | Date.:   TO BE SET |
| | Time: |
| | Dept.:   2 |
| | Judge:   Hon. Louise DeCarl Adler |

# ARTICLE I:    INTRODUCTION

Vestavia Hills, Ltd., an Alabama limited partnership (the "Debtor"), debtor and debtor in possession in the above-referenced Chapter 11 case, commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on January 3, 2020.

*The Debtor is the proponent (the "Proponent") of this First Amended Chapter 11 Plan of Reorganization dated August 6, 2021 (the "Plan") within the meaning of Bankruptcy Code § 1129*, and submits this Plan pursuant to Bankruptcy Code § 1121(a) and requests confirmation of the Plan pursuant to Bankruptcy Code § 1129.  In summary, this Plan provides for payment to holders of allowed claims. The timing of the Plan payments to particular creditor groups will depend upon their classification under the Plan.  <u>The Effective Date of the Plan shall be November 15, 2021.</u>

A DISCLOSURE STATEMENT DESCRIBING THE CHAPTER 11 PLAN OF REORGANIZATION (the "Disclosure Statement") accompanies this Plan. Reference is made to the Disclosure Statement for a discussion: (1) of the Debtor's history, business, and results of operations and properties; (2) regarding the reorganization process; and (3) of a summary and analysis of the Plan and confirmation related matters.

All holders of claims and interests entitled to vote to accept or reject the Plan should read the Plan and Disclosure Statement in their entirety before voting to accept or reject the Plan. No solicitation materials, other than the Disclosure Statement and the materials transmitted with it have been approved by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

## ARTICLE II:    DEFINITIONS, INTERPRETATIONS & RULES OF CONSTRUCTION

### A.    Definitions

For the purposes of the Plan, the following terms shall have the respective meanings set forth in this Article II. Any term used in this Plan not defined, but used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.    **"Accounts Payable Post-Petition Claim"** means Claims of third parties arising after the Petition Date for the purchase of merchandise, supplies, utilities and other non-employee related expenses incurred in the ordinary course of business.

2.    **"Administrative Claim"** means a Claim for costs and expenses of administration under §§ 503, 507(a)(2), 507(a)(3), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the commencement of the Chapter 11 Case for preserving the Debtor's Estate and operating the Debtor's business, such as wages, salaries or commissions for services); (b) compensation for legal, accounting and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code §§ 330(a) or 331; (c) all payments made to cure defaults under executory contracts and leases the Debtor has assumed; and (d) all fees and charges assessed against the Debtor under § 1930 of Title 28 of the United States Code.

3.    **"Administrative Claim Bar Date"** means the deadline of April 9, 2021, as set by the Order entered March 1, 2021 (ECF #470), the date by which anyone asserting an administrative claim (other than the

exceptions enumerated in the order) must file its proof of an Administration Claim.

4.    **"Allowed"** when used with respect to a Claim other than an Administrative Claim, means a Claim: (a) either, (i) scheduled by the Debtor pursuant to the Bankruptcy Code, other than a Claim scheduled as disputed, contingent, or unliquidated, or (ii) proof of which has been timely filed pursuant to the Bankruptcy Code and any order of the Bankruptcy Court, or late filed with leave of the Bankruptcy Court after notice and a hearing; and as to which (b) either: (i) no objection to the allowance of which has been filed within the periods of limitation fixed by the Plan or an order of the Bankruptcy Court, (ii) any objection to the allowance of which has been overruled by a Final Order, or (iii) which has otherwise been Allowed by a Final Order or this Plan only to the extent that it has been so Allowed.

5.    **"Allowed Administrative Claim"** means all or that portion of any Administrative Claim which either: (a) has become Allowed by a Final Order; or (b) was incurred in the ordinary course of business during the Case, is not disputed by the Debtor and is due and owing under the terms and conditions of any agreements or applicable law.

6.    **"Amount"** means, with respect to: (i) an Allowed Claim, the Amount of such Allowed Claim; and (ii) with respect to a Disputed Claim, the estimated Amount of such Disputed Claim, determined in accordance with Plan Article IX, ¶A.2.

7.    **Allowed Wells Fargo Section 506 Bifurcated Judgment Claim"** means an Allowed unsecured claim against the Debtor, arising from the unsecured portion of Wells Fargo Bank, N.A.'s claim, not entitled to priority under Bankruptcy Code § 507(a) in an amount to be determined by the Bankruptcy Court based upon the net amount owed to Wells Fargo Bank by the Limited Partners on the Alabama Judgment following credit against the

Judgment amount being applied for payments made to Wells Fargo Bank during the Chapter 11 Case, including payment of the Class 1 Claim.

8. **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended and codified in Title 11 United States Code, 11 U.S.C. §§ 101–1532, and applicable to cases filed as of the Petition Date.

9. **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of California or such other court as may have jurisdiction over the Chapter 11 Case.

10. **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, as amended from time to time, and any local Bankruptcy Court rules.

11. **"Bar Date"** means July 6, 2020, the bar date for filing certain proofs of Claim or Interest in the Chapter 11 Case.

12. **"Business Days"** means each Monday, Tuesday, Wednesday, Thursday and Friday, which is not a day on which banking institutions in New York are authorized or obligated by law, governmental decree, or executive order to be closed.

13. **"Chapter 11 Case"** means this Chapter 11 case filed in the Bankruptcy Court entitled "In re Vestavia Hills, Ltd., dba Mount Royal Towers, Debtor," Case No. 20-00018-LA11, under Chapter 11, Title 11 of the Bankruptcy Code.

14. **"Cash"** shall mean United States currency, a certified check, a cashier's check or a wire transfer of good funds from any source, or a check from the Reorganized Debtor.

15. **"Claim"** means a claim against the Debtor as defined in Bankruptcy Code § 101(5).

16. **"Claimant"** means the holder of a Claim.

17. **"Class"** means a class of Claims against or Interests in the Debtor.

18. **"Commonwealth"** means Commonwealth Assisted Living, LLC, Series E.

19. **"Commonwealth Case**" means: (i) the removed Adversary Proceeding case originally filed by Commonwealth in the State Courts of Alabama and which was removed to Alabama Federal Court and then subsequently transferred to the Bankruptcy Court entitled "*Commonwealth Assisted Living, LLC, Series E v. Vestavia Hills, Ltd., Judith A. Chance, Karen McElliott, Frank A. Virgadamo, Connie Virgadamo, B. Renee Barnard, Charles Barnard and Jack L. Rowe*," Case No. 20-00018-LA11, Adversary No. 20-90060-LA; and (ii) all claims objections, requests for affirmative relief and other litigation or disputed brought or Filed against Commonwealth. Additionally, the individual defendants in the removed Adversary Proceeding, Judith A. Chance, Karen McElliott, Frank A. Virgadamo, Connie Virgadamo, B. Renee Barnard, Charles Barnard and Jack L. Rowe are referred to in this Plan as being the "Limited Partners."

20. **"Confirmation"** means the entry of the Confirmation Order.

21. **"Confirmation Hearing Date"** means the hearing before the Bankruptcy Court on Plan Confirmation and any continued hearing date(s).

22. **"Confirmation Order"** means the order issued by the Bankruptcy Court confirming the Plan.

23. **"Consummation Date"** means the Business Day on which all conditions to Plan consummation set forth in Article XI are satisfied or waived.

24. **"Damages"** means any loss, liability, claim, damage, expense (including, without limitation, costs of investigation and defense and reasonable attorneys' fees and expenses) or diminution of value.

25. **"Disclosure Statement"** means the Disclosure Statement (and all exhibits and schedules annexed to or referenced in the Disclosure Statement) relating to the Plan that was approved pursuant to Bankruptcy Code § 1125 by a Bankruptcy Court order, as amended, modified, or supplemented.

26. **"Disputed Claim"** means, for the purpose of receiving Plan distributions: (a) a Claim, as to which, if no Proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such Claim has been scheduled by the Debtor in its schedule of liabilities as other than disputed, contingent or unliquidated, the Debtor has Filed an objection by the Effective Date; or (b) a Claim as to which, if a Proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law, an objection has been timely Filed by the Debtor or any other party in interest and such objection has not been withdrawn on or before any date fixed by the Plan or order of the Bankruptcy Court for Filing such objections and such objection has not been denied by a Final Order.  For the purpose of receiving Plan Distributions, a Claim or Claims asserted in a Proof of Claim shall be considered a Disputed Claim in its entirety if an objection is timely filed to any portion of such Claim or Claims.

27. **"Disputed Claims Reserve Account"** means the Amount of Cash or other property that would have been distributed to Allowed Disputed Claims.

28. **"Disputed Unsecured Commonwealth Claim"** means the disputed unsecured Class 3A Claim of Commonwealth against the Debtor, arising from Commonwealth's claim, not entitled to priority under Bankruptcy Code § 507(a), in an amount to be determined by the Bankruptcy Court.

29. **"Disputed Unsecured SBA Claim"** means the disputed unsecured Class 3B Claim of the SBA against the Debtor, arising from the SBA's claim,

not entitled to priority under Bankruptcy Code § 507(a), in an amount to be determined by the Bankruptcy Court.

30. **"Distribution"** means the distribution of Cash or other property required under the Plan.

31. "**Distribution Fund"** means the fund established pursuant to the Plan, out of which certain Distributions will be made.

32. **"Effective Date"** means November 15, 2021.

33. **"Estate"** means the Chapter 11 Bankruptcy Estate including all property interests as defined in Bankruptcy Code § 541.

34. **"Excess Reserve"** means any Unclaimed Distributions described in Plan Article IX(A).

35. **"Filed"** means filed with the Bankruptcy Court in the Debtor's Case.

36. **"Final Order"** means an order or a judgment which has not been reversed or stayed and as to which: (i) the time to appeal or seek review, rehearing or certiorari has expired; and (ii) no appeal or petition for review, rehearing or certiorari is pending.

37. **"General Unsecured Claims"** means all Unsecured Claims not entitled to priority (excluding the Allowed Wells Fargo Section 506 Bifurcated Judgment Claim, the Disputed Unsecured Commonwealth Claim, and the Disputed Unsecured SBA claim, as defined herein).

38. **"Interests"** means the legal, equitable and contractual rights represented by any Debtor equity security defined in Bankruptcy Code § 101(16), and includes any references to any pre-petition or post-confirmation Interests. Post-Confirmation a one percent (1%) general partnership equity ownership interest of the Reorganized Debtor will be held by a corporate entity to be formed after voting on the Plan is concluded (the "New General Partner") and a ninety-nine percent limited partnership equity ownership

**Debtor in Possession's [Proposed] First Amended Plan of Reorganization Dated 08/06/21 Case No. 20-00018-LA11**

interest of the Reorganized Debtor will be held by a separate corporate entity to be formed after voting on the Plan is concluded (the "New Limited Partner").

39. **"Legal Proceeding(s)"** means a judicial, administrative, or arbitration action, lawsuit, proceeding (public or private), or other governmental proceedings.

40. **"Litigation Proceeds"** means the monetary damages recovered by the Debtor or by the Debtor's Limited Partners from Commonwealth.

41. **"Petition Date"** means January 3, 2020.

42. **"Plan"** means the Debtor in Possession's First Amended Plan of Reorganization Dated August 6, 2021, including, without limitation, any modifications, or amendments thereto.

43. **"Post-Petition Accrued Wages and Other Claims"** means Claims arising after the Petition Date for employee or management related costs incurred in the ordinary course of business, including salaries, commissions, management fees, payroll withholdings and contributions to any employee benefit plans.

44. **"Professionals"** means all professionals, firms, or entities employed in the Chapter 11 Case pursuant to Bankruptcy Code §§ 327 or 1103, and all professionals seeking compensation or reimbursement of expenses pursuant to Bankruptcy Code § 503(b)(4).

45. **"Pro Rata"** means with respect to Allowed Claims or Interests in the same Class, the proportion that the dollar amount of an Allowed Claim or Interest bears to the aggregate dollar amount of all Allowed Claims or Interests of that Class or group of Interests.

46. "**Real Property**" means that certain real property and the continuing care retirement community located thereon commonly known as Mount Royal Towers located in Birmingham, Alabama.

Debtor in Possession's [Proposed] First Amended Plan of Reorganization Dated 08/06/21 Case No. 20-00018-LA11

47. **"Reorganized Debtor"** means the Debtor as reorganized under the Plan.

48. **"Reserve Amounts"** means the Amount of Cash or other property required to be deposited in the Disputed Claims Reserve Account on account of Disputed Claims.

49. **"SBA"** means the Small Business Administration, and its administrator and agents, as named in the action entitled *Vestavia Hills vs. The Small Business Administration, et al.*, adversary no. 20-90073, and the related appeal presently pending before the Ninth Circuit Court of Appeals entitled *Vestavia Hills, Appellant, vs. The Small Business Administration, et al., Appellees*, appeal no. 21-55547.

50. **"Secured Claim"** means a Claim to the extent of the value of any Lien on or security interest in property of the Debtor that secures payment of such Claim.

51. **"Tax Claim"** means an Allowed priority Claim for taxes of the kind specified in Bankruptcy Code § 507(a)(8).

52. **"Unclaimed Distribution(s)"** means those Distributions held by the disbursing agent for the benefit of the holders of Allowed Claims who have failed to request and acquire such Distributions.

53. **"Unsecured Claim(s)"** means all unsecured claims against the Debtor, except the Allowed Wells Fargo Section 506 Bifurcated Judgment Claim, the Disputed Commonwealth Unsecured Claim, and the Disputed Unsecured SBA claim, as defined herein, not entitled to priority under Bankruptcy Code § 507(a).

**B.    Rules of Interpretation, Computation of Time and Governing Law**

**1.    Rules of Interpretation:**

a.    The words "herein, "hereof, "hereto," "hereunder" and others of similar usage refer to this Plan as a whole and not to any particular article,

section, subsection, paragraph or clause contained in this Plan, unless a particular reference is stated.

b.    Any reference to the word "on" shall mean "on or about."

c.    Any reference to the word "including" shall mean "including without limitation."

d.    Unless specified otherwise in a particular reference, a reference in this Plan to a particular Article, Section, Subsection, Paragraph or Exhibit of this Plan is a reference only to that Article, Section, Subsection, Paragraph or Exhibit.

e.    Unless otherwise specified in a particular reference, all references in the Plan to Articles, Sections, Subsections, Paragraphs or exhibits are references to Articles, Sections, Subsections, Paragraphs or exhibits of or to the Plan.

f.    Any reference in this Plan to a document being in a particular form means that the document shall be in substantially such form.

g.    Any reference in this Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit as it may have been amended, modified or supplemented from time to time prior to the date hereof, unless a particular reference is stated.

h.    Whenever it is appropriate in context, each term stated in either the singular or the plural shall include both the singular and the plural.

i.    Captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.

j.    In addition to the foregoing, the rules of construction set forth in Bankruptcy Code § 102 shall apply to this Plan.

k.      All exhibits and schedules to the Disclosure Statement are incorporated into the Plan, and shall be deemed to be included in the Disclosure Statement, as well, regardless of when they are filed.

### C.      Computation of Time

In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

### D.      Section Numbers

References in this Plan and the Disclosure Statement to a Code section, or to the Bankruptcy Code, are references to the United States Bankruptcy Code (Title 11 of the United States Code) except as otherwise indicated.

## ARTICLE III:    CLASSIFICATION OF CLAIMS OR INTERESTS

As required by the Bankruptcy Code, the Plan separates Claims and Interests into various categories and classes according to the nature and legal rights associated with such Claims and Interests.  All Claims and Interests, except for Administrative Claims and Tax Claims, are placed in the Classes set forth below. In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims and Tax Claims have not been classified. Holders of unclassified Claims not considered impaired and not entitled to vote on the Plan; rather the holders of unclassified, unimpaired Claims and Interests are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  The Debtor is not aware of any Tax Claims.

A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that the Claim or Interest is an Allowed Claim or Allowed Interest.  The Plan designates which classes are impaired and which classes are unimpaired, as applicable.  The Plan also describes the treatment each class will receive under the Plan.  The Proponent will ask the Bankruptcy Court to confirm its

Plan pursuant to Bankruptcy Code § 1129(b) if any impaired class does not vote to accept the Plan and if the Plan can otherwise be confirmed.

### A.    Class 1

Class 1 consists of the Allowed Secured Claim of Wells Fargo Bank, N.A. ("Wells Fargo") or its successor(s) in interest, if any.

### B.    Class 2

Class 2 consists of the Allowed Wells Fargo Section 506 Bifurcated Judgment Claim, if any.

### C.    Class 3

Class 3 consists of two sub-classes. Class 3A consists of the Disputed Unsecured Commonwealth Claim, if any. Class 3B consists of the Disputed Unsecured SBA Claim, if any.

### D.    Class 4

Class 4 consists of the Claims of Residents of Mount Royal Towers not previously assumed and assigned, if any, as of the Effective Date.

### E.    Class 5

Class 5 consists of all Allowed General Unsecured Claims not included in any other Class.

### F.    Class 6

Class 6 consists of Allowed Claim for taxes other than the kind specified in Code as entitled to priority under Bankruptcy Code § 507(a)(8).

### G.    Class 7

Class 7 consists of two Sub-Classes. Sub-Class 7-A consists of the Allowed pre-petition Unsecured Claims of the Limited Partners of the Debtor. Sub-Class 7-B consists of the Allowed post-petition Claims of the Limited Partners of the Debtor.

### H.    Class 8

Class 8 consists of the Allowed Interests in the Debtor comprised of all existing equity interests as of the Petition Date including the interests of the Debtor's

---

general partner and all limited partners possessing an ownership or equity interest in the Debtor as of the Petition Date.

## ARTICLE IV:    DESIGNATION AND TREATMENT OF UNCLASSIFIED CLAIMS

The following sets forth the designation and treatment of all Unclassified Claims. The Distributions received pursuant to the provisions set forth in this Article IV shall represent full and final satisfaction of all such Unclassified Claims. The following Unclassified Claims are neither classified nor impaired under the Plan and are not entitled to vote on the Plan.

### A.    Administrative Claims

1.    **Description:**  Allowed Administrative Claims are all costs and expenses of administration of the Chapter 11 Case Allowed under Bankruptcy Code § 507(a)(1), including, without limitation, the actual and necessary costs and expenses of preserving the Debtor's Estate and operating its businesses, including wages, salaries, management fees or commissions for services rendered post-petition, any indebtedness or obligation incurred or assumed by the Debtor, as debtor in possession. The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date, unless a particular Claimant agrees to a different treatment, and this Plan so provides.

Further to the various applications to employ Professionals filed with and approved by order of the Bankruptcy Court, as reported in the Debtor's various Chapter 11 Status Reports filed with the Bankruptcy Court, the Debtor has employed various Professionals including Sullivan Hill Rez & Engel, APLC, as General Counsel; Baker Tilly (formerly Squar Milner, LLP) as Accountants; Elisabeth Eisner as Special Transactional Counsel; Campbell Partners, APC as Special Litigation Counsel; and Harbuck Keith & Holmes LLC as Special Alabama Licensing and Regulatory Counsel; and such Professionals are authorized to be paid on an interim basis per such prior orders of the Bankruptcy Court. Additionally, the Bankruptcy Court appointed a

healthcare supervising professional to serve as the Patient Care Ombudsman in the Bankruptcy Case.

The current balance of unpaid Professionals' fee claims, the unpaid claims of other Court appointed officials such as the Patient Care Ombudsman (ECF #60), and the fees owed to the Office of the United States Trustee, will not be classified in the Plan, but will be paid in full by the Debtor on the Effective Date or as the Professionals or claimholders may otherwise agree.

2.      **Treatment:**  All: (i) employees who were scheduled as holders of pre-petition priority wage or benefit claims; (ii) all holders of Allowed Accounts Payable Post-Petition Claims; and (iii) all holders of Allowed Post-Petition Accrued Wages and Other Claims (the "Paid Priority Claims") have been paid the full amount of any such claims pursuant to an Order of the Bankruptcy Court. On the earlier of the Effective Date or the date which is fifteen (15) Business Days following entry of a final Order of the Bankruptcy Court approving the Fees and Costs of professionals or of the ombudsman, or as soon thereafter as is practical, each holder of an Allowed Administrative Claim (including the United States Trustee but excluding holders of Paid Priority Claims) shall receive on account of such Allowed Claim, payment in full in Cash from the Distribution Fund, unless otherwise agreed.

Each Professional employed at the expense of the Debtor's Estate pursuant to Bankruptcy Code §§ 327 and 1103 and an appropriate order of the Bankruptcy Court and the ombudsman, shall be paid the unpaid portion of its Allowed Administrative Claim in Cash from the Distribution Fund. Allowed Accounts Payable Post-Petition Claims and Allowed Post-Petition Accrued Wages and Other Claims shall receive payment in full in Cash from the Reorganized Debtor in the ordinary course of business.  The United States Trustee's Fees will be paid in accordance with 28 U.S.C. § 1930(a)(6).  The Reorganized Debtor  shall be responsible for the

timely payment of all fees incurred after the Effective Date pursuant to 28 U.S.C. § 1930(a)(6).

The United States Trustee's fees shall accrue and be paid on a quarterly basis until a final decree is entered or the case is dismissed or converted.

**3.** **Court Approval of Fees Required:** Requests by Professionals for payment of fees and costs are subject to review and approval by the Bankruptcy Court. Fees of the Court Clerk and the Office of the United States Trustee are not subject to Bankruptcy Court approval and may be paid in the ordinary course of business when due.

## ARTICLE V: DESIGNATION AND TREATMENT OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS

The following provisions describe the designation and treatment of those classified Claims and Interests set forth in Article III which are impaired Classes under the Plan. Each member of the impaired Classes set forth in this Article V is entitled to vote on the Plan. The Distributions received pursuant to this Article V shall represent full and final satisfaction of all such Allowed Claims.

**A.** **The Allowed Class 1 Secured Claim of Wells Fargo Bank, N.A.**

**1.** **Description:** Class 1 consists of the Allowed Secured Claim of Wells Fargo in an amount equal to the net proceeds to be received when the sale of the Debtor's assets to MED closes. The Allowed Secured Claim of Wells Fargo is secured by liens on all pre-petition real and personal property assets of the Debtor subject to Wells Fargo's first priority deed of trust and security agreement perfected by applicable trust deed and UCC-1 filings. The Debtor believes that the fair market value of the assets in which Wells Fargo claims a security interest is $12,000,000 minus the net costs of sale. This value is based on the price available to the Debtor upon closing of the court-approved Bankruptcy Code § 363 sale of Mount Royal Towers real and personal property assets to MED as approved by the Court's order entered August 30, 2020 (ECF #381). Pursuant to Bankruptcy Code § 506 (a), an

allowed claim of a creditor secured by a lien on property in which the estate has an interest is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property and is an unsecured claim to the extent that the value of such creditor's interest is less than the amount of such allowed claim.

　　　　　**2.**　　**Treatment:** The then due and owing amount of the secured portion of the Class 1 Secured Claim will be paid in full by paying to Wells Fargo the net sales proceeds resulting from sale of the Debtor's assets to MED, which net sales proceeds shall be paid to Wells Fargo directly out of escrow, which is expected to close on or before October 31, 2021. Notwithstanding any other provision of this Plan, the Class 1 Secured Claim of Wells Fargo is not discharged.

　　　　　**3.**　　**Impaired/Not Impaired**: The Class 1 Claimant is impaired.

　　　　　**4.**　　**Voting:** The Class 1 Claimant is entitled to vote on the Plan.

　　**B.**　　**The Allowed Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim**

　　　　　**1.**　　**Description:** Class 2 consists of the unsecured portion of the Allowed partially secured and partially unsecured Claim held by Wells Fargo, calculated as being the remaining net amount owed to Wells Fargo on the Effective Date of the Plan based upon on the Federal Court Judgment amount that Wells Fargo obtained on April 16, 2020 against the Limited Partners after applying and deducting as credits all payments received by Wells Fargo from the Debtor and the Limited Partners after January 3, 2020. Wells Fargo's Class 2 Claim is undersecured as provided by Bankruptcy Code § 506.

　　　　　The Debtor believes that the undersecured Amount of the Wells Fargo Judgment Claim is or will be equal to at least $2,500,000. Following payment all net sales proceeds to Wells Fargo from the close of escrow of the Bankruptcy Court-approved sale of the Mount Royal Towers related assets, the Allowed amount of any remaining Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim will be determined by the Bankruptcy Court after notice and opportunity for hearing.

**2.     Treatment:**  The Allowed Amount of any Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim will be paid in full as follows:  (i) monthly Cash payments in the amount of $80,000 on the 15th day of each full calendar month remaining in 2021 following the Effective Date; and (ii) monthly Cash payments in the amount of $165,000 per month beginning on January 15, 2022 and through and including the 24th calendar month following the Effective Date (October 2023), at which time the entire remaining unpaid balance owing on the Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim shall be paid in full by a balloon payment to be made no later than October 31, 2023.  Simple interest at the rate of twenty-two hundredths of one percent (0.22%) per annum shall accrue and be payable on the allowed amount of the Class 2 Claim (as determined by the Court), with each such payment to be applied first to then outstanding interest and then to outstanding principal from the Effective Date of the Plan until the Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim is paid in full, which shall be no later than October 31, 2023.

In addition, the Debtor and Limited Partners intend to continue to pursue legal proceedings and remedies against Commonwealth following the Effective Date of the Plan and through that litigation will seek recovery of Litigation Proceeds including monetary damages, attorneys' fees, and costs in the amount as determined by the Court in connection with the Commonwealth Case.  Following payment by the Debtor of any Litigation Proceeds applied to full payment of the Allowed Amount of any then unpaid Class 5 Claims , the Debtor will apply any excess Litigation Proceeds received by the Debtor, up to the Allowed Amount of any Class 2 Judgment Claim, to payment of the Allowed Amount of any Class 2 Judgment Claim. Notwithstanding any other provision of this Plan, the Class 2 Judgment Claim of Wells Fargo is not discharged.

Following receipt by the Limited Partners of any Litigation Proceeds in connection with the legal proceedings, the Limited Partners will apply any Litigation

Proceeds received by the Limited Partners up to the Allowed Amount of any Class 2 Judgment Claim to payment of the Allowed Amount of any Class 2 Judgment Claim.

Until fully paid, with interest as provided herein, the Class 2 Judgment Claim is not discharged by the Confirmation of the Plan. As to the Debtor, the Reorganized Debtor and the Limited Partners, the Class 2 Judgment Claim and the Alabama Judgment shall not be discharged by reason of the entry of the Order confirming the Plan.

Until fully paid, with interest as provided herein, the Debtor, Reorganized Debtor and the Limited Partners shall not be released and shall not receive a release of the obligations to pay the Class 2 Judgment Claim or to pay the Alabama Judgment.

 **3.** **Impaired/Not Impaired:** The Class 2 Claimant is impaired.

 **4.** **Voting:** The Class 2 Claimant is entitled to vote on the Plan.

**C.** **The Class 3 Disputed Claims**

 **1.** **Class 3A–The Disputed Unsecured Commonwealth Claim**

 **a.** **Description:** Class 3A consists of the Disputed Claim of Commonwealth which the Debtor believes will only include the Disputed Unsecured Commonwealth Claim, if any. The Disputed Unsecured Commonwealth Claim is disputed and unliquidated and was filed as a $0 (Zero) amount claim, and should not be allowed as a Claim against the Debtor, and as such it will receive $0 (Zero) under the Plan, and is, in the Debtor's opinion, therefore unimpaired. The existence and amount of any Class 3A Claim will be determined by the Bankruptcy Court after notice and a hearing.

Commonwealth has litigation pending in the Bankruptcy Court against the Debtor. The Debtor and Limited Partners intend to move for summary judgment in the Commonwealth Case and believe they will be successful on this motion. In the event the Debtor is successful on the motion for summary judgment, or thereafter if a trial on the merits is required, there will not be any Unsecured Commonwealth

Claim. Commonwealth has Filed a Proof of Claim. The Debtor and the Limited Partners intend to pursue objections to the Commonwealth Proof of Claim and to seek affirmative relief from Commonwealth consisting of the Litigation Proceeds.

      **b.**    **Treatment:** The disputed and disallowed Commonwealth Claim will receive nothing under the Plan. The Proof of Claim filed by Commonwealth identifies no damage or claim amount being owed by the Debtor. If the Commonwealth Claim is finally allowed in any amount against the Debtor, or if Commonwealth obtains a money judgment against the Limited Partners, then Commonwealth will be paid 100 percent of its Allowed Class 3 Claim or Judgment in equal quarterly installments of principal and interest over a five-year (60-month) period with simple interest fixed at the federal judgment rate that exists as of the Effective Date, amortized over a five-year (60-month) period commencing upon the order allowing its Claim or Judgment becoming final, with quarterly payments then commencing thereafter to Commonwealth on the 10th day of the first full month following the order approving the Class 3 Claim or judgment becoming final, in full satisfaction of the Class 3 Claim or Judgment.

      **c.**    **Impaired/Not Impaired:** The Class 3A Claimant is disputed and not impaired to the extent that the Commonwealth Claim is determined to be $0 (Zero) consistent with Commonwealth's Proof of Claim.

      **d.**    **Voting:** The Class 3A Claimant is not entitled to vote on the Plan unless the Bankruptcy Court permits Commonwealth to vote on the Plan after a hearing.

    **2.**    **Class 3B–The Disputed Unsecured SBA Claim**

      **a.**    **Description:** Class 3B consists of Disputed Claim of the SBA which the Debtor believes will only include the Disputed Unsecured SBA Claim, if any. The SBA Claim is disputed, as the Debtor believes that the claim, which is based upon the claim asserted by the SBA for repayment by the Debtor of the post-petition Paycheck Protection Program ("PPP") loan that the Debtor received

on July 2, 2020 in the amount of $1,138,105. The Debtor believes that the entire amount of the PPP loan is subject to applicable forgiveness rules, and it has applied for such forgiveness. Accordingly, then the SBA should have no Claim against the Debtor, and as such it will receive $0 (Zero) under the Plan, and is, in the Debtor's opinion, therefore unimpaired. The existence and amount of any Class 3B Claim will be determined by the Bankruptcy Court after notice and a hearing. In the event the Debtor is successful on its forgiveness application, there will not be any Unsecured SBA Claim. If and to the extent the Debtor is not successful in having the Unsecured SBA Claim forgiven or disallowed, the Debtor will pay and satisfy the SBA Claim as provided herein.

> **b.      Treatment:** The disputed and disallowed SBA Claim will receive nothing under the Plan. If the SBA Claim is finally allowed in any amount against the Debtor, then the SBA will be paid 100 percent of its Allowed Class 3B Claim in equal quarterly installments of principal and interest over a five-year (60-month) period with simple interest fixed at one percent (1%) per annum (as provided in applicable SBA regulations governing repayment of any PPP loan not qualified for forgiveness–see https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/first-draw-ppp-loan) amortized over a five-year (60-month) period commencing upon the order allowing the SBA Claim becoming final, with quarterly payments then commencing thereafter to the SBA on the 10th day of the first full month following the order approving the Class 3B Claim becoming final, in full satisfaction of the Class 3B Claim.

> **c.      Impaired/Not Impaired:** The Class 3B Claimant is disputed and not impaired to the extent that the SBA Claim is deemed to be $0 (Zero) at this time.

> **d.      Voting:** The Class 3B Claimant is not entitled to vote on the Plan unless the Bankruptcy Court permits the SBA to vote on the Plan after a hearing.

**D.**    **The Allowed Class 4 Claims of the Residents of Mount Royal Towers**

**1.**    **Description:**  Class 4 consists of the Allowed Claims of the residents of Mount Royal Towers whose Resident Contracts have not been assumed prior to the Effective Date (the "Residents").  The Residents are parties to executory contracts with the Debtor which will be assumed by the buyer of Mount Royal Towers upon the closing of the sale of Mount Royal Towers.

**2.**    **Treatment:**  The Allowed Class 4 Claims of the Residents of Mount Royal Towers whose Resident Contracts have not yet been assumed and assigned are impaired. The Debtor will assume any contracts with the residents of MRT, to the extent not already assumed by the Debtor and assigned to MED pursuant to the terms of the August 30, 2020 Order approving the sale of the MRT assets to MED (ECF #381), on the Effective Date which remain executory on the Effective Date as obligations of the Debtor.  The Debtor will transfer or assign any remaining unassigned Resident Contracts in connection with the proposed sale of the Debtor's assets to MED or in connection with any other potential future sale of the Debtor's assets.  The Confirmation Order constitutes an order approving the assumption of each Resident Contract, as modified.

**3.**    **Impaired/Not Impaired:**  The Class 4 Claimants are impaired.

**4.**    **Voting:**  The Class 4 Claimants are entitled to vote on the Plan.

**E.**    **The Allowed Class 5 Unsecured Claims**

**1.**    **Description:**  Class 5 consists of the Allowed General Unsecured Claims not included in any other Class in amounts to be determined by the Bankruptcy Court, excluding the Claims included in any other Class.

**2.**    **Treatment:**  The Allowed Class 5 Unsecured Claims will be paid in full, with simple interest fixed at the federal judgment rate that exists as of the Effective Date, amortized over a two-year (24-month) period commencing on the Effective Date.  The Class 5 Unsecured Allowed Claims shall be payable in equal

pro rata quarterly installments of principal and interest with each such installment made on the 10th day of each month beginning with the first such distribution on the 10th day of the first month following the Effective Date, for a period of twenty-four (24) months following the Effective Date of the Plan; provided, however, that the holders of Allowed Class 5 Claims may be paid earlier than  the defined two-year (24-month) amortization period of payments on Class 5 Claims up to the remaining balance due on such claims on the 30th day following the Debtor's receipt, if any, of any post-confirmation net Litigation Proceeds (after application of payment of the Litigation Proceeds described above to Allowed Class 2 Claims).

        **3.**     **Impaired/Not Impaired:**  The Class 5 Claimants are impaired.

        **4.**     **Voting:**  The Class 5 Claimants are entitled to vote on the Plan.

**F.**     **The Allowed Class 6 Tax Claims**

        **1.**     **Description:**  Allowed Claims for Taxes other than Priority Claims under Bankruptcy Code §  507(a)(8).

        **2.**     **Impaired:** No

        **3.**     **Treatment:** The holders of Allowed Class 6 Claims will be paid in full in Cash on the Effective Date of the Plan.  At this time, the Debtor does not believe that there are any such claims.

        **4.**     **Voting:** Class 6 is not entitled to vote on the plan.

**G.**     **The Allowed Class 7 Sub-Class 7-A and Sub-Class 7-B Claims**

        **1.**     **Description:**  Sub-Class 7-A consists of the Allowed Pre-Petition Unsecured Claims filed by the Limited Partners. Sub-class 7-B consists of the Allowed Post-Petition Priority Claims of the Limited Partners.

        **2.**     **Treatment:**  The holders of Allowed Class 7-A Unsecured Claims will receive nothing in the Plan and will have their Sub-Class 7-A Claims discharged in the Order Confirming the Plan.  The holders of Allowed Pre-Petition Class 7 Claims are divided into two sub-classes. Sub-Class 7-A consists of the Allowed Pre-Petition Claims of the Limited Partners. Sub-Class 7-B consists of the

Allowed Post-Petition Claims of the Limited Partners. The Holders of Allowed Sub-Class 7-B Claims will be entitled to receive all Litigation Proceeds that may be awarded and paid to the Limited Partners and which they will use to pay to the holder of the Class 2 Judgment Claim until such Class 2 Judgment Claim is paid in full, and to the extent that any such Litigation Proceeds are also used to pay Allowed Class 5 Claims. In full satisfaction of the Allowed Sub-Class 7-B Claims, the Holders of Allowed Sub-Class 7-B Claims will be paid, Pro Rata, the net Litigation Proceeds received by the Reorganized Debtor after payment of all Class 2 and Class 5 Claims are paid in full as provided in the Plan.

Sub-Class 7-A Claims will be discharged under the Plan.

Sub-Class 7-B members will each receive cash payments to be paid from litigation proceeds after, in order: (i) payment in full of the Class 2 Judgment Claim; and (ii) payment in full of the Class 5 Claims. If no litigation proceeds are recovered by the Debtor, then the holders of Class 7-B Claims will receive nothing on account of their claims and the Sub-Class 7-B Claims will be discharged.

**3.    Impaired/Not Impaired:**    The Sub-Class 7-A and 7-B Claimants are impaired.

**4.    Voting:**    The Sub-Class 7-A and Sub-Class 7-B Claimants are entitled to vote on the Plan.

**H.    The Allowed Class 8 Interests**

**1.    Description:** Class 8 consists of the Allowed equity interests of the Debtor existing on the Petition Date.  As of the Petition Date, the Debtor had eight limited partners and a general partner.

**2.    Treatment:**  The Allowed equity interests of the Debtor existing on the Petition Date shall be cancelled and extinguished as of the Effective Date and shall not receive any Distributions under the Plan.

**3.    Voting:**   The Class 8 Interest Holders are receiving nothing under the Plan on account of such interests and pursuant to § 1126(g) are deemed to have rejected the Plan and are not entitled to vote on the Plan.

## ARTICLE VI:    DESIGNATION AND TREATMENT OF UNIMPAIRED CLASSES OF CLAIMS AND INTERESTS

Except to the extent the Court may estimate and allow for voting purposes only the disputed Claims in Class 3A and Class 3B,  Classes 3A, 3B and 6 are deemed not impaired and, as a result, are not entitled to vote on the Plan.  Pursuant to § 1126(f), the Class 3A, 3B and 6 Claimants are deemed to have accepted the Plan and are not entitled to vote on the Plan.  Should the Court estimate and allow either or both the Claims of Class 3A and 3B for voting purposes only, the holders of Class 3A and 3B may nevertheless be permitted to vote on the Plan as deemed impaired holders of Claims, which the Debtor disputes.  Should such holders of Class 3A and 3B Claims vote against confirmation, the Debtor believes, and will argue, that its Plan may be confirmed and that the treatment afforded such creditors may be "crammed down" on such Classes pursuant to Bankruptcy Code § 1129(b).

## ARTICLE VII:    MEANS FOR PLAN IMPLEMENTATION

### A.    Means of Effectuating the Plan

The Reorganized Debtor will make the Distributions required under the Plan to holders of Allowed Claims by using Cash received from: (i) the then-existing Cash assets of the Reorganized Debtor's bank account; (ii) and new value Cash infusions from the New General Partner and the New Limited Partner; and (iii) Litigation Proceeds collected by the Reorganized Debtor from Commonwealth, if any. The New General Partner and New Limited Partner of the Reorganized Debtor will use the financial resources and assets of the Limited Partners and the Reorganized Debtor will commit its financial capability and capitalization to fully consummate the Plan.

**B.     Funding the Plan**

The Distribution Fund will be funded with: (i) all new value cash contributions received from the Reorganized Debtor's New General Partner and New Limited Partner which will be the only owners of the equity interests of the Reorganized Debtor. The Limited Partners will fund and infuse all amounts necessary to consummate the Plan into the New General Partner and New Limited Partner of the Reorganized Debtor.

The New General Partner and New Limited Partner of the Reorganized Debtor will fund the Distribution Account. From the Distribution Account, the Reorganized Debtor will make all Plan required payments to the holders of Allowed Class 1, Class 2, Class 3, Class 4, Class 5, Class 6 and Class 7-B Claims as provided in the Plan. To the extent a Claim in any class does not participate in early rounds of distribution because such Claim was not Allowed at the time, and later becomes and allowed Claims, the Reorganized Debtor is authorized to make such "catch up" distributions as are necessary to provide such Allowed Claim its pro rata share equal to that distributed to other members of its Class.

**C.     Management of the Reorganized Debtor**

**1.     Identity.** The managers, officers and general partner identified and set forth in the Disclosure Statement shall serve as managers and officers of the Reorganized Debtor as of the Effective Date.  Renee Barnard will continue as the Manager of the Reorganized Debtor.  Kevin Moriarty will continue as the Chief Executive Officer of the Reorganized Debtor.

**2.     Post-confirmation managerial duties.**  The managerial duties of the current management staff as established post-petition will include but not be limited to ensuring all required Plan payments are timely made, assisting Professionals with any and all objections to Claims that may be necessary, and managing, directly, and participating in the litigation matters that will continue after Confirmation.

**3.**     No manager will be paid any compensation after confirmation.

### D.     Bar Date for Certain Administrative Claims

Except as otherwise provided in the Confirmation Order, all applications by Professionals for final compensation for services rendered and for reimbursement of expenses incurred on or before the Effective Date (including, without limitation, any compensation requested by any Professional or other entity for making a substantial contribution to the Chapter 11 Case) and all other requests for payment of Administrative Claims not otherwise Allowed but incurred before the Effective Date under Bankruptcy Code §§ 507(a)(1) or 507(b) (except only for Claims in trade debt incurred in the ordinary course of business and Claims under 28 U.S.C. § 1930) shall be Filed no later than thirty (30) days after the Effective Date, unless such date is extended by order of the Bankruptcy Court entered upon motion Filed prior to the deadline hereunder, on notice to the Reorganized Debtor.  This deadline for filing claims does not apply to and excludes any Professionals whose service are continuing and whose services are expected to continue after Confirmation with respect to any and all continuing litigation matters.  Any such Claim that is not filed by the deadline shall be forever barred. Holders of Administrative Claims who are required to file applications or other requests for payment of such Claims and who do not do so timely shall be forever barred from asserting such Claims against the Reorganized Debtor or any other entity in connection with their respective activities in the Reorganized Case or any of their respective property. The Bankruptcy Court shall retain exclusive jurisdiction over any disputes concerning the Administrative Claims as set forth in Paragraph A of Article XIV.

### E.     Effectuating Documents; Further Transactions

The Chief Operating Officer, President, Chief Executive Officer, or any other appropriate agent or officer of the Debtor, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, partnership interests or other

equity interests, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Secretary or any other appropriate agent or officer of the Debtor, shall be authorized to certify or attest to any of the foregoing actions, if necessary.

### F.    Objections to Claims

Any Claim which is not timely objected to and which has not previously been disallowed will be deemed to be an Allowed Claim upon the expiration of the applicable time for making an objection. A Claim which is timely objected to will be considered a Disputed Claim until such time as an order has been entered by the Bankruptcy Court and such order has become a Final Order.

Unless another date is established by the Bankruptcy Court, all objections to Claims shall be filed and served on the holders of such Claims by ninety (90) days after the Effective Date except as extended by: (a) an agreement between the Claimant and the Debtor, if the Proof of Claim is filed before the Effective Date; (b) an agreement between the Claimant and the Reorganized Debtor if the Proof of Claim is filed after the Effective Date; or (c) by order of the Bankruptcy Court upon application by the Reorganized Debtor; provided, however, that if a Proof of Claim is filed after the Effective Date, then the deadline to object to such claim shall be ninety (90) days after such Proof of Claim has been filed.

## ARTICLE VIII:    ACCEPTANCE   OR   REJECTION   OF   THE   PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS

### A.    Classes Entitled to Vote

Each Impaired Class shall be entitled to vote to accept or reject the Plan. Pursuant to § 1126(f), any Unimpaired Class of Claims shall be deemed to have accepted the Plan and shall not be entitled to vote to accept or reject the Plan. Pursuant to § 1126(g), any Class of Claims or interests receiving nothing under the

**Debtor in Possession's [Proposed] First Amended Plan of Reorganization Dated 08/06/21 Case No. 20-00018-LA11**

Plan on account of such claims or interests shall be deemed to have rejected the Plan and shall not be entitled to vote to accept or reject the Plan.

### B.  Class Acceptance Requirement

Under Bankruptcy Code § 1126(d), an impaired Class of Claims has accepted the Plan if the holders of at least two-thirds (2/3) in dollar Amount and more than one-half (1/2) in number of the Allowed Claims of such Class who have voted on the Plan, have voted to accept the Plan.

Under Bankruptcy Code § 1126(d), an impaired Class of Interests has accepted the Plan if the holders of at least two-thirds (2/3) in Amount of the Interests of such Class who have voted on the Plan, have voted to accept the Plan.

### C.  Cramdown

To the extent necessary, the Debtor requests Plan Confirmation (as the Plan may be amended and modified from time to time) under Bankruptcy Code § 1129(b). The Debtor believes that the treatment afforded all impaired Classes of Claims is fair and appropriate and that the Plan may be "crammed down" on all non-consenting impaired Classes of Claims pursuant to Bankruptcy Code § 1129(b).

## ARTICLE IX:   DISTRIBUTIONS UNDER THE PLAN

### A.  Plan Distributions

#### 1.  The Initial Distributions

On the Effective Date of the Plan or as soon thereafter as is practical, the Reorganized Debtor shall act as the disbursing agent and make the Distributions and payments required under the Plan and deposit the Reserve Amounts in the Disputed Claims Reserve Accounts to the extent required by the Bankruptcy Court in respect of Disputed Claims.

#### 2.  Treatment of Disputed Claims

If in Class 5 there exists with respect to General Unsecured Claims, as of the Effective Date or any relevant date thereafter, any Disputed Claims, the Reorganized Debtor shall hold in the Disputed Claims Reserve Account and reserve

all Pro Rata Distributions to which such holder of a Disputed Claim would otherwise be entitled to receive on the Effective Date, for the benefit of such holder, in either: (a) the Pro Rata amount of the claim to be paid based on the full Amount claimed by the holder of such Claim; or (b) the Pro Rata amount of the Claim to be paid based on the Amount of such Claim as estimated or allowed by Bankruptcy Court Order; provided, however, that no reserve shall be necessary on account of unliquidated Class 5 Claims and such Claims shall become disallowed, unless and until the holder of such Claim shall obtain a Bankruptcy Court Order estimating such Claim for the purpose of calculating a proper reserve prior to the allowance thereof by Bankruptcy Court Order. No Claimant shall be entitled to recover any Distributions made to holders of Allowed Claims regardless of any delay in obtaining an order allowing or estimating a Disputed Claim or an unliquidated Claim. The Reorganized Debtor shall have the responsibility of liquidating and/or otherwise resolving General Unsecured Claims which are Disputed Claims.

After a Final Order has been entered or other final resolution has been reached with respect to all Disputed Claims, the Reorganized Debtor shall distribute each Claimant's percentage share in accordance with the Plan, but in no event no later than sixty (60) days after the entry of such order, pursuant to the terms of the order allowing the Claim and the terms of this Plan, with any Distributions reserved by the Reorganized Debtor in an Amount greater than that required sums to be distributed as a result of the order allowing such Disputed Claim becoming property of the Reorganized Debtor for Distribution Pro Rata to the respective holders of Allowed General Unsecured Claims in Class 5.

### 3. Unclaimed Distributions

#### a. Safeguarding Unclaimed Distributions

All Unclaimed Distributions shall be held by the Reorganized Debtor in the Distribution Fund for the later of one hundred and eighty (180) days following the date of Distribution or the date upon which the Claim is Allowed. Such Distributions

shall be held solely for the benefit of the holders of Allowed Claims and Allowed Administrative Claims who have failed to claim such Distributions and shall be released from the Distribution Fund and delivered to such holder, net of any taxes or other applicable charges required to be paid by the Reorganized Debtor in respect thereof, upon presentation of proper proof by such holder of its entitlement thereto. Any Distributions under the Plan that are unclaimed or undeliverable for a period of 180 days after Distribution thereof shall revest in the Reorganized Debtor, free of any restrictions thereon, and any entitlement of any holder of any Claim to such Distribution shall be extinguished and forever barred.

### b.    Release of Unclaimed Distributions

After 180 days, the Unclaimed Distributions (including interest thereon) may be released by the Reorganized Debtor from the Distribution Fund and in such case, shall then constitute an Excess Reserve.

### c.    Excess Reserves

All Excess Reserves shall be distributed to holders of Allowed Class 5 Claims, Pro Rata, until such Allowed Claims are paid in full, and thereafter shall remain unrestricted funds of the Reorganized Debtor.

### B.    Form of Distributions

Any cash payment to be made pursuant to the Plan shall be in United States dollars and may be made by a check or wire transfer or as otherwise required and drawn on any domestic bank selected by the disbursing agent.

### C.    Rounding

Fractions of cents will not be distributed. Therefore, whenever a payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole cent.

### D.    Post-Confirmation Employment

After the entry of the order of confirmation of the Plan, the Reorganized Debtor may employ, without notice, hearing or order of the Bankruptcy Court, such

attorneys, accountants, and other professionals (the Post-confirmation Professionals") as it may desire to render services on such terms as it deems reasonable. With respect to services rendered by the Post-confirmation Professionals, the Reorganized Debtor shall be authorized to pay for such services, related costs, and expenses without notice, hearing or order of the Bankruptcy Court.

### E.   Remedies Upon Default; Post-Confirmation Conversion/Dismissal

The Reorganized Debtor will have various obligations which it must perform in order to consummate the Plan. Many of these obligations will be required to be performed on or shortly after the Effective Date of the Plan.  The obligations under the Plan include such things as: (1) paying allowed administrative, priority and other claims; (2) making payments to secured creditors; and (3) making Distributions to Unsecured Creditors.

If there is an inability on the part of Reorganized Debtor to substantially consummate the Plan, or if there is a material default by the Reorganized Debtor with respect to the Plan, any creditor, party in interest or the United States trustee may request that the Bankruptcy Court: (1) convert the bankruptcy case to a case under Chapter 7 of the Bankruptcy Code; or (2) dismiss the bankruptcy case. Upon such request, and if appropriate cause is shown, the Bankruptcy Court may convert of dismiss the case, whichever is in the best interest of creditors and the estate.  If the cause for conversion or dismissal is the failure to make a required payment under the Plan, a creditor or party in interest must give the Reorganized Debtor thirty (30) days written notice of the default in the Plan payment and the opportunity to cure the default.  If the Reorganized Debtor fails to cure the default timely, a motion to dismiss or convert may be filed.  In addition, a creditor or party in interest may exercise any other rights under any applicable law.  The Debtor is in material default under the Plan if it fails within twenty-one (21) days of the service of such notice of default, plus three (3) additional days if served by mail, either: (i) to cure the default,

or (ii) to obtain from the Bankruptcy Court an extension of time to cure the default or a determination that no default occurred.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within one hundred and eighty (180) days after the entry of the order of confirmation.

### F.    Final Decree

Once the Estate has been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtor shall file a motion with the Bankruptcy Court to obtain a final decree to close this case.

## ARTICLE X:    TREATMENT OF MISCELLANEOUS ITEMS

### A.    Executory Contracts and Unexpired Leases

#### 1.    Assumption

Most of the Debtor's executory contracts and unexpired leases shall be assumed by the Debtor and assigned to the buyer of Mount Royal Towers, pursuant to the Court's sale order entered August 31, 2020 (ECF #381).  Any other contracts for ongoing operations of the Real Property which are still executory on the Effective Date and which have not otherwise been rejected shall be rejected by the Debtor on the Effective Date. See the Notice of assumption, Assignment and Cure filed July 16, 2020 (ECF #330).  The Debtor reserves the right to modify the Plan to designate additional contracts or leases to be assumed or to be rejected at any time prior to the hearing on confirmation of the Plan.

#### 2.    Rejections

The Debtor rejects any contract which is the subject of a Legal Proceeding in which the Debtor is a defendant or cross-defendant. The Debtor reserves the right to modify the Plan to designate additional contracts or leases for either assumption or rejection at any time prior to the hearing on confirmation of the Plan. The

Confirmation Order shall constitute an order approving the assumption or rejection of each such subsequently designated contract.

If you are a party to an unexpired lease or executory contract designated to be rejected, and you object to the rejection of your lease or contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan. See the Disclosure Statement and any applicable order of the Bankruptcy Court setting a specific date for such objections.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS THIRTY (30) DAYS AFTER THE EFFECTIVE DATE. Any claim based on the rejection of an executory contract or unexpired lease will be barred if the proof of claim arising from such rejection is not timely filed unless the Bankruptcy Court orders otherwise.

**B.    Recapitalization and Reorganization**

The existing equity interests in the Debtor will be cancelled and extinguished as of the Effective Date and the Class 8 Interest holders will not receive any Distributions. Following the Effective Date, the Debtor will be recapitalized by Cash from the New General Partner and the New Limited Partner. In return for Cash and Cash equivalents paid by the Limited Partners, the Limited Partners, Pro Rata, will own the equity interests of the New General Partner and the New Limited Partner in fulfilling their ongoing obligations to fund all Plan required payments.

The Debtor reserves the right to convert from an Alabama limited partnership to other type of limited liability entity following the Effective Date.

**C.    Changes in Rates Subject to Regulatory Commission Approval**

The Debtor is not changing any rates charged to Residents or other third parties in connection with the Plan and is not subject to any regulatory commission which must approve its rates.

### D.   Preservation of Claims Against Commonwealth or Any Other Person or Entity

All rights and claims of the Debtor against Commonwealth, or against any other person or entity, shall pass to the Reorganized Debtor.  The right to suspend Plan payments to Commonwealth or any other person or entity during the pendency of any litigation is reserved to the Reorganized Debtor unless otherwise ordered by the Bankruptcy Court.

## ARTICLE XI:    CONDITIONS PRECEDENT

### A.   Conditions Precedent to Confirmation

The following are conditions precedent to confirmation of the Plan that may be satisfied or waived in accordance with Article XI, ¶C:

(1)   The Confirmation Order shall be in form and substance reasonably acceptable to the Debtor as the Plan Proponent, and

(2)   The sale to MED shall have closed.

### B.   Conditions Precedent to the Effective Date of the Plan

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article XI, ¶C, including the passage of 60 days after the date on which the Bankruptcy Court enters the Confirmation Order and the commencement of Distributions under the Plan.

(1)   the date of Confirmation shall have occurred;

(2)   the Confirmation Order shall, among other things, provide that:

(a) The provisions of the Confirmation Order are non-severable and mutually dependent; (b) Except as expressly provided in the Plan or the Confirmation Order, as allowed by applicable law, the Debtor is discharged effective upon the date of Confirmation from any "debt" (as that term is defined in Bankruptcy Code § 101(12); and (c) the Debtor's liability in respect thereof is extinguished completely, whether reduced to judgment or not, liquidated or unliquidated, contingent or

noncontingent, asserted or unasserted, fixed or unfixed, matured or unmatured, disputed or undisputed, legal or equitable, or known or unknown, or that arose from any agreement of the Debtor that has either been assumed or rejected in the Case or pursuant to the Plan, or obligation of the Debtor incurred before the date of Confirmation, or from any conduct of the Debtor prior to the date of Confirmation, or that otherwise arose before the date of Confirmation, including, without limitation, all interest, if any, on any such debts, whether such interest accrued before or after the Petition Date; and (d) the Plan does not provide for the liquidation of all or substantially all of the property of the Debtor and its Confirmation is not likely to be followed by the liquidation of the Reorganized Debtor or the need for further financial reorganization; and

(3)    no request for revocation of the Confirmation Order under Bankruptcy Code § 1145 shall have been made, or, if made, shall remain pending.

## C.    Waiver of Conditions to Confirmation and to the Effective Date

The conditions set forth in this Article XI may be waived by the Debtor as the Plan Proponent without notice or a hearing. The failure to satisfy or waive any condition to Confirmation or the Effective Date may be asserted by the Debtor as Plan Proponent regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtor as the Plan Proponent). The failure of the Debtor as Plan Proponent to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE XII:    REVOCATION, MODIFICATION AND AMENDMENT OF PLAN

Subject to the restrictions on Plan modifications set forth in Bankruptcy Code § 1127, the Debtor as Plan Proponent reserves the right to alter, amend or modify the Plan so long as such alteration, amendment or modification is consistent with the requirements of Bankruptcy Code §§ 1122 and 1123, and before the substantial consummation of the Plan.  The Debtor as Plan Proponent reserves the right to revoke or withdraw the Plan so long as such revocation or withdrawal is prior to the date of Confirmation. If the Debtor as Plan Proponent withdraws or revokes the Plan in accordance with this Section, or if Confirmation does not occur, then the Plan shall be null and void in all respects.

## ARTICLE XIII:   EFFECT OF CONFIRMATION

### A.    Discharge and Release of Claims and Termination of Interests

Except as otherwise provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims, including any interest accrued on Claims from the Petition Date.  The Class 2 Judgment Claim and the Alabama Judgment shall not be discharged until the Class 2 Claim and the Alabama Judgment have been paid in full under the Plan.

1.    **DISCHARGE OF THE DEBTOR**. PURSUANT TO § 1141(D) OF THE BANKRUPTCY CODE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN OR IN THE CONFIRMATION ORDER, AND EXPRESSLY EXCLUDING THE CLASS 1 AND CLASS 2 CLAIMS OF WELLS FARGO, WHICH ARE NOT DISCHARGED UNTIL PAID IN FULL AS PROVIDED IN THIS PLAN, THE RIGHTS AFFORDED AND THE PAYMENTS AND DISTRIBUTIONS TO BE MADE AND THE

TREATMENT UNDER THE PLAN SHALL BE IN COMPLETE EXCHANGE FOR, AND IN FULL AND UNCONDITIONAL SETTLEMENT, SATISFACTION, DISCHARGE, AND RELEASE OF ANY AND ALL EXISTING DEBTS AND CLAIMS AND TERMINATION OF ALL INTERESTS OF ANY KIND, NATURE, OR DESCRIPTION WHATSOEVER AGAINST OR IN THE DEBTOR, THE REORGANIZED DEBTOR, THEIR PROPERTY, THE DEBTOR'S ASSETS, OR THE ESTATE, AND SHALL EFFECT A FULL AND COMPLETE RELEASE, DISCHARGE, AND TERMINATION OF ALL LIENS, SECURITY INTERESTS, OR OTHER CLAIMS, INTERESTS, OR ENCUMBRANCES UPON ALL OF THE DEBTOR'S ASSETS AND PROPERTY. FURTHER, ALL PERSONS ARE PRECLUDED FROM ASSERTING, AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR OR THEIR RESPECTIVE SUCCESSORS, OR ANY PROPERTY THAT IS TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN, ANY CLAIMS, OBLIGATIONS, RIGHTS, CAUSES OF ACTION, LIABILITIES, OR INTERESTS BASED UPON ANY ACT, OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE, OTHER THAN AS EXPRESSLY PROVIDED FOR IN THE PLAN, OR THE CONFIRMATION ORDER, WHETHER OR NOT (A) A PROOF OF CLAIM BASED UPON SUCH DEBT IS FILED OR DEEMED FILED UNDER § 501 OF THE BANKRUPTCY CODE; (B) A CLAIM BASED UPON SUCH DEBT

IS ALLOWED; OR (C) THE CLAIMANT BASED UPON SUCH DEBT HAS ACCEPTED THE PLAN.

2.      **INJUNCTION**. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL CLAIMANTS AND HOLDERS OF INTERESTS ARISING PRIOR TO THE EFFECTIVE DATE OTHER THAN THE HOLDER OF THE CLASS 2 JUDGMENT CLAIM SHALL BE PERMANENTLY BARRED AND ENJOINED FROM ASSERTING AGAINST THE REORGANIZED DEBTOR OR THE DEBTOR, OR THEIR SUCCESSORS OR PROPERTY, OR THE DEBTOR'S ASSETS, ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF SUCH CLAIM OR INTEREST: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING ON ACCOUNT OF SUCH CLAIM AGAINST OR INTEREST IN THE REORGANIZED DEBTOR, THE DEBTOR, OR THE PROPERTY TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN, OTHER THAN TO ENFORCE ANY RIGHT TO DISTRIBUTION WITH RESPECT TO SUCH PROPERTY UNDER THE PLAN; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE REORGANIZED DEBTOR, THE DEBTOR OR ANY OF THE PROPERTY TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN, OTHER THAN AS PERMITTED UNDER SUB-PARAGRAPH (I) ABOVE; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST PROPERTY OF THE

REORGANIZED DEBTOR, THE DEBTOR, OR ANY PROPERTY TO BE DISTRIBUTED UNDER THE TERMS OF THE PLAN; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTOR, THE REORGANIZED DEBTOR, THEIR ASSETS OR ANY OTHER PROPERTY OF THE DEBTOR, THE REORGANIZED DEBTOR, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THE PLAN. THE FOREGOING DISCHARGE, RELEASE AND INJUNCTION ARE AN INTEGRAL PART OF THE PLAN AND ARE ESSENTIAL TO ITS IMPLEMENTATION. THE DEBTOR AND THE REORGANIZED DEBTOR SHALL HAVE THE RIGHT TO INDEPENDENTLY SEEK THE ENFORCEMENT OF THE DISCHARGE, RELEASE AND INJUNCTION SET FORTH IN THIS ARTICLE XI.

**3.      No Waiver of Discharge**. Except as otherwise specifically provided herein, nothing in the Plan shall be deemed to waive, limit, or restrict in any way the discharge granted to the Debtor upon confirmation of the Plan by Bankruptcy Code § 1141.

**4.      Binding Effect**. As of the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized

Debtor, all Claimants and holders of Interests, other parties-in-interest and their respective heirs, successors, and assigns.

5.      **Term of Injunctions or Stays**. Unless otherwise provided in this Plan, all injunctions or stays provided for in the Chapter 11 Case pursuant to Bankruptcy Code §§ 105 or 362, or otherwise, and in effect on the Confirmation Date, shall remain in full force and effect until the Effective Date, at which time as to injunctions issued against all Claimants other than the holder of the Class 2 Judgment Claim, they are replaced with the injunction set forth in Section 1 of the Plan. Further, with respect to Wells Fargo and the Class 2 Judgment Claim, pursuant to Bankruptcy Rule 7069, making applicable Federal Rule of Civil Procedure Rule 69, in the interests of justice and acting under the express authority of California Code of Civil Procedure §§ 1710.50(a)(4) and 1710.50(b), enforcement of and collection activities on the Alabama Judgment by Wells Fargo against the assets of the Limited Partners shall be temporarily stayed for two years after the Effective Date as against the Limited Partners only on the following conditions: (1) That the Reorganized Debtor make timely payments to Wells Fargo as set forth in the Plan; and, (2) That the Reorganized Debtor provide Wells Fargo with quarterly financial statements of the Limited Partners identifying the nature, amount and location of the assets of the Limited Partners. If the Limited Partners fail to satisfy either of these conditions, the Bankruptcy Court shall retain jurisdiction to lift the temporary stay of judgment execution upon noticed motion by the holder of the Class 2 Judgment Claim.

**6.** **Setoffs**. Except with respect to Claims specifically Allowed under the Plan, the Debtor or the Reorganized Debtor, as applicable, may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtor may have against such Claimant; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claim that the Debtor or the Reorganized Debtor may have against such Claimant.

**B.    Revesting of Property of the Estate**

All property of the Estate as defined in Bankruptcy Code § 541 not distributed to holders of Allowed Claims pursuant to the Plan shall revest in the Reorganized Debtor on the Effective Date.  Thereafter, the Reorganized Debtor may operate its remaining affairs in conformity with the terms of this Plan, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all property of the Reorganized Debtor shall be held by it free and clear of all Claims and Interests, except as specifically provided in the Plan or the Confirmation Order. In addition, in accordance with Bankruptcy Code § 1123(b)(3), the Reorganized Debtor shall retain and may pursue all rights and claims as it deems appropriate. Without limiting the foregoing, the Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay fees that it incurs after the Effective Date for Professional and other similar expenses.

**C.    United States Trustee's Reports**

Post-confirmation quarterly reports will be filed in accordance with the United States Trustee Chapter 11 Operating and Reporting Requirements and forms.

**ARTICLE XIV:  JURISDICTION RETAINED**

**A.**    The Bankruptcy Court shall retain jurisdiction for the following purposes:

     (i)    to determine the allowance of Claims and Interests upon the timely objection thereto;

     (ii)    to approve, pursuant to Bankruptcy Code §365, the assumption, assignment or rejection of any executory contract or unexpired lease of the Debtor except as otherwise provided in the Plan;

     (iii)    to determine requests for payments of Claims entitled to priority under Bankruptcy Code § 507(a)(1), including compensation of parties entitled thereto;

     (iv)    to resolve controversies and disputes regarding the interpretation of the Plan or any exhibit thereto;

     (v)    to implement the provisions of the Plan and enter orders in aid of Confirmation and consummation of the Plan;

     (vi)    to adjudicate any disputes with holders of Claims or Interests or any causes of action, as well as the Commonwealth Case;

     (vii)    to hear and determine all pending or future controversies, suits, and disputes that may arise under the Plan including, without limitation, disputes between the Debtor and the Claimants and controversies arising in connection with the interpretation of the Plan, including any and all schedules, documents, and exhibits, or any documents intended to implement the provisions of the Plan;

     (viii)    to consider any modification, alteration, or amendment to the Plan;

     (ix)    to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, including any Exhibit thereto, or in any order of the Bankruptcy Court, including the Confirmation Order, as

may be necessary to carry out the purposes and intent of the Plan and to implement and effectuate the Plan;

(x)    to determine such other matters as may be provided for in the Confirmation Order or other orders of the Bankruptcy Court as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(xi)    to enforce all orders, judgments, injunctions, and rulings entered in connection with the Chapter 11 Case; and

(xii)    to enter a final decree closing the Chapter 11 Case.

## ARTICLE XV:    MISCELLANEOUS PROVISIONS

### A.    Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtor, the holders of Claims, the holders of Interests, and their respective successors and assigns.

### B.    Revocation, Withdrawal or Non-Confirmation

#### 1.    Right to Revoke or Withdraw

The Plan Proponent reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date.

#### 2.    Effect of Withdrawal, Revocation or Non-Confirmation

If the Plan Proponent revokes or withdraws the Plan in accordance with Article XII prior to the date of Confirmation, or if Confirmation or the Consummation Date does not occur, then the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an Amount certain any Claim or Class of Claims unless such settlement or compromise is also embodied in a separate agreement), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void. In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver

**Debtor in Possession's [Proposed] First Amended Plan of Reorganization Dated 08/06/21 Case No. 20-00018-LA11**

or release of any Claims by or against the Debtor or any other person, to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor, or to constitute an admission of any sort by the Debtor or any other person.

### C.  Notices

Any notice required or permitted to be provided to the Plan Proponent shall be in writing and served by: (a) certified mail, return receipt requested; (b) hand delivery; or (c) overnight delivery service to be addressed as follows:

> Vestavia Hills, Ltd., an Alabama limited partnership
> 9619 Chesapeake Drive, Suite 103
> San Diego, CA 92123

> With a copy to:

> Sullivan Hill Rez & Engel, APLC
> Attention: James P. Hill, Esq.
> 600 B Street, Suite 1700
> San Diego, CA  92101

### D.  Prepayment

Unless the Plan or Confirmation Order otherwise provides, the Reorganized Debtor shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; provided, however, that any such prepayment shall not violate, or otherwise prejudice, the relative priorities, and parities among the Classes of Claims.

### E.  Choice of Law

Except to the extent that the Bankruptcy Code, Bankruptcy Rules or California General Corporation Law are applicable, and subject to the provisions of any contract, instrument, release or other agreement or document entered into in connection with the Plan or this Disclosure Statement, the rights and obligations

arising under the Plan and this Disclosure Statement shall be governed by, and construed and enforced in accordance with, the laws of the State of California without giving effect to the principles of conflict of laws of the State of California.

**F.    Headings**

The headings are for convenience only and will not control or affect the meaning or construction of the provisions of this Plan. When a reference is made in this Plan to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Plan unless otherwise indicated. Whenever "include," "includes," or "including" is used in this Plan, it shall be deemed to be followed by the words "without limitation." Whenever "or" is used in this Plan it shall be construed in the nonexclusive sense.

Dated: August 6, 2021          By: _____

Kevin Moriarty
President/CEO of the Debtor's General
Partner, IPG Holding
*Debtor and Plan Proponent*

# EXHIBIT 9

SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
James P. Hill, SBN 90478
Christopher V. Hawkins, SBN 222961
Kathleen Cashman-Kramer, SBN 128861
600 B Street, 17th Floor
San Diego, California 92101
Telephone: (619) 233-4100
Fax Number: (619) 231-4372

Attorneys for Debtor and Debtor In Possession,
Vestavia Hills, Ltd., dba Mount Royal Towers

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

In re

VESTAVIA HILLS, LTD.,
DBA MOUNT ROYAL TOWERS,

Debtor

Case No. 20-00018-LA11

Chapter 11

**DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING THE DEBTOR'S [PROPOSED] FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED AUGUST 6, 2021**

Date.:       August 26, 2021
Time:       2:00 p.m.
Dept.:       2
Judge:      Hon. Louise DeCarl Adler

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

     A.    EXECUTIVE SUMMARY OF THE PLAN ....................................... 2

     B.    FACT BACKGROUND SUMMARY ............................................. 4

          1.    Pre-Petition Issues Leading to the Filing of Chapter 11 ............ 5
          2.    The Post-Petition Sale of the Debtor's Business ....................... 8
          3.    Wells Fargo Claims and Treatment. ........................................ 9
          4.    Post-Petition Challenges Faced by the Debtor ....................... 10
          5.    Summary of Classification and Treatments of Classified
                Claims and Interests ............................................................ 14
          6.    Recommendation of the Plan Proponent. .............................. 18

     C.    PURPOSE OF THIS DOCUMENT ............................................ 18

     D.    DEADLINES FOR VOTING AND OBJECTING;
           CONFIRMATION HEARING DATE .......................................... 19

     E.    TIME AND PLACE OF THE CONFIRMATION HEARING .......... 19

     F.    DEADLINE FOR OBJECTING TO THE CONFIRMATION OF
           THE PLAN ........................................................................... 20

     G.    IDENTITY OF PERSON TO CONTACT FOR MORE
           INFORMATION REGARDING THE PLAN ................................ 20

     H.    DISCLAIMER ....................................................................... 20

     I.    IMPORTANT NOTICES AND CAUTIONARY STATEMENTS ... 20

II.   FURTHER BACKGROUND INFORMATION. ..................................... 22

     A.    DESCRIPTION AND HISTORY OF DEBTOR'S BUSINESS
           AND MANAGEMENT ............................................................ 22

     B.    PRINCIPALS/AFFILIATES OF DEBTOR'S BUSINESS ............. 22

     C.    MANAGEMENT OF DEBTOR BEFORE AND AFTER THE
           BANKRUPTCY ..................................................................... 23

     D.    EVENTS LEADING TO CHAPTER 11 FILING ......................... 23

     E.    SIGNIFICANT EVENTS DURING THE BANKRUPTCY
           CASE .................................................................................. 23

          1.    Significant Bankruptcy Proceedings and Events ................... 24
          2.    Legal Proceedings ............................................................. 27
          3.    Post-Confirmation Litigation Information for Creditors .......... 28

     F.    CLAIMS AND CLAIMS OBJECTIONS ..................................... 31

i

G.    FRAUDULENT CONVEYANCES AND PREFERENCE
RECOVERIES ....................................................................... 34

III.    SUMMARY OF THE PLAN OF REORGANIZATION ............................ 34

A.    UNCLASSIFIED ADMINISTRATIVE CLAIMS ............................ 34
1.    Description ................................................................ 34
2.    Treatment ................................................................. 36
3.    Court Approval of Post-Confirmation Fees Not Required ....... 37

B.    DESIGNATION AND TREATMENT OF IMPAIRED
CLASSES OF CLAIMS AND INTERESTS ................................. 37

C.    MEANS FOR PLAN IMPLEMENTATION ................................... 40
1.    Means of Effectuating the Plan ................................. 40
2.    Management of the Reorganized Debtor ..................... 40
3.    Bar Date for Certain Administrative Claims ............... 40
4.    Effectuating Documents; Further Transactions ........... 41
5.    Objections to Claims ............................................... 41

D.    RISK FACTORS .................................................................. 42

E.    OTHER PROVISIONS OF THE PLAN .................................... 42
1.    Executory Contracts and Unexpired Leases: ............... 42
2.    Recapitalization and Reorganization ......................... 43
3.    Retention of Jurisdiction ......................................... 43

F.    TAX CONSEQUENCES OF THE PLAN ................................... 44

G.    CONFIRMATION REQUIREMENTS AND PROCEDURES ......... 45

H.    WHO MAY OBJECT OR VOTE TO APPROVE THE PLAN ......... 45
1.    Who May Object to Confirmation of the Plan ............. 45
2.    Who May Vote to Accept/Reject the Plan .................. 46
3.    What is an Alleged Claim/Interest ............................ 46

IV.    SIGNIFICANT PLAN TERMS AND DEFINITIONS .............................. 46

A.    The Bar Date. .................................................................. 46
B.    What Is an Impaired Claim/Interest ................................ 48
C.    Who is Not Entitled to Vote ........................................... 48
D.    Who Can Vote in More Than One Class ........................... 49
E.    Votes Necessary to Confirm the Plan .............................. 49
F.    Votes Necessary for a Class to Accept the Plan ............... 49
G.    Treatment of Non-Accepting Classes .............................. 49

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

H.      Request for Confirmation Despite Non-Acceptance by Impaired
        Classes ................................................................................50

I.      Absolute Priority Rule ............................................................50

V.      LIQUIDATION ANALYSIS ...........................................................51

VI.     FEASIBILITY .............................................................................53

VII.    EFFECT OF CONFIRMATION OF PLAN ...........................................53

A.      DISCHARGE ...............................................................................53

B.      REVESTING OF PROPERTY IN DEBTOR .....................................54

C.      REVOCATION, MODIFICATION AND AMENDMENT OF
        PLAN ........................................................................................55

D.      POST-CONFIRMATION STATUS REPORT ....................................55

E.      QUARTERLY FEES .....................................................................55

F.      POST-CONFIRMATION EMPLOYMENT .......................................55

G.      REMEDIES UPON DEFAULT; POST-CONFIRMATION
        CONVERSION/DISMISSAL ...........................................................56

H.      FINAL DECREE ..........................................................................57

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST
AMENDED PLAN DATED 08/06/21

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

FEDERAL STATUTES, REGULATIONS, AND RULES

4

5

11 U.S.C.
  § 101 ...........................................................................................................passim
  § 1129(a)(8) .......................................................................................................49
  § 1129(b) ............................................................................................................49
  § 1129(b)(2)(B)(ii) .............................................................................................50

28 U.S.C.
  § 1930 .................................................................................................................41
  § 1930(a)(6) ...............................................................................................36, 55

Chapter 7 of the Bankruptcy Code ......................................................50, 51, 52, 56

Bankruptcy Code
  § 327 ...................................................................................................................36
  § 365 ...................................................................................................................43
  § 501 ...................................................................................................................54
  § 502 ...................................................................................................................54
  § 502(g) ..............................................................................................................53
  § 502(h) ..............................................................................................................53
  § 506 .............................................................................................................9, 26
  § 507(a)(1) ..........................................................................................34, 43, 45, 48
  § 507(a)(2) ..........................................................................................................48
  § 507(a)(7) ..........................................................................................................48
  § 507(a)(8) ...............................................................................................17, 39, 48
  § 524 ...................................................................................................................54
  § 541 ...................................................................................................................54
  §§ 547 and 548 ...................................................................................................34
  § 1103 .................................................................................................................36
  § 1122 .................................................................................................................55
  § 1123 .................................................................................................................55
  § 1123(b)(3) ........................................................................................................54
  § 1125 ...................................................................................................................1
  § 1127 .................................................................................................................55
  § 1129 ...................................................................................................................1
  § 1141 .................................................................................................................54

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST
AMENDED PLAN DATED 08/06/21

Coronavirus Aid, Relief, and Economic Security Act
     (CARES Act) ...................................................................... 11, 28, 29, 30

**RULES**

Bankruptcy Rule 3022 ........................................................................... 57

Local Bankruptcy Rule 3020-1(b) ........................................................... 55

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST
AMENDED PLAN DATED 08/06/21

## I.    <u>INTRODUCTION</u>

Vestavia Hills, Ltd., an Alabama limited partnership dba Mount Royal Towers ("Company" or "Debtor"), debtor and debtor-in-possession in the above-referenced Chapter 11 case ("Bankruptcy Case"), commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. ("Bankruptcy Code") on January 3, 2020 with the United States Bankruptcy Court for the Southern District of California ("Bankruptcy Court").

The Debtor submits this proposed First Amended[1] Disclosure Statement ("Disclosure Statement") in support of the Debtor's [Proposed] First Amended Chapter 11 Plan of Reorganization dated August 6, 2021 ("Plan") pursuant to Section 1125 of the Bankruptcy Code. Chapter 11 allows debtors, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization. The Plan may provide for debtors to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. Debtor is the proponent (the "Proponent"), within the meaning of Bankruptcy Code § 1129, of the [Proposed] First Amended Chapter 11 Plan of Reorganization dated August 6, 2021 sent to you in the same envelope as this document.  No solicitation materials, other than this Disclosure Statement and the materials transmitted with it have been approved by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.  All holders of claims entitled to vote to accept or reject the Plan should read the Plan and this Disclosure Statement in their entirety before voting to accept or reject the Plan.

**THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE PLAN.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE**

---

[1] This First Amended Disclosure Statement amends the original Disclosure Statement filed July 2, 2021 (ECF #516) to clarify and/or add additional non-material information that was unintentionally omitted from that original document, as well as to modify the treatments of certain claims based upon the Debtor's revised or additional projections.

1

**PLAN, AND THE RESPECTIVE EXHIBITS AND SCHEDULES THERETO IN THEIR ENTIRETY**.

Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

Please read the Plan attached as Exhibit A to this Disclosure Statement. The terms of the Plan will control your rights as a creditor, equity interest holder or other party in interest in this Chapter 11 case. In general, however, the Plan assumes closing a Bankruptcy Court approved sale of certain Debtor's real and personal property assets to MED Healthcare Partners, LLC ("MED") by, on or before October 31, 2021.

## A. EXECUTIVE SUMMARY OF THE PLAN

The Plan, at its core, is a liquidating plan that reorganizes the Debtor and Debtor Estate in order to accomplish the sale of the Debtor's significant operating assets and to provide for the continuing administration of the Reorganized Debtor Estate to collect and distribute proceeds of other assets and to receive and distribute proceeds of funding from new equity in amounts sufficient to pay all Allowed Creditor Claims. The Plan is a 100-cent-on-the dollar payment plan, with holders of Allowed General Unsecured claims being paid in full over two years (24 months), if not sooner.  The Debtor will sell certain Debtor's real and personal property assets consisting of its continuing care retirement community, commonly known as "Mount Royal Towers," ("MRT"), on real property currently owned by the Debtor located near Birmingham, Alabama to a cash buyer with the net sales proceeds being paid to the Debtor's only secured creditor,  Wells Fargo Bank, N. A. ("Wells Fargo"). The sale is expected to close on or before October 31, 2021 to the current Bankruptcy Court approved purchaser of those assets, MED.  Following sale closing, the Debtor will be involved in winding up its financial affairs and finalizing pending litigation involving the Debtor, various alleged creditors and certain of the Debtor's Limited Partners.[2]  The

---

[2] The following limited partners of the Debtor are treated as being five members. Though seven individuals are involved and they serve as Trustees or Successor or Co-Trustees of various Trusts which may also be involved as limited partners.

2

Debtor is able to offer General Unsecured Creditors a payment-in-full plan solely based on the agreement by its Limited Partners to provide essential additional new value funding as provided in and subject to confirmation of the Plan as presented herein.

The Debtor previously requested and obtained Bankruptcy Court approval to sell MRT to MED free and clear of all liens, claims and interests. MED was the only qualified purchaser willing to buy MRT for a Cash sales price of Twelve Million Dollars ($12,000,000). Under the Plan, the net proceeds of sale will be paid to Wells Fargo in full satisfaction of the secured claim possessed by Wells Fargo. The remainder of the Wells Fargo debt is separately classified in the Plan as the "Judgment Claim" and is the only allowed, under-secured claim for which the Debtor and Limited Partners have joint and several liability.

To recapitalize the Reorganized Debtor, which will allow the Debtor to perform the Plan, two new corporate entities will be formed by the Limited Partners. On confirmation, the newly formed entities will become the New General Partner and the New Limited Partner of the Reorganized Debtor. The entities will be funded with sufficient loans from the Limited Partners for the Reorganized Debtor to: (i) make all payments required to be made on the Effective Date of the Plan which is November 15, 2021 ("Effective Date"); and (ii) thereafter make all future payments on Allowed Claims of creditors as required by the Plan. Acting through the newly created corporate entities, owned equally by the Limited Partners, the Reorganized Debtor will borrow the amounts necessary for the Reorganized Debtor to wind up various litigation matters, perform all Plan obligations and close the Case.

The only remaining assets then to be used for Plan distributions will be: (i) Cash in the Debtor's account at sale closing; (ii) proceeds of litigation recoveries from Commonwealth Assisted Living, LLC, Series E ("Commonwealth") and its agents;

---

Of the seven individuals, three, Jack Rowe, Judy Chance and Karen McElliott, are widowed. Collectively, they are referred to as the Limited Partners.

3

and (iii) additional funding provided by the Limited Partners to make Plan payments to allowed priority Claims and also to pay Allowed General Unsecured creditor Claims over time to the extent the forgoing funding sources prove insufficient to pay the Allowed General Unsecured creditor Claims in full.

The Debtor's and Limited Partners' most significant joint financial obligation concerns Wells Fargo. On April 16, 2020, Wells Fargo obtained a judgment against the Limited Partners as guarantors of the Debtor's loan. Under the Plan, money received by the Reorganized Debtor from the Limited Partners will be paid to Wells Fargo to fully satisfy the net balance owed on the judgment over time. Plan payments to Wells Fargo of $80,000 per month will be made through December 31, 2021.  On January 15, 2022, monthly payments of $165,000 per month will be made to Wells Fargo until the judgment is paid in full by a balloon payment on October 31, 2023, while accruing simple interest at the rate of  0.22 percent per annum.

The Plan impairs all classes of Claims other than Class 3A, Class 3B and Class 6. Operational feasibility depends on the  Limited Partners willingness to: (i) withhold collection of their pre-petition unsecured Claims and their post-petition Administrative Claims; and (ii) continue to recapitalize the Reorganized Debtor entity with loans in order to fund all future ongoing post-confirmation payments necessary to: (i) pay the Judgment Claim in full; (ii) pay legal fees to achieve plan confirmation and conclude post-confirmation litigation; and (iii) make a 100 percent distribution on Allowed Claims of General Unsecured Creditors over a two-year (24-month) period payable in equal quarterly installments with each such installment made on the 10th day of each month beginning with the first such quarterly distribution on the 10th day of the first month following the Effective Date and continuing each quarter thereafter until all such Allowed Claims are paid in full.  The Limited Partners have agreed to all of the foregoing.

4

## B.    FACT BACKGROUND SUMMARY

Upon filing the Chapter 11 Case, the Debtor owned and operated a continuing care retirement community, MRT. The Debtor provided (or previously provided) facilities for independent living, licensed assisted living, specialty care assisted living for memory care and skilled nursing for seniors.  Real Property[3] owned by the Debtor then consisted of: (i) three buildings, including an 11-story main building, additional residence buildings, and an ancillary building for equipment; and (ii) a two-level parking lot. Additionally, the Debtor owned personal property, equipment and inventory necessary to operate the facility and had cash in the bank valued at $1,531,957.02.

When the Chapter 11 Case was filed, the Debtor had approximately 148 employees and there were then 144 residents at MRT as well as available "beds" and rooms that could house an additional number of residents. During the course of the Chapter 11 Case, the Debtor continued operations of MRT in the senior living facility business with the same management that was in place on the Petition Date.

The most significant events affecting post-petition operations included: (i) the global COVID-19 Pandemic which hit senior residential care facilities and their residents and employees tragically hard; and (ii) the Debtor's efforts to sell MRT to a qualified buyer for cash. Other significant events included: (i) disputes over the Debtor's access to certain government provided financial assistance including litigation with the Small Business Administration ("SBA"), a matter which remains on appeal as of the date that this Disclosure Statement is being filed and served; and (ii) ongoing litigation with Wells Fargo, Commonwealth and other creditors.

---

[3] On the Debtor's Schedules and Statements filed as ECF Docket Number 1, the value of the Debtor's Real Property was listed as $17 Million. The true actual market value of the Real Property was determined to be less than $12 Million based on the purchase price received from MED. For clarity, future ECF Docket References will relate to filings made in the Main Bankruptcy Case ("ECF # ___"), and in various Adversary Proceedings identified separately by reference to a designation for either the Adversary Party or the Court in which the action is pending.

5

1.      **Pre-Petition Issues Leading to the Filing of Chapter 11**

The Company's financial difficulties arose as the result of a series of unfortunate events the bulk of which were unrelated to the Debtor's operations, management, or financial viability. Though the Company never missed or was never late on any monthly debt service obligation owed to its series of three bank lenders, the loan and security interest owed by the Company were part of an asset portfolio that was acquired by Wachovia Bank, which itself subsequently failed and then fell into FDIC receivership. During this period of financial institution turmoil, the then outstanding loan amount of in excess of $23 Million transformed from a fully performing, short-term obligation that was due for renewal into an "all due" mammoth sum owed after the loan subsequently devolved to Wells Fargo once Wachovia was declared insolvent.

Thus, what had originally been a manageable, timely paid, five-year renewable, secured debt burden in the hands of Wachovia and the original lender with which the Company had maintained a good working relationship, unfortunately became an all-due, secured obligation "in default" after Wells Fargo acquired the position. Despite its best efforts, the Company was unable to refinance the principal amount then owed in excess of $23 Million. The Company's Limited Partners arranged for a $5 Million personal loan and used the proceeds of that loan to pay down principal of the Wells Fargo obligation. With Wells Fargo unwilling to further extend the loan, the debt principal matured on December 31, 2017. Wells Fargo subsequently delivered a Notice of Default on January 3, 2018 declaring that the Company owed Wells Fargo $18,366,477.28 as of December 31, 2017, and simultaneously also proceeded with foreclosure proceedings.

Pending foreclosure, the Company sought to sell MRT to satisfy all outstanding debt owed to Wells Fargo. On February 1, 2018, Company and Commonwealth entered into a non-binding Letter of Intent for the sale and purchase of MRT and subsequently entered into a purchase agreement on March 29, 2018 ("Purchase

6

Agreement"). Pursuant to the Purchase Agreement, Commonwealth agreed to purchase MRT for $26,680,000.

Following Purchase Agreement execution, and in consideration of payment by the Company of $1,500,000 in principal and approximately $536,708.33 in accrued interest to Wells Fargo, Wells Fargo executed a forbearance agreement with the Company dated April 9, 2018 ("Forbearance Agreement"). Pursuant to the Forbearance Agreement, Wells Fargo agreed to delay foreclosure proceedings until October 1, 2018, pending consummation of the Purchase Agreement. Under the terms of the Forbearance Agreement, the Company had the option to further extend the forbearance period until December 14, 2018. In order to exercise this option, the Company had to pay an additional $500,000 in principal by September 14, 2018.

From March 2018 through November 2018, the Company and Commonwealth entered into a total of nine amendments to the Purchase Agreement. Among other things, these amendments extended dates: (i) by which approvals could be received from certain governmental authorities and regulatory agencies in the State of Alabama in connection with Commonwealth's acquisition of MRT, and (ii) to consummate the transaction or terminate the Purchase Agreement. While Commonwealth and the Debtor were extending and exchanging Purchase Agreement Amendments, the Alabama Department of Public Health issued a Consent Decree, which mandated that, if the Company failed to transfer its operational licenses for the assisted living facility and specialty care assisted living facility before November 30, 2018, it would be required to issue discharge notices to MRT's Residents. Delay in consummation of the transactions contemplated by the Purchase Agreement also resulted in the Company exercising its extension option under the Forbearance Agreement by paying Wells Fargo $500,000 to extend the forbearance period until December 14, 2018.

Unfortunately, the sale to Commonwealth was never consummated. Following Commonwealth's failure to timely procure financing and to timely obtain required

7

operating approvals by the last agreed deadline, the Purchase Agreement terminated by its own terms on November 16, 2018, and the Company began the search for a new qualified buyer for MRT and all of its assets and operations.

On November 21, 2018, Commonwealth filed a lawsuit under seal against the Company and its limited partners entitled, "*Commonwealth Assisted Living, LLC, Series E v. Vestavia Hills, Ltd., Judith A. Chance, Karen McElliott, Frank A. Virgadamo, Connie Virgadamo, B. Renee Barnard, Charles Barnard and Jack L. Rowe*," in Alabama State Court ("Commonwealth Lawsuit"). The Commonwealth Lawsuit when filed sought specific performance by the Company under the Purchase Agreement and requested money damages from the Debtor and from the limited partner Defendants. The Company asserted counterclaims against Commonwealth and is now seeking damages for Commonwealth's failure to timely perform its obligations under the Purchase Agreement. The Debtor's filing of the Bankruptcy Case initiated an automatic stay of Commonwealth's litigation against the Debtor and eventually, removal of the Commonwealth Lawsuit to Federal Court and the subsequent transfer of venue to the Bankruptcy Court.

As a result of the collapse of the Commonwealth sale, the Company was unable to meet its obligation to Wells Fargo under the extended Forbearance Agreement. Wells Fargo instituted an arbitration action against the Limited Partners. On December 20, 2019, the AAA arbitration panel entered a final award in favor of Wells Fargo and against the Limited Partners of $18,086,910.61. The Company and Limited Partners attempted to reach a settlement with Commonwealth and to obtain a new loan to pay off Wells Fargo in full. When neither option materialized, the Debtor sought bankruptcy protection. On January 3, 2020, the Debtor filed its Chapter 11 Petition.

## 2. The Post-Petition Sale of the Debtor's Business

On February 6, 2020, the Debtor and MED entered into an Asset Purchase Agreement ("Asset Purchase Agreement"). The Asset Purchase Agreement provides

8

for the sale of certain of the Debtor's Mount Royal Towers real and personal property assets ("Debtor Assets") to MED for an aggregate purchase price of $12,000,000 and payment of a sale commission equal to 1.5 percent of the purchase price to Blueprint Healthcare Real Estate Advisors ("Blueprint").  On March 25, 2020, the Bankruptcy Court issued an order approving MED as a "Stalking Horse Bidder" in connection with the proposed sale of the Debtor Assets.  ECF #185.  The Bankruptcy Court initially scheduled a final sale hearing for May 21, 2020 to consider final approval of the sale of the Debtor Assets.

At the May 21, 2020 hearing, the Bankruptcy Court granted Debtor's motion to set a new date for final sale hearing, among other things, and set the final sale hearing on the sale of the Debtor Assets for July 30, 2020.  At the July 30, 2020 hearing, the Bankruptcy Court approved the bid of MED as the final and only qualified bid for the Debtor Assets and authorized the assumption and assignment to MED of certain executory contracts and unexpired leases.  On August 31, 2020, the Bankruptcy Court issued an order ("August 2020 Order") which, among other things: (a) approved the sale of the Debtor Assets to MED, as described in and pursuant to the terms of the Asset Purchase Agreement; and (b) rejected the purported "overbid" by Commonwealth's affiliate, MCAP Birmingham LLC, as non-conforming and a non-qualifying bid.  ECF #381

Sale closing is anticipated to occur on or before October 31, 2021. The transaction contemplated by the Asset Purchase Agreement was initially delayed due to interference by Commonwealth in the license transfer process concerning administrative procedural requirements related to Alabama's licensing requirements. Additionally, COVID-19 Pandemic restrictions created further delays by preventing MED's ability to have contractors and other agents access MRT to perform various assessments related to modifications of the MRT facility required to satisfy closing

9

1   conditions. During these delay periods, the Debtor continued to operate and received

2   financial assistance from various federal government disaster relief programs.

3       Following the closing of the sale to MED of the MRT facility and related

4   business assets as defined in the Court's August 2020 Order: (i) net sale proceeds will

5   be paid to Wells Fargo directly from escrow; (ii) executory contracts and unexpired

6   leases will be assigned to MED; and (iii) the sale commission will be paid to Blueprint.

7   The August 2020 Order also included rulings that MED will not become a successor

8   or *alter ego* to Debtor or continue any enterprise of Debtor in connection with its

9   purchase of Debtor Assets, and that MED will have no liability to any creditor or to

10  any other person or entity as a purported successor to Debtor.  The August 2020 Order

11  further enjoined all creditors and interest holders from taking any actions against MED

12  or any affiliate or assignee of MED or against Debtor Assets to recover any claim that

13  such creditors and interest holders may have against Debtor relating in any way to

14  Debtor, Debtor Assets and/or the sale and transfer of Debtor Assets.

### 3.   Wells Fargo Claims and Treatment

16      On April 16, 2020, Wells Fargo obtained a money judgment in the Northern

17  District of Alabama Federal Court against the Limited Partners ("Judgment").

18  Collection of that Judgment has been stayed by Order of the Bankruptcy Court in

19  Adversary Proceeding Number 20-90083-LA. ("WF Adv. ECF #37"). Under

20  Bankruptcy Code Section 506, Wells Fargo is what is known as an under-secured

21  creditor. The debt amount owed to Wells Fargo is greater than the sales price the

22  Debtor obtained from MED. Net sale proceeds, after payment of the costs and

23  expenses of sale, including the sale commission to Blueprint and ordinary course

24  expenses of sale closing, such as escrow fees, title fees and related expenses reasonable

25  and necessary to close escrow, will be paid to Wells Fargo as a secured creditor in

26  satisfaction of Wells Fargo's Class 1 secured claim.  After receiving net sale proceeds

27  directly from escrow, Wells Fargo will still be owed money by both: (i) the Debtor (as

28

10

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST
AMENDED PLAN DATED 8/06/21

an under-secured, unsecured claimholder); and (ii) by the Limited Partners who were guarantors of the Debtor's financial obligations to Wells Fargo and against whom Wells Fargo obtained the judgment.

As a debt obligation of both the Debtor and the Limited Partners, however, the balance of Wells Fargo's claim amount after Wells Fargo's receipt of the net proceeds of sale has been separately classified in the Plan as the Class 2 Judgment Claim. The Judgment Claim amount will continue to earn interest at the applicable Federal Judgment Interest Rate of 0.22 percent. Interest and principal will be paid to Wells Fargo on its Judgment Claim under the Plan by regular monthly payments of $80,000 per month until December 31, 2021 and payments of $165,000 per month thereafter until the Class 2 Judgment Claim is paid in full by a balloon payment of the full remaining balance of Wells Fargo's Class 2 Judgment Claim no later than October 31, 2023, as more fully discussed below.

### 4. <u>Post-Petition Challenges Faced by the Debtor</u>

The COVID-19 pandemic has had a significant impact on senior care facilities nation-wide and world-wide. For the Debtor, the COVID-19 pandemic significantly increased operating costs. The care and safety of Residents and employees was and remains the Debtor's top priority. Fortunately, MRT did not experience any known cases of the novel coronavirus in Residents or staff until early 2021. As the development and proliferation of an immunization became available, the Debtor took steps to expedite the vaccination of Residents and employees in the early portion of 2021.  The Debtor's vaccination and safety protocols created very effective barriers against the spread and effects of COVID-19 at MRT.

The significant financial impacts from the COVID-19 pandemic were partially offset through the Debtor's participation in various government assistance and grant programs. Following the June 26, 2020 entry of a Preliminary Injunction Order issued by the Bankruptcy Court in Adversary Proceeding Number 20-90073-LA ("SBA Adv.

11

ECF #26) on July 2, 2020, the Debtor received $1,138,105.00 in a Small Business Administration ("SBA") guaranteed funding grant through the PPP Program (the "PPP Funds"). Additionally, between April 2020 and February 2021, the Debtor received additional funds consisting of grant funds from the CARES Act Healthcare Relief Program, stimulus and other funds from the HHS Provider Relief Fund, and funds from Medicaid. These funds, received post-petition, between April 2020 and February 2021, including the PPP Funds described above, total $1,801,716, all of which were reported and reflected in the Debtor's Monthly Operating Reports filed in the Case.

A second significant challenge facing the Debtor concerns litigation with the SBA. With the exception of the PPP Funds, all of the other governmental emergency relief funding which the Debtor received was in the form of grants which do not need to be repaid. Use and forgiveness of the PPP Funds, however, became the subject of significant litigation between the Debtor and the SBA. Initially, the SBA took the position that Chapter 11 Debtors were not eligible to obtain PPP Funds. The Debtor disagreed and sought emergency declaratory and injunctive relief from the Bankruptcy Court ordering the SBA to permit the Debtor to participate in the PPP Funds Program.

On May 27, 2020, the Debtor filed an Adversary Proceeding naming as defendants the SBA and its then Administrator, the Honorable Jovita Corranza.[4] On June 26, 2020, following extensive briefing and argument, the Bankruptcy Court granted the Debtor's Emergency Application for an Injunction (SBA Adv. ECF #26), and the SBA honored the Injunction thereby permitting the Debtor to receive the PPP Funds. Subsequently, on July 10, 2020, the SBA appealed the Bankruptcy Court's Decision to the United States District Court for the Southern District of California (SBA ECF Adv. #31). On March 26, 2021, the District Court entered an Order: 1) vacating the Bankruptcy Court's decision; and 2) granting the SBA's Motion for

---

[4] The SBA Adversary Proceeding is identified as Adversary Proceeding Number 20-90073-LA. The initial appeal by the SBA to the United States District Court for the Southern District of California is identified as Case Number 20-CV-1308. Currently, the pending Appeal that has been taken by the Debtor to the United States Court of Appeals for the Ninth Circuit is identified as Appellate Case Number 21-55547.

12

Withdrawal of the Reference (SBA ECF Adv. #78). On May 24, 2021, the Debtor appealed the District Court Decision to the Ninth Circuit Court of Appeals where the matter remains pending.

On June 21, 2021, Debtor filed its Opening Brief in the Appeal (Appeal ECF# 10) and the parties have subsequently agreed to participate in the Ninth Circuit's voluntary mediation program. If settlement cannot be achieved, challenges presented by the SBA litigation remain active for the Debtor.  Full briefing to the Ninth Circuit Court of Appeals is not expected to be completed until October 2021.  If and to the extent that the SBA prevails in its arguments on appeal, and if the Debtor's application for forgiveness of the PPP funds is denied[5], it is possible that the SBA will ultimately be allowed a post-petition claim that the Debtor will have to repay, and which may require additional funding by the Limited Partners, which the Limited Partners have agreed to provide.  If and to the extent that any portion of the SBA claim survives the pending appeal process, the Debtor intends to object to the SBA's claim on multiple grounds and to seek disallowance of the claim.  If the SBA Claim is finally allowed in any amount against the Debtor, then the SBA will be paid 100 percent of its allowed claim in quarterly installments of principal and interest over a five-year (60-month) period together with 1 percent per annum interest  amortized over a five-year (60-month) period commencing upon the order allowing its Claim becoming final, with quarterly payments then commencing thereafter to the SBA on the 10th day of the first full month following the order approving its Claim becoming final, in full satisfaction of the SBA's Claim.

A third major challenge which the Debtor faced related to the litigation which was required to be commenced by the Debtor against Wells Fargo.  Since the Debtor was the principal obligor on the debt owed to Wells Fargo, and the Limited Partners

---

[5] The SBA has never argued that the Debtor did not use the PPP funds as Congress intended and, as a result, the Debtor believes that its application for forgiveness should be approved in full.  The SBA has been in receipt of that application since November 2020, and has failed to act on it, despite the Debtor's complete compliance with all requirements.

13

were only secondarily liable for the debt, the Debtor was placed in an unusually difficult financial dilemma. On January 22, 2020, the Bankruptcy Court initially approved emergency loan (line of credit) funding for the Debtor from the Limited Partners in order for the Debtor to maintain safe operating conditions at MRT (ECF #48). On February 4, 2020, the Bankruptcy Court approved Interim Financing arrangements between the Debtor and the Limited Partners for line of credit borrowing (ECF #100). Thus, the Limited Partners effectively became the financial backstop for the Debtor to continue in safe operation while timely paying all post-petition operating expenses and making adequate protection payments of $65,000 per month to Wells Fargo.

On April 16, 2020, Wells Fargo obtained the Alabama Judgment against the Limited Partners and shortly thereafter commenced actions to collect on the Judgment. With the financial viability of the Debtor's operations and the health and safety of Residents and employees being placed in jeopardy, the Debtor commenced an Adversary Proceeding (Adversary Proceeding Number 20-90083-LA) against Wells Fargo requesting that Wells Fargo be restrained and enjoined from taking actions against the Limited Partners to collect the Judgment debt. On June 23, 2020, the Debtor commenced an Adversary Proceeding naming Wells Fargo as the Defendant. (WF Adv. ECF #1). On August 6, 2020, the Preliminary Injunction requested by the Debtor was approved (WF Adv. #37) and continues in place pursuant to Court Order approving a Stipulation between the parties. (WF Adv. EFC #38).

The injunction, by its terms, will expire 30-days after closing of the sale to MED, but Plan confirmation provides for and allows the Debtor and the Limited Partners to pay the full amount of Wells Fargo's Class 2 Judgment Claim over time and without the necessity of further injunctive relief being necessary other than as expressly provided in the Plan.

14

The final set of hurdles placed as obstacles to the Debtor's Chapter 11 progress concerned litigation efforts undertaken by Commonwealth both to pursue Commonwealth's pre-petition actions against the Debtor and the Limited Partners and to interfere with the actions undertaken by the Debtor to sell Debtor Assets to MED. After the Chapter 11 Case was filed, the Debtor removed the Commonwealth Lawsuit to Alabama Federal Court. The Alabama Bankruptcy Court then ordered venue of the removed lawsuit transferred to the Southern District of California, and the Commonwealth Lawsuit has become an Adversary Proceeding in the Bankruptcy Court as Adversary Proceeding Number 20-90060-LA-11.

Litigation of Commonwealth related actions and proceedings has been held in abeyance pending closing of the sale of the Debtor Assets in order to maintain safe operations at MRT and allow the Debtor and its management to focus on finalizing the sale closing. The Debtor anticipates that litigation with Commonwealth will proceed after the sale closing. The Debtor believes that: (i) Commonwealth is owed nothing by either the Debtor or by the Limited Partners; and (ii) Commonwealth's actions have caused significant damage to the Debtor and the Limited Partners by reason of Commonwealth's pre-and post-petition actions, including violations of the automatic stay. It is assumed that Commonwealth disputes the Debtor's and the Limited Partners' contentions and holds contrary beliefs.

### 5. Summary of Classification and Treatments of Classified Claims and Interests

The discussion below summarizes the classification and treatment of the classified Allowed Claims and Interests. The detailed discussion of these topics are set forth at length in section III.B. below.

**Class 1:** The Allowed Secured Claim of Wells Fargo ("Secured Claim") will be paid in full through payments to Wells Fargo directly from escrow of the net sales proceeds resulting from sale of the Mount Royal Towers Debtor Assets to MED.

15

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

**Class 2:**  The Class 2 Allowed Wells Fargo Section 506 Bifurcated Judgment Claim ("Judgment Claim") will be paid in full with interest over 24 months on the terms described in section III.B. below.

**Class 3A:**  The Class 3A Disputed Unsecured Commonwealth Claim is disputed and unliquidated and was filed by Commonwealth as a $0 (Zero) amount claim, and as such it will receive $0 (Zero) under the Plan. If the Commonwealth Claim is finally allowed in any amount against the Debtor, or if Commonwealth obtains a money judgment against the Limited Partners, then Commonwealth will be paid 100 percent of its Allowed Class 3 Claim or Judgment with interest over five years on the terms set forth in section III.B.  below.

**Class 3B:**  The Class 3B Disputed Unsecured SBA Claim will receive nothing under the Plan.  If the SBA Claim is finally allowed in any Amount against the Debtor, then the SBA will be paid 100 percent of its Allowed Class 3B Claim with interest over five years on the terms set forth in section III.B. __ below.

**Class 4:**  The Allowed Class 4 Claims of the Residents of Mount Royal Towers will be treated as follows: Resident Contracts will be assumed by the Debtor and assigned to MED on the terms set forth in section III.B below.

**Class 5:**  The Allowed Unsecured Claims of all creditors not included in any other Class will be paid in full, with simple interest fixed at the federal judgment rate that exists as of the Effective Date, amortized over a two-year (24-month) period commencing on the Effective Date on the terms set forth in section III.B.  below.

**Class 6:** The holders of Allowed Class 6 Claims will be paid in full in Cash on the Effective Date of the Plan.

**Class 7:**  The holders of Allowed Class 7-A Unsecured Claims will receive nothing in the Plan and will have their Sub-Class 7-A Claims discharged in the Order Confirming the Plan.  The Holders of Allowed Sub-Class 7-B Claims will be entitled to receive all Litigation Proceeds that may be awarded and paid to the Limited Partners

16

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

and which they will use to pay to the holder of the Class 2 Judgment Claim until such Class 2 Judgment Claim is paid in full, and to the extent that any such Litigation Proceeds are also used to pay Allowed Class 5 Claims.

**Class 8:** The Allowed equity interests of the Debtor existing on the Petition Date shall be cancelled and extinguished as of the Effective Date and the holders of Class 8 interests shall not receive any distributions under the Plan.

### 6.    Recommendation of the Debtor as Plan Proponent

IN THE VIEW OF THE DEBTOR AS PLAN PROPONENT, THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY AND CERTAINTY FOR CREDITORS THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS OF THE DEBTOR AND RECOMMENDS THAT CREDITORS VOTE TO ACCEPT THE PLAN.

### C.    PURPOSE OF THIS DOCUMENT

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

(1)    **WHO CAN VOTE OR OBJECT TO CLAIMS;**

(2)    **WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your Claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

17

**(3)    THE HISTORY OF DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;**

**(4)    WHAT THINGS THE BANKRUPTCY COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

**(5)    WHAT IS THE EFFECT OF CONFIRMATION; AND**

**(6)    WHETHER THE PLAN IS FEASIBLE**

This Disclosure Statement cannot tell you everything about your rights. It is recommended that you consult with your own legal counsel to obtain more specific advice on how the Plan will affect your rights and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement. If there are any inconsistencies between the Plan and this Disclosure Statement, the provisions of the Plan will govern.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court [has approved] this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**D.    DEADLINES FOR VOTING AND OBJECTING; CONFIRMATION HEARING DATE**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THE CHAPTER 11 CASE.

18

### E.  TIME AND PLACE OF THE CONFIRMATION HEARING

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place on [DATE–TBD], 2021 in Department 2, Room 118, of the United States Bankruptcy Court for the Southern District of California.

### F.  DEADLINE FOR OBJECTING TO THE CONFIRMATION OF THE PLAN

Objections to the Confirmation of the Plan must be filed with the Bankruptcy Court and properly served to ensure that any objections are actually and timely received by counsel for Debtor by [DATE–TBD], 2021.

### G.  IDENTITY OF PERSON TO CONTACT FOR MORE INFORMATION REGARDING THE PLAN

Any interested party desiring further information about the Plan should contact counsel for Debtor, James P. Hill, Sullivan Hill Rez & Engel, APLC, 600 B Street, 17th Floor, San Diego, California 92101, Telephone: (619) 233-4100, or electronic mail at hill@sullivanhill.com.

### H.  DISCLAIMER

The financial data relied upon in formulating the Plan is based on Debtor's books and records and historical financial statements. Debtor's management represents that the information contained in this Disclosure Statement is true and correct to Debtor's best knowledge. The Bankruptcy Court has not yet determined whether the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

### I.  IMPORTANT NOTICES AND CAUTIONARY STATEMENTS

The liquidation analysis, estimates, and other financial information referenced in this Disclosure Statement and in the Plan were developed by the Debtor with the assistance of its Professionals. Although the Debtor's Professionals assisted in the preparation of this Disclosure Statement, in doing so, such Professionals relied upon

19

factual information and assumptions regarding financial, business, and accounting data provided by Debtor and management, none of which information has been audited. Debtor's Professionals have not independently verified such information and, accordingly, make no representations or warranties as to its accuracy. Moreover, although reasonable efforts have been made to provide accurate information, Debtor cannot represent or warrant that the information provided or referenced in this Disclosure Statement, including without limitation any and all financial information, is without inaccuracy or omission.

This Disclosure Statement contains only a summary of the Plan. All creditors and holders of Interests are encouraged to read and carefully analyze this Disclosure Statement in its entirety, including the attached Plan and the matters described in this Disclosure Statement, prior to submitting votes in favor of or against the Plan. All summaries of the Plan contained in this Disclosure Statement are qualified in their entirety by the Plan itself and documents described in this Disclosure Statement and the Plan as being filed prior to approval of this Disclosure Statement, which are controlling in the event of any inconsistency. Subsequent to this date, there can be no assurance that (a) the information and representations contained are materially accurate or (b) that this Disclosure Statement contains all material information.

No person or entity may rely upon the Plan or Disclosure Statement for any purpose other than to determine whether to vote in favor of or against the Plan. Nothing contained in such documents constitutes an admission of any fact or liability by any party and no information contained in such documents may be deemed evidence of any tax or other legal effects of the Plan on holders of Claims or Interests in the Chapter 11 Case.

Bankruptcy Court approval of this Disclosure Statement does not constitute either a guaranty of the accuracy or completeness of the information contained in this Disclosure Statement or an endorsement of the Plan by the Bankruptcy Court.

20

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission nor has the Commission passed or opined upon the accuracy or adequacy of the statements contained herein.

As to contested matters, adversary proceedings and other actions or threatened actions, this Disclosure Statement shall not be construed as an admission or stipulation, but rather as a statement made in settlement negotiations.

No statements or information regarding the Debtor, its assets or securities are authorized, offered, or made, other than the statements expressly made in this Disclosure Statement.

## II.    FURTHER BACKGROUND INFORMATION

### A.    DESCRIPTION AND HISTORY OF DEBTOR'S BUSINESS AND MANAGEMENT

Vestavia Hills, Ltd. was formed as an Alabama limited partnership in 1997. The Debtor is currently owned by eight limited partners, including the Limited Partners. The Debtor owns a 100 percent ownership interest in MRT.

Renee Barnard, the trustee and beneficiary of one of the Limited Partners, is the Debtor's Chief Operating Officer, and Charles Barnard, also a Limited Partner, has been the Debtor's on-site property manager.

### B.    PRINCIPALS/AFFILIATES OF DEBTOR'S BUSINESS

The Debtor has one general partner, IPG Holding, a California corporation, which is entitled to 1 percent of the Debtor's profits and losses pursuant to the Debtor's existing limited partnership agreement, as amended to date. The Debtor has eight limited partners who, as of the date hereof and prior to the Effective Date, would otherwise be entitled collectively to the other 99 percent of the Debtor's profits and losses and individually as follows: HCG Lending, LLC, a California limited liability Debtor, 62.093125 percent; HCG Properties, LLC, a California limited liability Debtor, 16.573951 percent; Judith Chance, Trustee, Declaration of Trust dated 2/16/88

21

Trust No. 2, as amended, 3.483231 percent; Karen L. McElliott, Trustee, Non-Exempt Trust C under the Ronald Joseph & Karen L. McElliott 1985 Family Trust dated 8/4/84, 3.483231 percent; Frank A. Virgadamo, Trustee, Virgadamo Family Trust dated May 6, 1996, 3.483231 percent; Jack L. Rowe, Trustee, Jack and Barbara Rowe Family Trust dated April 21, 1998, 3.483231 percent; JRMF Leasing Corporation, a California corporation, 3.340520 percent; and B. Renee Barnard, Trustee, Barnard Living Trust dated April 13, 2000, 3.059480 percent.

Each of HCG Lending, LLC and HCG Properties, LLC are managed by ActivCare Living, Inc.  D. Kevin Moriarty is the Chief Executive Officer of ActivCare Living, Inc. and B. Renee Barnard is the President of ActivCare Living, Inc.  HCG Lending, LLC is owned by the Limited Partners, and ActivCare Living, Inc.  HCG Properties, LLC is owned by the Limited Partners and six other individuals.  D. Kevin Moriarty is the President/CEO of JRMF Leasing Corporation, and B. Renee Barnard is the Exec. Vice President/Treasurer of JRMF Leasing Corp.  JRMF Leasing Corporation is owned by the trusts of Rowe, McElliott, Chance and Virgadamo.

## C.    MANAGEMENT OF DEBTOR BEFORE AND AFTER THE BANKRUPTCY

The management of the Debtor before the bankruptcy filing was performed through a management team, which consisted of: Renee Barnard, Charles Barnard and Kevin Moriarty. In addition, outside consultants were retained as needed. Accounting is, for the most part, handled through an outside accountant.  The Debtor is currently using the same management team and will continue to do so through and after closing the sale of the MRT facility and related business assets to MED.

## D.    EVENTS LEADING TO CHAPTER 11 FILING

The Debtor had gross income in 2019 of $9,850,144 with operating income losses of $3,075,022. In 2020, the Debtor had gross income of $9,672,787 with operating income losses of $3,551,392.  Year-end balance sheets of the Debtor and

22

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

profit and loss statements reflecting the results of the Debtor's operations for the years 2017 through 2020 are available for review by contacting counsel to the Debtor and requesting said balance sheets and statements.

Before the petition was filed the Debtor was able generally to pay its expenses and claims as they became due, up until the time Wells Fargo called its note all due and payable, as described above. The Chapter 11 filing became necessary as a result of the enormous financial burdens imposed by the "all-due" nature of the Debtor's principal loan obligation with Wells Fargo as discussed above, and further as a result of the increasingly costly impact of Commonwealth's refusal to timely close on the Commonwealth Purchase Agreement.

### E.   SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE

#### 1.   Significant Bankruptcy Proceedings and Events

On January 3, 2020, the Debtor filed a voluntary petition to reorganize under Chapter 11 of the Bankruptcy Code and an order for relief was entered by the Bankruptcy Court. The Chapter 11 Case was assigned to the Honorable Louise DeCarl Adler, United States Bankruptcy Judge. ECF #1. Since the Petition Date, the Debtor has operated as a debtor-in-possession pursuant to the applicable provisions of the Bankruptcy Code.

First, as required, pursuant to Court Orders, the Debtor retained Sullivan Hill Rez & Engel as General Counsel; Squar Milner, LLP as Accountants; Elisabeth Eisner as Special Transactional Counsel; Campbell Partners, APC as Special Litigation Counsel; and Harbuck Keith & Holmes LLC as Special Alabama Licensing and Regulatory Counsel. The Bankruptcy Court approved the employment of these professional persons by Orders, respectively: (i) entered January 30, 2020 of Sullivan Hill (ECF #80); (ii) entered February 3, 2020 of Squar Milner (ECF #96); (iii) entered February 10, 2020 of Ms. Eisner (ECF #112); (iv) entered February 10, 2020 of

23

Campbell Partners (ECF #114); and (v) entered April 16, 2020 of Harbuck Keith (ECF #210).

Second, Debtor filed its emergency Motion for Interim Use of Cash Collateral on January 3, 2020 (ECF #5). Commonwealth objected to the use of cash collateral, but the Bankruptcy Court granted the Debtor's emergency motion on January 15, 2020 (ECF #35).  Ultimately, the Debtor and Wells Fargo stipulated to adequate protection permitting the use of cash collateral so long as the Debtor paid Wells Fargo $65,000 per month. An order approving the Debtor's Stipulation with Wells Fargo was entered by the Bankruptcy Court on February 3, 2020 (ECF #95).

Third, the § 341(a) Meeting of Creditors was held on January 28, 2020 and concluded at that time.

Fourth, on May 4, 2020, the Bankruptcy Court entered the Bar Date order (ECF #235) fixing July 6, 2020 as the deadline for filing certain proofs of Claim and Interests in the Chapter 11 Case.  Notice of the Bar Date was mailed to parties in interests in the Chapter 11 Case on May 5, 2020 (ECF #237).  Finally, the Bar Date order provides that any creditor that is required to, but does not, file a proof of Claim within the time fixed therein for so doing shall be forever barred from (i) participating in the Chapter 11 Case; (ii) voting with respect to any plan of reorganization filed in the Chapter 11 Case; and (iii) receiving any distribution under any plan of reorganization filed in the Chapter 11 case. (ECF # 235).

Fifth, on February 6, 2020, the Debtor and MED entered into the Asset Purchase Agreement, which provides for the sale of the Debtor Assets to MED for an aggregate purchase price of $12,000,000 and payment of a sale commission equal to 1.5 percent of the purchase price to Blueprint. The August 31, 2020 Order issued by the Bankruptcy Court (ECF #381), among other things: (a) approved the sale of Debtor Assets to MED, pursuant to the terms of the Asset Purchase Agreement; (b) rejected the purported "overbid" by Commonwealth's affiliate, MCAP Birmingham LLC as

24

non-conforming and a non-qualifying bid; and (c) approved the assumption of the then-existing Resident Contracts with residents of MRT and further approved the assignment of those then-existing Resident Contracts to MED, effective on the closing of the sale of the MRT assets to MED.

The net proceeds of the sale, after payment of the costs and expenses of sale, including the sale commission to Blueprint and the ordinary course expenses of sale closing, including escrow fees, title fees and related expenses reasonable and necessary to close escrow, will be paid to Wells Fargo directly from escrow. The balance of the claim of Wells Fargo will be a general unsecured claim, subject to final allowance pursuant to Bankruptcy Code § 506(a). The closing date of the sale of the Debtor Assets to MED is expected to occur approximately on or before September 30, 2021. At or promptly following the closing of the sale of the Debtor Assets to MED: (i) the net proceeds of the sale will be paid to Wells Fargo directly from escrow; (ii) certain executory contracts and unexpired leases (as more fully described in Exhibit "2" of the August 2020 Order) will be assigned to MED; and (iii) the sale commission will be paid to Blueprint.

Sixth, between January 23, 2020, and April 16, 2020, pursuant to order issued by the Bankruptcy Court, the Debtor made payments to Wells Fargo totaling $195,000 at $65,000 per month. Between April 17, 2020, and June 15, 2021, the Debtor made payments to Wells Fargo totaling an additional $910,000 at $65,000 per month. On August 6, 2020, the Bankruptcy Court issued an order granting a preliminary injunction against Wells Fargo preventing Wells Fargo from enforcing the Alabama Court's April 16, 2020 Judgment against assets of the Limited Partners. Based on the preliminary injunction order, between August 15, 2020 and June 15, 2021, Wells Fargo received additional payments from the Limited Partners totaling $165,000. On January 15, 2021, Wells Fargo received an additional payment of $1,000,000 from the Limited Partners. In summary, after the Petition was filed, Wells Fargo has been paid

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

a total of $2,270,000 consisting of $1,105,000 from the Debtor and $1,165,000 from the Limited Partners.

Seventh, on February 4, 2020, the Bankruptcy Court issued an order authorizing the Debtor to enter into a Post-Petition Line of Credit with the Limited Partners as lenders totaling $3,100,000. (ECF #100). The Line of Credit has been used as it was intended, namely, to make payments for the Debtor's operating expenses, general corporate expenses, and administrative expenses as allowed by the Bankruptcy Court, including as necessary for the Debtor to make the Debtor's monthly $65,000 payments to Wells Fargo.

**2.    Legal Proceedings**

The Debtor has the following lawsuits or Adversary Proceedings pending:

    a.  *Commonwealth Assisted Living, LLC, Series E v. Vestavia Hills, Ltd., Judith A. Chance, Karen McElliott, Frank A. Virgadamo, Connie Virgadamo, B. Renee Barnard, Charles Barnard and Jack L. Rowe," now identified in* Case No. 20-00018-LA11, Adv. Proc. No. 20-90060-LA, and *Vestavia Hills, Ltd. Vs. Commonwealth Assisted Living, LLC*, Adv. Proc. 20-90029-LA, which have both been stayed but which the Debtor believes will or should be proceeding to a conclusion in the Bankruptcy Court.

    b.  *Vestavia Hills, Ltd. dba Mount Royal Towers v. Wells Fargo Bank National Association,* Adv. Proc. No. 20-90083-LA, which the Debtor believes is fully resolved by the treatment of Wells Fargo by the Plan, albeit the Section 105 injunction

26

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

against Wells Fargo is to remain in place as long as Plan payments continue to be made as provided herein.

c.  *Vestavia Hills, Ltd. dba Mount Royal Towers v. the Administrator of the United States Small Business Administration,* Adv. Proc. No. 20-90073, currently on appeal in the United States Court of Appeals for the Ninth Circuit as Case Number 21-55547, as more fully discussed below.

d.  The Jefferson County Board of Tax Assessors ("Board") improperly assessed the value of the Real Property.  On April 17, 2020, the Debtor filed a motion in the Bankruptcy Court for determination of the value of the Real Property in Alabama.  (ECF #213). On May 29, 2020, the Bankruptcy Court granted the motion that the tax assessments of the Real Property for the years 2019 and 2020 be lowered to $12,000,000. (ECF #276).  The Board and the Debtor subsequently agreed to compromise their positions settling the dispute, and all sums due to the Board pursuant to the parties' settlement for the Debtor's ad valorum taxes for tax years 2019 and 2020 have been paid in full.  This matter has since been concluded.

### 3.    <u>Post-Confirmation Litigation Information for Creditors</u>

The SBA, Commonwealth and Wells Fargo cases and proceedings listed above have been stayed pending the closing of the sale of the Debtor Assets to MED.

Following closing of the sale to MED and termination or expiration of the stays or injunctions then in place with respect to the SBA, Commonwealth and Wells Fargo, the Limited Partners will continue to honor their post-confirmation agreement to fund

27

the Reorganized Debtor to enable the Debtor to receive and use new equity funding as needed to: (A) pay ongoing administrative costs and expenses of the Reorganized Debtor; (B) make Plan required payments to Wells Fargo; and (C) continue to pursue and defend litigation and appeals with: [i] the SBA concerning the Debtor's right to receive PPP loan funds and to have forgiven the portion of the PPP funding eligible for forgiveness, as permitted by the CARES Act and applicable SBA regulations;  [ii] Commonwealth; and [iii] Wells Fargo, if and as needed.

Post-Confirmation, the Debtor and Limited Partners believe that ongoing or stayed litigation will continue or terminate as follows.

**With respect to Wells Fargo:** Plan Confirmation will functionally end the litigation with Wells Fargo. So long as the Debtor and Limited Partners stay current with all Plan required payments to Wells Fargo, then Wells Fargo will continue to be stayed and enjoined from commencing or undertaking any enforcement or collection actions against the Limited Partners or against the assets of the Limited Partners.  Upon payment in full of the Class 2 Judgment Claim, Wells Fargo will file an Acknowledgement of Satisfaction of Judgment and will cause the dismissal of the Alabama Federal Court Action, with prejudice, to occur.

**With Respect to Commonwealth**: The Debtor believes that the Bankruptcy Court will retain jurisdiction to hear, determine and decide all matters relating to the litigation between Commonwealth on the one side and the Debtor and its Limited Partners on the other. Commonwealth filed a motion for the Bankruptcy Court to Abstain; or in the Alternative to Remand the Removed Lawsuit to State Court. The Court fixed September 16, 2021 as the date for hearing Commonwealth's motions.

Commonwealth's litigation as filed to date also includes Commonwealth's Motion for Relief from Stay filed in the Bankruptcy Court to continue its action against the Limited Partners and the Debtor.  Once the sale to MED closes, the Debtor will stipulate to stay relief so that all litigation with Commonwealth, including any claim

28

objections and affirmative claims for damages which the Debtor and Limited Partners will be filing against Commonwealth, can be fully, fairly, and finally resolved.

The Debtor will apply 100 percent of the proceeds which the Debtor receives from any litigation recovery from its litigation against Commonwealth: [i] first, *pro rata* to all Allowed Class 5 Claimholders up to the Allowed Principal Amount of any Class 5 Claim until all such Allowed Class 5 Claims are paid in full; [ii] next to Wells Fargo until the Allowed Class 2 Judgment Claim is paid in full with interest as provided in the Plan; [iii] finally, the balance of any then remaining litigation recovery amounts will be paid to the Limited Partners on account of their Class 7-B Claim until the Allowed Principal Amount of the Class 7-B Claims are paid in full, without interest.

The Limited Partners will assign to Wells Fargo 100 percent of the proceeds which the Limited Partners may receive from any Commonwealth litigation recovery for the payment of the Allowed Amount of any then remaining unpaid amount of the Class 2 Judgment Claim. If the Class 2 Judgment Claim is paid in full, any remaining litigation proceeds will then be used to pay any then unpaid legal or accounting fees owed by the Reorganized Debtor to its legal and accounting professionals.

**With Respect to the SBA:** The Debtor sued the SBA and the Administrator of the SBA for injunctive relief to compel the SBA to permit the Debtor to participate in the PPP under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") passed by the United States Congress in response to the COVID-19 pandemic. The PPP expanded allowable uses of SBA 7(a) loans to support payroll costs, rent, mortgage interest, utilities, and interest on existing debt obligations. Provided that loan proceeds are used for the uses permitted under the PPP and all other PPP conditions are satisfied, a significant percentage or the entirety of the PPP funds would qualify for forgiveness, and any balance not forgiven would be loaned to the borrower at an interest rate of 1 percent per annum payable over a five-year period for PPP

29

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

funding made on or after June 2020 as permitted by applicable amended SBA regulations.  The Debtor initially prevailed in obtaining a preliminary injunction in its lawsuit against the SBA and received PPP funds totaling $1,138,105.

The Debtor applied for full forgiveness of the entirety of the PPP loan since the Debtor's use of the funds qualified in full for forgiveness under the PPP.  As stated above, that application for full forgiveness was timely filed by the Debtor in November 2020, and the SBA has not yet acted upon it.

The SBA, however, successfully appealed the decision in the Debtor's favor to the United States District Court for the Southern District of California and obtained a reversal of the decision granting an injunction. The decision of the United States District Court for the Southern District of California was subsequently appealed by the Debtor to the Ninth Circuit Court of Appeals.

The Debtor will continue to pursue and defend litigation and appeals concerning its right to receive PPP loan funds and to have the portion of the PPP loan that is eligible for forgiveness forgiven as permitted by the CARES Act and applicable SBA regulations.  The Debtor and SBA have agreed to enter into the Ninth Circuit's Voluntary Mediation Program to see if the matter can be settled.  Additionally, the briefing schedule for the Appeal has been extended by the Court of Appeals in order to accommodate what will hopefully be a consensual resolution of the Debtor's dispute with the SBA.  If settlement with the SBA cannot be achieved, if and to the extent thereafter the SBA prevails in its arguments on appeal, it is possible that the SBA will assert it should be allowed a post-petition Administrative Priority Claim that the Debtor will have to pay, and which may require additional funding by the Limited Partners.  If and to the extent that any portion of the SBA Claim survives the pending appeal process, the Debtor intends to object to the SBA's claim on multiple grounds and to seek disallowance of the claim. If the SBA Claim is finally allowed in any amount against the Debtor, then the SBA will be paid 100 percent of its Allowed

30

Class 3B Claim in quarterly installments of principal and interest over a five-year (60-month) period with 1 percent per annum simple interest amortized over a five-year (60-month) period commencing upon the order allowing its Claim becoming final, with quarterly payments then commencing thereafter to the SBA on the 10th day of the first full month following the order approving the Class 3B Claim becoming final, in full satisfaction of the Class 3 Claim.

## F. CLAIMS AND CLAIMS OBJECTIONS

Claims against the Debtor consist of those scheduled by the Debtor (ECF #1) and those filed by Creditors on Proof of Claim forms (*see*, Claims Register in Bankruptcy Case Number 20-00018-LA-11), as well as any additional claims that may be added by amendment. The only secured claim against the Debtor Assets is the claim possessed by Wells Fargo, for an amount which exceeds the value of the Debtor Assets. In the Plan, Wells Fargo is separately classified as possessing two classes of Claims, Class 1, Secured, and Class 2, Judgment.

In the scheduled Claims, a number of those identified as having been owed or payable by the Debtor on the filing date consisted of two distinct categories of claims which are no longer involved as creditors in the Chapter 11 process based on actions taken by the Debtor and approved by the Bankruptcy Court to resolve the claims of the scheduled creditors.  In general, those two categories of claims involve: (i) priority employee wage and benefit claims; and (ii) Resident claims.

With respect to the priority employee claims, on January 10, 2020, the Claims of employees owed pre-petition wages, salaries, benefits, and tax withholding obligations were ordered allowed and paid by the Bankruptcy Court in full. (ECF #25). Accordingly, the Debtor paid all such Claims of employees, and therefore, all scheduled Claims belonging to employees have been satisfied, are not classified, and will not be treated in, dealt with, or paid though the Plan.

31

With respect to Resident Claims, to the extent not assumed and assigned as part of the sale process and sale to MED, those claims are separately classified (Class 4), and all such Claims will be separately satisfied through the closing of the sale by being assigned to MED upon sale closing. Modification of the Class 4 Claims (through substituting a new health service provider by Court Order) may constitute "impairment" of the Claims which the Residents may possess, again, to the extent not already assumed and assigned. Accordingly, the remaining Class 4 Residents whose contracts are to be assigned to MED are treated in the Plan as being impaired and, as a result, are eligible to vote to accept or reject the Plan.

Finally, the Claims of the Limited Partners are also separately classified as Sub-Class 7-A and 7-B in the Plan. Prior to the Chapter 11 filing, the Limited Partners loaned the Debtor substantial amounts of money in order to obtain extensions from Wells Fargo, reduce the principal of the Wells Fargo debt and cover operating losses. The Limited Partners also guaranteed the Debtor's debt to Wells Fargo, which as discussed above, became the subject of an American Arbitration Award issued against the Limited Partners in the amount of $18,086,910.61.

Class 5 consists of scheduled and filed, non-duplicate, undisputed claims of general unsecured creditors, after removing from Class 5 all employee (priority/satisfied), and separately classified Resident, Limited Partner, Wells Fargo, SBA and Commonwealth claims. Class 5 thus consists of: (i) eight (8) unsecured creditor claims that were timely filed totaling $187,595.30; and (ii) sixty-seven (67) scheduled (originally and by recent amendment) unsecured creditors with scheduled claims totaling $1,436,133.96. This amount includes the $1,188,556.34 unsecured claim for ActivCare Living for advances, management fees, and direct chargebacks. The eight filed claims are included within the 67 scheduled claims. The Debtor has identified at least six unsecured claims to date for which objections will be filed, due to disputes over amounts owed. The Debtor is informed that ActivCare Living will

32

waive any distribution on its claim of $1,188,556.34 conditioned on confirmation of the Debtor's Plan as presented herein, which will enable the Debtor to make 100-cents-on-the-dollar distributions to holders of Allowed Claims of non-insider Class 5 general unsecured creditors. As a result, after removal of ActivCare Living's unsecured claim, there remains $247,577.62 in general unsecured claims to be paid through the Plan, subject to adjustment based on resolution of claims objections as appropriate.

Class 3A includes the disputed, unliquidated general unsecured Claim of Commonwealth, arising as a result of the Debtor's rejection of the Commonwealth pre-petition contract which Commonwealth breached and failed to perform for its purchase of the Debtor's MRT assets. The Limited Partners have filed an objection to Commonwealth's Claim. That objection also requests affirmative relief from Commonwealth seeking money damages.

Wells Fargo filed objections to the Claims of the Limited Partners. (ECF #s 321–325). The Limited Partners initially responded to the Objections requesting time to file responses. (ECF #373). Wells Fargo and the Limited Partners agreed by Stipulation to postpone all litigation related to the claim objections (ECF #377). On August 19, 2020, the Court Ordered Approval of the Stipulation. (ECF #378). The Debtor believes that Wells Fargo will withdraw the objections for two reasons. First, the unsecured claims of the Limited Partners are being discharged and not being paid through the Plan. Second, Wells Fargo will be receiving an assignment to receive any litigation proceeds which the Limited Partners will receive on account of their Class 7-B (priority and post-petition) Allowed Claims.

Objections to claims are filed by parties in interest in the Bankruptcy Case creating litigation with scheduled or filing creditors who have not proven their disputed claims, where claims are duplicative, over-inflated or not legally tenable claims. Some of the creditor claims included in the disputed portion of the creditor claims are in all three of these categories, meaning they were filed by a party in

33

DEBTOR'S PROPOSED FIRST AMENDED DISCLOSURE STATEMENT RE [PROPOSED] FIRST AMENDED PLAN DATED 8/06/21

litigation with Debtor, are over inflated, and they include claims that are part of a separate claim in the bankruptcy and thus are duplicative. Other than objections to the Commonwealth Proof of Claim, objections to the Claim of the SBA to the extent any portion of it survives following resolution of the appeal process, and objections to other claims for which Proofs of Claims were filed that are at variance with and greater than the amounts scheduled by the Debtor, the Debtor has not identified claims of other creditors which it intends to dispute other than duplicated claims. Proofs of Claim timely filed by Scheduled Creditors control claim amounts to be paid to creditors under the Plan except to the extent the Debtor files objections to those claims. Duplicate recoveries will not be paid.  The Debtor reserves all rights to object to Claims as appropriate in accordance with applicable rules and law.

## G.    FRAUDULENT CONVEYANCES AND PREFERENCE RECOVERIES

Debtor and Debtor's counsel has investigated potential claims under Bankruptcy Code §§547 and 548 and believe that there are no viable actions for avoidance and recovery of preferential and fraudulent transfers.

## III.    SUMMARY OF THE PLAN OF REORGANIZATION

### A.    UNCLASSIFIED ADMINISTRATIVE CLAIMS

**1.    Description:**  Allowed Administrative Claims are all costs and expenses of administration of the Chapter 11 Case allowed under Code §§507(a)(1), including without limitation the actual and necessary costs and expenses of preserving the Debtor's estate and operating its businesses, including wages, salaries, management fees or commissions for services rendered post-petition, any indebtedness or obligation incurred or assumed by the Debtor, as debtor-in-possession. The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date unless a particular Claimant agrees to a different treatment.

34

The Debtor employed various Professionals including Sullivan Hill Rez & Engel as General Counsel; Baker Tilly (fka Squar Milner, LLP) as Accountants; Elisabeth Eisner as Special Transactional Counsel; Campbell Partners, APC as Special Litigation Counsel; and Harbuck Keith & Holmes LLC as Special Alabama Licensing and Regulatory Counsel. Such Professionals were authorized to be paid 80 percent of their fees and reimbursed all of their costs on an interim basis. The Professionals received interim payments per a March 5, 2020 Order of the Bankruptcy Court.  (ECF #165).  Pursuant to an order granting the Professionals' first interim fee applications, the Bankruptcy Court authorized payment of the 20 percent "holdback" portions of the Professionals' fees on August 14, 2020 (ECF #374) and September 11, 2020 (ECF #390), which the Debtor has paid.  Similarly, pursuant to the order granting the Professionals' second interim fee applications, the Bankruptcy Court further authorized payment of the 20 percent "holdback portions of the Professional' fees on March 17, 2021 (ECF #s 476, 477, 478, 479, 480, and 481).

The Debtor expects the Professionals will file their third interim fee applications prior to confirmation of the Debtor's Plan, seeking authorization for payment of the 20 percent holdback portion on such Professionals' fees from December 1, 2020 through the cut-off date of their third interim fee applications.  Final fee applications for all estate Professionals will be filed after confirmation of the Plan.

The balance of unpaid Professionals' fee claims, the unpaid claims of other Court appointed officials such as the Patient Care Ombudsman (ECF #60) and the fees owed to the Office of the United States Trustee, will not be classified in the Plan, but will be paid in full  by the Debtor on the Effective Date or as the Professionals or claimholders may otherwise agree.  The following amounts were outstanding to the Professionals as of June 30, 2021:

35

| Professional | Time Period | Current Holdback (7 Months) | Monthly Average |
|---|---|---|---|
| Sullivan Hill | Dec 2020–June 2021 | $89,782.60 | $12,826.09 |
| Campbell Partners | Dec 2020–June 2021 | $8,029.50 | $1,147.07 |
| Elisabeth Eisner | Dec 2020–June 2021 | $154.00 | $22.00 |
| Baker Tilly fka Squar Milner | Dec 2020–June 2021 | $6,191.90 | $884.56 |
| Patient Care Ombudsman | Dec 2020–June 2021 | $169.46 | $24.21 |
| Harbuck | Dec 2020–June 2021 | $2,474.50 | $353.50 |
| | | $106,801.96 | $15,257.42 |

The Debtor estimates that the aggregate Amount of Allowed Administrative Claims to be paid on the Effective Date of the Plan will be approximately $150,000 based on the historical monthly average of the aggregate amounts incurred and paid to the Professionals, as reported above, taking into account that interim fees and costs will be paid in the interim period up to the Effective Date pursuant to the interim fee procedures in effect in the Case.

        **2.    Treatment:**  On the Effective Date, or as soon thereafter as is practical, each holder of an Allowed Administrative Claim (including the United States Trustee) except for the Limited Partners as Class 7-B Claimholders shall be paid in full, in cash on the Effective Date.  Each Professional employed at the expense of the Debtor's estate pursuant to Code §§327 and 1103 and an appropriate order of the Bankruptcy Court, shall be paid the unpaid portion of its Allowed Administrative Claim in Cash.  Allowed Accounts Payable Post-Petition Claims and Allowed Post-Petition Accrued Wages, if any, and other post-confirmation claims of a similar nature shall receive payment in full in Cash on the Effective Date of the Plan.  Subsequent professional legal and accounting fees will be paid by the Reorganized Debtor in the ordinary course of business without the need for Bankruptcy Court Approval.

36

The United States Trustee's fees will be paid in accordance with 28 U.S.C. §1930(a)(6). The Reorganized Debtor shall be responsible for the timely payment of all fees incurred after the Effective Date pursuant to 28 U.S.C. § 1930(a)(6).

Post-Confirmation, the United States Trustee's fees shall be paid on a quarterly basis until a final decree is entered or the Chapter 11 Case is dismissed or converted and shall not accrue thereafter.

### 3. Court Approval of Post-Confirmation Fees Not Required

Requests by Professionals for payment of fees and costs are generally subject to review and approval by the Bankruptcy Court. Post-Confirmation no such approval will be necessary and those fees and costs will be paid in the ordinary course of business. Additionally, fees of the Bankruptcy Court Clerk and the Office of the United States Trustee will not be subject to Bankruptcy Court approval and may be paid in the ordinary course of business when due.

### B. DESIGNATION AND TREATMENT OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS

The following sets forth the designation and treatment of those classified Claims and Interests which are impaired under the Plan. Each member of the impaired Classes as set forth below are entitled to vote on the Plan. The Distributions received pursuant to this Article III shall represent full and final satisfaction of all Allowed Claims.

### Class 1: The Allowed Class 1 Secured Claim of Wells Fargo Bank, N.A.

**Description:** Class 1 consists of the Allowed Secured Claim of Wells Fargo in an amount equal to the net proceeds to be received when the sale of the Debtor Assets to MED closes. The Allowed Secured Claim of Wells Fargo is secured by liens on all pre-petition real and personal property assets of the Debtor subject to Wells Fargo's first priority deed of trust and security agreement perfected by applicable trust deed and UCC-1 filings. The Debtor believes that the fair market value of the Real

37

Property in which Wells Fargo claims a security interest is $12,000,000 minus the net costs of sale. This value is based on the price available to the Debtor upon closing of the Court-approved Bankruptcy Code § 363 sale of the certain Mount Royal Towers real and personal property assets, defined herein as the Debtor Assets, as approved by the Court's August 2020 Order entered August 30, 2020 (ECF #381). Pursuant to Bankruptcy Code § 506 (a), an allowed claim of a creditor secured by a lien on property in which the estate has an interest is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property and is an unsecured claim to the extent that the value of such creditor's interest is less than the amount of such allowed claim.

**Treatment:** The then due and owing amount of the secured portion of the Class 1 Secured Claim will be paid in full by paying to Wells Fargo the net sales proceeds resulting from sale of the Debtor Assets to MED, which net sales proceeds shall be paid to Wells Fargo directly out of escrow, which is expected to close on or before October 31, 2021. Notwithstanding any other provision of this Plan, the Class 1 Secured Claim of Wells Fargo is not discharged.

**Impaired/Not Impaired:** The Class 1 Claimant is impaired.

**Voting:** The Class 1 Claimant is entitled to vote on the Plan.

<u>**Class 2:**</u>     **The Allowed Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim**

**Description:** Class 2 consists of the unsecured portion of the Allowed partially secured and partially unsecured Claim held by Wells Fargo, calculated as being the remaining net amount owed to Wells Fargo on the Effective Date of the Plan based upon on the Federal Court Judgment amount that Wells Fargo obtained on April 16, 2020 against the Limited Partners after applying and deducting as credits all payments received by Wells Fargo from the Debtor and the Limited Partners after January 3, 2020. Wells Fargo's Class 2 Claim is undersecured as provided by

38

Bankruptcy Code § 506. The Debtor believes that the undersecured Amount of the Wells Fargo Judgment Claim is or will be equal to at least $2,500,000.  Following payment of all net sales proceeds to Wells Fargo from the close of escrow of the Bankruptcy Court-approved sale of the Debtor Assets, the Allowed amount of any remaining Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim will be determined by the Bankruptcy Court after notice and opportunity for hearing based upon the net amount owed to Wells Fargo Bank by the Limited Partners on the Alabama Judgment following credit against the Judgment amount being applied for payments made to Wells Fargo Bank during the Chapter 11 Case, including payment of the Class 1 Claim.

**Treatment:**  The Allowed Amount of any Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim will be paid in full as follows:  (i) monthly Cash payments in the amount of $80,000 on the 15th day of each full calendar month remaining in 2021 following the Effective Date; and (ii) monthly Cash payments in the amount of $165,000 per month beginning on January 15, 2022 and through and including the 24th calendar month following the Effective Date (October 2023), at which time the entire remaining unpaid balance owing on the Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim shall be paid in full in a balloon payment to be made no later than October 31, 2023.  Simple interest at the rate of twenty-two hundredths of one percent (0.22 percent) per annum shall accrue and be payable on the allowed amount of the Class 2 Claim (as determined by the Court), with each such payment to be applied first to then outstanding interest and then to outstanding principal from the Effective Date of the Plan until the Class 2 Wells Fargo Section 506 Bifurcated Judgment Claim is paid in full, which shall be no later than October 31, 2023. In addition, the Debtor and Limited Partners intend to continue to pursue legal proceedings and remedies against Commonwealth following the Effective Date of the Plan and through that litigation will seek recovery of Litigation Proceeds including

39

monetary damages, attorneys' fees, and costs in the amount as determined by the Court in connection with the Commonwealth Case. Following payment by the Debtor of any Litigation Proceeds applied to full payment of the Allowed Amount of any then unpaid Class 5 Claims without, the Debtor will apply any excess Litigation Proceeds received by the Debtor, up to the Allowed Amount of any Class 2 Judgment Claim, to payment of the Allowed Amount of any Class 2 Judgment Claim. Notwithstanding any other provision of this Plan, the Class 2 Judgment Claim of Wells Fargo is not discharged. Following receipt by the Limited Partners of any Litigation Proceeds in connection with the legal proceedings, the Limited Partners will apply any Litigation Proceeds received by the Limited Partners up to the Allowed Amount of any Class 2 Judgment Claim, to payment of the Allowed Amount of any Class 2 Judgment Claim. Until fully paid, with interest as provided herein, the Class 2 Judgment Claim is not discharged by the Confirmation of the Plan. As to the Debtor, the Reorganized Debtor and the Limited Partners, the Class 2 Judgment Claim and the Alabama Judgment shall not be discharged by reason of the entry of the Order confirming the Plan. Until fully paid, with interest as provided herein, the Debtor, Reorganized Debtor and the Limited Partners shall not be released and shall not receive a release of the obligations to pay the Class 2 Judgment Claim or to pay the Alabama Judgment.

**Impaired/Not Impaired:** The Class 2 Claimant is impaired.

**Voting:** The Class 2 Claimant is entitled to vote on the Plan.

**C.** **The Class 3 Disputed Claims**

**1.** **Class 3A–the Disputed Unsecured Commonwealth Claim:**

**Description:** Class 3A consists of the Disputed Claim of Commonwealth which the Debtor believes will only include the Disputed Unsecured Commonwealth Claim, if any. The Disputed Unsecured Commonwealth Claim is disputed and unliquidated and was filed as a $0 (Zero) amount claim, and should not be allowed as a Claim against the Debtor, and as such it will receive $0 (Zero) under the Plan, and

40

is, in the Debtor's opinion, therefore unimpaired. The existence and amount of any Class 3A Claim will be determined by the Bankruptcy Court after notice and a hearing.

Commonwealth has litigation pending in the Bankruptcy Court against the Debtor. The Debtor and Limited Partners intend to move for summary judgment in the Commonwealth Case and believe they will be successful on this motion. In the event the Debtor is successful on the motion for summary judgment, or thereafter if a trial on the merits is required, there will not be any Unsecured Commonwealth Claim. Commonwealth has Filed a Proof of Claim. The Debtor and the Limited Partners intend to pursue objections to the Commonwealth Proof of Claim and to seek affirmative relief from Commonwealth consisting of the Litigation Proceeds.

**Treatment:** The disputed and disallowed Commonwealth Claim will receive nothing under the Plan. The Proof of Claim filed by Commonwealth identifies no damage or claim amount being owed by the Debtor. If the Commonwealth Claim is finally allowed in any amount against the Debtor, or if Commonwealth obtains a money judgment against the Limited Partners, then Commonwealth will be paid 100 percent of its Allowed Class 3 Claim or Judgment in equal quarterly installments of principal and interest over a five-year (60-month) period with simple interest fixed at the federal judgment rate that exists as of the Effective Date, amortized over a five-year (60-month) period commencing upon the order allowing its Claim or Judgment becoming final, with quarterly payments then commencing thereafter to Commonwealth on the 10th day of the first full month following the order approving the Class 3 Claim or judgment becoming final, in full satisfaction of the Class 3 Claim or Judgment.

**Impaired/Not Impaired:** The Class 3A Claimant is disputed and not impaired to the extent that the Commonwealth Claim is determined to be $0 (Zero) consistent with Commonwealth's Proof of Claim.

41

**Voting:**  The Class 3A Claimant is not entitled to vote on the Plan unless the Bankruptcy Court permits Commonwealth to vote on the Plan after a hearing.

## 2.    Class 3B:   The Disputed Unsecured SBA Claim

**Description:** Class 3B consists of the Disputed Claim which the Debtor believes will only include the Disputed Unsecured SBA Claim, if any.  The SBA Claim is disputed, as the Debtor believes that the claim, which is based upon the claim asserted by the SBA for repayment by the Debtor of the post-petition Paycheck Protection Program ("PPP") loan that the Debtor received on July 2, 2020 in the amount of $1,138,105.  The Debtor believes that the entire amount of the PPP loan is subject to applicable forgiveness rules, and it has applied for such forgiveness. Accordingly, then the SBA should have no Claim against the Debtor, and as such it will receive $0 (Zero) under the Plan, and is, in the Debtor's opinion, therefore unimpaired. The existence and amount of any Class 3B Claim will be determined by the Bankruptcy Court after notice and a hearing. In the event the Debtor is successful on its forgiveness application, there will not be any Unsecured SBA Claim. If and to the extent the Debtor is not successful in having the Unsecured SBA Claim forgiven or disallowed, the Debtor will pay and satisfy the SBA Claim as provided herein.

**Treatment:**   The disputed and disallowed SBA Claim will receive nothing under the Plan.  If the SBA Claim is finally allowed in any amount against the Debtor,  then the SBA will be paid 100 percent of its Allowed Class 3B Claim in equal quarterly installments of principal and interest over a five-year (60-month) period with simple interest fixed at one percent (1 percent) per annum (as provided in applicable SBA regulations governing repayment of any PPP loan not qualified for forgiveness– see   https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/first-draw-ppp-loan)  amortized  over  a  five-year  (60-month) period commencing upon the order allowing its Claim becoming final, with quarterly payments then commencing thereafter to the SBA on the 10th day of the first full

42

month following the order approving the Class 3B Claim becoming final, in full satisfaction of the Class 3B Claim.

**Impaired/Not Impaired:**  The Class 3B Claimant is disputed and not impaired to the extent that the SBA Claim is deemed to be $0 (Zero) at this time.

**Voting:**  The Class 3B Claimant is not entitled to vote on the Plan unless the Bankruptcy Court permits the SBA to vote on the Plan after a hearing.

D.    <u>Class 4</u>:    **<u>The Allowed Class 4 Claims of the Residents of Mount Royal Tower</u>**

**Description:**  Class 4 consists of the Allowed Claims of the residents of Mount Royal Towers whose Resident Contracts have not been assumed prior to the Effective Date (the "Residents").  The Residents are parties to executory contracts with the Debtor which will be assumed by the buyer of Mount Royal Towers upon the closing of the sale of Mount Royal Towers.

**Treatment:**  The Allowed Class 4 Claims of the Residents of Mount Royal Towers whose Resident Contracts have not yet been assumed and assigned are impaired. The Debtor will assume any contracts with the residents of MRT, to the extent not already assumed by the Debtor and assigned to MED pursuant to the terms of the August 30, 2020 Order approving the sale of the MRT assets to MED (ECF #381), on the Effective Date which remain executory on the Effective Date as obligations of the Debtor.  The Debtor will transfer or assign any remaining unassigned Resident Contracts in connection with the proposed sale of Debtor Assets to MED or in connection with any other potential future sale of Debtor Assets.  The Confirmation Order constitutes an order approving the assumption of each Resident Contract, as modified.

**Impaired/Not Impaired.**  The Class 4 Claimants are impaired.

**Voting**.  The Class 4 Claimants are entitled to vote on the Plan.

43

E.    **Class 5:    The Allowed Class 5 Unsecured Claims**

**Description.**  Class 5 consists of the Allowed General Unsecured Claims not included in any other Class in amounts to be determined by the Bankruptcy Court, excluding the Claims included in any other Class.

**Treatment**.  The Allowed Class 5 Unsecured Claims will be paid in full, with simple interest fixed at the federal judgment rate that exists as of the Effective Date, amortized over a two-year (24-month) period commencing on the Effective Date.  The Class 5 Unsecured Allowed Claims shall be payable in equal pro rata quarterly installments of principal and interest with each such installment made on the 10th day of each month beginning with the first such distribution on the 10th day of the first month following the Effective Date, for a period of twenty-four (24) months following the Effective Date of the Plan; provided, however, that the holders of Allowed Class 5 Claims may be paid earlier than  the defined two-year (24-month) amortization period of payments on Class 5 Claims up to the remaining balance due on such claims on the 30th day following the Debtor's receipt, if any, of any post-confirmation net Litigation Proceeds (after application of payment of the Litigation Proceeds described above to Allowed Class 2 Claims).

**Impaired/Not Impaired.**  The Class 5 Claimants are impaired.

**Voting.**  The Class 5 Claimants are entitled to vote on the Plan.

F.    **Class 6:    The Allowed Class 6 Tax Claims.**

**Description:**  Allowed Claims for Taxes other than Priority Claims under Bankruptcy Code § 507(a)(8).

**Treatment:** The holders of Allowed Class 6 Claims will be paid in full in Cash on the Effective Date of the Plan.  At this time, the Debtor does not believe that there are any such claims.

**Impaired/Not Impaired** The Class 6 Tax Claims are not  impaired.

**Voting:** Class 6 is not entitled to vote on the plan.

44

**G.**    **Class 7:**    **The Allowed Class 7 Sub-Class 7-A and Sub-Class 7-B Claims**

**Description:**    Sub-Class 7-A consists of the Allowed Pre-Petition Unsecured Claims filed by the Limited Partners. Sub-class 7-B consists of the Allowed Post-Petition Priority Claims of the Limited Partners.

**Treatment:**    The holders of Allowed Class 7-A Unsecured Claims will receive nothing in the Plan and will have their Sub-Class 7-A Claims discharged in the Order Confirming the Plan.  The holders of Allowed Pre-Petition Class 7 Claims are divided into two sub-classes. Sub-Class 7-A consists of the Allowed Pre-Petition Claims of the Limited Partners. Sub-Class 7-B consists of the Allowed Post-Petition Claims of the Limited Partners. The Holders of Allowed Sub-Class 7-B Claims will be entitled to receive all Litigation Proceeds that may be awarded and paid to the Limited Partners and which they will use to pay to the holder of the Class 2 Judgment Claim until such Class 2 Judgment Claim is paid in full, and to the extent that any such Litigation Proceeds are also used to pay Allowed Class 5 Claims. In full satisfaction of the Allowed Sub-Class 7-B Claims, the Holders of Allowed Sub-Class 7-B Claims will be paid, Pro Rata, the net Litigation Proceeds received by the Reorganized Debtor after payment of all Class 2 and Class 5 Claims are paid in full as provided in the Plan.

Sub-Class 7-A Claims will be discharged under the Plan.

Sub-Class 7-B members will each receive cash payments to be paid from litigation proceeds after, in order: (i) payment in full of the Class 2 Judgment Claim; and (ii) payment in full of the Class 5 Claims. If no litigation proceeds are recovered by the Debtor, then the holders of Class 7-B Claims will receive nothing on account of their claims and the Sub-Class 7-B Claims will be discharged.

**Impaired/Not Impaired:**    The Sub-Class 7-A and 7-B Claimants are impaired.

**Voting:**  The Sub-Class 7-A and Sub-Class 7-B Claimants are entitled to vote on the Plan.

**H.    Class 8:        The Allowed Class 8 Interests**

**Description:**  Class 8 consists of the Allowed equity interests of the Debtor existing on the Petition Date.  As of the Petition Date, the Debtor had eight limited partners and a general partner.

**Treatment:**  The Allowed equity interests of the Debtor existing on the Petition Date shall be cancelled and extinguished as of the Effective Date and shall not receive any Distributions under the Plan.

**Impaired/Not Impaired:**  The Class 8 Interest Holders are receiving nothing under the Plan on account of such interests and pursuant to § 1126(g) are deemed to have rejected the Plan.

**Voting:**  The Allowed Class 8 Interests are not entitled to vote on the Plan.

**I.    DESIGNATION AND TREATMENT OF UNIMPAIRED CLASSES OF CLAIMS AND INTERESTS**

Except to the extent the Court may estimate and allow for voting purposes only the disputed Claims in Class 3A and Class 3B,  Classes 3A, 3B and 6 are deemed not impaired and, as a result, are not entitled to vote on the Plan.  Pursuant to Bankruptcy Code § 1126(f), the Class 3A, 3B and 6 Claimants are deemed to have accepted the Plan and are not entitled to vote on the Plan.  Should the Court estimate and allow either or both the Claims of Class 3A and 3B for voting purposes only, the holders of Class 3A and 3B may nevertheless be permitted to vote on the Plan as deemed impaired holders of Claims, which the Debtor disputes.  Should such holders of Class 3A and 3B Claims vote against confirmation, the Debtor believes, and will argue, that its Plan may be confirmed and that the treatment afforded such creditors may be "crammed down" on such Classes pursuant to Bankruptcy Code § 1129(b).

46

### J.    MEANS FOR PLAN IMPLEMENTATION

#### 1.    Means of Effectuating the Plan

The Reorganized Debtor will make the distributions required under the Plan to holders of Allowed Claims by using cash received from the then-existing cash in the Debtor's bank account.  In addition, funding will come from periodic cash infusions by the new corporate General Partner or Limited Partner in such amounts as necessary to make all Plan required payments. Litigation recoveries, if any, collected from Commonwealth will be used as provided in the Plan. The Reorganized Debtor and the New General Partner and Limited Partner of the Reorganized Debtor with loans from the Limited Partners will commit their financial capability and re-capitalization to fund the Plan.

The Reorganized Debtor will pay all monthly post-confirmation expenses within thirty (30) days of the date such expenses are due.  Monthly expenses include, but are not limited to professional fees and litigation costs.

#### 2.    Management of the Reorganized Debtor

**Identity**. The managers, officers and general partner identified and set forth in this Disclosure Statement shall serve as managers and officers and owners of the Reorganized Debtor as of the Effective Date.  Renee Barnard will continue as the Chief Operating Officer of the Reorganized Debtor.  Kevin Moriarty will continue as the President/CEO of the Reorganized Debtor, and together with Renee Barnard will oversee operations of the Reorganized Debtor.

**Post-confirmation managerial duties**.  The managerial duties of the current management staff as established post-petition will remain the same.

**No Post-Confirmation Compensation.** Management will not receive compensation from the Reorganized Debtor after confirmation.

47

### 3. <u>Bar Date for Certain Administrative Claims.</u>

Except as otherwise provided in the Confirmation Order, all applications by Professionals for final compensation for services rendered and for reimbursement of expenses incurred on or before the Effective Date (including without limitation any compensation requested by any Professional or other entity for making a substantial contribution to the Chapter 11 Case) and all other requests for payment of Administrative Claims not otherwise Allowed but incurred before the Effective Date under Code §§507(a)(1 ) or 507(b) (except only for Claims in trade debt incurred in the ordinary course of business and Claims under 28 U.S.C. §1930) shall be filed no later than thirty (30) days after the Effective Date, unless such date is extended by order of the Bankruptcy Court entered upon motion filed prior to the deadline hereunder, on notice to the Reorganized Debtor. Any such Claim that is not filed by the deadline shall be forever barred.  Holders of Administrative Claims required to file applications, motions, or other requests for payment of such Claims and who do not do so timely shall be forever barred from asserting such Claims against the Reorganized Debtor or any other individual or entity in connection with their respective activities in the Reorganized Case or any of their respective property. The Bankruptcy Court shall retain exclusive jurisdiction over any disputes concerning Administrative Claims.

### 4. <u>Effectuating Documents; Further Transactions</u>

The Chief Operating Officer, President, Chief Executive Officer, or any other appropriate agent or officer of the Reorganized Debtor, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, partnership interests or other equity interests, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Secretary or any other appropriate agent or officer of

48

the Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions, if necessary.

### 5. Objections to Claims

Any Claim which is not timely objected to and which has not previously been disallowed, will be deemed to be an Allowed Claim upon the expiration of the applicable time for making an objection. A Claim which is timely objected to will be considered a Disputed Claim until such time as an order has been entered by the Bankruptcy Court and such order has become a Final Order.

Unless another date is established by the Bankruptcy Court, all objections to Claims shall be filed and served on such Claimholders ninety (90) days after the Effective Date except as extended by: (a) agreement between the Claimant and the Debtor, if the Proof of Claim is filed before the Effective Date; (b) agreement between the Claimant and the Reorganized Debtor, if the Proof of Claim is filed after the Effective Date; or (c) by order of the Bankruptcy Court upon application by the Reorganized Debtor; provided, however, that if a Proof of Claim is filed after the Effective Date, then the deadline to object to such claim shall be ninety (90) days after such Proof of Claim has been filed.

### K. RISK FACTORS

The Debtor does not believe any risks are associated with the Reorganized Debtor's performance under the Plan. The Limited Partners have sufficient liquid assets to fund all necessary Plan required financial obligations into the new entities that will become the Reorganized Debtor's New General and New Limited Partners. Thus, the Debtor believes that the Reorganized Debtor will be able to meet all of its financial obligations under the Plan.

Risks from litigation recoveries are inherent in any litigation scenario, but the structuring of the Plan is such that all required Plan payments will be made in a timely

49

manner even if no litigation recoveries are recovered and collected by either the Reorganized Debtor or by the Limited Partners.

## L.    OTHER PROVISIONS OF THE PLAN

### 1.    Executory Contracts and Unexpired Leases

After the sale to MED closes, the Debtor will have no executory contracts or unexpired leases. All Resident Contracts are being assumed and assigned to MED, if not already assigned to MED prior to the Effective Date by reason of the sale closing to MED.

### 2.    Recapitalization and Reorganization

The existing equity interests in the Debtor will be cancelled and extinguished as of the Effective Date and the Class 8 Interest holders will not receive or retain any property or rights on account of their equity interests. On the Effective Date, in return for a cash infusion sufficient to pay all obligations required to be paid on the Effective Date: (i) a newly formed corporate entity will become the General Partner of the Reorganized Debtor which will hold a 1 percent ownership and profit and distribution entitlement as the sole General Partner of the Reorganized Debtor; and (ii) a separate newly formed corporate entity will become the Limited Partner of the Reorganized Debtor which will hold a 99 percent ownership and profit and distribution entitlement as the sole Limited Partner of the Reorganized Debtor.

The Debtor reserves the right to convert from an Alabama limited partnership to any other type of limited liability entity following the Effective Date.

### 3.    Retention of Jurisdiction

The Bankruptcy Court will retain jurisdiction over the Bankruptcy Case until a final decree is entered by the Bankruptcy Court. It is estimated that the final decree will be entered approximately eighteen months (18) months after the Plan is confirmed

50

by the Bankruptcy Court. At that time, the Bankruptcy Case will be closed. The Bankruptcy Court shall retain jurisdiction for the following purposes:

a.   to determine the allowance of Claims and Interests upon the timely objection thereto;

b.   to determine all adversary proceedings and contested matters;

c.   to approve, pursuant to Code §365, the assumption, assignment or rejection of any executory contract or unexpired lease of the Debtor except as otherwise provided in the Plan;

d.   to determine requests for payments of Claims entitled to priority under Code §507(a)(1), including compensation of parties entitled thereto;

e.   to resolve controversies and disputes regarding the interpretation of the Plan or any exhibit thereto;

f.   to implement the provisions of the Plan and enter orders in aid of Confirmation and consummation of the Plan;

g.   to adjudicate any disputes with holders of Claims or Interests or any causes of action;

h.   to hear and determine all pending or future controversies, suits, and disputes that may arise under the Plan including without limitation disputes between the Debtor and the Claimants and controversies arising in connection with the interpretation of the Plan, including any and all schedules, documents, and exhibits and any documents intended to implement the provisions of the Plan;

i.   to consider any modification, alteration, or amendment to the Plan;

j.   to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, including any exhibit thereto, or in any order of the Bankruptcy Court, including the Confirmation Order, as may be

51

necessary to carry out the purposes and intent of the Plan and to implement and effectuate the Plan;

k.  to determine such other matters as may be provided for in the Confirmation Order or other orders of the Bankruptcy Court as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

l.  to enforce all orders, judgments, injunctions, and rulings entered in connection with the Chapter 11 Case; and

m.  to enter a final decree closing the Chapter 11 Case.

## M.  TAX CONSEQUENCES OF THE PLAN

CREDITORS AND INTERESTS HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to the Debtor. The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules that make it difficult to state completely and accurately all the tax implications of any proposed action.

The Debtor does not anticipate that Plan confirmation will have a material effect on its tax liability. THE DEBTOR MAKES NO REPRESENTATIONS REGARDING POTENTIAL TAX CONSEQUENCES TO CREDITORS.

## N.  CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OR THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain

52

deadlines for filing Claims. Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Plan. Some requirements include: (i) the Plan must be proposed in good faith, (ii) the Plan must be accepted by all holders of Claims entitled to vote to accept or reject it unless certain other conditions are met with respect to satisfying confirmation, (iii) the Plan contemplates paying creditors at least as much as creditors would receive in a Chapter 7 liquidation, and (iv) the Plan must be feasible.  These requirements are not the only requirements necessary for confirmation of the Plan by the Bankruptcy Court.

## O.    WHO MAY OBJECT OR VOTE TO APPROVE THE PLAN

### 1.    Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

### 2.    Who May Vote to Accept/Reject the Plan

A creditor or Interest holder has a right to vote for or against the Plan if such creditor or Interest holder has a Claim or Interest which is both: (1) Allowed or Allowed for voting purposes and (2) classified as an impaired class.

### 3.    What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an Allowed Claim or interest to have the right to vote. Generally, any Rule–compliant Proof of Claim or Interest will be allowed, unless a party in interest objects. When an objection to a Claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

53

## IV.  SIGNIFICANT PLAN TERMS AND DEFINITIONS

### A.  The Bar Dates for Filing Claims

THE BAR DATE FOR FILING A PROOF OF CLAIM FOR GENERAL PREPETITION CLAIMS IN THE CHAPTER 11 CASE WAS JULY 6, 2020. (ECF #235). A creditor or Interest holder may have an allowed Claim or Interest even if a Proof of Claim or Interest was not timely filed.  A Claim is deemed allowed if (1) it is scheduled on Debtor's schedules and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim. An Interest is deemed allowed if it is scheduled and no party in interest has objected to the Interest. The general bar date order applies to general prepetition Claims,  governmental claims and claims under Section 503(b)(9).  The general bar date did not apply and excluded the following creditors (who were not required to file Claims by the July 6, 2020 bar date): (1) Claims of the U.S. Trustee for fees payable pursuant to 28 U.S.C. § 1930; (2) Claims for which a Proof of Claim against Debtor was properly filed; (3) any Claim (i) that is listed in schedules of the Debtor or any amendments thereto, and (ii) that is not described therein as "disputed," "contingent," or "unliquidated," and (iii) whose holder does not dispute the amount or characterization of the Claim as set forth in the schedules; (4) Claims allowable under Sections 503(b) and 507(a)(2) of the Bankruptcy Code as an administrative expense (other than any Claim allowable under Section 503(b)(9) of the Bankruptcy Code), including such Claims held by Professionals; (5) Claims of any party that are exempt from filing a Proof of Claim pursuant to an order of the Court in this Chapter 11 case, including without limitation any order approving postpetition debtor in possession financing; (6) any Claim that has been paid in full by the Debtor pursuant to the Bankruptcy Code or in accordance with an order of the Court; and (7) any Claim against the Debtor that has been allowed by an order of the Court, entered on or before the July 6, 2020 general bar date.

**THE BAR DATE FOR FILING POSTPETITION ADMINISTRATIVE EXPENSE CLAIMS IN THE CHAPTER 11 CASE WAS APRIL 9, 2021.** The Bankruptcy Court set April 9, 2021 as the Chapter 11 Administrative Claims Bar Date. ECF 470. The only parties not required to comply with the Chapter 11 Administrative Claims Bar Date are: (a) the U.S. Trustee, on account of Claims for fees payable pursuant to 28 U.S.C. § 1930; (b) any person or entity that has already properly filed a Proof of Claim for a post-petition administrative priority claim against the Debtor; (c) any and all Professionals retained in this Chapter 11 case by the Debtor; (d) Claims of any party that are exempt from filing a filing a Proof of Claim pursuant to an order of the Court in these this Chapter 11 case, including without limitation any order approving postpetition debtor in possession financing; (e) any Claim that has been paid in full by the Debtor pursuant to the Bankruptcy Code or in accordance with an order of the Court; and (f) any Claim against the Debtor that has been allowed by an order of the Court entered on or before the April 9, 2021 Administrative Claims Bar Date.

The SBA filed an unsecured, non-priority Claim, Claim #18-1, on April 9, 2021 in the amount of $1,138,104.75. Other administrative priority Claims were timely filed by the Debtor's Limited Partners for their post-petition debtor in possession financing advances and for payments required by court order on behalf of the Debtor to Wells Fargo Bank. See Claim #s 19, 20, 21, 22 and 23, filed on April 9, 2021.

## B. What Is an Impaired Claim/Interest?

As noted above, an Allowed Claim or Interest only has the right to vote if it is in a class that is <u>impaired</u> under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of such class. For example, a class comprised of General Unsecured Claims is impaired if the Plan fails to pay the members of such class 100 percent of what they are owed.

55

In the Chapter 11 Case, the Debtor believes that Classes 1, 2, 4, 5, 8 and Sub-Classes 7-A and 7-B are impaired and that holders of Claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Proponent believes that holders of unclassified administrative Claims are unimpaired and that holders of Claims of these unclassified Claims therefore do not have the right to vote to accept or reject the Plan. Parties who dispute the Debtor's characterization of their Claim or Interest as being impaired or unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the class.

### C.   Who is Not Entitled to Vote?

The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired classes; (3) Claims entitled to priority pursuant to § 507(a)(1), (a)(2), and (a)(8); and (4) Claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to § 507(a)(l), (a)(2), and (a)(7) are not entitled to vote because such Claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### D.   Who Can Vote in More Than One Class?

A creditor whose Claim has been Allowed in part as a secured Claim and in part as an unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured Claim and another ballot for the unsecured Claim.

### E.   Votes Necessary to Confirm the Plan

If impaired classes exist, the Bankruptcy Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any

56

insiders within such class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed below.

### F. Votes Necessary for a Class to Accept the Plan

A class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted, voted in favor of the Plan. A class of Interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the shareholders of such class that actually voted, voted to accept the Plan.

### G. Treatment of Non-Accepting Classes

As noted above, even if all impaired classes do not accept the proposed Plan, the Bankruptcy Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code. The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown." The Code allows the Plan to be "crammed down" on nonaccepting classes of Claims or Interests if it meets all consensual requirements except the voting requirements of §1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### H. Request for Confirmation Despite Non-Acceptance by Impaired Classes

The Debtor will ask the Court to confirm the Plan by "cramdown" on any impaired classes if any of these classes do not vote to accept the Plan.

### I. Absolute Priority Rule

The Plan cannot be confirmed by the Court if it violates the absolute priority rule. That rule is set forth in 11 U.S.C. §1129(b)(2)(B)(ii). That requirement applies only if the unsecured class, as a group, votes against confirmation of the Plan. If the

57

unsecured class votes against the Plan, the Plan violates the absolute priority rule, meaning that shareholders cannot keep their ownership Interests unless they pay in "new value." The newly formed corporate General Partner will pay cash into the Reorganized Debtor accounts sufficient to make all Plan required payments.

Under the Plan the General or Limited Partners will not receive or retain anything of value on account of existing partnership Interests. Therefore, the Plan does not violate the Absolute Priority Rule even if any class of Claims votes to deny confirmation. In addition, the Limited Partners have each agreed to provide "new value" to the Reorganized Debtor as under the Plan, the Limited Partners will: (i) cancel their existing limited partnership Interests; (ii) have their 7-A Claims discharged; and (iii) continue to lend sufficient funds to Reorganized Debtor to enable the Reorganized Debtor to make all required Plan payments.

Assuming the Bankruptcy Court determines that this type of contribution by the Limited Partners is "necessary," what is effectively a subordination of their post-petition Sub-Class 7-B administrative priority Claims and their agreement to infuse cash as needed into the Reorganized Debtor constitutes "new value" sufficient to satisfy the absolute priority rule, should the issue arise.

This "new value" will not increase the sums unsecured creditors would receive under the Plan. If the estate is converted to a Chapter 7 liquidation, the unsecured creditors would, most likely, receive nothing on their Claims.

## V.    LIQUIDATION ANALYSIS

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a claimant or Interest holder is in an impaired class and that claimant or Interest holder does not vote to accept the Plan, then that claimant or Interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

58

In a Chapter 7 case, a debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative Claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed Claim in relationship to the total allowed unsecured Claims. Finally, Interest holders receive the balance, if any, that remains after all creditors are paid.

In a Chapter 7 case, a trustee is appointed and entitled to compensation from the bankruptcy estate in an amount not to exceed 25 percent on the first $5,000 of all moneys disbursed, 10 percent on any amount over $5,000 but less than $50,000, 5 percent on any amount over $50,000 but not in excess of $1 million, and 3 percent on all amounts over $1 million.

For the Bankruptcy Court to be able to confirm the Plan, the Bankruptcy Court must find that all creditors and Interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Debtor as Plan Proponent maintains that this requirement is met in the Plan.

Based on the nature of Debtor's business, if it were forced into a Chapter 7 liquidation, the value of the Debtor would very likely be far less than the amount of secured and priority Claims. This reality is due to the fact that a functional liquidation sale of Debtor Assets is the basic and most central feature of the Plan.  No added Chapter 7 fees, costs or expenses are being incurred under the Debtor's Plan whereas in a Chapter 7 liquidation numerous layers of fees and costs would be incurred, including a Chapter 7 trustee's fee, trustee's professionals' fees and costs, broker's fees, and other attendant fees and costs incurred in carrying the case forward, which would further greatly reduce any potential recoveries by any creditor. Further, Wells Fargo claims to hold a security interest in all of the Debtor's prepetition real and

59

personal property assets, including the Mount Royal Towers facility and related business assets, the fair market value of which, as established by the sale price of these defined Debtor Assets to MED, is far less than the amount owed to Wells Fargo as a secured creditor. In short, there is little to no hope, in the opinion of Debtor's management, that any creditor would receive more in a Chapter 7 liquidation than creditors will receive under the Debtor's Plan.

If a trustee in a Chapter 7 case were to liquidate the Debtor's assets, it is unlikely that the trustee would receive proceeds in excess of the costs of the Chapter 7 administration and the secured creditor's liens. Furthermore, liquidation of the Debtor's assets at this time would also likely result in rejection of the existing contracts which are now being assumed and assigned to MED, which would create large administrative Claims which would need to be paid before any unsecured creditors would be paid. Therefore, it is highly unlikely there would be any remaining funds available to general unsecured creditors in a Chapter 7 case.

As the Debtor has maintained throughout this Chapter 11 case, the Debtor has made a good faith effort to realize the maximum value for its business and assets and has concluded that the price being received from the sale of its Mount Royal Towers assets to MED represents the true fair market and going concern value of the Debtor's operating assets. In contrast, a Chapter 7 Trustee would not be able to sell the business as a going concern given that the Limited Partners would not be providing additional post-conversion financial support to the Debtor Estate. Inasmuch as the Plan pays more to all creditors than those creditors could possibly ever receive in a Chapter 7 liquidation, the Plan clearly pays more than the liquidation value of the business.

## VI.    **FEASIBILITY**

Another requirement for confirmation involves Plan "feasibility", which means that confirmation of the Plan is not likely to be followed by a liquidation or the need

60

for further financial reorganization of Debtor or any successor to Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether Debtor will have enough cash on hand on the Effective Date to pay all the Claims and expenses which are entitled to be paid on such date. Debtor will have sufficient funds available from the new General Partner or new Limited Partner to make the required payments on the Effective Date.

The second aspect considers whether Debtor will have enough cash during the effective Plan period to make required Plan payments. Debtor is confident that it will have sufficient cash on hand in order to meet its obligations under the Plan because the Limited Partners have the available financial resources to fund future Plan obligations and they have committed to continue to do so as required.

YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR AND LEGAL COUNSEL IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL REPRESENTATIONS.

## VII.   EFFECT OF CONFIRMATION OF PLAN

### A.   DISCHARGE AND RELEASES

Except as otherwise provided in the Plan or the Confirmation Order, and expressly excluding the Class 1 and Class 2 Claims of Wells Fargo which are not discharged until paid in full as provided in the Debtor's Plan, the rights afforded under the Plan and the treatment of Claims under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims, including any interest accrued on Claims from the Petition Date. Except as otherwise provided in the Plan or the Confirmation Order, and as allowed by applicable law, Confirmation shall discharge and release the Debtor from all Claims or other debts that arose before the date of Confirmation, and all debts of the kind specified in Code §§ 502(g), 502(h) or 502(i), irrespective of whether: (i) a proof of Claim based on such debt is Filed or

61

deemed Filed pursuant to Code §501; (ii) a Claim based on such debt is allowed pursuant to Section 502 of the Bankruptcy Code; or (iii) the holder of a Claim based on such debt has accepted the Plan.

As of the date of Confirmation, except as provided in the Plan or Confirmation Order, all entities shall be precluded by the Confirmation Order from asserting against the Debtor, the estate of the Debtor, the Reorganized Debtor, or their respective officers, directors, members and managers, successors or property, any other or further Claims, debts, rights, causes of action, liabilities based upon any act, omission, transaction or other activity or inactivity of any kind or nature that occurred prior to the date of Confirmation. In accordance with the foregoing, except as provided in the Plan or Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and all other debts and liabilities against the Debtor, pursuant to Code §§ 524 and 1141, and such discharge shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.

## B. <u>REVESTING OF PROPERTY IN DEBTOR</u>

All property of the estate as defined in Code § 541 not distributed to holders of Allowed Claims pursuant to the Plan shall revest in the Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor may operate its business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and Bankruptcy Court. As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims and Interests, except as specifically provided in the Plan or the Confirmation Order. In addition, in accordance with Code § 1123(b)(3), the Reorganized Debtor shall retain and may pursue all rights and Claims as it deems appropriate. All rights and claims of the Debtor against Commonwealth, or against any other person or entity, shall pass to the Reorganized Debtor upon the Effective Date. The right to suspend Plan payments to

62

Commonwealth or any other person or entity during the pendency of any litigation is reserved to the Reorganized Debtor unless otherwise ordered by the Bankruptcy Court. Without limiting the foregoing, the Reorganized Debtor may, without application to or approval by the Court, pay fees that it incurs after the Effective Date for professional fees and expenses.

### C.   REVOCATION, MODIFICATION AND AMENDMENT OF PLAN

Subject to the restrictions on Plan modifications set forth in Code § 1127, the Debtor reserves the right to alter, amend or modify the Plan so long as such alteration, amendment or modification is consistent with the requirements of Code §§ 1122 and 1123, and occurs prior to the substantial consummation of the Plan.  The Debtor reserves the right to revoke or withdraw the Plan so long as such revocation or withdrawal is prior to the date of Confirmation. If the Debtor as Plan Proponent withdraws or revokes the Plan in accordance with this section, or if Confirmation does not occur, then the Plan shall be null and void in all respects.

### D.   POST-CONFIRMATION STATUS REPORT

Unless otherwise ordered by the Bankruptcy Court, pursuant to Local Bankruptcy Rule 3020-1(b), within one hundred and twenty (120) days following the entry of the Plan Confirmation Order, the Reorganized Debtor shall file a status report with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan.

### E.   QUARTERLY FEES

The Reorganized Debtor shall be responsible for the timely payment of all fees incurred after the Effective Date pursuant to 28 U.S.C. § 1930(a)(6).

### F.   POST-CONFIRMATION EMPLOYMENT

After the Confirmation Hearing Date, the Reorganized Debtor may engage, without notice, hearing, or order of the Bankruptcy Court, such attorneys, accountants,

63

and other professionals (the "Post-Confirmation Professionals") as it may desire to render services on such terms as it deems reasonable. With respect to services rendered by the Post-Confirmation Professionals, the Reorganized Debtor shall be authorized to pay for such services, related costs, and expenses without notice, hearing, or order of the Bankruptcy Court.

### G.    REMEDIES UPON DEFAULT; POST-CONFIRMATION CONVERSION/DISMISSAL

The Reorganized Debtor will have a number of obligations which it must perform in order to consummate the Plan. Many of these obligations will be required to be performed on or shortly after the Effective Date.  Plan obligations include such things as: (1) paying Allowed administrative and priority Claims; (2) making payments to secured creditors; and (3) making distributions to Unsecured Creditors.

If there is an inability on the part of Reorganized Debtor to substantially consummate the Plan, or if there is a material default by the Reorganized Debtor with respect to the Plan, any creditor, party in interest or the United States Trustee may request the Bankruptcy Court to: (1) convert the bankruptcy case to a case under Chapter 7 of the Bankruptcy Code; or (2) dismiss the bankruptcy case. Upon such request, and if appropriate cause is shown, the Bankruptcy Court may convert of dismiss the Chapter 11 Case, whichever option is in the best interest of creditors and the estate.  If the cause for conversion or dismissal is the failure to make a required payment under the Plan, a creditor or party in interest must give the Reorganized Debtor thirty (30) days written notice of the default in the Plan payment and the opportunity to cure the default.  If the Reorganized Debtor fails to timely cure the default, a motion to dismiss or convert may be filed.  In addition, a creditor or party in interest may exercise any other rights under any applicable law.  The Reorganized Debtor will be in material default under the Plan if it fails within twenty-one (21) days of the service of notice of default, plus three (3) additional days if served by mail,

64

either: (i) to cure the default or (ii) to obtain from the Bankruptcy Court an extension of time to cure the default or a determination that no default occurred.

The Confirmation Order may also be revoked under very limited circumstances. The Bankruptcy Court may revoke the Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke the Confirmation within one hundred and eighty (180) days after the entry of the Confirmation Order.

**H.    FINAL DECREE**

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtor shall file a motion with the Bankruptcy Court to obtain a final decree to close the Chapter 11 Case.

Dated: August 6, 2021          By: _____
                                    Kevin Moriarty
                                    President/CEO of the Debtor's General
                                    Partner, IPG Holding
                                    *Debtor and Plan Proponent*

Dated: August 6, 2021          SULLIVAN HILL REZ & ENGEL, APLC

                               By:  */s/ James P. Hill*
                                    James P. Hill
                                    *Attorneys for Plan Proponent*

65

# EXHIBIT 10

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

# Minute Order

### *Hearing Information:*

|  |  |  |  |
|---|---|---|---|
| **Debtor:** | VESTAVIA HILLS, LTD. | | |
| **Case Number:** | 20-00018-LA11 | **Chapter:** | 11 |
| **Date / Time / Room:** | THURSDAY, AUGUST 12, 2021 02:00 PM   DEPARTMENT 2 | | |
| **Bankruptcy Judge:** | LOUISE DeCARL ADLER | | |
| **Courtroom Clerk:** | TINA SCHMITT | | |
| **Reporter / ECR:** | TRISH CALLIHAN | | |

### *Matter:*

CHAPTER 11 PETITION 1) SETTING STATUS CONFERENCE; 2) SETTING COMPLIANCE DEADLINES; AND 3) SETTING SANCTIONS, IF APPROPRIATE, INCLUDING DISMISSAL, CONVERSION OR APPOINTMENT OF A CHAPTER 11 TRUSTEE OR EXAMINER BECAUSE OF NONCOMPLIANCE WITH ABOVE-REFERENCE REQUIREMENTS (Fr 7/1/21)

### *Appearances:*

Appearances excused.

### *Disposition:*

Tentative Ruling of the Court is Affirmed. Hearing continued to 8/26/21 at 2:00 p.m. in Department No. 2.

# EXHIBIT 11

TENTATIVE RULING

ISSUED BY JUDGE LOUISE DECARL ADLER

Debtor:       VESTAVIA HILLS, LTD.
Number:       20-00018-LA11

Hearing:      02:00 PM   Thursday, August 26, 2021

Motion:       DEBTOR'S MOTION FOR ORDER: (A) APPROVING DISCLOSURE
STATEMENT; (B) CONFIRMING SCHEDULE FOR HEARING ON CONFIRMATION OF THE
DEBTOR'S CH. 11 PLAN OF REORGANIZATION; (C) APPROVING SOLICITATION
PACKAGES AND PROCEDURESS FOR THE DISTRIBUTION OF THE DISCLOSURE
STATEMENT ; (D) APPROVING FORM OF VALLOTS AND (E) ESTABLISHING VOTING

**AMENDED TENTATIVE RULING:**
**At the request of the parties this hearing will be held telephonically.**

The hearing will be conducted *by telephone*. Please review the Department 2
Procedural Guidelines for Judge Adler on the Court's website under the
Judges/Calendars tab: https://www.casb.uscourts.gov/content/judge-louise-d-adler.

Motion to Approve Disclosure Statement **DENIED.**   Although arguably a confirmation
issue, the debtor has proposed a plan that is facially *unconfirmable*.

*FACTUAL BACKGROUND*:   The Debtor owns and operates a nursing home in
Alabama. The Debtor's pre-Ch. 11 filing history is adequately described in its First
Amended Disclosure Statement (1st DS, ECF #549, p. 5-8:1-24).

On 8/31/2020, this Court entered an order (ECF #381) permitting the sale of Debtor's
business to MED but as of this hearing, escrow for sale has not yet closed.   The Debtor
projects the sale will close on or before 10/31/21.   Under the Debtor's plan, the net
sale proceeds will be paid to Wells Fargo Bank ("WFB") on the secured portion of its
claim; however, WFB will still be owed a significant amount on the unsecured portion of
its claim against the Debtor and its non-debtor limited partners (LP's) who are
guarantors of the debt. The amounts owed to WFB have been quantified by a Judgment
entered against the LPs in April, 2020, by the USDC, N.D. Ala. When WFB commenced
collection actions against the LPs, in June 2020, the Debtor filed an adversary
proceeding (Adv. Proc. No. 20-90083) against WFB seeking an injunction under 11 USC
Sec. 105 halting the execution against the LPs and extending the protections of the
automatic stay. This Court entered a preliminary injunction enjoining WFB from
enforcing the judgment against the LPs until 30 days after the closing of the sale to
MED or other order of the Court during the Ch. 11 case. (ECF #37). As a condition to

maintaining the injunction, the Debtor was required to make adequate protection payments of $65K/mo under the Debtor's cash collateral agreement with WFB and the LPs were required to make payments to WFB of $15K/mo. for post-judgment interest accruals during the injunction period. That injunction has remained in effect and it appears its terms have been performed. It is undisputed that the LP's contributions to supporting the Debtor's operations, including payments to its employees and its secured creditor, WFB, were crucial to the Debtor continuing its business operations during this case so the Debtor could market and sell its business as a going concern.

In broad terms, the Debtor's Chapter 11 plan proposes:

1.   A condition precedent to confirming the plan is the sale to MED must close. The net sales proceeds will be paid directly from escrow to WFB to partially satisfy its claim. At that point the Debtor will not have a business to operate or any other assets except its disputed litigation claims against Commonwealth. The Debtor proposes a 100% liquidating plan, funded by contributions from the LPs.
2.   The Debtor and its LPs will pursue its litigation claims for pre-petition conduct against Commonwealth, the entity that initially offered to purchase the Debtor's business pre-petition but failed to close the transaction, allegedly in breach of its contract with the Debtor, which allegedly caused damages. The Debtor also claims a right to seek damages against Commonwealth for post-petition conduct for intentionally interfering with its sale to MED and violating the automatic stay. Conversely, Commonwealth has litigation claims against the Debtor and the LPs for breach of contract arising from this same transaction. If the Debtor's alleged claims against Commonwealth are unsuccessful or the Alabama action for the pre-petition breach of contract is unsuccessful and Commonwealth affirmatively recovers from the the Debtor and its LPs, any allowed claims of Commonwealth against the Debtor will be paid over a 5 year period after the EDOP.
3.   The Debtor will pay all administrative claims in full, except for the SBA PPP loan which may be denied forgiveness.   If the SBA claim (which is currently in dispute) is allowed against the Debtor, then the SBA administrative claim will be paid 100% of its claim in installments over a 5 year period.
4.   All unsecured creditors will be paid 100% with interest over a 2 year period following the EDOP.
5.   The unsecured portion of WFB's debt not satisfied by the net proceeds from the sale of Debtor's business will be paid 100% plus interest over a 2 year period following the EDOP.
6.   Most critical to this Court's tentative ruling on this Motion is the plan provision for treatment of WFB: So long as the LPs continue to make contributions to the Debtor's plan, enabling it to perform the plan as above-described, the injunction against WFB against collection actions against the LPs entered in 8/2020 will continue in effect post-confirmation. (ECF #549, 34:10-14) There is a similar injunction against Commonwealth for five years should it affirmatively recover on its litigation claims against the Debtor and LPs.

**LEGAL ANALYSIS**:

The most glaring problem with Debtor's plan is the post-confirmation third-party injunction granted to the non-debtor LP's. While the Court agrees that there are scenarios where a temporary post-confirmation third-party injunction *might* be approved, the facts of this case do not remotely resemble the cases cited by the Debtor/LPs. For instance, the "narrow in time and scope" exculpation clause approved in *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1082-83 (9th Cir. 2020) solely was directed to willful misconduct or gross negligence and negligent acts taken/committed during the bankruptcy case, not prepetition debts. *Id.* at 1081-82.   The type of injunction proposed in the Debtor's plan does not remotely resemble the limited injunction in *Blixseth*, and the rationale in *Blixseth* indicates this Debtor's proposed injunction would not have been approved because it alters the pre-existing rights of Wells Fargo and Commonwealth to pursue/collect their *prepetition debts* from non-debtors.   Debtor also cites *In re Plant Insulation Co.*, No. 09-31347, 2012 LEXIS 1716, *58-59 (Bankr. N.D. Cal. March 16, 2012) for support, but the exculpation clause/injunction was similarly limited to postpetition misconduct conduct occurring within the bankruptcy case.

Likewise, the post-confirmation injunctions in *In re Brotby*, 303 B.R. 177, 187 (9th Cir. BAP 2003) and *In re Hamilton*, 2018 WL 3637905, *6 (9th Cir. BAP 2018) bear no resemblance to the injunction in this plan. These cases upheld a plan injunction that barred a creditor with a nondischargeable debt from collecting the debt *from the debtor* during the pendency of the plan which paid the nondischargeable debt in full over time. These cases did not implicate or discuss the creditor's right to collect the debt from nondebtors or § 524(e), which is the issue in this case.

Debtor has not cited cases outside the Ninth Circuit for good reason. First, they are not relevant because the Court is bound by the Ninth Circuit's precedent. Second, the cases which the Court has reviewed involved debtors with an *operating business* that hinged on a rationale that the third-party guarantor's services/assets were critical to the Debtor's *successful reorganization of its operating business*. That rationale does not apply here because this Debtor will not have an operating business and its plan is a liquidating plan. [See [Plan Art. XI.A.(2) (a condition precedent to *confirmation* is that the sale to MED must close)] The Limited Partners argue that Debtor's post-confirmation business will be litigation and payment of claims. The argument is nonsense. A case that solely liquidates litigation claims and pays creditors is a liquidation case, not a reorganization case.

The most instructive case on this issue has not been cited by any of the parties.   It is *In re Linda Vista Cinemas*, 442 B.R. 724 (Bankr. D. Ariz. 2010). Under facts that are similar to this case – except the debtor had an operating business (Tower Theaters) -- the court granted a temporary *pre-confirmation* injunction pending the plan's confirmation for the same reasons we granted the Limited Partners their temporary

injunction/stay. *Id.* at 741. However, the court *denied confirmation of the debtor's plan because it continued to enjoin the creditor's collection of the guarantee for the duration of the 100% payment plan, provided the plan payments were timely made*. *Id.* at 741-42. The court examined the Ninth Circuit precedents at length -- and even though it recognized that the debtor's guarantors were providing substantial financial support to the plan and were critically involved in operating the debtor's business, and that they would likely be forced to file their own bankruptcy cases if the collection on the guaranty obligations were not enjoined -- the court concluded it was bound by the existing Ninth Circuit's precedent to hold that the plan's temporary injunction violated § 524(e). *Id.* at 748. Here, our facts are similar, but not nearly as strong as *Linda Vista Cinemas* because our Debtor has no operating business to reorganize. The Court agrees with the holding in *In re Linda Vista Cinemas*, that the plan cannot be confirmed as a matter of law because the temporary injunction violates § 524(e). *1*

Further, hypothetically, even if we held that a "temporary 24 month stay" of collection does not violate § 524(e) because the discharge of Wells Fargo's debt is delayed until Wells Fargo is fully paid, that argument would only apply to WFB's Judgment. The discharge of the debt owed to Commonwealth is on the EDOP, and the plan pays Commonwealth's allowed claim *over 60 months* during which it is enjoined from collecting a judgment against the LPs in the Alabama action (if it obtains one) – except through the plan [RL Amended Plan, Pgs. 38-39] Therefore, the plan violates § 524(e) as to Commonwealth.

Additionally, the New Value objection might have merit but it is a confirmation issue. The Limited Partners are retaining value on account of their equity interests in the form of the exclusive opportunity to contribute "new value" to fund the plan. The Debtor/Limited Partners contend this fact is irrelevant because creditors will receive full payment with interest, so the absolute priority rule isn't violated. However, the Limited Partners' financial commitment on the EDOP is nominal. Their promise to contribute the funds as necessary in the future to pay the other allowed claims in full over time is NOT intended to be backed by a binding written agreement.   Whether this loose commitment is sufficient to deem that the absolute priority rule is, in fact, satisfied is an open question.

W/r/t to the "inadequate disclosure" objections, the Court agrees there is inadequate disclosure regarding: the extent/timing of the Limited Partners ongoing financing commitment; the total projected claims to be paid and the assets, if any, from which to pay them.   The mere fact that WFB may have this information about the LP's financial ability to perform its plan commitments does not satisfy the adequacy of information as to other creditors and, indeed, the Court.   For example, what happens if a Limited Partner does not pay its share of new funds as needed?   Is this plan feasible even if Debtor loses the SBA appeal? The Commonwealth litigation?   Additionally, in the Reply we learn that at least one of the Limited Partners is 90 years old and living in a care facility.   Who is handling his financial affairs?   Is he competent to make this

commitment? What happens if he passes away before the potentially five-year plan is completed?

Finally, the Court questions why Class 4 -- The Residents of Mount Royal Towers – even exists as a class and why it is "impaired."   The creation of this class appears to be gerrymandering. The Residents' hypothetical claims arise from executory contracts, which Debtor acknowledges will be assumed and assigned to MED when the sale closes (a condition precedent to confirming the plan). Even if any still exist upon confirmation, the plan should simply provide that these executory contracts will be assumed and assigned per the purchase agreement; and the cure, if any, will be paid as an administrative claim upon assumption.

For the foregoing reasons, this Court denies approval of the Disclosure Statement because of the facial unconfirmability of the underlying Plan.

--------------------------------------------------------------------

1.    Section 524(e) provides in pertinent part that: "[D]ischarge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." Debtor's Amended Plan (filed with its Reply) purportedly resolves the violation by _delaying_ the Debtor's "discharge" solely respecting debtor's debt owed to WFB until WFB is paid in full through the plan. However, this discharge provision still affects the liability of the Limited Partners for the debt because it holds WFB (and Commonwealth) hostage to collect their debt solely from Debtor on the terms proposed in the plan, which clearly alters/affects the liability of another entity for the discharged debt in violation of § 524(e).    The teaching of _Linda Vista Cinemas_ is that delaying collection alters/affects the liability of a nondebtor for a debt that is being discharged by the plan.

# EXHIBIT 12

**CSD 1159C** [07/01/18]
Name, Address, Telephone No. & I.D. No.

JULIAN I. GURULE (SBN: 252160)
ANTHONY J. NAPOLITANO (SBN: 227691)
BUCHALTER, a Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Telephone: (213) 891-0700
Facsimile: (213) 896-0400
jgurule@buchalter.com; anapolitano@buchalter.com

Order Entered on
October 13, 2021
by Clerk U.S. Bankruptcy Court
Southern District of California

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

| In Re    VESTAVIA HILLS, LTD. | **LODGED** |
|---|---|
| d/b/a/ MOUNT ROYAL TOWERS | |
| Debtor. | BANKRUPTCY NO.    20-00018-LA11 |
| COMMONWEALTH ASSISTED LIVING, LLC, SERIES E | |
| Movant(s) | RS NO. JIG-001 |
| v.  VESTAVIA HILLS, LTD. | |
| Respondent(s) | Date of Hearing: September 21, 2021<br>Time of Hearing: 10:00 a.m.<br>Name of Judge:  Louise D. Adler |

## ORDER ON
### COMMONWEALTH ASSISTED LIVING, LLC, SERIES E'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

The court orders as set forth on the continuation pages attached and numbered 2 through 10 with exhibits, if any,

for a total of 10 pages.  Notice of Lodgment Docket Entry No. 604 .

//

//

//

//


DATED:    October 12, 2021


Judge, United States Bankruptcy Court

CSD 1159C [07/01/18]

ORDER ON COMMONWEALTH'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

DEBTOR: VESTAVIA HILLS, LTD.                                        CASE NO.: 20-00018-LA-11

                                                                   RS NO.: JIG-001

---

The hearing on the Motion for Relief from the Automatic Stay [Docket No. 56 as supplemented by Docket No. 553] (the "Motion") of Commonwealth Assisted Living, LLC, Series E ("Commonwealth") came on for hearing on September 21, 2021 at 10:00 a.m. in the above captioned court.  Appearances at the hearing were as set forth in the record.

The Court considered Commonwealth's Motion and supporting documents and the oppositions filed by debtor Vestavia Hills, Ltd. (the "Debtor") at Docket Nos. 117, 164 and 574 and the Limited Partners' Joinder in Supplemental Opposition to Motion for Relief from the Automatic Stay filed at Docket No. 575.  On September 17, 2021, this Court issued its Tentative Ruling [Docket No. 594] in which the Court indicated its intention to grant the Motion.  A copy of the Tentative Ruling is attached hereto as Exhibit 1 and is incorporated by this reference as if set forth herein in full.  Accordingly, and good cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.  The Motion is granted in its entirety under 11 U.S.C. § 362(d)(1);

2.  Based upon the findings and reasoning set forth in the Tentative Ruling, the automatic stay of 11 U.S.C. § 362(a) is hereby immediately terminated as to Commonwealth, its successors and assigns, with respect to the Alabama State Court Action (as defined in the Tentative Ruling) to permit Commonwealth to proceed against the Debtor and its estate to entry of a final judgment (including any appeals) in accordance with applicable non-bankruptcy law;

3.  Based upon the findings and reasoning set forth in the Tentative Ruling, the extension of the automatic stay of 11 U.S.C. § 362(a) to non-debtors Renee Barnard and Charles Barnard as set forth in this Court's Order on Notice of Hearing and Motion re Injunction; Memorandum of Points and Authorities in Support of Injunction Pursuant to 11 U.S.C. § 105 and/or for Extension of Automatic Stay entered on April 30, 2020 as Docket No. 60 in the adversary proceeding designated as Vestavia Hills, Ltd. v. Commonwealth Assisted Living, LLC, Series E, Adv. Proc. No. 20-90029-LA (Bankr. S.D. Cal.) is hereby vacated and terminated in all respects effective immediately;

4.  Commonwealth may take any action in connection with the further litigation of the Alabama State Court Action; and

5.  This order is binding and effective despite any conversion of this bankruptcy case to a case under any other chapter of the Bankruptcy Code.

IT IS SO ORDERED.

CSD 1159C

# EXHIBIT 1

## TENTATIVE RULING

### ISSUED BY JUDGE LOUISE DECARL ADLER

Debtor:     VESTAVIA HILLS, LTD.
Number:     20-00018-LA11

Hearing:    10:00 AM   Tuesday, September 21, 2021

Motion:     1) MOTION FOR RELIEF FROM AUTOMATIC STAY R/S JIG-1 FILED BY
JULIAN GURULE ON BEHALF OF COMMONWEALTH ASSISTED LIVING, LLC (Fr 7/1/21)

Commonwealth Assisted Living, LLC's Motion for Relief from Stay **GRANTED**.

The Alabama State Court Action is a breach of contract action filed _by Commonwealth_
against the Vestavia Hills, Ltd. ("Debtor") and its Limited Partners (Judith Chance,
Karen McElliott, Frank Virgadamo, Connie Virgadamo, B. Renee Barnard, Charles
Barnard, and Jack Rowe) (collectively "Defendants") that seeks: (1) damages for
Debtor's alleged breach of purchase contract; and (2) declaratory relief regarding the
parties' rights/obligations under the purchase contract/guarantees (the "Alabama State
Court Action" or "Remover Action"). The Debtor/LPs do not appear to have filed a
cross-complaint against Commonwealth in the Alabama State Court Action; yet it
appears that they may intend to adjudicate their affirmative damage claims through the
Removed Action and/or the LPs' Claim Objection.

The Debtor/LPs' damage claims against Commonwealth are the subject of the Alabama
USDC Action. The Alabama USDC _granted_ Commonwealth's motion to abstain from
exercising its jurisdiction under the _Colorado River_ doctrine and stayed the USDC Action
until the Alabama State Court Action was completed. Upon filing bankruptcy, the
Debtor/LPs removed and transferred to this Court only the Alabama State Court Action
pursuant to 28 U.S.C. § 1452(a) (a/k/a the bankruptcy removal statute) as "related to"
the Debtor's bankruptcy case; and sought (and obtained a temporary stay) of the
Removed Action against the key non-debtor LPs, so that the Defendants could focus
their resources on operating the Debtor's nursing home business and this Chapter 11
case. At issue now is whether it is time to grant relief from stay as to all Defendants to
permit the Alabama State Court Action to be completed where it originated.

The decision to grant relief from stay to allow a creditor to proceed to judgment in state
court litigation is discretionary and must be made on a case-by-case basis. _In re
Castlerock Properties_, 781 F.2d 159, 163 (9th Cir. 1986). Courts have identified the
following 12-factors (aka the "_Curtis_" factors) to weigh in determining whether to grant
relief from stay:

1) Whether the relief will result in a complete or partial resolution of the issues;
2) The degree of connection or interference with the bankruptcy case;
3) Whether the litigation involves the debtor as a fiduciary;
4) Whether the litigation is before a specialized tribunal with necessary expertise to determine the issues;
5) Whether the debtor's defense and potential liability is covered by insurance;
6) Whether the action involves primarily third parties;
7) Whether the case would prejudice other creditors' interests;
8) Whether a resulting judgment would be subject to equitable subordination (§ 510(c)),
9) Whether a resulting judgment would result in a judicial lien avoidable by the debtor (§ 522(f)),
10) The interests of judicial economy and the expeditious and economical resolution of litigation;
11) Whether the parties are ready for trial; and
12) The impact of the stay on the parties and the balance of harms?

*In re Curtis*, 40 B.R. 795, 803-7 (Bankr. D. Utah 1984); see also *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2nd Cir. 1990) (adopting the *Curtis* factors); *In re Hakim*, 212 B.R. 632, 639-40 (Bankr. N.D. Cal. 1997).

Here, factors 3, 5, 6, 8, and 9 are *not* relevant. The majority of the other factors weigh in favor of ***GRANTING*** relief from stay at this time, as follows:

### Factor 1 - Whether Relief Would Result in a Partial or Complete Resolution of the Issues:

This factor favors granting relief from stay because the Alabama State Court can completely resolve all of Commonwealth's claims against the Debtor *and* the non-debtor LPs, who are the true remaining stakeholders since they are the only Defendants with assets to pay a judgment. The fact that Commonwealth filed a POC in this bankruptcy case that attached the Alabama State Court complaint did not transform the Alabama State Court Action into a "core" proceeding. *In re Conejo Enterprises, Inc.* 96 F.3d 346, 349-50 (9th Cir. 1996) (recognizing that the filing of a proof of claim does not consolidate the underlying state court litigation into the proof of claim even though they are based on the same transaction; both continue to separately exist). Moreover, within the context of a claim objection proceeding, the only Constitutionally "core" matters are those that are "necessarily resolved" by a ruling on the creditor's proof of claim. *Stern v. Marshall*, 564 U.S. 462, 497-98 and 501-3 (2011) (counterclaim asserted by estate against creditor is not Constitutionally "core" where it asserted a state law tort claim that was not "necessarily resolved" by a ruling to allow or disallow the proof of claim).

Here, the LPs have filed an objection to Commonwealth's POC which Debtor has joined. However, the sole issue to be "necessarily resolved" by the Claim Objection is whether Commonwealth has an allowed claim *against the estate* for breach of contract and, if so, what amount. This matter is Constitutionally "core," and by filing a POC of claim

Commonwealth gave up its right to jury trial on this matter. In contrast, Commonwealth's Alabama state law claims against the non-debtor LPs are not a claim against the estate. Although there is factual overlap (as in *Stern v. Marshall*), these claims concern a different agreement against non-debtors that is subject to different defenses (*ie.,* lack of consideration and duress); they will not be necessarily resolved by the Claim Objection. Likewise, the Debtor's affirmative damage claims against Commonwealth would not necessarily be resolved by a ruling on the Claim Objection. These Alabama state law claims are "Constitutionally" non-core claims that are related to the bankruptcy case. *See In re McElwee*, 469 B.R. 566, 576 (M.D. Penn. 2012) (explaining that where a debtor's counterclaim seeks an affirmative monetary recovery against the claimant to augment the bankruptcy estate, and not merely to reduce the amount owed to the claimant, it is a Constitutionally "non-core" *Stern* claim).

Commonwealth has not consented to this Court conducting a jury trial on its Alabama state law claims, and it is clearly entitled to one on its claims against the LPs. Further, it has not consented to this Court entering a final judgment on the non-core and "Constitutionally" non-core claims and issues that must be resolved in order to grant complete relief between the parties. Therefore, this factor favors granting relief from stay (and remand) to allow the litigation to be completed in a non-bankruptcy forum with the authority to grant complete relief.

### **Factor 2 -The lack of any connection with or interference with the bankruptcy case:**

This factor favors granting relief from stay because it is now clear that the case is a liquidating case. After the Debtor's sale of MRT to MED closes in early October 2021, it will have no business to protect or reorganize and its only remaining asset will be its disputed Alabama state law claims against Commonwealth which need to be litigated. These claims are Constitutionally "non-core," and they would be more efficiently completed by remand to the Alabama State Court so that complete relief between the parties can be granted.

While it is true that the Alabama State Court Action could result in the LPs' assertion of potential indemnity claims against the estate -- if the Debtor is found liable to Commonwealth, and if the guarantees are found to be enforceable – these additiona**l** claims will not materially impact the estate because the Debtor will have no funds to pay them. The only way the LPs' indemnity claims will be paid is if the LPs contribute the funds to the Debtor's Plan to pay themselves, which would be circular. Thus, per the current plan, their indemnity claims (Class 7-A) are paid nothing and discharged and this argument is not a basis to keep the litigation in this Court or the stay in place.

Likewise, the Court's unique knowledge of the events in this bankruptcy case is not a sufficient reason to retain jurisdiction or keep the stay in place. The Removed Action predominately concerns *prepetition* transactions and events. There has been no ruling

by this Court that Commonwealth failed to mitigate its damages because it failed to participate in the § 363 sale; nor has this Court made any other rulings on the causation/damages issues in this *prepetition* litigation. These are Alabama state law issues to be decided in the underlying litigation.

### Factor 4 - Whether a specialized tribunal has been established to hear the particular cause of action and whether that tribunal has the expertise to hear such cases:

This factor favors granting relief from stay. Prior to filing bankruptcy, the Alabama State Court had jurisdiction over the action which solely involves Alabama state law. The Alabama State Court is a "specialized tribunal" to apply Alabama law. *See, e.g.*, *In re PG&E Corp.*, 2020 Bankr. LEXIS 535 at *8 (Bankr. N.D. Cal. Feb. 25, 2020) (applying the *Curtis* factors and reasoning that "[a]lthough [the] state court is not a specialized tribunal for retaliation cases, the court acknowledges that the state court is suited to hear state law claims, but does not weigh this factor significantly in its decision."); *In re Shaffer*, 563 B.R. 301, 307-08 (Bankr. D. Ariz. 2016) ("The Maricopa County Superior Court is a specialized tribunal established to hear these kinds of real property disputes.").   Here, although this is a contract dispute, resolution of the Purchase Agreement's meaning and intent will turn on an understanding of the Alabama state regulatory process and approvals for buyers of healthcare facilities. The state of Alabama has the stronger interest in these issues, and the Alabama State Court is better positioned to address them.

### Factor 7 - Whether the litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties:

This factor is neutral. However, the Court rejects the Debtor's argument that it would be prejudiced by relief from stay/remand because the Court's Rejection Order already ruled that the issue of whether the Purchase Agreement was terminated prepetition by its terms is a "matter" that "remains to be determined by this Court." [ECF No. 186, Ex. 1] It is not unusual for a bankruptcy court to determine "core" bankruptcy matters, *e.g.*, allowance or disallowance of claims against the estate, based upon the factual findings made by a non-bankruptcy tribunal where appropriate.

Further, the Court's alleged "ruling" was made in a footnote in its tentative ruling; and it contradicts ¶ 4 of the Rejection Order which expressly made no substantive determinations as to the Purchase Agreement and preserved all of the parties' rights. If the Debtor misunderstood that this dicta in a footnote denied the remand motion, this is not a prejudice to be weighed.

### Factor 10 - The interests of judicial economy and the expeditious and economical determination of litigation for the parties:

This factor heavily favors lifting the stay. "Where the stayed non-bankruptcy litigation has reached an advanced stage, courts have shown a willingness to lift the stay to allow the litigation to proceed." *In re Fernstrom Storage & Van Company*, 938 F.2d 731, 737 (7th Cir. 1991). Congress plainly intended for the bankruptcy courts to consider whether the prepetition forum chosen by the parties could "relieve the bankruptcy court from duties that may be handled elsewhere." *See In re Project Orange Assocs., LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010). The interests of judicial economy favor relief from stay where state law and regulatory issues are set to be adjudicated within months by a state court that is familiar with the case and discovery practices since the filing of the complaint. *See Roger*, 539 B.R. 837, at 851-52 (C.D. Cal. 2015).

Here, the Alabama State Court Action was pending for over thirteen months when the Debtor filed this bankruptcy case. As more fully set forth in the Court's tentative ruling for Commonwealth's companion motion to remand, the Alabama State Court Action had reached an advanced stage: Many motions had been filed and decided and/or were still under submission (would this Court write these opinions?); the written discovery was substantially completed with 23,806 pages of documents produced by Commonwealth and 14,297 pages of documents produced by Debtor; and all parties had reached the motion for summary judgment phase of the litigation, as evidenced by the LPs' proposed motion for summary judgment in the Removed Action despite there being no activity in the litigation since it was removed.

Given the litigation's advanced stage, judicial economy is served by allowing the Alabama State Court to complete its rulings that were in progress, conduct a jury trial if necessary, and enter a final judgment as to all Defendants forthwith.

### Factor 11 - Whether the non-bankruptcy proceedings have progressed to the point where the parties are prepared for trial:

Although a trial is not yet been set by the Alabama State Court, all parties had reached the summary judgment phase of the litigation when the litigation was removed.

### Factor 12. The impact of the stay on the parties and the "balance of hurt":

This factor favors relief from stay because, absent relief from stay, Commonwealth would be forced to re-litigate the exact same issues that had already advanced to summary judgment in the Alabama State Court. Moreover, the Court is mindful that the Alabama USDC has abstained and stayed the Debtor/LPs' virtually identical USDC Action in favor of completing the litigation in the Alabama State Court Action under the *Colorado River* doctrine because, in part, the Debtor/LPs were actively evading service of process in order to forum shop. Now that the purpose of this bankruptcy case – to sell the MRT facility as a going concern and protect the health and safety of the MRT

residents – is essentially accomplished; and as the Debtor has no funds of its own to pay its creditors, the "balance of hurt" favors granting Commonwealth relief from stay to conclude its litigation in the Alabama State Court where it originated, consistent with the Alabama USDC's prior ruling to abstain in favor of the Alabama State Court.

2)   OBJECTION TO PROOF OF CLAIM NO. 10, COMMONWEALTH ASSISTED LIVING

Objection to the Proof of Claim #10 by Commonwealth Assisted Living, LLP is **OVERRULED**.

The objection to the *prima facie* validity of the POC, which was filed/signed using the proper Official Form in an "[a]mount to be determined at trial" along with a copy of the underlying state court complaint that contains ample factual allegations to form the basis for CW's claims *against the* Debtor, is overruled. The information in the POC is sufficient to satisfy FRBP 3001(a) and (f), and it is *prima facie* valid in an amount greater than zero.   Moreover, for purposes of voting/confirmation, Commonwealth is separately classified so the Court doesn't require a dollar amount (a separate motion to estimate would need have to be filed, but estimation is unnecessary).

Because of the many underlying legal and factual issues that remain to be litigated – *i.e.,* the intended terms of the Purchase Agreement, liability, and damages -- this Claim Objection will be set for a status conference pending a ruling by the Alabama State Court on the underlying issues in the Alabama State Court Action *following remand* and *relief from stay* to allow the Alabama State Court Action to be completed.

3) LIMITED PARTNERS AND POST-PETITON DIP LENDERS'S MOTION TO CONSOLIDATE MOTION AND OBJECTION TO COMMONWEALTH BANKRUPTCY CLAIM #10 INTO ADVERSARY PROCEEDING FILED BY WILLIAM A. SMELKO.

Vestavia Hills Limited Partners' Motion to Consolidate Objection to Commonwealth POC #10 with Adversary Proceeding **DENIED AS MOOT** in view of Court's tentative ruling remanding the removed action to Alabama State Court.

The Court has broad authority to consolidate or choose not to consolidate the two matters.    However, if the Court granted this motion to consolidate, Commonwealth correctly points out that we must still treat the Constitutionally "non-core" and the "non-core" related to claims differently than the "core" Claim Objection because of 28 U.S.C. § 157(c)(1) and *Stern*. The Debtor/LP arguments/cases are out-of-date on this point.

The Limited Partners (LP's) with whom the Debtor joins, rely on the Pre-*Stern* cases of: *Granfinanciera, S.A. v. Nornberg,* 492 US 33, 58-59 (1989); *Ta Chong Bank Ltd. V. Hitachi High Technologies America, Inc.,* 610 F3d 1063, 1086 (9th Cir. 2010); and *In re*

*Sun West Distributors Inc.,* 63 B.R. 861, 864-866 (Bankr. S.D. CA 1987), for the prospect that filing a POC brings *all* claims in the attached underlying complaint within the Court's "core" equitable jurisdiction. This is not accurate after *Stern v. Marshall* which held that within the context of a claim objection proceeding, the only Constitutionally "core" matters are those that are "necessarily resolved" by a ruling on the creditor's proof of claim. *Stern v. Marshall,* 564 U.S. 462, 497-98 and 501-3 (2011) (counterclaim asserted by estate against creditor is not Constitutionally "core" where it asserted a state law tort claim that was not "necessarily resolved" by a ruling to allow or disallow the proof of claim); *see also In re McElwee,* 469 B.R. 566, 576 (M.D. Penn. 2012) (explaining that where a debtor's counterclaim seeks an affirmative monetary recovery against the claimant to augment the bankruptcy estate, and not merely to reduce the amount owed to the claimant, it is a Constitutionally "non-core" *Stern* claim).   Here, the Debtor's affirmative counterclaims for damages and Commonwealth's claims against the LPs are "non-core" because they will not necessarily be resolved by a ruling Commonwealth's Claim.

The LPs also cite to a very favorable statement in *In re HA-LO Industries* that the filing of a proof of clam against the estate, "makes any litigation against the claimant 'part of the claims allowance process.'" *See In re HA-LO,* 326 B.R. at 124 (citing *Langenkamp* at 348). However, *In re HA-LO* predates *Stern* so the statement is not accurate regarding purely related-to prepetition state law litigation claims such as these; and   the *HA-LO* decision cites to a page in *Langenkamp*   that this Court could not locate nor could the Court find this exact quoted language in *Langenkamp* .

Further, the Debtor/LPs fail to recognize that *Langenkamp is distinguishable* because it involved the issue of whether a creditor who filed a claim was entitled to a jury trial on a *preference claim brought by the trustee which implicated the public rights exception*. This exception was left intact by *Stern*, but that exception does not apply to the Removed Action. The Removed Action pleads solely prepetition state law related to claims which fall squarely within the *Stern* rationale.

Finally, even if this Court retained jurisdiction over the Removed Action, arguably the Court does *not* need to consolidate the two proceedings because it is imminently feasible to adjudicate the Removed Action, submit our proposed factual findings and judgment to the USDC for *de novo* review; and upon entry of the final factual findings and judgment, apply them to our Claim Objection ruling. However, we would still have the separate problem of Commonwealth's right to a jury trial against the LPs on the guaranty claims which sends the Removed Action litigation to the USDC, and thus, leads us back to remand as the more efficient solution.

# Notice Recipients

District/Off: 0974–3          User: Admin.                Date Created: 10/13/2021

Case: 20–00018–LA11          Form ID: pdfO1              Total: 8

**Recipients of Notice of Electronic Filing:**

aty   Christopher V. Hawkins        hawkins@sullivanhill.com
aty   James P. Hill        Hill@sullivanhill.com
aty   Kathleen A. Cashman–Kramer        Cashman–Kramer@Sullivanhill.com

TOTAL: 3

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

db    Vestavia Hills, Ltd.        9619 Chesapeake Drive        Suite 103        San Diego, CA 92123
ombh  Virginia Moore–Bell        201 Monroe St., Ste. 350        Montgomery, AL 36104
acc   Squar Milner LLP        San Diego        3655 Nobel Drive        Suite 300        San Diego, CA 92122 UNITED STATES
cr    Alabama Self–Insured Worker's Compensation Fud        PO Box 59509        Birmington, AL 35259
      United States Trustee        Office of the U.S. Trustee        880 Front Street        Suite 3230        San Diego, CA 92101

TOTAL: 5

# EXHIBIT 13

1

2

3

4   SULLIVAN HILL REZ & ENGEL
    A Professional Law Corporation
5    James P. Hill, SBN 90478
     Christopher Hawkins, SBN 222961
6   600 B Street, Suite 1700
    San Diego, California 92101
7   Telephone:   (619) 233-4100
    Fax:         (619) 231-4372
8
    Counsel for Debtor and Debtor in Possession,
9   Vestavia Hills, Ltd., dba Mount Royal Towers

10              **UNITED STATES BANKRUPTCY COURT**

11              **SOUTHERN DISTRICT OF CALIFORNIA**

12  In re                              ) CASE NO. 20-00018-LA11
                                       )
13  VESTAVIA HILLS, LTD., dba          ) Chapter 11
    MOUNT ROYAL TOWERS,                )
14                                     ) **NOTICE OF SALE CLOSING**
                   Debtor.             ) **AND NOTICE VACATING RESERVED**
15                                     ) **HEARING DATES**
                                       )
16                                     )
                                       )
17                                     )
                                       ) Ctrm:      Dept. 2, Room 128
18                                     )            United States Bankruptcy Court
                                       )            325 West "F" Street
19                                     )            San Diego, CA 92101-6991
                                       ) Judge:     Hon. Louise DeCarl Adler
20                                     )
                                       )
21  _____)

22

23        TO THE HON. LOUISE DECARL ADLER, UNITED STATES

24  BANKRUPTCY JUDGE, AND ALL INTERESTED PARTIES:  PLEASE TAKE

25  NOTICE OF THE FOLLOWING:

26        On October 19, 2021, Vestavia Hills, Ltd., dba Mount Royal Towers

27  ("Debtor") closed the sale of its Mount Royal Towers facility and related business

28  assets to MED Healthcare Partners, LLC ("MED"). The sale was made pursuant to

#4807272v2                      - 1 -

1    the Asset Purchase Agreement dated February 6, 2020 ("APA") and the Court's order

2    entered August 31, 2020 ("Sale Order") approving the sale.

3         A copy of the fully-executed Settlement Statement for the sale to MED of the

4    Debtor's real estate and related business assets located in Alabama dated October 19,

5    2021 is attached as Exhibit "A" hereto. The Settlement Statement sets forth the court-

6    reviewed and established $12,000,000 sale price for the Debtor's Mount Royal

7    Towers real property and related business assets and tracks and lists the various debits

8    and credits made upon closing of the sale, including identifying all disbursements

9    made from sale proceeds, including payment of the net sale proceeds to the Debtor's

10   senior secured creditor, Wells Fargo Bank.

11        All of the Debtor's resident care agreements for its senior care and other

12   assisted living and independent living residents were assigned to MED pursuant to the

13   Sale Order, and MED has now taken over responsibility for performance of all such

14   agreements.

15        Given the closing of the sale to MED of the Mount Royal Towers assets, the

16   previously-reserved hearing dates of October 28, 2021) and December 16, 2021

17   (which had been reserved for consideration of the Debtor's Amended Disclosure

18   Statement and Amended Chapter 11 Plan) are being vacated. The Debtor intends to

19   and will file its Amended Chapter 11 Plan and an accompanying Amended Disclosure

20   Statement prior to year end and will schedule a hearing date for approval of the

21   Disclosure Statement in early January 2022, subject to availability of the Court's

22   calendar. Other matters in the Chapter 11 case are set for hearing and will go forward

23   on November 18, 2021 at 2 p.m., including but not limited to the Debtor's Chapter 11

24

25   / / /

26   / / /

27   / / /

28   / / /

Status Hearing, for which the Debtor will be filing and serving its Chapter 11 Status Report on November 11, 2021, as previously noted on the record at the last hearings in the Chapter 11 case on September 21, 2021.

Dated:     October 20, 2021          SULLIVAN HILL REZ & ENGEL
                                     A Professional Law Corporation

                                     By:   /s/ James P. Hill
                                           James P. Hill
                                           Counsel for Debtor and Debtor in
                                           Possession, Vestavia Hills, Ltd., dba
                                           Mount Royal Towers

**EXHIBIT TABLE**

| Exhibit | Description | Pages |
|---------|-------------|-------|
| A | Settlement Statement dated October 19, 2021 | 5–9 |

**EXHIBIT "A"**

### Riverside Abstract, LLC

212 Second Street, Suite 502
Lakewood, NJ 08701
Phone: (718) 252-4200 Fax: (718) 252-4226

### Settlement Statement

| | |
|---|---|
| Settlement Date: | 10/19/2021 |
| Disbursement Date: | 10/19/2021 |
| Order Number: | RAAL-39002 |
| Buyer: | Royal Towers Realty LLC |
| Seller: | Vestavia Hills, Ltd. |
| Lender: | Bankwell Bank |
| Property: | 126 Royal Tower Drive A/K/A 300 Royal Tower Drive |
| | Homewood, AL 35209 |
| | Jefferson County |
| | Parcel(s): 28-00-17-4-002-003.000 |

| | Description | Payee | Buyer | Seller |
|---|---|---|---|---|
| | **Total Consideration** | | | |
| 1. | Purchase Price | | $12,000,000.00 | ($12,000,000.00) |
| 2. | Deposit Held By Madison | | ($200,000.00) | |
| | **Loan - Bankwell Bank** | | | |
| 3. | Loan Amount Funded at Closing | | ($9,000,000.00) | |
| 4. | Good Faith Deposit | | ($30,000.00) | |
| 5. | Commitment Fee | | $112,500.00 | |
| 6. | Appraisal | | $10,500.00 | |
| 7. | Environmental Review | | $750.00 | |
| 8. | PCR Review | | $750.00 | |
| 9. | Odd Days Interest (10/19 - 11/1/21) | | $17,062.50 | |
| 10. | RE Tax Escrow (3 @ $33,661.35) | | $100,984.05 | |
| 11. | Credit Bureau & Flood Determination | | $39.70 | |
| 12. | Site Visit | | $3,000.00 | |
| 13. | CapEx for Immediate Repairs | | $48,350.00 | |
| 14. | DAISA/DACA Fees | | $2,000.00 | |
| | **Lender Net Wire to Title: $8,734,063.75** | | | |
| | **CapEx Loan** | | | |
| 15. | CapEx Loan- Wire to Title | | ($1,500,000.00) | |
| 16. | CapEx- Wire Return | Bankwell Bank | $1,500,000.00 | |
| | **Prorations/Adjustments** | | | |
| 17. | PTO Credit | Credit to Buyer | ($158,384.55) | $158,384.55 |
| 18. | 2021 Taxes | Credit to Seller | $81,893.91 | ($81,893.91) |
| | 10/19/21-12/31/21 | | | |
| | **Miscellaneous Charges** | | | |
| 19. | Title Company Charges | Riverside Abstract, LLC | $26,352.50 | $20,975.00 |
| 20. | Mortgage Tax | Riverside Abstract, LLC | $16,875.00 | |
| 21. | Transfer Tax | Riverside Abstract, LLC | | $12,000.00 |
| 22. | Elite Invoices | Mount Royal Operations LLC | $11,025.00 | |
| 23. | Professional Service Fees | New Legacy Professional Services | $4,575.00 | |
| 24. | Broker Fee | HHC Capital Advisory Group, LLC | $48,750.00 | |
| 25. | 2021 Tax Escrow | Riverside Abstract, LLC | | $403,936.20 |
| 26. | Purchaser Legal Fee | Gutnicki LLP | $83,000.00 | |
| 27. | Legal Fee | Polsinelli PC | $222,904.59 | |
| 28. | Legal Fee | Maynard, Cooper & Gale, P.C. | $7,000.00 | |
| 29. | Survey and Zoning Fee | CRESurveys | $5,995.00 | |
| 30. | Consulting Fee | JRPT LLC | $20,000.00 | |
| 31. | Legal Fee | Duane Morris LLP | $84,454.75 | |

## Settlement Statement

| Description | Payee | Buyer | Seller |
|---|---|---|---|
| **Miscellaneous Charges (continued)** | | | |
| **32.** Formation and Representation Fee | Vcorp Services, LLC | $512.20 | |
| **33.** Broker Fee | Blueprint Healthcare Real Estate Advisors, LLC | | $180,000.00 |
| **Balance Due FROM Buyer** | | **$3,520,889.65** | |
| **Balance Due TO Seller** | | | **$11,306,598.16** |

## SIGNATURE PAGE

**NOTICE REGARDING ANCILLARY SERVICES: Title costs for this transaction may include charges for certain services provided by Riverside Abstract, LLC, at the request of your lender or attorney. The issuance of the title policy is not dependent upon the performance of such services. This bill is a good faith estimate of closing charges made to induce company to issue title insurance.**

IN WITNESS WHEREOF, the undersigned hereby acknowledges that he has carefully reviewed the Settlement Statement and to the best of his knowledge and belief it is a true and accurate statement of all receipts and disbursements made for this transaction.

**SELLER:**

**Vestavia Hills, Ltd.**

BY: _____

Name: Kevin Moriarty

Title: Pres./CEO of Gen. Ptnr.

The parties hereto agree that all water, sewer and utility charges shall be prorated and adjusted between the parties outside of closing. This settlement statement was prepared by Riverside Abstract, LLC, as agent for Chicago Title Insurance Company with information and figures provided and reviewed by Seller and Purchaser. Seller and Purchaser hereby approve the settlement statement and authorize disbursement of funds accordingly. In the event that the figures included herein are in error and/or do not reflect the terms of the Purchase Agreement between Seller and Purchaser then the parties agree that adjustments, including but not limited to additional funds paid or reimbursed as appropriate, will be made post-closing. Seller and Purchaser hereby release and agree to hold Riverside Abstract, LLC, and Chicago Title Insurance Company harmless from any and all claims or causes of action relative to the accuracy of the closing figures.

[Additional Signatures Follow]

Signature Page to Settlement Sheet

RAAL-39002

**NOTICE REGARDING ANCILLARY SERVICES: Title costs for this transaction may include charges for certain services provided by Riverside Abstract, LLC at the request of your lender or attorney. The issuance of the title policy is not dependent upon the performance of such services. This bill is a good faith estimate of closing charges made to induce company to issue title insurance.**

IN WITNESS WHEREOF, the undersigned hereby acknowledges that he has carefully reviewed the Settlement Statement and to the best of his knowledge and belief it is a true and accurate statement of all receipts and disbursements made for this transaction.

PURCHASER:

**Royal Towers Realty LLC, an Alabama limited liability company**

BY:

Name: Ephram Lahasky

Title: Authorized Signatory

The parties hereto agree that all water, sewer and utility charges shall be prorated and adjusted between the parties outside of closing. This settlement statement was prepared by Riverside Abstract, LLC, as agent for Chicago Title Insurance Company with information and figures provided and reviewed by Seller and Purchaser. Seller and Purchaser hereby approve the settlement statement and authorize disbursement of funds accordingly. In the event that the figures included herein are in error and/or do not reflect the terms of the Purchase Agreement between Seller and Purchaser then the parties agree that adjustments, including but not limited to additional funds paid or reimbursed as appropriate, will be made post-closing. Seller and Purchaser hereby release and agree to hold Riverside Abstract, LLC, and Chicago Title Insurance Company harmless from any and all claims or causes of action relative to the accuracy of the closing figures.

# EXHIBIT 14

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN   DISTRICT OF   CALIFORNIA

In Re. Vestavia Hills, Ltd. DBA Mount Royal Towers

§
§
§
§

_____
Debtor(s)

Case No.   20-00018   _____

☐ Jointly Administered

# Monthly Operating Report

Chapter 11

Reporting Period Ended: 01/31/2022   _____

Petition Date: 01/03/2020   _____

Months Pending: 25

Industry Classification: | 6 | 2 | 3 | 3 |

Reporting Method:          Accrual Basis ⦿          Cash Basis ◯

Debtor's Full-Time Employees (current):          0   _____

Debtor's Full-Time Employees (as of date of order for relief):          127   _____

**Supporting Documentation** (check all that are attached):

(For jointly administered debtors, any required schedules must be provided on a non-consolidated basis for each debtor)

☒ Statement of cash receipts and disbursements
☒ Balance sheet containing the summary and detail of the assets, liabilities and equity (net worth) or deficit
☒ Statement of operations (profit or loss statement)
☐ Accounts receivable aging
☐ Postpetition liabilities aging
☐ Statement of capital assets
☐ Schedule of payments to professionals
☐ Schedule of payments to insiders
☒ All bank statements and bank reconciliations for the reporting period
☐ Description of the assets sold or transferred and the terms of the sale or transfer

/s/ James P. Hill
_____
Signature of Responsible Party

02/23/2022
_____
Date

James P. Hill
_____
Printed Name of Responsible Party

600 B Street, Suite 1700 San Diego CA 92101
_____
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

UST Form 11-MOR (12/01/2021)          1

| Debtor's Name | Vestavia Hills, Ltd. DBA Mount Royal Towers | | Case No. | 20-00018 |
|---|---|---|---|---|

| Part 1: Cash Receipts and Disbursements | Current Month | Cumulative |
|---|---|---|
| a. Cash balance beginning of month | $800,027 | |
| b. Total receipts (net of transfers between accounts) | $146,125 | $25,230,443 |
| c. Total disbursements (net of transfers between accounts) | $465,829 | $24,836,794 |
| d. Cash balance end of month (a+b-c) | $480,323 | |
| e. Disbursements made by third party for the benefit of the estate | $0 | $12,000,000 |
| f. Total disbursements for quarterly fee calculation (c+e) | $465,829 | $36,836,794 |

| Part 2: Asset and Liability Status (Not generally applicable to Individual Debtors. See Instructions.) | Current Month |
|---|---|
| a. Accounts receivable (total net of allowance) | $48,618 |
| b. Accounts receivable over 90 days outstanding (net of allowance) | $48,618 |
| c. Inventory    (Book ○  Market ○  Other ◉  (attach explanation)) | $0 |
| d. Total current assets | $856,413 |
| e. Total assets | $856,413 |
| f. Postpetition payables (excluding taxes) | $5,262,741 |
| g. Postpetition payables past due (excluding taxes) | $36,861 |
| h. Postpetition taxes payable | $101,018 |
| i. Postpetition taxes past due | $0 |
| j. Total postpetition debt (f+h) | $5,363,759 |
| k. Prepetition secured debt | $0 |
| l. Prepetition priority debt | $0 |
| m. Prepetition unsecured debt | $20,114,115 |
| n. Total liabilities (debt) (j+k+l+m) | $25,477,874 |
| o. Ending equity/net worth (e-n) | $-24,621,462 |

| Part 3: Assets Sold or Transferred | Current Month | Cumulative |
|---|---|---|
| a. Total cash sales price for assets sold/transferred outside the ordinary course of business | $0 | $12,000,000 |
| b. Total payments to third parties incident to assets being sold/transferred outside the ordinary course of business | $0 | $12,000,000 |
| c. Net cash proceeds from assets sold/transferred outside the ordinary course of business (a-b) | $0 | $0 |

| Part 4: Income Statement (Statement of Operations) (Not generally applicable to Individual Debtors. See Instructions.) | Current Month | Cumulative |
|---|---|---|
| a. Gross income/sales (net of returns and allowances) | $-1,821 | |
| b. Cost of goods sold (inclusive of depreciation, if applicable) | $0 | |
| c. Gross profit (a-b) | $-1,821 | |
| d. Selling expenses | $0 | |
| e. General and administrative expenses | $-27,985 | |
| f. Other expenses | $0 | |
| g. Depreciation and/or amortization (not included in 4b) | $0 | |
| h. Interest | $0 | |
| i. Taxes (local, state, and federal) | $0 | |
| j. Reorganization items | $-20,220 | |
| k. Profit (loss) | $5,944 | $-3,859,690 |

UST Form 11-MOR (12/01/2021)    2

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers                              Case No.  20-00018

**Part 5:  Professional Fees and Expenses**

|   | | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|---|
| a. | Debtor's professional fees & expenses (bankruptcy)  *Aggregate Total* | | $61,943 | $3,186,333 | $243,740 | $2,732,913 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | Sullivan Hills Rez & Engel, AP | Lead Counsel | $50,428 | $2,626,651 | $199,792 | $2,263,162 |
| ii | Campbell Partners LLC | Special Counsel | $5,842 | $218,169 | $17,748 | $180,342 |
| iii | Elisabeth Eisner | Special Counsel | $660 | $51,535 | $3,674 | $41,910 |
| iv | Squar Milner/Baker Tilly | Financial Professional | $5,013 | $155,002 | $17,034 | $133,258 |
| v | Harbuck Keith & Holmes LLC | Special Counsel | $0 | $134,977 | $5,492 | $114,241 |
| vi | | | | | | |
| vii | | | | | | |
| viii | | | | | | |
| ix | | | | | | |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |
| xxx | | | | | | |
| xxxi | | | | | | |
| xxxii | | | | | | |
| xxxiii | | | | | | |
| xxxiv | | | | | | |
| xxxv | | | | | | |
| xxxvi | | | | | | |

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers          Case No.  20-00018

| | | | | | |
|---|---|---|---|---|---|
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxvii | | | | | |

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers                    Case No.  20-00018

| | | | | | | |
|---|---|---|---|---|---|---|
| lxxix | | | | | | |
| lxxx | | | | | | |
| lxxxi | | | | | | |
| lxxxii | | | | | | |
| lxxxii | | | | | | |
| lxxxiv | | | | | | |
| lxxxv | | | | | | |
| lxxxvi | | | | | | |
| lxxxvi | | | | | | |
| lxxxvi | | | | | | |
| lxxxix | | | | | | |
| xc | | | | | | |
| xci | | | | | | |
| xcii | | | | | | |
| xciii | | | | | | |
| xciv | | | | | | |
| xcv | | | | | | |
| xcvi | | | | | | |
| xcvii | | | | | | |
| xcviii | | | | | | |
| xcix | | | | | | |
| c | | | | | | |
| ci | | | | | | |

| | | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|---|
| b. | Debtor's professional fees & expenses (nonbankruptcy)  *Aggregate Total* | | | $0 | $3,256 | $0 | $2,857 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | Firm Name | Role | | | | | |
| i | Virginia Moore-Bell | Other | | $0 | $3,256 | $0 | $2,857 |
| ii | | | | | | | |
| iii | | | | | | | |
| iv | | | | | | | |
| v | | | | | | | |
| vi | | | | | | | |
| vii | | | | | | | |
| viii | | | | | | | |
| ix | | | | | | | |
| x | | | | | | | |
| xi | | | | | | | |
| xii | | | | | | | |
| xiii | | | | | | | |
| xiv | | | | | | | |

UST Form 11-MOR (12/01/2021)                    5

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers                     Case No.  20-00018

| | | | | | |
|---|---|---|---|---|---|
| xv | | | | | |
| xvi | | | | | |
| xvii | | | | | |
| xviii | | | | | |
| xix | | | | | |
| xx | | | | | |
| xxi | | | | | |
| xxii | | | | | |
| xxiii | | | | | |
| xxiv | | | | | |
| xxv | | | | | |
| xxvi | | | | | |
| xxvii | | | | | |
| xxviii | | | | | |
| xxix | | | | | |
| xxx | | | | | |
| xxxi | | | | | |
| xxxii | | | | | |
| xxxiii | | | | | |
| xxxiv | | | | | |
| xxxv | | | | | |
| xxxvi | | | | | |
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |

Debtor's Name Vestavia Hills, Ltd. DBA Mount Royal Towers          Case No. 20-00018

| | | | | | | |
|---|---|---|---|---|---|---|
| lvii | | | | | | |
| lviii | | | | | | |
| lix | | | | | | |
| lx | | | | | | |
| lxi | | | | | | |
| lxii | | | | | | |
| lxiii | | | | | | |
| lxiv | | | | | | |
| lxv | | | | | | |
| lxvi | | | | | | |
| lxvii | | | | | | |
| lxviii | | | | | | |
| lxix | | | | | | |
| lxx | | | | | | |
| lxxi | | | | | | |
| lxxii | | | | | | |
| lxxiii | | | | | | |
| lxxiv | | | | | | |
| lxxv | | | | | | |
| lxxvi | | | | | | |
| lxxvii | | | | | | |
| lxxvii | | | | | | |
| lxxix | | | | | | |
| lxxx | | | | | | |
| lxxxi | | | | | | |
| lxxxii | | | | | | |
| lxxxii | | | | | | |
| lxxxiv | | | | | | |
| lxxxv | | | | | | |
| lxxxvi | | | | | | |
| lxxxvi | | | | | | |
| lxxxvi | | | | | | |
| lxxxix | | | | | | |
| xc | | | | | | |
| xci | | | | | | |
| xcii | | | | | | |
| xciii | | | | | | |
| xciv | | | | | | |
| xcv | | | | | | |
| xcvi | | | | | | |
| xcvii | | | | | | |
| xcviii | | | | | | |

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers                     Case No.  20-00018

| | | | | | | |
|---|---|---|---|---|---|---|
| | xcix | | | | | |
| | c | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | $61,943 | $3,189,589 | $243,740 | $2,735,770 |

| Part 6:  Postpetition Taxes | Current Month | Cumulative |
|---|---|---|
| a. | Postpetition income taxes accrued (local, state, and federal) | $0 | $0 |
| b. | Postpetition income taxes paid (local, state, and federal) | $0 | $200 |
| c. | Postpetition employer payroll taxes accrued | $0 | $450,311 |
| d. | Postpetition employer payroll taxes paid | $0 | $690,121 |
| e. | Postpetition property taxes paid | $0 | $724,513 |
| f. | Postpetition other taxes accrued (local, state, and federal) | $0 | $1,190,678 |
| g. | Postpetition other taxes paid (local, state, and federal) | $0 | $0 |

**Part 7: Questionnaire - During this reporting period:**

| | | |
|---|---|---|
| a. | Were any payments made on prepetition debt?  (if yes, see Instructions) | Yes ○  No ◉ |
| b. | Were any payments made outside the ordinary course of business without court approval?  (if yes, see Instructions) | Yes ○  No ◉ |
| c. | Were any payments made to or on behalf of insiders? | Yes ○  No ◉ |
| d. | Are you current on postpetition tax return filings? | Yes ◉  No ○ |
| e. | Are you current on postpetition estimated tax payments? | Yes ◉  No ○ |
| f. | Were all trust fund taxes remitted on a current basis? | Yes ◉  No ○ |
| g. | Was there any postpetition borrowing, other than trade credit? (if yes, see Instructions) | Yes ○  No ◉ |
| h. | Were all payments made to or on behalf of professionals approved by the court? | Yes ◉  No ○  N/A ○ |
| i. | Do you have:  Worker's compensation insurance? | Yes ○  No ◉ |
| | If yes, are your premiums current? | Yes ○  No ○  N/A ◉  (if no, see Instructions) |
| | Casualty/property insurance? | Yes ○  No ◉ |
| | If yes, are your premiums current? | Yes ○  No ○  N/A ◉  (if no, see Instructions) |
| | General liability insurance? | Yes ○  No ◉ |
| | If yes, are your premiums current? | Yes ○  No ○  N/A ◉  (if no, see Instructions) |
| j. | Has a plan of reorganization been filed with the court? | Yes ◉  No ○ |
| k. | Has a disclosure statement been filed with the court? | Yes ◉  No ○ |
| l. | Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930? | Yes ◉  No ○ |

| Debtor's Name | Vestavia Hills, Ltd. DBA Mount Royal Towers | Case No. | 20-00018 |
|---|---|---|---|

**Part 8: Individual Chapter 11 Debtors (Only)**

| | | |
|---|---|---|
| a. | Gross income (receipts) from salary and wages | $0 |
| b. | Gross income (receipts) from self-employment | $0 |
| c. | Gross income from all other sources | $0 |
| d. | Total income in the reporting period (a+b+c) | $0 |
| e. | Payroll deductions | $0 |
| f. | Self-employment related expenses | $0 |
| g. | Living expenses | $0 |
| h. | All other expenses | $0 |
| i. | Total expenses in the reporting period (e+f+g+h) | $0 |
| j. | Difference between total income and total expenses (d-i) | $0 |
| k. | List the total amount of all postpetition debts that are past due | $0 |
| l. | Are you required to pay any Domestic Support Obligations as defined by 11 U.S.C § 101(14A)? | Yes ○   No ● |
| m. | If yes, have you made all Domestic Support Obligation payments? | Yes ○   No ○   N/A ● |

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information, and provision of this information is mandatory under 11 U.S.C. §§ 704, 1106, and 1107. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6). The United States Trustee will also use this information to evaluate a chapter 11 debtor's progress through the bankruptcy system, including the likelihood of a plan of reorganization being confirmed and whether the case is being prosecuted in good faith. This information may be disclosed to a bankruptcy trustee or examiner when the information is needed to perform the trustee's or examiner's duties or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Monthly Operating Report and its supporting documentation are true and correct and that I have been authorized to sign this report on behalf of the estate.**

/s/ Kevin Moriarty
_____
Signature of Responsible Party

President/CEO of the General Partner
_____
Title

Kevin Moriarty
_____
Printed Name of Responsible Party

02/23/2022
_____
Date

Exhibit 14, Page 276

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers                    Case No.  20-00018



PageOnePartOne

PageOnePartTwo



PageTwoPartOne

PageTwoPartTwo

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers          Case No.  20-00018



Bankruptcy1to50



Bankruptcy51to100



NonBankruptcy1to50



NonBankruptcy51to100

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers          Case No.  20-00018



PageThree



PageFour

# In re: Vestavia Hills, Ltd. DBA Mount Royal Towers

USBC Case No.: 20-00018
January 31, 2022
Attachments to MOR

## In re: Vestavia Hills, Ltd. dba Mount Royal Towers
## U.S.B.C. Case No.: 20-00018-LA11
## Narrative Statement–January 2022 Monthly Operating Report

Vestavia Hills, Ltd. dba Mount Royal Towers ("Debtor") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (Case No. 20-00018-LA18, on file with the United States Bankruptcy Court in the Southern District of California) on January 3, 2020.

The Debtor was the owner of real property in Vestavia Hills, Alabama, on which it operated a senior housing community commonly known as Mount Royal Towers (MRT) since 1982. As noted below, the sale of the Debtor's MRT facility and related business assets closed on October 19, 2021.

The Debtor wishes to disclose the following information in connection with the bankruptcy estate's monthly operating report:

- See prior Monthly Operating Reports for response to item 7(a)—referencing ECF 95 (cash collateral order) and for response to item 7(c)—referencing ECFs 101 and 150 (insider compensation orders).

- At the request of the U.S. Trustee's office, the Debtor's operating reports for the months of October and November 2021 were amended and filed with the Court on January 13, 2022. See ECFs 658, 659.]

- On March 25, 2020, the Court granted the Debtor's motion to approve sale procedures for the sale of the Debtor's Mount Royal Towers facility and related business assets, approving a "stalking horse" purchase agreement with MED Healthcare Partners, LLC ("MED") and establishing procedures for overbid, and setting certain deadlines and dates for receipt of qualifying overbids and setting a final sale hearing date (ECF 185). While the sale process was underway, in recognition of the challenges posed by the COVID-19 pandemic, the Debtor filed a motion to extend certain deadlines and dates associated with the sale process, which the Court granted by order entered May 21, 2020 (ECF 264), moving the deadline to submit qualifying overbids to July 9, 2020 and setting the final sale hearing on July 30, 2020. Notwithstanding objections to the sale having been filed by Commonwealth Assisted Living LLC ("Commonwealth") (ECF 329, 336, and 342), the Court approved the Debtor's Sale Motion at the July 30 hearing, adopting her previously issued Tentative Decision and making various findings on the record at the hearing approving the sale to the Stalking Horse Bidder, MED, for $12,000,000. An order approving the Sale Motion was entered on August 31, 2020. The sale to MED closed on October 19, 2021. The Debtor filed its notice of the closing of the sale (ECF 623) and separately a motion for termination of the appointment of the patient care ombudsman (ECF 624) in light of the closing of the sale and the transfer by assignment of all residential care contracts to MED, which order was approved and entered on November 19, 2021 (ECF 638).

- The Court set a general Claims Bar Date of July 6, 2020 (ECF 237). The Court also set an Administrative Claims Bar Date of April 9, 2021 (ECF 470). The only parties not required to comply with the Chapter 11 administrative claims bar date are: (a) the U.S. Trustee, on account of claims for fees payable pursuant to 28 U.S.C. § 1930; (b) any person or entity that has already properly filed a proof of claim for a post-petition administrative priority claim against the Debtor;

## In re: Vestavia Hills, Ltd. dba Mount Royal Towers
## U.S.B.C. Case No.: 20-00018-LA11
## Narrative Statement–January 2022 Monthly Operating Report

(c) any and all professionals retained in this Chapter 11 case by the Debtor who assert administrative claims for fees and expenses subject to the Court's approval pursuant to sections 330 and 331 of the Bankruptcy Code; (d) claims of any party that is exempt from filing a proof of claim pursuant to an order of the Court in these this Chapter 11 case, including without limitation any order approving post-petition debtor in possession financing; (e) any claim that has been paid in full by the Debtor pursuant to the Bankruptcy Code or in accordance with an order of the Court; and (f) any claim against the Debtor that has been allowed by an order of the Court entered on or before the applicable Administrative Claims Bar Date. The SBA filed an unsecured, non-priority claim, claim 18-1, on April 9, 2021 in the amount of $1,138,104.75. Other administrative priority claims were filed by the Debtor's Limited Partners for their post-petition debtor in possession financing advances and adequate protection payments paid on behalf of the Debtor to Wells Fargo Bank. See Claim Nos. 19, 20, 21, 22, and 23, filed on April 9, 2021. All claims listed in the Debtor's Schedules and as filed will be analyzed and treated as appropriate within their respective priorities and classes as the Debtor works toward conclusion of this Chapter 11 case. On January 12, 2022 the Debtor filed a Motion to set a Supplemental Administrative Bar Date (ECF 657) for those administrative expense priority claims that arose after the April 9, 2022 Administrative Bar Date. The order setting the supplemental administrative claims bar date – which falls on February 28, 2022 - was entered on January 13, 2022 (ECF 664), notice of which was served on all parties in interest on January 21, 2022. ECF 673.

- In recognition of the challenges the COVID pandemic visited upon the Debtor, and the attendant delays in closing the court-approved sale of Mount Royal Towers to MED (including also the delays in closing the sale caused by the well-documented interference by Commonwealth Assisted Living and its affiliate, MCAP, and their principals and attorneys (see, inter alia, ECF 405)), the Court granted the Debtor's seriatim motions to extend the exclusive periods for the Debtor to file its Chapter 11 plan to July 3, 2021, and to solicit acceptances to that plan to September 3, 2021. ECF 453. On July 2, 2021 the Debtor filed its Chapter 11 plan and disclosure statement within these extended exclusivity periods. ECFs 515, 516. On July 30, 2021, Wells Fargo Bank (ECF 539) and Commonwealth (ECF 532) filed objections to the disclosure statement. On August 6, 2021, the Debtor filed its amended plan and amended disclosure statement. ECFs 548, 549. It also filed replies to the two objections it received. ECFs 553, 554. The Limited Partners also filed their reply to the objections to the Debtor's disclosure statement. ECF 552. By tentative rulings issued on August 25, 2021, the Court indicated it would not approve the Debtor's disclosure statement and plan as presented in light of, among other things, the underlying Plan's third-party injunction provisions. ECF 578. As a result, the hearing on approval of the disclosure statement, which was originally set for August 26, 2021, was initially continued to October 28, 2021, and thereafter moved to November 18, 2021. As previously reported, in light of the closing of the sale to MED, and the recently approved settlement agreement with the Debtor's senior secured lender, Wells Fargo Bank (approved by order entered November 19, 2021, ECF 639), and as now reported below, the pending settlement with the SBA resolving the SBA's claim and forgiveness of a substantial majority of the Debtor's PPP loan funding, the Debtor's remaining challenges to closing this Chapter 11 case have narrowed (a) to dealing with the hotly disputed Commonwealth claims now in litigation in Alabama, as this Court ordered, and to the extent not

## In re: Vestavia Hills, Ltd. dba Mount Royal Towers
## U.S.B.C. Case No.: 20-00018-LA11
## Narrative Statement–January 2022 Monthly Operating Report

fully resolved there, to be litigated in this Court thereafter, also as the Court ordered, and (b) to determining a handful of disputed claims of other creditors.

- The Debtor filed and served its Tenth Chapter 11 Status Report  on January 13, 2022 (ECF 663). Parties should review that Status Report, and all previous Status Reports, for more details as to this Chapter 11 case status and events.  At the January 20, 2022 Status Hearing in the Chapter 11 case, the Court set May 12, 2022 at the continued date for the Debtor's Chapter 11 Status Hearing.

- The Debtor and the SBA participated in multiple court-sponsored mediation sessions in an effort to resolve the pending appeal to the Ninth Circuit Court of Appeals of the adverse decision rendered below by United States District Judge Curiel from Judge Adler's June 25, 2020 preliminary injunction order in Adversary No. 20-90073.  The Debtor and the SBA reached agreement resolving all issues between them, as encapsulated in their definitive settlement agreement. That settlement resolves all issues with respect to the SBA's proof of claim (POC no. 18-1), the Adversary Proceeding, and the Ninth Circuit appeal.  The settlement required repayment of a fraction of the PPP loan and provided that a substantial majority of the Debtor's PPP loan will be forgiven. On December 23, 2021, the Debtor filed its  notice and motion for approval of the settlement with the SBA, which was set for hearing on January 20, 2022.  ECF 652, 653.  On January 19, 2022, the Court issued its tentative decision (ECF 668) approving the settlement with the SBA and excusing appearances of the parties at the January 20 hearing.  The order approving the settlement was entered on January 22, 2022.  ECF 679.  The settlement has been mostly performed, including repayment of the settlement amount, filing of dismissals of all pending litigation, and withdrawal of the SBA's proof of claim.  The Debtor is awaiting confirmation of the forgiveness of the balance of the PPP loan, at which time this matter with the SBA will be concluded.

- As set forth above, the sale of Debtor's Mount Royal Towers facility and related business assets closed on October 19, 2021.  On October 18, 2021, the Debtor filed its motion for approval of settlement of all claims of Wells Fargo Bank (ECF 619), which had its secured claim paid and satisfied in full from the net proceeds of sale at the closing of the sale to MED.  By order entered on November 19, 2021, the Court approved the Debtor's motion to approve the settlement with Wells Fargo which resolved all issues with respect to the Wells Fargo claims.  Further details as to the settlement agreement with Wells Fargo and the agreed treatment of its remaining claims in this Chapter 11 case can be found in the Wells Fargo settlement approval motion (ECF 619) and supporting documents.

- Commonwealth State Court Litigation: The Debtor is proceeding to litigate with Commonwealth in Alabama pursuant to the Court's orders mentioned above. On November 2, 2021, Commonwealth filed a Notice of Remand and Relief from Automatic Stay in the Alabama State Court Lawsuit notifying the Circuit Court of Jefferson County, Alabama of this Court's decision to remand the State Court Lawsuit.  That same day, the Debtor filed a Motion for Status Conference in the State Court Lawsuit.  Then, on December 2, 2021, the Debtor and the guarantors amended their answer to assert counterclaims against Commonwealth that had not been alleged in the State Court Lawsuit prior to its removal.  A status conference was held in the State Court

## In re: Vestavia Hills, Ltd. dba Mount Royal Towers
## U.S.B.C. Case No.: 20-00018-LA11
## Narrative Statement–January 2022 Monthly Operating Report

Lawsuit on December 3, 2021. Given the elapsed time and the additional discovery needed in the case, the parties agreed to moot (and remove from the court's calendar) all pending motions previously filed prior to Vestavia Hills' Chapter 11 bankruptcy and to continue with discovery in the State Court Lawsuit. Under the new scheduling order in the State Court Lawsuit, the parties are to complete all fact discovery in the State Court Lawsuit before December 31, 2022, and the next status hearing is currently set for June 10, 2022. On January 17, 2022, Commonwealth filed a motion to dismiss the counterclaims. The Debtor and the Limited Partners will be filing their oppositions to Commonwealth's motion in due course in accordance with applicable Alabama rules and law.

- Commonwealth Claim Objection: On July 12, 2021 the Limited Partners filed objections to proof of claim no. 10-1 filed by Commonwealth Assisted Living, LLC, Series E. ECF 524. The Debtor filed a joinder to that objection on July 22, 2021. ECF 526. On July 26, 2021 the Limited Partners filed a motion to consolidate the Claims Objection with the Removed Adversary Proceeding (litigation that was removed from Alabama between Commonwealth and the Debtor and Limited Partners). The Court issued tentative rulings regarding these matters on September 17, 2021 adverse to the positions taken by the Debtor and by the Limited Partners. An order was entered on October 12, 2021 denying the motion to consolidate the claims objection with the adversary proceeding. ECF 611. Also, on October 12, 2021 the Court overruled the Debtor's and the Limited Partners' objections to Commonwealth's proof of claim no. 10-1, pending rulings in the Alabama state court action and pending further consideration following a status conference to be set at a later date following resolution of the Alabama state court action. ECF 612. The Debtor intends to litigate with Commonwealth in Alabama and, upon resolution of the Alabama litigation, in this Court as necessary to fully adjudicate its claims against Commonwealth.

- Commonwealth Motion for Relief from Stay: On August 20, 2021 the Debtor filed supplemental opposition to Commonwealth's motion for relief from stay. ECF 574. The Limited Partners filed a joinder to that opposition. ECF 575. On August 30, 2021 Commonwealth filed its reply to the oppositions. ECF 581. As noted above, the Court issued its tentative ruling on September 17, 2021 adverse to the positions taken by the Debtor and the Limited Partners. On October 12, 2021, the Court entered its order granting relief from stay for the Alabama state court action to proceed in that venue. ECF 609.

- The Removed Action, Adversary No. 20-90060: On August 20, 2021, the Debtor (as a defendant) filed its opposition to Commonwealth's motion to remand that proceeding to state court in Alabama. ECF 48. The Limited Partners, also defendants in that action, joined in the Debtor's opposition. ECF 50. On August 30, 2021 Commonwealth filed its reply to those oppositions. ECF 51. As noted above, the Court issued its tentative ruling on September 17, 2021 adverse to the positions taken by the Debtor and the Limited Partners. The matter was argued on September 21, 2021, and on October 12, 2021, the Court entered its order granting the remand motion. See ECF 62 in Adversary No. 20-90060.

- The Debtor is current on payment of all U.S. Trustee fees, as the calculation of those fees should not include non-estate property that had been held by the Debtor in trust for the MRT residents, or on

**In re: Vestavia Hills, Ltd. dba Mount Royal Towers**
**U.S.B.C. Case No.: 20-00018-LA11**
**Narrative Statement–January 2022 Monthly Operating Report**

the funds held in trust by the Debtor for MED following the closing of the sale of the MRT assets to MED. None of these funds constituted property of the estate upon which U.S. Trustee fees should be calculated and paid.

- In summary, the Court Ordered sale of the Debtor's Mount Royal Towers facility and related business assets has closed. All costs and expenses of operating Mount Royal Towers have been eliminated. The Wells Fargo settlement agreement was approved by the Court. The Debtor and Limited Partners remain in full compliance with all terms and conditions of that Court-approved settlement. Resolution of claims by and claims against Commonwealth remains a key gating item in the Chapter 11 case. In the interim, the Debtor will focus upon resolving other claims and as much as possible narrowing the focus of the case to disputes involving Commonwealth only.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Balance Sheet**
**(Accrual Basis Only)**

| | As of January 31, 2022 |
|---|---:|
| **ASSETS** | |
| Current Assets: | |
| Unrestricted Cash | $ 480,323 |
| Restricted Cash - Buyer's Holding Account | 14,175 |
| Accounts Receivable - postpetition | 87,448 |
| Accounts Receivable - prepetition | - |
| Less: Allowance for Doubtful Accounts | (38,830) |
| CARES Act ERC Credits A/R | 305,704 |
| Inventory | - |
| Notes Receivable | 7,000 |
| Prepaid Expenses | 593 |
| Other - Proceeds Held in Escrow Account Reserved for Property Tax | - |
| Total Current Assets | 856,413 |
| | |
| Property & Equipment | - |
| Accumulated Depreciation | - |
| Net Property, Plant & Equipment | - |
| | |
| Other Assets (Net of Amortization): | |
| Special Basis Entries | - |
| Other Assets (Itemize) Costs Related to Sale | - |
| Other Assets (Itemize) CON Beds | - |
| Total Other Assets | - |
| | |
| TOTAL ASSETS | $ 856,413 |
| | |
| **LIABILITIES** | |
| Postpetition Liabilities: | |
| Accounts Payable | $ 158,698 |
| Accrued Payables | 57,142 |
| Accrued Payroll | - |
| Taxes Payable | 101,018 |
| Other - Accounts Receivable Prepayments | 4,341 |
| Other - Leases | - |
| Other - Buyer's Holding Account | 42,560 |
| Other - Medicaid/CARES Provider Funding | - |
| Other - PPP Loan Proceeds | - |
| Other - DIP Financing Borrowing [a] | 5,000,000 |
| Total Postpetition Liabilities | 5,363,759 |
| | |
| Prepetition Liabilities: | |
| Secured Liabilities [b] | - |
| Priority Liabilities | - |
| Unsecured Liabilities | 20,114,115 |
| Total Prepetition Liabilities | 20,114,115 |
| TOTAL LIABILITIES | 25,477,874 |
| | |
| **EQUITY:** | |
| Prepetition Owners' Equity/(Deficit) | (20,761,771) |
| Postpetition Profit/(Loss) | (3,859,690) |
| Direct Charges to Equity | - |
| TOTAL EQUITY | (24,621,461) |
| | |
| TOTAL LIABILITIES & EQUITY | $ 856,413 |

[a] The DIP Financing Borrowing was authorized by the Court in its *ORDER ON MOTION FOR AUTHORITY TO OBTAIN POSTPETITION UNSECURED FINANCING* entered on February 4, 2020 (ECF 100).

[b] The Debtor completed its sale of its Mount Royal Towers facility and related business assets in October 2021, at which time the Debtor's secured creditor, Wells Fargo, received payment of $11,306,598.16 directly from net proceeds. The remaining balance of the amount due to Wells Fargo continues to be carried on the Debtor's balance sheet. The remaining balance is unsecured and as such is included above within the unsecured liabilities section. The Debtor also filed its motion for approval of settlement of all claims with Wells Fargo in October 2019, which was approved by the Court in November 2021 (ECF619 and ECF639).

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Profit and Loss Statement**
**(Accrual Basis Only)**

| | For the month of January 2022 | Cumulative |
|---|---|---|
| **Sales/Revenue:** | | |
| Skilled Nursing Revenues | | |
| Skilled Nursing Facility Revenue - Primary Services | $ (30) | $ 15,987,203 |
| Skilled Nursing Facility Revenue - Ancillary Services | (1,791) | 591,987 |
| Skilled Nursing Facility Revenue - Misc Contracts | - | 534,376 |
| Less: COVID Medicaid Add On Pay Back | - | (982,785) |
| Add back 2020 Cost Report MCD | - | 982,785 |
| Less: Contractual Adjustments/Discounts | - | (4,532) |
| Net Skilled Nursing Revenues | (1,821) | 17,109,034 |
| | | |
| Retirement Care Revenues | | |
| Retirement Care Revenues - Primary Services | - | 868,844 |
| Retirement Care Revenues - Ancillary Services | - | (13,587) |
| Less: Contractual Adjustments/Discounts | - | (31,952) |
| Net Retirement Care Revenues | - | 823,305 |
| | | |
| Other Operating Revenues | | |
| Net Sales/Revenue | (1,821) | 17,932,339 |
| | | |
| **Operating Expenses:** | | |
| SNF Nursing | - | 5,850,164 |
| SNF Bed Tax | - | 1,188,677 |
| SNF Ancillary | 6,624 | 1,495,353 |
| Repairs and Maintenance | - | 1,026,260 |
| Housekeeping | - | 801,368 |
| Dietary | - | 1,877,769 |
| Activities/Resident Services | - | 664,071 |
| Marketing | - | 283,381 |
| Administrative | (34,609) | 3,414,472 |
| Property Taxes | - | 521,012 |
| Insurance | - | 690,580 |
| Bad Debt Write Off | - | 65,806 |
| Utilities | - | 1,569,341 |
| Total Operating Expenses | (27,985) | 19,448,254 |
| | | |
| Net Income/(Loss) from Operations | 26,164 | (1,515,915) |
| | | |
| Non-Operating Income: | | |
| Other Income [1] | - | 1,747,540 |
| HHS Stimulus Proceeds | - | 1,570,522 |
| PPP Loan Proceeds | - | 1,029,105 |
| ACL Debt Adjusted Off | - | 1,188,574 |
| Total Non-Operating Income | - | 5,535,741 |
| | | |
| Non-Operating Expenses: | | |
| Interest Expense | - | 2,394,335 |
| Legal and Professional | 16,535 | 3,060,781 |
| US Trustee Quarterly Fees | 3,685 | 328,608 |
| Management Fees [2] | - | - |
| Loss from Sale of Asset | - | 106,954 |
| Depreciation and Amortization Expenses [3] | - | 1,987,906 |
| Total Non-Operating Expenses | 20,220 | 7,878,584 |
| | | |
| Net Income/Loss (Including Non Operating Items) Before Taxes | 5,944 | (3,858,758) |
| | | |
| Corporate Taxes | - | (932) |
| | | |
| Net Income/Loss (Including Non Operating Items) | $ 5,944 | $ (3,859,690) |

[1] Other income is comprised of CARES Act Employee Retention Credits.

[2] Pursuant to a prepetition agreement, ActivCare Living Inc. assists the Debtor with limited portions of its operations, namely bookkeeping, accounting and marketing. The Debtor includes this management fee in its budgets; however, ActiveCare Living Inc. is not seeking payment for such management fees during the Debtor's bankruptcy case.

[3] The Debtor historically posts depreciation and amortization annually.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**

**Summary of Monthly Receipts and Disbursements (excluding Trust Accounts aka Accounts #5 and #11)** [1]

**For the period January 4, 2020 through January 31, 2022**

|  | January 2022 | Cumulative |
|---|---|---|
| Cash balance beginning of period | $ 800,027.44 | $ 86,673.23 |
| **Receipts:** | | |
| Total receipts for Debtor from external sources | 146,124.76 | 25,230,443.31 |
| Total funds received in trust FBO buyer [2] | 438,916.54 | 1,025,693.85 |
| Total transfers in | 31,888.08 | 16,771,908.22 |
| | 616,929.38 | 43,028,045.38 |
| **Disbursements:** | | |
| Total disbursements to external parties | 465,829.22 | 24,836,793.56 |
| Total transfers out | 470,804.62 | 17,797,602.07 |
| | 936,633.84 | 42,634,395.63 |
| Cash balance end of period | $ 480,322.98 | $ 480,322.98 |

Notes:

*Sources:*  Monthly operating reports filed by the Debtor and other accounting records of the Debtor.

[1] The Debtor held funds in trust for its patients ("Account #5").  Each month this account was used to pay patient incidentals and, in some instances, their bills due to the Debtor for services. Likewise, the Debtor occasionally disbursed funds to Account #5 to reimburse patients for various items, pay bank fees or other items. This account is recorded on the Debtor's balance sheet as restricted cash and as a liability.  The Debtor's position is that, as these funds are not the Debtor's assets, Account #5 should be reported in the monthly operating reports but excluded from quarterly OUST fees. Therefore, Account #5 has been excluded from this summary of receipts and disbursements, except to the extent that funds were paid from Account #5 to the Debtor for services or the Debtor paid Account #5 for an operational purpose. After the sale of its assets in October 2021, the Debtor established a trust fund account on behalf of the buyer as the Debtor is still receiving subtantial payments for services rendered by new buyer during the transition.

[2] As part of the sale, the Debtor agreed to receive and hold in trust patient service revenue from third parties until the buyer is established in the records of the various paying agencies (Medicare, insurance, etc.).  These funds were not earned by the Debtor and must be transmitted to the buyer.  Therefore, the Debtor set up a trust account, similar to its historical patient trust fund account, for these funds held in trust as both an asset and a liability on its balance sheet.  The Debtor will transfer funds it receives into its operating accounts to the trust account. The Debtor will report all activities in this account in its monthly operating reports until the account has been closed, and exclude payments made to the buyer from this account from its calculation of OUST quarterly fees.

**Vestavia Hills  Ltd. DBA Mount Royal Towers**
**Summary Schedule of Cash**
**For the Month Ended January 31  2022**

| | Beginning Balance | Receipts [1] | Transfers In | Disbursements | Transfers Out | Ending Balance |
|---|---|---|---|---|---|---|
| DIP General Checking Account #1 | $   798,027.44 | $   75,597.61 | $   31,888.08 | $   (465,829.22) | $          - | $  439,683 91 |
| General Checking Account #2 | - | - | - | - | - | - |
| DIP Payroll Checking Account #3 | - | - | - | - | - | - |
| Payroll Checking Account #4 | - | - | - | - | - | - |
| Patient Trust Account #5 - trust funds | - | 47,052.47 | - | (47,052.47) | - | - |
| DIP Reserve Account #6 | 2,000.00 | 509,443.69 | - | - | (470,804.62) | 40,639 07 |
| DIP Imprest Account #7 | - | - | - | - | - | - |
| Petty Cash - Activities Account #8 | - | - | - | - | - | - |
| Petty Cash - Administrator Account #9 | - | - | - | - | - | - |
| Property Tax Money Market Account #10 | - | - | - | - | - | - |
| Buyer's Holding Account #11  - trust funds | 26,658.78 | - | 438,916.54 | (451,400.32) | - | 14,175 00 |
| | 826,686.22 | 632,093.77 | 470,804.62 | (964,282.01) | (470,804.62) | 494,497 98 |
| | | | | | | |
| LESS:  Restricted Funds - Patient Trust Account #5 | - | (47,052.47) | - | 47,052.47 | - | - |
| LESS:  Restricted Funds - Buyer's Holding Account #11 | (26,658.78) | - | (438,916.54) | 451,400.32 | - | (14,175 00) |
| | | | | | | |
| Total Unrestricted Cash | $   800,027.44 | $   585,041.30 | $   31,888.08 | $   (465,829.22) | $  (470,804.62) | $  480,322 98 |

Notes:

[1] Includes amounts received and held in trust on behalf of buyer.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**DIP General Checking Account #1**
**For the Month Ended January 31, 2022**

| | | |
|---|---|---|
| BEGINNING BALANCE AT PETITION DATE: | | $ - |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $ 25,804,706.31 |
| LESS: TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $ 25,006,678.87 |
| BEGINNING BALANCE: | | $ 798,027.44 |

| | | |
|---|---|---|
| RECEIPTS DURING CURRENT PERIOD: | | |
| RECEIPTS - OPERATIONS | $ 7,844.20 | |
| RECEIPTS FOR PATIENT SERVICES FROM PATIENT TRUST | $ - | |
| RECEIPTS FOR MISC VENDOR REFUNDS | $ 67,753.41 | |
| RECEIPTS FBO ELITE SENIOR LIVING (BUYER) | $ - | |
| TRANSFERS FROM DIP RESERVE ACCOUNT #6 | $ 31,888.08 | |
| TRANSFERS FROM DIP BUYERS HOLDING ACCT #11 | $ - | |
| TOTAL RECEIPTS THIS PERIOD: | | $ 107,485.69 |

| | | |
|---|---|---|
| LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD: | | |
| DISBURSEMENTS | $ 465,829.22 | |
| TRANSFERS TO DIP PAYROLL CHECKING ACCOUNT #3 | $ - | |
| TRANSFERS TO DIP RESERVE ACCOUNT #6 | $ - | |
| TRANSFERS TO PETTY CASH - ACTIVITIES CASH ACCOUNT #8 | $ - | |
| TRANSFERS TO PETTY CASH - ADMINISTRATOR CASH ACCOUNT #9 | $ - | |
| TRANSFERS TO BUYERS HOLDING ACCOUNT #11 | $ - | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $ 465,829.22 |

| | | |
|---|---|---|
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | | $ (358,343.53) |
| ENDING BALANCE: | | $ 439,683.91 |

DIP GENERAL CHECKING ACCOUNT #1 ***6702
COMERICA BANK
955 J STREET
SAN DIEGO, CA 92101

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**DIP General Checking Account #1**
**January 31, 2022**

**Total Receipts Into DIP General Checking Account #1 For Current Period**

| Date | Payor | Purpose | Amount |
|------|-------|---------|--------|
| 01/17/22 | Dep #1404 | Misc A/R | $ 6,229.67 |
| 01/17/22 | Dep #1405 | Misc A/R | 219.53 |
| 01/20/22 | UHS Wire | Misc A/R | 30.00 |
| 01/26/22 | UHC Wire | Misc A/R | 1,365.00 |
| | | Receipts-Operations (Misc. A/R, resident payments, etc.) | 7,844.20 |
| | | | |
| 01/06/22 | Insurance Refund | Refund of premiums | 66,867.80 |
| 01/13/22 | Isolved | Unclaimed property funds | 138.06 |
| 01/28/22 | Catered Living Reimb | Reimb prior period | 747.55 |
| | | Vendor Refunds | 67,753.41 |
| | | | $ 75,597.61 |

**Vestavia Hills, Ltd. DBA Mount Royal Tow Vestavia Hills, Ltd. DBA Mount Royal Towers**
**DIP General Checking Account #1**
**January 31, 2022**

**Total Disbursements From DIP General Checking Account #1 For Current Period**

| Date | Check# | Payee | Purpose | Amount |
|------|--------|-------|---------|--------|
| 01/03/22 | 7415 | ███████ | Refund TransAmerica Life Deductions | $ 279.76 |
| 01/17/22 | 7416 | ACTIVCARE LIVING - 102717 CHGBACK | RBG Retirement- Resource Investment Advisors Q4 2021 | 100.00 |
| 01/17/22 | 7417 | EXPERIENCE CARE, LLC | Net Solutions A/R: 12/21 | 416.46 |
| 01/17/22 | 7418 | WELLS FARGO VENDOR FIN SERV | 2020 Personal Property Tax | 108.16 |
| 01/17/22 | 7419 | LTC CONSULTING | Accounts Receivable Billing SNF - 12/21 | 170.08 |
| 01/21/22 | 7420 | ███████ | Replace Employee Payroll Check # 200670 | 1,286.41 |
| 01/21/22 | 7421 | 7EVEN TRANSPORT LLC | Medicaid Transport 8/27/21 - 10/18/21 | 1,785.00 |
| 01/21/22 | 7422 | NORTHSTAR EMS, INC. JEFFERSON | Medicare Transport 8/27/21 | 964.00 |
| 01/21/22 | 7423 | VOHRA WOUND PHYSICIANS OF FL | Wound Care for Med/A Resident 8/18/21 | 105.93 |
| 01/21/22 | Wire | Pay.Gov | US Trustee Quarterly Fee | 106,966.00 |
| 01/25/22 | 7424 / WIRE | SULLIVAN HILL REZ & ENGEL, APL | 80% of Post-Petition 11/21 Legal Fees | 39,171.28 |
| 01/25/22 | 7425 / WIRE | CAMPBELL PARTNERS | 80% of Post-Petition 11/21 Legal Fees | 7,776.00 |
| 01/25/22 | 7426 / WIRE | ELISABETH EISNER | 80% of Post-Petition 11/21 Legal Fees | 2,464.00 |
| 01/25/22 | 7427 / WIRE | BAKER TILLY US, LLP | 80% of Post-Petition 11/21 CPA Fees | 5,148.00 |
| 01/25/22 | 7428 / WIRE | HARBUCK, KEITH, & HOLMES, LLC | 80% of Post-Petition 11/21 Legal Fees | 1,344.00 |
| 01/25/22 | 7429 / WIRE | SULLIVAN HILL REZ & ENGEL, APL | 20% Balance of Post-Petition 12/20 - 09/21 Legal Fees | 160,620.80 |
| 01/25/22 | 7430 / WIRE | CAMPBELL PARTNERS | 20% Balance of Post-Petition 12/20 - 09/21 Legal Fees | 9,972.00 |
| 01/25/22 | 7431 / WIRE | ELISABETH EISNER | 20% Balance of Post-Petition 12/20 - 09/21 Legal Fees | 1,210.00 |
| 01/25/22 | 7432 / WIRE | BAKER TILLY US, LLP | 20% Balance of Post-Petition 12/20 - 09/21 CPA Fees | 11,886.40 |
| 01/25/22 | 7433 / WIRE | HARBUCK, KEITH, & HOLMES, LLC | 20% Balance of Post-Petition 12/20 - 09/21 Legal Fees | 4,147.50 |
| 01/27/22 | Wire | Scratch | Payoff PPP Loan | 109,000.00 |
| 01/28/22 | 7434 | ABILITY NETWORK INC. | SNF Billing Subscription - 01/22 | 433.19 |
| 01/28/22 | 7435 | ███████ | ███████ - Unclaimed Property - Payroll Check | 219.25 |
| 01/28/22 | 7436 | DWC-401(k) EXPERTS | 2021 RMD | 255.00 |
| | | | | $ 465,829.22 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**DIP General Checking Account #1**
**January 31, 2022**

**DIP General Checking Account #1**
**Bank Reconciliation**

BALANCE PER BANK STATEMENT DATED: _____01/31/22_____  $   441,724.33

PLUS DEPOSITS IN TRANSIT:

| DEPOSIT DATE | DEPOSIT AMOUNT |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

TOTAL DEPOSITS IN TRANSIT  $            -

LESS OUTSTANDING CHECKS:

| CHECK NUMBER | CHECK DATE | CHECK AMOUNT |
|---|---|---|
| 7415 | 01/03/22 | $      279.76 |
| 7420 | 01/21/22 | $   1,286.41 |
| 7435 | 01/28/22 | $      219.25 |
| 7436 | 01/28/22 | $      255.00 |

TOTAL OUTSTANDING CHECKS  $      2,040.42

BANK STATEMENT ADJUSTMENTS  $            -

ADJUSTED BANK BALANCE  $   439,683.91

80869

lllilllllllllllllllllllllllllll
VESTAVIA HILLS LTD DEBTOR-IN-POSSESSION
20-00018-11
GENERAL ACCOUNT
9619 CHESAPEAKE DR STE 103
SAN DIEGO CA 92123

_____  _____  _____

*Commercial Checking* statement

**January 1, 2022** to **January 31, 2022**
**Account number** ▮▮▮▮▮▮▮▮▮

# Account summary

| | |
|---|---|
| **Beginning balance on January 1, 2022** | **$806,532.21** |
| Plus deposits | |
| Electronic deposits | $68,400.86 |
| Paper deposits | $7,196.75 |
| Transfers from other accounts | $31,888.08 |
| Less withdrawals | |
| Checks | -$12,587.59 |
| Electronic (EFT) withdrawals | -$459,705.98 |
| **Ending balance on January 31, 2022** | **$441,724.33** |

**To contact us**

**Call**
(800) 888-3595
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
955 J ST
SAN DIEGO, CA 92101-4569

**Important information**

The Account Balance Fee for this statement period for this account is $0.125/$1,000.

**Thank you**

*Commercial Checking* statement
January 1, 2022 to January 31, 2022



## *Commercial Checking* account details: ▮▮▮▮▮▮

### Electronic deposits this statement period

| Date | Amount | Activity | Reference numbers Customer | Bank |
|------|--------|----------|----------|------|
| Jan 06 | 66,867.80 | W US Holding Com ACH 2771144 | | 9488592944 |
| Jan 20 | 30.00 | Unitedhealthcare Hcclaimpmt 621688625 | | 9488102393 |
| Jan 21 | 138.06 | 3482s425  Cater Payroll 220121 | | 9488277395 |
| Jan 26 | 1,365.00 | Unitedhealthcare Hcclaimpmt 621688625 | | 9488378936 |

**Total Electronic Deposits: $68,400.86**
**Total Number of Electronic Deposits: 4**

### Paper deposits this statement period

| Date | Amount ($) | Reference numbers Customer | Bank | Date | Amount ($) | Reference numbers Customer | Bank |
|------|-----------|----------|------|------|-----------|----------|------|
| Jan 18 | 6,229.67 | | 0940788808 | Jan 18 | 219.53 | | 0940788806 |
| | | | | Jan 28 | 747.55 | | 0940445056 |

**Total Paper Deposits: $7,196.75**
**Total Number of Paper Deposits: 3**

### Transfer from other accounts this statement period

| Date | Amount | Activity | | Bank reference number |
|------|--------|----------|---|------|
| Jan 04 | 428.76 | Tpa Funds Transfer From Account | Xxxxxx3953 | 0T74001087 |
| Jan 07 | 6,600.00 | Tpa Funds Transfer From Account | Xxxxxx3953 | 0T74025651 |
| Jan 19 | 15,687.38 | Tpa Funds Transfer From Account | Xxxxxx3953 | 0T74086484 |
| Jan 19 | 9,171.94 | Tpa Funds Transfer From Account | Xxxxxx3953 | 0T74086462 |

**Total Transferred from Other Accounts: $31,888.08**
**Total Number of Transfers from Other Accounts: 4**

### Checks paid this statement period

\* Symbol indicates a break in check number sequence
\# Symbol indicates an original item not enclosed
@ Symbol indicates a break in check number sequence and an original item not enclosed

| Check Number | Amount | Date Paid | Bank Reference Number | Check Number | Amount | Date Paid | Bank Reference Number |
|------|--------|-----------|------|------|--------|-----------|------|
| #7392 | -2,471.77 | Jan 11 | 0970364936 | #7419 | -170.08 | Jan 25 | 0970674406 |
| @7412 | -6,033.00 | Jan 03 | 0970050205 | @7421 | -1,785.00 | Jan 27 | 0970375429 |
| @7416 | -100.00 | Jan 21 | 0940436335 | #7422 | -964.00 | Jan 26 | 0970591539 |
| #7417 | -416.46 | Jan 24 | 0971003678 | #7423 | -105.93 | Jan 27 | 0970385281 |
| #7418 | -108.16 | Jan 24 | 0970201489 | @7434 | -433.19 | Jan 31 | 0970655517 |

**Total checks paid this statement period: -$12,587.59**
**Total number of checks paid this statement period: 10**

### Electronic withdrawals this statement period

| Date | Amount ($) | Activity | Reference numbers Customer | Bank |
|------|-----------|----------|----------|------|
| Jan 21 | -106,966.00 | Quarterly Fee Payment 220120 0000 | | 9488507895 |
| Jan 26 | -199,792.08 | Wire # 006100 Bnf Sullivan Hill  Fed # 000503 | | 9485006338 |

*Commercial Checking* statement
January 1, 2022 to January 31, 2022

## Commercial Checking: 1█████████

### Electronic withdrawals this statement period (continued)

| Date | Amount ($) | Activity | Reference numbers | |
|------|-----------|----------|----------|------|
| | | | Customer | Bank |
| Jan 26 | -17,748.00 | Wire # 006164 Bnf Campbell Partn Fed # 000518 | | 9485006339 |
| Jan 26 | -17,034.40 | Wire # 006125 Bnf Banker Tilly U Fed # 000490 | | 9485006340 |
| Jan 26 | -5,491.50 | Wire # 006106 Bnf Harbuck Keith  Fed # 000494 | | 9485006341 |
| Jan 26 | -3,674.00 | Wire # 006144 Bnf Elisabeth Eisn Fed # 000521 | | 9485006342 |
| Jan 27 | -109,000.00 | Wire # 007266 Bnf Scratch Servic Fed # 000692 | | 9485007427 |

**Total Electronic Withdrawals: -$459,705.98**
**Total Number of Electronic Withdrawals: 7**

### $ Lowest daily balance

Your lowest daily balance this statement period was **$441,409.97** on **January 27, 2022**.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**General Checking Account #2**
**For the Month Ended January 31, 2022**

| | | |
|---|---|---|
| BEGINNING BALANCE AT PETITION DATE: | $ | 2,889.42 |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | $ | - |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | $ | 2,889.42 |
| BEGINNING BALANCE: | $ | - |

RECEIPTS DURING CURRENT PERIOD:
    RECEIPTS                                    $       -

TOTAL RECEIPTS THIS PERIOD:  $      -

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD
    DISBURSEMENTS                           $      -

TOTAL DISBURSEMENTS THIS PERIOD:  $      -

| | | |
|---|---|---|
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | $ | - |
| ENDING BALANCE: | $ | - |

GENERAL CHECKING ACCOUNT #2 ***8425 (ACCOUNT CLOSED IN JANUARY 2020)
REGIONS BANK
101 OFFICE PARK DRIVE
BIRMINGHAM, AL 35223

Exhibit 14, Page 297

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**DIP Payroll Checking Account #3**
**For the Month Ended January 31, 2022**

| | | |
|---|---|---:|
| BEGINNING BALANCE AT PETITION DATE: | | $ - |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $ 1,470,105.99 |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $ 1,470,105.99 |
| BEGINNING BALANCE: | | $ - |
| RECEIPTS DURING CURRENT PERIOD: | | |
| RECEIPTS | $ - | |
| TRANSFERS FROM DIP GENERAL CHECKING ACCOUNT #1 | $ - | |
| TOTAL RECEIPTS THIS PERIOD: | | $ - |
| LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD: | | |
| DISBURSEMENTS | $ - | |
| TRANSFERS TO DIP GENERAL CHECKING ACCOUNT #1 | $ - | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $ - |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | | $ - |
| ENDING BALANCE: | | $ - |

DIP PAYROLL CHECKING ACCOUNT #3 ***6710 (ACCOUNT CLOSED DECEMBER 2021)
COMERICA BANK
955 J STREET
SAN DIEGO, CA 92101

Exhibit 14, Page 297

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**Payroll Checking Account #4**
**For the Month Ended January 31, 2022**

| | | |
|---|---|---:|
| BEGINNING BALANCE AT PETITION DATE: | $ | 2,605.46 |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | $ | - |
| LESS: TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH | $ | 2,605.46 |
| BEGINNING BALANCE: | $ | - |
| RECEIPTS DURING CURRENT PERIOD: | | |
| RECEIPTS | $ - | |
| TOTAL RECEIPTS THIS PERIOD: | $ | - |
| LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD: | | |
| DISBURSEMENTS | $ - | |
| TOTAL DISBURSEMENTS THIS PERIOD: | $ | - |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | $ | - |
| ENDING BALANCE: | $ | - |

PAYROLL CHECKING ACCOUNT #4 ***4335 (ACCOUNT CLOSED JANUARY 2020)
REGIONS BANK
101 OFFICE PARK DRIVE
BIRMINGHAM, AL 35223

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**Patient Trust Account #5**
**For the Month Ended January 31, 2022**

| | | | |
|---|---|---|---|
| BEGINNING BALANCE AT PETITION DATE: | | $ | 141,130.11 |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $ | 1,506,009.74 |
| LESS: TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $ | 1,647,139.85 |
| BEGINNING BALANCE: | | $ | - |
| RECEIPTS DURING CURRENT PERIOD: | | | |
|    RECEIPTS - RESIDENT DEPOSITS | $ - | | |
|    RECEIPTS - MOUNT ROYAL OPERATIONS FUNDS RECEIVED | $ 47,052.47 | | |
|    RECEIPTS - MRT REIMBURSEMENT FOR OPERATIONS | $ - | | |
| TOTAL RECEIPTS THIS PERIOD: | | $ | 47,052.47 |
| LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD: | | | |
|    DISBURSEMENTS TO MOUNT ROYAL OPERATIONS (Buyer) | $ 47,052.47 | | |
|    DISBURSEMENTS FOR PATIENT SERVICES TO VESTAVIA HILLS | $ - | | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $ | 47,052.47 |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | | $ | - |
| ENDING BALANCE: | | $ | - |

PATIENT TRUST ACCOUNT #5 ***1595
WELLS FARGO
P.O. BOX 63020
SAN FRANCISCO, CA 94163

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Patient Trust Account #5**
**January 31, 2022**

### Total Receipts Into Patient Trust Account #5 For Current Period

| Date | Payor | Purpose | Amount |
|------|-------|---------|--------|
| 01/03/22 | SSA Treasury Wire | Mount Royal Operations - Buyers Funds Received | $ 43,624.10 |
| 01/14/22 | CMWC Treasury Wire | Mount Royal Operations - Buyers Funds Received | 346.80 |
| 01/19/22 | SSA Treasury Wire | Mount Royal Operations - Buyers Funds Received | 3,077.20 |
| 01/31/22 | Wells Fargo Bank | Interest Earned by resident in patient trust account | 4.37 |
|  |  | Receipts - funds collected FBO buyer | $  47,052.47 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Patient Trust Account #5**
**January 31, 2022**

### Total Disbursements From Patient Trust Account #5 For Current Period

| Date | Check# | Payee | Purpose | Amount |
|------|--------|-------|---------|--------|
| 01/04/22 | 4197 | Mount Royal Operations - Buyers | Transfer Resident Funds to buyer's operations account | $   43,624.10 |
| 01/11/22 | Draw | Wells Fargo | Bank Fees | 29.23 |
| 01/17/22 | 4198 | Mount Royal Operations - Buyers | Transfer Resident Funds to buyer's operations account | 317.57 |
| 01/20/22 | 4199 | Mount Royal Operations - Buyers | Transfer Resident Funds to buyer's operations account | 3,077.20 |
| 01/31/22 | 4200 | Mount Royal Operations - Buyers | Transfer Resident Funds to buyer's operations account | 4.37 |
| | | | | $   47,052.47 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Patient Trust Account #5**
**January 31, 2022**

**Patient Trust Account #5**
**Bank Reconciliation**

BALANCE PER BANK STATEMENT DATED:  01/31/22  $  6,250.84

PLUS DEPOSITS IN TRANSIT:

| DEPOSIT DATE | DEPOSIT AMOUNT |
|---|---|
| | |
| | |
| | |

TOTAL DEPOSITS IN TRANSIT  $  -

LESS OUTSTANDING CHECKS:

| CHECK NUMBER | CHECK DATE | CHECK AMOUNT |
|---|---|---|
| 4162 | 09/16/21 | $ 1,795.70 |
| 4180 | 10/19/21 | $ 1,056.00 |
| 4198 | 01/17/22 | $ 317.57 |
| 4199 | 01/20/22 | $ 3,077.20 |
| 4200 | 01/31/22 | $ 4.37 |

TOTAL OUTSTANDING CHECKS  $  6,250.84

BANK STATEMENT ADJUSTMENTS  $  -

ADJUSTED BANK BALANCE  $  -

# Commercial Checking Acct W Interest

Account number: 2000019371595 ■ January 1, 2022 - January 31, 2022 ■ Page 1 of 4



**WELLS FARGO**

VESTAVIA HILLS LTD
PATIENT FUND ACCOUNT
9619 CHESAPEAKE DR STE 103
SAN DIEGO CA 92123-1394

### Questions?

Call your Customer Service Officer or Client Services
1-800-AT WELLS (1-800-289-3557)
5:00 AM TO 6:00 PM Pacific Time Monday - Friday

*Online: wellsfargo.com*

*Write:* Wells Fargo Bank, N.A. (182)
PO Box 63020
San Francisco, CA 94163

## Account summary

### Commercial Checking Acct W Interest

| Account number | Beginning balance | Total credits | Total debits | Ending balance |
|---|---|---|---|---|
| | $5,914.73 | $47,052.47 | -$46,716.36 | $6,250.84 |

### Interest summary

| | |
|---|---|
| Annual percentage yield earned this period | 0.16% |
| Interest earned during this period | $4.37 |
| Year to date interest and bonuses paid | $4.37 |
| Total interest and bonuses earned in 2021 | $304.69 |

### Credits

Electronic deposits/bank credits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 01/03 | 1,871.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx2374A SSA N1*1U*Vestavia Hills Ltd for\N1*Be* |
| | 01/03 | 1,828.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx1846A SSA N1*1U*Vestavia Hills Ltd for\N1*Be* |
| | 01/03 | 1,794.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx5441A SSA N1*1U*Vestavia Hills Ltd for\N1*Be* |
| | 01/03 | 1,776.10 | SSA Treas 310 Xxsoc Sec 010322 xxxxx7977A SSA N1*1U*Vestavia Hills Ltd for\N1*Be |
| | 01/03 | 1,725.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx5717A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*$ |
| | 01/03 | 1,551.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx9990A SSA N1*1U*Vestavia Hills Ltd for\N1*Be* |
| | 01/03 | 1,498.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx7695A SSA N1*1U*Vestavia Hills Ltd for\N1*Be |
| | 01/03 | 1,490.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx7548D SSA N1*1U*Vestavia Hills Ltd for\N1*Be |
| | 01/03 | 1,436.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx9283C2 SSA N1*1U*Vestavia Hills Ltd for\N1*Be* |

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

Account number: 2█████████ ▪ January 1, 2022 - January 31, 2022 ▪ Page 2 of 4



*Electronic deposits/bank credits (continued)*

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 01/03 | 1,238.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx2006A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 1,213.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx6115A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 1,199.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx9473A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 1,169.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx4966C1 SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 1,141.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx2637A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 1,114.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx2969A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 1,114.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx5059A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 1,094.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx7256A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 1,055.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx1521A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 1,023.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx5029A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 1,023.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx7260A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 1,018.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx4219C1 SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 908.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx7401A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 904.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx6084A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 894.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx9408C4 SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 870.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx6703A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 864.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx3185A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 859.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx4072A SSA ███████ |
| | 01/03 | 845.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx9604A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█ |
| | 01/03 | 826.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx9642C3 SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 819.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx3107A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 791.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx0072A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 787.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx2910A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 777.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx0024A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 771.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx7124A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |
| | 01/03 | 767.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx8985A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*███████ |

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

Account number: ▇▇▇▇▇▇ ■ January 1, 2022 - January 31, 2022 ■ Page 3 of 4



**WELLS FARGO**

*Electronic deposits/bank credits (continued)*

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 01/03 | 763.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx9480A SSA N1*1U*Vestavia Hills Ltd for\N1*Be▇ |
| | 01/03 | 733.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx3443A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*▇ |
| | 01/03 | 699.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx3043A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*▇ |
| | 01/03 | 536.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx4842A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*▇ |
| | 01/03 | 442.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx9379A SSA N1*1U*Vestavia Hills Ltd for\N1*Be▇ |
| | 01/03 | 399.00 | SSA Treas 310 Xxsoc Sec 010322 xxxxx5706A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*▇ |
| | 01/14 | 346.80 | Cmwc Treas 310 Misc Pay 011422 C4223Xxxxxlwl11 Mount Royal Towers Rp |
| | 01/19 | 3,077.20 | SSA Treas 310 Xxsoc Sec 011922 xxxxx7977A SSA N1*1U*Vestavia Hills Ltd for\N1*Be▇ |
| | 01/31 | 4.37 | Interest Payment |
| | | $47,052.47 | Total electronic deposits/bank credits |
| | | $47,052.47 | Total credits |

## Debits

Electronic debits/bank debits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 01/11 | 29.23 | Client Analysis Srvc Chrg 220110 Svc Chge 1221 002000019371595 |
| | | $29.23 | Total electronic debits/bank debits |

Checks paid

| Number | Amount | Date | Number | Amount | Date | Number | Amount | Date |
|---|---|---|---|---|---|---|---|---|
| 4118 | 2,638.97 | 01/27 | 4196* | 424.06 | 01/21 | 4197 | 43,624.10 | 01/21 |
| | | | $46,687.13 | Total checks paid | | | | |

*\* Gap in check sequence.*

| | $46,716.36 | Total debits |
|---|---|---|

## Daily ledger balance summary

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 12/31 | 5,914.73 | 01/14 | 49,856.40 | 01/27 | 6,246.47 |
| 01/03 | 49,538.83 | 01/19 | 52,933.60 | 01/31 | 6,250.84 |
| 01/11 | 49,509.60 | 01/21 | 8,885.44 | | |
| Average daily ledger balance | | $32,140.88 | | | |

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**DIP Reserve Account #6**
**For the Month Ended January 31, 2022**

| | | |
|---|---:|---:|
| BEGINNING BALANCE AT PETITION DATE: | | $ 78,158.65 |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $ 14,535,299.85 |
| LESS: TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $ 14,611,458.50 |
| BEGINNING BALANCE: | | $ 2,000.00 |

RECEIPTS DURING CURRENT PERIOD:

| | | |
|---|---:|---:|
| RECEIPTS | $ 41,141.83 | |
| RECEIPTS FBO BUYER | $ 468,301.86 | |
| TRANSFERS FROM PAYROLL CHECKING ACCOUNT #4 | $ - | |
| TOTAL RECEIPTS THIS PERIOD: | | $ 509,443.69 |

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD:

| | | |
|---|---:|---:|
| DISBURSEMENTS | $ - | |
| TRANSFERS TO DIP GENERAL CHECKING ACCOUNT #1 | $ 31,888.08 | |
| TRANSFERS TO BUYER HOLDING ACCOUNT #11 | $ 438,916.54 | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $ 470,804.62 |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | | $ 38,639.07 |
| ENDING BALANCE: | | $ 40,639.07 |

DIP RESERVE ACCOUNT #6 ***3953
COMERICA BANK
955 J STREET
SAN DIEGO, CA 92101

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**DIP Reserve Account #6**
**January 31, 2022**

**Total Receipts Into DIP Reserve Account #6 For Current Period**

| Date | Payor | Purpose | Amount |
|------|-------|---------|--------|
| 01/03/22 | EDS WIRE | Resident A/R payments | $ 428.76 |
| 01/06/22 | UHC Wire | 2021 Special Payment | 6,600.00 |
| 01/18/22 | EDS Wire | Resident A/R payments | 15,687.38 |
| 01/19/22 | Medicare Remit #1620 | Resident A/R payments | 9,171.94 |
| 01/31/22 | EDS Wire | Resident A/R payments | 9,253.75 |
| | | | 41,141.83 |
| | | | |
| 01/03/22 | EDS WIRE | Mount Royal Operations - funds | 4,159.16 |
| 01/11/22 | Medicare Remit #1619 | Mount Royal Operations - funds | 3,536.84 |
| 01/18/22 | EDS Wire | Mount Royal Operations - funds | 418,045.54 |
| 01/25/22 | UHC Wire | Mount Royal Operations - funds | 13,175.00 |
| 01/01/22 | EDS Wire | Mount Royal Operations - funds | 29,385.32 |
| | | | 468,301.86 |
| | | Total receipts | $ 509,443.69 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**DIP Reserve Account #6**
**January 31, 2022**

### Total Disbursements From DIP Reserve Account #6 For Current Period

| Date | Check# | Payee | Purpose | Amount |
|------|--------|-------|---------|--------|
|      |        |       |         | $            - |
|      |        |       | Total Disbursements | $            - |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**DIP Reserve Account #6**
**January 31, 2022**

**DIP Reserve Account #6**
**Bank Reconciliation**

BALANCE PER BANK STATEMENT DATED:        01/31/22                    $   40,639.07

PLUS DEPOSITS IN TRANSIT:

| DEPOSIT DATE | DEPOSIT AMOUNT |
| --- | --- |
| | |
| | |
| | |

TOTAL DEPOSITS IN TRANSIT                               $          -

LESS OUTSTANDING CHECKS:

| CHECK NUMBER | CHECK DATE | CHECK AMOUNT |
| --- | --- | --- |
| | | |
| | | |
| | | |

TOTAL OUTSTANDING CHECKS                              $          -

BANK STATEMENT ADJUSTMENTS                           $          -

ADJUSTED BANK BALANCE                                $   40,639.07

80869

Ilıluılıluılılıluılılıld
VESTAVIA HILLS LTD
DEBTOR-IN-POSSESSION
#20-00018-11
9619 CHESAPEAKE DR STE 103
SAN DIEGO CA 92123

*Commercial Checking* statement

**January 1, 2022** to **January 31, 2022**
**Account number** █████████
**Previous account number** 11075568

## Account summary

| | |
|---|---|
| **Beginning balance on January 1, 2022** | **$2,000.00** |
| Plus deposits | |
| Electronic deposits | $509,443.69 |
| Transfers to other accounts | -$470,804.62 |
| **Ending balance on January 31, 2022** | **$40,639.07** |

**To contact us**

**Call**
(800) 888-3595
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
955 J ST
SAN DIEGO, CA 92101-4569

**Important information**

The Account Balance Fee for this statement period for this account is $0.125/$1,000.

**Thank you**

*Commercial Checking* statement
January 1, 2022 to January 31, 2022

— — —
—

# *Commercial Checking* account details: ████████

## Electronic deposits this statement period

| | | | Reference numbers | |
| | | | Customer | Bank |
| Date | Amount | Activity | | |
|------|--------|----------|----------|------|
| Jan 03 | 4,587.92 | Dxc MS Llc Hcclaimpmt 211224 4758180s | | 9488938348 |
| Jan 06 | 6,600.00 | Unitedhealthcare Payment 220106 0000304399 | | 9488570429 |
| Jan 11 | 3,536.84 | Noridian Jea Hcclaimpmt 220111 015455 | | 9488069220 |
| Jan 18 | 433,732.92 | Dxc MS Llc Hcclaimpmt 220107 4758180s | | 9488469258 |
| Jan 18 | 9,171.94 | Noridian Jea Hcclaimpmt 220117 015455 | | 9488990720 |
| Jan 25 | 13,175.00 | Unitedhealthcare Payment 220125 0000304399 | | 9488905469 |
| Jan 31 | 38,639.07 | Dxc MS Llc Hcclaimpmt 220121 4758180s | | 9488670809 |

**Total Electronic Deposits: $509,443.69**
**Total Number of Electronic Deposits: 7**

## Transfers to other accounts this statement period

| Date | Amount ($) | Activity | | Bank reference number |
|------|-----------|----------|------|-----------------------|
| Jan 04 | -4,159.16 | Tpa Funds Transfer To Account | Xxxxxx6229 | 0T74001088 |
| Jan 04 | -428.76 | Tpa Funds Transfer To Account | Xxxxxx6702 | 0T74001087 |
| Jan 07 | -6,600.00 | Tpa Funds Transfer To Account | Xxxxxx6702 | 0T74025651 |
| Jan 12 | -3,536.84 | Tpa Funds Transfer To Account | Xxxxxx6229 | 0T74047614 |
| Jan 19 | -9,171.94 | Tpa Funds Transfer To Account | Xxxxxx6702 | 0T74086462 |
| Jan 19 | -418,045.54 | Tpa Funds Transfer To Account | Xxxxxx6229 | 0T74086485 |
| Jan 19 | -15,687.38 | Tpa Funds Transfer To Account | Xxxxxx6702 | 0T74086484 |
| Jan 27 | -13,175.00 | Tpa Funds Transfer To Account | Xxxxxx6229 | 0T74137918 |

**Total Transferred to Other Accounts: -$470,804.62**
**Total Number of Transfers to Other Accounts: 8**

## 💲 Lowest daily balance

Your lowest daily balance this statement period was **$2,000.00** on **January 1, 2022.**

Exhibit 14, Page 311

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**DIP Imprest Account #7**
**For the Month Ended January 31, 2022**

| | | |
|---|---|---|
| BEGINNING BALANCE AT PETITION DATE: | | $         - |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $      35,889.34 |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $      35,889.34 |
| BEGINNING BALANCE: | | $         - |

RECEIPTS DURING CURRENT PERIOD:

| | | |
|---|---|---|
| RECEIPTS | $         - | |
| TRANSFERS FROM DIP GENERAL CHECKING ACCOUNT #1 | $         - | |
| TOTAL RECEIPTS THIS PERIOD: | | $         - |

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD:

| | | |
|---|---|---|
| DISBURSEMENTS | $         - | |
| TRANSFERS TO GENERAL ACCOUNT #1 | $         - | |
| TRANSFERS TO PETTY CASH ACTIVITIES #8 | $         - | |
| TRANSFERS TO PETTY CASH ADMIN #9 | $         - | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $         - |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | | $         - |
| ENDING BALANCE: | | $         - |

DIP IMPREST ACCOUNT #7 ***6694 (ACCOUNT CLOSED DECEMBER 2021)
COMERICA BANK
955 J STREET
SAN DIEGO, CA 92101

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**Petty Cash - Activities Cash Account #8**
**For the Month Ended January 31, 2022**

| | | |
|---|---|---:|
| BEGINNING BALANCE AT PETITION DATE: | | $ 1,700.00 |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $ 44,005.38 |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $ 45,705.38 |
| BEGINNING BALANCE: | | $ - |

RECEIPTS DURING CURRENT PERIOD:

| | | |
|---|---:|---:|
| RECEIPTS | $ - | |
| TRANSFERS FROM DIP GENERAL CHECKING ACCOUNT #1 | $ - | |
| TRANSFERS FROM DIP IMPREST ACCOUNT #7 | $ - | |
| TOTAL RECEIPTS THIS PERIOD: | | $ - |

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD:

| | | |
|---|---:|---:|
| DISBURSEMENTS | $ - | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $ - |

| | |
|---|---:|
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | $ - |
| ENDING BALANCE: | $ - |

ACCOUNT #8 (ACCOUNT CLOSED NOVEMBER 2021)

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**Petty Cash - Administrator Cash Account #9**
**For the Month Ended January 31, 2022**

| | | |
|---|---|---:|
| BEGINNING BALANCE AT PETITION DATE: | | $ 1,319.70 |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $ 58,985.01 |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $ 60,304.71 |
| BEGINNING BALANCE: | | $ - |
| RECEIPTS DURING CURRENT PERIOD: | | |
| RECEIPTS | $ - | |
| TRANSFERS FROM DIP GENERAL CHECKING ACCOUNT #1 | $ - | |
| TRANSFERS FROM IMPREST ACCOUNT #7 | $ - | |
| TOTAL RECEIPTS THIS PERIOD: | | $ - |
| LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD: | | |
| DISBURSEMENTS | $ - | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $ - |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | | $ - |
| ENDING BALANCE: | | $ - |

ACCOUNT #9 (ACCOUNT CLOSED NOVEMBER 2021)

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**Property Tax Money Market  - Account #10**
**For the Month Ended January 31, 2022**

| | | |
|---|---|---:|
| BEGINNING BALANCE AT PETITION DATE: | | $              - |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $      462,124.50 |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $      462,124.50 |
| BEGINNING BALANCE: | | $              - |

RECEIPTS DURING CURRENT PERIOD:

| | | |
|---|---|---:|
| RECEIPTS | $              - | |
| INTEREST INCOME | $              - | |
| TRANSFERS FROM DIP GENERAL CHECKING ACCOUNT #1 | $              - | |
| TOTAL RECEIPTS THIS PERIOD: | | $              - |

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD:

| | | |
|---|---|---:|
| DISBURSEMENTS | $              - | |
| TRANSFERS TO DIP GENERAL CHECKING ACCOUNT #1 | $              - | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $              - |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | | $              - |
| ENDING BALANCE: | | $              - |

PROPERTY TAX MARKET ACCOUNT #10 ***3709 (ACCOUNT CLOSED MAY 2021
COMERICA BANK
955 J STREET
SAN DIEGO, CA 92101

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**Buyer's Holding Account #11** [1]
**For the Month Ended January 31, 2022**

| | | |
|---|---|---:|
| BEGINNING BALANCE AT PETITION DATE: | | $ - |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $ 591,651.71 |
| LESS: TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $ 564,992.93 |
| BEGINNING BALANCE: | | $ 26,658.78 |
| RECEIPTS DURING CURRENT PERIOD: | | |
| RECEIPTS | $ - | |
| TRANSFERS FROM DIP GENERAL CHECKING ACCOUNT #1 | $ - | |
| TRANSFERS FROM RESERVE ACCOUNT #6 | $ 438,916.54 | |
| TOTAL RECEIPTS THIS PERIOD: | | $ 438,916.54 |
| LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD: | | |
| DISBURSEMENTS TO MOUNT ROYAL OPERATIONS (BUYER) | $ 451,400.32 | |
| TRANSFERS TO DIP GENERAL CHECKING ACCOUNT #1 | $ - | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $ 451,400.32 |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | | $ (12,483.78) |
| ENDING BALANCE: | | $ 14,175.00 |

BUYER S HOLDING ACCOUNT #11 ***6229
COMERICA BANK
955 J STREET
SAN DIEGO, CA 92101

[1] Account established as holding account for funds due to buyer during transition period in which the buyer's revenues are collected by the Debtor (seller) and subsequently turned over to buyer. Therefore, the Debtor is treating this account as a trust funds account.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Buyer's Holding Account #11**
**January 31, 2022**

### Total Receipts Into Buyer's Holding Account #11 For Current Period

| Date | Payor | Purpose | Amount |
|------|-------|---------|--------|
| | | | $         - |
| | | Total Receipts | $         - |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Buyer's Holding Account #11**
**January 31, 2022**

### Total Disbursements From Buyer's Holding Account #11 For Current Period

| Date | Payee | Purpose | Amount |
|------|-------|---------|--------|
| 01/03/22 | Mount Royal Operations | MC Remit #1618 | $   25,658.78 |
| 01/06/22 | Mount Royal Operations | EDS Wire 01/03 | 4,159.16 |
| 01/13/22 | Mount Royal Operations | MC Remit #1619 | 3,536.84 |
| 01/20/22 | Mount Royal Operations | EDS Wire 01/18 | 418,045.54 |
| | | Total Disbursements | $   451,400.32 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Buyer's Holding Account #11**
**January 31, 2022**

**Buyer's Holding Account #11**
**Bank Reconciliation**

| | | | |
|---|---|---|---|
| BALANCE PER BANK STATEMENT DATED: | 01/31/22 | | $ 14,175.00 |

PLUS DEPOSITS IN TRANSIT:

| DEPOSIT DATE | DEPOSIT AMOUNT |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

| | |
|---|---|
| TOTAL DEPOSITS IN TRANSIT | $            - |

LESS OUTSTANDING CHECKS:

| CHECK NUMBER | CHECK DATE | CHECK AMOUNT |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

| | |
|---|---|
| TOTAL OUTSTANDING CHECKS | $            - |
| BANK STATEMENT ADJUSTMENTS | $            - |
| ADJUSTED BANK BALANCE | $ 14,175.00 |

80869

Hlluubhlludludhuhdhldulludl
VESTAVIA HILLS LTD,
DEBTOR-IN-POSSESSION #20-00018-11
HOLDING ACCOUNT
9619 CHESAPEAKE DR STE 103
SAN DIEGO CA 92123

*Commercial Checking* statement

**January 1, 2022** to **January 31, 2022**
**Account number** 1 ▮▮▮▮▮▮▮▮

## Account summary

| | |
|---|---|
| **Beginning balance on January 1, 2022** | **$26,658.78** |
| Plus deposits | |
| Electronic deposits | $155.32 |
| Transfers from other accounts | $438,916.54 |
| Less withdrawals | |
| Electronic (EFT) withdrawals | -$451,400.32 |
| Fees and service charges | -$155.32 |
| **Ending balance on January 31, 2022** | **$14,175.00** |

**To contact us**

**Call**
(800) 888-3595
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
955 J ST
SAN DIEGO, CA 92101-4569

**Important information**

The Account Balance Fee for this statement period for this account is $0.125/$1,000.

**Thank you**

*Commercial Checking* statement
**January 1, 2022 to January 31, 2022**

___  ___  ___
___

# *Commercial Checking* account details: ▮▮▮▮▮▮

## Electronic deposits this statement period

| | | | Reference numbers | |
|---|---|---|---|---|
| Date | Amount | Activity | Customer | Bank |
| Jan 19 | 155.32 | Analysis Service Charge Refund | | MXW625 |

**Total Electronic Deposits: $155.32**
**Total Number of Electronic Deposits: 1**

## Transfer from other accounts this statement period

| Date | Amount | Activity | | Bank reference number |
|---|---|---|---|---|
| Jan 04 | 4,159.16 | Tpa Funds Transfer From Account | Xxxxxx3953 | 0T74001088 |
| Jan 12 | 3,536.84 | Tpa Funds Transfer From Account | Xxxxxx3953 | 0T74047614 |
| Jan 19 | 418,045.54 | Tpa Funds Transfer From Account | Xxxxxx3953 | 0T74086485 |
| Jan 27 | 13,175.00 | Tpa Funds Transfer From Account | Xxxxxx3953 | 0T74137918 |

**Total Transferred from Other Accounts: $438,916.54**
**Total Number of Transfers from Other Accounts: 4**

## Electronic withdrawals this statement period

| | | | Reference numbers | |
|---|---|---|---|---|
| Date | Amount ($) | Activity | Customer | Bank |
| Jan 03 | -25,658.78 | Wire # 004861 Bnf Mount Royal Op Fed # 000415 | | 9485005229 |
| Jan 06 | -4,159.16 | Wire # 004946 Bnf Mount Royal Op Fed # 000514 | | 9485005721 |
| Jan 13 | -3,536.84 | Wire # 005576 Bnf Mount Royal Op Fed # 000563 | | 9485005800 |
| Jan 20 | -418,045.54 | Wire # 006237 Bnf Mount Royal Op Fed # 000594 | | 9485006583 |

**Total Electronic Withdrawals: -$451,400.32**
**Total Number of Electronic Withdrawals: 4**

## Fees and service charges this statement period

| Date | Amount ($) | Activity | Bank reference number |
|---|---|---|---|
| Jan 13 | -155.32 | Service Charge | 0000042400 |

**Total Fees and Service Charges: -$155.32**
**Total Number of Fees and Service Charges: 1**

## $ Lowest daily balance

Your lowest daily balance this statement period was **$844.68** on **January 13, 2022**.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**United States Trustee Quarterly Fees**
**(Total Payments)**

| Quarterly Period Ending | Total Disbursements [1] | Quarterly Fees | Date Paid per the Debtor | Amount Paid per the Debtor |
|---|---|---|---|---|
| 03/31/20 | $ 2,466,012.83 | $ 24,660.13 | 04/17/20 | $ 24,660.13 |
| 06/30/20 | $ 3,311,473.87 | $ 33,114.74 | 07/17/20 | $ 33,114.74 |
| 09/30/20 | $ 3,441,948.91 | $ 34,419.49 | 10/20/20 | $ 34,419.49 |
| 12/31/20 [2] | $ 3,431,343.82 | $ 34,313.44 | 01/20/21 | $ 34,313.44 |
| 03/31/21 | $ 4,329,660.97 | $ 43,297.00 | 04/19/21 | $ 43,297.00 |
| Cumulative Adjustment through 03/31/21 [3] | $ 3,994.48 | $ 40.00 | 07/19/21 | included below |
| 06/30/21 | $ 3,136,619.12 | $ 25,093.00 | 07/19/21 | $ 31,364.00 |
| 09/30/21 [4] | $ 2,873,877.78 | $ 22,991.00 | 10/20/21 | $ 22,991.00 |
| 12/31/21 [5] | $ 13,376,032.65 | $ 106,965.56 | 01/20/22 | $ 106,966.00 |
| | | | | |
| | | | | |

[1] Pursuant to agreement with OUST, disbursements from Patient Trust Account (account #5) will be excluded from OUST Quarterly Fee calculations as the Patient Trust Account contains funds held in trust on behalf of its patients, rather than the funds of the Debtor.

[2] Payment to OUST is comprised of a credit balance of $12.36 and wire transfer issued of $34,301.08.

[3] During the process of amending the Debtor's June 2021 MOR cumulative receipts and disbursements summary, the Debtor changed the way it is reporting certain disbursements to the account it holds in trust for its patients (these disbursements were formerly treated as transfers and therefore excluded from quarterly fees). As the Debtor had overpaid its Q2 2021 quarterly fees by $6,271, the newly calculated fees of $40 for Q1 2021 were effectively paid on 7/19/21. This left a remaining credit balance of $6,231 available for Q3 2021 quarterly fees.

[4] Payment to OUST is comprised of a credit/carryforward balance of $6,231 and a wire transfer issued in the amount of $16,760.

[5] Payment to OUST is comprised of a credit/carryforward balance of $42.44 and a wire transfer issued in the amount of $106,965.56.

CSD 3010 [07/01/18] #5027915v1
Name, Address, Telephone No. & I.D. No.
SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
James P. Hill (SBN 90478)/Christopher V. Hawkins (SBN 222961)
Kathleen Cashman-Kramer (SBN 128861)
600 B Street, Suite 1700 San Diego, CA 92101
Tel.: (619) 233-4100      Fax: (619) 231-4372
Attorneys for Debtor and Debtor In Possession,
Vestavia Hills, Ltd., dba Mount Royal Towers

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF
CALIFORNIA
325 West F Street, San Diego, California 92101-6991

In Re
VESTAVIA HILLS, LTD., dba MOUNT ROYAL
TOWERS,

Debtor.

BANKRUPTCY NO.  20-00018-LA11

Plaintiff(s)

ADVERSARY NO.

v.

,

Defendant(s)

# PROOF OF SERVICE

I,    Laurel Dinkins              am a resident of the State of California, over the age of 18 years,
and not a party to this action.

On   February 23, 2022          , I served the following documents:

**1.    DEBTOR'S MONTHLY OPERATING REPORT–JANUARY 2022**

1.      **To Be Served by the Court via Notice of Electronic Filing ("NEF")**:

Under controlling Local Bankruptcy Rules(s) ("LBR"), the document(s) listed above will be served by the
court via NEF and hyperlink to the document. On   February 23, 2022      , I checked the CM/ECF docket for
this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail
Notice List to receive NEF transmission at the e-mail address(es) indicated and/or as checked below:

- John Cannizzaro    john.cannizzaro@icemiller.com
- Kathleen A. Cashman-Kramer    Cashman-Kramer@Sullivanhill.com, cashman-kramer@ecf.courtdrive.com;rudolph@sullivanhill.com;hill@sullivanhill.com;bkstaff@sullivanhill.com;rudolph@ecf.inforuptcy.com
- Glen F. Dorgan    glen.dorgan@usdoj.gov, Brenda.seyler@usdoj.gov
- Ajay Gupta    ajay@guptalc.com, guptaar87864@notify.bestcase.com
- Julian Gurule    jgurule@buchalter.com, smartin@buchalter.com,docket@buchalter.com
- Christopher V. Hawkins    hawkins@sullivanhill.com, hill@sullivanhill.com;cashman-kramer@sullivanhill.com;bkstaff@sullivanhill.com;vidovich@ecf.inforuptcy.com;hawkins@ecf.inforuptcy.com
- James P. Hill    Hill@sullivanhill.com, hawkins@sullivanhill.com;bkstaff@sullivanhill.com;vidovich@ecf.inforuptcy.com;hill@ecf.inforuptcy.com;cashman-kramer@sullivanhill.com
- J. Barrett Marum    bmarum@sheppardmullin.com, egarcia@sheppardmullin.com

#5044151v1
CSD 3010

- Anthony Napolitano    anapolitano@buchalter.com
- David Ortiz    david.a.ortiz@usdoj.gov,
  USTP.REGION15@USDOJ.GOV;tiffany.l.carroll@usdoj.gov;abram.s.feuerstein@usdoj.gov
- William A. Smelko    bill.smelko@procopio.com,
  kristina.terlaga@procopio.com;calendaring@procopio.com
- United States Trustee    ustp.region15@usdoj.gov

☐  Chapter 7 Trustee:

| ☐ For Chpt. 7, 11, & 12 cases: | ☐ For ODD numbered Chapter 13 cases: | ☐ For EVEN numbered Chapter 13 cases: |
| --- | --- | --- |
| UNITED STATES TRUSTEE ustp.region15@usdoj.gov | THOMAS H. BILLINGSLEA, JR., TRUSTEE Billingslea@thb.coxatwork.com | DAVID L. SKELTON, TRUSTEE admin@ch13.sdcoxmail.com dskelton13@ecf.epiqsystems.com |

#5044151v1
CSD 3010

CSD 3010 [07/01/18] (Page 2)

2. **Served by United States Mail**:

On _____ , I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing accurate copies in a sealed envelope in the United States Mail via 1) first class, postage prepaid or 2) certified mail with receipt number, addressed as follows:

3. **Served by Personal Delivery, Facsimile Transmission, Overnight Delivery, or Electronic Mail**:

Under Fed.R.Civ.P.5 and controlling LBR, on  February 23, 2022,  I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission, by overnight delivery and/or electronic mail as follows:

| | |
|---|---|
| Aaron Malo<br>amalo@sheppardmullin.com<br>Counsel for Wells Fargo | Kevin Moriarty, President/CEO<br>IPG Holding, Inc.<br>kevin@activcareliving.com |
| Elisabeth Eisner<br>eeisner@eeisner.com<br>Special Transactional Counsel for Debtor | Andy Campbell<br>Harris Hagood<br>Campbell Partners<br>harris@campbellpartnerslaw.com<br>andy@campbellpartnerslaw.com<br>Alabama Litigation Counsel for Debtor |
| Harbuck Keith Hunt & Palmer<br>Kenny Keith<br>David Hunt<br>kkeith@hkh.law<br>dhunt@hkh.law<br>Regulatory Counsel for Debtor | Stacy Elledge-Chiang<br>Baker Tilly fka Squar Milner<br>Stacy.Chiang@bakertilly.com |

I declare under penalty of perjury under the laws of the United States of America that the statements made in this proof of service are true and correct.

Executed on   February 23, 2022
                (Date)

Laurel Dinkins */s/Laurel Dinkins*
(Typed Name and Signature)

600 B Street, Suite 1700
(Address)

San Diego, CA  92101
(City, State, ZIP Code)

# EXHIBIT 15

# UNITED STATES BANKRUPTCY COURT

SOUTHERN  DISTRICT OF  CALIFORNIA

In Re. Vestavia Hills, Ltd. DBA Mount Royal Towers

Debtor(s)

§
§
§
§

Case No.  20-00018

☐ Jointly Administered

## Monthly Operating Report

Chapter 11

Reporting Period Ended: 02/28/2022

Petition Date: 01/03/2020

Months Pending: 26

Industry Classification: | 6 | 2 | 3 | 3 |

Reporting Method:                    Accrual Basis ⊙                  Cash Basis ○

Debtor's Full-Time Employees (current):                                0

Debtor's Full-Time Employees (as of date of order for relief):          127

**Supporting  Documentation**  (check all that are attached):

(For jointly administered debtors, any required schedules must be provided on a non-consolidated basis for each debtor)

☒       Statement of cash receipts and disbursements
☒       Balance sheet containing the summary and detail of the assets, liabilities and equity (net worth) or deficit
☒       Statement of operations (profit or loss statement)
☐       Accounts receivable aging
☐       Postpetition liabilities aging
☐       Statement of capital assets
☐       Schedule of payments to professionals
☐       Schedule of payments to insiders
☒       All bank statements and bank reconciliations for the reporting period
☐       Description of the assets sold or transferred and the terms of the sale or transfer

/s/ James P. Hill

Signature of Responsible Party

James P. Hill

Printed Name of Responsible Party

03/23/2022

Date

600 B Street, Suite 1700 San Diego CA 92101

Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

Debtor's Name Vestavia Hills, Ltd. DBA Mount Royal Towers                Case No. 20-00018

| Part 1: Cash Receipts and Disbursements | Current Month | Cumulative |
|---|---|---|
| a. Cash balance beginning of month | $480,323 | |
| b. Total receipts (net of transfers between accounts) | $-3,069 | $25,227,374 |
| c. Total disbursements (net of transfers between accounts) | $65,556 | $24,902,350 |
| d. Cash balance end of month (a+b+c) | $411,699 | |
| e. Disbursements made by third party for the benefit of the estate | $0 | $12,000,000 |
| f. Total disbursements for quarterly fee calculation (c+e) | $65,556 | $36,902,350 |

| Part 2: Asset and Liability Status (Not generally applicable to Individual Debtors. See Instructions.) | Current Month | |
|---|---|---|
| a. Accounts receivable (total net of allowance) | $7,040 | |
| b. Accounts receivable over 90 days outstanding (net of allowance) | $7,040 | |
| c. Inventory   (Book ○   Market ○   Other ◉   (attach explanation)) | $0 | |
| d. Total current assets | $787,936 | |
| e. Total assets | $787,936 | |
| f. Postpetition payables (excluding taxes) | $5,252,067 | |
| g. Postpetition payables past due (excluding taxes) | $9,552 | |
| h. Postpetition taxes payable | $101,018 | |
| i. Postpetition taxes past due | $0 | |
| j. Total postpetition debt (f+h) | $5,353,085 | |
| k. Prepetition secured debt | $0 | |
| l. Prepetition priority debt | $0 | |
| m. Prepetition unsecured debt | $20,114,115 | |
| n. Total liabilities (debt) (j+k+l+m) | $25,467,200 | |
| o. Ending equity/net worth (e-n) | $-24,679,264 | |

| Part 3: Assets Sold or Transferred | Current Month | Cumulative |
|---|---|---|
| a. Total cash sales price for assets sold/transferred outside the ordinary course of business | $0 | $12,000,000 |
| b. Total payments to third parties incident to assets being sold/transferred outside the ordinary course of business | $0 | $12,000,000 |
| c. Net cash proceeds from assets sold/transferred outside the ordinary course of business (a-b) | $0 | $0 |

| Part 4: Income Statement (Statement of Operations) (Not generally applicable to Individual Debtors. See Instructions.) | Current Month | Cumulative |
|---|---|---|
| a. Gross income/sales (net of returns and allowances) | $588 | |
| b. Cost of goods sold (inclusive of depreciation, if applicable) | $0 | |
| c. Gross profit (a-b) | $588 | |
| d. Selling expenses | $0 | |
| e. General and administrative expenses | $9,008 | |
| f. Other expenses | $53 | |
| g. Depreciation and/or amortization (not included in 4b) | $0 | |
| h. Interest | $0 | |
| i. Taxes (local, state, and federal) | $0 | |
| j. Reorganization items | $-49,436 | |
| k. Profit (loss) | $-57,803 | $-3,917,493 |

UST Form 11-MOR (12/01/2021)                2

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers                    Case No.  20-00018

## Part 5:  Professional Fees and Expenses

|   |   | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|
| a. | Debtor's professional fees & expenses (bankruptcy)  *Aggregate Total* | $65,456 | $3,251,789 | $49,723 | $2,782,636 |
|   | *Itemized Breakdown by Firm* | | | | |
|   | **Firm Name** / **Role** | | | | |
| i | Sullivan Hill Rez & Engel APL / Lead Counsel | $49,757 | $2,676,408 | $40,436 | $2,303,599 |
| ii | Campbell Partners LLC / Special Counsel | $5,805 | $223,974 | $4,749 | $185,091 |
| iii | Elisabeth Eisner / Special Counsel | $2,805 | $54,340 | $528 | $42,438 |
| iv | Squar Milner/Baker Tilly / Financial Professional | $6,664 | $161,666 | $4,010 | $137,268 |
| v | Harbuck Keith & Holmes, LLC / Special Counsel | $425 | $135,402 | $0 | $114,241 |
| vi | | | | | |
| vii | | | | | |
| viii | | | | | |
| ix | | | | | |
| x | | | | | |
| xi | | | | | |
| xii | | | | | |
| xiii | | | | | |
| xiv | | | | | |
| xv | | | | | |
| xvi | | | | | |
| xvii | | | | | |
| xviii | | | | | |
| xix | | | | | |
| xx | | | | | |
| xxi | | | | | |
| xxii | | | | | |
| xxiii | | | | | |
| xxiv | | | | | |
| xxv | | | | | |
| xxvi | | | | | |
| xxvii | | | | | |
| xxviii | | | | | |
| xxix | | | | | |
| xxx | | | | | |
| xxxi | | | | | |
| xxxii | | | | | |
| xxxiii | | | | | |
| xxxiv | | | | | |
| xxxv | | | | | |
| xxxvi | | | | | |

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers                    Case No.  20-00018

| | | | | | |
|---|---|---|---|---|---|
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxvii | | | | | |

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers                          Case No.  20-00018

| | | | | | | |
|---|---|---|---|---|---|---|
| lxxix | | | | | | |
| lxxx | | | | | | |
| lxxxi | | | | | | |
| lxxxii | | | | | | |
| lxxxiii | | | | | | |
| lxxxiv | | | | | | |
| lxxxv | | | | | | |
| lxxxvi | | | | | | |
| lxxxvii | | | | | | |
| lxxxviii | | | | | | |
| lxxxix | | | | | | |
| xc | | | | | | |
| xci | | | | | | |
| xcii | | | | | | |
| xciii | | | | | | |
| xciv | | | | | | |
| xcv | | | | | | |
| xcvi | | | | | | |
| xcvii | | | | | | |
| xcviii | | | | | | |
| xcix | | | | | | |
| c | | | | | | |
| ci | | | | | | |

| | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|
| b. | Debtor's professional fees & expenses (nonbankruptcy)  *Aggregate Total* | $0 | $3,256 | $0 | $2,857 |
| | *Itemized Breakdown by Firm* | | | | |
| | Firm Name | Role | | | | |
| i | Virginia Moore-Bell | Other | $0 | $3,256 | $0 | $2,857 |
| ii | | | | | | |
| iii | | | | | | |
| iv | | | | | | |
| v | | | | | | |
| vi | | | | | | |
| vii | | | | | | |
| viii | | | | | | |
| ix | | | | | | |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |

Exhibit 15, Page 332

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers                    Case No.  20-00018

| | | | | | |
|---|---|---|---|---|---|
| xv | | | | | |
| xvi | | | | | |
| xvii | | | | | |
| xviii | | | | | |
| xix | | | | | |
| xx | | | | | |
| xxi | | | | | |
| xxii | | | | | |
| xxiii | | | | | |
| xxiv | | | | | |
| xxv | | | | | |
| xxvi | | | | | |
| xxvii | | | | | |
| xxviii | | | | | |
| xxix | | | | | |
| xxx | | | | | |
| xxxi | | | | | |
| xxxii | | | | | |
| xxxiii | | | | | |
| xxxiv | | | | | |
| xxxv | | | | | |
| xxxvi | | | | | |
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |

Debtor's Name Vestavia Hills, Ltd. DBA Mount Royal Towers

Case No. 20-00018

| | | | | | |
|---|---|---|---|---|---|
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxvii | | | | | |
| lxxix | | | | | |
| lxxx | | | | | |
| lxxxi | | | | | |
| lxxxii | | | | | |
| lxxxii | | | | | |
| lxxxiv | | | | | |
| lxxxv | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxix | | | | | |
| xc | | | | | |
| xci | | | | | |
| xcii | | | | | |
| xciii | | | | | |
| xciv | | | | | |
| xcv | | | | | |
| xcvi | | | | | |
| xcvii | | | | | |
| xcviii | | | | | |

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers                    Case No.  20-00018

| | | | | | | |
|---|---|---|---|---|---|---|
| | xcix | | | | | |
| | c | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | $65,456 | $3,255,045 | $49,723 | $2,785,493 |

| Part 6:  Postpetition Taxes | Current Month | Cumulative |
|---|---|---|
| a.  Postpetition income taxes accrued (local, state, and federal) | $0 | $0 |
| b.  Postpetition income taxes paid (local, state, and federal) | $0 | $200 |
| c.  Postpetition employer payroll taxes accrued | $0 | $450,311 |
| d.  Postpetition employer payroll taxes paid | $0 | $690,121 |
| e.  Postpetition property taxes paid | $0 | $724,513 |
| f.  Postpetition other taxes accrued (local, state, and federal) | $0 | $1,190,678 |
| g.  Postpetition other taxes paid (local, state, and federal) | $0 | $0 |

**Part 7: Questionnaire - During this reporting period:**

a. Were any payments made on prepetition debt?  (if yes, see Instructions)    Yes ○  No ◉

b. Were any payments made outside the ordinary course of business without court approval?  (if yes, see Instructions)    Yes ○  No ◉

c. Were any payments made to or on behalf of insiders?    Yes ○  No ◉

d. Are you current on postpetition tax return filings?    Yes ◉  No ○

e. Are you current on postpetition estimated tax payments?    Yes ◉  No ○

f. Were all trust fund taxes remitted on a current basis?    Yes ◉  No ○

g. Was there any postpetition borrowing, other than trade credit? (if yes, see Instructions)    Yes ○  No ◉

h. Were all payments made to or on behalf of professionals approved by the court?    Yes ◉  No ○  N/A ○

i. Do you have:    Worker's compensation insurance?    Yes ○  No ◉

   If yes, are your premiums current?    Yes ○  No ○  N/A ◉  (if no, see Instructions)

   Casualty/property insurance?    Yes ○  No ◉

   If yes, are your premiums current?    Yes ○  No ○  N/A ◉  (if no, see Instructions)

   General liability insurance?    Yes ○  No ◉

   If yes, are your premiums current?    Yes ○  No ○  N/A ◉  (if no, see Instructions)

j. Has a plan of reorganization been filed with the court?    Yes ◉  No ○

k. Has a disclosure statement been filed with the court?    Yes ◉  No ○

l. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930?    Yes ◉  No ○

| Debtor's Name | Vestavia Hills, Ltd. DBA Mount Royal Towers | Case No. | 20-00018 |

**Part 8: Individual Chapter 11 Debtors (Only)**

| | | |
|---|---|---|
| a. | Gross income (receipts) from salary and wages | $0 |
| b. | Gross income (receipts) from self-employment | $0 |
| c. | Gross income from all other sources | $0 |
| d. | Total income in the reporting period (a+b+c) | $0 |
| e. | Payroll deductions | $0 |
| f. | Self-employment related expenses | $0 |
| g. | Living expenses | $0 |
| h. | All other expenses | $0 |
| i. | Total expenses in the reporting period (e+f+g+h) | $0 |
| j. | Difference between total income and total expenses (d-i) | $0 |
| k. | List the total amount of all postpetition debts that are past due | $0 |
| l. | Are you required to pay any Domestic Support Obligations as defined by 11 U.S.C § 101(14A)? | Yes ◯  No ◉ |
| m. | If yes, have you made all Domestic Support Obligation payments? | Yes ◯  No ◯  N/A ◉ |

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information, and provision of this information is mandatory under 11 U.S.C. §§ 704, 1106, and 1107. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6). The United States Trustee will also use this information to evaluate a chapter 11 debtor's progress through the bankruptcy system, including the likelihood of a plan of reorganization being confirmed and whether the case is being prosecuted in good faith. This information may be disclosed to a bankruptcy trustee or examiner when the information is needed to perform the trustee's or examiner's duties or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Monthly Operating Report and its supporting documentation are true and correct and that I have been authorized to sign this report on behalf of the estate.**

/s/ Kevin Moriarty
Signature of Responsible Party

President/CEO of the General Partner
Title

Kevin Moriarty
Printed Name of Responsible Party

03/22/2022
Date

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers          Case No.  20-00018



PageOnePartOne

PageOnePartTwo

PageTwoPartOne

PageTwoPartTwo

| Debtor's Name | Vestavia Hills, Ltd. DBA Mount Royal Towers | Case No. | 20-00018 |



Bankruptcy1to50

Bankruptcy51to100



NonBankruptcy1to50

NonBankruptcy51to100

Debtor's Name  Vestavia Hills, Ltd. DBA Mount Royal Towers                    Case No.  20-00018



PageThree



PageFour

# In re: Vestavia Hills, Ltd. DBA Mount Royal Towers

USBC Case No.: 20-00018

February 28, 2022

Attachments to MOR

## In re: Vestavia Hills, Ltd. dba Mount Royal Towers
## U.S.B.C. Case No.: 20-00018-LA11
## Narrative Statement – February 2022 Monthly Operating Report

Vestavia Hills, Ltd. dba Mount Royal Towers ("Debtor") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (Case No. 20-00018-LA18, on file with the United States Bankruptcy Court in the Southern District of California) on January 3, 2020.

The Debtor was the owner of real property in Vestavia Hills, Alabama, on which it operated a senior housing community commonly known as Mount Royal Towers (MRT) since 1982. As noted below, the sale of the Debtor's MRT facility and related business assets closed on October 19, 2021.

The Debtor wishes to disclose the following information in connection with the bankruptcy estate's monthly operating report:

- See prior Monthly Operating Reports for response to item 7(a)—referencing ECF 95 (cash collateral order) and for response to item 7(c)—referencing ECFs 101 and 150 (insider compensation orders).

- At the request of the U.S. Trustee's office, the Debtor's operating reports for the months of October and November 2021 were amended and filed with the Court on January 13, 2022. See ECFs 658, 659.]

- On March 25, 2020, the Court granted the Debtor's motion to approve sale procedures for the sale of the Debtor's Mount Royal Towers facility and related business assets, approving a "stalking horse" purchase agreement with MED Healthcare Partners, LLC ("MED") and establishing procedures for overbid, and setting certain deadlines and dates for receipt of qualifying overbids and setting a final sale hearing date (ECF 185). While the sale process was underway, in recognition of the challenges posed by the COVID-19 pandemic, the Debtor filed a motion to extend certain deadlines and dates associated with the sale process, which the Court granted by order entered May 21, 2020 (ECF 264), moving the deadline to submit qualifying overbids to July 9, 2020 and setting the final sale hearing on July 30, 2020. Notwithstanding objections to the sale having been filed by Commonwealth Assisted Living LLC ("Commonwealth") (ECF 329, 336, and 342), the Court approved the Debtor's Sale Motion at the July 30 hearing, adopting her previously issued Tentative Decision and making various findings on the record at the hearing approving the sale to the Stalking Horse Bidder, MED, for $12,000,000. An order approving the Sale Motion was entered on August 31, 2020. The sale to MED closed on October 19, 2021. The Debtor filed its notice of the closing of the sale (ECF 623) and separately a motion for termination of the appointment of the patient care ombudsman (ECF 624) in light of the closing of the sale and the transfer by assignment of all residential care contracts to MED, which order was approved and entered on November 19, 2021 (ECF 638).

- The Court set a general Claims Bar Date of July 6, 2020 (ECF 237). The Court also set an Administrative Claims Bar Date of April 9, 2021 (ECF 470). The only parties not required to comply with the Chapter 11 administrative claims bar date are: (a) the U.S. Trustee, on account of claims for fees payable pursuant to 28 U.S.C. § 1930; (b) any person or entity that has already properly filed a proof of claim for a post-petition administrative priority claim against the Debtor;

## In re: Vestavia Hills, Ltd. dba Mount Royal Towers
## U.S.B.C. Case No.: 20-00018-LA11
## Narrative Statement – February 2022 Monthly Operating Report

(c) any and all professionals retained in this Chapter 11 case by the Debtor who assert administrative claims for fees and expenses subject to the Court's approval pursuant to sections 330 and 331 of the Bankruptcy Code; (d) claims of any party that is exempt from filing a proof of claim pursuant to an order of the Court in these this Chapter 11 case, including without limitation any order approving post-petition debtor in possession financing; (e) any claim that has been paid in full by the Debtor pursuant to the Bankruptcy Code or in accordance with an order of the Court; and (f) any claim against the Debtor that has been allowed by an order of the Court entered on or before the applicable Administrative Claims Bar Date.  The SBA filed an unsecured, non-priority claim, claim 18-1, on April 9, 2021 in the amount of $1,138,104.75.  Other administrative priority claims were filed by the Debtor's Limited Partners for their post-petition debtor in possession financing advances and adequate protection payments paid on behalf of the Debtor to Wells Fargo Bank. See Claim Nos. 19, 20, 21, 22, and 23, filed on April 9, 2021.  On January 12, 2022 the Debtor filed a Motion to set a Supplemental Administrative Bar Date (ECF 657) for those administrative expense priority claims that arose after the April 9, 2021 Administrative Bar Date. The order setting the supplemental administrative claims bar date as February 28, 2022 was entered on January 13, 2022 (ECF 664), notice of which was served on all parties in interest on January 21, 2022. ECF 673.  As of the date of this report, the second administrative bar date has passed, and no new proofs of claim were filed. All claims listed in the Debtor's Schedules and as filed will be analyzed and treated as appropriate within their respective priorities and classes as the Debtor works toward conclusion of this Chapter 11 case.

- In recognition of the challenges the COVID pandemic visited upon the Debtor, and the attendant delays in closing the court-approved sale of Mount Royal Towers to MED (including also the delays in closing the sale caused by the well-documented interference by Commonwealth Assisted Living and its affiliate, MCAP, and their principals and attorneys (see, inter alia, ECF 405)), the Court granted the Debtor's seriatim motions to extend the exclusive periods for the Debtor to file its Chapter 11 plan to July 3, 2021, and to solicit acceptances to that plan to September 3, 2021.  ECF 453.  On July 2, 2021, the Debtor filed its Chapter 11 plan and disclosure statement within these extended exclusivity periods. ECFs 515, 516. On July 30, 2021, Wells Fargo Bank (ECF 539) and Commonwealth (ECF 532) filed objections to the disclosure statement.  On August 6, 2021, the Debtor filed its amended plan and amended disclosure statement.  ECFs 548, 549.  It also filed replies to the two objections it received.  ECFs 553, 554.  The Limited Partners also filed their reply to the objections to the Debtor's disclosure statement. ECF 552.  By tentative rulings issued on August 25, 2021, the Court indicated it would not approve the Debtor's disclosure statement and plan as presented in light of, among other things, the underlying Plan's third-party injunction provisions. ECF 578. As a result, the hearing on approval of the disclosure statement, which was originally set for August 26, 2021, was initially continued to October 28, 2021, and thereafter moved to November 18, 2021.  As previously reported, in light of the closing of the sale to MED, and the court-approved settlement agreement with the Debtor's senior secured lender, Wells Fargo Bank (approved by order entered November 19, 2021, ECF 639), and as now reported below, the court-approved settlement with the SBA resolving the SBA's claim and forgiveness of a substantial majority of the Debtor's PPP loan funding, the Debtor's remaining challenges to closing this Chapter 11 case have narrowed (a) to dealing with the hotly

## In re: Vestavia Hills, Ltd. dba Mount Royal Towers
### U.S.B.C. Case No.: 20-00018-LA11
### Narrative Statement – February 2022 Monthly Operating Report

disputed Commonwealth claims now in litigation in Alabama, as this Court ordered, and to the extent not fully resolved there, to be litigated in this Court thereafter, also as the Court ordered, and (b) to determining a handful of disputed claims of other creditors.

- The Debtor filed and served its Tenth Chapter 11 Status Report on January 13, 2022 (ECF 663). Parties should review that Status Report, and all previous Status Reports, for more details as to the Chapter 11 case status and events. At the January 20, 2022 Status Hearing in the Chapter 11 case, the Court set May 12, 2022 as the continued date for the Debtor's Chapter 11 Status Hearing. At the Debtor's Chapter 11 Status Hearing on January 20, 2022, the Court declined to set a deadline for the Debtor to file a Chapter 11 Plan in light of outstanding rulings and developments in the case.

- The Debtor and the SBA participated in multiple court-sponsored mediation sessions in an effort to resolve the pending appeal to the Ninth Circuit Court of Appeals of the adverse decision rendered below by United States District Judge Curiel from Judge Adler's June 25, 2020 preliminary injunction order in Adversary No. 20-90073. The Debtor and the SBA reached agreement resolving all issues between them, as encapsulated in their definitive settlement agreement. The settlement resolved all issues with respect to the SBA's proof of claim (POC no. 18-1), the Adversary Proceeding, and the Ninth Circuit appeal. The settlement required repayment of a fraction of the PPP loan and provided that a substantial majority of the Debtor's PPP loan will be forgiven. On December 23, 2021, the Debtor filed its notice and motion for approval of the settlement with the SBA. ECF 652, 653. On January 19, 2022, the Court issued its tentative decision (ECF 668) approving the settlement with the SBA and excusing appearances of the parties at the January 20, 2022 hearing. The order approving the settlement with the SBA was entered on January 22, 2022. ECF 679. The settlement has been fully performed, including repayment of the settlement amount, filing of dismissals of all pending litigation, and withdrawal by the SBA of the SBA's proof of claim. On March 9, 2022, the Debtor received written confirmation that the balance of the PPP loan, in the amount of $1,029,104.79, was being fully forgiven by the SBA's agent bank. Accordingly, this matter with the SBA and the PPP loan should be deemed resolved.

- As set forth above, the sale of Debtor's Mount Royal Towers facility and related business assets closed on October 19, 2021. On October 18, 2021, the Debtor filed its motion for approval of settlement of all claims of Wells Fargo Bank (ECF 619), which had its secured claim paid and satisfied in full from the net proceeds of sale at the closing of the sale to MED. By order entered on November 19, 2021, the Court approved the Debtor's motion to approve the settlement with Wells Fargo which resolved all issues with respect to the Wells Fargo claims. Further details as to the settlement agreement with Wells Fargo and the agreed treatment of its remaining claims in this Chapter 11 case can be found in the Wells Fargo settlement approval motion (ECF 619) and supporting documents. On March 16, 2022, the adversary proceeding that the Debtor had brought against Wells Fargo (Adversary Proceeding No. 20-90083) for injunctive relief was dismissed by the Debtor in light of the Debtor's and its Limited Partners' settlement with Wells Fargo. See ECF #40 in that adversary proceeding.

## In re: Vestavia Hills, Ltd. dba Mount Royal Towers
### U.S.B.C. Case No.: 20-00018-LA11
### Narrative Statement – February 2022 Monthly Operating Report

- Commonwealth State Court Litigation: The Debtor is proceeding to litigate with Commonwealth in Alabama pursuant to the Court's orders mentioned above. On November 2, 2021, Commonwealth filed a Notice of Remand and Relief from Automatic Stay in the Alabama State Court Lawsuit notifying the Circuit Court of Jefferson County, Alabama of this Court's decision to remand the State Court Lawsuit. That same day, the Debtor filed a Motion for Status Conference in the State Court Lawsuit. Then, on December 2, 2021, the Debtor and the guarantors amended their answer to assert counterclaims against Commonwealth that had not been alleged in the State Court Lawsuit prior to its removal. A status conference was held in the State Court Lawsuit on December 3, 2021. Given the elapsed time and the additional discovery needed in the case, the parties agreed to moot (and remove from the court's calendar) all pending motions previously filed prior to Vestavia Hills' Chapter 11 bankruptcy and to continue with discovery in the State Court Lawsuit. Under the new scheduling order in the State Court Lawsuit, the parties are to complete all fact discovery in the State Court Lawsuit before December 31, 2022, and the next status hearing is currently set for June 10, 2022. On January 17, 2022, Commonwealth filed a motion to dismiss the counterclaims. The Debtor and the Limited Partners filed their oppositions to Commonwealth's motion. The parties appeared and argued their respective positions at a hearing conducted in the Alabama State Court Lawsuit on March 11, 2022, and the court there took the matter under submission.

- Commonwealth Claim Objection: On July 12, 2021, the Limited Partners filed objections to proof of claim no. 10-1 filed by Commonwealth Assisted Living, LLC, Series E. ECF 524. The Debtor filed a joinder to that objection on July 22, 2021. ECF 526. On July 26, 2021, the Limited Partners filed a motion to consolidate the Claims Objection with the Removed Adversary Proceeding (litigation that was removed from Alabama between Commonwealth and the Debtor and Limited Partners). The Court issued tentative rulings regarding these matters on September 17, 2021 adverse to the positions taken by the Debtor and by the Limited Partners. An order was entered on October 12, 2021 denying the motion to consolidate the claims objection with the adversary proceeding. ECF 611. Also, on October 12, 2021, the Court overruled the Debtor's and the Limited Partners' objections to Commonwealth's proof of claim no. 10-1, pending rulings in the Alabama state court action and pending further consideration following a status conference to be set at a later date following resolution of the Alabama state court action. ECF 612. The Debtor intends to litigate with Commonwealth in Alabama and, upon resolution of the Alabama litigation, in this Court as necessary to fully adjudicate its claims against Commonwealth.

- Commonwealth Motion for Relief from Stay: On August 20, 2021 the Debtor filed supplemental opposition to Commonwealth's motion for relief from stay. ECF 574. The Limited Partners filed a joinder to that opposition. ECF 575. On August 30, 2021, Commonwealth filed its reply to the oppositions. ECF 581. As noted above, the Court issued its tentative ruling on September 17, 2021 adverse to the positions taken by the Debtor and the Limited Partners. On October 12, 2021, the Court entered its order granting relief from stay for the Alabama state court action to proceed in that venue. ECF 609.

## In re: Vestavia Hills, Ltd. dba Mount Royal Towers
## U.S.B.C. Case No.: 20-00018-LA11
## Narrative Statement – February 2022 Monthly Operating Report

- The Removed Action, Adversary No. 20-90060:  On August 20, 2021, the Debtor (as a defendant) filed its opposition to Commonwealth's motion to remand that proceeding to state court in Alabama.  ECF 48.  The Limited Partners, also defendants in that action, joined in the Debtor's opposition.  ECF 50.  On August 30, 2021 Commonwealth filed its reply to those oppositions. ECF 51.  As noted above, the Court issued its tentative ruling on September 17, 2021 adverse to the positions taken by the Debtor and the Limited Partners.   The matter was argued on September 21, 2021, and on October 12, 2021, the Court entered its order granting the remand motion.  See ECF 62 in Adversary No. 20-90060.

- The Debtor is current on payment of all U.S. Trustee fees, as the calculation of those fees should not include non-estate property that had been held by the Debtor in trust for the MRT residents, or on the funds held in trust by the Debtor for MED following the closing of the sale of the MRT assets to MED.  None of these funds constituted property of the estate upon which U.S. Trustee fees should be calculated and paid.

- The Debtor has reached an agreement in principle with the taxing authorities of Jefferson County, Alabama regarding the assessed valuation of Debtor's Mount Royal Towers property which led to the Debtor paying real property ad valorum taxes based on a disputed $21,810,000 valuation of the MRT property rather than at the $12,000,000 sale price of the MRT property that closed on October 19, 2021.  The settlement, providing for an assessed value of $16,000,000 for tax year 2021 and a refund in taxes of approximately $107,000 from the $403,936.20 amount paid under protest on December 30, 2021, when approved in the Alabama state court, will be noticed for approval in the Chapter 11 case.

- On March 18, 2022, pursuant to a stipulation between the Debtor and Commonwealth, the Court dismissed the adversary proceeding (case no. 20-90029) under which the Debtor had initially sought injunctive relief against Commonwealth.  See ECF #s 92 (stipulation) and 93 (order approving the stipulation).

- In summary, the Court Ordered sale of the Debtor's Mount Royal Towers facility and related business assets has closed.  All costs and expenses of operating Mount Royal Towers have been eliminated.  The Wells Fargo settlement agreement was approved by the Court.  The Debtor and Limited Partners remain in full compliance with all terms and conditions of that Court-approved settlement. Resolution of claims by and claims against Commonwealth remains a key gating item in the Chapter 11 case.  In the interim, the Debtor will focus upon resolving other claims and as much as possible narrowing the focus of the case to disputes involving Commonwealth only.

**Vestavia Hills, Ltd. dPBA Mount Royal Towers**
**Balance Sheet**
**(Accrual Basis Only)**

| | As of February 28, 2022 |
|---|---:|
| **ASSETS** | |
| | |
| Current Assets: | |
| Unrestricted Cash | $ 411,699 |
| Restricted Cash - Buyer's Holding Account | 56,494 |
| Accounts Receivable - postpetition | 45,516 |
| Accounts Receivable - prepetition | - |
| Less: Allowance for Doubtful Accounts | (38,476) |
| CARES Act ERC Credits A/R | 305,704 |
| Inventory | - |
| Notes Receivable | 7,000 |
| Prepaid Expenses | - |
| Other - Proceeds Held in Escrow Account Reserved for Property Tax | - |
| Total Current Assets | 787,936 |
| | |
| Property & Equipment | - |
| Accumulated Depreciation | - |
| Net Property, Plant & Equipment | - |
| | |
| Other Assets (Net of Amortization): | |
| Special Basis Entries | - |
| Other Assets (Itemize) Costs Related to Sale | - |
| Other Assets (Itemize) CON Beds | - |
| Total Other Assets | - |
| | |
| TOTAL ASSETS | $ 787,936 |
| | |
| **LIABILITIES** | |
| | |
| Postpetition Liabilities: | |
| Accounts Payable | $ 115,431 |
| Accrued Payables | 91,865 |
| Accrued Payroll | - |
| Taxes Payable | 101,018 |
| Other - Accounts Receivable Prepayments | 5,588 |
| Other - Leases | - |
| Other - Buyer's Holding Account | 39,183 |
| Other - Medicaid/CARES Provider Funding | - |
| Other - PPP Loan Proceeds | - |
| Other - DIP Financing Borrowing [a] | 5,000,000 |
| Total Postpetition Liabilities | 5,353,085 |
| | |
| Prepetition Liabilities: | |
| Secured Liabilities [b] | - |
| Priority Liabilities | - |
| Unsecured Liabilities | 20,114,115 |
| Total Prepetition Liabilities | 20,114,115 |
| TOTAL LIABILITIES | 25,467,200 |
| | |
| **EQUITY:** | |
| Prepetition Owners' Equity/(Deficit) | (20,761,771) |
| Postpetition Profit/(Loss) | (3,917,493) |
| Direct Charges to Equity | - |
| TOTAL EQUITY | (24,679,264) |
| | |
| TOTAL LIABILITIES & EQUITY | $ 787,936 |

[a] The DIP Financing Borrowing was authorized by the Court in its *ORDER ON MOTION FOR AUTHORITY TO OBTAIN POSTPETITION UNSECURED FINANCING* entered on February 4, 2020 (ECF 100).

[b] The Debtor completed its sale of its Mount Royal Towers facility and related business assets in October 2021, at which time the Debtor's secured creditor, Wells Fargo, received payment of $11,306,598.16 directly from net proceeds. The remaining balance of the amount due to Wells Fargo continues to be carried on the Debtor's balance sheet. The remaining balance is unsecured and as such is included above within the unsecured liabilities section. The Debtor also filed its motion for approval of settlement of all claims with Wells Fargo in October 2019, which was approved by the Court in November 2021 (ECF619 and ECF639).

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Profit and Loss Statement**
**(Accrual Basis Only)**

| | For the month of February 2022 | Cumulative |
|---|---|---|
| **Sales/Revenue:** | | |
| Skilled Nursing Revenues | | |
| Skilled Nursing Facility Revenue - Primary Services | $          588 | $     15,987,791 |
| Skilled Nursing Facility Revenue - Ancillary Services | - | 591,987 |
| Skilled Nursing Facility Revenue - Misc Contracts | - | 534,376 |
| Less: COVID Medicaid Add On Pay Back | - | (982,785) |
| Add back 2020 Cost Report MCD | - | 982,785 |
| Less: Contractual Adjustments/Discounts | - | (4,532) |
| Net Skilled Nursing Revenues | 588 | 17,109,622 |
| | | |
| Retirement Care Revenues | | |
| Retirement Care Revenues - Primary Services | - | 868,844 |
| Retirement Care Revenues - Ancillary Services | - | (13,587) |
| Less: Contractual Adjustments/Discounts | - | (31,952) |
| Net Retirement Care Revenues | - | 823,305 |
| | | |
| Other Operating Revenues | | |
| Net Sales/Revenue | 588 | 17,932,927 |
| | | |
| **Operating Expenses:** | | |
| SNF Nursing | - | 5,850,164 |
| SNF Bed Tax | - | 1,188,677 |
| SNF Ancillary | 1,044 | 1,496,397 |
| Repairs and Maintenance | - | 1,026,260 |
| Housekeeping | - | 801,368 |
| Dietary | - | 1,877,769 |
| Activities/Resident Services | - | 664,071 |
| Marketing | - | 283,381 |
| Administrative | 7,964 | 3,422,436 |
| Property Taxes | - | 521,012 |
| Insurance | - | 690,580 |
| Bad Debt Write Off | - | 65,806 |
| Utilities | - | 1,569,341 |
| Total Operating Expenses | 9,008 | 19,457,262 |
| | | |
| Net Income/(Loss) from Operations | (8,420) | (1,524,335) |
| | | |
| **Non-Operating Income:** | | |
| Other Income [1] | 53 | 1,747,593 |
| HHS Stimulus Proceeds | - | 1,570,522 |
| PPP Loan Proceeds | - | 1,029,105 |
| ACL Debt Adjusted Off | - | 1,188,574 |
| Total Non-Operating Income | 53 | 5,535,794 |
| | | |
| **Non-Operating Expenses:** | | |
| Interest Expense | - | 2,394,335 |
| Legal and Professional | 51,039 | 3,111,820 |
| US Trustee Quarterly Fees | (1,603) | 327,005 |
| Management Fees [2] | - | - |
| Loss from Sale of Asset | - | 106,954 |
| Depreciation and Amortization Expenses [3] | - | 1,987,906 |
| Total Non-Operating Expenses | 49,436 | 7,928,020 |
| | | |
| Net Income/Loss (Including Non Operating Items) Before Taxes | (57,803) | (3,916,561) |
| | | |
| Corporate Taxes | - | (932) |
| | | |
| Net Income/Loss (Including Non Operating Items) | $       (57,803) | $    (3,917,493) |

[1] Other income is comprised of CARES Act Employee Retention Credits.

[2] Pursuant to a prepetition agreement, ActivCare Living Inc. assists the Debtor with limited portions of its operations, namely bookkeeping, accounting and marketing. The Debtor includes this management fee in its budgets; however, ActiveCare Living Inc. is not seeking payment for such management fees during the Debtor's bankruptcy case.

[3] The Debtor historically posts depreciation and amortization annually.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**

**Summary of Monthly Receipts and Disbursements (excluding Trust Accounts aka Accounts #5 and #11)** [1]

**For the period January 4, 2020 through February 28, 2022**

|  | February 2022 | Cumulative |
|---|---|---|
| Cash balance beginning of period | $   480,322.98 | $     86,673.23 |
| **Receipts:** | | |
| Total funds received for Debtor | 26,316.81 | 25,256,760.12 |
| Total funds received in trust FBO buyer [2] | 12,933.71 | 1,038,627.56 |
| Total transfers in | 9,253.75 | 16,781,161.97 |
| | 48,504.27 | 43,076,549.65 |
| **Disbursements:** | | |
| Total disbursements to external parties | 65,555.61 | 24,902,349.17 |
| Total transfers out | 51,572.78 | 17,849,174.85 |
| | 117,128.39 | 42,751,524.02 |
| Cash balance end of period | $   411,698.86 | $   411,698.86 |
| | | |
| Total funds received, excluding Accounts #5 and #11,  per above | $     39,250.52 | |
| Net transfers out, excluding Accounts #5 and #11, per above | (42,319.03) | |
| Receipts shown on MOR, Part 1, line b | $     (3,068.51) [3] | |

Notes:

*Sources:*  Monthly operating reports filed by the Debtor and other accounting records of the Debtor

[1] Prior to the close of the MRT property to MED on October 19, 2021, the Debtor held funds in trust for its patients ("Account #5"). Each month this account was used to pay patient incidentals and, in some instances, their bills due to the Debtor for services. Likewise, the Debtor occasionally disbursed funds to Account #5 to reimburse patients for various items, pay bank fees or other items. This account is recorded on the Debtor's balance sheet as restricted cash and as a liability. The Debtor's position is that, as these funds are not the Debtor's assets, Account #5 should be reported in the monthly operating reports but excluded from quarterly OUST fees. Therefore, Account #5 has been excluded from this summary of receipts and disbursements, except to the extent that funds were paid from Account #5 to the Debtor for services or the Debtor paid Account #5 for an operational purpose. After the sale of its assets in October 2021, the Debtor established a trust fund account on behalf of MED, the buyer, as the Debtor was still receiving substantial payments for services rendered by new buyer during the transition.

[2] As part of the sale of the Debtor's MRT Property to MED, the Debtor agreed to receive and hold in trust patient service revenue from third parties until the buyer is established in the records of the various paying agencies (Medicare, insurance, etc.).  These funds were not earned by the Debtor and must be transmitted to the buyer. Therefore, the Debtor set up a trust account, similar to its historical patient trust fund account, for these funds held in trust as both an asset and a liability on its balance sheet.  The Debtor transfers funds it receives into its operating accounts to the trust account. The Debtor will report all activities in this account in its monthly operating reports until the account has been closed, and exclude payments made to the buyer from this account from its calculation of OUST quarterly fees.

[3] Negative receipts due to timing difference. EDS wire received 1/31/22 into Account #6 FBO buyer and transferred to Account #11 on 2/01/22.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Summary Schedule of Cash**
**For the Month Ended February 28, 2022**

| | Beginning Balance | Receipts [1] | Transfers In | Disbursements | Transfers Out | Ending Balance |
|---|---|---|---|---|---|---|
| DIP General Checking Account #1 | $ 439,683.91 | $ 26,316.81 | $ 9,253.75 | $ (65,555.61) | $ - | $ 409,698.86 |
| General Checking Account #2 | - | - | - | - | - | - |
| DIP Payroll Checking Account #3 | - | - | - | - | - | - |
| Payroll Checking Account #4 | - | - | - | - | - | - |
| Patient Trust Account #5 - trust funds | - | 41,580.18 | - | (41,580.18) | - | - |
| DIP Reserve Account #6 | 40,639.07 | 12,933.71 | - | - | (51,572.78) | 2,000.00 |
| DIP Imprest Account #7 | - | - | - | - | - | - |
| Petty Cash - Activities Account #8 | - | - | - | - | - | - |
| Petty Cash - Administrator Account #9 | - | - | - | - | - | - |
| Property Tax Money Market Account #10 | - | - | - | - | - | - |
| Buyer's Holding Account #11 - trust funds | 14,175.00 | - | 42,319.03 | - | - | 56,494.03 |
| | 494,497.98 | 80,830.70 | 51,572.78 | (107,135.79) | (51,572.78) | 468,192.89 |
| | | | | | | |
| LESS: Restricted Funds - Patient Trust Account #5 | - | (41,580.18) | - | 41,580.18 | - | - |
| LESS: Restricted Funds - Buyer's Holding Account #11 | (14,175.00) | - | (42,319.03) | - | - | (56,494.03) |
| | | | | | | |
| Total Unrestricted Cash | $ 480,322.98 | $ 39,250.52 | $ 9,253.75 | $ (65,555.61) | $ (51,572.78) | $ 411,698.86 |

Notes:

[1] Includes amounts received and held in trust on behalf of buyer.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**DIP General Checking Account #1**
**For the Month Ended February 28, 2022**

| | | |
|---|---|---:|
| BEGINNING BALANCE AT PETITION DATE: | | $ - |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $ 25,912,192.00 |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $ 25,472,508.09 |
| BEGINNING BALANCE: | | $ 439,683.91 |

RECEIPTS DURING CURRENT PERIOD:

| | | |
|---|---:|---:|
| RECEIPTS - ACCOUNTS RECEIVABLE COLLECTIONS | $ 25,670.56 | |
| RECEIPTS FOR MISC VENDOR REFUNDS | $ 646.25 | |
| RECEIPTS FBO ELITE SENIOR LIVING (BUYER) | $ - | |
| TRANSFERS FROM DIP RESERVE ACCOUNT #6 | $ 9,253.75 | |
| TOTAL RECEIPTS THIS PERIOD: | | $ 35,570.56 |

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD:

| | | |
|---|---:|---:|
| DISBURSEMENTS | $ 65,555.61 | |
| TRANSFERS TO DIP RESERVE ACCOUNT #6 | $ - | |
| TRANSFERS TO BUYERS HOLDING ACCOUNT #11 | $ - | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $ 65,555.61 |

| | | |
|---|---|---:|
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | | $ (29,985.05) |
| ENDING BALANCE: | | $ 409,698.86 |

DIP GENERAL CHECKING ACCOUNT #1 ***6702
COMERICA BANK
955 J STREET
SAN DIEGO, CA 92101

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**DIP General Checking Account #1**
**February 28, 2022**

**Total Receipts Into DIP General Checking Account #1 For Current Period**

| Date | Payor | Purpose | Amount |
|------|-------|---------|--------|
| 02/03/22 | Mount Royal Operations | Pre-sale accounts receivable remitted to buyer on behalf of former resident by Kindred Hospice | $   23,456.38 |
| 02/04/22 | Vestavia Patient Trust | Accounts Receivable payment on behalf of former resident from SSA | 2,214.18 |
| | | Receipts - accounts receivable collections | 25,670.56 |
| 02/15/22 | USPS | Postage Refund for returned meter | 593.11 |
| 02/28/22 | Midway Class Action | Class Action Receipt | 53.14 |
| | | Vendor Refunds | 646.25 |
| 02/01/22 | Transfer from Reserve Account #6 | EDS Wire received on 1/31/22 for Vestavia A/R | 9,253.75 |
| | | Total receipts including transfers | $   35,570.56 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**DIP General Checking Account #1**
**February 28, 2022**

### Total Disbursements From DIP General Checking Account #1 For Current Period

| Date | Check# | Payee | Purpose | Amount |
|------|--------|-------|---------|--------|
| 02/01/22 | WIRE | INFINISOURCE | W-2 Production | $ 155.44 |
| 02/04/22 | 7437 | CARR RIGGS & INGRAM CPA | Medicaid Cost Report | 4,000.00 |
| 02/04/22 | 7438 | EXPERIENCE CARE, LLC | Net Solutions A/R: 01/22 | 20.00 |
| 02/08/22 | 7439 | ███████████ | Medicaid Collections | 5,889.67 |
| 02/08/22 | 7440 | POINTCLICK CARE TECHNOLOGIES | AR System | 5,058.70 |
| 02/10/22 | 7441 | ███████████ | Unclaimed Property Payment | 138.06 |
| 02/11/22 | 7442 | LTC CONSULTING | Medicare Collections 01/22 | 137.58 |
| 02/22/22 | 7443/WIRE | SULLIVAN HILL REZ & ENGEL, APLC | 80% of Post-Petition 12/21 Legal Fees | 40,436.38 |
| 02/22/22 | 7444/WIRE | CAMPBELL PARTNERS | 80% of Post-Petition 12/21 Legal Fees | 4,748.59 |
| 02/22/22 | 7445/WIRE | ELISABETH EISNER | 80% of Post-Petition 12/21 Legal Fees | 528.00 |
| 02/22/22 | 7446/WIRE | BAKER TILLY US, LLP | 80% of Post-Petition 12/21 Legal Fees | 4,010.00 |
| 02/25/22 | 7447 | ABILITY NETWORK INC. | SNF Billing Subscription - 02/22 | 433.19 |
| | | | | $ 65,555.61 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**DIP General Checking Account #1**
**February 28, 2022**

**DIP General Checking Account #1**
**Bank Reconciliation**

BALANCE PER BANK STATEMENT DATED:          02/28/22                    $    410,132.05

PLUS DEPOSITS IN TRANSIT:

| DEPOSIT DATE | DEPOSIT AMOUNT |
|---|---|
|  |  |
|  |  |
|  |  |

TOTAL DEPOSITS IN TRANSIT                                                            $              -

LESS OUTSTANDING CHECKS:

| CHECK NUMBER | CHECK DATE | CHECK AMOUNT |
|---|---|---|
| 7447 | 02/25/22 | $    433.19 |
|  |  |  |
|  |  |  |
|  |  |  |

TOTAL OUTSTANDING CHECKS                                              $            433.19

BANK STATEMENT ADJUSTMENTS                                         $              -

ADJUSTED BANK BALANCE                                                     $    409,698.86

80869

Ilılıuılılıdılılıdılıuıllıl
VESTAVIA HILLS LTD DEBTOR-IN-POSSESSION
20-00018-11
GENERAL ACCOUNT
9619 CHESAPEAKE DR STE 103
SAN DIEGO CA 92123

***Commercial Checking* statement**

**February 1, 2022** to **February 28, 2022**
**Account number** ▮▮▮▮▮▮▮▮

# Account summary

| | |
|---|---|
| **Beginning balance on February 1, 2022** | **$441,724.33** |
| Plus deposits | |
| Electronic deposits | $23,456.38 |
| Paper deposits | $2,860.43 |
| Transfers from other accounts | $9,253.75 |
| Less withdrawals | |
| Checks | -$17,284.43 |
| Electronic (EFT) withdrawals | -$49,878.41 |
| **Ending balance on February 28, 2022** | **$410,132.05** |

**To contact us**

**Call**
(800) 888-3595
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
955 J ST
SAN DIEGO, CA 92101-4569

**Important information**

The Account Balance Fee for this statement period for this account is $0.125/$1,000.

**Thank you**

*Commercial Checking* statement
February 1, 2022 to February 28, 2022

## *Commercial Checking* account details:

### Electronic deposits this statement period

| Date | Amount | Activity | Reference numbers | |
|------|--------|----------|----------|------|
| | | | Customer | Bank |
| Feb 03 | 23,456.38 | Mount Royal Oper Achbatch 35927 | | 9488730802 |

Total Electronic Deposits: $23,456.38
Total Number of Electronic Deposits: 1

### Paper deposits this statement period

| Date | Amount ($) | Reference numbers | | Date | Amount ($) | Reference numbers | |
|------|------------|----------|------|------|------------|----------|------|
| | | Customer | Bank | | | Customer | Bank |
| Feb 04 | 2,214.18 | | 0940361981 | Feb 15 | 593.11 | | 0940449804 |
| | | | | Feb 28 | 53.14 | | 0940767016 |

Total Paper Deposits: $2,860.43
Total Number of Paper Deposits: 3

### Transfer from other accounts this statement period

| Date | Amount | Activity | | Bank reference number |
|------|--------|----------|--|------------------|
| Feb 01 | 9,253.75 | Tpa Funds Transfer From Account | Xxxxxx3953 | 0T74167015 |

Total Transferred from Other Accounts: $9,253.75
Total Number of Transfers from Other Accounts: 1

### Checks paid this statement period

\* Symbol indicates a break in check number sequence

\# Symbol indicates an original item not enclosed

@ Symbol indicates a break in check number sequence and an original item not enclosed

| Check Number | Amount | Date Paid | Bank Reference Number | Check Number | Amount | Date Paid | Bank Reference Number |
|------|--------|------|------|------|--------|------|------|
| #7415 | -279.76 | Feb 09 | 0970389506 | #7438 | -20.00 | Feb 08 | 0970747336 |
| @7420 | -1,286.41 | Feb 02 | 0970017335 | #7439 | -5,889.67 | Feb 17 | 0970090009 |
| @7435 | -219.25 | Feb 07 | 0970136287 | #7440 | -5,058.70 | Feb 14 | 0880027244 |
| #7436 | -255.00 | Feb 04 | 0970334292 | #7441 | -138.06 | Feb 15 | 0970423922 |
| #7437 | -4,000.00 | Feb 10 | 0970409161 | #7442 | -137.58 | Feb 17 | 0970598993 |

Total checks paid this statement period: -$17,284.43
Total number of checks paid this statement period: 10

### Electronic withdrawals this statement period

| Date | Amount ($) | Activity | Reference numbers | |
|------|------------|----------|----------|------|
| | | | Customer | Bank |
| Feb 01 | -155.44 | Wire # 006810 Bnf Infinisource I Fed # 001016 | | 9485007158 |
| Feb 23 | -40,436.38 | Wire # 006727 Bnf Sullivan Hill  Fed # 000744 | | 9485006965 |
| Feb 23 | -4,748.59 | Wire # 006735 Bnf Campbell Partn Fed # 000746 | | 9485006966 |
| Feb 23 | -4,010.00 | Wire # 006747 Bnf Banker Tilly U Fed # 000749 | | 9485006967 |
| Feb 23 | -528.00 | Wire # 006740 Bnf Elisabeth Eisn Fed # 000748 | | 9485006968 |

Total Electronic Withdrawals: -$49,878.41
Total Number of Electronic Withdrawals: 5

**Commercial Checking** statement
**February 1, 2022 to February 28, 2022**

# Commercial Checking: 18█████████

 **Lowest daily balance**

Your lowest daily balance this statement period was **$410,078.91**
on **February 23, 2022**.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**General Checking Account #2**
**For the Month Ended February 28, 2022**

| | | |
|---|---|---|
| BEGINNING BALANCE AT PETITION DATE: | $ | 2,889.42 |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | $ | - |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | $ | 2,889.42 |
| BEGINNING BALANCE: | $ | - |
| RECEIPTS DURING CURRENT PERIOD: | | |
| RECEIPTS | $ - | |
| TOTAL RECEIPTS THIS PERIOD: | $ | - |
| LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD | | |
| DISBURSEMENTS | $ - | |
| TOTAL DISBURSEMENTS THIS PERIOD: | $ | - |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | $ | - |
| ENDING BALANCE: | $ | - |

GENERAL CHECKING ACCOUNT #2 ***8425 (ACCOUNT CLOSED IN JANUARY 2020)
REGIONS BANK
101 OFFICE PARK DRIVE
BIRMINGHAM, AL 35223

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**DIP Payroll Checking Account #3**
**For the Month Ended February 28, 2022**

| | | |
|---|---|---|
| BEGINNING BALANCE AT PETITION DATE: | $ | - |
| | | |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | $ | 1,470,105.99 |
| | | |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | $ | 1,470,105.99 |
| | | |
| BEGINNING BALANCE: | $ | - |

RECEIPTS DURING CURRENT PERIOD:

| | | | |
|---|---|---|---|
| RECEIPTS | $ | - | |
| TRANSFERS FROM DIP GENERAL CHECKING ACCOUNT #1 | $ | - | |
| | | | |
| TOTAL RECEIPTS THIS PERIOD: | | | $  - |

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD:

| | | | |
|---|---|---|---|
| DISBURSEMENTS | $ | - | |
| TRANSFERS TO DIP GENERAL CHECKING ACCOUNT #1 | $ | - | |
| | | | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | | $  - |

| | | |
|---|---|---|
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | $ | - |
| | | |
| ENDING BALANCE: | $ | - |

DIP PAYROLL CHECKING ACCOUNT #3 ***6710 (ACCOUNT CLOSED DECEMBER 2021)
COMERICA BANK
955 J STREET
SAN DIEGO, CA 92101

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**Payroll Checking Account #4**
**For the Month Ended February 28, 2022**

| | | |
|---|---|---|
| BEGINNING BALANCE AT PETITION DATE: | $ | 2,605.46 |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | $ | - |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | $ | 2,605.46 |
| BEGINNING BALANCE: | $ | - |
| RECEIPTS DURING CURRENT PERIOD: | | |
| RECEIPTS | $ | - |
| TOTAL RECEIPTS THIS PERIOD: | $ | - |
| LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD: | | |
| DISBURSEMENTS | $ | - |
| TOTAL DISBURSEMENTS THIS PERIOD: | $ | - |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | $ | - |
| ENDING BALANCE: | $ | - |

PAYROLL CHECKING ACCOUNT #4 ***4335 (ACCOUNT CLOSED JANUARY 2020)
REGIONS BANK
101 OFFICE PARK DRIVE
BIRMINGHAM, AL 35223

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**Patient Trust Account #5**
**For the Month Ended February 28, 2022**

| | | |
|---|---|---:|
| BEGINNING BALANCE AT PETITION DATE: | $ | 141,130.11 |
| | | |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | $ | 1,553,062.21 |
| | | |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | $ | 1,694,192.32 |
| | | |
| BEGINNING BALANCE: | $ | - |

RECEIPTS DURING CURRENT PERIOD:

| | | |
|---|---|---:|
| RECEIPTS - RESIDENT FUNDS FOR VESTAVIA | $ | 2,214.18 |
| RECEIPTS - MOUNT ROYAL OPERATIONS (BUYER) FUNDS RECEIVED | $ | 39,366.00 |
| RECEIPTS - MRT REIMBURSEMENT FOR OPERATIONS | $ | - |
| TOTAL RECEIPTS THIS PERIOD: | $ | 41,580.18 |

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD:

| | | |
|---|---|---:|
| DISBURSEMENTS TO MOUNT ROYAL OPERATIONS (Buyer) | $ | 39,311.03 |
| DISBURSEMENTS TO BANK FOR BANK CHARGES | $ | 54.97 |
| DISBURSEMENTS FOR PATIENT SERVICES TO VESTAVIA HILLS | $ | 2,214.18 |
| TOTAL DISBURSEMENTS THIS PERIOD: | $ | 41,580.18 |

| | | |
|---|---|---:|
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | $ | - |
| | | |
| ENDING BALANCE: | $ | - |

PATIENT TRUST ACCOUNT #5 ***1595
WELLS FARGO
P.O. BOX 63020
SAN FRANCISCO, CA 94163

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Patient Trust Account #5**
**February 28, 2022**

### Total Receipts Into Patient Trust Account #5 For Current Period

| Date | Payor | Purpose | Amount |
|------|-------|---------|--------|
| 02/03/22 | SSA Treasury Wire | Resident Funds for Vestavia A/R | $    2,214.18 |
| | | Receipts - Vestavia resident funds | 2,214.18 |
| 02/01/22 | SSI Treasury Wire | Mount Royal Operations - Buyers Funds Received | 420.00 |
| 02/03/22 | SSA Treasury Wire | Mount Royal Operations - Buyers Funds Received | 38,559.92 |
| 02/15/22 | CMWC Teasury Wire | Mount Royal Operations - Buyers Funds Received | 354.40 |
| 02/22/22 | SSI Treasury Wire | Mount Royal Operations - Buyers Funds Received | 30.00 |
| 02/28/22 | Wells Fargo Bank | Interest Earned by resident in patient trust account | 1.68 |
| | | Receipts - funds collected FBO buyer | 39,366.00 |
| | | Total receipts | $   41,580.18 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Patient Trust Account #5**
**February 28, 2022**

**Total Disbursements From Patient Trust Account #5 For Current Period**

| Date | Check# | Payee | Purpose | Amount |
|------|--------|-------|---------|--------|
| 02/04/22 | 4201 | Mount Royal Operations (Buyer) | Transmit Resident Funds to buyer's operations account | $ 38,979.92 |
| 02/04/22 | 4202 | Vestavia Hills Ltd | A/R Payment for MRT | 2,214.18 |
| 02/11/22 | Draw | Wells Fargo | Bank Fees | 54.97 |
| 02/16/22 | 4203 | Mount Royal Operations (Buyer) | Transmit Resident Funds to buyer's operations account | 299.43 |
| 02/23/22 | 4204 | Mount Royal Operations (Buyer) | Transmit Resident Funds to buyer's operations account | 30.00 |
| 02/28/22 | 4205 | Mount Royal Operations (Buyer) | Transmit Resident Funds to buyer's operations account | 1.68 |
| | | | | $ 41,580.18 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Patient Trust Account #5**
**February 28, 2022**

**Patient Trust Account #5**
**Bank Reconciliation**

BALANCE PER BANK STATEMENT DATED:      02/28/22      $    2,883.38

PLUS DEPOSITS IN TRANSIT:

| DEPOSIT DATE | DEPOSIT AMOUNT |
|---|---|
| | |
| | |
| | |

TOTAL DEPOSITS IN TRANSIT                                      $         -

LESS OUTSTANDING CHECKS:

| CHECK NUMBER | CHECK DATE | CHECK AMOUNT |
|---|---|---|
| 4162 | 09/16/21 | $   1,795.70 |
| 4180 | 10/19/21 | $   1,056.00 |
| 4204 | 02/26/22 | $      30.00 |
| 4205 | 02/28/22 | $       1.68 |

TOTAL OUTSTANDING CHECKS                                      $    2,883.38

BANK STATEMENT ADJUSTMENTS                                $         -

ADJUSTED BANK BALANCE                                          $         -

# Commercial Checking Acct W Interest

Account number: ▮▮▮▮▮▮▮▮▮    February 1, 2022 - February 28, 2022 ■ Page 1 of 5



---

Questions?

Call your Customer Service Officer or Client Services
1-800-AT WELLS (1-800-289-3557)
5:00 AM TO 6:00 PM Pacific Time Monday - Friday

VESTAVIA HILLS LTD
PATIENT FUND ACCOUNT
9619 CHESAPEAKE DR STE 103
SAN DIEGO CA 92123-1394

*Online: wellsfargo.com*

*Write:* Wells Fargo Bank, N.A. (182)
PO Box 63020
San Francisco, CA  94163

---

## Account summary

### Commercial Checking Acct W Interest

| Account number | Beginning balance | Total credits | Total debits | Ending balance |
|---|---|---|---|---|
| ▮▮▮▮▮▮▮▮▮ | $6,250.84 | $41,580.18 | -$44,947.64 | $2,883.38 |

### Interest summary

| | |
|---|---|
| Annual percentage yield earned this period | 0.16% |
| Interest earned during this period | $1.68 |
| Year to date interest and bonuses paid | $6.05 |
| Total interest and bonuses earned in 2021 | $304.69 |

---

### Credits
Electronic deposits/bank credits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx7616 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*▮ |
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx9975 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*▮ |
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx0758 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*▮ |
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx7050 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*▮ |
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx8756 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*▮ |
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx0921 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*▮ |
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx1837 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*▮ |
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx8130 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*.▮ |
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx7227 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*▮ |

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

Account number: 2000███████████ February 1, 2022 - February 28, 2022 ■ Page 2 of 5



*Electronic deposits/bank credits (continued)*

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx6256 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*█████████ |
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx3312 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*█████████ |
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx0195 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*█████████ |
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx4086 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*.█████████ |
| | 02/01 | 30.00 | Ssi Treas 310 Xxsupp Sec 020122 xxxxx7908 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*█████████ |
| | 02/03 | 1,871.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx2374A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,828.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx1846A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,794.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx5441A SSA N1*1U*Vestavia Hills Ltd for\N1*Be█████████ |
| | 02/03 | 1,776.10 | SSA Treas 310 Xxsoc Sec 020322 xxxxx7977A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,725.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx5717A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,551.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx9990A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,498.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx7695A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*████████s |
| | 02/03 | 1,490.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx7548D SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,436.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx9283C2 SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,238.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx2006A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,199.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx9473A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,169.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx4966C1 SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,141.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx2637A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,114.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx5059A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,114.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx2969A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,094.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx7256A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,055.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx1521A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,023.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx5029A SSA N1*1U*Vestavia Hills Ltd for\N1*Be█████████ |
| | 02/03 | 1,023.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx7260A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |
| | 02/03 | 1,018.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx4219C1 SSA N1*1U*Vestavia Hills Ltd for\N1*Be*█████████ |

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

Account number: ███████████    February 1, 2022 - February 28, 2022 ■ Page 3 of 5



**WELLS FARGO**

---

*Electronic deposits/bank credits (continued)*

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 02/03 | 908.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx7401A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*████████ |
| | 02/03 | 894.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx9408C4 SSA N1*1U*Vestavia Hills Ltd for\N1*Be*████████ |
| | 02/03 | 870.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx6703A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*██████ |
| | 02/03 | 864.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx3185A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*██████ |
| | 02/03 | 859.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx4072A SSA ████████ |
| | 02/03 | 845.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx9604A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*██████ |
| | 02/03 | 826.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx9642C3 SSA N1*1U*Vestavia Hills Ltd for\N1*Be*████ |
| | 02/03 | 819.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx3107A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*██████ |
| | 02/03 | 791.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx0072A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*████████ |
| | 02/03 | 787.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx2910A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*██████ |
| | 02/03 | 777.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx0024A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*████████ |
| | 02/03 | 771.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx7124A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*██████ |
| | 02/03 | 767.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx8985A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*██████ |
| | 02/03 | 763.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx9480A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*██████ |
| | 02/03 | 699.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx3043A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*████████ |
| | 02/03 | 536.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx4842A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*██████ |
| | 02/03 | 442.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx9379A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*████ |
| | 02/03 | 399.00 | SSA Treas 310 Xxsoc Sec 020322 xxxxx5706A SSA N1*1U*Vestavia Hills Ltd for\N1*Be*██████ |
| | 02/15 | 354.40 | Cmwc Treas 310 Misc Pay 021522 C4223Xxxxxlwl11 Mount Royal Towers Rp |
| | 02/22 | 30.00 | Ssi Treas 310 Xxsupp Sec 022222 xxxxx6776 Ssi N1*1U*Vestavia Hills Ltd \N1*Be*██████ |
| | 02/28 | 1.68 | Interest Payment |
| | | **$41,580.18** | Total electronic deposits/bank credits |
| | | **$41,580.18** | Total credits |

---

## Debits

Electronic debits/bank debits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 02/11 | 54.97 | Client Analysis Srvc Chrg 220210 Svc Chge 0122 002000019371595 |
| | | **$54.97** | Total electronic debits/bank debits |

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

Exhibit 15, Page 366

Account number: ▮▮▮▮▮▮ ■ February 1, 2022 - February 28, 2022 ■ Page 4 of 5



**WELLS FARGO**

---

### Checks paid

| Number | Amount | Date | Number | Amount | Date | Number | Amount | Date |
|---|---|---|---|---|---|---|---|---|
| 4198 | 317.57 | 02/08 | 4200 | 4.37 | 02/10 | 4202 | 2,214.18 | 02/04 |
| 4199 | 3,077.20 | 02/08 | 4201 | 38,979.92 | 02/10 | 4203 | 299.43 | 02/28 |
| | $44,892.67 | | Total checks paid | | | | | |
| | $44,947.64 | | Total debits | | | | | |

---

### Daily ledger balance summary

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 01/31 | 6,250.84 | 02/08 | 41,835.99 | 02/15 | 3,151.13 |
| 02/01 | 6,670.84 | 02/10 | 2,851.70 | 02/22 | 3,181.13 |
| 02/03 | 47,444.94 | 02/11 | 2,796.73 | 02/28 | 2,883.38 |
| 02/04 | 45,230.76 | | | | |

Average daily ledger balance    $13,694.58

---

Addendum to Wells Fargo Commercial Account Agreement

Effective March 18, 2022, Wells Fargo is updating the descriptions of its procedures in Wells Fargo's Commercial Account Agreement (and the other agreements governing your commercial deposit account) for determining your account's available balance, posting transactions to your account, and overdrawing your account. In the event of a conflict between this update and any other agreements governing your deposit account, this update will control. Except as expressly modified by this Addendum, these agreements remain in full force and effect.

In the Wells Fargo Commercial Account Agreement, delete the provision titled "Available balance, posting order, and overdrafts" (and similar provisions in other agreements governing your Wells Fargo commercial deposit account) and replace them with the following:

Available balance, posting order, and overdrafts

How do we determine your account's available balance?

Your account's available balance is our most current record of the amount of money in your account available for your use or withdrawal. We use the available balance to process your transactions during the day (e.g., wire transfers and other electronic transactions). We also use the available balance when we process your transactions during our nightly processing. We calculate your available balance as follows:
- We start with the ending daily account balance from our prior business day nightly processing that includes all transactions deposited to or paid from your account.
- We subtract from this balance any holds placed on a deposit to your account and any holds placed due to legal process.
- We add pending deposits that are immediately available for your use (including cash deposits, electronic deposits, and the portion of a paper check deposit we make available; see "Funds availability policy" section for details).
- We subtract pending withdrawals we have either received (such as wire transfers and other electronic transactions) or are known to us (such as your checks we receive for payment from your account) but have not processed.

How do we post transactions to your account?

We post transactions each business day (Monday through Friday except federal holidays) during our nightly processing. Once we process a transaction, we post the results to your account. There are three key steps to this process. The most common types of transactions are processed as described below.
1. We determine the available balance in your account (as described above) that we can use to pay your transactions.
2. We sort your transactions into three categories: deposits, "must-pay" transactions, and checks and certain ACH payments.
- Deposits. We credit your account for deposits, including cash and check deposits and incoming electronic transfers, received before the cutoff time at the location the deposit or transfer was made.

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**DIP Reserve Account #6**
**For the Month Ended February 28, 2022**

| | | |
|---|---|---:|
| BEGINNING BALANCE AT PETITION DATE: | | $ 78,158.65 |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $ 15,044,743.54 |
| LESS: TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $ 15,082,263.12 |
| BEGINNING BALANCE: | | $ 40,639.07 |
| RECEIPTS DURING CURRENT PERIOD: | | |
| RECEIPTS | $ - | |
| RECEIPTS FBO BUYER | $ 12,933.71 | |
| TRANSFERS FROM PAYROLL CHECKING ACCOUNT #4 | $ - | |
| TOTAL RECEIPTS THIS PERIOD: | | $ 12,933.71 |
| LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD: | | |
| DISBURSEMENTS | $ - | |
| TRANSFERS TO DIP GENERAL CHECKING ACCOUNT #1 | $ 9,253.75 | |
| TRANSFERS TO BUYER HOLDING ACCOUNT #11 | $ 42,319.03 | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $ 51,572.78 |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | | $ (38,639.07) |
| ENDING BALANCE: | | $ 2,000.00 |

DIP RESERVE ACCOUNT #6 ***3953
COMERICA BANK
955 J STREET
SAN DIEGO, CA 92101

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**DIP Reserve Account #6**
**February 28, 2022**

### Total Receipts Into DIP Reserve Account #6 For Current Period

| Date | Payor | Purpose | Amount |
|------|-------|---------|--------|
| 02/16/22 | BCBS Wire | Mount Royal Operations - funds | $      608.71 |
| 02/16/22 | UHC Wire | Mount Royal Operations - funds | 12,325.00 |
| | | Receipts FBO Buyer | $   12,933.71 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**DIP Reserve Account #6**
**February 28, 2022**

**Total Disbursements From DIP Reserve Account #6 For Current Period**

| Date | Check# | Payee | Purpose | Amount |
|------|--------|-------|---------|--------|
| 02/01/22 | Transfer | Transfer to General Account #1 | EDS Wire received 01/31 | $  9,253.75 |
| 02/01/22 | Transfer | Transfer MRO funds to Holding Account #11 | EDS Wire received 01/31 | 29,385.32 |
| 02/18/22 | Transfer | Transfer MRO funds to Holding Account #11 | BCBS/UHC Wires received 2/1 | 12,933.71 |
| | | | | 42,319.03 |
| | | | Total Transfers | $   51,572.78 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**DIP Reserve Account #6**
**February 28, 2022**

**DIP Reserve Account #6**
**Bank Reconciliation**

| | | | |
|---|---|---|---|
| BALANCE PER BANK STATEMENT DATED: | 02/28/22 | | $  2,000.00 |

PLUS DEPOSITS IN TRANSIT:

| DEPOSIT DATE | DEPOSIT AMOUNT | |
|---|---|---|
| | | |
| | | |
| | | |

| TOTAL DEPOSITS IN TRANSIT | | $        - |
|---|---|---|

LESS OUTSTANDING CHECKS:

| CHECK NUMBER | CHECK DATE | CHECK AMOUNT |
|---|---|---|
| | | |
| | | |
| | | |

| TOTAL OUTSTANDING CHECKS | $        - |
|---|---|
| BANK STATEMENT ADJUSTMENTS | $        - |
| ADJUSTED BANK BALANCE | $  2,000.00 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**DIP Imprest Account #7**
**For the Month Ended February 28, 2022**

| | | |
|---|---|---|
| BEGINNING BALANCE AT PETITION DATE: | $ | - |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | $ | 35,889.34 |
| LESS: TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | $ | 35,889.34 |
| BEGINNING BALANCE: | $ | - |

RECEIPTS DURING CURRENT PERIOD:

| | | |
|---|---|---|
| RECEIPTS | $ | - |
| TRANSFERS FROM DIP GENERAL CHECKING ACCOUNT #1 | $ | - |
| TOTAL RECEIPTS THIS PERIOD: | $ | - |

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD:

| | | |
|---|---|---|
| DISBURSEMENTS | $ | - |
| TRANSFERS TO GENERAL ACCOUNT #1 | $ | - |
| TRANSFERS TO PETTY CASH ACTIVITIES #8 | $ | - |
| TRANSFERS TO PETTY CASH ADMIN #9 | $ | - |
| TOTAL DISBURSEMENTS THIS PERIOD: | $ | - |

| | | |
|---|---|---|
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | $ | - |
| ENDING BALANCE: | $ | - |

DIP IMPREST ACCOUNT #7 ***6694 (ACCOUNT CLOSED DECEMBER 2021)
COMERICA BANK
955 J STREET
SAN DIEGO, CA 92101

80869

||l|l.....|l...|l...|l..|l.l.l..|l.l.l|

VESTAVIA HILLS LTD
DEBTOR-IN-POSSESSION
#20-00018-11
9619 CHESAPEAKE DR STE 103
SAN DIEGO CA 92123

*Commercial Checking* statement

**February 1, 2022** to **February 28, 2022**
**Account number** ███████
**Previous account number** ███████

## Account summary

| Beginning balance on February 1, 2022 | $40,639.07 |
|---|---|
| Plus deposits | |
| Electronic deposits | $12,933.71 |
| Transfers to other accounts | -$51,572.78 |
| **Ending balance on February 28, 2022** | **$2,000.00** |

**To contact us**

**Call**
(800) 888-3595
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
955 J ST
SAN DIEGO, CA 92101-4569

**Important information**

The Account Balance Fee for this statement period for this account is $0.125/$1,000.

**Thank you**

*Commercial Checking* statement
February 1, 2022 to February 28, 2022



## *Commercial Checking* account details: ██████████

### Electronic deposits this statement period

| | | | Reference numbers | |
| Date | Amount | Activity | Customer | Bank |
|------|--------|----------|----------|------|
| Feb 16 | 12,325.00 | Unitedhealthcare Payment 220216 0000304399 | | 9488809742 |
| Feb 16 | 608.71 | Bcbsal Cross R Hcclaimpmt 1033215660-6216 | | 9488567162 |

**Total Electronic Deposits: $12,933.71**
**Total Number of Electronic Deposits: 2**

### Transfers to other accounts this statement period

| Date | Amount ($) | Activity | | Bank reference number |
|------|-----------|----------|---|------------------------|
| Feb 01 | -29,385.32 | Tpa Funds Transfer To Account | Xxxxxx6229 | 0T74167016 |
| Feb 01 | -9,253.75 | Tpa Funds Transfer To Account | Xxxxxx6702 | 0T74167015 |
| Feb 18 | -12,933.71 | Tpa Funds Transfer To Account | Xxxxxx6229 | 0T74271888 |

**Total Transferred to Other Accounts: -$51,572.78**
**Total Number of Transfers to Other Accounts: 3**

 ### Lowest daily balance

Your lowest daily balance this statement period was **$2,000.00** on **February 1, 2022**.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**Petty Cash - Activities Cash Account #8**
**For the Month Ended February 28, 2022**

| | | |
|---|---:|---:|
| BEGINNING BALANCE AT PETITION DATE: | $ | 1,700.00 |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | $ | 44,005.38 |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | $ | 45,705.38 |
| BEGINNING BALANCE: | $ | - |

RECEIPTS DURING CURRENT PERIOD:

| | | |
|---|---:|---:|
| RECEIPTS | $ | - |
| TRANSFERS FROM DIP GENERAL CHECKING ACCOUNT #1 | $ | - |
| TRANSFERS FROM DIP IMPREST ACCOUNT #7 | $ | - |
| TOTAL RECEIPTS THIS PERIOD: | $ | - |

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD:

| | | |
|---|---:|---:|
| DISBURSEMENTS | $ | - |
| TOTAL DISBURSEMENTS THIS PERIOD: | $ | - |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | $ | - |
| ENDING BALANCE: | $ | - |

ACCOUNT #8 (ACCOUNT CLOSED NOVEMBER 2021)

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**Petty Cash - Administrator Cash Account #9**
**For the Month Ended February 28, 2022**

| | | |
|---|---|---:|
| BEGINNING BALANCE AT PETITION DATE: | $ | 1,319.70 |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | $ | 58,985.01 |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | $ | 60,304.71 |
| BEGINNING BALANCE: | $ | - |

RECEIPTS DURING CURRENT PERIOD:

| | | |
|---|---|---:|
| RECEIPTS | $ | - |
| TRANSFERS FROM DIP GENERAL CHECKING ACCOUNT #1 | $ | - |
| TRANSFERS FROM IMPREST ACCOUNT #7 | $ | - |
| TOTAL RECEIPTS THIS PERIOD: | $ | - |

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD:

| | | |
|---|---|---:|
| DISBURSEMENTS | $ | - |
| TOTAL DISBURSEMENTS THIS PERIOD: | $ | - |
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | $ | - |
| ENDING BALANCE: | $ | - |

ACCOUNT #9 (ACCOUNT CLOSED NOVEMBER 2021)

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**Property Tax Money Market  - Account #10**
**For the Month Ended February 28, 2022**

| | | |
|---|---|---:|
| BEGINNING BALANCE AT PETITION DATE: | | $                     - |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $        462,124.50 |
| LESS:  TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $        462,124.50 |
| BEGINNING BALANCE: | | $                     - |

RECEIPTS DURING CURRENT PERIOD:

| | | |
|---|---:|---:|
| RECEIPTS | $                - | |
| INTEREST INCOME | $                - | |
| TRANSFERS FROM DIP GENERAL CHECKING ACCOUNT #1 | $                - | |
| TOTAL RECEIPTS THIS PERIOD: | | $                     - |

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD:

| | | |
|---|---:|---:|
| DISBURSEMENTS | $                - | |
| TRANSFERS TO DIP GENERAL CHECKING ACCOUNT #1 | $                - | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $                     - |

| | | |
|---|---|---:|
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | | $                     - |
| ENDING BALANCE: | | $                     - |

PROPERTY TAX MARKET ACCOUNT #10 ***3709 (ACCOUNT CLOSED MAY 2021)
COMERICA BANK
955 J STREET
SAN DIEGO, CA 92101

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Cash Receipts and Disbursements**
**Buyer's Holding Account #11** [1]
**For the Month Ended February 28, 2022**

| | | |
|---|---|---:|
| BEGINNING BALANCE AT PETITION DATE: | | $ - |
| | | |
| TOTAL POSTPETITION RECEIPTS THROUGH PRIOR MONTH: | | $ 1,030,568.25 |
| | | |
| LESS: TOTAL POSTPETITION DISBURSEMENTS THROUGH PRIOR MONTH: | | $ 1,016,393.25 |
| | | |
| BEGINNING BALANCE: | | $ 14,175.00 |

RECEIPTS DURING CURRENT PERIOD:

| | | |
|---|---:|---:|
| RECEIPTS | $ - | |
| TRANSFERS FROM DIP GENERAL CHECKING ACCOUNT #1 | $ - | |
| TRANSFERS FROM RESERVE ACCOUNT #6 | $ 42,319.03 | |
| TOTAL RECEIPTS THIS PERIOD: | | $ 42,319.03 |

LESS: TOTAL DISBURSEMENTS DURING CURRENT PERIOD:

| | | |
|---|---:|---:|
| DISBURSEMENTS TO MOUNT ROYAL OPERATIONS (BUYER) | $ - | |
| TRANSFERS TO DIP GENERAL CHECKING ACCOUNT #1 | $ - | |
| TOTAL DISBURSEMENTS THIS PERIOD: | | $ - |

| | | |
|---|---|---:|
| NET RECEIPTS (DISBURSEMENTS) FOR THE PERIOD: | | $ 42,319.03 |
| | | |
| ENDING BALANCE: | | $ 56,494.03 |

BUYER'S HOLDING ACCOUNT #11 ***6229
COMERICA BANK
955 J STREET
SAN DIEGO, CA 92101

[1] Account established as holding account for funds due to buyer during transition period in which the buyer's revenues are collected by the Debtor (seller) and subsequently turned over to buyer. Therefore, the Debtor is treating this account as a trust funds account.

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Buyer's Holding Account #11**
**February 28, 2022**

### Total Receipts Into Buyer's Holding Account #11 For Current Period

| Date | Payor | Purpose | Amount |
|------|-------|---------|--------|
| 02/01/22 | Transfer MRO funds from Reserve Account #6 | EDS Wire received 01/31 | $ 29,385.32 |
| 02/18/22 | Transfer MRO funds from Reserve Account #6 | BCBS/UHC Wire received 02/01 | 12,933.71 |
| | | | $ 42,319.03 |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Buyer's Holding Account #11**
**February 28, 2022**

### Total Disbursements From Buyer's Holding Account #11 For Current Period

| Date | Payee | Purpose | Amount |
|------|-------|---------|--------|
|      |       | Total Disbursements | $          - |

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**Buyer's Holding Account #11**
**February 28, 2022**

**Buyer's Holding Account #11**
**Bank Reconciliation**

BALANCE PER BANK STATEMENT DATED:          02/28/22                    $   56,494.03

PLUS DEPOSITS IN TRANSIT:

| DEPOSIT DATE | DEPOSIT AMOUNT |
|---|---|
| | |
| | |
| | |

TOTAL DEPOSITS IN TRANSIT                                        $          -

LESS OUTSTANDING CHECKS:

| CHECK NUMBER | CHECK DATE | CHECK AMOUNT |
|---|---|---|
| | | |
| | | |
| | | |

TOTAL OUTSTANDING CHECKS                                       $          -

BANK STATEMENT ADJUSTMENTS                                 $          -

ADJUSTED BANK BALANCE                                           $   56,494.03

80869

Ilılıııılıllıılılılılılıllıllıl
VESTAVIA HILLS LTD,
DEBTOR-IN-POSSESSION #20-00018-11
HOLDING ACCOUNT
9619 CHESAPEAKE DR STE 103
SAN DIEGO CA 92123

___  ___  ___

*Commercial Checking* statement

**February 1, 2022** to **February 28, 2022**
**Account number** ▮▮▮▮▮▮▮▮

## Account summary

| | |
|---|---|
| **Beginning balance on February 1, 2022** | **$14,175.00** |
| Plus deposits | |
| Transfers from other accounts | $42,319.03 |
| **Ending balance on February 28, 2022** | **$56,494.03** |

**To contact us**

**Call**
(800) 888-3595
**Visit our web site**
www.comerica.com

**Write to us**
COMERICA BANK
955 J ST
SAN DIEGO, CA 92101-4569

**Important information**

The Account Balance Fee for this statement period for this account is $0.125/$1,000.

**Thank you**

*Commercial Checking* statement
**February 1, 2022 to February 28, 2022**

# *Commercial Checking* account details:  ███████

## Transfer from other accounts this statement period

| Date | Amount | Activity | | Bank reference number |
|------|--------|----------|--|----------------------|
| Feb 01 | 29,385.32 | Tpa Funds Transfer From Account | Xxxxxx3953 | 0T74167016 |
| Feb 18 | 12,933.71 | Tpa Funds Transfer From Account | Xxxxxx3953 | 0T74271888 |

**Total Transferred from Other Accounts: $42,319.03**
**Total Number of Transfers from Other Accounts: 2**

 **Lowest daily balance**

Your lowest daily balance this statement period was **$14,175.00** on **February 1, 2022.**

**Vestavia Hills, Ltd. DBA Mount Royal Towers**
**United States Trustee Quarterly Fees**
**(Total Payments)**

| Quarterly Period Ending | Total Disbursements [1] | Quarterly Fees | Date Paid per the Debtor | Amount Paid per the Debtor |
|---|---|---|---|---|
| 03/31/20 | $ 2,466,012.83 | $ 24,660.13 | 04/17/20 | $ 24,660.13 |
| 06/30/20 | $ 3,311,473.87 | $ 33,114.74 | 07/17/20 | $ 33,114.74 |
| 09/30/20 | $ 3,441,948.91 | $ 34,419.49 | 10/20/20 | $ 34,419.49 |
| 12/31/20 [2] | $ 3,431,343.82 | $ 34,313.44 | 01/20/21 | $ 34,313.44 |
| 03/31/21 | $ 4,329,660.97 | $ 43,297.00 | 04/19/21 | $ 43,297.00 |
| Cumulative Adjustment through 03/31/21 [3] | $ 3,994.48 | $ 40.00 | 07/19/21 | included below |
| 06/30/21 | $ 3,136,619.12 | $ 25,093.00 | 07/19/21 | $ 31,364.00 |
| 09/30/21 [4] | $ 2,873,877.78 | $ 22,991.00 | 10/20/21 | $ 22,991.00 |
| 12/31/21 [5] | $ 13,376,032.65 | $ 106,965.56 | 01/20/22 | $ 106,966.00 |
| | | | | |
| | | | | |

[1] Pursuant to agreement with OUST, disbursements from Patient Trust Account (account #5) will be excluded from OUST Quarterly Fee calculations as the Patient Trust Account contains funds held in trust on behalf of its patients, rather than the funds of the Debtor.

[2] Payment to OUST is comprised of a credit balance of $12.36 and wire transfer issued of $34,301.08.

[3] During the process of amending the Debtor's June 2021 MOR cumulative receipts and disbursements summary, the Debtor changed the way it is reporting certain disbursements to the account it holds in trust for its patients (these disbursements were formerly treated as transfers and therefore excluded from quarterly fees). As the Debtor had overpaid its Q2 2021 quarterly fees by $6,271, the newly calculated fees of $40 for Q1 2021 were effectively paid on 7/19/21. This left a remaining credit balance of $6,231 available for Q3 2021 quarterly fees.

[4] Payment to OUST is comprised of a credit/carryforward balance of $6,231 and a wire transfer issued in the amount of $16,760.

[5] Payment to OUST is comprised of a credit/carryforward balance of $42.44 and a wire transfer issued in the amount of $106,965.56.

CSD 3010 [07/01/18] #5027915v1
Name, Address, Telephone No. & I.D. No.
SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
James P. Hill (SBN 90478)/Christopher V. Hawkins (SBN 222961)
Kathleen Cashman-Kramer (SBN 128861)
600 B Street, Suite 1700 San Diego, CA  92101
Tel.: (619) 233-4100      Fax:  (619) 231-4372
Attorneys for Debtor and Debtor In Possession,
Vestavia Hills, Ltd., dba Mount Royal Towers

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF
CALIFORNIA
325 West F Street, San Diego, California 92101-6991

In Re
VESTAVIA HILLS, LTD., dba MOUNT ROYAL
TOWERS,
                                                    Debtor.

BANKRUPTCY NO.  20-00018-LA11

                                                    Plaintiff(s)

ADVERSARY NO.

v.

,
                                                    Defendant(s)

# PROOF OF SERVICE

I,    Laurel Dinkins                 am a resident of the State of California, over the age of 18 years,
and not a party to this action.

On   March 25, 2022                , I served the following documents:

**1.   DEBTOR'S MONTHLY OPERATING REPORT–FEBRUARY 2022**

1.      **To Be Served by the Court via Notice of Electronic Filing ("NEF")**:

Under controlling Local Bankruptcy Rules(s) ("LBR"), the document(s) listed above will be served by the
court via NEF and hyperlink to the document. On     March 25, 2022           , I checked the CM/ECF docket for
this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail
Notice List to receive NEF transmission at the e-mail address(es) indicated and/or as checked below:

- John Cannizzaro    john.cannizzaro@icemiller.com
- Kathleen A. Cashman-Kramer    Cashman-Kramer@Sullivanhill.com, cashman-
  kramer@ecf.courtdrive.com;rudolph@sullivanhill.com;hill@sullivanhill.com;bkstaff@sullivanhill.com
  ;rudolph@ecf.inforuptcy.com
- Glen F. Dorgan    glen.dorgan@usdoj.gov, Brenda.seyler@usdoj.gov
- Ajay Gupta    ajay@guptalc.com, guptaar87864@notify.bestcase.com
- Julian Gurule    jgurule@buchalter.com, smartin@buchalter.com,docket@buchalter.com
- Christopher V. Hawkins    hawkins@sullivanhill.com, hill@sullivanhill.com;cashman-
  kramer@sullivanhill.com;bkstaff@sullivanhill.com;vidovich@ecf.inforuptcy.com;hawkins@ecf.inforu
  ptcy.com
- James P. Hill    Hill@sullivanhill.com,
  hawkins@sullivanhill.com;bkstaff@sullivanhill.com;vidovich@ecf.inforuptcy.com;hill@ecf.inforuptc
  y.com;cashman-kramer@sullivanhill.com
- J. Barrett Marum    bmarum@sheppardmullin.com, egarcia@sheppardmullin.com

#5126855v1
CSD 3010

- Anthony Napolitano    anapolitano@buchalter.com
- David Ortiz    david.a.ortiz@usdoj.gov,
  USTP.REGION15@USDOJ.GOV;tiffany.l.carroll@usdoj.gov;abram.s.feuerstein@usdoj.gov
- William A. Smelko    bill.smelko@procopio.com,
  kristina.terlaga@procopio.com;calendaring@procopio.com
- United States Trustee    ustp.region15@usdoj.gov

☐    Chapter 7 Trustee:

☐    For Chpt. 7, 11, & 12 cases:        ☐    For ODD numbered Chapter 13 cases:        ☐    For EVEN numbered Chapter 13 cases:

UNITED STATES TRUSTEE            THOMAS H. BILLINGSLEA, JR., TRUSTEE        DAVID L. SKELTON, TRUSTEE
ustp.region15@usdoj.gov            Billingslea@thb.coxatwork.com            admin@ch13.sdcoxmail.com
                                                    dskelton13@ecf.epiqsystems.com

#5126855v1
CSD 3010

CSD 3010 [07/01/18] (Page 2)

2.     **Served by United States Mail:**

On _____ , I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing accurate copies in a sealed envelope in the United States Mail via 1) first class, postage prepaid or 2) certified mail with receipt number, addressed as follows:

3.     **Served by Personal Delivery, Facsimile Transmission, Overnight Delivery, or Electronic Mail:**

Under Fed.R.Civ.P.5 and controlling LBR, on   March 25, 2022,        I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission, by overnight delivery and/or electronic mail as follows:

| | |
|---|---|
| Aaron Malo<br>amalo@sheppardmullin.com<br>Counsel for Wells Fargo | Kevin Moriarty, President/CEO<br>IPG Holding, Inc.<br>kevin@activcareliving.com |
| Elisabeth Eisner<br>eeisner@eeisner.com<br>Special Transactional Counsel for Debtor | Andy Campbell<br>Harris Hagood<br>Campbell Partners<br>harris@campbellpartnerslaw.com<br>andy@campbellpartnerslaw.com<br>Alabama Litigation Counsel for Debtor |
| Harbuck Keith Hunt & Palmer<br>Kenny Keith<br>David Hunt<br>kkeith@hkh.law<br>dhunt@hkh.law<br>Regulatory Counsel for Debtor | Stacy Elledge-Chiang<br>Baker Tilly fka Squar Milner<br>Stacy.Chiang@bakertilly.com |

I declare under penalty of perjury under the laws of the United States of America that the statements made in this proof of service are true and correct.

Executed on   March 25, 2022                         Laurel Dinkins */s/Laurel Dinkins*
              (Date)                                        (Typed Name and Signature)

                                                   600 B Street, Suite 1700
                                                        (Address)

                                                   San Diego, CA  92101
                                                        (City, State, ZIP Code)

#5126855v1
CSD 3010

# EXHIBIT 16

**CSD 3000C** [07/01/18]
Name, Address, Telephone No. & I.D. No.

JULIAN I. GURULE (SBN: 252160)
ANTHONY J. NAPOLITANO (SBN: 227691)
BUCHALTER, a Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Telephone: (213) 891-0700
Facsimile: (213) 896-0400
jgurule@buchalter.com; anapolitano@buchalter.com

Order Entered on
October 13, 2021
by Clerk U.S. Bankruptcy Court
Southern District of California

### UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

| | |
|---|---|
| In Re    VESTAVIA HILLS, LTD.<br>           d/b/a/ MOUNT ROYAL TOWERS<br><br>                                              Debtor. | **LODGED**<br><br>BANKRUPTCY NO.    20-00018-LA-18 |
| COMMONWEALTH ASSISTED LIVING, LLC, SERIES E<br><br>                                              Plaintiff(s) | ADVERSARY NO.  20-90060-LA |
| v.  VESTAVIA HILLS, LTD.<br><br>                                              Defendant(s) | Date of Hearing: September 21, 2021<br>Time of Hearing: 10:00 a.m.<br>Name of Judge:  Louise D. Adler |

## ORDER ON
### MOTION TO REMAND THE ADVERSARY PROCEEDING IN WHOLE OR IN PART
### UNDER 11 U.S.C. § 1452 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9027(d)

        The court orders as set forth on the continuation pages attached and numbered <u>2</u> through <u>18</u> with exhibits, if any,

for a total of <u>18</u> pages.  Notice of Lodgment Docket Entry No. <u>60</u> .

//

//

//

//


DATED:      October 12, 2021


Judge, United States Bankruptcy Court

CSD 3000C [07/01/18]

ORDER ON MOTION TO REMAND ADVERSARY PROCEEDING UNDER 11 U.S.C. § 1452

DEBTOR:  VESTAVIA HILLS, LTD.

CASE NO.: 20-00018-LA-11

ADV. NO.: 20-90060-LA

The hearing on the Motion for Remand and/or for Abstention [Adv. Docket No. 7] as supplemented by the Supplemental Brief in Support of Plaintiff's Motion to Remand the Adversary Proceeding in Whole or in Part Under 11 U.S.C. § 1452 and Federal Rule of Bankruptcy Procedure 9027(d) [Adv. Docket No. 41] (collectively, the "Remand Motion") filed by Commonwealth Assisted Living, LLC, Series E ("Commonwealth") came on for hearing on September 21, 2021 at 10:00 a.m. in the above captioned court.  Appearances at the hearing were as set forth in the record.

The Court considered Commonwealth's Remand Motion and supporting documents and the opposition filed by debtor Vestavia Hills, Ltd. (the "Debtor") at Adv. Docket No. 48 and the Joinder in Debtor's Opposition to Motion by Commonwealth Assisted Living, LLC, Series E, to Remand Action to the State Court in Alabama or, in the Alternative, to Abstain Under 28 U.S.C. Section 1334(c) filed by limited partners Judith A. Chance, Karen L. McElliott, Frank A. Virgadamo, Connie A. Virgadamo, B. Renee Barnard, Charles L. Barnard, and Jack L. Rowe filed at Adv. Docket No. 50.  On September 17, 2021, this Court issued its Tentative Ruling [Adv. Docket No. 56] in which the Court indicated its intention to grant the Remand Motion.  On September 29, 2021, this Court issued its Letter of Opinion by Judge [Adv. Docket No. 58] (together with the Tentative Ruling, the "Rulings") to address certain of the arguments raised at the hearing.  A copy of the Tentative Ruling and the Letter of Opinion are attached hereto as Exhibits 1 and 2, respectively, and are incorporated by this reference as if set forth herein in full.  Accordingly, and good cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.  The Remand Motion is granted in its entirety under 28 U.S.C. § 1452(b);

2.  Based upon the findings and reasoning set forth in the Rulings, the Court hereby remands the adversary proceeding designated as Commonwealth Assisted Living, LLC, Series E v. Vestavia Hills, Ltd., et al., Adv. Proc. No. 20-90060-LA (Bankr. S.D. Cal.) in its entirety to the Alabama Circuit Court as designated as Commonwealth Assisted Living, LLC, Series E v. Vestavia Hills, Ltd., et al., Case No. CV-2018-00390 (Ala. Cir. Ct.);

3.  The Clerk of this Court is hereby directed to provide notice of the remand to the Clerk of the Alabama Circuit Court by providing a certified copy of this order to the Alabama Circuit Court as follows:

> Jefferson County Circuit Court Clerk (Birmingham Division)
> Jefferson County Courthouse
> 716 Richard Arrington, Jr. Blvd. North
> Birmingham, AL 35203

4.  The Clerk of this Court is further directed to transmit the case file and any other necessary documents to the Clerk of the Alabama Circuit Court.

5.  The Clerks are hereby authorized and directed to promptly take all actions necessary in connection with the remand.


IT IS SO ORDERED.

CSD 3000C

Signed by Judge Louise DeCarl Adler October 12, 2021

# EXHIBIT 1

TENTATIVE RULING

ISSUED BY JUDGE LOUISE DECARL ADLER

Adversary Case Name:    Commonwealth Assisted Living, LLC, Serie v. Vestavia Hills LTD

Adversary Number: 20-90060

Case Number:    20-00018-LA11

Hearing:    10:00 AM   Tuesday, September 21, 2021

Motion:    MOTION FOR REMAND AND/OR FOR ABSTENSION FILED BY JULIEN GURULE ON BEHALF OF COMMONWEALTH ASSISTED LIVING, LLC SERIES E (Fr 7/1/21)

Commonwealth Assisted Living LLC's Motion for Remand of the removed Alabama State Court Action pursuant to 28 U.S.C. Sec. 1452(b) **GRANTED**.

The Alabama State Court Acton is a breach of contract action filed by Commonwealth against the Vestavia Hills, Ltd. ("Debtor") and its Limited Partners (Judith Chance, Karen McElliott, Frank Virgadamo, Connie Virgadamo, B. Renee Barnard, Charles Barnard, and Jack Rowe) (collectively "Defendants"). Commonwealth's remaining claims seek: (1) damages for Debtor's alleged breach of purchase agreement; and (2) declaratory relief regarding the parties' rights/obligations under the purchase agreement/guarantees (the "Alabama State Court Action" or "Removed Action"). The Court has carefully considered the briefs filed by the parties and the record in this case (including the record in this adversary proceeding, the main bankruptcy case and the rulings and orders of the Alabama Bankruptcy Court, the Alabama USDC and the Alabama State Court), and concludes that the equities heavily weigh in favor of remand.

    **I. FACTS:**   The following facts are from the Alabama State Court complaint and the Alabama USDC complaint; and written decisions and rulings by the Alabama State Court, the Alabama USDC and the Alabama Bankruptcy Court; and the record in this bankruptcy case:

    **A. The Purchase Agreement.**

Prior to the petition date, the Debtor owned and operated a senior care and skilled nursing home facility in Alabama called Mount Royal Towers ("MRT"). In December 2017, the Debtor defaulted on its note with its secured lender, Wells Fargo Bank (which its Limited Partners had personally guaranteed). The Debtor was unable to refinance or

negotiate an extension of the note, so it put MRT up for sale to prevent foreclosure.

In March 2018, the Debtor and Commonwealth entered into a purchase agreement for the sale of MRT ("Purchase Agreement"). The Purchase Agreement included a performance guaranty signed by the LPs. The operation/sale of the MRT facility required a transfer of ownership approval and other licenses and approvals from the State of Alabama and its various agencies ("Operating Approvals"). Thus, a condition precedent to closing was that Commonwealth must obtain these Operating Approvals by July, 30, 2018 (the "Outside Approval Date"). The Purchase Agreement provided that this condition precedent was "solely for the benefit of Commonwealth" and it could be waived. As result of the pending sale, the Debtor was able to secure a forbearance agreement from Wells Fargo Bank to delay the foreclosure until October 1, 2018.

For various reasons that are the subject of this litigation, the Operating Approvals were not obtained as anticipated. The parties executed nine amendments to the Purchase Agreement (and the LPs executed additional guaranties). The ninth amendment extended the Outside Approval Date to November 16, 2018, and the Outside Closing Date to December 10, 2018.   On November 16, 2018, Commonwealth provided written notice to the Debtor that the Operating Approvals had either been obtained or were otherwise waived, so it would be able to close by December 10, 2018. That same day, the Debtor demanded that Commonwealth provide proof that the Operating Approvals had in fact been obtained. When Commonwealth did not provide proof, the Debtor notified Commonwealth that the Purchase Agreement had automatically terminated as of November 16, 2018 due to its failure to obtain the Operating Approvals. Commonwealth maintained that it had met the November 16 deadline and/or that it had properly exercised its option to extend the contract's performance deadlines and paid the additional fee, but the Debtor maintained that the Purchase Agreement had terminated.

### B. The State Court Action and Federal Action.

On November 21, 2018, Commonwealth filed the Alabama State Court Action against the Debtor and its LPs ("Defendants") for specific performance, breach of contract and declaratory relief.**1** However, Commonwealth was unable to serve the summons and complaint because the Defendants refused to accept service of process and/or actively evaded service. [*See* Adv. Proc. ECF 4, Ex. 3, Pg. 5 (Memorandum Decision by Alabama USDC describing Commonwealth's extensive efforts serve the summons and complaint)]

On December 17, 2018 (while the Defendants were evading service of process of the Alabama State Court complaint), the Defendants filed their own USDC Action against Commonwealth and its Affiliate, MCAP, in the Northern District of Alabama. This action seeks declaratory relief that Commonwealth, not Debtor, breached the Purchase Agreement and damages for same (the "USDC complaint" and "USDC Action").**2** The Alabama USDC complaint alleged, *inter alia*, that the USDC has subject matter

jurisdiction over the claims pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and the amount in controversy.

Commonwealth responded to the USDC complaint by filing a motion to dismiss or abstain. The motion to dismiss argued, *inter alia*, that the USDC lacks subject matter jurisdiction over the claims because diversity of citizenship is lacking. This issue of diversity of citizenship was not decided on the merits because the Alabama USDC, by written opinion, granted the motion to abstain and stayed the Alabama USDC Action in favor the Alabama State Court Action under the *Colorado River* doctrine. [Adv. Proc. ECF 4, Ex. 3, pg. 12] Importantly, *the Alabama USDC reasoned that "sufficiently exceptional circumstances exist" to warrant granting the motion to abstain* because of the conduct of the Debtor and the Limited Partners in actively evading service of process to bolster their arguments for the Alabama USDC to retain jurisdiction. The Alabama USDC reasoned that it would not reward "bad behavior," and "[a]s a matter of policy, intentional avoidance of service is not a practice that ought to be encouraged." [*Id.* at Pg. 12]. Therefore, by its order dated May 20, 2019, the Alabama USDC *stayed the USDC Action until the Alabama State Action was completed* and directed the filing of status reports regarding the progress of the Alabama State Court Action every sixty days. [*Id.*]

The litigation in the Alabama State Court continued until January 3, 2020, when the Debtor filed its Chapter 11 bankruptcy case in California. At that time, the Alabama State Court Action had been pending in the Alabama State Court for *thirteen months*. The record in the Alabama State Court Action is voluminous and includes approximately 1,566 pages. [See ECF Nos. 4, 11-13 (compiling the Alabama State Court record)] The record includes many motions and ruling, including an order directing the Clerk's Office to serve process on certain Defendants due to their evasion of service; and an order denying the LPs' motions to dismiss for lack of jurisdiction and to stay the proceedings.**3**

Commonwealth represents that the written discovery in the Alabama State Court Action was substantially completed; and that it had produced 23,816 pages of documents and received 14,297 pages of documents from the Defendants. Further, it represents that the Alabama State Court had two discovery disputes under submission: (i) Commonwealth's motion to compel additional discovery responses; and (ii) Commonwealth's motion to compel certain LPs to appear for their depositions which it contends were duly noticed and ignored. Additionally, Commonwealth had a pending motion for summary judgment on the liability issue (not damages). On January 2, 2020, the Alabama State Court entered an order scheduling this motion for summary judgment for hearing. The next day the Debtor filed this bankruptcy case (although Debtor had apparently already warned that it was in the process of filing bankruptcy).

### C. The Notice of Stay, Removal and Remand Motions.

On January 12, 2020, the Debtor filed a Notice of Stay in the Alabama State Court Action asserting that the Debtor's bankruptcy filing automatically stayed the action as to *all of the Defendants*. On January 13, 2020, the Alabama State Court issued an order staying the action *solely as to the Debtor*. The next day, the Defendants removed the Alabama State Court Action to the Alabama Bankruptcy Court and moved to transfer venue to this Court in California as the "home" bankruptcy court.**4**

Commonwealth responded with a motion in the Alabama Bankruptcy Court to remand the removed Alabama State Court Action and/or to abstain. The Alabama Bankruptcy Court considered both motions and (i) granted the motion to transfer venue, and (ii) declined to rule on the motion to abstain and/or remand because it reasoned that the "home" bankruptcy court is better situated to decide the issues raised therein. [Adv. Proc. ECF No. 49, RJN Ex. 4] In April 2020, the Removed Action – which included Commonwealth's motion to abstain and/or for remand – was transferred to this Court. However, the Court's rulings on these motions and Commonwealth's companion motion for relief from stay have been delayed, suspended and/or stayed for a variety of reasons.

At the outset of this bankruptcy case, the Debtor represented that it had a stalking horse bidder (MED) to purchase MRT and it intended to complete a prompt sale subject to overbid. Unfortunately, the sale did not proceed as planned due to the intervening Covid-19 pandemic which chilled the interest in overbidding and the sale price. In August 2020, the Court approved the sale to MED for a "bargain price." However, the sale still has not closed. The reason for the delay in closing is *partially* due to the continuing Covid-19 pandemic, but it also appears that selling MRT is a more complex transaction than the Debtor represented. Thus, the Court directed Debtor to file its plan and DS if it intended to file them; and it granted Commonwealth's request to re-schedule this motion to remand and/or to abstain and its companion motion for relief from stay.

### II. Legal Analysis:

Remand of a removed action is governed by 28 U.S.C. § 1452(b), which provides in pertinent part that: "[t]he court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground."   The court has an extremely broad grant of authority to exercise its discretion to remand a removed action. *In re Prince*, 230 B.R. 414, 417 (9th Cir. BAP 1999). Remand in the Ninth Circuit is guided by the following fourteen-factor test set forth in *In re Cedar Funding, Inc.*, 419 B.R. 807 (9th Cir. BAP 2009):

> (1) the effect or lack thereof on the efficient administration of the estate if the Court recommends remand or abstention; (2) extent to which state law issues predominate over bankruptcy issues; (3) difficult or unsettled nature of applicable law; (4) presence of related proceeding commenced in state court or

other nonbankruptcy proceeding; (5) jurisdictional basis, if any, other than § 1334; (6) degree of relatedness or remoteness of proceeding to main bankruptcy case; (7) the substance rather than the form of an asserted core proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden on the bankruptcy court's docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; (12) the presence in the proceeding of nondebtor parties; (13) comity; and (14) the possibility of prejudice to other parties in the action.

*Cedar Funding*, 419 B.R. at 820, n. 18 (internal modifications omitted). These equitable factors favor remand as follows:

**1. The Effect or Lack Thereof on the Efficient Administration of the Estate if the Court Orders Remand:** This factor is either neutral or it favors remand. The Debtor filed this bankruptcy case to give itself (and the LPs who operated the Debtor's business) a breathing spell so that it could maximize the sale of MRT as a going concern instead of being foreclosed and protect the health and safety of its vulnerable residents while the Debtor transitioned its operations to the new owner. This case served that purpose.   The residents of MRT remained COVID-free during the entirety of this Ch. 11 case and the Debtor reports that it will close its sale of MRT in early October 2021. Unfortunately, there will be no "net proceeds" to fund a plan. All "net proceeds" will be paid to WFB directly from escrow to satisfy the secured portion of its under-secured claim. Upon closing, the Debtor will be shell with no business or potential recoveries from which to pay its creditors, except for its disputed litigation claims against Commonwealth. The issue then is whether remanding the Alabama State Court Action will disrupt the Debtor's efficient liquidation of this remaining litigation claim? The Court thinks not for the reasons explained in its discussion of the other factors below.

In weighing this factor, the Court has considered that the LPs have filed a Claim Objection and they have agreed to fund the Debtor's liquidating plan. However, their Claim Objection and the plan's confirmation can be decided irrespective of whether the underlying state court claims between the Commonwealth and the Debtor/LPs are remanded to the Alabama State Court. Additionally, the Court rejects the Debtor/LPs' argument that the Rejection Order implicitly ruled that this Court was retaining jurisdiction over the Removed Action (allegedly due to its critical importance to the bankruptcy case). The Debtor/LPs misread the Rejection Order, which expressly reserved all rights. The Court's dicta in a footnote to its tentative ruling could *not* adjudicate this motion to remand, which was not argued or on calendar when the rejection motion was decided.

**2. The Extent to Which State Law Issues Predominate Over Bankruptcy Issues:**
The Debtor cannot dispute that the Alabama State Court Action exclusively involves Alabama state law. The issues to be litigated -- including causation, damages _and_ Commonwealth's alleged "failure to mitigate" -- must be decided under Alabama state law. Further, even if there are events during this bankruptcy case that are relevant to calculating damages (allegedly due to Commonwealth's failure to mitigate by failing to submit a proper overbid for the § 363 sale and its unnecessary attorney's fees), the transaction that gave rise to this prepetition litigation transpired in Alabama years before this bankruptcy case was filed.   It is Alabama state law and the prepetition events in Alabama that will predominate in this litigation, not bankruptcy issues. Therefore, this factor strongly favors remand.

**3. The Difficulty or Unsettled Nature of the Applicable Law:** This factor favors remand. The Court does not agree that the Removed Action is a straightforward breach of contract dispute that will likely be resolved by cross-motions for summary judgment that can be filed forthwith. Commonwealth's motion for summary judgment that was scheduled in the Alabama State Court concerned only _liability_, and the Defendants previously argued to the Alabama State Court that a trial would be necessary.

Moreover, the Court has reviewed the Alabama State Court complaint and agrees that that the action requires familiarity with the Alabama regulatory process and regulatory approvals for purchasers of healthcare facilities in order to construe the terms and intent of the Purchase Agreement and decide which party breached. This Alabama state law is not within the Court's unique area of expertise. Moreover, given the length of time it has taken for Debtor to close its sale of MRT to MED, it appears that the required regulations and approvals to transfer a healthcare business are more complicated than the Debtor initially represented.

Additionally, in the Claim Objection, the Court learned that the LPs are asserting the defenses of lack of consideration and duress to their liability on the guaranties. These additional claims/defenses – which are solely between Commonwealth and the LPs regarding the enforceability of the LPs' guaranties -- cannot be adjudicated in the Claim Objection proceeding. They are issues that must be resolved in the Removed Action, and so it is not a simple action to decide which party breached.

**4. The Presence of Related Proceeding Commenced in State Court or other Nonbankruptcy Proceeding:** This factor strongly favors remand. Although there is no related proceeding in the state court because all the claims in the Alabama State Court Action were removed, there is a related Alabama USDC Action. The Alabama USDC Action -- which the Debtor/LPs filed to assert their damage claims against Commonwealth in federal court -- was not transferred to this Court. Importantly, the judge in the related Alabama USDC Action *abstained and stayed the USDC Action* under the *Colorado River* doctrine until the until the Alabama State Court Action is completed. Thus, a federal court in related litigation has decided that if the basis for federal jurisdiction is diversity jurisdiction under 28 U.S.C. § 1332, then the litigation should be completed in the Alabama State Court, not the federal court.

**5. The Jurisdictional Basis, If Any, Other Than § 1334:** The Court rejects the Defendants' argument that there is an independent basis for federal jurisdiction over the Removed Action under 28 U.S.C. § 1332 due complete diversity. Even if there was complete diversity *when the Alabama State Court Action was filed on November 21, 2018*, the Notice of Removal did not assert diversity jurisdiction as the basis for the removal, and the deadline to remove the Alabama State Court Action based on diversity jurisdiction had long since passed. *See* 28 U.S.C. § 1446(b) (imposing 30-day time limit on removal from the date the federal jurisdictional basis for removal became apparent); 28 U.S.C. § 1146(c) (imposing an outside deadline of 1 year after commencement of the action for removal based on federal diversity jurisdiction); *see also In re Tailored Fund Cap LLC v. RWDY, Inc.*, 2020 WL 6343307, *7 (N.D.N.Y. 2020) (recognizing that a notice of removal may not be sustained on grounds not stated in that notice and also holding that the time to remove based on diversity had long since passed under both 28 U.S.C. §§ 1446(b) and (c); and therefore, finding that the sole basis for federal jurisdiction was 28 U.S.C. § 1334(b)).

Here, as in *In re Tailored Fund*, the Notice of Removal did not rely on diversity jurisdiction because the deadline to remove based on complete diversity had long since passed. Therefore, the sole basis for removal is 28 U.S.C. § 1334(b), and this factor favors remand.

**6. The Degree of Relatedness or Remoteness of Proceeding to the Main Bankruptcy Case:** This factor favors remand. The Debtor improperly conflates "relatedness" for purposes of a remand motion with "related to" jurisdiction. Even if the Court has "related to" subject matter jurisdiction over Commonwealth's guaranty claims against the LPs, the analysis for remand is how closely the litigation relates to the bankruptcy case. The case law is clear that asserted indemnification claims – especially indemnification claims that are likely to receive no recovery – are not sufficient to establish relatedness to retain the litigation solely on that basis. *See, e.g., Digital Satellite Lenders, LLC v. Ferchill*, 2004 U.S. Dist. LEXIS 15736, at *15-18 (S.D.N.Y. Aug. 6, 2004) (Where the only relationship of the defendants with the bankruptcy proceeding

is the possibility that the debtor may indemnify the defendants in the event that plaintiffs prevail in the action, courts have held that if the defendants acquire an indemnification claim, they can assert it by filing a proof of claim and jurisdiction over the action should not be retained on that basis.)   Here, whether the LPs ultimately acquire indemnification claims is irrelevant because there are no assets to pay these claims.   [See Plan, Sub-Class 7-A (providing that the indemnity claims are discharged)]

### 7. The Substance Rather than the Form of the Asserted Core Proceeding:   This factor favors remand because the substance of the Removed Action is primarily "non-core." Commonwealth's remaining claims in the Alabama State Court Action are for (1) breach of contract/damages, and (3) declaratory judgment regarding the rights and obligations of the parties under the Purchase Agreement and LP guaranties. Conversely, the Debtor/LPs have asserted affirmative damage claims against Commonwealth arising from the Purchase Agreement which they seek to adjudicate. Although the Court is unclear, it appears that the Debtor may be asserting its affirmative damage claims in the Claim Objection proceeding *and* in the Removed Action because the Debtor has repeatedly stated that that the claims and issues to be litigated in both proceedings are "precisely the same"; therefore, the Remanded Action is also a "core" proceeding.

This argument is incorrect. Commonwealth's filing of a POC in this in this bankruptcy case, which attached the Alabama State Court complaint as its underlying basis, did not transform the underlying Removed Action into a "core" proceeding. *See In re Conejo Enterprises, Inc.* 96 F.3d 346, 349-50 (9th Cir. 1996) (recognizing that the filing of a proof of claim does not consolidate the underlying state court litigation into the proof of claim even though they are based on the same transaction; both continue to separately exist). Nor did filing the Claim Objection proceeding transform the Removed Action into a "core" proceeding. Within the context of a claim objection proceeding, the only Constitutionally "core" matters are those that are "necessarily resolved" by a ruling on the creditor's proof of claim. *Stern v. Marshall*, 564 U.S. 462, 497-98 and 501-3 (2011) (holding that notwithstanding 28 U.S.C. § 157(b)(2)(C), counterclaim asserted by estate against creditor is not Constitutionally "core" where it asserted a state law tort claim that was not "necessarily resolved" by a ruling to allow or disallow the proof of claim); *see also In re Resource Technology Corp.*, 2004 WL 419918, *4 (N.D. Ill. Fed. 13, 2004) (notwithstanding the claim objection, the bankruptcy court abstained from exercising its "related to" jurisdiction over the underlying prepetition state court contract dispute because it would be limited to exercising "related to" jurisdiction over these claims which are "non-core" since they do not arise under or in the bankruptcy proceeding so the bankruptcy court could only enter proposed findings of fact and conclusions of law per 28 U.S.C. § 157(c)(1) on the state law claims).

Here, the Debtor's *affirmative damage claims* against Commonwealth arise under Alabama state law and they will not necessarily be resolved by a ruling on the Claim Objection. These counterclaims are pre-petition, state law claims that are "Constitutionally" non-core claims although related to the bankruptcy case. *See In re McElwee*, 469 B.R. 566, 576 (M.D. Penn. 2012) (explaining that where a debtor's counterclaim seeks an *affirmative monetary recovery* against the claimant to augment the bankruptcy estate, and not merely to reduce the amount owed to the claimant, it is a Constitutionally "non-core" *Stern* claim); *see also* Fed. R. Bankr. P. 3007(b) (providing that a proceeding to allow or disallow a proof of claim cannot include a demand for relief of the type specified in Rule 7001).

Likewise, Commonwealth's Alabama state law claim against the nondebtor LPs to enforce their guaranties is "non-core" irrespective of the LPs' attempt to make it "core" by raising their defenses in the Claim Objection. The sole "core" issue to be "necessarily resolved" by the Claim Objection is whether Commonwealth has an allowed claim *against the estate* for breach of contract and, if so, what amount. The issue of whether Commonwealth can also collect the debt from non-debtors is not relevant to the "core" Claim Objection.

Commonwealth has not consented to this Court entering a final judgment on the non-core and Constitutionally non-core claims in the Removed Action.   Additionally, it has not consented to this Court conducting a jury trial in the Removed Action, and it is clearly entitled to one on its claims against the LPs.   Therefore, this Court is not able to grant complete relief between the parties and this factor favors remand.

**8. The Feasibility of Severing the State Law Claims from the Core Bankruptcy Matters to Allow Judgment to be Entered by the State Court with Enforcement by the Bankruptcy Court:** This factor favors remand. Where (as here) there is pending state law litigation that has reached an advanced stage, the Court routinely severs the state law claims to be completed in the state court action and reserves for this Court the determination of the core bankruptcy matters (*i.e.,* the allowance or disallowance of the claim and/or the nondischargeability of a state court judgment).   Here, aside from the pending Claim Objection which supposedly asserts "precisely the same issues" as the Removed Action, the Debtor/LPs have not offered a reason why the Alabama state law issues cannot feasibly be severed and a judgment entered by the Alabama State Court, with this Court reserving the "core" determinations of (i) whether the Purchase Agreement was an executory contract on the petition date and (ii) whether to allow or disallow Commonwealth's POC, based on the findings and rulings in the Alabama State Court judgment.

**9. The Burden on the Bankruptcy Court's Docket:** The Debtor's suggestion that this Court has spent the last 18 months reviewing the Alabama State Court Action and coming up to speed on the applicable Alabama state laws and the prepetition facts and events is incorrect. The litigation has been stayed. Although the burden on the Court's docket will definitely increase if it retains jurisdiction over the Removed Action, the Court treats this factor as neutral.

**10. The Likelihood that the Commencement of the Proceeding in Bankruptcy Court Involves Forum Shopping by One of the Parties:** The Court finds that the Defendants have engaged in forum shopping, both before and after this bankruptcy case was filed. The Court's factual findings show that the Debtor timed its bankruptcy filing to stay litigation of the Alabama State Court Action against *all* Defendants, including Commonwealth's looming motion for summary judgment. When the Alabama State Court refused to stay the action against *all* Defendants, the Defendants filed their Notice of Removal and moved to transfer venue to this Court. Further, by removing the action to this Court, the Defendants escaped the Alabama state court's ruling on two other motions – a motion to compel additional written discovery and a motion to compel the LPs to appear for their depositions -- which were under submission when the action was removed. Finally, and importantly, the Defendants' removal of the Alabama State Court Action is arguably contrary to the Alabama USDC's ruling to abstain under the *Colorado River* doctrine in favor of completing the litigation in the Alabama State Court because the Debtor and the LPs had engaged in "bad behavior" by actively evading service of process to bolster their arguments for the Alabama USDC to retain jurisdiction, *i.e.,* forum shopping. [Adv. Proc. ECF 4, Ex. 3, pg. 12]   The Defendants' forum shopping should not be rewarded, and given that there is no longer a pending reorganization to justify retention of jurisdiction in the bankruptcy court, this factor heavily favors remand.

**11. The Existence of a Right to a Jury Trial:** This factor favors remand. The Defendants cited no authority for the proposition that Commonwealth is not entitled to a jury trial – at a minimum, with respect to its claims against the LPs based on their guaranties.   All issues related to this underlying determination of liability on the guaranties must be made by a jury, and Commonwealth has clearly (and repeatedly) stated that it does not consent to this Court conducting a jury trial or entering a final judgment on its State law claims. Therefore, the Removed Action should be returned to the Alabama State Court where it originated and where complete relief between the parties can be granted.

**12. The Presence in the Proceeding of Non-Debtor Parties:** This factor favors remand because all parties, other than the Debtor, are non-debtors.

**13. Comity:** This factor favors remand. The Removed Action undisputedly concerns solely Alabama State law claims and no bankruptcy claims. Further, the Court has no critical interest in interpreting or applying Alabama's healthcare and licensing regulations for a Debtor that has no other significant remaining assets or business to reorganize. It is Alabama, not this Court, that has a critical interest in the transfer of its healthcare facilities – and any alleged fraud/misconduct that may have occurred in the process of such transfers -- because it implicates the public safety of its most vulnerable citizens. Therefore, this factor favors remand.

**14. The Possibility of Prejudice to Other Parties in the Action:** This factor favors remand. The fact that Commonwealth has appeared in the bankruptcy case and the Removed Action does not equate to lack of prejudice. The Alabama State Court Action was actively litigated and had reached the summary judgment stage at the time of its removal, and it has effectively been dormant since its removal and transfer to this Court. This delay has prejudiced Commonwealth. Further, at the time of removal Commonwealth had two motions to compel that were under submission, in addition to its pending motion for summary judgment. Commonwealth will clearly be prejudiced if remand is denied, and it must restart these motions (or the discovery) in this Court.

Accordingly, the motion to remand is granted.

_____

_____

**1**. The specific performance claim is now moot because of the Rejection Order.

**2**. Commonwealth refers to the Alabama USDC Action as the "copycat" action.

**3**. The Court could not locate a cross-complaint filed by the Defendants for their affirmative damage claims against Commonwealth. It appears that their affirmative claims against Commonwealth are asserted only in the Alabama USDC Action, which was not removed and is stayed by the USDC's abstention/stay order.

**4**. The Notice of Removal asserts that the Defendants are entitled to remove the Alabama State Court Action because it is "related to" the Debtor's bankruptcy case and that federal subject matter jurisdiction is pursuant to 28 U.S.C. § 1334(b).   Therefore, the Alabama State Court Action may be removed pursuant to 28 U.S.C. § 1452(a) (the Bankruptcy Removal statute). [ECF No. 4 (Notice of Removal, ¶ 9)]

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

JACOB WEINBERGER UNITED STATES COURTHOUSE
325 WEST "F" STREET
SAN DIEGO, CALIFORNIA 92101-6989

LOUISE DE CARL ADLER
BANKRUPTCY JUDGE

FILED

2021 SEP 29  PM 12: 49

CLERK
U.S. BANKRUPTCY #1
SO DIST. (619) 557-5641
FX: (619) 557-6975

September 29, 2021

James P. Hill
Sullivan Hill Rez & Engel, APLC
600 B Street, Ste 1700
San Diego, CA 92101

William A. Smelko
Procopio Cory Hargreaves & Savitch, LLP
525 B St., Ste 2200
San Diego, CA 92101

Julian I. Gurule
Buchalter, APC
1000 Wilshire Blvd., Ste 1500
Los Angeles, CA 90017

> Re: *Commonwealth Assisted Living, LLC, Series E v. Vestavia Hills, Ltd., et al.*
> (Adv. Proc. 20-90060-LA); Motion for Remand

Dear Counsel,

At the hearing held September 21, 2021, on the motion of Commonwealth Assisted Assisting living, LLC, Series E ("Commonwealth") to remand the Removed Action to the Alabama State Court, the Court took under submission the issue of whether the Ninth Circuit's precedent in *Williams v. Costco Wholesale Corp.*, 471 F.3d 975 (2006), precludes remand. Specifically, Mr. Smelko who represents the Limited Partners, and Mr. Hill who represents the Debtor (collectively "Removing Parties"), argued that *Williams* holds that where there is an independent basis for federal subject matter jurisdiction under 28 U.S.C. § 1332(a) due to complete diversity, a federal court has no discretion to remand a state court action back to the state court as a matter of law. The Court does not agree that *Williams* controls in this case.

*Williams* did not involve removal in a bankruptcy case pursuant to 28 U.S.C. § 1452(a), or remand pursuant to 28 U.S.C. § 1452(b). In *Williams* the plaintiff filed an action in the state court that pled a federal question claim and other state law claims. The defendant properly removed the state court action to the district court, relying on federal question jurisdiction in its notice of removal. Thereafter, the plaintiff amended his complaint to eliminate the federal claim, thereby removing the basis for federal jurisdiction pled in the notice of removal; and filed a motion to remand. *Williams,* 471 F.3d at 976. The district court held that it had discretion to remand because there was no longer a basis for federal jurisdiction and granted the motion to remand. *Id.* at 976. The Ninth Circuit reversed because "post-removal amendments to the

pleadings cannot affect whether a case is removable, because the propriety of removal is based solely upon the pleadings filed in state court." *Id.* at 977. The Ninth Circuit concluded that the amended state court complaint presented an independent basis for federal subject matter jurisdiction over the state law claims based on diversity and, where the district court is presented with a case within its original jurisdiction, it has "a 'virtually unflagging obligation' to exercise jurisdiction conferred upon [it] … and duly invoked by the litigants." *Id.* (citing *United States v. Rubenstein,* 971 F.2d 288, 293 (9th Cir. 1992), quoting the landmark case of *Colo. River Water Conservation Dist. v. United States,* 424 800 (1976)). Therefore, the district court had no discretion to remand. *Id.*

This case is distinguishable. First, this is *not* a situation where the plaintiff (Commonwealth) eliminated the federal question claim from the complaint and then moved to remand. Second, this case differs from *Williams* because the district court did *not* have proper diversity jurisdiction over the removed action when it was removed, or when the motion to remand was filed because the deadlines to remove the Alabama State Court Action based on diversity had long since passed. *See* 28 U.S.C. § 1446(b) (imposing 30-day time limit on removal from the date the federal jurisdictional basis for removal became apparent); 28 U.S.C. § 1146(c) (imposing an outside deadline of one year after commencement of the action for removal based on federal diversity jurisdiction); *see also In re Tailored Fund Cap LLC v. RWDY, Inc.,* 2020 WL 6343307, *7 (N.D.N.Y. 2020) (recognizing that a notice of removal may not be sustained on grounds not stated in that notice and that the deadlines in 28 U.S.C. §§ 1446(b) and (c) had long since passed by the time the defendants attempted to remove; and therefore, finding that the sole basis for federal jurisdiction was 28 U.S.C. § 1334(b) and abstaining).

Here, the Alabama State Court Action was commenced on November 21, 2018, and the Notice of Removal was filed on January 14, 2020. The Removing Parties cannot plausibly deny that: (i) they had knowledge of the existence of federal diversity jurisdiction in time to have properly removed the Alabama State Court Action based on diversity; and (ii) at the time they filed their Notice of Removal, both the deadlines in 28 U.S.C. §§ 1446(b) and (c) to remove based on diversity had long since passed. Therefore, similar to *In re Tailored Fund Cap LLC,* at the time of removal the sole proper basis for federal jurisdiction was "related to" jurisdiction in 28 U.S.C. § 1334(b) and *Williams* does not control.

Additionally, at the hearing the Removing Parties cited *Kakarala v. Wells Fargo Bank, NA,* 615 Fed. Appx. 424 (9th Cir. 2015); *Locher v. Thor Motor Coach, Inc.,* 2017 WL 6016114 (9th Cir. 2017); *Schnabel v. Lui,* 302 F.3d 1023 (9th Cir. 2002); and *RTC Corp. v. Bayside Developers,* 43 F.3d 1230 (9th Cir. 1994), as holding that remand is legally impossible. These cases are also non-bankruptcy cases. Consequently, they did not involve state court litigation that was removed under 28 U.S.C. § 1452(a) and referred to the bankruptcy court under 28 U.S.C. § 157, based on bankruptcy subject matter jurisdiction under § 1334(b). [*See* ECF No. 4 (Notice of Removal ¶ 9)] Nor did these cases discuss a bankruptcy court's statutory authority to remand under 28 U.S.C. § 1452(b).

Importantly, in *Williams* the district court's remand decision hinged on its belief that it lacked a basis for federal subject matter jurisdiction over the remaining state law claims. Here, the Court is *not* remanding for jurisdictional reasons. The Court is remanding pursuant to its statutory authority in 28 U.S.C. § 1452(b), which grants bankruptcy courts broad authority to

remand "on any equitable ground." *In re Cedar Funding, Inc.*, 419 B.R. 807, 820 (9th Cir. BAP 2009) (stating that the bankruptcy court's equitable discretion is broad and identifying up to fourteen factors that a court may consider under § 1452(b)). Only one of these fourteen factors is whether there is an independent basis for federal jurisdiction other than 28 U.S.C. § 1334. *Id.* at n. 18; *see also In re Tucson Estates, Inc.*, 912 F.2d 1162, 1166-69 (9th Cir. 1990) (identifying virtually identical factors that a bankruptcy court may consider to equitably abstain under 28 U.S.C. § 1332(c)(1) -- including whether there is an independent basis for federal jurisdiction other than § 1334 -- and recognizing that no single factor is dispositive).

Here, the Court carefully weighed each of the fourteen factors for equitable remand in *In re Cedar Funding, Inc.*, and found they favored remand. [ECF No. 56] The Court will not repeat its findings here, except to point out the following findings in this Court's tentative ruling:

(i) Factor 5:  The Court found that even if there is diversity jurisdiction, it was not timely asserted and the deadline to remove based on diversity had long since passed.

(ii) Factor 4**:** The Court found that the Alabama USDC had *declined to exercise diversity jurisdiction* over the "copycat" action, which the Removing Parties had commenced pre-petition in lieu of timely removing the Alabama State Court Action, because it found the *Colorado River* doctrine warranted abstaining in favor of Alabama State Court Action, which "strongly favors" remand. [*See also* ECF No. 7, Ex. 3 (Alabama USDC Mem. Dec. and Order)]

The Court's findings remain correct in the context of equitable remand under 28 U.S.C. § 1452(b); and therefore, the Court reaffirms its tentative ruling to grant the motion to remand.

Commonwealth is directed to prepare and lodge and order forthwith granting the motion for the reasons set forth in the tentative ruling, as augmented by this letter ruling.  Likewise, Commonwealth should prepare and lodge an order granting the main case motions for the reasons stated in the tentative rulings.

Sincerely,

*Louise De Carl Adler*

LOUISE De CARL ADLER, Judge

/JMB

CSD3034
Rev. 01/07

# United States Bankruptcy Court
## Southern District of California
Jacob Weinberger U.S. Courthouse
325 West F Street
San Diego, CA 92101–6991

Telephone: 619–557–5620
Website: www.casb.uscourts.gov
Hours: 8:30am – 4:30pm Monday–Friday

| | | |
|---|---|---|
| Vestavia Hills, Ltd.<br><br>Debtor(s) | BANKRUPTCY NO. | 20–00018–LA11 |
| Commonwealth Assisted Living, LLC, Series E<br><br>Plaintiff(s) | ADVERSARY NO. | 20–90060–LA |
| v.<br><br>Vestavia Hills LTD<br><br>Defendant(s) | | |

## NOTICE OF  REMAND OF CASE

TO THE ATTORNEYS FOR THE ABOVE–ENTITLED PLAINTIFF(S) AND DEFENDANT(S)

You are hereby notified that pursuant to the order of this Court entered on **10/13/21**

### TRANSFERRED CASE

The above entitled case has been transferred to the following court:

### REMANDED CASE

The above entitled proceeding has been remanded to the following court:

**Jefferson County Circuit Court Clerk (Birmingham Division)**
**Jefferson County Courthouse**
**716 Richard Arrington, Jr. Blvd. North**
**Birmingham, AL 35203**

Please file all further papers concerning this remanded proceeding with that office.

Dated:  10/13/21

Michael Williams
Clerk of the Bankruptcy Court

# Notice Recipients

| | | |
|---|---|---|
| District/Off: 0974–3 | User: Admin. | Date Created: 10/13/2021 |
| Case: 20–90060–LA | Form ID: 3034 | Total: 9 |

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| aty | Anthony Napolitano | anapolitano@buchalter.com |
| aty | James P. Hill | Hill@sullivanhill.com |
| aty | Julian Gurule | jgurule@buchalter.com |
| aty | William A. Smelko | bill.smelko@procopio.com |

TOTAL: 4

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

Vestavia Hills, Ltd.        9619 Chesapeake Drive        Suite 103        San Diego, CA 92123
Virginia Moore–Bell        201 Monroe St., Ste. 350        Montgomery, AL 36104
United States Trustee        Office of the U.S. Trustee        880 Front Street        Suite 3230        San Diego, CA 92101
Squar Milner LLP        San Diego        3655 Nobel Drive        Suite 300        San Diego, CA 92122
Alabama Self–Insured Worker's        Compensation Fud        PO Box 59509        Birmington, AL 35259

TOTAL: 5

# Notice Recipients

| | | |
|---|---|---|
| District/Off: 0974−3 | User: Admin. | Date Created: 10/13/2021 |
| Case: 20−90060−LA | Form ID: pdfO1 | Total: 9 |

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| aty | Anthony Napolitano | anapolitano@buchalter.com |
| aty | James P. Hill | Hill@sullivanhill.com |
| aty | Julian Gurule | jgurule@buchalter.com |
| aty | William A. Smelko | bill.smelko@procopio.com |

TOTAL: 4

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

Vestavia Hills, Ltd.    9619 Chesapeake Drive    Suite 103    San Diego, CA 92123
Virginia Moore−Bell    201 Monroe St., Ste. 350    Montgomery, AL 36104
United States Trustee    Office of the U.S. Trustee    880 Front Street    Suite 3230    San Diego, CA 92101
Squar Milner LLP    San Diego    3655 Nobel Drive    Suite 300    San Diego, CA 92122
Alabama Self−Insured Worker's    Compensation Fud    PO Box 59509    Birmington, AL 35259

TOTAL: 5

# EXHIBIT 17

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

# Minute Order

### *Hearing Information:*

|  |  |  |  |
|---|---|---|---|
| **Debtor:** | VESTAVIA HILLS, LTD. | | |
| **Case Number:** | 20-00018-LA11 | **Chapter:** | 11 |
| **Date / Time / Room:** | THURSDAY, AUGUST 26, 2021 02:00 PM   DEPARTMENT 2 | | |
| **Bankruptcy Judge:** | LOUISE DeCARL ADLER | | |
| **Courtroom Clerk:** | KAREN FEARCE | | |
| **Reporter / ECR:** | TRISH CALLIHAN | | |

### *Matters:*

**1)** DEBTOR'S MOTION FOR ORDER: (A) APPROVING DISCLOSURE STATEMENT; (B) CONFIRMING SCHEDULE FOR HEARING ON CONFIRMATION OF THE DEBTOR'S CH. 11 PLAN OF REORGANIZATION; (C) APPROVING SOLICITATION PACKAGES AND PROCEDURESS FOR THE DISTRIBUTION OF THE DISCLOSURE STATEMENT ; (D) APPROVING FORM OF VALLOTS AND (E) ESTABLISHING VOTING

**2)** CHAPTER 11 PETITION 1) SETTING STATUS CONFERENCE; 2) SETTING COMPLIANCE DEADLINES; AND 3) SETTING SANCTIONS, IF APPROPRIATE, INCLUDING DISMISSAL, CONVERSION OR APPOINTMENT OF A CHAPTER 11 TRUSTEE OR EXAMINER BECAUSE OF NONCOMPLIANCE WITH ABOVE-REFERENCE REQUIREMENTS (fr 8/12/21)

### *Appearances:*

JAMES P. HILL, ATTORNEY FOR VESTAVIA HILLS, LTD. (Tele)
AARON MALO, ATTORNEY FOR WELLS FARGO BANK, N.A. (Tele)
PATTON HAHN, ATTORNEY FOR WELLS FARGO BANK, N.A. (Tele)
JULIAN GURULE, ATTORNEY FOR COMMONWEALTH ASSISTED LIVING, LLC,(Tele)
WILLIAM A. SMELKO, ATTORNEY FOR THE LIMITED PARTNERS (Tele)
DAVID ORTIZ, ATTORNEY FOR U.S. TRUSTEE (Tele)
RANDYE SOREF, ATTORNEY FOR MED HEALTHCARE PARTNERS, LLC (Tele)

### *Disposition:*

1) Hearing continued to 10/28/21 at 2:00 (Telephonic) for an amended plan & disclosure statement to be filed by 9/27/21; objections filed no later than 10/14/21 & replies filed by 10/21/21.

2)  Hearing continued to 10/28/21 at 2:00.

All the hearings re: Vestavia Hills that are scheduled on 9/16/21 at 2:00 will be vacated & heard on 9/21/21 at 10:00 a.m.(telephonic) due to the Jewish holiday.